# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOY EVANS, *et al.*,        ) | |
|        ) | |
|        ) | |
|    **Plaintiffs,**        ) | |
|        ) | |
|    **and**        ) | |
|        ) | |
| UNITED STATES OF AMERICA,        ) | |
|        ) | |
|    **Plaintiff-Intervenor,**     ) | Civil Action No. 76-293 (ESH) |
|        ) | |
|    **v.**        ) | |
|        ) | |
| ADRIAN M. FENTY, *et al.*,        ) | |
|        ) | |
|    **Defendants.**        ) | |
|        ) | |

## MEMORANDUM OPINION

This case was filed more than thirty years ago in an effort to remedy the constitutionally deficient level of care, treatment, education, and training being provided to residents of Forest Haven, the District of Columbia's institution for persons with developmental disabilities, which was closed as a result of this litigation in 1991. Plaintiffs are a class of over 650 former residents of Forest Haven. Defendants are the District of Columbia ("the District") and the Honorable Adrian Fenty, the City's Mayor.[1] The United States is also a party, having been permitted to intervene as a plaintiff in January 1977.[2]

---

[1] Mayor Fenty took office in January 2007 and was thereafter substituted as a named defendant. Between 1976 and January 2007, a series of his predecessors in office were named. At the time the case was filed, other District of Columbia officials were also named as defendants; however, those defendants are no longer parties.

[2] Between July 1976 and January 1977, the United States participated in the case as an *amicus curiae* in support of plaintiffs.

As described in greater detail below, this litigation has resulted in a series of consent orders and remedial plans in which defendants have admitted that class members' constitutional rights have been violated and have agreed to take actions necessary to remedy these constitutional violations.  Because these measures have been unsuccessful in achieving desired outcomes for class members in many critical areas, the litigation has also resulted in a series of efforts by plaintiffs and plaintiff-intervenor to force compliance with the Court's orders through motions for contempt and other relief.  Before the Court is the latest such effort.  Plaintiffs have moved for an order finding defendants in noncompliance with the prior Court orders and placing the District's Mental Retardation and Developmental Disabilities Administration ("MRDDA") into receivership.[3]  At a July 20, 2006, status conference, the Court bifurcated proceedings on the motion into a liability and a remedy phase and directed the parties to submit proposed findings of fact on the liability question, *i.e.*, whether there has been substantial noncompliance with Court orders.  (July 20, 2006 Hr'g Tr. at 6, 9-10.)[4]  This Memorandum Opinion sets forth the Court's factual findings on that issue.

---

[3]At the same time that plaintiffs filed their receivership motion, the United States moved for an order to show cause why defendants should not be held in contempt.  The Court granted the latter motion to the extent that defendants were ordered to submit a response.  However, as discussed below, the Court has concluded that contempt is not an appropriate mechanism to address defendants' deficient performance.

[4]The exhibits submitted by the parties in support of their proposed factual findings include excerpts from the transcripts of various Court hearings in this case and from various reports by the Court Monitor.  For ease of reference, the Court has cited to the hearing transcripts and Court Monitor reports directly, rather than to the parties' exhibits.  The Court also notes that certain exhibits submitted by plaintiff-intervenor have been filed under seal to prevent the disclosure of class members' names and other identifying information.

**BACKGROUND**

This case began in February 1976, when a group of individual plaintiffs filed suit alleging that they and other residents of Forest Haven were not receiving "a constitutionally minimal level of habilitation" (Compl. ¶ 1) and seeking declaratory and injunctive relief.[5]  The Honorable John H. Pratt, who presided over this case until his death in August 1995, certified a plaintiff class consisting of present, former, and future residents of Forest Haven in June 1976.  Following a period of discovery, plaintiffs moved for partial summary judgment on the issue of liability in November 1977.  Plaintiffs urged the Court to require defendants to "undertake a phased Court supervised planning process for remedying the statutory and constitutional violations."  (Mem. of Law in Support of Pls.' Mot. for Partial S.J. at 52.)  Although defendants objected to plaintiffs' characterization of the conditions at Forest Haven, noting that changes had been implemented following the filing of plaintiffs' lawsuit, defendants acknowledged that "the level of care and habilitation at Forest Haven has never been that which any of the parties to this action desire." (Defs.' Opp'n to Pls.' Mot. for Partial S.J. at 2.)  Defendants urged the Court to deny the motion and instead to direct counsel for the parties to enter into discussions as to "what further actions can and should be done . . . to better provide for the mentally retarded at Forest Haven."  (*Id.* at 1, 4.)

---

[5]The conditions challenged by plaintiffs included the lack of comprehensive habilitation programs to meet individual needs of residents; the unsafe, unsanitary, and unpleasant condition of the Forest Haven facilities; inadequate staffing, lack of training, and abuse of residents by staff; inadequate medical, dental, and mental health care and nutrition; inadequate recordkeeping; lack of after-care and rehabilitation programs and vocational training for former residents; and inadequate funding.

## I.     The 1978 Consent Order

On June 14, 1978, Judge Pratt entered a "Final Judgment and Order" (the "1978 Consent Order" or the "1978 Order"), which was consented to by defendants. *Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978). The Court found that plaintiffs have a federal constitutional right to habilitative care and treatment, to be free from harm, and to receive habilitative care and treatment in the alternative least restrictive of individual liberty and to be kept free from harm. *Id.* at 484.[6] The Court went on to find that violations of these constitutional rights had occurred and ordered extensive permanent injunctive relief, requiring defendants to deinstitutionalize class members and imposing a series of requirements governing virtually all aspects of the District's interim operation of Forest Haven. *Id.* at 484-90.

With respect to deinstitutionalization, the Court prohibited any further admissions to Forest Haven and ordered defendants to provide all class members with suitable community living arrangements and with the community-based day programs and services necessary to provide them with minimally adequate habilitation in the most integrated and least restrictive community settings. *Id.* at 484-85, 488.[7] The Court also ordered defendants, *inter alia*, to provide each class member with a written individualized habilitation plan and an individualized

---

[6]The Court explained that habilitation "includes, but is not limited to, programs of formal, structured education and training" and that receiving habilitative care and treatment in the alternative least restrictive of individual liberty "means living as normally as possible and receiving appropriate individualized services in the community in the least separate, most integrated and least restrictive settings." *Id.*

[7]The Court ordered defendants to provide class members with such community living arrangements, programs, and services "at the earliest possible opportunity" but also set targets for the number of residents to be deinstitutionalized in each of the next three Fiscal Years. *Id.* at 487-88.

habilitation program designed in accordance with the plan; to retain a full-time "Developmental Disabilities professional" (later referred to as the "Court Monitor") to assist defendants and the Court in implementing the Consent Order, including reporting to the Court at ninety-day intervals regarding the status and progress of defendants' efforts to do so; and, in conjunction with the Court Monitor, to develop and submit for court approval a detailed implementation plan for the provision of community living arrangements, programs, and services.  *Id.* at 484-87.

With respect to Forest Haven, the Court ordered defendants, again in conjunction with the Court Monitor, to prepare a plan for the interim operation of the facility pending the placement of class members in community living arrangements and set out a series of requirements for the facility's continued operation.  *Id.* at 488-89.  Among other things, the Court prohibited all "[a]cts of physical or psychological abuse, neglect or mistreatment of any Forest Haven resident," required the prompt investigation of all such incidents, and required "[a] program of medical, dental and health related services for class members which provides accessibility, quality and continuity of care for physical illness or injury."  *Id.*

## II.    The 1981 and 1983 Consent Orders

In January 1981, plaintiff and plaintiff-intervenor filed motions for contempt and for enforcement of the Court's June 1978 Consent Order.  The motions were ultimately withdrawn, and the Court entered a further Consent Order on June 25, 1981 (the "1981 Consent Order" or the "1981 Order"), setting forth a list of agreed-upon measures "necessary to the implementation of this Court's Order of June 14, 1978."  *Evans v. Barry*, No. 76-293, Consent Order at 1 (D.D.C.

June 25, 1981).[8]  The 1981 Consent Order reaffirmed defendants' obligations under the 1978

Order and imposed a series of further requirements with respect to staffing and staff training at

Forest Haven; the provision of individualized assessments and habilitation plans to all class

members, including the identification of all services required by class members regardless of the

current availability of those services; procurement of necessary supplies and performance of

routine maintenance and repairs required for class members' health, safety, and sanitation;

outplacement of class members from Forest Haven with appropriate day programs and living

arrangements and with adequate case management support; funding for class members; and the

timely processing of contracts.  *See generally id.*

Plaintiff and plaintiff-intervenor again filed contempt motions in June 1982 that resulted

in the entry of a further Consent Order on February 8, 1983 (the "1983 Consent Order" or the

"1983 Order").  *See Evans*, Consent Order at 14 (Feb. 8, 1983).  The 1983 Order again affirmed

defendants' obligations under the earlier Consent Orders and required defendants to take certain

additional steps to implement those Orders.  *See generally id.*  The 1983 Order required

defendants to ensure that periodic assessments were conducted and that individual habilitation

plans were developed for all class members; to prepare an assessment of services required by

class members; to address certain budget and staffing issues, including maintenance of the

appropriate case manager to class member ratio;[9] and to properly maintain the facilities at Forest

---

[8]This unpublished Consent Order will hereafter be cited as "*Evans*, Consent Order at __ (June 25, 1981)."  Citations to other unpublished opinions and orders in this case will follow a similar format.

[9]The 1983 Order required defendants to maintain a case manager to class member ratio of one to sixty.  *Evans*, Consent Order at 5 (Feb. 8, 1983).  This ratio was later reduced to one to thirty.  (*See* 2001 Plan for Compliance and Conclusion of *Evans v. Williams* at 37.)

Haven. *Id.* at 2-9.  The Order also imposed requirements with respect to the reporting of

"unusual incidents" involving class members; safekeeping of class members' funds;

programming; and outplacement of class members, including the requirement that all residents of

Forest Haven be placed in community settings by the end of Fiscal Year 1988.  *Id.* at 8-14.

## III.    Closure of Forest Haven

When defendants failed to meet the 1983 Consent Order's September 30, 1988 deadline

for the outplacement of all class members, plaintiffs and plaintiff-intervenor again initiated

contempt proceedings in July 1989.  The Court did not immediately grant the motion to show

cause but instead continued the matter for 120 days to give the parties time to agree to a further

consent decree.  (Sept. 29, 1989 Hr'g Tr. at 2.)  The parties did not agree, however, and after a

January 1990 hearing, the Court issued an Order holding the District in civil contempt, observing

that it had "no alternative except to find that the District of Columbia has been in consistent and

continuing violation of the three Consent Orders [of 1978, 1981 and 1983]."  *Evans*, Order (Jan.

30, 1990).  The Court held a sanctions hearing in March 1990 and issued a further Order

imposing a schedule for outplacement of the remaining 233 residents of Forest Haven that

required all residents to be outplaced by September 30, 1991, and providing for the imposition of

fines in the event that defendants failed to meet quarterly outplacement quotas.  *Evans*, Order

(Apr. 9, 1990).

In July 1990, while outplacement of the remaining Forest Haven residents pursuant to the

Court's April 1990 Order was underway, plaintiffs and plaintiff-intervenor again moved for civil

contempt sanctions and damages based on the conditions at Forest Haven.[10]  The Court denied

the motion in May 1991, finding that the level of medical care at Forest Haven, while imperfect,

was adequate to meet the needs of the declining population there, *Evans*, Mem. Op. & Order at 6

(May 15, 1991), and the D.C. Circuit affirmed.  *Evans v. Kelly*, No. 91-5237, 1992 WL 337321,

at *1 (D.C. Cir. Nov. 1992).[11]

Outplacement of all remaining residents was completed in October 1991.

## IV.   Appointment of Special Master

Plaintiffs and plaintiff-intervenor next initiated contempt proceedings in March 1995,

filing motions for contempt, contempt sanctions, appointment of a special master, and emergency

injunctive relief based on defendants' nonpayment of providers of residential and day

programming services, failure to maintain the required case manager to class member ratio of

one to sixty, mismanagement of class members' personal funds, and nonpayment of the Court

Monitor.[12]  The Court issued an Order to Show Cause in April 1995, finding the District to be in

_____

[10]Also in July 1990, the plaintiffs petitioned the Court for immediate enforcement of the 1978 Consent Order to prevent defendants from placing certain class members in a nursing home rather than in smaller, community-based placements.  The Court denied the motion in November 1990, finding the nursing home placement to be appropriate for the class members in light of their medical needs.  *Evans v. Barry*, 1990 WL 201488, at *1 (D.D.C. Nov. 28, 1990).

[11]In November 1990, while the contempt motions were pending, the United States sought to compel the Court to act on the pending motions by filing a petition for a writ of mandamus in the D.C. Circuit.  The Circuit Court denied the petition in 1991, finding that the two-month delay between the completion of briefing on the sanctions motion and the filing of the mandamus petition was "not sufficient to establish that [the United States] ha[d] a 'clear and indisputable right' to issuance of the writ."  *In re United States*, No. 90-5371, 1991 WL 17225, at *2 (D.C. Cir. Feb. 11, 1991).

[12]In addition to seeking an order requiring defendants to remedy these problems and the appointment of a Special Master, the plaintiff parties also requested that the Court order defendants to prepare and file a Medicaid Home and Community-Based Services waiver request

violation of the three previously-issued Consent Orders, particularly with respect to the payment

of care providers, but suspended further contempt proceedings and consideration of the requests

for emergency relief to afford the parties an opportunity to devise a viable plan to bring the

District into compliance.  *Evans*, Order to Show Cause at 4 (Apr. 21, 1995).  Negotiations

between the parties proved unsuccessful, and at a May 1995 hearing, the Court found the District

to be in contempt.  *See Evans*, Findings of Fact & Conclusions of Law at 2 (Oct. 11, 1995).

   In October 1995, the Honorable Stanley S. Harris, to whom the case was reassigned upon

Judge Pratt's death, issued formal Findings of Fact and Conclusions of Law and an Order of

Reference.  The Court found the District to be in contempt of the prior Consent Orders in three

material respects: (1) by being substantially in arrears on undisputed payments to care providers;

(2) by failing to maintain the required case manager to class member ratio; and (3) by failing to

provide all class members with "community living arrangements suitable to each, in the least

separate, most integrated and least restrictive community settings, and to provide all class

members with such community-based day programs and services as are necessary to provide

them with minimally adequate habilitation."  *Id.* at 7-8.[13]  Based on the defendants' long history

of noncompliance, the Court determined that the appointment of a Special Master was necessary.

*Evans*, Order of Reference at 1-2 (Oct. 11, 1995).  The Court appointed Margaret G. Farrell to

serve in that capacity and ordered the Special Master to work with the parties to develop and

_____

to enable the District to obtain financial support for services so that class members could live in
less restrictive settings at substantial savings to the District.

   [13]The Court also identified as additional areas of concern the provision of adequate
medical, dental, and health services; the provision of adequate funding for the Court Monitor;
and the safeguarding of class members' personal funds.  (*Id.* at 6-7.)

submit a remedial plan through which defendants could purge themselves of the Court's

contempt findings.  *Id.* at 2-3.

The Special Master submitted a remedial plan in January 1996, and in August of that

year, the Court issued an Order adopting the plan and the Special Master's proposed findings of

fact that accompanied it.  *Evans v. Barry*, No. 76-293, 1996 WL 451054, at *1-2 (D.D.C. Aug. 2,

1996) (the "1996 Plan").  The Court-ordered 1996 Plan imposed a series of further requirements

with respect to the timely payment of care providers, negotiation of long-term provider contracts,

maintenance of the required case management ratio, and implementation of class members'

individual habilitation plans.[14]  *Id.* at *3-8.  The 1996 Plan also provided for imposition of

coercive civil fines in the event that defendants failed to meet the Plan's requirements – fines that

the Court determined were necessary in light of defendants' "unrelenting contempt" of the

Court's prior Consent Orders and "seeming inability to bring themselves into compliance

therewith."  *Id.* at *2-8.[15]

## V.    The 2001 Plan

In February 1999, as part of its decision imposing contempt fines, Judge Harris also

---

[14]The Special Master also recommended that defendants be required to apply to the
Health Care Financing Administration for a Medicaid Home and Community-Based Services
waiver as part of the remedial plan.  Because defendants had submitted a waiver application by
the time the Court adopted the 1996 Plan, however, the waiver was not included in that Court-
ordered Plan.  *Id.* at *3.

[15]Plaintiffs thereafter moved for sanctions under the 1996 Plan, and the Court ultimately
granted the motion, ordering defendants to pay approximately $5 million in fines based on their
failure to comply with the purgation conditions of the 1996 Plan and failure to purge the 1995
and 1996 findings of contempt.  *Evans*, Judgment (Feb. 10, 1999).  The imposition of contempt
fines was later reversed by the D.C. Circuit on the ground that the fines amounted to a criminal
sanction that could not be imposed without a criminal trial.  *Evans v. Williams*, 206 F.3d 1292
(D.C. Cir. 2000).

amended the 1996 Plan to order the Special Master to work with the parties to develop and

recommend to the Court a plan for the conclusion of the litigation and the termination of the

Court's jurisdiction in a manner that would ensure that plaintiffs' interests would continue to be

protected. *Evans*, Op. at 18-20 (Feb. 10, 1999). Pursuant to the Court's Order, under the

direction of Special Master Farrell, and with the assistance of her then-consultant Clarence L.

Sundram,[16] the parties engaged in lengthy negotiations that resulted in a series of agreements

intended to achieve compliance with the prior Court Orders, to provide for permanent and

independent mechanisms to safeguard the rights of class members, and to permit the phased

withdrawal of judicial oversight as compliance with the Court Orders was achieved. *See Evans*

*v. Williams*, 139 F. Supp. 2d 79, 81 (D.D.C. 2001). In particular, the parties agreed to and

submitted for Court approval: (1) a set of joint stipulated findings of fact regarding the status of

defendants' compliance with the outstanding Court Orders; (2) the "2001 Plan for Compliance

and Conclusion of *Evans v. Williams*" (the "2001 Plan" or the "Plan"); and (3) a Consent Order

and accompanying settlement agreement regarding the creation of an external monitoring body to

protect the interests of class members and other MRDDA consumers after the end of the case. In

March 2001, Judge Harris issued an Opinion and Order approving these agreements. *Id.* at 85.[17]

---

[16]Mr. Sundram was appointed as Co-Special Master in February 2001. *Evans*, Order
(Feb. 20, 2001).

[17]In November 2000, shortly before these agreements were submitted for Court approval,
the Court entered an Order granting the parties' joint motion for the appointment of an
independent Court Monitor. *Evans*, Order Regarding the Appointment of an Independent Court
Monitor (hereinafter "Appointment Order") (Nov. 21, 2000). The 1978 Consent Order had
required defendants to retain a Court Monitor (then known as the Developmental Disabilities
Professional) but provided that the Monitor would report to the Director of the District's
Department of Human Resources. *Evans*, 459 F. Supp. at 485. To comply with the Consent
Order, defendants had hired a Court Monitor through a contract with a community provider, with

The parties' stipulated findings of fact, which the Court adopted, painted a bleak picture as to defendants' record of noncompliance.  The findings acknowledged that there had been a "serious breakdown" in the District's system of support for individuals with developmental disabilities and that the system, which had suffered from years of neglect and mismanagement, "urgently need[ed] to be fixed."  *Evans*, 139 F. Supp. 2d at 96-97; *see also, e.g.*, *id.* at 98 (noting that District's mental retardation and developmental delivery system was "broken" and needed to be "redefined and rebuilt").  The findings noted that defendants' compliance with the prior Court Orders had deteriorated following the closure of Forest Haven in 1991 and that defendants were not complying with many of the requirements of those Orders.  *Id.* at 98.  The findings also identified numerous "fundamental problems," including problems with respect to staffing, staff training, and monitoring; management; reporting of and response to unusual incidents; safeguarding of class members' funds; the budgeting process; and the District's Medicaid Home and Community-Based Services waiver.  *See id.* at 98-107.

Intended to remedy these deficiencies and to provide a means for defendants to come into compliance with the outstanding Court Orders, the 2001 Plan was organized thematically around the broad goals of those Orders.  The Plan identified the major goals (and sub-goals) of the

---

the result that the person employed as the Court's Monitor was also employed as a contractor of the District.  *Evans*, Appointment Order at 1 (Nov. 21, 2000).  Finding this contractual arrangement to be inappropriate, the Court created an independent Court Monitor's office that was to be directly responsible to the Court.  *Id.* at 2.  The Order specified that the duties of the Court Monitor were to include observing, monitoring, reporting findings, and making recommendations to the parties, the Special Master, and the Court regarding implementation of the Court's Orders, and in order to perform these duties, the Monitor was granted broad access "to the persons, residences, facilities, buildings, programs, services, documents, records, personnel and materials the Monitor deems necessary or appropriate in performing [her duties]."  *Id.* at 4-5.

Orders as follows:

(1)     appropriate individualized habilitation and treatment in the community in the least separate, most integrated and least restrictive settings, including (a) individualized habilitation plans, (b) the provision of residential, vocational, and day services, (c) staff training, and (d) restricted control procedures (including use of medication, restraints, and time out);

(2)     protection from harm;

(3)     safeguarding consumers' personal possessions;

(4)     monitoring, including (a) case management, (b) quality assurance and fiscal audits, and (c) external monitoring;

(5)     advocacy for consumers;

(6)     adequate budget; and

(7)     timely payment of vendors.

For each of these goals (and sub-goals), the Plan went on to (a) identify the specific provisions of the existing Court Orders that must be complied with; (b) identify the tasks necessary for defendants to meet the requirements of the relevant Court Orders; (c) establish a time frame for implementation of the identified tasks; (d) identify specific outcome criteria for determining defendants' compliance with the relevant Court Orders; (e) establish a threshold standard of compliance that defendants must meet for the particular Court Orders;[18] and (f) establish a method for assessing compliance. Although the Plan was developed in the context of the *Evans* case, it referred throughout to "consumers" rather than "class members." This choice of words

---

[18]The Plan set three threshold levels of compliance: "full" (95%) compliance, "high" (90%) compliance, and "significant" (80%) compliance, and indicated that the standard of compliance applicable to a particular set of Court Orders was dependent upon the nature of the interest at stake and the degree to which the defendants' noncompliance affected that interest. (2001 Plan at 7-8.)

was intentional and reflected defendants' "express[] agree[ment] not to create a bifurcated system of services for its citizens with developmental disabilities" but to "provide the same level of services to class and non-class members."  (2001 Plan at 5 n.2.)

The Plan made clear that the measure of defendants' compliance with each group of underlying Court Orders would be whether they had satisfied the specific outcome criteria relating to those Orders.  (*Id.* at 7 ("[W]hile it is the intent of the parties to monitor the timely implementation of the specific tasks that have been identified as necessary for implementation of the Court Orders in each section, *the ultimate test of compliance will be in satisfying all of the related outcome criteria*.") (emphasis in Plan); *see also id.* ("[T]he Plan identifies specific outcome criteria for determining compliance with the related group of Court Orders.").)  The parties agreed that

> if the Court finds that defendants have satisfied the outcome criteria, the defendants will also be in compliance with the related Court Orders pursuant to this Plan, and the Court may vacate the related Court Orders.

(*Id.* at 7.)  Although compliance with the Court Orders depended on defendants' satisfaction of the outcome criteria rather than their completion of the tasks identified therein (*see id.* ("In the final analysis, it is compliance with the specific outcome criteria that is required . . . , and the tasks identified are a means to this end."), the parties also agreed that "[t]he failure of the defendants to implement the actions identified in the Plan as necessary to meet the requirements of the related Court Orders is also evidence of noncompliance with those Court Orders."  (*Id.*)

The Plan contemplated that as defendants satisfied the outcome criteria for particular groups of Court Orders, they would move the Court to have those Orders vacated and dismissed with the ultimate goal that, over time, defendants would

implement all of the required actions and meet the specified outcome
criteria in order to successfully move the Court to vacate and dismiss the
related Court Orders, except the declaratory judgment on the constitutional
rights of the consumers to receive individualized habilitation in the least
separate, most integrated and least restrictive environment and to be
protected from harm.

(*Id.* at 9-10.)  Although the Plan itself was "not intended to be an enforceable document," the

underlying Court Orders, until vacated and dismissed as provided for in the Plan, would

"continue to remain enforceable in federal court."  (*Id.* at 10.)  In particular, plaintiffs and

plaintiff-intervenor "retain[ed] the right to seek appropriate judicial relief, based on this evidence

of noncompliance with the Court Orders, including Orders requiring specific performance of the

Plan."  (*Id.*)

The final section of the Plan, captioned "Essential Systemic Conditions," addressed

certain other actions to be taken by defendants to assist the District in "developing additional

options for the cost-effective implementation of the goals of this action" – namely,

"individualized services in the least restrictive environment to the persons served by the mental

retardation and developmental disabilities service delivery system."  (*Id.* at 62.)  In particular, the

Plan addressed the need to amend the District's Medicaid waiver to expand the number of

MRDDA consumers served by the waiver and outlined a series of actions to be taken by District

in order to achieve this goal.  (*Id.* at 62-64.)  The Plan also set forth certain steps to be taken by

the parties and the Special Master to develop and propose legislation to revise and update the

existing statutes governing services and supports for persons with developmental disabilities to

reflect contemporary approaches.  (*Id.* at 64-65.)

The third component of the series of agreements approved by the Court in March 2001

concerned the creation of the Quality Trust for Individuals with Disabilities, Inc. (the "Quality

Trust"), a durable, independent, nonprofit organization to "monitor and advance the individual

and collective interests of people with developmental disabilities in the District of Columbia's

service delivery system." *Evans*, 139 F. Supp. 2d at 86.  In the Consent Order, defendants agreed

to endow and annually fund the Quality Trust with a total of $31.5 million over eleven years in

exchange for a waiver of all claims for past violations of Court's Orders, subject to certain

exceptions. *See id.* at 85-90.  The settlement agreement set forth in detail the structure of the

Quality Trust, the control and use of the funds to be provided by defendants, and the Trust's right

of access to information. *See id.* at 90-96.  The settlement agreement also described the purpose

and obligations of the Quality Trust, which was to be charged with advancing the individual and

collective interests of consumers with developmental disabilities and, in particular, *Evans* class

members; monitoring the health, safety, and welfare of consumers and the protections, services,

and supports provided to these consumers; and providing for individual and collective legal

services and lay advocacy services for consumers. *Id.* at 92-95.

## VI.     Post-2001 Plan Developments

Shortly after the 2001 Plan was approved, this case was reassigned to the undersigned

upon the retirement of Judge Harris.  Since that time, the Court has monitored defendants'

progress in implementing the Plan through periodic status hearings and through the Court

Monitor's written quarterly reports.

Although it quickly became apparent that compliance would not be achieved within the

time frames set forth in the Plan itself (*see, e.g.*, April-June 2001 Monitor's Report at 1 (noting

defendants' failure to comply with Plan's completion dates)), in the six years since the Plan's

adoption, defendants have made progress in some respects.  The Quality Trust has been

established, and defendants have endowed and funded the Trust, as required by both the Plan

(2001 Plan at 48) and the Consent Order that accompanied it.  *Evans*, 139 F. Supp. 2d at 87.  An

independent financial review of the District's treatment of funds held in custody for class and

non-class members served by MRDDA for the years 1992 to 2001 was completed, and in June

2004, defendants paid approximately $1.2 million to reimburse class members and other

MRDDA consumers for amounts found to be owed to them as a result of that review.  (*See*

Special Master's Report, Recommended Findings of Fact and Conclusions of Law and Proposed

Order Regarding the Independent Financial Review of Consumers' Funds at 6-7; *Evans*, Order

(Feb. 25, 2004); Defs.' Proposed Findings of Fact ["Defs.' Findings"] at 26.)  Defendants have

consistently maintained the required ratio of at least one case manager for every thirty class

members.  (*See* 2001 Plan ¶¶ D.1.b.2., D.1.d.iv.)  Defendants have also developed policies and

procedures required by the 2001 Plan and have created systems and structures intended to assist

them in achieving the Plan's goals.  For example, defendants have established an Incident

Management and Investigation Unit ("IMIU"), a quality assurance unit, a training unit, a Fatality

Review Committee ("FRC"), and an intake process for the reporting of serious incidents.

Notwithstanding these efforts, problems have persisted with respect to the

implementation of defendants' policies and procedures and the effectiveness of defendants'

systems and structures.  Concerns have repeatedly been raised, for example, with respect to the

performance of case managers and providers; the monitoring of health needs and the delivery of

health care services; investigations of class member deaths and other serious incidents and the

implementation of recommended corrective and preventive actions; and the lack of progress in

implementing the Medicaid waiver.  Significantly, not one of the underlying Court Orders has been vacated based on a showing by defendants that they have satisfied the standard for compliance with the related outcome criteria under the 2001 Plan.

In January 2004, recognizing that a lack of coordination among the District of Columbia agencies with responsibility for actions necessary to achieve compliance with the 2001 Plan had impeded the timely completion of those actions, the Court ordered the Mayor to assign a Deputy Mayor or other senior official who reported directly to the Mayor to be responsible for the day-to-day efforts of District agencies to achieve compliance with the Plan.  *Evans*, Order at 1-2 (Jan. 21, 2004).  The Court further ordered that the Deputy Mayor or other senior official be required to coordinate the efforts of all District agencies "as necessary to secure the timely delivery of appropriate services to class members in compliance with the 2001 Plan and previous [Court Orders],"[19] and that the official be required to report periodically to the Special Masters, the Court Monitor, and the Court.  *Id.* at 2-3.  Since January 2004, several different individuals have served in this capacity, but as explained herein, bureaucratic bottlenecks still plague the defendants' ability to achieve results.

In the fall of 2005, the parties agreed to a time-limited initiative (the "ninety-day plan") to address some of the more persistent concerns for a subset of class members in need of specialized attention.  The ninety-day plan was intended to produce specified improvements, over

---

[19]The Court specified that such efforts were to include the development of necessary memoranda of understanding among agencies; the development of appropriate policies and procedures; the publication of rules and regulations; the drafting and presentation of legislation to the City Council; monitoring provider agency compliance with performance expectations set forth in licensure, certification, or contractual agreements; and the development of effective procedures for the enforcement of laws, rules, and regulations as needed to implement the District's obligations under the 2001 Plan.  *Id.* at 2.

a period of ninety days, for a limited number of class members and, in the process, to identify and correct some of the systemic barriers that had impeded progress in the past. (*See* Nov. 28, 2005 Hr'g Tr. at 6; Feb. 22, 2006 Monitor's Report at 4.)  In particular, defendants agreed:  (1) to review, revise, and implement health care plans for forty-eight "at-risk" class members; (2) to move forty-six consumers, including thirty class members, from unsafe and inappropriate residential programs into smaller, community-based housing;[20] and (3) to move forty-two class members out of segregated day programs and into supported employment opportunities. (*See* Nov. 28, 2005 Hr'g Tr. at 6-8; Feb. 22, 2006 Monitor's Report at 1, 4; U.S. Ex. 6.)  When defendants failed to make significant progress towards achieving these goals by the end of January 2006, shortly before the ninety-day period was to expire, the Court directed the parties to negotiate a further Consent Order that would formalize defendants' obligations to address the short-term needs of the identified at-risk class members.  (*See* United States' Notice of the Parties' Failure to Agree at 1, 7-8.)  The parties were unable to reach agreement on such an order and so informed the Court in mid-February.  (*See id.*; Pls.' Endorsement of United States' Notice; Def. Anthony Williams's Notice of Filing.)  At the conclusion of the ninety-day period, defendants had made only three out of forty-six promised residential placements and only five out of forty-two promised supported employment placements, two of which did not even meet the agreed-upon criteria.  (Feb. 22, 2006 Monitor's Report at 1.)  Moreover, although defendants made progress in identifying class members' health care needs, health interventions were not

---

[20]The residential component of the ninety-day plan targeted nine residential sites with histories of poor performance or with residents capable of greater independence.  (Feb. 22, 2006 Monitor's Report at 5.)   The parties agreed that all residents at these sites, including class members and non-class members, should be relocated to more appropriate settings.  (*Id.* at 6.)

implemented for the forty-eight at-risk class members as promised.  (*Id.*)

## VII.   Current Procedural Posture

Discouraged by the failure of the ninety-day plan, as well as by the lack of progress under

the 2001 Plan, plaintiffs filed the instant motion in May 2006, seeking an order finding

defendants in noncompliance with the outstanding Court Orders and placing MRDDA into

receivership.  The United States, as plaintiff-intervenor, also filed a motion for a finding of

contempt.  At a status conference on June 29, 2006, the Court ordered the parties to engage in

settlement discussions with the goal of agreeing to structural changes that would survive the

change in administration at the end of the calendar year.  (June 29, 2006 Hr'g Tr. at 27, 31.)  *See

also Evans*, Order at 1 (June 29, 2006).  The Court also directed the parties to establish a

discovery schedule and ordered further briefing in response to plaintiffs' argument that the Court

need not decide the issue of contempt as a threshold manner.  *Id.* at 1-2.

The Court held a further status conference on July 20, 2006.  Although settlement

discussions during the preceding weeks had been unsuccessful, the Court encouraged the parties

to continue their efforts to reach a settlement.  (July 20, 2006 Hr'g Tr. at 4.)  With respect to the

pending motions, the Court indicated that it would not proceed on plaintiff-intervenor's contempt

motion, noting that contempt remedies would be ineffective in addressing the kinds of problems

that had been identified by the parties (*see id.* at 29),[21] and bifurcated proceedings on plaintiffs'

---

[21]Plaintiff-intervenor argued that a contempt finding would increase the remedial options
available to the Court, noting that possible contempt sanctions included admonishment, ordering
specific performance of existing Court Orders, issuing additional orders, appointing a monitor
and/or a master, and imposing a scheme of fines, as well as appointing a receiver.  (Pl.-
Intervenor's Resp. to the Ct.'s Order of June 29, 2006 at 3-4.)  As plaintiff-intervenor
acknowledged, however, the Court has already appointed a monitor and two masters in this case,
and the Court's prior effort to impose a scheme of fines was struck down by the D.C. Circuit.

receivership motion into a "liability" and a "remedy" phase.  (*Id.* at 9.)  In the "liability" phase,

plaintiffs would be required to show that there had been "systemic, continuous, serious

noncompliance" with Court Orders.  (*Id.* at 6-7, 9, 12.)  Only upon a finding of liability would

the Court reach the issue of what remedy or remedies should be imposed.  (*Id.* at 9-10, 12.)

The Court directed plaintiffs and plaintiff-intervenor to submit proposed findings of fact

and supporting evidence on the issue of liability by August 7, 2006, and directed defendants to

file any evidentiary objections to plaintiffs' and plaintiff-intervenor's evidence by August 14,

2006.  *Evans*, Order at 1 (July 20, 2006).  The parties agreed that all evidentiary objections would

be resolved by Magistrate Judge John M. Facciola, and that Judge Facciola's rulings would be

final.  *Id.*  (*See also* July 20, 2006 Hr'g Tr. at 22, 29, 34.)  Defendants were directed to submit

their proposed findings of fact by September 8, 2006, with evidentiary objections by plaintiffs

and plaintiff-intervenor to be filed by September 15, 2006, and with plaintiffs' and plaintiff-

intervenor's reply to be filed by September 22, 2006.[22]  *Evans*, Order at 1-2 (July 20, 2006).

The Court informed the parties that they would be afforded an opportunity to take

discovery, if they so desired, permitting each side a maximum of ten document requests and/or

requests for admission, and indicating that additional discovery would be permitted, if necessary,

upon agreement of the parties and Magistrate Judge Facciola, following receipt of the opposing

party's proposed findings of fact.  *Id.* at 2.  (*See also* July 20, 2006 Hr'g Tr. 11, 16, 27-28, 38-

40.)  The Court set an evidentiary hearing on the liability phase of plaintiffs' receivership motion

---

*See Evans*, 206 F.3d at 1294-97.  Moreover, there is little reason to believe that the imposition of
fines will ensure compliance with the myriad requirements of the 2001 Plan and existing Court
Orders.  Accordingly, the Court will deny plaintiff-intervenor's motion.

[22]These dates were later extended at the parties' request.

for October 2, 2006, and directed the parties to file a joint status report in advance of the hearing

to indicate what evidence, if any, each side intended to present. *Evans*, Order at 2 (July 20,

2006).

After plaintiffs and plaintiff-intervenor submitted their proposed findings of fact on

liability, defendants objected that given the volume of exhibits submitted and the short time-

frame in which to make objections, it was impossible for them to do anything more than object to

categories of exhibits. (Defs.' Evidentiary Objections to Ps.' and Pl.-Intervenor's Exs. in

Support of Their Respective Proposed Findings of Fact ["Defs.' Objections"] at 2.)  Defendants

presented their specific evidentiary objections to plaintiffs' and plaintiff-intervenor's exhibits in

chart form, listing each exhibit separately, indicating whether defendants objected to the exhibit

and, if so, citing the particular rule of evidence on which the objection was based.  Defendants

objected to the vast majority of the exhibits based on Rules 802, 402, 805, and 701-705.  (*See id.*

at 4-23.)  Defendants also made a general hearsay objection, particularly with respect to reports

of investigations of class member deaths and serious incidents involving class members and

certain quality assurance reports.  (*See id.* at 3.)  Analogizing such reports to reports generated in

the medical peer review process, which are inadmissible in judicial and administrative

proceedings pursuant to D.C. Code § 44-805(a)(1), defendants argued that these reports should

likewise be inadmissible in order to avoid chilling the self-improvement process.  (*See id.* at 4.)

On August 30, 2006, Judge Facciola issued a Memorandum Order overruling defendants'

objections.  With respect to defendants' relevance objections pursuant to Rule 402, Judge

Facciola found that the exhibits were "legitimately tendered in support of the proposed findings"

and were, therefore, "unquestionably relevant." *Evans*, Mem. Order at 2 (Aug. 30, 2006).[23]
Judge Facciola also overruled defendants' objections based on Rules 701-705 (concerning
opinion testimony by lay witnesses and experts), noting that defendants had failed to identify the
particular portion or portions of the exhibit that they found objectionable. *Id.* at 2.  As to
defendants' hearsay objections, Judge Facciola rejected defendants' argument based on D.C.
Code § 44-805, finding the statute to be inapplicable and noting that defendants had not
identified any applicable common law privilege. *Id.* at 3.  Judge Facciola also found that the
reports cited by plaintiffs and plaintiff-intervenor would be admissible as admissions of a party
opponent to the extent that they were created by the District or its agents and that, even if not
admissions, they might be admissible under Rule 803(8)(B) and (C). *Id.* at 2-3.  Finally, Judge
Facciola observed that given the Court's years of reliance upon the reports, without objection by
defendants, to assess defendants' compliance with the Court Orders, defendants could not now
argue that the reports should not be used in determining liability. *Id.* at 4.  Although Judge
Facciola overruled defendants' "broad brush" objections, which failed to specify which sections
of particular reports were objectionable, he gave defendants five days in which to correct this
deficiency in a supplemental filing. *Id.*  Defendants did not submit anything further with respect
to their evidentiary objections.

When defendants thereafter filed their proposed findings of fact on liability, neither
plaintiffs nor plaintiff-intervenor submitted any evidentiary objections.  Despite the opportunity
to do so, no party chose to engage in discovery, and no party presented any testimony at the

---

[23]Judge Facciola noted that whether the exhibits in fact proved what plaintiffs and
plaintiff-intervenor claimed they proved was a different question that went to weight, not
admissibility.  (*Id.*)

hearing on October 4, 2006.  *See Evans*, Minute Order (D.D.C. Sept. 20, 2006).  Instead, the

Court heard oral argument from the parties.  The Court also held a status conference the

following day, at which the Court heard from the Court Monitor and Kathy E. Sawyer,

MRDDA's Interim Administrator, as well as from counsel.  At the Court's request, the Court

Monitor filed a supplemental report on November 29, 2006, addressing the distribution of serious

reportable incidents among providers.  As is the practice in connection with the Court Monitor's

regular quarterly reports, all parties had an opportunity to review and comment on the Monitor's

supplemental report before the report was filed with the Court.  (*See* Oct. 4, 2006 Hr'g Tr. at 31.)

The Court held a further status hearing on February 6, 2007.  The day before that hearing,

defendants submitted a notice of filing to inform the Court of their disagreement with certain of

the observations in the Court Monitor's January 2007 quarterly report and to apprise the Court of

progress they had made since the October 2006 status hearing.  (Defs.' Notice of Filing of

Supplemental Information in Response to the Court Monitor's Quarterly Report ["Defs.' Notice

of Filing"] at 2.)  The notice of filing, which was accompanied by affidavits from Ms. Sawyer

and from Robert Maruca, the Senior Deputy Director for the Medical Assistance Administration

("MAA") of the District's Department of Health, urged the Court to hold the motions in

abeyance in light of the positive developments and the Fenty administration's commitment to the

District's newly-created Department of Disability Services ("DDS")[24] and its consumers.  (*Id.* at

---

[24]The DDS was established by emergency legislation on December 20, 2006.
Developmental Disabilities Services Management Reform Emergency Amendment Act of 2006,
§ 103.  The DDS was created as a separate Cabinet-level agency to serve consumers formerly
served by the MRDDA and the Rehabilitation Services Agency ("RSA"), another entity within
the District's Department of Human Services.  *See id.* §§ 105(1), (2).  Responsibility for
MRDDA consumers was transferred to DDS immediately upon its creation.  The legislation
contemplates that responsibility for RSA consumers will be transferred to DDS no later than June

10-11.)  At the February 6th hearing, the Court rejected this request and indicated that it intended

to issue a ruling based on the record as of November 29, 2006, when the Court Monitor filed the

supplemental report requested by the Court.  (Feb. 6, 2007 Hr'g Tr. at 23-24.)  But, as explained

more fully herein, the extent of defendants' recent progress in remedying its prior deficiencies

will be a critical consideration at the remedy phase.

## LEGAL ANALYSIS

### I.     Legal Standard

The issue before the Court at this stage is liability: whether defendants have failed to

comply with the Court's prior Orders in this case.  The Court advised the parties at the July 20,

2006 status conference of the standard by which defendants' liability would be assessed.

Plaintiffs, as the moving party, must demonstrate that there has been systemic, continuous, and

serious noncompliance with Court Orders.  (July 20, 2006 Hr'g Tr. at 6-7, 9-10, 12.)  *See also*

*Dixon v. Barry*, 967 F. Supp. 535, 541, 552-53 (D.D.C. 1997) (imposing receivership based on

findings that District was "substantially noncompliant with [prior Court Orders]"); *Gary W. v.*

*Louisiana*, No. 74-2412, 1990 WL 17537, at *32-33 (E.D. La. Feb. 26, 1990) (noting state's

"persistent[]" inability to "comply substantially" with Court Orders and imposing receivership

with respect to demonstrated areas of "protracted non-compliance"); *Newman v. Alabama*, 466 F.

Supp. 628, 630 (M.D. Ala. 1979) (imposing receivership based on findings that, in critical areas,

state had not achieved substantial compliance with Court Orders).

### II.    Violations of 2001 Plan as Evidence of Noncompliance With Court Orders

The 2001 Plan incorporates the relevant portions of the existing Court Orders and sets

---

30, 2007.  *See id.*

-25-

forth an agreed-upon means by which defendants can come into compliance with those Orders.[25] The Plan provides that defendants' failure "to implement the actions identified in the Plan as necessary to meet the requirements of the related Court Orders is . . . evidence of noncompliance with those Court Orders." (2001 Plan at 7.) *See also Evans*, 139 F. Supp. 2d at 83. The Court is therefore required, as agreed to by the parties, to consider evidence that defendants have failed to perform the "tasks" identified for each set of Court Orders as evidence that defendants have not complied with those Orders.

Defendants argue, however, that plaintiffs and plaintiff-intervenor cannot rely on defendants' failure to meet the associated "outcome criteria" as further evidence of defendants' noncompliance. (Defs.' Findings at 2-3.) Defendants contend that the 2001 Plan and the Court Order approving it limit the manner in which the Plan may be used as evidence of noncompliance with the related Orders, restricting plaintiffs to evidence regarding defendants' failure to implement the "tasks." (*Id.* at 2.) The "outcome criteria," according to defendants, are relevant only to the extent that defendants are seeking to exit from and terminate the related Court Orders. (*Id.* at 3.)

The Court disagrees. Nothing in either the 2001 Plan or the Order approving it limits the evidence plaintiffs may rely on to show that defendants have failed to comply with the

---

[25]To the extent that defendants contend that they are no longer bound by certain provisions of the 1978 Consent Order contained in the section of that Order captioned "Interim Operation of Forest Haven" (*see* Defs.' Findings at 4 nn.5 & 6, 11 n.9, 16 n.14), that argument is incorrect. Each of the provisions that defendants contend "no longer relate[s] to the current system of community care" (*id.* at 4 n.5) was incorporated into the 2001 Plan as a "specific provision of [the] outstanding Court Orders *that must be complied with*." (2001 Plan at 6 (emphasis added).) Having reaffirmed their obligations under these Orders in 2001, nearly a decade after Forest Haven was closed, defendants cannot be heard to argue that the Orders apply only to the operation of that facility.

underlying Court Orders.  As noted, the Plan specifies that defendants' failure "to implement the actions identified in the Plan as necessary to meet the requirements of the related Court Orders is *also* evidence of noncompliance with those Court Orders."  (2001 Plan at 7 (emphasis added).)  But this in no way suggests that *only* defendants' performance with respect to tasks may be used as evidence of noncompliance.  To the contrary, the use of the word "also" indicates that tasks are *not* the only aspect of the Plan that may be used in this manner.

In the 2001 Plan, the parties agreed that the measure of defendants' compliance with a particular group of Court Orders would be whether defendants had satisfied the associated outcome criteria.  (*Id.*)  The Plan itself thus makes defendants' performance with respect to the outcome criteria relevant to a determination as to whether defendants have complied with the underlying Court Orders.  *See Evans*, 139 F. Supp. 2d at 82 (commenting that in the 2001 Plan, the parties agreed "on the yardsticks to be utilized in making determinations of compliance").  Defendants note that the Plan "is 'not intended to be an independently enforceable document.'"  (Defs.' Findings at 2 (quoting *Evans*, 139 F. Supp. 2d at 83); *see also* 2001 Plan at 10.)  Until they are vacated, however, the underlying Court Orders are enforceable.  (*Id.*)  *See also Evans*, 139 F. Supp. 2d at 83.  The outcome criteria reflect the parties' agreement as to what the underlying Court Orders require, and the Court may therefore consider defendants' performance with respect to the outcome criteria as evidence regarding defendants' compliance with the underlying Orders.  (*See* 2001 Plan at 10 ("[I]n the event that the defendants do not implement the provisions of the Plan effectively and on a timely basis, plaintiffs and plaintiff-intervenor retain the right to seek appropriate judicial relief, based on this evidence of noncompliance with the Court Orders.").)

It is also appropriate to consider defendants' performance with respect to the Plan's outcome criteria for purposes of the present motion because the outcome criteria are generally independently relevant to the associated Court Orders. For example, the 2001 Plan incorporates the requirement of the 1978 Consent Order that defendants "provide a program of medical, dental and health related services for class members which provides accessibility, quality and continuity of care for physical illness or injury." (2001 Plan at 12 (citing 1978 Consent Order).) The outcome criteria associated with this Court Order, in turn, include the requirement that "[m]edical and dental services are being provided within professionally acceptable timeframes." (*Id.* ¶ A.1.d.iii.) Whether and to what extent class members are actually receiving needed medical and dental services within professionally acceptable timeframes is unquestionably relevant to whether defendants are, in fact, providing a program of medical, dental, and health-related services that provides accessibility, quality and continuity of care. Likewise, whether case managers ensure that class members receive all of the supports and services referenced in their Individual Service Plans, another outcome criterion (*id.* ¶ D.1.d.ii.), bears directly on whether defendants are providing "all necessary and proper monitoring mechanisms to assure that community living arrangements, programs, and supportive community services of the necessary quantity and quality are provided and maintained," as required by the 1978 Consent Order. *Evans*, 459 F. Supp. at 485.[26]

---

[26]The Court also notes that the distinction that defendants seek to draw between "tasks" and "outcome criteria" is illusory in many instances as the tasks and outcome criteria associated with a particular group of Court Orders often overlap. (*Compare, e.g.*, 2001 Plan ¶ A.1.b.iv. (task requiring that a consumer's Individual Service Plan identify the services and supports needed by the consumer and that Plan be implemented promptly), *with id.* ¶ A.1.d.iii. (outcome criterion requiring that consumers receive the services and supports identified in their Individual Support Plans in a timely manner); 2001 Plan ¶ A.3.b.ii. (task requiring defendants to develop

For these reasons, the Court will consider defendants' performance with respect to the outcome criteria as evidence of defendants' compliance with the related Court Orders.

## III.   Court Monitor's Reports

Defendants have also argued that the Court should not rely on the Court Monitor's reports, objecting that the data in those reports are unreliable as evidence of defendants' noncompliance with Court Orders because the Court Monitor does not perform a proper statistical analysis. (*See* Oct. 4, 2006 Hr'g Tr. at 70-72.) This objection is unpersuasive.

Prior to the submission of plaintiffs' and plaintiff-intervenor's proposed findings, the Court established a procedure and time frame for defendants to lodge their evidentiary objections. *Evans*, Order (July 20, 2006). At the same time, the Court also established a procedure and time frame for the parties to take additional discovery, if they desired to do so. *Id.* at 2. (*See also* July 20, 2006 Hr'g Tr. 11, 16, 27-28, 38-40.) Notwithstanding these rulings, defendants did not object to the use of the Court Monitor's findings on grounds of statistical inaccuracy within the prescribed time period, nor did they seek to depose the Court Monitor or take discovery regarding her methodology.[27]

--------------------------------

*and implement* an ongoing training program for staff working within defendants' service delivery system in order to develop the skills and competencies required to provide services meeting applicable standards), *with id.* ¶ A.3.d.ii. (outcome criterion requiring that staff employed by the District and provider agencies have attended required training programs and satisfactorily demonstrated competence in the skills required for the positions they hold).)

[27]Defendants made certain evidentiary objections to the Court Monitor's reports relied on by plaintiffs and plaintiff-intervenor in support of their proposed findings. (*See generally* Defs.' Objections (Court Monitor reports proferred by plaintiffs and plaintiff-intervenor as exhibits included in chart of exhibits to which defendants objected).) As noted above, however, those objections were overruled by Judge Facciola, *Evans*, Mem. Order at 2-3 (Aug. 30, 2006), whose rulings defendants agreed would be final. (*See* July 20, 2006 Hr'g Tr. at 29.)

Moreover, since the first Consent Order was entered in this case in 1978, the parties have agreed that defendants' implementation of the Court's Orders would be monitored by an outside expert who would report to the Court on a regular basis. The 1978 Consent Order required defendants to hire a full-time Court Monitor whose responsibilities were to include "fil[ing] a verified report every ninety (90) days . . . detailing the status and progress of the defendants in the implementation of this and any further Order of the Court." *Evans*, 459 F. Supp. at 485. The provisions of the 1978 Order concerning the role of the Court Monitor were superceded in November 2000, when the Court granted the parties' joint motion for the appointment of an independent Court Monitor, but that later Order, to which the parties agreed, again required the Court Monitor to "regularly monitor the class members' community residential placements and day or other programs to determine Defendants' implementation of this Court's Orders." *Evans*, Appointment Order at 3 (Nov. 21, 2000); *see also id.* at 4 (Court Monitor's duties "shall be to observe, monitor, report findings, and make recommendations to the parties, Special Master and the Court concerning the implementation of this Court's Orders"). The November 2000 Order also contemplated that the Court Monitor's reports could be used as evidence, providing that "[t]he findings, recommendations and reports of the Court Monitor . . . may be introduced as evidence when relevant and admissible in accordance with the Federal Rules of Evidence." *Id.* at 5.

Pursuant to the November 2000 Order, the Court Monitor has submitted regular quarterly reports that reflect the results of her reviews of defendants' progress with respect to randomly selected samples of class members. Although the Court Monitor's findings are subject to review by the parties before her reports are finalized and filed with the Court, *see Evans*, Appointment

Order at 4 (Nov. 21, 2000) (directing Monitor to submit draft report to the parties for comment and directing Monitor to consider the parties' comments before filing a final report with the Court), there is no indication that defendants have objected to her findings.  Nor is there any indication that defendants have objected to the Court Monitor's methodology.  *See id.* at 3-4 (directing Monitor to "consult with the parties and the Special Master concerning the methodologies to be used by the Monitor to assess Defendants' compliance with and implementation of Court Orders").  To the contrary, in their own proposed findings, defendants affirmatively rely on the Monitor's findings to show the extent to which they have satisfied certain requirements – the same purpose for which they contend the findings may *not* be used by plaintiffs.  (*See, e.g.*, Defs.' Findings at 3 (citing to Monitor's findings that Individualized Service Plans for 90% of class members reviewed were current).)

In these circumstances, defendants cannot complain that the Court Monitor has not conducted the appropriate statistical analysis.  The Monitor has reviewed randomly-selected subsets of class members quarter after quarter, and her findings are remarkably consistent in many respects.  These reviews provide significant data with respect to defendants' overall performance under the 2001 Plan and the underlying Court Orders, and these findings will therefore be considered as evidence of whether defendants have complied with Court Orders.[28]

_____

[28]It is worth noting that the method of assessing compliance with the outcome criteria set forth in the 2001 Plan is, in many instances, a review of a random sample of a specified percentage of class members.  (*See, e.g.*, 2001 Plan at 20 (method of compliance includes review of "a 10 percent random sample of consumers in large congregate day programs and in residential programs to determine whether the placements comply with the criteria and procedures adopted in compliance with the Plan").)

## FACTUAL FINDINGS

There is no question that defendants have made progress in some areas under the 2001 Plan.  As previously noted, they have funded the Quality Trust's $11 million endowment.  They have repaid class members and other MRDDA consumers a total of $1.2 million owed to them for the years 1992 through 2001.  They have consistently maintained the required case management ratios.  And, as defendants note in their proposed findings, they have developed many policies and procedures required by the Plan and have created systems for implementing the Plan's goals.

Plaintiffs and plaintiff-intervenor do not dispute that policies and procedures have been adopted or that systems have been created.  Rather, plaintiffs challenge the effectiveness of these systems and defendants' failure to adequately implement their existing policies.  Plaintiffs contend that in the core areas that have the most direct impact on the day-to-day welfare of class members – the provision of health care, the delivery of services and supports necessary for habilitation, the provision of case management services, and protection from abuse and neglect – defendants are not, and have never been, in compliance with the underlying Court Orders, not one of which has been vacated as contemplated by the 2001 Plan.

Although the parties have submitted competing findings of fact, the underlying record, which consists principally of materials generated by the Court Monitor's office or by defendants and their agents, is basically uncontested.  Both parties rely on the Court Monitor's quarterly reports and on various other data compilations prepared by defendants.  Plaintiffs also rely on reports by the Court Monitor's consultants and on reports of investigations of class member deaths or other serious incidents performed by defendants' own IMIU or by their consultant, the

Columbus Organization.  Defendants also cite to numerous policies and procedures, manuals, and training materials.

Based on a voluminous but basically uncontested record, the Court finds that plaintiffs have demonstrated, by clear and convincing evidence, that defendants have failed to comply with existing Court Orders in the core areas of health, safety, and welfare.  These failures are systemic in that they affect many class members served by a cross-section of providers and occur throughout defendants' service delivery system.  They are serious in that they concern matters that are integral to class members' health, safety, and well-being.  And, they are continuous in that the same issues of noncompliance have persisted year after year.  Although the Court has organized its findings in terms of these three broad categories (health, safety, and welfare), there is substantial overlap among them.  Noncompliance in the area of case management, for example, impacts all three core areas.  Notwithstanding defendants' commitment to "provide the same level of service to class and non-class members" (2001 Plan at 5 n.2), in evaluating defendants' compliance with the Plan as it relates to defendants' compliance with the underlying Court Orders, the Court has, unless otherwise noted, relied exclusively on evidence concerning class members.

## I.    HEALTH

1.    Under the existing Court Orders, defendants are required to provide "[a] program of medical, dental and health related services for class members which provides accessibility, quality and continuity of care for physical illness or injury."  *Evans*, 459 F. Supp. at 489. "Written policies and procedures governing the safe administration and handling of medications" must be established, and medications may be administered only by appropriately trained and

qualified staff.  *Id.*  Class members' medications must be monitored, with at least monthly review

by a physician, and class members must be fed in the maximum upright position consistent with

their capabilities and disabilities.  *Id.*  Defendants are also required to develop and provide for

each class member "a written habilitation plan, based upon individualized assessments and

formulated in accordance with professional standards."  *Id.* at 484-85.  Individual Habilitation

Plans, now known as Individual Support Plans or Individual Service Plans ("ISPs"),[29] must be

revised annually, *Evans*, Consent Order at 4 (June 25, 1981); *Evans*, 459 F. Supp. at 485, and

must identify all services required by class members.  *Evans*, Consent Order at 4 (June 25, 1981).

Priority in implementing ISPs must be given to "class members who have been identified as

assaultive, self-injurious, self-abusive, mentally ill, or who have acute medical needs or

identified needs for physical rehabilitation services."  *Id.* at 6.  Defendants must also ensure that

appropriate training programs for all staff, including staff assigned to residential settings, are

developed and implemented.  *See Evans*, Consent Order at 13 (Feb. 8, 1983); *Evans*, Consent

Order at 3 (June 25, 1981); *Evans*, 459 F. Supp. at  489.

2.      Each of the foregoing Court Orders was incorporated into the 2001 Plan.  (2001

Plan ¶¶ A.1.a.i., A.1.a.ii., A.1.a.iii., A.1.a.vii., A.2.a.vi., A.3.a.ii., A.4.a.i., A.4.a.iv., A.4.a.v.)

The "tasks" identified in the Plan as necessary to implement these Court Orders require that ISPs

identify each class member's service, support and protection needs regardless of availability, that

---

[29]The ISP "serves as the single document that integrates all supports a person may receive
irrespective of where the person resides."  (Defs.' Ex. 71 at 3; *see also* Defs.' Ex. 12 at 24 (ISPs
"describe[] the services and support MRDDA provides to consumers").)  The ISP "presents the
measurable goals and objectives identified as required for meeting the person's preferences,
choices, and desired outcomes" and "addresses the provision of safe, secure, and dependable
supports that are necessary for the person's [well-being], independence, and social inclusion."
(Defs.' Ex. 71 at 3.)

they be modified as the class member's needs and circumstances change, and that they be implemented promptly (*id.* ¶ A.1.b.iv.); that the District develop procedures for including in each ISP an assessment of the individual consumer's need for medical and dental care and the means for securing such services within professionally acceptable time frames (*id.* ¶ A.1.b.v.); and that the District develop and implement an ongoing training program for all staff working within the developmental disabilities services delivery system in order to develop the skills and competencies required to provide services meeting the standards applicable to the programs in which they work.  (*Id.* ¶ A.3.b.ii.)

3.      The parties agreed, as part of the 2001 Plan, that the measure of defendants' compliance with the foregoing Court Orders (*i.e.*, the "outcome criteria" for these Orders) would include such factors as whether ISPs are developed or revised in accordance with professional standards at least annually and reviewed whenever there is a significant change in circumstances (2001 Plan ¶ A.1.d.i.); whether ISPs address class members' need for medical, dental, and mental health services and provide for decision making by a guardian for class members with decision making incapacity (*id.* ¶ A.1.d.iii.); whether needed medical and dental services are provided within professionally acceptable time frames (*id.* ¶ A.1.d.iii.); whether class members are fed according to their individual needs by adequately trained staff (*id.* ¶ A.2.d.iv.); whether, in the event that private providers fail to comply with performance expectations, including the expectation that medical and dental services will be provided within professionally acceptable time frames, the District takes action to ensure compliance or imposes sanctions designed to ensure compliance, including terminating provider agreements, where necessary (*id.* ¶ A.1.d.viii.); whether staff employed by the District and provider agencies have attended required

training programs and satisfactorily demonstrated competence in the skills required for the positions they hold (*id.* ¶ A.3.d.ii.), and whether defendants have developed and implemented a policy governing the safe administration and handling of medications.  (*Id.* ¶ A.4.d.ii.)

4.       MRDDA has a policy setting forth the guidelines to be used in assessing consumers' medical and dental needs and identifying the mechanism for securing treatment.  (*See* Defs.' Ex. 9.)  Consistent with the requirement of the 2001 Plan that defendants develop procedures for including in class members' ISPs an assessment of their need for medical and dental care, the policy requires that written evaluations from medical and dental professionals be part of MRDDA consumers' ISPs and requires those assessments to address consumers' comprehensive care needs, including primary and long-term needs.  (*See id.* at 2.)  The policy requires MRDDA to work with residential providers to ensure that consumers' medical and dental needs are evaluated annually and integrated into ISPs; that residential records are monitored to track appointments, timeliness of service, follow-up visits, consistency, treatment delivery, and documentation of data that impact consumer habilitation (*e.g.*, diet, vital signs, behaviors); that treatment plans are monitored to ensure that quality service is provided by medical and dental providers; and that residential providers actively communicate with physicians and dentists.  (*See id.* at 5-6.)  Defendants acknowledge that MRDDA case managers and nurse managers "are responsible for monitoring the medical care provided to class members."  (Defs.' Findings at 5.)  A separate MRDDA policy addresses the use of psychotropic medications for MRDDA consumers.  (*See* Defs.' Ex. 11.)

5.       MRDDA has also developed a "Comprehensive Health Plan" aimed at establishing "effective and consistent health, clinical and behavioral supports for persons with

mental retardation across the MRDDA system." (Defs.' Ex. 12 at 2.) As part of this Comprehensive Health Plan, ISPs are required to include a Health Management Care Plan, also known as a Health Risk Management Plan (hereinafter "Health Plan"). (*See* Defs.' Ex. 12 at 4, 14, 24.) Health Plans also address the 2001 Plan's requirement that ISPs include an assessment of the consumer's medical needs and the means for securing such services within professionally acceptable time frames. The Health Plan is designed to be "a clear, comprehensive, and easily understood description of a consumer's health and mental health risks, diagnoses, intervention(s), medical and behavioral history, medication(s), recommended screening(s), and scheduled medical or behavioral events for an MRDDA consumer." (*Id.* at 24.) Health Plans are to include responses to any identified diagnoses or recommendations, are to be written in "clear basic English so that entries can be easily understood by lay persons," and must identify an implementation procedure (including responsible parties and oversight staff) for each intervention. (*Id.*; *see also id.* at 4 (the Health Plan "is similar to a nursing plan except that it is written for lay people, particularly Direct Support Staff, and it explains each intervention or recommendation in detail including documentation requirements").)

6.      More recently, defendants have contracted with Georgetown University to form the Health Resources Development Partnership (the "Health Partnership") "to assist the District in its efforts to assure appropriate health care is available to people with developmental disabilities in their communities." (Defs. Ex. 19 at 3.) The Health Partnership has assisted defendants in developing a database of medical providers that serve individuals with developmental disabilities, recruiting new medical providers, conducting trainings and panels for case managers and provider agency staff, and providing technical assistance to provider agencies.

(*See* Defs.' Exs. 21-34.)  The Health Partnership has also developed a "health passport," a short document intended to address the need for a concise method of communicating an individual's health history.  (Defs.' Ex. 23 at 6; Defs.' Ex. 36.)

7.      Notwithstanding defendants' policies and procedures and the work of the Health Partnership, plaintiffs have presented compelling evidence that there have been, and continue to be, serious problems with the implementation of defendants' policies, with the result that many class members do not receive needed medical care within professionally acceptable time frames as required by the 2001 Plan and the 1978 Consent Order.  (2001 Plan ¶¶ A.1.b.iv. (requiring that ISPs, of which Health Plans are a part, be implemented promptly), A.1.d.iii. (requiring that medical and dental services be provided within professionally acceptable time frames).)  *Evans*, 459 F. Supp. at 489 (requiring a program of medical, dental, and health-related services providing for accessibility, quality, and continuity of care).

8.      According to MRDDA's own training report for the period from April to June 2006, the vast majority of providers have not completed staff training regarding MRDDA's medical and dental policy, psychotropic medications, or behavior support plans.  (Sept. 24, 2006 Monitor's Report at 20 (55 out of 64 providers had not completed training about medical/dental policy; 56 out of 65 providers had not completed training about behavior support plans; 53 out of 64 providers had not completed training on psychotropic medication).)  Although 85 to 86% of case managers had completed training in these areas, only about half of other relevant MRDDA staff were trained.  (*Id.* (43% of other relevant MRDDA staff were trained regarding medical/dental policy, 51% were trained about psychotropic medications, 48% were trained about behavior support plans).)

9.     The Court Monitor repeatedly has found that Health Plans do not reference current health problems and do not provide for appropriate interventions for a substantial proportion of class members reviewed.[30]  Sixty-three percent of Health Plans reviewed by the Court Monitor's office between October 2004 and September 2005 did not reference class members' current health problems or provide for appropriate interventions.  (Nov. 3, 2005 Monitor's Report at 1, 9.)  The statistic improved in the Court Monitor's reviews in the first two quarters of 2006, but even so, Health Plans for 34% and 40% of class members reviewed in those quarters did not reference current health problems or provide for appropriate interventions. (Sept. 24, 2006 Monitor's Report at 15; June 26, 2006 Monitor's Report at 15.)  These problems were again present in two-thirds of Health Plans reviewed in the third quarter of 2006.  (Sept. 24, 2006 Monitor's Report 15, 18.)  Deficiencies documented by consultants to the Court Monitor during this time period include, for example, Health Plans that failed to reference one class member's "recent emergency abdominal surgery, fistula, and open, draining abdominal wound" (Pls.' Ex. 156(F)(1) at 3); another class member's sexually transmitted disease, pulmonic stenosis, and extensive deep vein thrombosis (Pls.' Ex. 156(A)(17) at 4); and a third class member's substantial weight loss (Pls.' Ex. 156(A)(29) at 26).[31]  MRDDA's own nursing staff have also identified major problems in a significant number of Health Plans.  (Sept. 24, 2006

_____

[30]Each quarter since at least November 2004, the Court Monitor's office has reviewed the health care provided to a subset of class members identified as having high health risks.

[31]Similar deficiencies have been documented by defendants and their consultants in reports of mortality investigations and investigations of serious incidents involving class members.  (*See, e.g.*, U.S. Ex. 11a at 12 (ISP did not list many of class member's serious medical concerns, including his weight loss and anemia); U.S. Ex. 21q (class member's cardiac condition was not adequately addressed in his Health Plan).)

-39-

Monitor's Report at 19 (MRDDA's quarterly reviews identified major problems in over one-third of Health Plans); June 22, 2006 Monitor's Report at 15 (major problems in 50% of Health Plans).)   As is obvious, Health Plans cannot guide the management of class members' health risks if they do not identify those risks and interventions necessary to address them.

10.     Even when health needs are recognized, class members often do not receive prescribed interventions within the appropriate time frames – or at all.  Recommendations by primary care physicians and/or specialty care consultants were not acted upon in a timely manner in a majority of cases reviewed by the Court Monitor's office during the past two years.  (Nov. 3, 2005 Monitor's Report at 2, 10 (recommendations not acted upon in 56% of the cases reviewed between October 2004 and September 2005); Sept. 24, 2006 Monitor's Report at 16, 19 (recommendations not timely acted upon in 49%, 64%, and 68% of cases reviewed in the first three quarters of 2006, respectively).)  Similarly, lab work and/or physician-ordered diagnostic tests and consults were not completed as ordered in a significant number of cases reviewed during this time frame.  (Nov. 3, 2005 Monitor's Report at 2, 10 (lab work/test/consults not completed as ordered in 51% of cases reviewed between October 2004 and September 2005); Sept. 24, 2006 Monitor's Report at 14, 19 (lab work/tests/consults not completed as ordered in 45%, 51%, and 38% of cases reviewed in first three quarters of 2006, respectively).  Dining plans, positioning plans, and behavioral plans also are not followed for many class members. (Nov. 3, 2005 Monitor's Report at 2, 11 (dining and positioning plans not followed in 52% of cases reviewed between October 2004 and September 2005; behavioral plans not followed in 40% of cases reviewed); Sept. 24, 2006 Monitor's Report at 23-24 (dining plans not implemented in 32%, 37%, and 43% of cases reviewed in the first three quarters of 2006;

positioning plans not implemented in 42%, 37%, and 60% of cases; behavioral plans not

implemented in 35%, 32%, and 47% of cases).)

11.     These problems are well documented not only by the Court Monitor but by

MRDDA's own nurse managers, who are required to provide quarterly monitoring for class

members and other MRDDA consumers identified as having high health risks.  (Defs.' Ex. 12 at

4.)  MRDDA nurses identified problems in the implementation of Health Plans in two-thirds of

the quarterly reviews performed in 2006.  (*Id.* at 19; June 22, 2006 Monitor's Report at 5, 15.)

12.     The same types of problems are also routinely cited in investigations of serious

incidents involving class members done by defendants' IMIU and in fatality investigations done

by defendant's consultant, the Columbus Organization.  For example, physician-prescribed

interventions to reduce or eliminate one class member's chronic urinary tract infections were not

fully implemented, placing the class member at increased risk of continued infections.  (Pls.' Ex.

156(A)(19).)  Although a specialist recommended that a lesion with a high probability for cancer

be surgically removed following another class member's colonoscopy, the surgery was not

performed until eleven months later, and, even then, IMIU investigators were unable to obtain

documentation verifying that the surgery had been performed.  (U.S. Ex. 21j at 2-3.)  A

physician's orders that a third class member receive weekly blood tests until the class member

"was deemed stable" were not followed.  (U.S. Ex. 21w.)  The provider for another class member

"failed to ensure implementation of physicians' orders such as weekly blood level electrolytes

and adequate documentation of input and output," and the class member's physical therapy,

speech therapy, and occupational therapy programs were not "consistently implemented nor

[were] recommendations followed."  (U.S. Ex. 21bb; *see also* U.S. Ex. 11b (colonoscopy

recommended in May 2004 was not done until February 2005); Pls.' Ex. 156(H)(13) (no

evidence that various ISP recommendations were implemented, including follow up with

speciality clinics, nutritional evaluation, monitoring of monthly weights).)

13.     Delays in obtaining needed medical care for class members are also the result of

defendants' failure to ensure that guardians are appointed for those class members who need

them.  Delayed medical care due to the lack of a legal guardian has been cited in Columbus

mortality investigations for at least five class members in 2005 and 2006.  (Pls.' Ex. 52 at 15

(lack of guardian to provide consent delayed class member's surgery four days until surgery was

determined to be an emergency); Pls.' Ex. 53 at 15 (due to lack of guardian, screening

colonoscopy recommended in April 2005 was not completed prior to class member's death eight

months later); Pls.' Ex. 55 at 15 (medical procedures were significantly delayed in at least two

instances due to lack of guardian); Pls.' Ex. 56 at 27 (lack of legally appointed guardian resulted

in delays in treatment and procedures during class member's hospitalization immediately prior to

his death); Pls.' Ex. 106 at 13 (lack of a legally appointed guardian created delays and confusion

in obtaining consents for medically necessary treatments at "critical time" when class member

was hospitalized).)  In addition, the FRC has repeatedly recommended that MRDDA "ensure that

at a minimum, persons with complex medical issues, terminal illnesses and/or other significant

medical compromise have a legal guardian appointed," a process that should be reinforced in the

ISP.  (Pls.' Ex. 120.)

14.     The Court Monitor found that, as of June 2006, there were twenty-eight class

members whose medical treatment was pending the appointment of a guardian.  (June 22, 2006

Monitor's Report at 19.)  Defendants admit that, as of September 2006, requests for guardians

remained pending in nineteen of the fifty-three cases in which MRDDA has requested guardians

since November 2005.  (Defs.' Findings at 12-13; Defs.' Ex. 43.)  In virtually all of those cases,

guardians were requested for medical reasons.  (*Id.*)  Yet, in a number of cases, guardian requests

were not sent to the Office of the Attorney General ("OAG") until months after the case manager

was notified of the need for a guardian.  (*See id.* (showing delays of at least three – and as many

as nine and a half – months between the date the case manager was notified and the date the

request was sent to OAG in sixteen cases); *see also* Pls.' Ex. 54 at 19 (although need for guardian

was "obvious" in July 2001, guardian was not appointed until January 2005); Pls.' Ex. 107

(noting failure to seek guardian for class member determined to be incompetent to make

independent and informed decisions); Pls.' Ex. 108 at 10 (guardian never appointed for class

member who died in 2004, notwithstanding that guardianship had been explored a decade

earlier).)

      15.     The Court Monitor's office and IMIU and Columbus Organization investigators

have also documented many other serious deficiencies in the delivery of health care to class

members.  The Court Monitor found, for example, that provider nursing assessments were not

comprehensive and did not address health risk issues for a majority of the class members

reviewed during the past two years.  (Sept. 24, 2006 Monitor's Report at 18 (problem present for

50%, 64%, and 78% of class members reviewed in first three quarters of 2006, respectively);

Nov. 3, 2006 Monitor's Report at 10 (problem present in 78% of class members reviewed

between October 2004 and September 2005).)  Health Plans were not adequately monitored by

provider nurses and Qualified Mental Retardation Professionals ("QMRPs") for a similarly large

segment of class members during this period.  (Nov. 3, 2005 Monitor's Report at 2 (82% of

Health Plans reviewed from October 2004 to September 2005 showed no evidence of monitoring

by provider nurses); Sept. 24, 2006 Monitor's Report at 16 (Health Plans not adequately

monitored by provider nurses in 56%, 52%, and 73% of cases reviewed in the first three quarters

of 2006, respectively); June 22, 2006 Monitor's Report at 5, 15 (60% of Health Plans reviewed

in second quarter of 2006 were not adequately monitored by QMRPs); Sept. 24, 2006 Monitor's

Report at 18 (three quarters of Health Plans reviewed in third quarter of 2006 were not

adequately monitored by QMRPs).)  Provider residences for a majority of class members

reviewed during this same time frame lacked effective systems for tracking class members' food

and fluid intake, tube feedings, seizures, and bowel movements and urine output.  (Nov. 3, 2005

Monitor's Report at 2, 15 (systems lacking in homes for 81% of class members reviewed

between October 2004 and September 2005); Sept. 24, 2006 Monitor's Report at 17 (systems

lacking in residences for 53%, 60%, and 75% of class members reviewed in first three quarters of

2006, respectively).)  Moreover, data for these areas were not reviewed by clinicians on a regular

basis in a significant portion of cases.  (Sept. 24, 2006 Monitor's Report at 19 (data not reviewed

in two-thirds of cases); June 22, 2006 Monitor's Report at 15 (data not reviewed in 49% of

cases).)

    16.    These deficiencies have serious consequences for class members.  Columbus

investigators have questioned whether the deaths of at least five class members might have been

prevented if health problems had been managed better.  (*See* U.S. Ex. 11a at 27 (citing the lack of

a "well-coordinated effort by [the provider] to comprehensively investigate and address the

decedent's weight loss and significant anemia," even though two other class members with

similar weight loss issues, also in the provider's care, had died in the past seven months, and

nursing staff's failure to adequately assess and monitor the decedent when he exhibited a

significant change in status months before his death); U.S. Ex. 11b at 20 (citing failure of

decedent's health care team to "adequately address his risk for morbidity and mortality due to his

underweight status and GI and pulmonary diagnoses"); U.S. Ex. 11c at 26 (citing lack of a

coordinated effort to "appropriately and comprehensively evaluate, assess, and monitor the

decedent when he presented with a change in status" and lack of an "aggressive approach to the

decedent's chronic underweight status"); U.S. Ex. 11f at 20-21 (citing failure of provider nursing

staff to comprehensively assess or adequately monitor class member when she exhibited a change

in status in the week prior to her death); U.S. Ex. 11m at 15 (citing monitoring and other

problems associated with the effort to taper decedent's anticonvulsant medication).

17.     Monitoring failures have also been found to contribute to preventable

hospitalizations.  For example, IMIU investigators found that one class member's emergency

inpatient hospital admission for pneumonia could have been avoided had the provider sought

appropriate medical attention when the class member's symptoms manifested themselves more

than a month earlier.  (Pls.' Ex. 156(A)(18).)  Columbus investigators concluded that appropriate

monitoring of a class member's thirty-eight-pound weight loss in a ten-month period may have

resulted in earlier detection of the class member's gastrointestinal bleeding, which resulted in a

fifty-eight-day hospitalization, numerous blood transfusions, and extensive surgery.  (Pls.' Ex.

156(A)(3).)  Columbus investigators also found that closer monitoring and intervention by

provider nursing staff "could very possibly have prevented" problems that resulted in a third

class member's emergency room visit and hospitalizations.  (Pls.' Ex. 156(A)(9).)  Closer

monitoring and evaluation of a fourth class member "might have prevented the exacerbation [of]

her cellulitis and subsequent hospitalization."  (Pls.' Ex. 156(A)(23).)

18.    Serious problems also persist with respect to medications.  The Court Monitor's reviews over the past two years consistently have found that a majority of class members who receive psychotropic medications do not receive competent and consistent monitoring of the side effects of those medications.  (Nov. 3, 2006 Monitor's Report at 2, 11 (monitoring lacking for 82% of class members reviewed); Sept. 24, 2006 Monitor's Report at 15, 19 (monitoring lacking for 60%, 69%, and 53% of class members reviewed in first three quarters of 2006, respectively).) Medications were not consistently and properly stored, administered or accounted for per acceptable standards of practice in approximately half of cases reviewed during the past year. (Sept. 24, 2006 Monitor's Report at 19 (problems in two-thirds of cases reviewed in quarter ending in September 2006); June 22, 2006 Monitor's Report at 5, 16 (problems in 48% of cases reviewed in quarter ending in June 2006); *see also* Feb. 22, 2006 Monitor's Report at 2, 8 (noting pattern of problems with medication administration and reconciliation).)

19.    As set forth above, defendants have failed in many significant respect to accomplish the tasks and to achieve the outcome criteria in the 2001 Plan that relate to the Court's Orders regarding the provision of health care and to comply with the terms of the Orders themselves.  Defendants' deficient performance with respect to these measures provides ample evidence that defendants have failed to comply with the Court's Order that "[a] program of medical, dental and health related services which provides accessibility, quality and continuity of care is required," as well as with Court Orders requiring development of habilitation plans and programs that incorporate all services needed by class members and implementation of appropriate training programs for all staff.  *See Evans*, Consent Order at 13 (Feb. 8, 1983);

*Evans*, Consent Order at 3-4, 6 (June 25, 1981); *Evans*, 459 F. Supp. at 485, 489.

## II.   SAFETY

1.      In the 1978 Consent Order, the Court recognized that class members'
constitutional right to be kept free from harm had been violated.  *Evans*, 459 F. Supp. at 484.  To
remedy such violations, the existing Court Orders prohibit all acts of "physical or psychological
abuse, neglect or mistreatment" and require that "each and every alleged incident of abuse,
neglect or mistreatment . . . be promptly investigated and a report made."  *Id.* at 488; *see also
Evans*, Consent Order at 8 (Feb. 8, 1983) (requiring defendants to submit to the Developmental
Disabilities Professional for review and approval their "Unusual Incident Reporting Form and the
procedures undertaken by defendants pursuant to any Unusual Incident Report").  Incident
reports must be maintained by defendants and made available upon reasonable notice to counsel
for plaintiffs and plaintiff-intervenor and members of the Community Advisory Board.  *Evans*,
459 F. Supp. at 488-89.  Defendants must notify the Court Monitor immediately upon the death
of a class member, provide the Court Monitor with prompt notice of pending or ongoing
investigations of serious incidents involving class members, and forward to the Court Monitor
copies of any incident reports related to deaths, autopsies, and/or death summaries of class
members, as well as all final reports of investigations that involve class members.  *Evans*,
Appointment Order at 4 (Nov. 21, 2000).  Defendants must also provide "all necessary and
proper monitoring mechanisms to assure that community living arrangements, programs and
supportive community services of the necessary quantity and quality are provided and
maintained," *Evans*, 459 F. Supp. at 485, ensure that appropriate training programs for all staff,
including staff assigned to residential settings, are developed and implemented, *see Evans*,

Consent Order at 13 (Feb. 8, 1983); *Evans*, Consent Order at 3 (June 25, 1981); *Evans*, 459 F.

Supp. at 489, and ensure that advocates are provided to assist in the protection of class members'

rights. *Id.* at 486.

2.      As part of the 2001 Plan, which incorporates the foregoing Court Orders (2001

Plan ¶¶ A.3.a.ii., B.a.ii., B.a.iii., B.a.v., D.2.a.i., D.2.a.ii.),[32] the parties agreed on numerous

"tasks" that defendants must complete in order to implement the Court's Orders.  With respect to

the reporting of incidents, defendants must develop written policies and a uniform written

incident reporting form and must disseminate the incident reporting form and policies to all

relevant entities and personnel.  (*Id.* ¶¶ B.b.i., B.b.ii.)  Defendants must also establish and

publicize a 24-hour hotline for the reporting of consumer incidents, develop an adequate and

appropriate intake process, and develop a computerized system that permits residential and day

treatment providers to report incidents on-line.  (*Id.* ¶¶ B.b.iii., B.b.iv., B.b.v.)

3.      Defendants must develop specific written protocols for the investigation of

incidents designated as "serious," including deaths.  (*Id.* ¶ B.b.vi.; *see also id.* ¶ D.1.b.iv.)

Among other things, such protocols must provide for "prompt, thorough investigations" of these

incidents by trained personnel and must specify the time frames for completion of investigations

and investigation reports and for the implementation of corrective and disciplinary action

recommendations.  (*Id.* ¶¶ B.b.vi., B.b.vii.)  Investigation reports and corrective action plans

must be submitted to the Court Monitor and the Quality Trust within seven days of completion.

(*Id.* ¶ B.b.xiii.)  With respect to consumer deaths in particular, defendants must ensure that such

---

[32]The Plan does not incorporate the Court's Order regarding the appointment of an
independent Court Monitor, which was entered just before the Plan was submitted for court
approval.

deaths are investigated "to determine the cause of death, the circumstances of the death and the factors which may have contributed to the death, as well as any preventive or corrective action that appears warranted to address any issues that may have been identified during the investigation." (*Id.* ¶ D.1.b.iv.)  Defendants must also provide for an interdisciplinary FRC that will have access to death investigation reports, make written recommendations based on a review of the circumstances of consumer deaths, and adopt procedures to ensure that recommendations emanating from the fatality review process are implemented and subject to follow-up monitoring by case managers.  (*Id.*)

4.     Defendants must develop a data system within MRDDA capable of aggregating information about consumer incidents, incident reporting, investigations, the investigation process and status, and the implementation of corrective action recommendations and investigation results (*id.* ¶ B.b.viii.), and they must disseminate aggregate and specific information about the overall performance of the system in protecting the health and safety of consumers to the Court Monitor and the Quality Trust on a quarterly basis.  (*Id.* ¶ B.b.xiv.) Defendants must also provide an effective quality assurance system to ensure the regular, independent review of incident reporting, investigations, identification of causes of and contributing factors to incidents, and implementation of any necessary corrective actions to protect consumers from harm, and to ensure that providers are made aware of problematic trends and that corrective action is taken on an individual consumer level, a provider-specific level, and a systemic level. (*Id.* ¶ B.b.ix.)  Defendants must provide initial training on incident reporting to providers, direct care staff, administrators, investigators, and case managers; reinforce such training through case-specific continuing education; and provide additional competency-based

training to investigators and their supervisors.  (*Id.* ¶¶ B.b.x., B.b.xi.)

5.    The parties agreed, as part of the 2001 Plan, that defendants' compliance with the Court's Orders would be measured in terms of a number of factors, including whether all incidents are reported in accordance with District policy (*id.* ¶ B.d.i.); whether defendants notify family members and guardians, the Court Monitor, and the Quality Trust of serous incidents within twenty-four hours of becoming aware of such incidents (*id.* ¶ B.d.ii.); whether serious incidents are reported within the required time frame and thoroughly investigated by trained investigators and whether all other incidents are investigated in accordance with policy requirements (*id.* ¶ B.d.iii.); whether investigation reports identify appropriate preventive, corrective, and disciplinary actions needed to protect MRDDA consumers from harm (*id.* ¶ B.d.iv.); whether all serious incident investigation reports are reviewed by MRDDA quality assurance staff and whether quality assurance staff review all other incidents for patterns and trends (*id.* ¶ B.d.v.); whether case managers follow up on recommendations for all serious incidents to ensure that appropriate preventive, corrective, or disciplinary actions are implemented promptly and document their actions, and whether case managers follow up on all incidents to ensure that all consumers are safe and protected from harm (*id.* ¶ B.d.vi.); whether MRDDA ensures that necessary preventive, corrective, and disciplinary actions are promptly implemented based on the quality assurance review of incident patterns and trends (*id.*; *see also id.* ¶ D.2.d.iii.); whether the Court Monitor and the Quality Trust receive incident reports of all serious incidents, all final investigation reports, and all recommendations for preventive and corrective action, as well as quarterly aggregate reports on pattens and trends for all other incidents (*id.* ¶ B.d.viii); whether deaths are reported to and reviewed by the FRC (*id.* ¶ D.2.d.i.);

whether recommendations from the FRC for preventive and corrective actions are followed up, implemented, and documented (*id.* ¶ D.2.d.ii.); and whether, when private providers do not comply with performance expectations, the District takes whatever immediate actions are necessary to correct the deficiency, including providing training or technical assistance to provider staff or imposing sanctions, including, where necessary, terminating provider agreements, contracts and licenses.  (*Id.* ¶¶ B.d.x., D.2.d.v.)

6.      As required by the 2001 Plan, MRDDA policy specifies the types of incidents involving MRDDA consumers that must be reported and designates certain types of incidents, including, for example, consumer deaths, incidents of abuse and neglect, serious physical injuries, serious medication errors, and emergency inpatient hospitalizations, as "serious reportable incidents."[33]  (Defs.' Ex. 53 at 2-10.)  Serious reportable incidents are investigated by the IMIU.  (Defs.' Ex. 57.)  The District previously contracted with the Columbus Organization to investigate consumer deaths; however, that contract ended sometime during 2006 and was not renewed due to budget constraints.  (Oct. 4, 2006 Hr'g Tr. at 79; Oct. 5, 2006 Hr'g Tr. at 44-45.) Responsibility for death investigations has since been assigned to the IMIU, whose staff was augmented by a registered nurse and a physician to assist in investigations of consumer deaths. (*Id.*)

7.      Although both the 1978 Consent Order and the 2001 Plan make clear that abuse,

---

[33]Under MRDDA's policy an incident is "[a]n event that results in harm or risk of harm to an MRDDA consumer."  (Defs. Ex. 53 at 2.)  A "reportable incident" is a significant event or situation involving a consumer that must be reported to designated authorities within a provider agency for review and internal investigation.  (*Id.*)  A "serious reportable incident" is an incident that, due to its significance or severity, requires "immediate notification to, and possible investigation by, external authorities, in addition to internal review and investigation by the provider agency."  (*Id.*)

neglect, and mistreatment of class members are prohibited, *Evans*, 459 F. Supp. at 488; (2001

Plan ¶ B.a.ii. (incorporating 1978 Consent Order); ¶ B.d.i. (defendants' policies and procedures

must "clearly prohibit[]" abuse, neglect, and mistreatment)), incidents of abuse and neglect of

class members nevertheless persist.  These incidents are well documented by the IMIU.  For

example, allegations of abuse of class members were substantiated in at least nine cases

investigated by the IMIU between January 2005 and June 2006.  (*See* U.S. Exs. 20b, 11o, 11p,

11r, 20c, 11s, 20d, 11t.)  An IMIU investigator recommended that a tenth abuse case be closed

when the provider staff member involved was criminally charged with abuse of a vulnerable

adult based on allegations that she had struck a class member in the face, injuring him in the eye.

(U.S. Ex. 20a.)  Moreover, IMIU investigators made findings of provider neglect or negligence,

or concluded that indicia of neglect were present,[34] in at least fifty-six cases involving class

members that were investigated during this same time period.  (*See* U.S. Exs. 2, 11u-11y, 21a-

21ww, 21yy.)  These cases include a provider staff member who pled guilty to criminal

negligence of a vulnerable adult for seating a class member in scalding bath water that had been

improperly heated on a stove top, causing second degree burns to the class member's buttocks

and legs (U.S. Exs. 1, 2), as well as incidents in which provider staff failed to adequately

supervise class members, leaving them at risk of injury (*see, e.g.*, U.S. Exs. 21a, 21e), failed to

---

[34]MRDDA policy defines neglect as "[t]he failure to provide sufficient, consistent, or
appropriate services, treatment, or care that harms or jeopardizes the customer's health, safety, or
welfare, such as: (1) [t]he failure to report or act on health problems of the customer or changes
in his or her health condition; (2) [l]ack of attention to the physical needs of a customer,
including personal care, hygiene, meals or appropriate nutrition, shelter, and safety; (3) [f]ailure
to carry out a plan of treatment or care prescribed by a physician or health care professional; (4)
[f]ailure to provide services or supports as indicated by the individual's plan of care; or (5)
[f]ailure to provide proper supervision to the consumer as required within a plan or by a court."
(Defs.' Ex. 53 at 6.)

timely seek or provide medical care for class members (*see, e.g.*, U.S. Exs. 21d, 21h, 21k), or otherwise failed to address class members' needs (*see, e.g.*, U.S. Ex. 21p).  These problems are widespread among providers, involving class members served at twenty-three different provider sites.  (*See* Nov. 29, 2006 Monitor's Report at 33-34.)

8.      The Court Monitor has also provided recent data regarding serious incidents. Between October 1, 2005 and August 31, 2006, a total of 230 serious incidents involving both class and non-class members were reported.  (*Id.* at 6.)  As of November 2006, defendants had investigated 166 of those incidents, and ninety-six incidents had been substantiated.  (*Id.*)  Of the ninety-six substantiated incidents, thirty-six involved incidents of abuse and neglect.  (*Id.* at 7.)[35] These incidents occurred at fourteen different provider sites.  (*Id.* at 9.)

9.      Defendants have adopted internal investigative protocols for the IMIU, which require IMIU investigative reports to be completed, including supervisory review, within forty-five work days.  (Defs.' Ex. 57.)  Despite this requirement, serious reportable incidents, including deaths, are not investigated in a timely manner in many instances.  Although defendants had reduced the backlog of overdue serious incident investigations for class members to two as of November 3, 2005 (Nov. 3, 2005 Monitor's Report at 15), there were seventy-one overdue

---

[35]Forty-three of the remaining substantiated serious incidents included in the Court Monitor's data involved serious physical injuries, and four involved serious medication errors. (*Id.* at 7.)  It is possible that some of these incidents also involved instances of provider neglect. In a number of the IMIU reports that the parties have provided to the Court, for example, investigations regarding class members' serious physical injuries have found evidence of negligence on the part of providers and provider staff in connection with those injuries.  (*See, e.g.*, U.S. Ex. 21b (finding day program provider to have been negligent in ensuring that class member was kept safe from harm based on failure to provide class member with proper assistance in using the bathroom); U.S. Ex. 21c (finding provider and provider staff to have been negligent in connection with serious physical injury suffered by class member who fell in the shower where staff failed to use a bath chair that had been purchased to prevent injuries).)

investigations for class members, including four overdue death investigations, three months later in February 2006.  (Feb. 22, 2006 Monitor's Report at 13.)  There were 107 overdue serious incident investigations for class members as of May 2006 (Pls.' Ex. 132), and ninety-two overdue investigations, including eight overdue death investigations, as of June 2006.  (June 22, 2006 Monitor's Report.)  And while the extent of defendants' backlog of overdue serious incident investigations as of September 2006 was disputed due to problems reconciling MRDDA's data with the Quality Trust's data, the backlog remained substantial whether one accepts the District's estimate (fifty-nine) or the Court Monitor's estimate (ninety-nine).  (Sept. 24, 2006 Monitor's Report at 10.)[36]  Investigations of serious reportable incidents are intended to identify those preventive and corrective actions necessary to ensure consumers' heath and safety.  (*See* Defs.' Ex. 53 at 11; 2001 Plan ¶ B.b.vii.)  When investigations are delayed, so too are these needed provider interventions.  Indeed, the FRC has identified the inability to timely obtain the information and data required for reviews as one obstacle to the Committee's effective operation.  (U.S. Ex. 13 at 3.)

      10.     Once investigation reports are completed, defendants must provide them to the Court Monitor within seven days.  *Evans*, Appointment Order at 4 (Nov. 21, 2000).  (*See also*

---

[36]The backlog of investigations of serious incidents is far more substantial for non-class members.  (June 22, 2006 Monitor's Report at 18 (reporting a backlog of 211 overdue incident reports, including six overdue death reports, for non-class members); Pls.' Ex. 132 (backlog of 196 overdue investigations for non-class members as of May 2006); Feb. 22, 2006 Monitor's Report at 13 (backlog of 298 overdue investigations, including 14 overdue death investigations, for non-class members); Nov. 3, 2005 Monitor's Report at 15 (backlog of 228 overdue investigation reports for non-class members).  As the Court Monitor has recognized, "[t]he lack of timely investigation into the serious reportable incidents filed regarding non-class members erodes the protection from harm for class members," who share the same residences and have the same staff as non-class members, as "the failure to rectify the problem affecting one person in a residence exposes other people in the house to the same risk."  (*Id.* at 15-16.)

2001 Plan ¶ B.b.xiii.; Defs.' Ex. 57 at 2.)  Yet, there have been serious problems with the accuracy and reliability of the information provided to the Court Monitor's office.  In June 2006, the Court Monitor determined that at least one of the Columbus death investigations she had received from the District had been edited to delete information critical of the District prior to being distributed.  (June 22, 2006 Monitor's Report at 9.)  When the Court Monitor thereafter requested that Columbus send copies of certain reports to her directly, Columbus was instructed not to do so, until Special Master Sundram intervened.  (*Id.*)  The Court Monitor later determined, by comparing nineteen Columbus death investigation reports received directly from Columbus to those distributed by the District, that in eight of the investigation reports forwarded by the District, factual information or recommendations had been deleted from the original Columbus document.  (Aug. 17, 2005 Monitor's Report at 1.)  With one exception, these deletions, which described gaps in case management, delays in obtaining consent for medical procedures, concerns about health care procedures, concerns about autopsy results and procedures, and difficulties in obtaining information critical of the investigation process, were not agreed to by Columbus.  (*Id.*)  These significant alterations of death investigation reports call into question the reliability of information provided by defendants, impede the implementation of needed interventions, and compromise defendants' ability to protect other class members from harm.  They also constitute clear evidence of defendants' noncompliance with the Court's Orders requiring that death investigations be provided to the Court Monitor.  *Evans*, Appointment Order at 4 (Nov. 21, 2000); *Evans*, 459 F. Supp. at 488-89.  (*See also* 2001 Plan ¶¶ B.b.xiii., B.d.viii.)[37]

---

[37]The Court Monitor has also commented on the lack of death and serious incident investigation reports received by her office on a number of occasions.  (March 31, 2005 Monitor's Report at 15 (no Columbus investigations received by Court Monitor's office between

11.     The Court Monitor has also repeatedly raised concerns regarding the quality of defendants' investigations.  In her December 2004 report, the Court Monitor raised concerns regarding the IMIU's practice of relying on provider interviews rather than conducting independent interviews of key informants, failure to review other recent incident reports involving the same class member or the concerning the same provider or residence, failure to take into account pertinent documentation that could be obtained from providers, and overall lack of thoroughness.  (Dec. 30, 2004 Monitor's Report at 11-12.)  Many of these same concerns were still present in September 2006, when the Court Monitor again commented on the failure of IMIU investigators to interview important sources of pertinent information; to review other incidents reports regarding the same class member and provider; and to review other relevant records, including staff logs at the residence, emergency room and hospital discharge summaries, agency nursing notes, and health records for the alleged victim.  (Sept. 24, 2006 Monitor's Report at 11.)

12.     Moreover, defendants do not consistently ensure that appropriate preventive and corrective actions are implemented based on fatality and serious incident investigations.  For example, a September 2005 IMIU investigation regarding one class member's series of emergency inpatient hospitalizations within a two-month period recommended that MRDDA assess the class member, who had a long history of noncompliance with diet and medications required to control her diabetes and blood pressure, to determine whether additional supports were warranted to ensure compliance with medical and dietary needs.  (Pls.' Ex. 129.)  Yet, four

---

September 2004 and March 2005); June 22, 2006 Court Monitor's Report at 8 (no IMIU investigation reports received by Court Monitor's office or Quality Trust between April 5, 2006 and June 1, 2006).)

months later, MRDDA had failed to identify interventions to address the class member's

identified risks and problems, including the lack of nursing services to monitor her diabetes and

hypertension. (Pls.' Ex. 130 at 26-27.) This failure by MRDDA is not an isolated incident. A

2005 report regarding the status of IMIU consumer and provider incident recommendations

reflected that 463 out of 847 recommendations remained unresolved as of August 2005. (Pls.'

Ex. 128.) The Court Monitor has also consistently criticized defendants for failing to review

death investigations with providers in a timely manner. In February 2006, the Court Monitor

reported that for a period of over one year, defendants repeatedly failed to notify providers of the

results of the Columbus mortality investigations, with the result that corrective actions were not

even discussed, let alone implemented. (Feb. 22, 2006 Monitor's Report at 13.) As of

September 2006, there were at least eleven death investigations – for class member deaths dating

back as far as January 2005 – that had not been reviewed with the responsible provider. (Sept.

24, 2006 Monitor's Report at 12.) As of November 2006, eight of ten Columbus death

investigations concerning class member deaths between October 1, 2005 and August 31, 2006

had not been reviewed with providers, though reviews of these death investigations were

scheduled to occur between November 2006 and February 2007. (Nov. 29, 2006 Monitor's

Report at 11-12.)

13.     The serious consequences that flow from defendants' failure to ensure that

appropriate corrective and preventive actions are promptly implemented are illustrated by the

deaths of three class members who had similar problems with weight loss issues that were not

addressed by the same provider over a seven-month period. (*See* Pls.' Exs. 100, 61, 56.)

Following the death of the first class member in November 2004, Columbus investigators raised

concerns that the class member's nutritional compromise had not been more aggressively

evaluated and managed and that daily monitoring of intake was not apparent, and as a result, they

recommended that MRDDA and the provider ensure that individuals exhibiting significant

weight issues be "comprehensively evaluated to determine the etiology of the problem and are

consistently and appropriately monitored by all relevant clinical disciplines." (Pls.' Ex. 100 at

13.)[38]  Yet two months later, when a second class member died after experiencing significant and

rapid weight loss, the death investigation again noted the lack of "an aggressive approach to the

[class member's] chronic underweight status." (Pls.' Ex. 61 at 26.)  When a third class member

died in the care of the same residential provider five months later, the death investigation again

noted the lack of a "well-coordinated effort by [the provider] to comprehensively investigate and

address the [class member's] weight loss and significant anemia." (Pls.' Ex. 56 at 27.)  It is

significant that investigators questioned whether the second and third deaths might have been

preventable.  (Pls.' Ex. 61 at 26; Pls.' Ex. 56 at 27.)

14.     Defendants have also failed to implement recommendations for preventive and

corrective action by the FRC.  The FRC's 2004 Annual Report, issued in April 2005, reflects that

41% of the Committee's recommendations had not been implemented as of that date.  (Defs.' Ex.

68 at 1.)  Moreover, recommendations issued based on the review of one class member's death

are re-issued (sometimes repeatedly) when the same underlying problems are identified in later

reviews.  For example, the FRC's recommendation, based on the review of a class member's

---

[38]The Court Monitor had filed an alert in May 2004, eight months before this class
member's death, informing MRDDA that the class member's eating protocol and nutritionist-
prescribed diet were not being followed.  (Nov. 3, 2005 Monitor's Report at 9.)  Although
MRDDA reported that the alert was resolved in May 2004, that was not the case, as the
subsequent death investigation revealed.

2002 death, that MRDDA "develop procedures to address coordination of hospital discharge planning, pain management and follow-up of end-of-life care" was re-issued following the review of three separate deaths in October 2005.  (*See* Pls.' Ex. 115.)  Although defendants indicated in April 2004 that the Department of Human Services would adopt the FRC's recommendation that MRDDA "incorporate the integration of End of Life issues into consumers' person-centered plans as appropriate" and "develop a training module on End of Life quality issues as part of the person-centered planning curriculum," this same recommendation was also re-issued in October 2005.  (*See* Pls.' Ex. 116.)  Similarly, while defendants responded in March 2004 to the FRC's recommendation that "MRDDA ensure that the oversight of clinical reviews and coordination of health care services on medically fragile individuals [be] conducted by appropriate health care professionals," including assigning adequate numbers of staff, this recommendation was re-issued five times in October 2005.  (*See* Pls.' Ex. 117; *see also, e.g.*, Pls.' Ex. 118 (FRC recommendation that MRDDA "develop a general education document highlighting [health care] coordination issues in serving MRDDA customers" for distribution to relevant health care community re-issued five times in October 2005); Pls.' Ex. 120 (FRC's March 2005 recommendation that MRDDA ensure that guardians are appointed for persons with complex medical issues, terminal illnesses, and other significant medical compromise re-issued in two cases in October 2005).)  The FRC's repeated re-issuance of these and other recommendations for preventive and corrective action is further evidence of defendants' inability to implement those recommendations.

15.     Defendants have also failed to ensure that all provider and direct care staff, as well as MRDDA's own case managers, are trained in incident reporting.  Defendants' quarterly

training report for the period from April to June 2006 reflects that MRDDA has completed staff

training regarding incident management for only six out of sixty-four providers.  (U.S. Ex. 19 at

6-9.)  For most providers, less than half of all direct support staff have been trained.  (*Id.*)[39]

Morever, 36% of MRDDA case managers and 62% of other MRDDA staff have not been trained

regarding incident management.  (*Id.* at 9.)  Defendants' incident management system cannot

function effectively if provider and MRDDA staff do not have the appropriate training.

16.     Finally, there is evidence that defendants fail to take appropriate corrective actions

when providers do not comply with performance expectations.  One of the key concerns

identified as the result of a collaborative review of the deaths of four class members and one non-

class member undertaken by representatives of MRDDA, the Inspector General's office, the

Health Partnership, University Legal Services, and the Court Monitor's office was the "lack of

enforcement penalties related to poor professional conduct," including the fact that staff cited for

neglect continue to be employed in the system.  (June 22, 2006 Monitor's Report at 11-12.)  At

the October 5, 2006 status conference, the Court Monitor observed that she is aware of only three

instances in which providers have been sanctioned, all during Ms. Sawyer's tenure with

MRDDA, and that, in each instance, action was taken only as a result of documentation filed by

the Monitor's office.  (Oct. 5, 2006 Hr'g Tr. at 26.)  First, following the Court Monitor's

complaints to Ms. Sawyer regarding problems with the administration of medication to one

consumer, Ms. Sawyer requested that the Department of Health investigate the matter.  (*Id.*)

Second, after the Court Monitor circulated a draft of her September 2006 report, which included

---

[39]Of the fifty-eight providers whose staff had not been fully trained, forty-seven had
completed training for less than half of all direct support staff, and eleven had completed training
for half or more of all such staff.  (U.S. Ex. 19 at 6-9.)

a chronology of the serious concerns that had been raised about one residence since 2003, the

provider was fined $3,500 for citations noted during a February 2006 licensing visit.  (*Id.* at 26-

27.)  The Court Monitor also reported that Ms. Sawyer had decided that clients would be moved

from the residence, but that had not happened by the time of the hearing.  (*Id.* at 27.)  Third, the

Department of Health terminated the provider agreement for one of the residences targeted in the

ninety-day plan, where the Court Monitor had observed clients being neglected and where one

non-class member had died.[40]  (*Id.* at 27-28.)  The Court Monitor has also expressed concern that

there is no evidence that the District sanctions providers for failing to complete their own death

investigations, as required.  (Sept. 24, 2006 Monitor's Report at 13.)

17.    As set forth above, defendants have failed in many significant respects to

accomplish the tasks and outcome criteria associated with the Court's Orders relating to class

member safety and to comply with the terms of the Orders themselves.  Defendants' performance

in the areas discussed above provides ample evidence that defendants have failed to comply with

the Court's Orders prohibiting all acts of "physical or psychological abuse, neglect or

mistreatment" of class members, *Evans*, 459 F. Supp. at 488, requiring the prompt reporting and

investigation of all such incidents and the prompt dissemination of the reports of such

investigations to the Court Monitor and other interested parties, *Evans*, Appointment Order at 4

(Nov. 21, 2000); *Evans*, Consent Order at 8 (Feb. 8, 1983); *Evans*, 459 F. Supp. at 488-89;

*Evans*, requiring the development and implementation of appropriate training programs for all

---

[40]Although the Court Monitor regarded the termination of this provider agreement as
appropriate, she raised concerns about the manner in which the termination was carried out,
which resulted in the five residents being moved without transition planning or preparation,
including two class members who went to day programs not knowing that they would not be
returning to the same residence.  (*Id.* at 27-28.)

staff, including staff assigned to residential settings, *Evans*, Consent Order at 13 (Feb. 8, 1983);

*Evans*, Consent Order at 3 (June 25, 1981); *Evans*, 459 F. Supp. at 489, and requiring defendants

to provide necessary monitoring mechanisms. *Id.* at 485.

## III.    WELFARE

### A.    Least Restrictive, Most Integrated Setting

1.    The 1978 Consent Order recognized that class members' constitutional right "to

receive habilitative care and treatment in the alternative least restrictive of individual liberty" had

been violated. *Evans*, 459 F. Supp. at 484.  To remedy these violations, the Court ordered

defendants to "[p]rovide all class members with community living arrangements suitable to each,

together with such community-based day programs and services as are necessary to provide them

with minimally adequate habilitation . . . in the least separate, most integrated and least restrictive

community settings." *Id.* at 485.  Later Court Orders reinforce this requirement. *See Evans*,

Court Order at 10-11 (Feb. 8, 1983) (requiring that class members be provided five hours of daily

programming and that a comprehensive recreation program be implemented for class members).

2.    The tasks identified in the 2001 Plan as necessary to implement these Court

Orders, which the Plan incorporates (2001 Plan ¶¶ A.2.a.i., A.2.a.iii., A.2.a.iv.), include

developing criteria and placement procedures for nursing home placements and discharges (*id.* ¶

A.2.b.i.); using community alternatives whenever possible for consumers with complex medical

needs (*id.*); and developing and implementing a plan for the placement of persons identified as

being inappropriately served in nursing homes, day programs, and employment programs into

less restrictive, more integrated and appropriate community settings.  (*Id.* ¶¶ A.2.b.ii., A.2.b.iii.)

3.    As part of the 2001 Plan, the parties agreed that the measure of defendants'

compliance with the foregoing Court Orders would be, *inter alia*, whether "[a]ll class members are served in residential and day or employment programs that are the least restrictive, most integrated settings appropriate to their needs" and "are provided with adequate supports to allow their participation in recreation and social activities in their communities" (*id.* ¶ A.2.d.i.) and whether "[n]o consumers are placed in or remain in large institutions or nursing homes inappropriately, or because appropriate community alternatives are not available." (*Id.* ¶ A.2.d.ii.)

4.    Notwithstanding the plain language of the 1978 Order and the Plan, defendants have admitted that class members are not placed in the least restrictive setting.  Testifying at budget hearings before the District's Committee on Human Services in April 2006, former MRDDA Administrator Marsha Thompson admitted that "one of the critical areas where the District is lagging is the failure to place people in the least restrictive setting based on their clinical needs and the agreed-upon service plan." (U.S. Ex. 10 at 5.)  Ms. Thompson went on to acknowledge that "[n]o one debates the fact that we have people placed in inappropriate settings." (*Id.*)  These admissions are underscored by defendants' agreement, as part of the ninety-day plan, to move forty-six MRDDA consumers, including thirty class members, into individualized, integrated, less restrictive residential settings.  (Nov. 28, 2005 Hr'g Tr. at 6-8; U.S. Ex. 5.)  The parties' decision to focus on residential placements as part of the ninety-day plan is particularly significant in light of the plan's purpose to address the "immediate and urgent needs of class members." (Nov. 28, 2005 Hr'g Tr. at 6.)  Although a total of forty-six class and non-class members were identified as requiring more appropriate residential placements in November 2005, defendants had made only three placements at the conclusion of the ninety-day

period in February 2006 (Feb. 22, 2006 Monitor's Report at 1, 6) and no additional placements

into more integrated and individualized settings as of June 2006.  (June 22, 2006 Monitor's

Report at 2.)[41]

5.      Defendants have submitted a declaration from the Chief of MRDDA's *Evans*

Intensive Case Management Branch I, indicating that commitment orders issued for 157 class

members between October 2005 and July 2006 reflect findings by D.C. Superior Court judges

that those class members were receiving habilitation by the least restrictive means as defined in

D.C. Code § 7-1301.03(16).[42]  (Defs.' Ex. 69 ¶ 8; *see also* Defs.' Ex. 70.)  While these findings

may indicate that some class members are appropriately placed, defendants have admitted that

many are not.  (U.S. Ex. 10 at 5 (admitting that placing class members in the least restrictive

_____

[41]Additional placements of individuals targeted to move under the ninety-day plan had
been made by October 2006; however, the number of class members and other MRDDA
consumers who were moved is disputed.  (*Compare* Oct. 5, 2006 Hr'g Tr. at 29 (Court Monitor
indicated that only three additional placements (for a total of six) had been made), *with id.* at 59
(Interim MRDDA Administrator indicated that a total of fifteen individuals, including thirteen
class members, had been moved).)  Even if the correct number is fifteen, it is clear that the
District has still fallen far short in moving even the forty-six most needy MRDDA consumers
who were identified in the ninety-day plan for immediate placement.

[42]D.C. Code § 7-1301.03(16) defines the term "[l]east restrictive alternative" as "that
living and/or habilitation arrangement which least inhibits an individual's independence and right
to liberty," including arrangements that move an individual from "[m]ore to less structured
living," "[l]arger to smaller facilities," "[l]arger to smaller living units," "[g]roup to individual
residences," "[s]egregated from the community to integrated with community living and
programming," and "[d]ependent to independent living."  According to defendants,
approximately 80% of class members are committed.  (Defs.' Findings at 21.)  Under D.C. law,
persons committed to a facility are required to be reviewed in a court hearing annually to
determine whether commitment should be continued, D.C. Code § 7-1304.11(a), including that
commitment to the facility "would be the least restrictive means of providing habilitation."  D.C.
Code § 7-1303.04(b)(4).  It is unclear, however, whether in making this determination the Court
considers all possible alternatives to individual's current living situation or only those
alternatives that are presently available.

setting was a "critical area" in which the District was "lagging").)[43]

6.      Day programs also do not serve class members in the most integrated, least restrictive setting in many instances.  In April 2003, the Court Monitor's office found that day programs were more restrictive than required by the functioning of the class members enrolled in such programs, with less than 10% of class members involved in supported employment programs.  (Apr. 21, 2003 Monitor's Report at 8.)  The Court Monitor's review of seventeen day program sites in 2004 revealed that a majority of day programs were overcrowded and provided segregated services of low intensity and interest to class members.  (Oct. 7, 2004 Monitor's Report at 10.)  Four of the seventeen day program sites reviewed (24%) provided little substantive activity of any kind, and only two sites (12%) were implementing supported employment.  (*Id.* at 9.)  More recently, the parties acknowledged that existing day programs are often inadequate, agreeing that, as part of the ninety-day plan, forty-two class members should be moved "out of segregated day programs, which are both expensive and unproductive," and into "integrated employment or day activities."  (*See* Nov. 28, 2005 Hr'g Tr. at 6, 8; *see also* Feb. 22,

---

[43]Plaintiffs contend that defendants' failure to place class members in the least restrictive setting is also evidenced by the fact that more than half of class members live in Intermediate Care Facilities for the Mentally Retarded ("ICF/MRs"), facilities that house and provide institutional care and services for up to eight individuals.  (*See* Oct. 5, 2006 Hr'g Tr. at 4-5 (366 out of 659 class members (55%) were living in ICF/MRs as of October 2006); Defs.' Ex. 74 at 2 (defining ICF/MR).)  Plaintiffs contend that, by definition, ICF/MRs are not the least restrictive setting because the vast majority of class members are capable of receiving more individualized services in a smaller, noninstitutional setting.  (*See* Oct. 4, 2006 Hr'g Tr. at 22.)  National trends with respect to the number of persons living in ICF/MRs versus the number of persons receiving noninstitutional services under the Medicaid Health and Community-Based Services waiver program provide some support for plaintiffs' position.  *See Residential Services for Persons with Developmental Disabilities: Status and Trends Through 2005* at 4, 59 (July 2006), *available at* http://rtc.umn.edu/risp05 (noting that the number of people receiving noninstitutional, community-based services under the waiver nationwide was more than four times the number of people living in ICF/MRs as of June 30, 2005).

2006 Monitor's Report at 1.)  Although the parties agreed that these forty-two class members were in need of more integrated, less restrictive day programs, employment was secured for only five class members, and two of the employment placements did not meet agreed-upon criteria. (*Id.* at 1, 11.)

       7.     The lack of an effective Medicaid waiver exacerbates the District's inability to meet its obligation to provide all class members with habilitative care and treatment in the least restrictive, most integrated setting.  The waiver program was designed to provide noninstitutional, community-based services to individuals with developmental disabilities who otherwise would remain in or be at risk of being placed in a Medicaid facility such as an ICF/MR.  *See Residential Services for Persons with Developmental Disabilities: Status and Trends Through 2005* ("*Residential Services: Status and Trends*") at 59 (July 2006), *available at* http://rtc.umn.edu/risp05.  The waiver authorizes the Secretary of Health and Human Services to waive certain existing Medicaid requirements to allow states to finance noninstitutional services for Medicaid-eligible individuals.  *Id.* at 58.  The waiver is thus an important source of federal funding for noninstitutional services and supports as an alternative to institutional care, and the District's inability to implement an effective waiver program has resulted in additional costs being borne by the District and its taxpayers.  (*See* Oct. 5, 2006 Hr'g Tr. at 53.)

       8.     Although defendants object that implementation of the waiver is not Court-ordered (Defs.' Findings at 26), defendants have consistently recognized that an effective waiver is necessary for them to meet their obligations under existing Court Orders.  Defendants stipulated, in December 2000, that "[t]he District's commitment to self-determination embodied in person centered planning *cannot be met* without the funding stream provided by an effective

waiver" and that "[t]he lack of an effective waiver is in itself sufficient to keep the District from effectively implementing person centered planning." *Evans*, 139 F. Supp. 2d at 99 (joint stipulated findings of fact adopted by the Court in connection with the 2001 Plan) (emphasis added). Moreover, as part of the 2001 Plan, the parties agreed that the District's existing waiver was too narrowly drawn and served too few consumers and that the District needed to take greater advantage of opportunities available under the waiver in order to implement the goal of providing individualized services in the least restrictive environment to class members and other MRDDA consumers. (2001 Plan at 62; *see also* Feb. 22, 2006 Monitor's Report at 14 ("All parties to this case concur that the redesign and implementation of a carefully amended Medicaid waiver is of paramount importance.").)[44]

9.     The District's waiver nevertheless remains too limited in terms of the number of enrollees and ineffective in terms of the services actually provided to those who are enrolled. The number of class members enrolled in the waiver has increased slowly over time, with only 219 class members enrolled as of September 2006. (Defs.' Ex. 111.) Even with this increased enrollment, the District still lags far behind other states in utilizing the waiver instead of more restrictive ICF/MRs. *See supra* note 43. Moreover, those class members who are enrolled in the waiver do not receive all services and do not receive services in the frequency and duration ordered. (Sept. 24, 2006 Monitor's Report at 7, 27.) The District's own review of 191 enrolled

---

[44]The waiver and its potential to assist defendants in meeting their court-ordered obligations have been recognized by the parties since at least the mid-1990s, when the Special Master recommended that defendants be required to submit a waiver application as part of the proposed 1996 Remedial Plan. Defendants submitted a waiver application before the 1996 Plan was adopted by the Court; hence, this requirement ultimately was not included in that Plan. *Evans*, 1996 WL 451054, at *3.

class members in August 2006 revealed that only 51% of these class members received all of the

required services and that 13% did not receive services in the frequency and duration ordered.

(*Id.*)  Indeed, some consumers do not receive any of their needed services under the waiver.  (*See*

Pls.' Ex. 150 (33 class members did not receive any waiver services as of April 30, 2006; 15

class members did not receive any waiver services as of May 31, 2006); Pls.' Ex. 147 (28 class

members did not receive any waiver services as of September 1, 2005).)  The lack of an adequate

pool of providers also contributes to this problem.  (*See* U.S. Ex. 9 at 13.)

      10.     The waiver is also still too narrowly drawn in ways that prevent class members

from being moved into less restrictive settings.  For example, the waiver limits the number of

hours that nursing services can be provided in community settings.  (*See* Oct. 5, 2006 Hr'g Tr. at

15-16.)  The waiver thus provides a disincentive for the District to move class members out of

ICF/MRs to the extent that they would need nursing services in excess of the cap, as the "extra"

nursing services would have to be funded solely by local dollars.  (*See id.*)  The Court Monitor

has noted that the District recently has made some progress towards amending the waiver,

retaining an outside consultant to assist with the amendment of the waiver and drafting needed

rule changes.  (Sept. 24, 2006 Monitor's Report at 27.)  However, the failure to take these steps

for many years has seriously impeded defendants' progress in moving class members into the

least restrictive setting.  (*See* Feb. 22, 2006 Monitor's Report at 1, 14 (noting that District had

made insufficient progress on the waiver's amendment, including failure to retain a consultant as

promised in September 2005).)

      11.     Residential placements for many class members are also unsuitable in other

respects.  The Court Monitor has consistently found that a quarter or more of class members

reviewed during the past two years live in homes that are not clean, safe, and environmentally pleasant.  (*See* Sept. 24, 2006 Monitor's Report at 19 (one-third of class members reviewed "d[o] not live in clean, safe or environmentally pleasant homes"); June 22, 2006 Monitor's Report at 16 (26% of class members reviewed "do not live in clean, safe, and pleasant conditions"); Nov. 3, 2005 Monitor's Report at 2, 11 (50% of homes reviewed between October 2004 and September 2005 did not evidence clean and safe environments).)[45]  As part of the ninety-day plan, seven sites with histories of poor performance and one site at which residents were placed at continuing risk of neglect were selected for remedial effort.  (Feb. 22, 2006 Monitor's Report at 5.)  At least three of these substandard homes remained open as of June 2006.  (June 22, 2006 Monitor's Report at 10.)

12.     Nursing home placements also remain problematic.  In 2001, defendants adopted a policy and procedure establishing criteria for the use of nursing homes, as required by the 2001 Plan.  (Defs.' Ex. 74; *see* Special Master's Report & Recommendation Regarding Nursing Home Admissions for Class Members ["Special Master's Nursing Home Report"] at 3; 2001 Plan ¶ A.2.b.i.)  Notwithstanding this policy, which the Special Master has found to be reasonable as written (Special Master's Nursing Home Report at 5), defendants have continued to place class members inappropriately in nursing homes.  (*See* Pls.' Ex. 13 at 2 (eight of fourteen class members residing in nursing home or acute care hospitals in 2001 were inappropriately placed);

---

[45]Poor living conditions documented by the Court Monitor and MRDDA's own Office of Quality Assurance include, for example, one class member's "rodent, cockroach and fly infested apartment with serious structural damage" (Feb. 22, 2006 Monitor's Report at 13) and another residence found to be dirty with rusty cooking appliances, broken and outdated furniture, loose and protruding bathroom tile, mildew, and a basement in "deplorable condition" with an inoperable furnace.  (Pls.' Ex. 7.)

Pls.' Ex. 14 (class member inappropriately placed in a nursing home in 2002); Pls.' Ex. 15 (same

in 2003); Sept. 24, 2006 Monitor's Report at 25 (one of five class members in nursing homes

reviewed in 2006 did not require nursing home care).)  It is particularly troubling that class

members remain in nursing home placements even after those placements have been identified as

inappropriate.  For example, a class member identified as not requiring nursing home care in

August 2001 and on three occasions thereafter still remained in the same nursing home

placement a year later with "no indication that any actions ha[d] been taken to secure a more

appropriate placement."  (Pls.' Ex. 14; *see also* Pls.' Ex. 15 (class member who had been ready

for discharge from her nursing home placement since December 2001 remained in that placement

in January 2003); Pls.' Exs. 17, 18 & Sept. 24, 2006 Monitor's Report at 25 (class member

identified as needing to move out of his nursing home in the spring of 2006 remained there as of

September 2006).)

13.     Based on defendants' admission that they have failed to place consumers in the

least restrictive setting; defendants' identification, as part of the ninety-day plan, of at least thirty

class members who needed to move to more appropriate and integrated settings and at least forty-

two class members who needed less restrictive, more integrated day programs; and defendants'

failure to implement an effective Medicaid waiver, the Court finds that defendants have not

complied with the Court's 1978 Order that all class members be provided with "community

living arrangements suitable to each, together with such community-based day programs and

services as are necessary to provide them within minimally adequate habilitation . . . in the least

separate, most integrated and least restrictive community settings."  *Evans.*, 459 F. Supp. at 484.

Defendants' continued inappropriate placement of class members in nursing homes is also

evidence of defendants' noncompliance with this Court Order.  (2001 Plan ¶ A.2.d.ii.; *see also id.* ¶¶ A.2.b.ii., A.2.b.iii.)

### B.     Individual Support Plans

1.      Defendants are required, under the existing Court Orders, to develop and provide for each class member a written ISP based upon individualized assessments and formulated in accordance with professional standards and an individualized habilitation program designed in accordance with the ISP.  *Evans*, 459 F. Supp. at 484-85; *see also Evans*, Consent Order at 3-4 (June 25, 1981).  ISPs must identify all services and supports required by class members regardless of availability and must be reviewed at least annually.  *Id.*; *Evans*, 459 F. Supp. at 485. Priority in the implementation of ISPs must be given to class members identified as assaultive, self-injurious, self-abusive, mentally ill, or having acute medical needs or identified needs for physical rehabilitation services.  *Evans*, Consent Order at 6 (June 25, 1981).  The existing Court Orders also require that individualized adaptive equipment be provided to class members who need such equipment, and that all class members be evaluated to assess their needs for such equipment.  *Evans*, 459 F. Supp. at 489.

2.      Each of the foregoing Court Orders was incorporated into the 2001 Plan.  (2001 Plan ¶¶ A.1.a.i., A.1.a.ii., A.1.a.iii., A.1.a.viii.)  The tasks identified in the Plan as necessary to implement these Orders require that ISPs identify class members' service, support, and protection needs regardless of availability, that they be modified as needs and circumstances change, and that they be implemented promptly (*id.* ¶ A.1.b.iv.); that the District develop procedures and time frames for assessing class members' needs for the acquisition or repair of adaptive equipment (*id.* ¶ A.1.b.vi.); and that such equipment be provided to consumers within sixty days from the date

the need is determined or, in the event that such equipment or repair services are not readily available due to special needs, as soon as possible.  (*Id.* ¶ A.1.b.vi.)

3.     The agreed-upon measure of defendants' compliance with the foregoing Court Orders includes whether class members receive the services and supports identified in ISPs on a timely basis; whether ISPs provide for individualized adaptive equipment, as needed; whether class members' needs for adaptive equipment are assessed within thirty days of a request; and whether adaptive equipment is provided or repaired within sixty days from the date the need is determined.  (*Id.* ¶ A.1.d.iii.)

4.     ISPs are the means by which class members' constitutional right to habilitative care and treatment in the least restrictive setting is implemented.  The ISP "serves as the single document that integrates all supports a person may receive irrespective of where the person resides."  (Defs.' Ex. 71 at 3.)  The ISP includes measurable goals and objectives for meeting the person's preferences, choices, and desired outcomes and also "addresses the provision of safe, secure, and dependable supports that are necessary for the person's [well-being], independence, and social inclusion."  (*Id.*)[46]

5.     The Court Monitor has consistently found ISPs to be current for around 90% of class members reviewed.  (Sept. 24, 2006 Monitor's Report at 5 (93% of ISPs reviewed were current); June 22, 2006 Monitor's Report at 14 (90% current); Mar. 31, 2005 Monitor's Report at

---

[46]ISPs are to be developed by a planning team consisting, at a minimum, of the class member, his or her parent or guardian, if any, and the MRDDA case worker.  (*Id.* at 4; *see also Evans*, 459 F. Supp. at 485.)  The ISP planning team may also include nutritionists, occupational therapists, physical therapists, psychologists, social workers, or other clinicians; family members; direct care staff from the person's day, work, and residential programs; and the person's attorney. (Defs.' Ex. 71 at 4-5.)

3 (83% current); Oct. 7, 2004 Monitor's Report at 7 (90% current); July-Sept. 2003 Monitor's

Report at 31 (90% current); July-Sept. 2002 Monitor's Report at 23 (95% current).)  These

findings indicate that ISPs are being revised annually for most class members, as required by

Court Orders and the Plan.

6.      Serious problems nevertheless persist in implementing ISPs and thus in ensuring

that class members actually receive the services and supports they require.  The Court Monitor

repeatedly has found that ISPs are not implemented as written in a substantial number of cases

reviewed.  (*See* Nov. 29, 2006 Monitor's Report at 3, 13 (65% of ISPs reviewed not implemented

fully as written); June 22, 2006 Monitor's Report at 4 (45% of ISPs reviewed not implemented

fully as written); Mar. 31, 2005 Monitor's Report at 12 (60% of ISPs not implemented as

written).)  Unless ISPs are implemented, class members do not receive the habilitative care and

treatment to which they are entitled under the 1978 Consent Decree and subsequent Court

Orders.

7.      Failure to fully implement ISPs as written is a problem that cuts across providers.

Between July and October 2006, the Court Monitor's office reviewed ISPs for 99 class members

served by twenty-four different residential providers.  (Nov. 29, 2006 Monitor's Report at 13-

24.)  ISPs were not fully implemented as written for sixty-three of the class members reviewed,

who resided at sixteen of the twenty-four residential providers.  (*Id.*)

8.      At the October 2006 hearing, defendants objected to "full implementation" as a

measure of compliance given the number of services and supports an ISP may require and the

varying level of urgency of those services and supports for a class member's well-being.  (*See*

Oct. 4, 2006 Hr'g Tr. at 94 (using the example that an ISP might require both that a class

member receive insulin and that he be afforded an opportunity to go to the park).)  The Court

Monitor responded to this concern in her November 2006 report, demonstrating that the services

and supports *not* provided to class members whose ISPs were found not to be fully implemented

are indeed serious.  In fact, the services and supports most often found to be lacking included

clinical assessments and lab work and health-related procedures.  (Nov. 29, 2006 Monitor's

Report at 13.)  Other services and supports found to be lacking included one-to-one staffing

required for protection from harm, transportation services, community-based employment, and

complete financial plans.  (*Id.*)

9.       There is also evidence that ISPs may be inadequate for many class members.  For

example, 40% of the ISPs reviewed by the Court Monitor's office between July and September

2006 did not include reasonable training goals and did not accommodate the individual's

strengths and level of disability.  (Sept. 24, 2006 Monitor's Report at 23; *see also* June 22, 2006

Monitor's Report at 16 (36% of class members reviewed did not have reasonable and

appropriately modified training goals).)

10.       MRDDA has developed a policy establishing guidelines for the proper and timely

acquisition, replacement, modification, and repair of adaptive equipment.  (Defs.' Findings at 12;

Defs.' Ex. 38.)  Notwithstanding this policy, almost 30% of class members reviewed by the

Court Monitor's office between July and October 2006 who needed adaptive equipment did not

have it.  The necessary equipment included such items as eyeglasses; wheelchairs; a raised toilet

seat, bars for the tub, and a shower seat; hearing aids; electronic communication devices; and

dentures.  (Nov. 29, 2006 Monitor's Report at 13, 25-27.)  In some instances, class members had

been without needed equipment for more than a year.  (*See, e.g.*, *id.* at 25 (class member fitted for

eyeglasses in June 2005 still did not have them as of September 2006), at 26 (class members still did not have a sport wristband fourteen months after occupational therapist recommended it).) The twenty-one class members who did not have needed adaptive equipment were served by twelve different providers. (*Id.* at 25-27.)

11.     Defendants' failure to fully implement ISPs, as required under the 2001 Plan, is evidence of defendants' noncompliance with the Court's Orders regarding ISPs. (*See* 2001 Plan ¶¶ A.1.b.iv., A.1.d.iii.) The failure to fully implement ISPs affects a large proportion of class members served by many different providers, and often implicates class members' health and safety needs. Problems with implementation of ISPs have been well documented since at least March 2005 and have continued throughout 2006. The Court finds that defendants' noncompliance in this regard has been systemic, serious, and continuous. The Court also finds that defendants have failed to comply with the Court's Orders regarding adaptive equipment.

### C.     Case Management

1.     The existing Court Orders require defendants to "[p]rovide all necessary and proper monitoring mechanisms to assure that community living arrangements, programs and supportive community services of the necessary quantity and quality are provided and maintained." *Evans*, 459 F. Supp. at 485. Defendants must recruit, hire, and train "a sufficient number of qualified community staff to prepare individual exit and community habilitation plans for each [class member] . . . and to assist in the execution of the responsibility to create, develop, maintain, and monitor the community living arrangements, programs and other services required." *Id.* at 486. In particular, defendants must maintain enough case manager positions to meet the required case manager to client ratio. *Evans*, Consent Order at 5 (Feb. 8, 1983); *see*

*also Evans*, 1996 WL 451054, at *6.  Defendants must also ensure that appropriate training programs for staff, including case managers, are developed and implemented.  *See Evans*, Consent Order at 13 (Feb. 8, 1983); *Evans*, Consent Order at 3 (June 25, 1981); *Evans*, 459 F. Supp. at 489.  Each of these Court Orders is incorporated into the 2001 Plan.  (2001 Plan ¶¶ A.3.a.ii., D.1.a.ii., D.1.a.iii.)[47]

2.      The tasks identified in the 2001 Plan as necessary for defendants to come into compliance with the foregoing Court Orders include developing "procedures to ensure that case managers are informed of recommendations made as a result of all quality assurance/quality improvement activities, including incident investigations, to enable them to monitor the implementation of the recommendations" (2001 Plan ¶ D.1.b.i.); providing for a case manager to client ratio of one to thirty, or even lower depending upon the intensity of consumer needs (*id.* ¶ D.1.b.ii.); ensuring that all case managers "receive competency-based training to carry out their responsibilities prior to being assigned responsibility for individual consumers" (*id.*); and requiring case managers "to conduct a minimum of eight monitoring visits a year and [to] file reports regarding compliance with ISPs and health/safety issues based on these visits."  (*Id.* ¶ D.1.b.iii.)

3.      As part of the 2001 Plan, the parties agreed that the measure of defendants' compliance with these Court Orders would be whether case managers and their supervisors have successfully completed the required competency based training (*id.* ¶ D.1.d.i.); whether case

---

[47]In addition, community placements must be regularly monitored by MRDDA and by the Developmental Disabilities Professional (now known as the Court Monitor) "to ensure that the residential arrangements and programming provided are appropriate to the individual's needs," and the results of such monitoring must be documented.  *Evans*, Consent Order at 8 (June 25, 1981).

managers participate in the development of ISPs for all consumers on their caseloads (*id.*);

whether case managers ensure that consumers receive all of the services and supports identified

in their ISPs, and document and attempt to resolve problems encountered in terms of access to, or

the quality or timeliness of, such services and supports (*id.* ¶ D.1.d.ii.); whether case managers

follow up when a consumer has been the subject of an incident or recommendation for corrective

or preventative action to ensure that appropriate actions for the safety and protection of the

consumer are implemented (*id.* ¶ D.1.d.iii.); and whether defendants maintain the required one to

thirty case manager to class member ratio.  (*Id.* ¶ D.1.d.iv.)

4.      Defendants have consistently maintained the required case manager to class

member ratio under the 2001 Plan.

5.      Despite having what the Court Monitor has described as some of the smallest

caseloads in the country (Nov. 3, 2005 Monitor's Report at 14), MRDDA case managers have

consistently failed to visit clients eight times per year, as required under the Plan.  In November

2005, the Court Monitor reported that a review of a year's worth of records for eighty-five class

members found evidence of the required eight visits for only 39% of class members reviewed.

(*Id.* at 15.)  Monitoring tools documenting the required eight visits had been completed for only

31% of class members reviewed.[48]  (*Id.*)  Seven months later, in June 2006, the Court Monitor

---

[48]Case managers are required to complete a monitoring tool for each client visit to document the visit.  (Defs.' Findings at 14; Pls.' Ex. 97 at 3.)  According to the Court Monitor, these monitoring tools are the only documents that can be reviewed to determine compliance with case management requirements.  (June 22, 2006 Monitor's Report at 13; *see also* Pls.' Ex. 97 at 3 (supervisors obtain signature pages of case managers' completed monitoring tools to determine frequency of visits).)  Thus, it cannot be conclusively determined from the data whether a case manager is failing to visit the client the required number of times per year or is not completing the appropriate documentation.  In either case, it cannot be concluded that defendants are fulfilling the requirements of the 2001 Plan with respect to client visits.

again found that monitoring tools documenting the required eight visits had been completed for only 30% of the sixty-three class members reviewed.[49]  (June 22, 2006 Monitor's Report at 13.) A total of twenty-four case managers were responsible for the 70% of class members reviewed for whom documentation of the required eight visits was lacking.  (*Id.*)  Data provided by the District in response to the Court Monitor's draft June 2006 report confirmed these findings on a broader scale.  MRDDA data for 657 class members indicated that only 27% of class members had eight monitoring tools completed.  (*Id.* at 13-14.)  More recently, the Court Monitor's office and the Quality Trust reviewed case management services provided to 222 randomly selected class members and found that eight visits per year had been documented for 68% of the class members reviewed.  (Sept. 24, 2006 Monitor's Report at 22.)  Although this is certainly an improvement, approximately one-third of the class members reviewed did not receive the required eight visits.  (*Id.*)[50]

6.      Case managers have also failed to ensure that class members' ISPs are implemented as written.  *See supra* section III.B. ¶ 6.

---

[49]In response to the Court Monitor's draft June 2006 report, the District maintained that monitoring tools had in fact been completed for seven additional class members but were not reflected in the data the Court Monitor relied upon because the tools had not yet been entered into MRDDA's computer system.  (*Id.* at 13.)  However, the Court Monitor concluded, based on the information provided by the District, that eight monitoring tools had been completed for only one of the seven additional class members.  (*Id.*)

[50]Defendants assert that, effective January 1, 2006, MRDDA changed its case management policy to require case managers to visit clients at least monthly for a total of twelve visits per year.  (Defs.' Findings at 16; Defs.' Ex. 52.)  Defendants do not suggest that case managers are in compliance with this policy.  Nor could they.  The Court Monitor's September 2006 report reflects that twelve case manager visits per year were documented for only 50% of 100 randomly selected class members.  (Sept. 24, 2006 Monitor's Report at 22.)  As noted, one-third of the 222 class members reviewed by the Court Monitor's office and the Quality Trust did not even receive eight visits.  (*Id.*)

7.      There is also evidence that case managers fail to take appropriate action when a class member has been the subject of an incident.  Although serious incident reports had been filed for thirty-nine of the eighty-five class members reviewed by the Court Monitor's office in late 2005, the case manager's notes referenced the serious incident only about half of the time. (Nov. 3, 2005 Monitor's Report at 4, 15.)

8.      Defendants' performance with respect to case manager training is also deficient. Defendants highlight the availability of training from MRDDA and through the Health Partnership and emphasize that 85% of case managers who monitor class members have completed training in at least seven of MRDDA's eight core training areas (*i.e.*, adaptive equipment, behavior support, incident management, ISPs, medical and dental, most integrated settings, psychotropic medications, and quality assurance).  (Defs.' Findings at 15; *see also* Defs.' Ex. 48.)  Under the 2001 Plan, however, defendants are required to ensure that "all case managers receive competency-based training to carry out their responsibilities *prior to being assigned responsibility for individual consumers*."  (2001 Plan ¶ D.1.b.ii. (emphasis added).) Yet, of the twenty-six case managers included in defendants' exhibit, only half had completed the required trainings in all eight areas.  (Defs.' Ex. 48.)  Moreover, according to MRDDA's training report for April to June 2006, 13% of case managers have not been trained in adaptive equipment, ISPs, or most integrated settings (U.S. Ex. 19 at 3, 12, 17); 14% have not been trained in medical and dental or psychotropic medications (*id.* at 14, 20); 15% have not been trained in behavior support plans or quality assurance (*id.* at 6, 22); and 36% have not been trained in incident management.  (*Id.* at 9.)

9.      Defendants' failure to ensure that case managers complete the required number of

visits and that they take appropriate action when a class member has been the subject of a serious

incident is evidence of defendants' noncompliance with Court's Orders regarding monitoring and

case management.  (*See* 2001 Plan ¶¶ D.1.b.iii., D.1.d.)  Defendants' noncompliance in this area

affects a significant proportion of class members.  Moreover, the Court finds that this

noncompliance is serious given case managers' role as "the principal link between the

individuals being served and the systems involved in the provision of services."  (Defs.' Ex. 63.)

As the Court Monitor recently remarked, case managers are the front line safeguards for the

client, and eight visits should be some guarantee that someone is looking at the care that is being

provided, and, when it is negligent or incomplete or ineffective, is raising that concern to the

appropriate official.  (Oct. 5, 2006 Hr'g Tr. at 25.)  Defendants' failure to ensure that case

managers are properly trained before receiving caseloads is also evidence of defendants'

noncompliance with the Court's Orders (*see* 2001 Plan ¶¶ D.1.b.ii., D.1.d.i.), as is the case

managers' failure to ensure that ISPs are fully implemented.  (*See id.* ¶ D.1.d.ii.)

## CONCLUSION

All of the Court Orders that plaintiffs seek to enforce through this action were agreed to

by defendants.  Defendants also agreed to the terms of the 2001 Plan.  In consenting to the entry

of these Orders, and in agreeing to the provisions of the Plan, defendants admitted – in 1978,

1981, 1983, and again in 2001 – that the existing system for persons with developmental

disabilities in the District of Columbia was seriously flawed.  Indeed, defendants stipulated to

violations of class members' constitutional rights in the 1978 Consent Order and acknowledged,

in the factual findings accompanying the 2001 Plan, that their service delivery system was

"broken" and in need of being "redefined and rebuilt."  In the Plan, defendants agreed to

undertake an ambitious (if not totally unrealistic) course of action to remedy these deficiencies and to come into compliance with the existing Court Orders.  Although the Plan itself was not court-ordered, defendants agreed that their compliance with the underlying Orders would be measured based on their ability to achieve the outcomes specified in the Plan and that their failure to perform the tasks identified in the Plan would be evidence of noncompliance with those Orders.

Following the Plan's adoption, defendants have made significant progress in some areas, including the development of policies and procedures to guide the various components of their service delivery system.  The problem is that defendants have been unable to effectively implement these policies and procedures in many important respects and have failed to achieve desired outcomes for many class members in the critical areas of health, safety, and welfare.

As a result of these failings, class members continue to be placed in inappropriate and overly restrictive residential and day programs, rather than in the least restrictive, most integrated settings.  Provider and MRDDA staff, including case managers, are not adequately trained, and case managers do not visit class members with the required frequency and do not adequately address deficiencies in class members' care.  In many instances, class members do not receive the needed services and supports that have been identified in their ISPs.  Protocols necessary to protect class members' health and safety, such as feeding, positioning, and behavioral plans, are routinely not followed.  Health risks are not adequately assessed and monitored for many class members, and recommendations by health care providers are not implemented in a timely manner.  While incidents of abuse and neglect of class members persist, defendants have failed to ensure that these and other serious incidents, including class member deaths, are investigated in a

timely manner, that the results of such investigations are shared with providers, and that recommended corrective and preventive actions are implemented.  Defendants have also compromised the monitoring process by altering death investigation reports.

Defendants' progress in achieving compliance with the Court's Orders has been impeded by a lack of consistent leadership within MRDDA, which is reported to have had ten different directors or acting directors in the past eight years.  Progress has also been impeded by a lack of inter-agency coordination within the District's government.  This is particularly true with respect to defendants' implementation of the Medicaid waiver, which is administered by the MAA.  The Court Monitor has also noted MRDDA's lack of authority to enforce sanctions against providers with a record of poor performance.  These types of bureaucratic difficulties led the Court to require Mayor Williams to assign a Deputy Mayor or other senior official to coordinate the efforts of all District agencies with responsibility for actions necessary to achieve compliance with the 2001 Plan.  Despite these efforts, the underlying systemic problems remain unsolved.

Based on these findings of fact, the Court concludes that there has been systemic, continuous, and serious noncompliance with many of the Court's Orders.  Failures have occurred throughout defendants' service delivery system, from providers and case managers to the managerial level.  Nor are these failures limited to a few isolated providers or case managers.  For these reasons, the Court finds that defendants' noncompliance has been systemic.  Defendants' noncompliance has also been continuous: defendants' service delivery system has been wholly inadequate, as documented by the Court Monitor and others, for many years.  Finally, plaintiffs and plaintiff-intervenor have presented compelling evidence that defendants' failures jeopardize class members' health, safety, and welfare, contributing to deaths and

hospitalizations that defendants' own investigators have found were preventable. The Court therefore finds that defendants' noncompliance with the Court's Orders is serious.

The Court notes that the findings made herein are based on the record as of November 2006, before Mayor Fenty took office. As a result, they do not take into account more recent improvements that have been made by the Fenty administration and under the leadership of Kathy Sawyer, who has agreed to stay on as the Interim Director of the newly-created DDS until June 1, 2007. (Feb. 5, 2007 Declaration of Kathy E. Sawyer ["Sawyer Decl."] ¶ 6.) These improvements, largely attributable to Ms. Sawyer's capable leadership, include the successful modification of seven Medicaid waiver rules to be more flexible in meeting consumers' needs, including coordination between the former MRDDA and MAA over a two-month period to finalize the modifications (*id.* ¶¶ 19-20); the development and execution of a long-contemplated interstate compact needed to facilitate participation in the waiver by providers and consumers residing in the State of Maryland (*id.* ¶ 21); and the revision of the scope of work in the District's contract with Georgetown to increase the physician and nursing hours devoted to the Health Partnership project. (*Id.* ¶ 12.) Moreover, to address concerns about the credibility of death investigations performed by the Incident Management and Enforcement Unit ("IMEU") (formerly the IMIU) following the expiration of the Columbus contract, the District has made a commitment to implement an independent death investigation process both to re-do certain death investigations previously completed by the IMEU and to conduct future death investigations. (Defs.' Notice of Filing at 2; Feb. 6, 2007 Hr'g Tr. at 18.) The District is also negotiating to have serious incident investigations completed under the auspices of the District's Office of the Inspector General, Medicaid Fraud Control Unit ("MFCU"). (Defs.' Notice of Filing at 2-3.)

These recent developments, which do not alter the Court's finding regarding defendants' noncompliance with Court Orders as of November 2006, are encouraging and will be highly relevant to the remedial phase of this action.

With respect to remedy, the plaintiffs contend that a receivership is the only appropriate remedy. The Court is not, at this time, prepared to endorse such an approach, for receivership is not strictly an issue of noncompliance with court orders. Rather, as a "remedy of last resort," receivership "should be undertaken only when absolutely necessary." *District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. 1999). The Court's determination whether other remedies are inadequate and whether receivership remains the only viable option to effectuate compliance with court orders is to be guided by a number of factors, including

> (1) 'whether there were repeated failures to comply with the Court's orders'; (2) whether further efforts to secure compliance would only lead to 'confrontation and delay'; (3) whether leadership is available which can 'turn the tide within a reasonable time period'; (4) 'whether there was bad faith'; (5) 'whether resources are being wasted'; and, (6) 'whether a receiver can provide a quick and efficient remedy.'

*Id.* (quoting *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997)). Although it is clear based on the tortured history of this case that there have been repeated failures to comply with the Court's Orders, this determination is in no way determinative of the question whether plaintiffs are correct in their argument that a receivership should be imposed. As is clear from the case law, a host of other considerations bear on this issue, and only now, at the remedial stage, is it appropriate for the Court to turn to those considerations.

In order to assist the Court in its consideration of these factors, it will enlist the assistance of the Special Masters, who have ably served in this capacity for many years, to make findings

and recommendations to the Court that address, *inter alia*, the current status of defendants'

compliance, what are the available options for curing the identified deficiencies, and whether a

receivership is the most effective and efficient remedy available to the Court.  To the extent that

the Court must revise the Order of Reference entered on October 11, 1995, the parties shall, in

consultation with the Special Masters, submit by April 20, 2007, a new order that conforms to

Federal Rule of Civil Procedure 53 and allows the Special Masters to perform the functions

delineated herein.  In addition, the parties, with the assistance of the Special Masters, must

propose a plan for how they will proceed with respect to the remedy phase.  In particular, the

parties must consider whether they wish to engage in discovery and/or present evidence to the

Special Masters in order to permit them to make findings and recommendations to the Court.

The parties shall submit a joint plan for the remedial phase of this litigation that addresses a

schedule for proposed discovery, the need for an evidentiary hearing before the Special Masters,

and/or a briefing schedule.  This plan shall also be filed by April 20, 2007.

In sum, while the Court has found that plaintiffs' motion should be granted to the extent

that they have sustained their burden as to liability, the daunting task of finding ways to remedy

the problems still remains.  In this regard, the Court expects the parties to continue their prior

efforts to resolve this matter so that the plight of the class members can be improved as

expeditiously as possible, and they will not have to continue to await the outcome of this

painfully lengthy and cumbersome litigation.

_____/s/_____
ELLEN SEGAL HUVELLE

Date: March 30, 2007