UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOY EVANS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | Civil Action No. 76-293 ESH |
| | ) | |
| v. | ) | |
| | ) | |
| ADRIAN FENTY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

SPECIAL MASTERS' REPORT AND RECOMMENDATION REGARDING A REMEDY FOR
DEFENDANTS' NONCOMPLIANCE WITH COURT ORDERS

1

Table of Contents

INTRODUCTION ……………………………………………………………………………3

I.  Procedural History  ……………………………………………………………………5

II.  Reliance on Court Monitor Reports  …………………………………………………9

III. Current Status of Defendants' Compliance  ………………………………………18
    A.  Health  …………………………………………………………………………18
        1.  Health Care  …………………………………………………………………18
        2.  Mental and Behavioral Health Care  ………………………………………32
        3.  Guardianship  ………………………………………………………………42
    B.  Safety and Protection from Harm  ……………………………………………50
    C.  Welfare  …………………………………………………………………………67
        1.  Least Restrictive/Most Integrated Alternatives  …………………………67
        2.  Individual Service Plans  …………………………………………………75
        3.  Case Management/Service Coordinators  …………………………………79

IV. Interagency Coordination  …………………………………………………………85

V.  Factors Guiding Extraordinary Judicial Intervention  …………………………94

    A.  General Equitable Authority  …………………………………………………95
    B.  Remedies Imposed on Public Officials  ………………………………………98
    C.  Special Administrators and "Limited Receivers"  …………………………104
    D.  Judicial Appointments in the District of Columbia  ………………………106

VI. Factors to be Considered Regarding a Remedy………………………………...117

VII. Conclusions and Recommendations  ……………………………………………122

    A.  Remedial History of this Case  ……………………………………………122
    B.  Recommendation Regarding a Remedy  ……………………………………133

    Appendix A - Rationale for Recommendation in the Draft Report………………… 139

**INTRODUCTION**

In this thirty-three year old class action suit on behalf of people with mental disabilities against the District of Columbia government, the Court has found defendants are in serious, systemic and continuing non-compliance with more than six court orders. (480 F. Supp. 280 [D.D.C. 2007]). After completing the liability phase of the adjudication of plaintiffs' motion for the appointment of a receiver, the Court assigned to the Special Masters the task of assessing compliance since 2006 and recommending to the Court a remedy for defendants' deficient performance of its court-ordered obligations. Thus, in its March 30, 2007 Opinion, the Court granted no relief, but instead asked the Special Masters to make findings and recommendations to the Court that address (a) the current status of defendants' compliance; (b) the available options for curing the identified deficiencies, and (c) whether a receivership is the most effective and efficient available remedy.[1]

As the following Final Report sets forth, the voluminous and well developed evidentiary record before the Special Masters clearly justifies the appointment of a judicial agent to bring about compliance, such as the Independent Compliance Administrator recommended here. Based on a record of events extending from November 2006 (when the record before the Court closed) to the end of 2008, the Special Masters in a Draft Report dated May 22, 2009, found that plaintiffs had proved by clear and convincing evidence that defendants continue to be in serious noncompliance with critical provisions of outstanding court orders.[2]

---

[1] *Evans v. Fenty*, 480 F. Supp.2d 280 (D.D.C. 2007).

[2] Special Masters' Recommendation Regarding a Remedy for Defendants' Noncompliance with Court Orders (May 22, 2009).

3

In their Draft Report, circulated to the parties for comment, the Special Masters recommended that the Court's 2004 Order be amended to provide for a Special Compliance Officer to be jointly appointed by the Court and the Mayor with enhanced authority to coordinate and direct the activities of the various District agencies urgently needed to deliver constitutionally acceptable services to the plaintiff class.[3]  This least intrusive, and least expensive, remedy was most likely in the Special Masters' opinion to achieve compliance with Court Orders, but required the Mayor's agreement.

The Mayor did not agree.  Defendants contend that they have already "ameliorated" unconstitutional conditions, though they do not claim to be in "compliance" with the outstanding court orders – explaining, perhaps, why defendants now request that the Court nullify the existing orders as "outdated" and dismiss the action.[4]

Plaintiffs generally concurred with the Special Masters' findings of continued serious non-compliance, but worried that the dual roles of a Special Compliance Officer recommended in the Draft Report could present conflicts that might impair the Officer's effectiveness.  Thus, plaintiffs renewed their request for the appointment of a broadly empowered Independent Special Administrator, if defendants rejected the Special Masters' hybrid Special Compliance Officer.

The Defendants having rejected the hybrid appointment, the Special Masters now recommend an alternative but more limited remedy than the one the plaintiffs seek– the appointment of an Independent Compliance Administrator accountable only to the Court to supervise and coordinate

---

[3] See Appendix A.

[4] The Court has deferred briefing and decision on defendants' motion to vacate the Court's Orders and dismiss the case until the next status conference.  Amelioration and compliance are not the same. Webster's New Collegiate Dictionary defines the terms as follows" *Ameliorate*: to make better or more tolerable.  *Comply*: to complete, perform what is due, to conform ones actions to a rule.  G. &C Merriam Co. 1980.

4

defendants' serial compliance with individual court ordered obligations so that the suit may be dismissed in three years time or less.  This remedy essentially enforces the bargain the parties struck in adopting the 2001 Plan for Compliance which was accepted and endorsed by the Court. The Independent Compliance Administrator would be primarily responsible for coordinating, facilitating, scheduling and directing defendants' compliance efforts and would have limited powers over only that conduct of defendants which is critical to compliance with court orders addressing the delivery of adequate health services, meaningful habilitation, integrated living arrangements and other services owed to class members who must live out their lives in defendants' service system.

## I.    PROCEDURAL HISTORY

The earlier procedural history of this case has been summarized in the Court's opinion in the liability phase of this bifurcated proceeding on plaintiffs' motion for the appointment of a receiver over the District's mental retardation services (Docket # 809) and will not be repeated here. (*Evans v. Fenty*, 480 F. Supp. 2d 280 (D.D.C. 2007.) The Court found that defendants have been in serious, systemic and continuing non-compliance with many of the court orders in this case.  In its opinion, the Court noted that its findings of non-compliance were based on a record that closed as of November 2006, before Mayor Adrian Fenty took office, and that developments since that time were encouraging and would be highly relevant to the remedial phase of this action.  Therefore, the Court granted no relief, but instead asked the Special Masters to make findings and recommendations concerning "the current status of defendants' compliance, what are the available options for curing the identified deficiencies, and whether a receivership is the most effective and efficient remedy available to the Court." (*Id.,* at 326.) The plaintiffs have since modified their request for a receiver and,

instead, now move for the appointment of a Special Administrator (Docket # 985, filed June 13, 2008).[5]

Following the issuance of the Court's opinion on March 30, 2007, and with the consent of the parties, the Court issued a Supplemental Order of Reference to the Special Masters with respect to the remedial phase of proceedings on the motion. (Docket # 920, filed May 3, 2007.) However, the parties did not immediately move into the remedial phase of this action. By mutual agreement, they postponed formal discovery for six months while the defendants continued to develop and implement plans for reforms. (*See*, April 26, 2007 Hr'g Tr. at 22, 44.)

In order to review the more current status of compliance subsequent to the period covered by the Court's March 30, 2007 opinion, the Court entered a Minute Order on September 12, 2007 requiring the parties to file an agreed-upon methodology to be used by the Court Monitor to monitor defendants' compliance with the 2001 Plan For Compliance and Conclusion of *Evans v. Williams* (hereinafter "2001 Plan") and the existing court orders. The Minute Order also required that the Court Monitor subsequently submit a budget for the proposed monitoring. However, on November 21, 2007, the defendants filed a Notice Concerning Proposed Comprehensive Monitoring (Docket #951). The notice stated:

> . . . [T]he Court stated a number of times that the reason for the comprehensive monitoring proposed by the Court Monitor was because the defendants took the position that conditions have materially changed since the Court's memorandum opinion of March

---

[5] As described by the plaintiffs, the Special Administrator would have authority over procurement and contracts, personnel, budget, licensing enforcement and the Medicaid waiver as necessary to effectuate compliance with the Court's orders. (*Id., at* 5.) Plaintiffs expert witness, Lewis Spence, described this as an *in situ* remedy, which does not remove an agency from the District's control, as would a receiver, but enables a court-appointed official to work with the defendants in achieving compliance, and intervening only when and if necessary to produce compliance (Spence Declaration, ¶ 49-60), Nevertheless, the Special Administrator would have power to hire and fire, and replace agency heads, if necessary to achieve compliance (*Id., at* 65-70; Trial Tr. 92:2-20). Defendants have asserted that this remedy is "a receiver in all but name." (Defs.' Post Trial Br. at 6, docket #1082-3.)

30, 2007. The Court, however, also noted that if the defendants did not persist in their claim, there would be no need for a comprehensive monitoring program.

By communication of November 16, 2007, faced with the expenditure of substantial resources and time to develop the above-reference to methodology, defendants informed the Court Monitor that a meeting to develop a methodology would not be needed since defendants would not assert that conditions have so fundamentally changed at this point that such comprehensive monitoring is appropriate. Accordingly, defendants expressed the view that there was no need for the comprehensive monitoring proposed by the Court Monitor and the significant expense attendant thereto that would be incurred.

Also, at a status conference on August 9, 2007 to review progress in the implementation of the "Fenty Plan" for reforming Developmental Disabilities Administration ("DDA"), the Court instructed the Special Masters to work with parties to develop a proposed Consent Order with short-term goals and enforceable benchmarks to measure the performance of the new Fenty Administration in two areas of long-standing performance and compliance problems in this agency—retaining and increasing the number of qualified providers, and improving the health and safety of class members (Minute Order, August 15, 2007). In response to the Court's directive, the parties, with the assistance of the Special Masters, proposed a Consent Order which was approved by the Court and filed on September 12, 2007 (Docket #938).

The Consent Order required the Special Masters to determine compliance with its provisions beginning in January 2008. In doing so, the Special Masters reviewed documentary evidence submitted by the defendants regarding their performance pursuant to the Consent Order, as well as a report from the Court Monitor pertaining to its provisions regarding class members' health and safety, and submissions from the plaintiffs and Plaintiff-intervener. In accordance with the Court's Scheduling Order of May 15, 2008, the Special Masters submitted to the parties on June 30, 2008 a draft of report of their findings and conclusions regarding compliance with the Consent Order. On July 30, 2008, plaintiffs and defendants respectively filed comments on the Special Masters' Draft Report.

On August 8, 2008, the Special Masters filed their Report and Recommendation Regarding Defendants' Compliance with the Consent Order of September 12, 2007 ("Special Masters' Report") concluding that the defendants had substantially complied with seven provisions and failed to demonstrate substantial compliance with the remaining six of the thirteen provisions of the Consent Order (Docket # 1002). Subsequently, on September 15, 2008, defendants filed a Motion to Modify the Special Masters' Report and Recommendation (Docket # 1011). The Court issued a Minute Order on October 6, 2008 holding defendants' motion to modify in abeyance and instructing that plaintiffs need not file an opposition to the motion until further order of the Court.

Following additional discovery and pretrial proceedings in the remedy phase of this action, the Special Masters conducted a three day trial on December 10-12, 2008, at which testimony was taken from 15 fact and expert witnesses called by plaintiffs and defendants. In addition, more than 200 exhibits were introduced into evidence. Subsequently, both parties submitted Proposed Findings of Fact and Conclusions of Law, as well as post-trial briefs. The Quality Trust for Individuals with Disabilities filed an *amicus* brief in support of plaintiff's motion and for the appointment of a Special Administrator (*Amicus Curiae* Brief of the Quality Trust in Support of Plaintiffs, January 30, 2009). On February 9, 2009, closing arguments were heard by the Special Masters. On May 22, 2009, the Special Masters issued a draft report of the Special Masters' Proposed Findings of Fact and Conclusions of Law and Recommendations regarding a Remedy based upon this record. On July 6, 2009, the parties filed their comments on this draft report. The defendants' exceptions to the Draft Report are accompanied by numerous assertions of the "current status of compliance" based on declarations and documents filed after the close of the record in December 2008. (Defendants' Exceptions to the Special Masters' Draft Report, ¶¶ 21, 27, 30, 33, 38, 44, 48, 49, 65, 73, and pp. 29-30 [hereinafter "Defendants' Exceptions"]) Plaintiffs have not had the opportunity to test these assertions of fact.

The defendants also submitted a cover letter stating that they would defer making legal objections to the report until the final report was issued. Nevertheless, on July 9, 2009, the defendants filed a Notice to the Special Masters of Supplemental Authority, calling attention to the decision of the United States Supreme Court in *Horne v. Flores,* (2009 US Lexis 4733 [June 25, 2009]) in support of their argument that no remedy is necessary in this case. The same day, the plaintiffs communicated to the Special Masters their view that this was an improper submission by the defendants as it was not supplemental to anything before the Special Masters, and relevant, if at all, to the motion pending with the Court. [6]

We have considered the comments and objections of the parties in adopting this final Report to the Court. As necessary, we have addressed the specific objections of the parties to the Draft Report in the body of this report.

## II. RELIANCE ON COURT MONITOR'S REPORTS

In its March 30, 2007 opinion, the Court relied upon reports of the Court Monitor in partial support for its findings of noncompliance with court orders. Similarly, the Special Masters' Report relied in part upon findings contained in a report by the Court Monitor. Defendants now challenge the reliability of the Court Monitor's reports, both in the current remedy phase, as well as the Court's earlier reliance upon them in the liability phase. [7] Defendants contend that the Court Monitor's reports are simply anecdotal, not based upon statistically significant samples and cannot be used to draw reliable conclusions about their performance. (Defs.' Findings at 224-229; Defs.' Proposed Conclusions of Law 9-11.) Defendants rely for this argument upon the Report and testimony of their

---

[6] A similar notice was filed with the Court with respect to defendants' pending motion to vacate all court orders in this case (Docket #1126).

[7] In its opinion, the Court rejected these objections to the reliability of the Court Monitor's Reports. (480 F. Supp. 2d at 296-98).

expert witness, John Sumner, a statistician employed by the District of Columbia Department of Health. (Defs.' Ex. 4 and 14)

In its 2007 Opinion the Court dismissed defendants' objection to the Court's reliance on Court Monitor's Reports on grounds that the Court Monitor does not perform a proper statistical analysis. (See Oct. 4, 2006, Hr'g Tr. at 70-72; 480 F. Supp. 2d at 296.) The Court found defendants' objection unpersuasive, noting that since the first consent order in 1978, the parties have agreed that court orders would be monitored by an independent expert who would report to the Court on defendants' implementation of court orders. (*Id.,* at 296.) In addition, defendants had submitted proposed findings of fact based on the Court Monitor's findings that showed the extent to which defendants satisfied certain requirements. (480 F. Supp.2d at 297.)

In the remedial phase, defendants have again objected to reliance on information in the Court Monitor's reports contending they are "not statistically significant." Defendants submit the testimony of their expert John Sumner who maintains that the Court Monitor's reports cannot be used to determine compliance or non-compliance with court orders. (Supplemental Direct Test. /Decl. of John Sumner, Defs.' Ex 14A, ¶ 6 at 2.) Defendants contend that the Court Monitor did not use a sufficiently large sample when she evaluated defendants' conduct related to court orders. (Sumner ¶ 6, p. 3.) At bottom, Mr. Sumner contends that the Monitor's reports are flawed because the Monitor reviewed only 70 of the 612 class members, while Mr. Sumner believed the number should have been 86 or 83, based on the sample size calculator available from Creative Research Systems. (*Id.,* at 2.)[8]

---

[8] Dr. Sumner's Declaration stated that the number should be 86 (Supplemental Decl. para. 3), but using the same online sample size calculator as did the Court Monitor's consultants he obtained a sample size of 83 (*Id., at* 4). In addition, defendants maintain that because quarterly reports prior to September 2008 did not use representative samples, the Court Monitor's reports cannot be used – as the Court used them – to find serious, systemic, continuous noncompliance with the court orders.

Essentially, Dr. Summer's opinion was limited to two aspects of the use of the Court Monitor's reports. One, it was Dr. Sumner's opinion that it would not be fair to use the Court Monitor's reports to judge the adequacy of the District's performance without comparing it to the performance of other agencies in jurisdictions with similar demographics ("benchmarked against what may be expected to be normal across the country." Trial Tr. 375- 379.) Two, based on the inadequate sample size used in the reviews, those reviews cannot be used to draw an inference to the entire *Evans* class or findings of noncompliance with court orders. (Trial Tr. 367:4-6; 374:10-15.)

As to the first point, Dr. Sumner's trial testimony was confusing and internally contradictory. He seemed to confuse the use of the Court Monitor's findings to determine compliance with *court-ordered standard*s with the use of the court monitor's findings to determine whether the District's implementation of its obligations measured up to *national norms and standards*. (*Id*.) Dr. Sumner testified that one of the flaws of the Court Monitor's methodology used in this case was that conclusions were being drawn without being benchmarked against "a theoretical national average" or what may be expected to be normal across the country. (Trial Tr., at 375:14-18.) In his opinion, for the Court Monitor's findings to have any validity, she would have to look not only at the sample of the *Evans* class, but would have to look at samples of similar classes in a sampling of the 50 other states that would be large enough to be representative of the national average. (*Id.,* at 376:12-23.)

To construct a theoretical national average against which to compare findings regarding the *Evans* class one would have to look not only at a significant sampling of other states but also a demographic sampling that mirrors that of the District of Columbia in order for that finding to have any validity. Dr. Sumner did not answer a question about the cost of such a study. (*Id.,* at 378) He testified that to come to a conclusion about the District in terms of compliance based only upon

_____

observations within the District does not rise to the fairness or reasonable criteria that he was using (*Id.,* at 385: 8-14).

His testimony indicates that Dr. Sumner misunderstands the purpose for which the Court Monitor's reports will be used. He got the impression that the Court Monitor was determining whether there was *compliance* within the meaning of the 2001 Plan in her reports, and criticized the Court Monitor for ignoring the 2001 Plan target levels of compliance, recommending that the Court should not reach a judgment of overall compliance outside of the framework of the 2001 Plan. (*Id.,* at 369-70) (Defs.' Ex. 14, at ¶ 5). However, contrary to Dr. Sumner's belief, the Court Monitor in this case does not make a judgment of compliance or non-compliance with court orders. Instead, the Monitor is ordered to gather factual information about defendants' implementation efforts and to report it to the Court (i.e. "to observe, monitor, report findings and make recommendations to the parties, Special Master and the Court concerning the implementation of this Court's Orders." *Evans*, Appointment Order at 3 (Nov. 21, 2000)). It is the Court that makes determinations of past compliance and the Special Masters who have been asked to recommend to the Court their determinations regarding defendants' current compliance.

Thus, Dr. Sumner's testimony on this subject, though interesting, has no bearing on the weight to be placed on the Court Monitor's reports in this proceeding. In this case, the District is bound to meet the standards established by the court orders. His opinion on its compliance with national norms is not relevant.

With regard to the second criticism regarding inadequate samples sizes, Dr. Sumner again confuses factual finding with legal conclusions regarding compliance with court orders.[9] For exam-

---

[9] Dr. Sumner testified that the 2001 Plan was deficient in selecting a 10% sampling, but that it did a pretty good job of recognizing different levels of compliance based on the critical nature of the service. (Trial Tr., at 386-87)

ple, he states that determinations about trends in defendants' performance can be based on the Monitor's tracking of defendants' performance in a series of reviews over the years. But, he says, they cannot be used to determine a trend toward *compliance or non-compliance*. This is because he mistakenly believes that a legal determination of compliance can only be based on strict, orthodox, statistical analysis as he understands it.[10] (Trial Tr. 374, 389- 390 and Sumner Expert Rpt. Appendix A.) Dr. Sumner's premise is incorrect.

What is significant about Dr. Sumner's opinion is that Dr. Sumner acknowledged that even if based on what he regarded as insufficient sample sizes, the Court Monitor's reports "have a lot of value" for the purposes for which they are actually used in this case. (Trial Tr. 387:14-19.) He first recognized that the Monitor's reporting of specific anecdotal instances are of "tremendous value" to determining whether defendants were meeting or not meeting specific "criteria" in the court orders. (*Id.,* at 387-88.) Secondly, Dr. Sumner recognized that even if the sample size were inadequate, the results of the Court Monitor's surveys over the years could be used "to track trends in terms of…specific criteria" in the orders. Thus, if the Monitor consistently finds deficiencies in every review "you can establish a trend based on those factual findings." (*Id.,* at 372:15-18; 390:2-3.) Finally, Dr. Sumner recognized that, irrespective of sample size, the information in the Court Monitor's reports can support a general, "qualitative opinion based on recurrent observations." (*Id.*, at 379-380.) Dr. Sumner correctly understood that it is not necessary to generalize the information from

---

[10] The Court Monitor maintains that she based her most comprehensive review in the September 2008 Report on a statistically sound random sample of sufficient size. The Court Monitor reports that "using a computer program called Random Sampler, researchers from Virginia Commonwealth University's Rehabilitation Research and Training Center pulled a random sample of seventy class members for the Court Monitor's health care review. The researchers determined that the survey sample of seventy…is sufficient for generalizing findings and drawing conclusions with statistical reliability." (September 10, 2008 Monitor's Report at 7.)

the Court Monitor's reports to the entire *Evans* class, because the information they provide are facts in and of themselves upon which the Court and the Masters may base their determinations.

When he thus credited the Court Monitor's reports, Dr. Sumner knew that the Monitor has reported reviewing the healthcare of 355 class members (57% of the class) at least once, and 15% of those more than once in the last three years. (Trial Tr. 370: 2-8; September 18, 2008, Hr'g Tr. at 31.) While there have been some variations in the size of the samples and in level of performance at different times, overall there has been a consistent pattern of significant deficiencies in important indicators of the quality of health care provided to class members. For instance, Dr. Sumner agreed that it was appropriate for the Court Monitor to separate out the at-risk group for special attention. (*Id.,* at 371:5-8.)

Given the importance of healthcare and the concomitant interest in a high level of compliance with related court orders, the numbers of class members reviewed are significant by themselves[11] and independently of whether the findings with respect to specific samples are generalizable to the class as a whole. In the Monitor's reports issued subsequent to the November 2006 close of evidence considered for the Court's March 30, 2007 opinion, the Monitor reported reviewing:

- Quarterly Report, January 26, 2007 (Jan. 26, 2007 Monitor's Report, docket # 895), 76 randomly selected class members from the at-risk list, served by 19 residential providers and 17 day program providers, including 36 seen by nurse consultants.

- Quarterly Report, April 19, 2007 (Apr. 19, 2007 Monitor's Report, docket #915 at 17), 79 class members, including review of healthcare for 36 randomly selected class members sup-

---

[11] *See*, 2001 Plan at 7-9.

ported by 18 provider agencies, and seven class members selected due to identified concerns (p. 17).

- Quarterly Report, August 2, 2007 (Aug. 2, 2007 Monitor's Report, docket # 933), health care provided to 37 class members, including 19 who were receiving one or more psychotropic drugs.

- Quarterly Report, January 10, 2008 (Jan. 10, 2008 Monitor's Report, docket #960), monitored healthcare to a sample of 59 class members, most of whom had not been previously reviewed by the nurse consultants and were served by 19 provider agencies.

- Quarterly Report, May 8, 2008 (May 8, 2008 Monitor's Report, docket # 975), conducted 72 reviews, including 25 class members jointly selected with the District pursuant to the September 12, 2007 Consent Order. The remaining 47 class members, including 16 individuals never previously reviewed, were served by 21 provider agencies.

- Quarterly Report, September 10, 2008 (Sept. 10, 2008 Monitor's Report, docket # 1006), reviewed 70 randomly selected class members served by 19 provider agencies. Twenty five class members in the sample were receiving psychotropic medications (out of a total of 228 such class members).

The graphs included in the Quarterly Report of May 8, 2008 summarize the findings of monitoring against healthcare indicators over previous quarterly reports of January 07, April 07, August 07, January 08 and May 08. The numbers of class members reviewed for each indicator in each quarter varied as not all indicators were relevant for all persons reviewed (e.g. not all class members were prescribed psychotropic medications or had positioning plans).

- Indicator: Health Risk Management Plans ("HRMP") reference current and significant health problems. A high of 53% in January 07, a low of 39% in January 08. (May 8, 2008 Monitor's Report. at 7.)

- Indicator: DDS quarterly monitoring identified major problems in cases where there were problems found by the Monitor. A high of 60% in May 08, a low of 32% in January 08. (*Id.,* at 8.)

- Indicator: DDS recommendations are implemented by facility. A high of 68% in January 07 and a low of 40% in January 08, and at 60% in May 08. (*Id.,* at 9.)

- Indicator: HRMP is monitored by the nurse. A high of 59% in January 07, steadily declining to 28% in May 08. (*Id.,* at 10.)

- Indicator: Primary physicians' and/or medical consultants' recommendations completed in a timely manner. A high of 68% in July 07, a low of 41% in January 08, and at 49% in May 08. (*Id.,* at 10.)

- Indicator: Lab work and physician order diagnostic tests and consults completed as ordered. A high of 72% in April 07, a low of 49% in January 08, and at 57% in May 08. (*Id.,* at 11.)

- Indicator: Effective system for tracking food, fluids, bowel movements etc. in place. A high of 67% in April 07 and a steady decline since then to a low of 32% in May 08 (17 sites managed by 14 providers are without effective systems). (*Id.,* at 12.)

- Indicator: Competent and consistent monitoring of psychotropic drug side effects. A high of 48% in January 08 declining sharply to a low of 17% in May 08 (*Id.,* at 13.)

- Indicator: Clinical therapy recommendations are implemented. A high of 70% in January 07 declining to 26% in May 08. (*Id.,* at 14.)

16

- Indicator: Nursing assessments are comprehensive and address ultimate issues. A high of 46% in July 07, declining to 13% in May 08. (*Id.,* at 15.)

- Indicator: Dining plans are followed. A high of 96% in April 07 and a low of 61% in January 08. (*Id.,* at 15.)

- Indicator: Positioning plans are followed. A high of 80% in January 07, low of 40% in April 07, and at 63% in May 08. (*Id.,* at 16.)

- Indicator: Behavioral plans are followed. A high of 88% in January 08 declining sharply to 48% in May 08. (*Id.,* at 17.)

Many of the Court Monitor's findings are consistent with deficiencies identified in the reports of independent investigation conducted by the Columbus Organization[12] into class member deaths as well as in survey reports of the Health Regulations and Licensing Administration ("HRLA"),[13] and reinforced by the conclusions reached by the District of Columbia Health Resources Partnership ("DCHRP"), funded by the defendants, following its own analysis of the District's healthcare system.[14] The consistency of the Court Monitor's findings with these other independent sources of information indicate that, despite the defendants' criticisms of the Monitor's methodology, the obser-

---

[12] The Columbus Organization is a private organization that has contracted with the District of Columbia to conduct investigations of the deaths of *Evans* class members. Its reports are reviewed by the Morality Review Committee along with autopsy reports in order to get a better understanding of the factors that may contribute to the death of class members.

[13] *See*, Review of Columbus Investigations of the Deaths of *Evans* Class Members by Elizabeth Chura, MS, RN (appendix A to the Court Monitor's Quarterly Report to the Court, September 10, 2008, pp. 32-35 (docket #1006, Pls.' Ex. 130.)) *See also*, specific findings and problems identified in individual Columbus investigations 08-0149 (Pls.' Ex. 154), 08-0116 (Pls.' Ex. 155), 07-0192 (Pls.' Ex. 156), 08-0040 (Pls.' Ex. 157) and 08-0132 (Pls.' Ex. 158.) See also HRLA reports cited *infra* pp. 31, 37-38.

[14] Health Resources Partnership, Georgetown University Center for Child and Human Development, Report of Clinical Review on 25 Class Members-Special Master's Order September 12, 2007, December 30, 2007, pp. 82-87. Defs.' Perf. Rpt., Ex. 8.07.

17

vations are substantially accurate and reliable evidence of the defendants' overall performance with respect to their obligations under court orders.

## III. CURRENT STATUS OF DEFENDANTS' COMPLIANCE[15]

### A. Health

### 1. Health care

1. Court-Ordered Obligations.

Defendants' obligation to provide adequate healthcare to class members is clear and long standing.  Court orders requiring defendants to provide class members quality care for physical illness or injury through medical, dental, and health related services are set out in this Court's March 30, 2007 Opinion.  480 F. Supp. 2d at 298.  In that Opinion, the Court based its findings of liability on evidence that defendants had failed to meet the requirements of the original 1978 Final Order, *Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978); the June 25, 1981 Order; and the February 8, 1983 Consent Order.[16]  (*Id.,* at 290, 294, 298.)  Among other things, the Court found that these Or-

---

[15] The period considered generally in this report covers the time from the close of the record in the liability phase on November 15, 2006 until the trial in the remedy phase in December 2008. Defendants' General Objections to the Draft Report criticizes the "inordinate amount of time" that the report spends on "needless repetition of the well-documented 30-year history of the case, much of which is no longer relevant." (Defendants' Exceptions, pp. 1-2.)

[16] Judge Pratt's 1978 Final Judgment and Order recited defendants consent to the entry of the Order and Judgment and further declared that mentally retarded plaintiff class members "have a federal constitutional right to habilitative care and treatment based upon the Due Process Clause of the Fifth Amendment." 459 F. Supp. at 484 (D.D.C. 1978.) The 1981 Order required the defendants to assess class members' needs for habilitation and treatment services in accordance with professional standards i.e. those of the Accreditation Council for Services for Mentally Retarded and other Developmentally Disabled Persons (1977) (now called the Council on Quality and Leadership, its

ders required safe administration of medications, feeding protocols, and written habilitation plans,

now known as Individual Support Plans (ISPs) meeting professional standards, reviewed annually.

(*Id.,* at 289-290.)[17]

On the individual level, the court orders in this case clearly set forth defendants' obligation to

assess the medical and other health needs of each plaintiff class member, establish health plans that

address his or her particular needs and implement the health plans. The requirement that defendants

identify individual class member's needs for medical and other health care services dates back to the

original 1978 Consent Order which declared that class members had a constitutionally protected

right to habilitative care and treatment.  The 1978 Final Order permanently enjoined defendants to

"develop and provide for *each class member a written individualized habilitation plan, based upon*

*individualized assessments and formulated in accordance with professional standards.*" (459 F.

Supp. at 484-485, [emphasis added].) Thus, defendants were required to develop "a plan … for indi-

vidual evaluations and the formulation of individual exit [from Forest Haven] and community

habitation plans required for the habilitation of each member of plaintiff class and the periodic re-

view of such plans." (*Id.,* at 486.)

---

standards superseded by 1990 and 1993 standards), as required by the 1978 Order I,1,5,a and to give
priority to class members who "have mental illness" or "acute medical needs" in the implementation
of their individual habilitation plans.  Consent Order, 1981 at Par. 2, c. and e (June 25, 1981.)  In the
1983 Consent Order, the court, again ordered defendants to conduct an assessment of the needs of all
*Evans* class members for services as required by the 1978 Order including their need for habilitation
and treatment. *Id., at* 2.  See also *In Re U.S.* 1991 WL 17225 (D.C. Cir.) unpublished opinion deny-
ing motion of the United States for a writ of mandamus to compel the District Court to complete its
adjudication of the government's motion for contempt based on defendants' violation of the medical
provisions of the 1978 Order.

[17] In his 1995 Findings Of Fact and Conclusions Of Law, Judge Harris found the District of Colum-
bia was in violation of several longstanding consent orders regarding health care, finding that
"Defendants admit that they also are required to provide adequate medical care, psychological care,"
day programming, and other support systems set forth in class members' IHPs.  Case, Findings of
Fact and Conclusions of Law, October 11, 1995, par. 19 at 6, ¶ 19.

On the systemic level, the 1978 Final Order enjoined defendants to provide "a program of medical, dental and health related services for class members which provides accessibility, quality and continuity of care for physical illness or injury" and to "develop a plan for the provision of community services necessary for the habilitation of all plaintiffs [defined in ¶ I.3 as the process by which a resident is assisted in acquiring and maintaining those life skills which enable him… to raise the level of his physical, mental, and social capabilities] …taking into account … additional services necessary …and a specified time frame for their provision." (*Id.*) This plan was to be based on aggregated individual assessments.

The 1981 Consent Order further defined defendants' obligations to assess needs, identify needed services and implement plans to secure them (cited at 480 F. Supp. 2d at 283 [hereinafter "*Evans*, 1981 Consent Order"]). Thus, defendants have an obligation to conduct individual *assessments* of class members' need for medical, dental and other habilitation services. It acknowledged that the *identification* of services, including medical services as part of habilitation plans needed by class members was specifically required by the Final Order. "Individualized assessments and habilitation plans, conforming to the standards set forth in the Final Order at ¶ 5(a) shall be provided to all class members … and thereafter, defendants shall ensure that each class member's assessment and habilitation plan is revised annually." (1981 Consent Order, 2. a.) "Services required by class members shall be identified in full in all assessments and habilitation plans, whether or not such services are presently available." (*Id.,* at.2. c.) The 1981 Consent Order provides that ISPs must be revised annually and must identify all services required by class members. Furthermore, priority in *implementing* ISPs must be given to class members identified as assaultive, self-injurious, self-abusive, mentally ill or who have acute medical needs or identified needs for physical rehabilitation services. (*Id.,* at 4-6 (June 25, 1981)

Two years later, the Court also sought to assure that "periodical assessments are conducted and that individual habilitation plans are developed for all class members, as required by the 1978 consent decree." (*Evans*, Consent Order, at ¶ I., 1[Feb. 8, 1983] ["*Evans*, 1983 Consent Order"].) Again, in 1996, the Court adopted the Special Masters' report which included findings that "The untimely dissemination of IHPs and lack of updated IHPs have been problems. …. The lack of updated IHPs has sometimes delayed annual commitment reviews in the Superior Court." (1996 WL 451054 at 2.) [18]

The Court observed, in its March 30, 2007 Opinion, that individual service plans (ISPs) are the means by which class members' constitutional right to habilitative care and adequate treatment is implemented. 480 F. Supp. 2d at 321 n.47. As part of their ISPs class, members are to have health plans that identify their individual health care needs and the means by which that care will be secured (Health Plans) 459 F. Supp. at 484-485, *Evans* Consent Order 3-6 (1981.) [19]

However, the Court, again, found that defendants had not met the requirements of the 1978 Final Order requiring the provision of a program of adequate, accessible, medical, dental, and health-related services to class members.[20] Based in part on Court Monitor's reports, the Court determined that for a substantial proportion of the class members reviewed class members' health plans do not

---

[18] Special Master's Proposed Recommended Findings of Fact and Conclusions of Law and Recommendations for a 1996 Remedial Plan Through Which Defendants May Purge Themselves of Contempt and for Penalties If Purgation is Not Achieved, pp. 19 – 21.

[19] The Court found that, as part of defendants' "Comprehensive Health Plan," class members' individual service plans are required to include a Health Management Care Plan (Health Plan) assessing consumer's medical needs and the means for securing such services within professionally acceptable time frames." (480 F. Supp. 2d at 300.)

[20] 480 F. Supp. 2d at 298 (citing *Evans*, 459 F. Supp. at 489.) The Court noted that specific sections of the 2001 Plan incorporated the 1978, 1981 and 1983 Court Orders. (480 F. Supp. 2d at 299 finding no. 2), citing 2001 Plan A.1.a.i – iii; A.1.a.vii, A.2.a.vi, A.3.a.ii, A. 4.a.1., A.4.a.iv., A.4.a.v. i.).

reference current health problems and do not provide for appropriate interventions. (480 F.Supp.2d at 301.) Even when health needs were recognized, in a majority of cases reviewed, the Court found that class members did not receive prescribed interventions within the appropriate time frames or sometimes at all, including interventions recommended by primary care and specialty physicians. (*Id.,* at 302.) The Court found that MRDDA's own nurse managers had identified problems in the implementation of Health Plans in two thirds of the quarterly reviews performed in 2006, citing June 22, 2006 Court Monitor's Report at 5. (480 F. Supp. 2d at 290, 294, 298, 302.)

Subsequent to the Court's 2007 Opinion, on September 12, 2007, the Court approved a Consent Order in which defendants agreed to take certain steps to improve their protection of *Evans* class members' health and safety by a date certain. (Docket #938.) Unlike prior Orders, this Consent Order did not impose continuing obligations on defendants. Defendants agreed to assess the health needs of all *Evans* class members, to adopt a methodology to identify the subset of "at-risk" class members who have higher health risks due to medical, behavioral or other conditions and to evaluate the care of 25 such at-risk class members. Defendants agreed to determine whether the diagnosis, evaluations and treatment provided to these 25 class members was appropriate, timely and adhered to acceptable standards of practice and health plans were implemented appropriately. To ensure quality health care, defendants agreed to take necessary action to correct identified deficiencies in the care of these class members. (September 12, 2007 Consent Order, II, a.)[21] The exhibits admitted into evidence by the Special Masters for their consideration in determining compliance with the particular short-term obligations of the 2007 Consent Order are part of the larger record upon which the Special Masters make their recommendations herein regarding remedy.

---

[21] In addition, defendants agreed to support an existing "medical home model" for the provision of medical care and to establish a second physician extender medical home model to serve a significant number of *Evans* at risk class members. (II. c).

2. Defendants' Evidence

Defendants maintain that they have made progress toward compliance with their court-ordered health care obligations on several fronts.  First, the City Council created a cabinet level Department of Disability Services (DDS) with new authority of procurement, personnel, budget and management.[22]  (Heumann Decl. at 9; Defs.' Findings at 8.)

Second, defendants point to the appointment of new personnel to leadership and management positions in defendant agencies, including DDS, as well as reorganization of departments and the revision of policies governing reimbursement for contract services.  (Defs.' Findings at 1 – 32.  Heumann Decl. at 9)  they maintain that persons appointed to leadership positions, as well as subordinate management positions in the Department of Disability Services, Developmental Disability Administration and the Department of Health Care Finance[23] are qualified by education and experience to hold those positions.  (Defs.' Mem. At 6 - 17, Defs.' Findings at 1-32.)

Third, defendants maintain that interagency cooperation among agencies[24] regarding Medicaid covered health services, provider rates, and transportation gives defendants the ability to "speak in one voice" to providers and improve health services to class members.  (Defs.' Findings at 33 – 38, 105-112, 114, 116, 126.)[25]

_____

[22] The Department on Disability Services Establishment Act of 2006. D.C. CODE § 7-761.01.

[23] The Department of Health Care Finance ("DHCF") was established as a separate cabinet-level agency effective October 1, 2008, to assume the responsibility of the former Medical Assistance Administration in the Department of Health, as a single state agency for the administration of the District's Medicaid program. When referring to the actions of the Medicaid agency, this report cites "MAA/DHCF."

[24] (Defs.' Findings 42-67), Heumann Decl. at ¶ 10 and see discussion of interagency cooperation *infra* section IV.

[25] Heumann Decl. at ¶ 10. See discussion of interagency cooperation *infra* at section IV.

Finally, defendants also cite as evidence of progress, many planned initiatives that will re-view, assess, revise, track, support, request, develop, and recruit future health services for class members. (See e.g. Findings at 128 to 143.)  Specifically, these reforms aimed at future compliance include:

- Implementation of the "medical" home model of primary care service and identifying clinics willing to participate in the physician extender model. (Defs.' Findings at 160, 172.)

- Improved key health screening tests and immunizations.  (Defs.' Findings at 161, 163.)

- Addition of nurses, physical therapists, behavioral psychologist and speech and language pathologist to the DCHRP. (Defs.' Findings at 159.)

- Execution of the Health Care Agreement (HCA) between defendants and the United States Department of Justice representing Plaintiff Intervenors to promote primary care, provider education, coordination of waiver service, trend analysis of health service utilization by class members.[26]

- Establishment of Health Initiative Advisory Board to meet monthly. (Defs.' Findings at 167. Nuss Declaration at ¶ 38, Alexander Decl. at ¶ 16.)

- Establishment of Health Care Quality Enhancement Unit. (Defs.' Findings at 168, Dr. Jackson, Trial Tr. At 33; Dr. Jackson Decl. at ¶ 10 (i).)

- Transitioning 62 patients (presumably including some class members) to two primary care providers.  It is unclear why these patients were transitioned from their former sources of primary care. (Defs.' Findings 171.)

- Development of a crisis response team with expertise in developmental disabilities. (Defs.' Findings 173, (c.))

- Implementation plan for mortality review recommendations. (Defs. 'Findings 173, (g.))

- Assessment and development of strategies to increase access to dental health professionals. (Defs.' Findings 173, (d.))

3.  Plaintiffs' Evidence of Non-Compliance.

_____

[26] Heath Care Agreement, May 12, 2008 Docket # 976-2, Pls.' Ex. 9.

Plaintiffs contend that during the period between the closing of the record before the Court's determination of liability in 2007 and the closing of the record before the Special Masters in December 2008, defendants have continued their failure to comply with court orders. For example, they point to evidence in the record demonstrating that defendants failed to perform their agreed upon obligations under the September 12, 2007 Consent Order, (including their obligation to evaluate and implement health plans of the 25 at-risk class members) as evidence of current non-compliance. (Pls.' Mem. at 9. See Special Masters' Report.)

Furthermore, plaintiffs dispute defendants' claim that effective relationships have developed between DDA management and managers in MAA/DHCF, HRLA, and CMS, that have resulted in improved services to class members sufficient to satisfy defendants' obligations under court orders. (Defs.' Findings at 68; Pls.' Findings at 105-112.)  Plaintiffs view defendants' claims of progress as simply a plan for more unimplemented plans.  While these agency efforts and plans may eventually result in compliance, they have not done so to date.   Plaintiffs maintain that compliance means objectively verifiable, current, substantial performance of court-ordered obligations in fact. Thus, defendants' policies and plans are not, in and of themselves, evidence of defendants' compliance nor have they resulted in demonstrable improvements in the lives of class members.

This conclusion is confirmed, plaintiffs maintain, by defendants' own documents, including IMEU incident reports, Columbus Organization's mortality investigations, survey reports of the Health Regulatory Licensing Administration (HRLA), and the District's report on guardianships which support the Court Monitor's Reports, consistently documenting fundamental failures in the health systems serving class members. (Pls.' mem. at 10 (citing Monitor's Reports, Pls.' Ex. 125-130))

<u>4. Special Masters' Findings and Conclusions</u>

In making their determination of current non-compliance, the Special Masters, like the Court, have relied on the evidence provided in Court Monitor's Reports, the parties' exhibits admitted into evidence and Declarations of the parties' witnesses as well as expert and lay testimony given at trial in December 2008.[27]

The Court Monitor has repeatedly cited her concern about continuing substandard practice in critical areas of health care.[28] Thus, in her Report submitted January 1, 2008, the Court Monitor stated that "longstanding serious concerns about health care, addressed repeatedly to the Court are largely unabated."[29] In May, 2008, the Court Monitor reported that the health care provided to the majority of the 72 class members reviewed in the quarter (more than 10% of the class) failed to meet minimally acceptable standards and remain at very serious risk.[30]

During the time period from November 2006 to December 2008, defendants have failed to completely perform some or all of the following duties with regard to class members: documenting significant health problems in class members' health management plans; monitoring implementation of health plans; implementing recommendations put forward by class members' physicians and med-

---

[27]  *See e.g.* 480 F. Supp. 2d at 291.  The Court declared that "in the liability phase, plaintiffs would be required to show that there had been 'systematic, continuous, and serious non-compliance' with Court Orders." quoting her ruling made during the previous status conference.  (July 20, 2006 Hr's Tr. at 6-7, 9, 12.)

[28] *See also*, discussion of the Court Monitor's findings regarding healthcare in Section II "Reliance on Court Monitor's Reports" *supra* in section II; the section on guardianship *infra*. §section III. A. 3; and section on safety and protection from harm *infra* in §section III. B.

[29] Jan. 10, 2008 Monitor's Report at 5.

[30] May 8, 2008 Monitor's Report.

ical specialists and completing lab work and physician-ordered diagnostic tests.  (Jan. 26, 2007

Monitor's Report at 13-19; Sept. 10, 2008 Monitor's Report at 9.)

### (a) Identifying health problems

All *Evans* class members were assessed by the Supports Intensity Scale (SIS) in 2008. [31]  The

application of agreed upon criteria to the 2008 SIS assessments produced an up dated at-risk list of

237 Evans class members. (Defendants' Performance Report to the Special Masters, exhibit 7.)

The methodology did not identify 74 individuals on a previous at-risk list created in 2004.

The Court Monitor, reviewing a random sample of 64 class members, concluded that 13 (20%) of

them who had scores indicative of a high medical and/or behavioral support need, were not included

in the new at-risk list. (Feb. 4, 2008, Monitor's Report at 3.) [32]

In the first quarter of 2007, the Monitor's nurse consultants reviewed the health care provided

to seven class members with known concerns about their health. They found that five were experi-

encing or were at risk of poor health outcomes.

- J.B. had a dislocated left hip, severe gastro paresis and severe abdominal gas.  These
  conditions were not referenced and a protocol for a knee brace was not implemented.
- L.B had gained twenty-five pounds in ninety days because effective interventions were
  not implemented by staff.  Although L.B.'s kidney function was declining, at the time of

---

[31] The September 12th Order required defendants to adopt a methodology for identifying class mem-
bers with "high health risks." (Sec. 2 (a))  In accordance with the terms of that order, the parties
agreed upon the use of the Support Intensity Scale (SIS) assessment tool to determine the needs of
all *Evans* class members. (2007 Consent Order, §section 2 (a.))  Based on the results of the SIS as-
sessments, DDS submitted a revised "at-risk" list – based on agreed upon criteria—to replace the
one created four years earlier.  (Feb. 4, 2008 Monitor's Report at 1.)  High risks were class members
with 1) exceptional medical supports; 2) exceptional behavioral supports; and/or 3) persons in nurs-
ing homes, terminal diagnosis, Alzheimer's disease or over age 74. (Special Masters' Report at 41.)

[32] Although defendants had agreed to re-administer the SIS for those individuals identified on the
original at -risk list who were not included in the second list, the work had not been done and the
Court Monitor's concern about the accuracy of the at-risk list remained unresolved as of May 8,
2008.  (May 8, 2008 Monitor's Report at 20.)

the visit, decisions had been made to withhold treatment.  This decision was rescinded after L.B.'s attorney objected and sought court intervention.

- M.E. has a stage 3-4 ischial ulcer that was not healing, as the staff was fully aware.  As a result of cancelled appointments, she went for a month without treatment at the wound clinic.

- Michael H. has multiple health risks including pica (ingestion of non-edible substances). Pica was not addressed as a concern in his health plan despite his ingestion and recent surgical removal of twelve plastic bags.

- Matthew H.'s health plan did not reference his esophageal ulcers, hiatal hernia, Hepatitis C or blindness in his right eye.  There was no evidence that his speech-language therapist's recommendation for low tech communication device was implemented.

(Aug. 2, 2007 Monitor's Report at 16.)

### (b) Implementation of health plans

In September, 2008, based on a random sample of 11.3% of class members, the Monitor found  that over 40% lacked adequate health care plans, only 12% of health plan record reviews evidenced DDS monitoring; only half of all recommendations issued by primary care physicians or specialists were recorded as implemented; 30% of physician ordered lab work and tests/consults were not completed; over 50% of the class members reviewed did not receive timely implementation of their recommendations for clinical therapies.[33] In summary, the Court Monitor reported that the percentage of individual health care plans that did not reference current concerns or appropriate interventions were 61% in January (Jan. 10, 2008 Monitor's Report at 5), 51% in May (May 8, 2008 Monitor's Report at 6), and 45% in September 2008 Monitor's Report (Sept. 10, 2008 Monitor's Report at 8.)  Defendants did little better identifying health problems and implementing health plans for

---

[33]  Sept. 10, 2008 Monitor's Report at 3.

class members at serious risk than for class members needing lower levels of care. That is, defendants' performance of health-related tasks for the 65 at-risk and the not-at-risk class members was about the same. (Sept. 10, 2008 Monitor's Report at 17-18.) Together, only 60% of the combined at-risk and not-at-risk groups (i.e. the total of the class members sampled) received adequate care according to the Monitor's review. The Monitor stated "It is troubling that over 40% of the class members reviewed lacked adequate health care plans." (*Id.*, at 9.) For instance, the Court Monitor found that about 30% of both at-risk and not at-risk class members' records disclosed that lab work and physician ordered tests and consults were not completed, such as swallow tests, thyroid testing, echocardiogram, and lab tests for diabetes. (*Id.*, at 14.)

Fifty percent of class members health plans reviewed by the Court Monitor did not reference current and significant health problems; about 10 percent failed to identify major health problems; primary physicians and or medical consultants recommendations were not completed in a timely manner in more than 40 percent of the cases reviewed, and lab work and physician ordered diagnostic test and consults were not completed as ordered in 35 percent.[34]

Defendants' expert witness, Dr. David Jackson, confirmed the findings of the Court Monitor that the recommendations of physicians and medical consultants were not implemented in a timely manner. Dr. Jackson stated in his August 2007 Morality Review undertaken for the District of Columbia Department on Disabilities, "The most frequently encountered concern was related to concerns about aspects of medical care for consumers. This was most prominently noted in the recurrent examples of a lack of documentation on the follow through on recommendations made to the

---

[34] See also, May 2008 Court Monitor's Report, at 6-7 and defendants' data submitted in response to the Court Monitor's draft Quarterly Report dated April 24th, 2008, Department of Disability Services' Comments and Observations to *Evans* Court Monitor's Draft Quarterly Report, dated April 24, 2008. pp. 4-5 appended to May 2008 Court Monitor's Report at 26-28.

PCP (primary care physician) by consultants from other medical disciplines. There were nineteen (19) cases where this was a substantial issue. There were multiple cases where either a lack of response to recommendations or a substantial delay in the response contributed to some degree to the occurrence of negative clinical outcomes." (August 2007 Mortality Review Report of Dr. David Jackson at 5 appended to Declaration.)

### (c) Monitoring health plans

In over 50% class members' records reviewed by the Court Monitor, the nursing assessments were not comprehensive and did not address health risks (Sept. 10, 2008 Monitor's Report at 18.) [35]

A 2008 review by the Court Monitor's nurse consultants of health records of five class members indicate difficulty in obtaining, documenting and monitoring medical services for them.

- Court Monitor's nurse consultant's report re provider MH Inc. July 12, 2008 finding that MH failed to pass 23 of the 25 applicable criteria, stating that a class member's health problems, needs and risks were not appropriately or completely referenced and incorporated in his January 15, 2008 ISP and his direct care staff did not have basic knowledge of his health needs. (Court Monitor Consultant's Rpt., Pls.' Ex. 132 at 2.)

- Court Monitor's nurse consultant's report re a second provider agency, July 13, 2008 finding that the provider failed to pass 11 of 19 applicable criteria, primary care physicians' and medical consultants' recommendations were not acted upon in a timely manner, behavioral interventions were not referenced and that class member was not given proper care. (Court Monitor Consultant's Rpt., Pls.' Ex. 134 at 2-3.)

- Court Monitor's nurse consultant's report re a third provider, August 4, 2008 finding that the provider failed to pass 22 of 27 applicable criteria; failed to reference class member's high risk of aspiration, severe dental problems, or his vision and communication deficits; failed to administer medications in accordance with professional standards; and provider's nurse failed to monitor and report changes in his health status. (Court Monitor Consultant's Rpt., Pls.' Ex. 136.)

---

[35] *Id., at* 5.

- Court Monitor's nurse consultant's report re the second provider August 4, 2008 finding no evidence of DDS monitoring in class member's record and failure of agency nurses to accurately record their monitoring of the effectiveness of the interventions or effective monitoring of class members' clinical therapy goals or otherwise oversee health care interventions.   (Court Monitor Consultant's Rpt., Pls.' Ex. 137 at 2.)

- Court Monitor's nurse consultant's report re a fourth provider, August 1, 2008 finding a lack of records regarding DDS monitoring, monitoring of psychotropic medications for side effects, and incomplete record of annual continuation of psychotropic medications. (Court Monitor Consultants' Rpt., Pls.' Ex. 144 at 2.)

In sum, the Special Masters find that plaintiffs have established by clear and convincing evidence that, since the time the Court made its findings in March 30, 2007, defendants have continued to be in non-compliance with certain important requirements of outstanding consent orders intended to safeguard class members' interest in health.  The evidence in the record indicates that a significant portion of the plaintiff class have health care needs that are not identified in their health plans.  Furthermore, too often needs identified in health plans are not met because health plans are not implemented – i.e. diagnostic tests, consultations and treatments and follow up appointments are not provided or documented in their health records.

In light of the findings of fact set out above, the Masters find that plaintiffs have demonstrated by clear and convincing evidence that defendants continue to be in systemic non-compliance with important court orders intended to protect class members' health, including defendants' failure to identify class members' specific health care needs and to monitor implementation of their individual health plans.

**2. Mental and behavioral health care**.

<u>1. Relevant Court Orders</u>

The defendants have an obligation to provide adequate mental health care to *Evans* class members under the 1978 Final Judgment, the 1981 Consent Order, the 1983 Consent Order, the 1996 Remedial Order, and the 2007 short term Consent Order.

Mental disorders are often manifest in harmful and aggressive behaviors, such as biting, head banging, aggression, and the ingestion of objects, that can be addressed through a variety of therapeutic and socializing techniques. There can be no dispute that defendants' obligations to provide class members adequate medical treatment and health care encompasses class members' need for mental health and behavior health services. In his 1995 Findings of Fact and Conclusions of Law, Judge Harris found the District of Columbia was in violation of several longstanding consent orders regarding health care, finding that "Defendants admit that they also are required to provide adequate medical care, *psychological care*," day programming, and other support systems set forth in class members' IHPs. (Findings of Fact and Conclusions of Law, October 11, 1995, at 6, ¶ 19. [Emphasis added])

The Court's 2007 Opinion found that defendants had failed to comply with the Court's Orders prohibiting all acts of physical or *psychological neglect* of class members. These include the safe administration of medications, feeding protocols, and written habilitation plans, now known as Individual Support Plans (ISPs) meeting professional standards and reviewed annually. (480 F. Supp.2d at 289-290 [Emphasis added]) That obligation was also recognized in the 2007 Consent Order which required defendants to organize comprehensive case reviews including "a comprehen-

sive review of each class member's medical record, including the class member's prescribed psychotropic medications." (¶ 2 (b))

### 2. Defendants' Evidence.

Defendants report that they have retained a psychiatrist "to meet the needs of individuals who need a comprehensive psychiatric evaluation, consultation and on-going medication management has been completed." (DCHRP Report of October 2008, Attachment 2; Nuss Decl. at ¶ 40(a)) Ms. Nuss' Declaration also states that the Health Care initiative will include "assessment of behavioral health services available and recommendations for additional behavioral health initiatives to meet the needs of individuals supported by DDA. In addition, DDA will utilize the DCHRP's new behavioral psychologist to facilitate this review and supply subsequent recommendations" (Nuss Decl. at ¶ 40(b)) Defendants do not submit evidence that such assessments and recommendations have been made.

In addition, DDA has drafted a revised format for the ISP which will include more information about the rationale for the use of psychotropic medications. (May 2008 Court Monitor's Report at 20.)

### 3. Plaintiffs' Evidence of Non-Compliance.

As evidence of defendants' systemic failure to meet class members' need for mental health and behavioral health services since the closure of the record upon which the 2007 Opinion was based, plaintiffs submit the DCHRP December 30, 2007 Report which expressed concern that class members' needs for mental health services was not being identified or met with adequate mental health care. (Defendants' Compliance Report regarding the 2007 Consent Order, Defs.' Ex. 8.07:0086.) The DCHRP's final report included a summary of findings regarding systemic deficien-

cies and a list of recommendations.  The DCHRP found that the area in most need of intervention is mental health care.  (DCHRP  Report at 84.)

In addition, plaintiffs maintain that Intermediate Care Facilities  for the Mentally retarded ("ICFs/MR") in which approximately 40% *Evans* class members live were often cited in 2007 and 2008 by the Health Regulatory and Licensing Administration for deficiencies in their provision of habilitative and behavioral support services and failure to follow ISPs.  (Pls.' Findings at 77.)[36] Plaintiffs cite the failure of ICFs/MR to train staff in the implementation of residents' behavior support plans and to ensure residents have assigned one-to-one staffing. (Survey by D.C. Health Regulations Administration [hereafter "HRA Survey Report"] re Provider 09G037 at 8-11, 18-20, 22-27 Jun. 06, 2008, Pls.' Ex. 32; HRA Survey Report, re Provider 09G172, June 6, 2008, at 5-7. [Finding that the facility was not in compliance with the conditions of client protections], Pls.' Ex. 27; HRA Survey Report, re Provider 09G161 June 2, 2008, at 11-17, Pls.' Ex. 95.) Further, plaintiffs maintain that multiple HRLA citations were issued to ICF/MR providers for failure to obtain informed consent from residents or their guardians for use of restrictive measures and behavioral techniques, including psychotropic medications and behavioral support plans, and for failing to get approval from the facilities' Human Rights Committee for such restrictive measures. (*Id.* and  HRA Survey Report, re Provider 09G171 at 12, March 7, 2008, Pls.' Ex. 108 [finding lack of guardian consent to psychotropic medications prescribed for behavioral management and lack of involvement of Human Rights Committee];  HRA Survey Report, re Provider 09G159 at 5-6 [finding lack of evidence that facility had obtained  guardian's consent to psychotropic medication], Pls.' Ex. 109.)

4. Special Masters' Findings and Conclusions

---

[36] See also section on ISPs *infra*.

About one third of the class members (228) receive psychotropic medications. (May Sept. 10, 2008 Monitor's Report at 3.) Overall, 305 class members have behavior support plans. (*Id.,* at 20.) This aspect of healthcare is important to significant numbers of class members. The evidence indicates that there are ongoing and significant problems with the delivery of timely and appropriate mental health and behavioral healthcare. These problems include: a) lack of access to sufficient psychiatric and psychological services; b) improper professional practices that are inconsistent with professional standards; c) recommended clinical therapies not being implemented; d) the failure to integrate the use of psychotropic medications into an overall treatment plan; e) the failure to obtain informed consent and approval from Human Rights Committees for use of these restrictive measures; and f) the lack of monitoring of the usage and side effects of psychotropic medications.

In compliance with requirements of the short term 2007 Consent Order, ¶ 2, b, defendants' partner, DC Health Resources Partnership ("DCHRP"), reviewed the health care records of 25 at-risk class members in order to identify deficiencies in care, take corrective action and make systemic recommendations.  (September 2007 Consent Order at 3.)   On December 30, 2007, DCHRP completed its final report and included a summary of findings regarding systemic deficiencies and a list of recommendations. (Defendant's Compliance Report regarding the 2007 Consent Order, Defs.' Ex. 8.07:0086.) In its final Report, DCHRP  found that the area in most need of intervention is mental health care.  (DCHRP Rpt. at 84.)

### a) Lack of access to sufficient psychiatric and psychological services

The DCHRP Report found that class members did not have access to sufficient psychiatric and psychological services (*Id.)* Defendants' expert witness, Dr. David Jackson, who reviewed several aspects of health care provided to class members and others, concurred that there was a serious

lack of mental health services for class members but, understanding the need for inter agency coordination,[37] stated that it could not be corrected by DDS alone.  He stated that in his expert opinion:

> The shortage of mental health professionals willing to provide services to class members is again, in large part, an issue of the lack of mental health services in the inner city in the District (and in most other large urban centers), but is an issue that can be addressed and ameliorated with specific focus and effort.  However, it is unlikely that it can be solved by any set of actions within DDS/DDA itself.  (Jackson Decl., at 8, ¶ 10 (k))

### b) Improper professional practices that are inconsistent with professional standards

The DCHRP Report also found that assessment, differential diagnosis, treatment options and effective treatment plans were generally inadequate; that behavioral support plans needed to be improved; diagnosis often did not meet standard criteria and were not supported by clinical evidence; medication rationale was poor and in some cases, the individual did not have the psychiatric diagnosis for which medications were prescribed.  Further the DCHRP  found that in several cases, the communicative intent of behavior was not being assessed and in one case medication was discontinued because Medicare did not cover it. (DCHRP December 30, 2007 Report at 84-85.)

In 2008, the Court Monitor reviewed the cases of class members who had been determined to be at high risk for health problems in connection with the September 2007 Consent Order.  The Court Monitor reviewed five randomly selected at-risk class members whose medical care had been reviewed by the DCHRP and found that four of the five continued to raise concerns regarding their mental health care.  For instance, for SK, the psychiatric medications indicated  in his medical records failed to meet professional standards; for K.F., there continued to be a lack of comprehensive assessment of psychiatric needs and a lack of consistent and accurate documentation of targeted behaviors; PJ's health management plan remained incomplete and he was found to spend the majority of his time lying in bed, fully clothed, crying or sitting idly; while DW's psychotropic medication

---

[37] See section IV *infra* on interagency coordination.

monitoring had improved, his medications were still "not administered in accordance with professional standards of practice."  (Sept. 10, 2008 Monitor's Report at 23.)

For example, a Columbus death investigation report cited by the Court Monitor in her August 2007 Report recites the sad health history of a class member, J.N. who died after hospital treatment for vomiting, abdominal pain and constipation. Although the cause of death may have been the ingestion of a large piece of bone, the Report also raises concerns about J.N.'s psychiatric care. [38] Records available to Columbus indicated that there was no evidence that an annual psychiatric evaluation had been done to summarize care provided since 2001.  Even though there was reference to quarterly screenings for tardive dyskinesia (a serious side effect), formal assessments were not found and were not noted in monthly psychoactive drug review. Furthermore there was no documentation of discussion or rationale for decisions regarding psychotropic medications (some of which were prescribed simultaneously so reactions were difficult to distinguish). The potential for J.N.s psychoactive medications to impact negatively on his GI problems or increase his aspiration risk was not considered. (Aug. 2, 2007 Monitor's Report at 7.)

### c) Recommended clinical therapies not being implemented

In the first quarter of 2007, the Court Monitor reported that for the 67% of the class members reviewed whose ISPs were not completely implemented, some were attended by staff who were not instructed in how to implement individual behavior plans.  (Apr. 19, 2007 Monitor's Report at 18.)

Overall, 305 class members have behavior support plans. More than ten percent of class members with behavior support plans were not receiving implementation services. (Sept. 10, 2008

---

[38] There was no documentation that the attending physicians addressed the radiologist's concerns regarding the finding of the abdominal CT on 2/22/07 that a foreign body (possibly ingested bone) might be present in the decedent's GI tract.  Based on the autopsy findings, if this had been addressed, it might have resulted in the physician's decision to perform the surgery as scheduled on 2/26/07 and possibly prevented this death. Aug. 2, 2007 Monitor's Report at 7.

Monitor's Report at 5, 20.)   Again, in January 2008, the Court Monitor reviewed the records of 27 class member who had been relocated to Medicaid waiver supported housing. (Jan. 10, 2008 Monitor's Report.) Her review was intended to determine the extent to which their ISPs were current and implemented.  She found that about half (13) were not fully implemented, and they included the failure to design, update, implement and/or monitor the behavior support plans incorporated in the ISP. (*Id.,* at 8.) Nevertheless, of the sample of 59 class members whose records were reviewed as part of her on-going monitoring, she reported that the behavioral plans were followed in the case of 34 class members (88%) who had such plans. This was the high water mark in performance, as the next Monitor's report in May 2008 reported a 48% compliance rate. (May 8, 2008 Monitor's Report at 16.)

Finally, of 25 class members reviewed who had behavior plans designed to reduce or eliminate harmful behaviors (typically by promoting positive actions), 12 of the 14 not-at-risk cases were followed and 8 of the 11 at-risk cases were followed.  (Sept. 10, 2008 Monitor's Report at 20.)

### d) the failure to integrate the use of psychotropic medications into an overall treatment plan

In addition, the Court Monitor's September 2008 Quarterly Report noted her nurse consultants' review of Columbus Death Investigation  reports for 2006 and 2007 raised serious concerns about mental health care. (*Id.,* at 24.) For example, it was noted that one-third, (7 out of 21) of deaths investigated and reviewed "indicated a need to ensure that the provision of psychiatric care includes ruling out of organic causes of behavior, identification of intended effects of medication, the side effects of medication, objective  behavioral data, comprehensive psychological assessments and realistic expectations for medication reduction." (*Id.*) In many respects, these observations are similar to those made in the DCHRP review quoted above.

38

***e) the failure to obtain informed consent and approval from Human Rights Committees for use of these restrictive measures***

The use of psychotropic medication to control maladaptive behaviors needs to be closely monitored so that it is not used when less restrictive measures would suffice.  Guardians are to be informed and their consent to treatment obtained and each facility's Human Rights Committee is to review and approve medical and behavioral plans to use psychotropic medications. There is much evidence in the survey reports of HRA that ICFs/MR often fail to inform family or guardians of recommended use of psychotropic medication, obtain the informed consent of the guardian or obtain Human Right Committee approval of the use, as indicated in the provider survey reports cited by plaintiffs referred to above.

For instance, a woman in an ICF/MR who had been determined incapable of giving informed consent to treatment and had no guardian was given Clorazepam, Clonidine, Paroxitine and Abilify which the medication nurse said were being used to address the client's behaviors. The client's sister was also not notified, nor did the facility's Human Rights Committee review or approve her Behavior Support Plan. (HRA Survey Report, re Provider 09G159 at 5-6, 16.)

Similarly, psychotropic medication was used to address targeted behaviors of another ICF/MR client which included screaming, self-injurious behaviors, physical aggression, property destruction, disrobing and inappropriate touching. Although her mother was very involved in her daughter's care, there was no indication in the facility's records that the mother had consented to the use of psychotropic medications (500 mg. of Depokote every morning and 1000 mg every evening) and the corresponding Behavior Support Plan, nor was there evidence that the Human Rights Committee had been involved.  (HRA Survey Report, re Provider 09G171

March 7, 2008 at 4.)  In addition, the facility had failed to follow her psychiatrist's instruction to repeat Depakote laboratory studies which had indicated levels above normal limits. (*Id.,* at14.)

One ICF/MR resident whose father was involved in his care had been given psychotropic medications (including Chlorpromazine, Naltrezone Hydrochloride, Topamax without the father's knowledge or consent or that of any legal guardian.  His father was also not notified of his son's fall at a doctor's office which resulted in an injury or that the son had gone into an explosive behavior and attacked the HRA surveyor in the home. (HRA Survey Report, re Provider 09G161 June 2, 2008, at 14-15, 17.)  Nor were bruises on the resident's knees and shoulder reported as reportable incidents by the facility. (*Id.,* at 21.)

### f) the lack of monitoring of the usage and side effects of psychotropic medications

While the use of psychotropic medications may be clinically appropriate treatment for class members with mental health diagnoses, these medications also can have severe and permanent side effects which can be harmful. Therefore, it is standard professional practice to carefully monitor the use of such medications. Thus, one of the most serious areas of concern is defendants' failure to ensure competent and consistent monitoring of psychotropic drugs and their side effects—a failing noted by the DCHRP  in its report of December 30, 2007 and by the Court Monitor in her May 8, 2008 Quarterly Report.  (May 8, 2008 Monitor's Report at 2.)

More than half of the class members who receive psychotropic medications were not monitored competently or consistently for side effects.  (January 10, 2008 Monitor's Report, at 5.) The Court Monitor has been tracking the monitoring of psychotropic drug effects with samples of class members since 2005. Her monitoring of differing samples each quarter has consistently found significant problems with compliance.

For example, side effects were not competently and consistently reviewed for forty percent of the twenty-five class members reviewed. (Sept. 10, 2008 Monitor's Report at 3.) The May 2008 Court Monitor's Report also noted that the review of 83 class member records disclosed a decline from 38% to 17% in the portion of class members whose records evidenced competent and consistently monitored of psychotropic drug side effects. (May 8, 2008 Monitor's Report at 6.)

Defendants' data, as reported by the Court Monitor, also shows that more than 35% of the class members' records indicated that there was not competent and consistent monitoring of psychotropic drug side effects and that clinical therapies were implemented in less than 40% of the cases reviewed. (*Id.,* at 13, 14.)

The Court Monitor reported in September 2008 that 15 of the 25 randomly selected class members receiving psychotropic medications (about 60%) were not receiving competent and consistent monitoring of the side effects of their psychotropic medications. (Sept. 10, 2008 Monitor's Report at 16.)

Columbus investigation reports completed between March 2007 and July 2008 also raised nurse consultants' concerns that 40% of the individuals whose deaths were reviewed did not receive competent and consistent monitoring of psychotropic medication. (Sept. 10, 2008 Monitor's Report at 3.)

Based on these findings of fact, the Special Masters have determined that plaintiffs have proved by clear and convincing evidence that defendants continue to be in non-compliance with above-referenced outstanding court orders with regard to their obligation to provide adequate mental and behavioral health care. Defendants' substantial failure to provide access to sufficient mental health professionals; to monitor the administration of psychotropic medications; and to adequately monitor for side effects is unacceptable and not consistent with their court-ordered obligations in this

area. Although defendants have recognized these problems, the evidence demonstrates that to date their efforts have not cured the noncompliance found by the Court.

## 3. Guardianship.

### 1. Court-Ordered Obligations

The 1978 Final Judgment and existing court orders require defendants to provide class members with medical treatment and health care that is *timely*, particularly class members who have acute medical needs. (Final Judgment, §§ I. 1., II., 5, a. and III.14.j. Consent Order at 4-6 (June 25, 1981.))

In the March 30, 2007 Opinion, the Court noted that emergency and expedited guardianship decisions are critically important to the health and safety of class members, as the lack of an authorized decision-maker can and has delayed health care for class members in the past and contributed to a deterioration of their health condition and occasionally their death. (*Evans*, 480 F. Supp. 2d at 303.)

The Court found that "Delays in obtaining needed medical care for class members are also the result of defendants' failure to ensure that guardians are appointed for those class members who need them. Delayed medical care due to the lack of a legal guardian has been cited in Columbus mortality investigations for at least five class members in 2005 and 2006," citing class members' medical and investigation reports documenting delayed surgery, colonoscopy, medical procedures and treatment. 480 F. Supp.2d at 303.[39]

---

[39] *Evans v. Fenty*, 480 F. Supp. 2d at 303. The Court also noted:

> In addition, the FRC has repeatedly recommended that MRDDA "ensure that at a minimum, persons with complex medical issues, terminal illnesses and/or other significant medical

2. Defendants' Evidence

Defendants reported that they have taken several actions intended to facilitate the appoint-
ment of guardians to make medical decisions for class members in the future, including additional
legal staff to process guardianship petitions and to train hospitals and providers regarding the Health-
Care Decisions for Persons with Developmental Disabilities Act of 2007, citing the testimony of de-
fendants' expert Dr. Jackson. (Trial Tr. at 28, 36-37 (Dr. Jackson.) Defs.' Findings at 174, 175;
Alexander Decl. at ¶¶ 5, 16.)

After the Health–Care Decisions for Persons with Developmental Disabilities Act of 2007
was passed, defendants report that there have been over 20 sessions provided by Ms. Patel (an attor-
ney dealing with guardianship petitions) from the D.C. Hospital Association to individual hospital
and physician groups and to the service coordinator case manager groups delineating the changes

---

compromise have a legal guardian appointed," a process that should be reinforced in the ISP.
* * *

The Court Monitor found that, as of June 2006, there were twenty-eight class members
whose medical treatment was pending the appointment of a guardian. (June 22, 2006 Moni-
tor's Report at 19.) Defendants admit that, as of September 2006, requests for guardians
remained pending in nineteen of the fifty-three cases in which MRDDA has requested guar-
dians since November 2005. (Defs.' Findings at 12-13; Defs.' Ex. 43.) In virtually all of those
cases, guardians were requested for medical reasons. (*Id.*). Yet, in a number of cases, guard-
ian requests were not sent to the Office of the Attorney General ("OAG") until months after
the case manager was notified of the need for a guardian. (*See Id.* (showing delays of at least
three-and as many as nine and a half-months between the date the case manager was notified
and the date the request was sent to OAG in sixteen cases); *see also* Pls.' Ex. 54 at 19 (al-
though need for guardian was "obvious" in July 2001, guardian was not appointed until
January 2005); Pls.' Ex. 107 (OMB form no. 0938-0391 noting provider plans of correction
and failure to seek guardian for class member determined to be incompetent to make inde-
pendent and informed decisions); Pls.' Ex. 108 at 10 (OMB form no. 0938-0391 noting
guardian never appointed for class member who died in 2004, notwithstanding that guardian-
ship had been explored a decade earlier.)

that have been made to increase the understanding of how emergency situations must be handled. (Trial Tr. at 36-37 (Dr. Jackson.); Defs.' Findings at 177.)

Further, defendants assert that there are new end-of-life policies, including re-categorizing all *Evans* class members as at risk or less risk for purposes of determining if guardianship issues will be present. (Trial Tr. at 27 (Dr. Jackson.); Defs.' Findings at 178.) Defendants did not submit evidence that this re-categorization has occurred.

### 3. Plaintiffs' Evidence of Non-Compliance.

Plaintiffs maintain that to date there has been little change in the unacceptable length of time between the identification of the need for a limited or medical guardian and the appointment of such a guardian. (Pls.' Post-Trial Brief Regarding Remedies (Pls.' Mem. at 10). Plaintiffs note that the Court Monitor's Report for January 2007 stated that between 43 and 267 days elapsed from the time the need for a guardian was identified to when case managers submitted necessary documents to the Office of the Attorney General. (Jan. 26, 2007 Monitor's Report at 24-25, citing defendants' Report to the Council on Securing Surrogate Decision Makers for Persons Living with Disabilities through the Department on Disability Services, January 17, 2007), Pls.' Findings 33.)

The Monitor's May 2008 Report noted that "There continue to be significant periods of time between the notification to the case manager that a guardian is needed and the time that the documentation is submitted to the Office of the Attorney General." (May 8, 2008 Monitor's Report at 28; Pls.' Findings at 35.) One class member waited 354 days from the start of the guardianship process until the actual appointment of a limited guardian. (May 8, 2008 Monitor's Report at 28.)

In addition to the evidence contained in Court Monitor's Reports, the incident management reports for individual class members that indicate medical procedures recommended by physicians

were delayed for lack of a medical guardian.  (Reports of Court Monitor's Nurse Consultants re JM

(Pls.' Ex. 138 at 1); *Id.*  Re WH [Pls.' Ex. 139 at 2], Apr. 19, 2007 Monitor's Report at 17.)

Finally, plaintiffs cite defendants' expert witness, Dr. David L. Jackson, MD, PhD, in the at-

tachment to his expert report stating "problems noted in the process to obtain consent for needed

medical interventions" was the basis for recommendations in 10 of the 35 case reports he reviewed

for defendants.  (Defs.' Ex. at 2, Attachment to Exp. Rpt, Jackson & Associates, Inc., DDS Mortality

Reviews: Case Reviews and Trend Analysis, Aug. 27, 2007, at 11, 15.)  In his Declaration, Dr. Jack-

son, President of Jackson & Associates, Inc. (J&A) stated that as further expressed in his Expert

Report, "J&A did describe "the simultaneous failure of both DDS system for securing the appoint-

ment of a legal guardian through the Probate Court process and the Emergency Consent process that

is available at acute care hospitals and most other health care facilities.  These four consumers did

not receive the services they needed in an appropriately timely fashion." (Jackson Decl. 10, (c) p. 6.)


### 4. Special Masters' Findings and Conclusions.

The delays in obtaining guardianship for the provision of informed consent for medical and

dental treatment of class members, as noted in the Court's March 30, 2007 opinion, have continued

in the compliance period as well, notwithstanding the initiatives described by the defendants in their

proposed findings of fact (Defs.' Findings at 174-75).

The Court's findings based on the pre-November 2006 record and the Court Monitor's 2007

findings are further supported by defendants' expert witness Dr. David Jackson, who stated in his

August 2007 report to DDS that "The issue of the lack of the appointment of a legal guardian, either

as a single issue or in combination with a delay in physicians utilizing the emergency consent proc-

ess was seen in 11 Case Reports.  In most of these cases (10) there was an issue with some

important, but not life threatening issue." Further, Dr. Jackson stated, "in four (4) cases the combination of a simultaneous failure of both the legal guardian appointment process and the emergency consent process was associated with significant delays in the consumer receiving necessary services and may have contributed to some degree in at least the timing of the death of the consumer." (District of Columbia Department on Disability Services Mortality Review: Case Reviews and Trend Analysis by Jackson & Associates, Inc, August 27, 2007, at 5.)

The time-limited, September 12, 2007 Consent Order addressed the need of class members for guardians to make medical treatment decisions. Based on evidence of compliance submitted by defendants, the Special Masters found that defendants had made a considerable, good faith effort to address the need of providers and DDS personnel to learn about when and how to petition for guardians for medical decision-making, although defendants were unable to document, as ordered, the attendance at training sessions. (Special Masters' Report at 89.) We also found that these defendants had failed to demonstrate compliance with their obligation for timely applications for guardianships pursuant to that order (*Id.*)

Delays in treatment can have significant consequences for class members. For example, as described in an investigation report substantiating a case of reported neglect (IMEU # 08-0388, Pls.' Ex. 166), a 57-year-old male class member was to have an MRI of his head with a contrast dye after a hospitalization in August 2007. As of March 2008, the MRI had not been done. Follow-up with the provider on April 28, 2008 indicated MRI still not done because there was no guardian to give consent. The MRI was not done during the prior August 2007 hospitalization because the hospital had ongoing difficulty obtaining consent for use of the dye. The class member was discharged home with an order to continue to pursue legal channels to obtain guardianship. A petition for guardianship dated April 21, 2008 is in the file. The case manager was aware of the need to have a

46

guardian appointed. Provider nurses made appointments for the MRI but had to cancel the appointments due to guardianship problems.        There were other similar problems with providing treatment due to consent issues for this class member.        According to the investigation file, an attempt to have a hernia operation in October 2006 was denied due to lack of consent. A year later, on October 31, 2007, he had hernia repair surgery under emergency guardianship, presumably because his medical condition had changed sufficiently to warrant being treated as an emergency.  The investigation report documents that the guardianship problems began as early as August 2006.  The provider made several attempts to obtain a guardian but paperwork was lost at least twice in the Attorney General's office. It took from August 2006 to June 12, 2008 for full guardianship to be granted.

In a case cited by the Court Monitor (Apr. 19, 2007 Monitor's Report at 17), the Monitor writes "during an unannounced site visit in February 2007, one class member (J.D.) was reported by staff to be vomiting daily. Her physician recommended an EGD/colonoscopy in May 2006. Her guardianship has been pending since May 18, 2006. It took 287 days for her packet of information to reach the office of the Attorney General. Her hearing date is April 19, 2007." (There is no further information in the record of when the guardianship application was acted upon or the outcome regarding JD's health care.)

Delays in the provision of medical treatment continued to be documented in investigation reports by the Columbus Organization into deaths of class members. The Court Monitor's report of January 10, 2008 (Jan. 10, 2008 Monitor's Report) cited the case of class member LF for whom the Medical Examiner gave a cause of death as "seizure disorder of undetermined etiology." The Monitor quotes the Columbus report:

> In March 2006, the decedent had changes in his cardiac status and his long-term cardiologist recommended a cardiac catheterization with possible stent replacement. However, there was

47

a delay of almost three months between the recommendation and appointment of a guardian who could give consent for the procedures. A limited medical guardian was subsequently appointed on June 28, 2006 but the decedent suffered an event on July 3, 2006 that led to cardiac arrest and eventual anoxic encephalopathy and he died approximately 7 weeks later. While it cannot be said that the decedent would have survived if the cardiac catheterization have been done when first recommended, timeliness of care was an issue. (*Id.,* at 11.)

In another case involving class member MC, the autopsy report of July 17, 2007 lists the cause of death as atherosclerotic cardiovascular disease. The Columbus report states:

> Although the decedent's cause of death remains unclear, it appeared from review of the available records that this individual's death was preventable based on the concerns identified related to the decedent's healthcare and the timeliness of care in the last year of his life. The almost nine month delay in completing a colonoscopy is of prime concern especially when considered in relation to the decedent's identified risk for colon cancer and his persistent anemia and significant weight loss starting in early 2007. As noted, the decedent's weight-loss that eventually resulted in significant nutritional compromise as well as his persistent anemia was not adequately addressed and monitored by the medical and nursing staff.
> There appeared to be a lack of urgency and advocacy regarding treatment once the colon cancer was diagnosed and the surgery scheduled almost 2 months later. (*Id.,* at 12.)

The Monitor's May 2008 Report noted that DDS had reported that there were eight individuals awaiting guardianship decision whose requests may have been delayed by difficulty in obtaining medical and psychological affidavits, searches for family members or poor transfers of caseloads between service coordinators. (May 8, 2008 Court Monitor's Report at 28.)  The time lapses between the identification of need and the submission of documentation to the Office of Attorney General ranged from 3 days to 273 days for these eight individuals. Further time typically elapses after the OAG receives the request and files a petition and between the time the petition is filed and the time the Superior Court acts on the petition.  (*Id.,* at 28.)

According to the data reported by defendants, from April 1, 2008 through August 10, 2008, it took an average of 153.5 days from the date the need for a guardian was identified by service coordinators (formerly called case managers) for 24 individuals until their respective information packets were submitted to the Office of the Attorney General (Department on Disability Services, Listing of

Requests for Guardianships, April1, 2008 through August 10, 2008, Requests for Guardianship, Pls.'

Ex. 188.)  Ten of the 24 waited more than 200 days for their packet to be submitted. Of these, 16

waited more than 60 days for the OAG to file their petition with the Superior Court, District of Co-

lumbia.[40]  The longest interval between notification of the service coordinator and submission to the

OAG was reported to be 292 days, with an additional interval of 118 days between the submission to

the OAG and the Superior Court hearing date, for a total of 410 days, or more than a year. (Requests

for Guardianship, Pls.' Ex. 188 at 1-2.)

The Court Monitor noted in her September 10, 2008 Quarterly Report that the lack of guardi-

anship was a contributing factor to inadequate care in at least two cases reviewed during the quarter.

In one case, the individual did not have a guardian to consent to deep conscious sedation for a dental

procedure, which was delayed until a family could be found who would agree to give medical con-

sent. In the other case, the individual had no guardian to provide consent for a needed colonoscopy

and the procedure was delayed while the provider agency attempted to complete the psychological

affidavit and assessment needed for the appointment of a guardian.  (Sept. 10, 2008 Monitor's Re-

port at 17.)

The Special Masters conclude that defendants are in continuing non-compliance with their

obligation under the 1978 Final Judgment and existing court orders to provide class members with

medical treatment and health care that is *timely*, particularly for class members who have acute med-

ical needs.  (Final Judgment, §§ I. 1., II., 5, a. and III.14.j; Consent Order at 4-6 (June 25, 1981.))

The Court, the Court Monitor and the defendants themselves have documented that the lack

of needed guardians delays treatment and results in harmful consequences for class members as de-

---

[40] Seventeen were requested for limited guardians and 6 were requests for limited medical guardians.
Only one temporary medical guardian was requested in the period and defendants state that the
packet was submitted to the OAG within 3 business days (4 consecutive days.).)

scribed above.  It cannot be said that defendants are in compliance with the 1978 Order requirements when guardians needed to make medical and health care decisions cannot be obtained for months, sometimes more than a year, after the need for a guardian is first identified—as indicated by the clear and convincing evidence cited here.

## B. Safety and protection from harm

### 1. Relevant Court Orders

The Court's March 30, 2007 opinion summarizes the prior court orders and legal obligations of the defendants with respect to protecting class members from harm. (480 F. Supp. 2d at 305-308.) These obligations require conducting timely and thorough investigations into serious incidents, including deaths; identifying causes and contributory factors as well as preventive and corrective actions that appear to be warranted; and ensuring the implementation of recommendations that are made as a result of the investigations. In addition to responding to individual cases, the defendants are required to identify systemic patterns and trends and communicate them to providers to facilitate corrective action for recurrent problems on an individual consumer level, provider level and a systemic level. (*Id.*)  Defendants must ensure that appropriate training programs for all staff, including staff assigned to residential settings are developed and implemented (*Id.,* at 306 – 307.)

The Court noted that there were widespread problems of abuse and neglect of class members among providers in the system, and that many serious reportable incidents, including deaths were not investigated in a timely manner (*Id.,* at 309.); that there were recurring problems with the quality and thoroughness of the investigations conducted; and that the defendants did not consistently ensure that appropriate preventive and corrective actions that were identified in the course of investigations were implemented. (*Id.,* at 310-312.) The Court also found that the defendants had failed to ensure the

provision of adequate training in incident reporting, and failed to take appropriate corrective actions when providers did not comply with performance expectations. (*Id.,* at 313-314.) The record on which the Court made its findings and conclusions closed in November 2006.

### 2. Defendants' Evidence

The testimony and evidence submitted by the defendants identify several actions that have been taken, are in process or are planned to address the problems identified by the Court. (*See*, Defs.' Findings 146, 151, 154 and 155.) This evidence addresses administrative actions to strengthen capabilities and capacities in the defendants' system to perform the required incident reporting, investigation, follow-up and enforcement functions. These actions include hiring additional investigators for the IMEU (Nuss Supp. Decl., at ¶ 3; Trial Tr. 355:23-25) providing additional support staff for the Mortality Review Committee (Defs.' Findings at 146), development of processes for tracking the implementation of recommendations (Nuss Decl. ¶¶ 28, 29) and examples of referrals of some licensed professionals to regulatory bodies for disciplinary actions (*Id.*). In addition, the expert testimony of Dr. David Jackson states that, from the limited data available, the mortality rate experienced by the MR/DD population in the District of Columbia for the years 2005-2006 is "normative" and consistent with the rates seen in at least two other large jurisdictions. (Jackson Decl. at ¶ 10 (a)) Dr. Jackson also testified that in 36 of the 40 cases he reviewed involving Columbus investigations into deaths that occurred in 2005 and 2006, that he did not find any direct effect on the consumers' deaths that had been created by an act of omission or commission by DDS staff or a direct failure of any DDS system. (*Id.,* at ¶ 10 (c)) In Dr. Jackson's opinion, the mortality review process in the District for individuals with developmental disabilities meets all six of the criteria outlined by the General Accounting Office for mortality reviews. (*Id.,* at ¶ 10 (n); Defs.' Findings at 147.)

### 3. Plaintiffs' Evidence of Non-Compliance

Despite these actions and plans, plaintiffs contend that many of the problems cited by the Court persisted in the period following the Court's opinion as evidenced by findings contained in the Court Monitor's reports (Pls.' Findings at 44, 47-51), IMEU investigation reports (*Id.,* at 52), Columbus death investigation reports (*Id.,* at 41-44) and the Special Master' Report. (*Id.,* at 46.) Further evidence of harm to class members is found in survey reports issued by the Health Regulation and Licensing Administration ("HRLA") (*Id.,* at 53-56.) and in the mishandling of the District's transportation contract with MTM which went into effect in October 2007. (*Id.,* at 57-63.)

4. Special Masters' Findings and Conclusions

*(a) Timely investigations*

In the Court Monitor's report of August 2, 2007 (Aug. 2, 2007 Monitor's Report), eight overdue investigations of serious reportable incidents and 18 outstanding death investigations were cited. (*Id.,* at 2.)  In a subset of 75 IMEU reports reviewed, 37 were not submitted in a timely manner by providers as required by DDS policy. (51.7% timely, *Id.,* at 21.) In the next report on January 10, 2008, DDS reported that it had completed 49 of the 78 investigations due this quarter. (62.8%, Jan. 10, 2008 Monitor's Report at 3-4.) Death investigations had not been completed for 11 class members who died in 2007 and for two who died in November 2006. In the following report on May 8, 2008, 33 of the 57 investigation reports that were due were received (57.89%, May 8, 2008 Monitor's Report at 23), but almost half (15) were late. Moreover, of the 123 investigation reports overdue from the previous quarter, 86 had been received (69.9%) with 37 still outstanding. Another 17 reports were still due from fiscal year 2007. Finally, the Court Monitor's report of September 10, 2008 reports that as of August 12, 2008, there were 179 investigations due but not yet completed, 80

of which pertained to class members. (Sept. 10, 2008 Monitor's Report at 5.) [41] Forty eight percent of the investigation reports were timely. In summary, the problem of a significant number of untimely investigations has continued and remained uncorrected.

### (b) Quality of investigations

Investigations into reported incidents are required to establish the immediate facts of the incident as well as to inquire into the circumstances leading to the incident and into the causes and contributing factors. A full understanding of the circumstances is necessary in order to identify preventive and corrective actions which may reduce the likelihood of recurrence of similar incidents to the particular consumer, at the particular provider site or more systemically.

The investigation reports generally follow a consistent structure in reporting the investigative steps, findings, conclusions and recommendations. The Court Monitor's report filed on September 10, 2008 reviewed 27 investigations against a check list of indicators and found that 26 of the 27 investigations contained evidence to support the conclusion; 23 of the 27 investigations clearly stated critical questions directly related to the incident; 21 of 27 included interviews with the reporter of the incident; 16 of the 27 investigations included interviews with the victim; and 12 of 15 applicable investigations included interviews with the alleged perpetrator (Sept. 10, 2008 Monitor's Report at 30.) On the other

---

[41] The Court has previously addressed the relevance of data pertaining to non-class members as follows:

> As the Court Monitor has recognized, "[t]he lack of timely investigation into the serious reportable incidents filed regarding non-class members erodes the protection from harm for class members," who share the same residences and have the same staff as non-class members, as "the failure to rectify the problem affecting one person in a residence exposes other people in the house to the same risk." (internal citation omitted)

480 F. Supp. 2d at 310 n. 35.

hand, the Monitor also reported that no investigators reviewed previous incidents or investigations for
the site, one investigator reviewed previous investigations and previous incidents for the class member,
nine provider investigations were not completed, and 6 of 16 applicable investigations reviewed the
perpetrator's background. (*Id.*)

    As is evident from these statistics of one small sample, although there are improvements in
some areas, some IMEU reports continue to fail to thoroughly investigate serious reportable incidents
and to protect class members from harm.[42] For example, a 56-year-old male class member was struck
in the eye by another consumer while having dinner in a restaurant, reportedly resulting in his eye
socket and nose being broken. (IMEU, Investigatory Report 08-0467, Pls.' Ex. 164 at 2.)  The assailant
had a behavior support plan for aggressive behavior, unpredictable explosive behaviors and risk of
safety in the home and community, requiring one to one staff. The investigation report recommends
substantiation for Serious Physical Injury. However, the investigation report does not inquire into
whether the assailant had the required one to one staff support at the time of the assault, and if not,
why. (IMEU, Investigatory Report 08-0467, Pls.' Ex. 164.)

    In other cases, the defendants have managed the investigative workload by closing some of the
cases administratively without conducting an investigation or a site visit. In such cases, while the
immediate facts of the incident may be apparent, there may not be an adequate inquiry into the cir-
cumstances leading to the incident or into the causes and contributing factors. For example, in June 3,
2008, a 61-year-old female class member with profound mental retardation had an emergency inpa-
tient hospitalization for treatment of decubitus ulcers and recurrent urinary tract infections. She was
sent to the emergency room after spiking a temperature. She was treated at the hospital and dis-
charged on June 11, 2008 to a second hospital for wound care treatment and remained there until

---

[42] The Court Monitor's report states that the interim Director, Kathy Sawyer, acknowledges that there
were problems with the quality of investigations (Apr. 19, 2007 Monitor's Report at 21.)

June 24, 2008. The incident was substantiated as an Emergency Inpatient Hospitalization and administratively closed, although noting that the provider's "internal investigative report was not adequately prepared" and did not assess the cause of the elevated temperature or relay the hospital's course of action. (IMEU, Investigatory Report 08-0473, Pls.' Ex. 168.) With the administrative closure, there was no inquiry into the adequacy of care by the provider that resulted in the apparent infection of her wound or the recurrent urinary tract infections, or whether any corrective action was needed at the provider site.

In January 2007, the Court Monitor reported that DDS was "administratively closing" 83 cases involving emergency inpatient hospitalization, 911 calls, serious physical injury, neglect and a missing person. (Jan. 26, 2007 Monitor's Report at 10.)

> The decision not to investigate fully meant that the class member's health care was not reviewed carefully; that a class member's reasons for running away or having a behavioral outburst were not examined and addressed by DDS; that measures were not taken to prevent similar incidents; and that the possible risk to other residents was not investigated.

*Id.,* at 2.

However, by the time of her report on September 10, 2008, the number of administrative closures had declined to four cases involving emergency inpatient hospitalizations and site visits were conducted in 24 of the 27 investigations reviewed as reported above.

### (c) Identification of preventive and corrective actions

Section 2 (g) of the Consent Order of September 12, 2007 (docket #938), responding to a concern raised in the March 30, 2007 decision, provided that:

> *Defendants shall amend the format for IMEU investigation reports to add a section requiring the investigator to identify factors potentially causing or contributing to the occurrence of*

*the incident investigated, and formulating recommendations for prevention or correction of any identified problems.*

The defendants amended the report format, but interpreted the order as limited to the form for Level 1 incidents, which include death, allegations of abuse, neglect, theft and personal injury, but exclude 911 calls or emergency inpatient hospitalization (as in the case cited above), serious medication errors, improper use of restraints, suicide attempts or threats, or incidents requiring services of law enforcement or emergency personnel (Special Masters' Report at 93-94). In the report, the Special Masters stated, "The purpose of this task was to improve the health and safety of class members by using the occasion of a serious incident as an opportunity to identify measures for prevention and correction, and to make recommendations to prevent a recurrence" (*Id.,* at 95.) The effect of defendants' action was that serious incident investigations "continue to miss opportunities to identify preventive and corrective action to prevent the recurrence of the incidents" (*Id.,* at 108.) We concluded that the defendants' unilateral action to limit the application of the amended form to a small subset of IMEU investigation reports is not responsive to and inconsistent with the requirements of the Consent Order. Subsequent to the issuance of the Special Master's Report, the defendants have continued to limit the use of the amended form to Level I incidents. For the remaining incidents, such as the one described above, the investigation report format does not inquire about potential causes and contributory factors leading to the incident under investigation.

In the context of widespread problems with the new transportation broker system implemented in the District in October 2007,[43] on December 11, 2007, the Director of the Medicaid Fraud Control Unit in the Office of the Inspector General sent an e-mail to senior officials in MAA, DDA and DOH stating:

---

[43] Discussed *infra* in section III. B (g) (iii).

I have opened at least 10 transportation investigations in the past month. We continue to re-view and open investigations into incident reports related to transportation providers leaving MR clients unattended and transportation providers not complying with safety practices such as using seatbelts, "registered" vehicles, and wheelchair tiedowns. We just opened another case yesterday because someone was left on the porch of an empty group home on 12/7. Is there something preventative that we can do to educate the providers? Is there something DDS or OIG or MAA can do? (Nuss Email, EVN 01835-36, Pls.' Ex. at 82.)

On December 18, 2007, she followed up "I've heard nothing from anyone on this e-mail. I'm opening another case with a transportation company and unsafe conduct." (*Id.*) There is no evidence of a response.

### (d) Identifying and addressing systemic issues arising in investigations

This area has long been a weakness in the defendants' system, with little usable data pro-duced (480 F. Supp. 2d at 311-312.) Defendants have stated that the DDA Mortality Review Committee has created a trend tracking system and that the District's MR/DD Fatality Review Committee has created an outcome tracking system operated by the City Administrator's office (Nuss decl. at ¶¶ 28, 29.) The defendants have also stated that the Incident Review Committee com-posed of representatives from the Office of Case Management, the Office of Program Integrity and the Incident Management Enforcement Unit (IMEU) tracks and monitors each alert and related is-sues identified for a waiver participants.[44] Data are entered into the DDS Management Consumer Information System for tracking and remediation. (Defs.' Findings at 155.)

The Court Monitor reported in April 2007 that there is evidence that the DDS Office of Pro-gram Integrity has begun tracking and trending of some incidents (Apr. 19, 2007 Monitor's Report at 22.) The Court Monitor's September 10, 2008 report notes that DDA has begun to restructure the

---

[44] As described, this effort does not affect class members in the ICF/MR program who constitute approximately 40% of the class.

IMEU and has hired a new director and continues to receive technical assistance from Labor Relations Alternatives. The Monitor's report states:

> Trending and tracking of incident data has long been needed. A recently issued quarterly report from DDA's Quality Management Division summarizes the agency's analysis of investigation outcomes. Of particular note is the identification of individuals with the most substantiated serious reportable incidents. Continued refinement of this data will be helpful in a number of key activities, including monitoring. (Sept. 10, 2008 Monitor's Report at 30.)

The Report of Defendant's expert witness, Dr. Jackson, also sheds light on the limits of trending and tracking at the present time. His report of July 14, 2008 stated "the lack of trending and tracking of issues and the overall clinical insights are essentially as I found in my review of earlier mortality Case Reports [covering 2005-2006] (Jackson Report, July 14, 2008 at 7.) Thus, there seems to be some modest progress towards developing a capacity for identifying and addressing recurrent systemic issues arising out of the investigative process. However, to date, substantial evidence of the actual functioning of such a system has not been submitted. The types of recurrent problems that seem apparent even in a cursory review of the sample of investigation reports—failure to report incidents, late reports of incidents, inadequate or nonexistent provider investigations into incidents—seem not to have been identified except as individual cases to be corrected rather than as a more systemic problem affecting the obligation to perform timely investigations.

In another critical component of the defendants' system, the head of the Health Regulations and Licensing Agency, which is responsible for licensing and enforcement with respect to ICFs/MR which serve approximately 40% of the class, testified that HRLA issues the same citations "with some regularity" (Dep. of Patricia W. VanBuren, Pls.' Ex. 199 at 246:13-247:6.) Despite the seriousness of the problems cited, such as the lack of informed consent for psychotropic medications, lack of active treatment, and staff working without criminal background checks, HRLA does not track or trend these incidents. The head of HRLA testified that the agency does not have a mechanism to collect

or analyze aggregate data, and as a result, assesses compliance on a house-by-house basis (*Id.*)

### (e) Implementation of recommendations

While the implementation of recommendations emanating from investigations has been a chronic problem in the defendants' system, as cited by the Court in its opinion (480 F. Supp. 2d at 307, 311-313),[45] the Court Monitor's recent report of September 10, 2008 which reviewed 31 investigations concluded that all of recommendations were implemented in 83% of the applicable reports (Sept. 10, 2008 Monitor's Report at 29-30.) Although this is one small sample, it suggests that the tracking systems described by the defendants seem to be on a path to improving performance in this area. Earlier, the September 12, 2007 Consent Order also required the defendants to implement specific recommendations from five Columbus Mortality Investigations (Consent Order, September 12, 2007 at ¶ 2 (h)). The Special Masters found that the defendants had substantially complied with this provision of the Consent Order (Special Masters' Report at 97-106).

### (f) Enforcement actions against providers

In the March 30, 2007 opinion, the Court cited evidence that the defendants failed to take appropriate corrective actions when providers do not comply with performance expectations (480 F. Supp. 2d at 313.) As noted above, the DDA Director, Laura Nuss, testified that the Fatality Review Committee has enhanced and implemented a more stringent procedure for corrective actions against providers and also makes referrals to the appropriate regulatory boards for medical and clinical pro-

---

[45] "[D]efendants do not consistently ensure that appropriate preventive and corrective actions are implemented based on fatality and serious incident investigations. * * * Defendants have also failed to implement recommendations for preventive and corrective action by the FRC. The FRC's 2004 Annual Report, issued in April 2005, reflects that 41% of the Committee's recommendations had not been implemented as of that date."

*Evans v. Fenty*, 480 F. Supp. 2d at 312-13.

fessionals, citing referrals that have been made for a review of a physician, a psychiatrist, a nurse and a physical therapist to date. *(*Nuss Declaration *¶ 28.*) Despite this evidence of some progress, there continue to be numerous instances of providers filing late incident reports or no reports at all,[46] conducting inadequate investigations,[47] or failing to conduct required investigations[48] with no recommendations for or evidence of enforcement actions being taken in response to these deficiencies.

### (g) Harm to class members

Incidents of harm to class members, including serious physical injury, physical abuse and neglect continue to occur as evidenced in the IMEU investigation reports and other documents discussed below. Not all such cases are preventable, and the fact that they are being reported and investigated is a healthy sign. Nevertheless, the recurrent failure of providers to adequately protect class members from harm is a continuing concern. For example, on May 22, 2008, the Court Moni-

---

[46] CMI, Case 08-0263, Pls.' Ex. 153 at 9 (noting that RCM failed to file an incident report as required by DDS policy); IMEU, Request for Administrative Closure, 08-0308, Pls.' Ex. 161 at 2 (noting a failure to report the incident within the 24 hour required time period); IMEU, Investigatory Report 08-0467, Pls.' Ex. 164; IMEU, Administrative Closure 08-0318, Pls.' Ex. 165; IMEU, Administrative Closure 08-0452, Pls.' Ex. 167 (finding a failure to report the incident within the 24 hour required time period); IMEU, Investigatory Report 08-0473, Pls.' Ex. 168; IMEU, Administrative Closure 08-0404, Pls.' Ex. 170 (finding that the report was submitted five days after the required submission date); and IMEU, Investigative Report Summ. 08-0146, Pls.' Ex. 176 (finding that the report was not submitted till around three weeks after the incident occurred.) *See also* the discussion regarding transportation problems and the failure to file incident reports, *infra* in section (g) (iii); Defendants' Annual Report on Home and Community Based Waiver Services for November 2006-November 2007. This report developed by the DDS Medicaid Waiver Unit to assess providers' compliance with required program standards and submitted by MAA/DHCF to the federal Centers for Medicaid and Medicare Services reports that 66% of incidents are reported according to policy and procedure (Pls.' Ex. 47 at 5.)

[47] *Id*; IMEU, Investigative Report Summ. 08-0134, Pls.' Ex. 177 at 6 (reviewing the provider's internal investigation report and finding that the report was brief and incomplete with failures to reflect the full investigative process and comply with proper DDS/IMEU formatting).

[48] 9 of 27 cases reviewed by the Court Monitor were found to have failed to conduct the required investigations. (Sept. 10, 2008 Monitor's Report at 30.)

tor discovered that a residential provider had failed to follow hospital discharge instructions for pneumonia, dehydration and dysphagia for a 60-year-old female class member. The case was substantiated as neglect, and a staff person terminated (IMEU, Investigative Report 08-0449, Pls.' Ex. 175 at 7.) In another case, on November 23, 2007, a Guardian advocate for a 50-year-old female class member discovered from reviewing records that an ear infection had gone untreated for several days, allowing a swelling to spread to the right side of her face, affecting the right eye. The class member was eventually taken to the emergency room for treatment. The case was substantiated as neglect (IMEU, Investigative Report Summ. 08-0146, Pls.' Ex. 176.)

*i) Delays in treatment due to problems with getting informed consent*[49]

Another case of neglect was reported by the Court Monitor on April 28, 2008 and later substantiated (IMEU, Investigative Report 08-0388, Pls.' Ex. 166 at 10) and is discussed above in the section on guardianship, as are other case examples illustrating the ongoing harm to class members as a result of delays in obtaining informed consent for treatment. Notably, none of these three cases was reported by provider staff.

*ii) Inadequate Health Care management*[50]

Class members also suffered harm due to inadequate health care management. Two cases illustrate this ongoing problem, which has been cited consistently by the Court Monitor in her periodic reports. The first case, which also illustrates problems with the reporting and investigation process, involved a 59-year-old man with a primary diagnosis of severe mental retardation. (CMI, Case 08-0263, Pls.' Ex. 153) On January 11, 2008, he fell, reportedly while getting out of a van. He was seen in the emergency room for an evaluation. He was discharged the same day with the diagnosis of

---

[49] *See also* the section III. A (3) *supra* of this report discussing guardianship issues.

[50] *See also*, section III. A. (1) *supra* on health care.

thigh pain. No x-ray was done at the ER apparently because the class member was resistant. He continued to complain of pain and refused to walk, requiring the use of a wheelchair. On January 28, 2008, his primary care physician ordered him to be seen in the ER for a Doppler test. He had a seizure in the ambulance. His discharge was planned for February 1, 2008 but due to his complaints of leg pain, a right hip x-ray was done that day revealing a fracture of the right proximal femur. Surgery was done on February 2, 2008. On February 19, he was noted to be lethargic with a low-grade temperature and a sepsis workup was initiated. On February 23, 2008 his temperature spiked to 102°, he was hypotensive and had tachycardia and died later that day. There was no autopsy. The cause of death was complications following blunt impact injury and surgical repair of right hip.  The facility did not file an incident report after the fall, or the hospitalization, although required to under DDA policies, and the case manager found out about those events on January 31, 2008.

The case was assigned to Columbus for a mortality investigation. The investigation reports states: "Per Mark Back, Acting General Counsel, a site visit was not conducted." (*Id.,* at 1.) This turned out to be an unfortunate decision as telephone interviews conducted by the Columbus staff revealed varying descriptions by the staff interviewed of how the fall occurred. The class member also had previous falls, the last occurring when he refused to get out of the wheelchair when he was going to the bathroom. The numerous deficiencies identified by Columbus included:

- despite the decedent's ongoing complaints of leg pain, his refusal to walk, and refusal to have his leg touched and examined, there was no evidence of any further workup to determine the cause of these complaints after his fall 1/11/08. Although there was a false assumption made that the decedent was x-rayed in the ER, it would appear that these ongoing complaints should have triggered further studies (*Id., at* 9-10.)

- There was a problem identified with the timeliness of a physical therapy evaluation and follow-up of recommendations. The physical therapist recommended on 10/9/07 standby assistance in the community and rear leg gliders for the walker. The therapist noted a concern with the decedent's inability to ambulate safely. It did not appear that the training was provided to the staff on standby assistance or that the rear leg gliders for the rolling walker were purchased (*Id.*)

- The decedent's pain management did not appear consistent or effective (*Id.*)

- A complete assessment of the efficacy of medical treatment and the impact of the fracture of the right hip prior to or contributing to the death by the reviewer is limited due to the limited autopsy (*Id.*)

In the second case, a 62-year-old woman, with mild mental retardation died on December 14, 2007. (CMI, Case 08-0149, Pls.' Ex. 154.) The cause of death was listed as "complications of volvulus of sigmoid colon, operated" (*Id.,* at 2.) The Columbus Mortality Investigation report again noted numerous deficiencies, including the absence of records of monitoring bowel movements for this class member who had suffered constipation, a finding similar to one frequently made by the Court Monitor (*Id.,* at 14.) Furthermore, there was no evidence that the decedent ever had the colonoscopy recommended by a G.I. specialist in 2006 (*Id.,* at 13.) There was no clearly documented rationale for psychoactive medication polypharmacy. The psychiatrist never discussed the potential and actual psychoactive medication adverse effects. The class member was taking Cogentin, which has a significant adverse effect of worsening constipation. The 2007 AIMS (Abnormal Involuntary Movement Scale) evaluation showed that she had significant adverse effects from the medications. (*Id.*) There was little evidence that the clinical team adequately addressed the decedent's weight loss. The overall conclusion was: "although the decedent received appropriate specialty evaluation and

follow-up and acute problems were generally addressed in a timely manner, it did not appear that the

decedent's overall health care management was well coordinated by the clinical team" (*Id.,* at 14.)


### iii) Transportation and the Safety of Class Members

Class members have been harmed and continue to be harmed as a result of the

District's transportation broker contract with MTM. Since the contract went into effect in October

2007, problems developed almost immediately. On the first day, October 19, 2007, an e-mail from

the DDS Service Planning Program Administrator to MTM, which was also copied to senior offi-

cials in DDS, MAA and DOH stated:

> While we expected to face some glitches in the transition, unfortunately we are faced
> with a crisis. Approximately half of the people served by the Developmental Disabilities
> Administration in the District of Columbia, who are relying on MTM services today,
> were not picked up for work, day program, senior program, medical appointments, or
> other activities. . . . We have attempted to contact the local MTM office all day thus far,
> but have been unable to reach anyone (Macia Email, EVN 00262, Pls.' Ex. 57.)

On October 23, 2007, the same official relayed a complaint that class member DW was

picked up on Monday morning, and dropped off at the wrong location of the church, and no one

knew where he was. At 6:00 PM, his residential provider called the police to file a missing persons

report. He did not arrive home until 4:30 the following morning. "This gentleman is able to tell

someone his name, but not where he lives or who to call for help. . . .People are facing some signifi-

cant safety risks" (Maruca Email, EVN 00366, Pls.' Ex. 58, emphasis in original) The DDS Director

reported to the City Council that the numbers of complaints were so great that DDS was unable to

track them. However, by October 24, 2007, a standardized daily log of complaints was established to

track the issues and send them to MTM. They were averaging 26 complaints per day. (Huemann

Email, EVN-A 14815, Pls.' Ex. 81 at 2.)

By the end of the month, the MAA Director was assuring the Chairman of the City Council that "aggressive steps being taken should resolve these problems within the next few days" (Letter from Robert Maruca, Senior Deputy Director, MAA, to Honorable Vincent Gray, Oct. 31, 2007 Pls.' Ex. 56.) However, the problems for class members continued. On November 5, 2007, the President and CEO of New Visions Photography, an innovative photography program for persons with disabilities wrote to the head of DDS and MAA, and other officials, that "At least five individuals with New Visions [DDA consumers] had lost their jobs due to no call, no show by MTM. Other jobs are in jeopardy" (Sawyer Email, EVN 00942, Pls.' Ex. 59.) On December 11, 2007, the Director of the District's Medicaid Fraud Control Unit wrote to the head of MAA and the DDA Director:

> I have opened at least 10 transportation investigations in the past month. We continue to review and open investigations into incident reports related to transportation providers leaving MR clients unattended and transportation providers not complying with safety practices such as using seatbelts, "registered" vehicles, and wheelchair tiedowns. We just opened another case yesterday because someone was left on the porch of an empty group home on 12/7. Is there something preventative that we can do to educate the providers? Is there something DDS or OIG or MAA can do?" (Nuss Email, EVN 01835-36, Pls.' Ex. 82.)

On December 18, 2007, she followed up "I've heard nothing from anyone on this e-mail. I'm opening another case with a transportation company and unsafe conduct." (*Id.*) The problems continued. On February 25, 2008, the program coordinator of NCC Adult Day Services complained to MTM and DDA that class member JS was left alone at his volunteer site again that morning and that had occurred at least six times. They had filed numerous complaints about this issue. "JS requires 24-hour staff supervision for safety and he cannot be left unattended in a public place like this" (Leshchiner Email, EVN 02078. Pls.' Ex. 66 at 2.)[51]

---

[51] The correspondence in this exhibit also suggests that incident reports are not being filed about these problems but are noted in a complaint log.

Despite the on-going communication between DDA and MAA regarding the transportation problems, and four months after the head of MAA has assured the Chairman of the City Council that these problems should be resolved "within the next few days," the DDA Director wrote to the MAA Director on February 27, 2008 to express continued concern about the transportation services provided by MTM. She communicated her concern that systemic problems continue: vehicles have been witnessed to have more passengers than available seats; vehicles are repeatedly without aides to assist passengers when the driver is providing door-to-door services, leaving vulnerable adults alone in the vehicle; transportation vendors consistently failed to pickup and drop-off individuals in a timely manner, causing tremendous difficulty in meeting medical appointments and successful employment and day activities; MTM refuses to coordinate transportation for medical appointments that are made with less than three days' notice, citing lack of urgent need; some families and DDS providers have given up relying on MTM or transportation due to the many problems, and are providing transportation themselves, without reimbursement (Letter from Laura Nuss, Deputy Director of DDA, to Robert Maruca, Senior Deputy Director of MAA, Feb. 27, 2008 Pls.' Ex. 55.) She noted that the resolutions had proved temporary and inconsistent, and the issues outlined above are systemic and repeated—"so much so, in fact, that families, case managers, and our contracted providers admit that they no longer complain about the concerns due to the lack of responsiveness" (*Id.*)

The transportation problems continued as illustrated by an incident report on August 5, 2008 when a class member was picked up at the Library of Congress at 9:35 PM. However, the MTM driver asked her to get off the van because he could not transport her. She was left unattended for 3 1/2 hours outside the Library of Congress until 12:30 AM when she was picked up by a supervisor from her provider agency and transported home. In her trial testimony, DDS Director Judith Heu-

mann acknowledged that "[The] services that were being provided were not appropriate services. [I]ndividuals were being placed at risk." (Heumann, Tr. 456:12-14.)

Tom Wilds, the President of a long time provider agency in the District, testified that during the month of September 2008, the transportation provider failed to pick up St. John's residents 29 times, picked up or dropped off residents late 21 times, and once dropped off a resident without any staff to receive him/her. (Wilds Decl., Pls.' Ex. 19 at ¶ 23.) One resident returned home hours after she was due to take her medication due to a late pick-up by the transportation provider. (*Id.*) Defendants' witness, Amy Brooks, the president of another provider agency, testified that transportation continues to be a challenge for everyone in the District and that her agency still had lingering issues (Trial Tr. at 192:9-10.) They chose to provide transportation themselves "as opposed to people being stuck in their homes." (*Id.,* at 192:22-24.)

In summary, while there are some nascent signs of progress in a few areas, as described above, there is clear and convincing evidence that the problems being experienced by class members in the area of safety and protection from harm are continuing, serious and systemic.

## C. Welfare

### 1.      Least Restrictive/Most integrated Alternatives

#### 1. Relevant Court Orders.

Entitlement to adequate habilitation in settings least restrictive of their individual liberty is the core of the plaintiffs' constitutional rights was first announced in the 1978 Consent Order and Final Order and Judgment requiring defendants to provide all class members with community-based day programs and services "as are necessary to provide them minimally adequate habilitation…in the least separate, most integrated and least restrictive community settings." (459 F. Supp. at 484 (cited

in the Court's March 30, 2007 Opinion. 480 F. Supp. 2d 280, 314 [D.D.C. 2006]). Defendants were obligated under subsequent court orders to establish criteria and procedures for the placement of class members in nursing homes and to provide five hours of daily programming and recreational programs. (*Evans*, Order at 10-11 [Feb. 8, 1983].)

In its 2007 Opinion, the Court found that defendants had admitted that class members are not placed in the least restrictive settings. (480 F. Supp. 2d at 314), citing defendants' failure to move 46 class members identified as in immediate need of placement in less restrictive more integrated settings. (480 F. Supp. 2d at 315 n.41.) Day programs, too, were often found to be over crowded, providing low levels of substantive activities of interest to their clients. (*Id.,* at 316.) The District's failure at that time to revise its Medicaid waiver program made these deficiencies difficult to redress. (*Id.*)

### 2. Defendants' Evidence

To the extent that defendants propose findings of fact based on the Declaration of Kathy Sawyer, the findings cannot be entertained because defendants withdrew the Declaration at trial.[52] (Trial. Tr. at 582.) The Special Masters permitted plaintiffs to submit deposition excerpts from Ms Sawyer's deposition and permitted defendants to file a response consisting of deposition excerpts and portions of Sawyer's Declaration to round out the picture. (*Id;* Special Masters' Order February 2, 2009, Docket # 1075.) Defendants have not based their proposed findings of fact on the deposition excerpts.

   ***Residential settings****.*

---

[52] Kathy E. Sawyer was Interim Administrator of the Mental Retardation and Developmental Disabilities Administration from June 19, 2006 to January 2007 and as Interim Director of then newly created District of Columbia Department on Disability Services (DDS) until June 1, 2007. Thereafter, Ms Sawyer was Evans Compliance Officer until September 30, 2008.

The new HCBS waiver, approved by CMS on November 9, 2007, provides services and supports that are more flexible to meet the individual needs of class members. (McCarthy Decl. at ¶ 8; Huemann Decl. at ¶ 180.) Defendants believe the new waiver has contributed to the expansion of new waiver providers. (Nuss Trial Tr. at 354:11-20.) Defendants maintain that they are now able to offer individuals a full array of service options and choice of qualified providers from among the well over 50 residential and vocational providers now enrolled in the HCBS waiver. (Nuss Decl. at 110-11, ¶¶ 20-21.) Defendants contend that there has been a movement of class members out of larger ICFs/MR to less restrictive settings for habilitation and care. Defendants maintain that the new HCBS Waiver, approved in November 2007, provides 24 services that are more flexible to meet the individual needs of class members and will permit the placement of class members in less restrictive more integrated residences. (Nuss. Decl. at 9-13, McCarthy Decl. at ¶ 8.) These new waiver services include such residential based services as in-home supports, host-homes (27 providers), supported living services (47 providers) and live-in caregivers. (Nuss Decl. at 13, ¶ 26.) The Deputy Director of DDA, Laura Nuss reports that 250 people have moved to less restrictive settings. (Nuss, Tr. at 354:17-18. See 480 F. Supp. 2d at 315 n. 43.)

*Day programs.*

In addition to expending integrated living alternatives, defendants report that when CMS approved the District's request for a renewal of its HCBS waiver in November 2007, it permitted the District to move ahead with the re-design of the service system, offering new services packages and a restructuring of the management system. (Nuss Decl. at 18, ¶ 17.) The District now has 29 day program providers and 30 supported employment providers (Laura Nuss, Trial Tr. 354:11-12.)

3. Plaintiffs' evidence of non-compliance.

69

*Residential settings*.  The plaintiffs contend that class members are placed in inappropriate, unsafe non-integrated residential settings where they are not provided essential support services. (Pls.' Findings at 72.) Defendants continue to place class members in inappropriate settings, such as neighborhoods frequented by drug dealers with trash strewn streets and high crime rates, plaintiffs assert. Others were placed in residences with accessibility barriers in need of repair. (*Id.*)  As evidence of these practices, plaintiffs cite the Court Monitor's Reports of April 2007, (Apr. 19, 2007 Monitor's Report); May 2008, (May 8, 2008 Monitor's Report); and September 2008, (Sept. 10, 2008 Monitor's Report), discussed below.

*Day programs.* Plaintiffs maintain that too many class members spend their days in large, over-crowded facilities offering activities that differ little from the kinds of unproductive arts and crafts offered 30 years ago when this suit began. Plaintiffs contend that these Day programs do not provide individualized services. (Nuss Tr. 280:1-11; citing data from a survey of the entire *Evans* class and the September 2008 Court Monitor's Report.) Although progress has been made in expanding Medicaid waiver services for *Evans*  class members, a little over 250 class members (approximately 40% of the class) reside in ICFs/MR as of December 2008 (Nuss, Tr. at 275:18-21) and thus are not eligible to receive waiver funded services.

4. Special Masters' Findings and Conclusions

- *Residential placements*.

The District provides residential and day programs for *Evans* class members through private facilities that are reimbursed by Medicaid and District appropriations. At the present time, there are 70 residential providers serving DDA clients,  27 host home contract agencies, an entirely new residential service (an increase from 22  reported in the Nuss Decl., Nuss, Tr. 354:17-18.) Well over 50 residential and vocational service providers are now enrolled in the HCBS waiver. Of these, the new

residential service model Host Homes, now has 22 providers enrolled to offer this service option and 47 providers are enrolled to offer Supported Living services. (Nuss Decl. at 13, ¶ 26.)

Programs are paid on the condition that they meet certain Medicaid requirements regarding safety and the quality of care they provide.[53] For example, these "conditions of participation" establish the minimum health, safety and quality requirements that Intermediate Care Facilities for People with Mental Retardation (ICFs/MR) providers must meet. These include requirements concerning the facility's governing body, client protections, facility staffing, facility environment, and services provided. These conditions become part of the contract between the District and the facility.

The District obtained CMS approval of its "home and community based services" (HCBS) waiver in November 2007 in order to expand its ability to pay for services to *Evans* class members in less restrictive community settings. (Nuss Decl. at ¶ 17.) In addition to approving a newly expanded array of waiver services, CMS approved in July 2008, a $37 million "Money Follows the Person Grant" over five years to permit DDA to assist class members who wish to move into a home or apartment of their choice and secure the services they need to live in their community.[54] (Nuss Decl. at 8, ¶ 17; Heumann Decl. ¶ 19; Thaler Rpt. at 9.)

In some cases, the transition of class members from ICFs/MR to smaller, more integrated, less restrictive residences has not been smooth. The Court Monitor found in her September 2008 report that since her last report the transition of class members from one residential provider to another had been problematic. In an investigation of one residential provider who discontinued services to 25 class members the Court Monitor found that the homes were not in good repair, records were

---

[53]   42 C.F.R. §§ 483.400 – 483.480.

[54]  The duration of this grant is inconsistently reported as either three years (Nuss Decl. Oct. 8, 2008, Para. 34) or five years (Thaler Expert Rpt. at 9.)

missing or unorganized or were not up-dated, the majority of Individual Service Plans (ISPs) are not implemented or followed, health care management plans are not incorporated in ISPs and nine class members lacked their adaptive equipment such as wheel chairs. (September 10, 2008 Court Monitor's Report at 27.) More than half were not provided regular opportunities for community integration. (*Id.*) [55] More than two thirds of the class members' ISPs were not fully implemented in their residential settings. (*Id.*)

While there is some evidence of problems of the types cited above in some of the ICFs/MR as documented in the report of the Court Monitor and HRLA, some of which are addressed in the sections of this report dealing with healthcare, and ISPs, this evidence is not primarily about less restrictive environments. The unchallenged testimony of defendants' witness, Laura Nuss, is that there have been 250 placements into less restrictive environments. Defendants have moved a significant number of class members to apartments and group homes. The evidence during the liability phase of this action was that 55% of class members resided in ICFs/MR (366 of 659 class members, 480 F. Supp 2d at 315 n.43.) That number is down to a little over 250 class members (approximately 40% of the class), and defendants reasonably expect to accelerate that movement with the further development of the community-based waiver and the Money Follows The Person Grant, which is expected to further reduce the utilization of ICFs/MR by 60% (Nuss Trial Tr. 275:18-21). Based on these findings of fact, the Special Masters find that plaintiffs have not sustained their burden of proving by clear and convincing evidence non-compliance with court orders requiring residential placements in less restrictive settings.

In objecting to this finding and conclusion of the Special Masters, plaintiffs argue that "too many class members continue to live in ICF-MR institutional settings, contrary to the compliance

that should have been expected by now." (Plaintiffs' Response to Special Masters' Draft Report and Recommendation Regarding a Remedy for Defendants' Noncompliance with Court Orders, pp. 3-4, 12-15 [hereinafter "Plaintiffs Exceptions"]) The record is undisputed that approximately 40% of the class resides in ICF/MR settings. However, there was no evidence submitted to establish that continued placement of all or some subset of these class members in such settings was improper or contrary to a choice made by the class member or an authorized surrogate decision-maker. Most of the evidence cited by the plaintiffs regarding the least restrictive environment for residential care deals with conditions within both ICF/MR and waiver homes, and the implementation of ISPs, issues which have been addressed in other sections of this Report.

- ***Day programs.***

In September 2008 the Court Monitor reported the results of a survey of all class members (the 70  in a random sample and the remaining 551) to determine how they spend their days, the intensity of services provided, the nature of the activities and the extent to which day services are integrated into the community. (September 10, 2008 Court Monitor's Report at 26.)  The majority of the class members surveyed by the Court Monitor received less than twenty hours per week of services and the average length of time in a day program was 7.9 years. Sixty percent of the sample was given no choice in how to spend their time and 40 percent wanted to work.  Day center staff reported that that 60% of the individuals attending were not receiving needed day or vocational services.  (*Id.,* at 26.)

Only 16% of the class members were participating in day programs that were integrated in the community.  Eighty-four percent were engaged in arts and craft activities in segregated day programs – an outmoded form of therapy.  Only half the class enrolled in day programs have opportunities to engage in community experiences – field trips, entertainment, shopping etc. (*Id.*)

Defendants admit that at present day programs for most class members are primarily provided in large, crowded congregate care settings that are not individualized. (Nuss, Trial Tr. 280:1-11.) Relatively few class members have the opportunity to engage in supported employment in the community.

Based on these findings of fact, the Special Masters conclude that there is clear and convincing evidence in the record that defendants have not met their obligation, under the court orders, to provide adequate habilitation in non-residential, least restrictive, community-integrated settings.

## 2. Individual Service Plans (ISPs.)[56]

### 1. Relevant Court orders.

As noted by the Court, the 1978 Final Judgment requires defendants to provide each class member with an Individual Service Plan (ISP) based on an individualized assessment of needs and including a written individualized habilitation program formulated in accordance with professional standards. (*Evans,* 459 F. Supp. at 484-85; 480 F. Supp. 2d at 319.)[57] ISPs must identify all services and supports required by class members regardless of availability and must be reviewed at least annually. (*Evans,* 459 F. Supp. at 485, 480 F. Supp. 2d at 319.)  Priority in the implementation of ISPs must be given to class members identified as assaultive, self-injurious, self-abusive, mentally ill, or having acute medical needs or identified needs for physical rehabilitation services. (*Evans,* Consent

---

[56] ISPs are the means by which class members' constitutional right to habilitative care and treatment in the least restrictive setting is implemented. The ISP serves as the single document that integrates all supports a person may receive irrespective of where the person resides.  The ISP includes measurable goals and objectives for meeting the person's preferences, choices, and desired outcomes and also addresses the provision of safe, secure, and dependable supports that are necessary for the person's [well-being], independence, and social inclusion. 480 F. Supp.2d at 320.

[57] *See also Evans,* Consent Order at 3-4 (June 25, 1981.)

Order at 6 (June 25, 1981.)) The existing court orders also require that individualized adaptive equipment be provided to class members who need such equipment, and that all class members be evaluated to assess their needs for such equipment. (*Evans,* 459 F. Supp. at 489.)

First, these orders require that ISPs *identify* class members' service, support, and protection needs, on a timely basis, regardless of availability. They must be *modified* as needs and circumstances change, and they be *implemented* promptly. (480 F. Supp. 2d at 299; 2001 plan § III, B. 2 and 3.) The defendants must also develop procedures and time frames for assessing class members' needs for the acquisition or repair of adaptive equipment and provide such equipment to class members within sixty days from the date the need is determined, or as soon as possible if such equipment or repair services are not readily available due to special needs.[58] (480 F. Supp. 2d at 299.)

The Court noted that the Court Monitor had consistently found ISPs to be current for about 90% of the class members whose ISPs were reviewed in her quarterly reports from September 2002 to September 2006. (*Id.,* at 320.) However, it held that defendants' failure to fully implement ISPs as written deprived class member of the habilitative care and treatment to which they are entitled under the 1978 Consent Decree and subsequent court orders. (*Id.)* The Court found that the failure to provide essential services identified in ISPs, such as clinical assessments and health-related procedures—supported the conclusion that defendants were in serious, continuous and systemic non-compliance with their obligations in this regard. (*Id.*)

2. Defendants' Evidence

---

[58] As noted by the Court, the agreed-upon measure of defendants' compliance with the foregoing Court Orders includes whether class members receive the services and supports identified in ISPs on a timely basis; whether ISPs provide for individualized adaptive equipment, as needed; whether class members' needs for adaptive equipment are assessed within thirty days of a request; and whether adaptive equipment is provided or repaired within sixty days from the date the need is determined. (Id. 2001 Plan at ¶ A. 1.d.iii.) 480 F. Supp.2d 280, 319-320.

In the past, ISPs for DDA clients, including *Evans* class members, were not written by MRDDA case managers/service coordinators. Instead, ISPs were written by private contractors whose performance was of varying quality. (Thaler Expert Rpt at 4.) According to Thaler, this has meant that need assessments and planning for each person was conducted by people who did not know that person and who did not see the person again after the planning was completed. (*Id.*)

Under the Fenty administration's reform plan, service coordinators will write ISPs for class members who are served by the waiver. (Nuss Trial Tr. 277:8-22.) This reform will extend to residents of ICFs/MR. (Id., at 278:7-13) The format of ISPs has been revised to provide more health information, including information about the rationale for and use of psychotropic medications and other health care information. (May 8, 2008 Court Monitor's Report at 20.)

3. Plaintiffs' Evidence of Non-Compliance.

Plaintiffs claim that class members' ISPs are not implemented or followed and that Health Care Management Plans (health plans) are not incorporated into the ISPs. (September 10, 2008 Monitor's Report at 27.)[59] Until service coordinators take over writing ISPs for class members not served by the HCBS waiver, Qualified Mental Retardation Professionals (QMRPs) employed by the ICF/MR providers, will continue the longstanding practice of writing ISPs for the subset of class members who live in ICFs/MR. (Nuss Trial Tr. 327:3-328:3.) They also claim that adaptive equipment indicated in ISPs is not ordered as recommended by clinical professionals or is not used. (Court Monitor's Consultant Review of PJ, Pls.' Ex. 132 at 3, *Id.* Review of RM, Pls.' Ex. 150.)

4. Special Masters' Findings and Conclusions.

---

[59] Plaintiffs also cite the case of class member AP, whose records were reviewed by the Court Monitor's nurse consultant who noted that "her health plan was not incorporated in her ISP, although there health risks such as hypertension, osteoporosis, and diabetes were diagnosed. Nevertheless, the nurse consultant concluded "There were no major problems with implementation of the HCMP". Review of Marj, Pls.' Ex. 142 at 1.

Starting in January 2007, the Court Monitor has reported the extent to which ISPs have been implemented for the class members surveyed during the quarter. For the quarter ending in December 2006 (only a month and a half after the closing of the Court's record in November), the Court Monitor found that ISPs were not implemented fully for 47 (62%) of the 76 clients reviewed. (January 26, 2007 Monitor's Report at 22.)  The Court Monitor's Report found that 62 of the 76 clients reviewed needed adaptive equipment. (*Id.,* at 4.) Almost 20% of those reviewed did not have the adaptive equipment they needed.  (*Id.*) The missing adaptive equipment included transfer slings, hearing aids, wheelchair head support, knee brace, hand comes, eyeglasses, wrist weights, hemi-walker, wheelchair accessible home/transportation and communication devices.  (*Id.,* at 22.)

During the first quarter of 2007, the Monitor reviewed the records of 79 class members and found that about one third of the ISPs available in the record were not current at the residential setting or the day program. (April 19, 2007 Monitor's Report at 5.  ("Thirty-one percent of the ISPs available in the record are *not current* at residential settings and twenty-nine percent were not current at the day program."))   In addition, she found that "The ISP was not fully implemented as written for sixty-seven percent of the class members in their residential settings." (Id.)   During the same quarter, the Court Monitor's office reviewed the implementation of ISPs for 36 randomly selected class members. The Court Monitor reported that:

- The ISP, as written, was observed to be fully implemented, in the residential setting, for eleven class members (31 %.)  The ISP was not implemented in the residential setting for twenty-four (67%) of the class members reviewed.  For example, medical follow-up was lacking, active treatment interventions were not implemented as written, nutritional guidelines were not followed, community recreational experiences were not provided, appropriate instruction was not provided to staff in the implementation of a behavioral support plan.

- The ISP, as written, was implemented fully at the day program for twenty-three (74%) class members.  It was not implemented fully for eight (26%) of the class members. (Five class members are either employed or perform volunteer work outside of the day program; they were not observed.)  The failure to implement the ISP primarily revolves

77

around the lack of active treatment interventions and the lack of programmatic review to
ensure that interventions are effective and/or properly implemented by staff.
(April 19, 2007 Monitor's Report at 18.)

The next quarter, of fifty class members visited who were scheduled for residential transition,
seven had received fewer than eight required case management visits and five lacked ISPs in their
residences, while one lacked adaptive equipment as reported.  (August 2, 2007 Monitor's Report at
4.)

By the time of her January 2008 Report, the Court Monitor found that case management vis-
its to class members had increased but implementation of their ISPs had not.  She found that there
was a current ISP in 19 of the 27 residential records reviewed that quarter. (January 10, 2008 Court
Monitor's Report at 8.)  However, although all had received the required eight case manager visits
that year, only six of the 27 class members had ISPs that were fully implemented as written.  (*Id.*)
The supports and activities not implemented included speech and language services; behavior sup-
port plans, physical therapy, and weekly community outings.  Seventeen of the 27 class members
needed adaptive equipment –13 were receiving it.  (*Id.*)    Twelve of the 33 class members, all of
whom had substantial disabilities, were reviewed concerning their placement in supported employ-
ment settings. (*Id.,* at 9.)   All were receiving at least the minimum wage but most did not work the
expected twenty hours per week and many were not placed in settings in which there was an oppor-
tunity to integrate with people without disabilities.  (*Id.,* at 10-11.)

To the extent that most if not all class members have written ISPs containing current habilita-
tion plans, behavioral support plans and health plans, defendants cannot be considered in substantial
non-compliance with applicable court orders. However, as the Court expressed in its 2007 Opinion,
if ISPs are not implemented their development is a hollow gesture and class members are deprived
of the benefits they were intended to bestow – needed services.  Therefore, based on the above find-

ings of fact and those regarding case managers/service coordinators below, the Special Masters conclude that the evidentiary record provides clear and convincing evidence that defendants are in continuing non-compliance with the above court orders.

**3. Case Managers/Service Coordinators.**

    <u>1. Relevant Court Orders.</u>

    The 1978 Final Order recognized the critical role of designated personnel to monitor the adequacy of class members living arrangements and the implementation of their ISPs. The Court Order required defendants to "[p]rovide all necessary and proper monitoring mechanisms to assure that community living arrangements, programs and supportive community services of the necessary quantity and quality are provided and maintained." (*Evans,* 459 F. Supp. at 485.) In particular, defendants must maintain enough case manager positions to meet the required case manager to client ratio and defendants must recruit, hire, and train "a sufficient number of qualified community staff to prepare individual exit and community habilitation plans for each [class member] ... and to assist in the execution of the responsibility to create, develop, maintain, and monitor the community living arrangements, programs and other services required." (*Id.*   At 486, 489;  *Evans*, Consent Order at 3 [June 25, 1981]; *Evans,* Consent Order at 5 [Feb. 8, 1983])

    As the Court noted in its 2007 Opinion on liability, defendants are to develop procedures "to ensure that case managers are informed of recommendations made as a result of all quality assurance/quality improvement activities, including incident investigations…." (480 F. Supp. 2d at 322.) In addition, defendants are also to maintain a case manager to client ratio of one to thirty clients, ensure that all case managers receive competency-based training and require case managers to conduct a minimum of eight monitoring visits a year and file reports regarding compliance with ISPs and

health/safety issues based on these visits. (*Id.*) Finally, case managers are responsible for monitoring

the implementation of quality assurance and incident investigation recommendations. (*Id.*)

On the record that closed in November 2006, the Court found that approximately one-third of

the class members reviewed by the Court Monitor did not receive the required eight visits a year

from their case managers. (480 F. Supp. 2d at 322.) The Court also found that case managers failed

to ensure that class members' ISPs are implemented as written and often failed to take note of seri-

ous incidents. (*Id.,* at 323.) Finally, the Court found that defendants did not meet their obligation to

train case managers before they were responsible for individual consumers. (*Id.*) The court found

these failings evidence of defendants' non-compliance with court orders regarding monitoring and

case management. (*Id.,* at 324.)

2. Defendants' evidence.

Defendants maintain that the role of case manager/service coordinators in developing and

implementing ISPs has been enhanced.[60] They report that ISPs now reflect the new DDA initiatives

and overall best practice in the field and can now be more easily used in risk assessment and plan-

ning as part of the annual ISP review process. (Nuss Decl. at ¶ 45; Findings at 186) As of September

30, 2008, the ISPs for individuals supported by DDA in waiver services and for those lining in their

family homes or independently are no longer written by third party organizations. (*Id.; Defs*.' Find-

ings at 185.) All service coordinators and provider agency representatives have received training for

---

[60] To the extent that defendants' proposed findings of fact numbered 182 through 189 are based on the Declaration of Kathy Sawyer, they cannot be entertained because defendants withdrew the Declaration at trial. Trial. Tr. at 582. The Special Masters permitted plaintiffs to submit deposition experts from Ms Sawyer's deposition and permitted defendants to file a response consisting of deposition excerpts and portions of Sawyer's Declaration to round out the picture. *Id.* Special Masters' Order Granting in Part and Denying in Part Plaintiffs' Motion to Strike, February 2, 2009. Docket # 1075. Defendants have not based their proposed findings on excerpts from Ms Sawyer's deposition or admitted portions of her Declaration.

writing the new ISP. (*Id.,* at 47, 189.) Finally, the MCIS is programmed for entry of the ISP document, which means providers will be able to have access to the document. (*Id.,* at 46, 188.)

3. Plaintiffs' Evidence of Non-Compliance.

Plaintiffs note that the recognition by defendants' expert Thaler that "service coordination is the weakest element" in the system speaks to the situation at the time of her Expert Report, some 16 months after the Court ruling on non-compliance. They also note that the opinion was shared by former Interim DDS director Kathy Sawyer and other managers Thaler interviewed at DOH and DDS. (Thaler Expert Rpt. at 4; Nuss Tr. 277:4-7; Pls.' Findings at 92.)

The Court Monitor reports, plaintiffs maintain, confirm the inadequate performance of service coordinators in overseeing implementation of class members ISPs. (April 19, 2007 Monitor's Report at 4-5; January 10, 2008 Monitor's Report at 8 (the ISPs of 8 out of 27 class members moved to a new residence were not fully implemented); May 8, 2008 Monitor's Report at 7, 25 (e.g. clinical therapy recommendations specified in class members' ISPs were not implemented in 74% of the at-risk class members in the Monitor's sample and behavioral plans were not implemented for 52% of the groups.) (*Id.,* at 7. Pls.' Findings at 96.)

4. Special Masters' Findings and Conclusions

As stated by defendants' expert Nancy Thaler

[Service planning, coordination and monitoring] is perhaps the most critical and yet currently the weakest element in the overall structure. Typically, support coordinators are the eyes and ears of the public agency. They assure that a plan is developed, that services are delivered, that the plan is modified as needs change and that desired outcomes are being achieved. Effective support coordination is crucial – there is simply no other way for a public agency to address the needs of individuals and to measure how well those needs are being met. (Thaler Expert Rpt. at 4.)

Service Coordinators are the critical person in each individual's service plan. All information about the individual, including incidents and risk reviews must be provided to the service

coordinator promptly. The inadequacy of and failure to fully implement Individual Support Plans have been two of the major issues identified by the Court Monitor and reviewers in the past. Ms Nuss reports this unit to be one that requires a great deal of attention. (*Id.*) "Almost every manager I interviewed, including those in both the DOH and the DDS, reports that coordination is a weak link in the service system." (*Id.*, at 4.)

Defendants have made progress in some respects since the Court's ruling in the liability phase. They have continued to maintain the case management ratios. More importantly, they have improved service coordinator compliance with the expectations for meeting persons on their casel-oads at least eight times a year (April 19, 2007 Monitor's Report at 4)  Defendants have also provided training for service coordinators and provider agency representatives for writing ISPs in the new format (Nuss Decl. at ¶ 47.) They have developed a capability for electronic entry of the ISP document to facilitate provider access to it (*Id.*) Given the recognized weaknesses in performance of this critical function, Deputy Director Nuss has reinforced expectations for staff by instituting disci-plinary measures for poor performance. She testified that 57 of the 78 service coordinators are in some form of performance management disciplinary action and eight of the 11 managers have also experienced such actions (Nuss, Trial Tr. at 359:24-360:1-3.) Of the 18 service coordinators who have left the agency since her tenure began, 16 were in personnel discipline action, and three manag-ers also left. (*Id.*, at 359:18-23.)

Nevertheless, at present, as defendants' expert witness, Nancy Thaler, and Deputy Director Laura Nuss testified, coordination remains a critical weak link in the service system. This weakness is manifested in the quality of the work done by service coordinators. Despite general compliance with the minimum expectation of making the required eight visits a year, the evidence demonstrates that service coordinators are not ensuring that ISPs are fully implemented or following up when they

are not. For example, in the April 2007 Report, the Monitor noted that the ISP was not fully imple-

mented in more than 60% of the cases reviewed. Class members were not receiving services critical

to their health, safety and habilitation, including adaptive equipment, required by their ISPs, both in

their residences and in their day programs. (April 19, 2007 Monitor's Report at 5, 17-18.)

Early in 2008, the Court Monitor reported on her review of 27 of the 40 class members who

moved to new residential settings under the Fenty Plan. (January 10, 2008 Monitor's Report at 7.)

She found that supports and activities were not fully implemented as prescribed in the ISPs of 13

class members. (*Id.,* at 8.) The kinds of supports and services not implemented included speech and

language services; behavioral support plans; physical therapy; and community outings. (*Id.*) Seven-

teen of the 27 required adaptive equipment – four of these did not have the equipment needed, such

as dentures, eye glasses, smaller wheel chair and walker to get through narrow doorways, or the

equipment was in disrepair. (*Id.*)

Similar problems were found several months later when the Court Monitor reviewed the ser-

vices provided to 25 class members who were transitioned to new residences from a residential

provider which had closed its homes. The Monitor found that the majority of their ISPs were not ful-

ly implemented as written; nine out of the nineteen lacked adaptive equipment; and more than half of

the class members were not provided regular opportunities for community integration. (September

10, 2008 Monitor's Report at 5.)  The same Report found that of 64 class members in the sample re-

viewed who had clinical therapy recommendations in their ISP documents (Occupational Therapy,

Physical Therapy, Speech/Language, Nutrition), implementation occurred for only 44% of the not-

at-risk class members and for just over 50% of the at-risk class members. (*Id.,* at 17.)

Based on these findings of fact, the Special Masters conclude that plaintiffs have sustained

their burden of proving by clear and convincing evidence that defendants are in continuing non-

compliance with the court orders to "[p]rovide all necessary and proper monitoring mechanisms to assure that community living arrangements, programs and supportive community services of the necessary quantity and quality are provided and maintained." (*Evans,* 459 F. Supp. at 485.)

## IV. INTERAGENCY COORDINATION

Although the primary responsibility for providing timely and effective services and supports to class members rests with DDS/DDA, the success of this enterprise depends upon the coordinated efforts of several District agencies, including MAA/DHCF, (formerly the Medical Assistance Administration (MAA) in the Department of Health (DOH) and now the Department of Health Care Finance (DHCF)) through which most of the funding is provided, the Health Regulations and Licensing Agency (HRLA) in the DOH, which is responsible for licensing and enforcement with respect to ICFs/MR, the Office of the Inspector General, which has investigative responsibilities for Medicaid fraud and abuse, the Office of Attorney General which files petitions for guardianships in court, and other agencies involved in the personnel, procurement, and budget process (*see*, Pls.' Findings at 105.) These include the Office of Contracts and Procurement, which has a significant role in the contracting process (John McCarthy, Trial Tr. at 75.)

### 1. Court-ordered obligations

The Court's March 30, 2007 opinion explained the importance of interagency coordination and collaboration as it relates to the defendants' obligation to comply with court orders.

> In January 2004, recognizing that a lack of coordination among the District of Columbia agencies with responsibility for actions necessary to achieve compliance with the 2001 Plan had impeded the timely completion of those actions, the Court ordered the Mayor to assign a Deputy Mayor or other senior official who reported directly to the Mayor to be responsible for the day-to-day efforts of District agencies to achieve compliance with the Plan. *Evans,* Order at 1-2 (Jan. 21, 2004.) The Court further ordered that the Deputy Mayor or other senior official be required to coordinate the efforts of all District agencies

84

"as necessary to secure the timely delivery of appropriate services to class members in
compliance with the 2001 Plan and previous [court orders]," and that the official be re-
quired to report periodically to the Special Masters, the Court Monitor, and the Court. *Id.*
at 2-3. Since January 2004, several different individuals have served in this capacity, but
as explained herein, bureaucratic bottlenecks still plague the defendants' ability to
achieve results.  (480 F. Supp. at 290)

The Court also cited the Monitor's observation regarding MRDDA's lack of authority to enforce
sanctions against providers with a record of poor performance. (480 F. Supp. at 325)

### 2. Defendants' Evidence

In the current phase of the case, the defendants describe their efforts to assure interagency
collaboration in implementing court orders related to health, safety and welfare of *Evans* class mem-
bers and other DDS consumers. Their evidence largely attempts to demonstrate that the DDS
director has access to other cabinet level officials and to the City Administrator as needed to solve
problems between departments (Heumann Decl. at ¶ 10, Trial Tr. at 492, 348.) They have submitted
evidence that the most important interagency relationship is between DDA and MAA/DHCF and has
been a functional, cooperative relationship that works effectively (Thaler Rpt. at 10, Defs.' Ex. 3;
Nancy Thaler, Trial Tr. at 419: 16-19; Laura Nuss, Trial Tr. 146-147, 162.) There is a high level of
collaboration between the two agencies with frequent communications back and forth including
weekly telephone calls (John McCarthy, Trial Tr. at 556-58.) An example of this collaboration that is
cited is the development of a new Medicaid waiver in late 2007 and the development of 27 rules ne-
cessary to effectuate the waiver (*Id.*). The two agencies work together to resolve claiming and billing
concerns (Nuss Decl. at ¶ 19, McCarthy Decl. at ¶ 13) and have collaborated to resolve issues that
arose from the implementation of the transportation broker system with MTM beginning in October
2007 (*Id;.*   Trial Tr. at 334, 519-20, 557-58).[61] In that process, there were daily, and then biweekly,
meetings in addition to the weekly conference call to resolve transportation complaints (*Id.*) Defs.'

---

[61] *See also* the discussion regarding MTM in section III. B. (g) (iii) *supra.*

Findings at. 57, 59, 61). Defendants do not deny that there were numerous complaints, but Deputy Director Nuss testified that the experience "helped fuel the need to make sure there was much closer collaboration and communication between the two agencies" (Trial Tr. at 334.)

There is also collaboration in the relationship between HRLA and DDS, with HRLA findings from reviews and investigations provided to DDS and some joint investigations. (Thaler Rpt. at 12.) There is a Memorandum of Understanding specifying the roles and responsibilities of the respective agencies and business processes and daily practices are consistent with that MOU (*Id*.). The defendants also cite evidence that providers agree that interagency collaboration has been improving. One provider testified that interagency collaboration is the best it has been in the last 11 years (Test. of Amy Brooks, RCM president, Trial Tr. at 200-201.)

### 3. Plaintiffs' Proposed Findings of Fact

Plaintiffs' Proposed Findings of Fact indicate that although the Mayor's former General Counsel and current Interim Attorney General, Peter Nickles, is the official in the Fenty administration responsible for interagency coordination,[62] he does not regularly meet with DDA Deputy Director Nuss. (Pls.' Findings at 110-111.) Moreover, senior Fenty administration officials who have direct responsibility for critical functions supporting class members were not aware of the Court's Order or Mr. Nickles' apparent responsibility for interagency coordination. (*Id.*, at 15, 109; Test. of Laura Nuss, Trial Tr. at 54:20-23; John McCarthy, Trial Tr. at 525:1-10). Plaintiffs' expert witness, Martha Knisley, testified that Mr. Nickles' dual role as the interagency coordinator and the Interim Attorney General, whose office represents the District in this litigation, leads to confusion and inherent conflict. (*Id.*, at 112.)

---

[62] February 6, 2007, Hr'g Tr. 21:21-23. Mr. Nickles informed the Court "I am acting not only as General Counsel, but in this area as deputy mayor."

86

Plaintiffs also state that although DDS has a Memorandum of Understanding with MAA/DHCF and with HRLA, the licensing division of the DOH, these mechanisms are insufficient to assure the required interagency coordination. (*Id.,* at 106-108.) Although there are weekly telephone calls between MAA and DDS that last 30 to 45 minutes, the MAA senior deputy director and the DDS director do not always participate in these telephone calls. (Test. of Laura Nuss, Trial Tr. at 253:8-10, 15-17; 254:12-14.) HRLA and DDA do not routinely share information, citing that HRLA does not routinely share its death investigations of DDA consumers with DDA. (Pls.' Findings at 107.)

As an example of the effect of this lack of coordination, plaintiffs submit the testimony of one residential provider who received conflicting information from the multitude of agencies involved in the licensing of a home. This provider asserted that the four involved agencies coordinated poorly with one another, gave the provider conflicting information and direction, had conflicting legal interpretations of requirements, resulting in five years and hundreds of hours spent in trying to obtain a license for the home, which resulted in a decision from an Administrative Law Judge favorable to the agency, but still no license (John M. Cook Decl. at ¶ 10-11.)[63] "Even though the leadership of DDS has improved, the problems with DOH and FEMSD [Fire and Emergency Management Services Department] remain unabated and apparently unaddressed," he stated. (*Id.,* at 12.)

As a further example of the lack of effective interagency coordination among District agencies responsible for class members, plaintiffs cite the myriad problems that resulted in implementing a change to the transportation broker system, without adequate consultation and advance communication from MAA/DHCF to DDS whose consumers account for as many as 50% of the Medicaid

---

[63] At trial, Mr. Cook testified that he had since received the license from DOH. (Trial Tr. 146:12-14)

funded transportation trips. (Pls.' Findings at 113.) [64] There were also communication gaps with the District's Income Maintenance Administration which provided DHCF with incorrect addresses for Medicaid recipients served by DDS. (Testimony of Laura Nuss, Trial Tr. 257:21-258:9-12), resulting in letters that were intended to alert people to the change in the transportation system not reaching hundreds of DDS/DDA consumers. (*Id.* McCarthy testimony, Trial Tr. 520:3-6.) DDS director Judith Heumann agreed that this was a failure of interagency coordination (Trial Tr., 457:4-7.)

The third instance of failure of interagency communication and collaboration occurred in July 2008 when MAA/DHCF, without conferring in advance with DDS, issued a Medicaid transmittal letter which precluded medical directors of ICFs/MR from billing Medicaid for services provided to their residents in the community. (Pls.' Findings at 128-133.) The effect of this letter was to require medical directors to see residents of ICF's/MR at their facilities rather than in the community or other clinics, as the physicians would not receive compensation for providing primary care services at other sites. This change affected the approximately 255 class members who live in ICF's/MENTAL RETARDATION. (*Id.,* at 130.) Prior to this transmittal from MAA, DDA had been giving contrary advice to providers (Nuss Test., Trial Tr., at 266:6-9) and did not have the opportunity to alert providers and prepare them to adjust to the changed interpretation of the rules. (*Id.,* at 264:7-17.) There were concerns that this new policy would cause confusion in the provider community and be a barrier to class members accessing medical care. (Lisa Alexander Test., Trial Tr., at 168:25-169:7.) Although weekly teleconferences had been instituted in the wake of the problems with the transportation system as described above, the planned transmittal of this letter by MAA/DHCF to the DDA provider community was not brought up and discussed with DDA in this forum. (McCarthy Test., Tr. 508:7-17; Heumann Test., Trial Tr., at 467:20-469:6; *see also* Thaler Rpt. at 11-12.)

---

[64] *Id.*

Another example cited by the plaintiffs is the development of the application for The Money Follows the Person Grant, during which MAA/DHCF failed to adequately involve DDA staff.

Plaintiffs assert that these examples illustrate that weekly teleconferences are not adequate to ensure cooperation, collaboration and coordination, as intended by the Court's 2004 order. (Pls.' Findings at 134-136, 180-183.)

### 4. Special Masters' Findings and Conclusions

With the division of responsibility for critical functions among different District agencies, a level of communication and collaboration is indispensable for the system to function at all. For example, a relationship between MAA/DHCF and DDS/DDA *has* to exist for critical financing, the lifeblood of the system, to flow to the provider agencies that deliver the services and supports to class members and others. This type of communication has always existed between the agencies, and continues to exist. However, the Court took the extraordinary step of issuing a *sua sponte* order requiring the Mayor to assign a Deputy Mayor or other senior official "to be responsible for the day-to-day efforts of the District of Columbia agencies to achieve compliance with this Court's orders and the 2001 Plan" because, notwithstanding this communication, the lack of coordination had impeded the timely completion of a number of necessary tasks identified in the 2001 Plan as a means of complying with the court orders.

The evidence that has been submitted indicates that the level of communication and collaboration between DDS/DDA and the new Medicaid agency, DHCF, has improved. The new leadership of the two agencies, the deputy director of DDA and the deputy director of DHCF, are qualified and capable individuals who appear to be working hard to forge an effective working relationship that has facilitated the development of the new Medicaid waiver and the promulgation of implementing rules. The joint work between the agencies was successful in addressing deficiencies that had been

previously identified by the Centers for Medicaid and Medicare Services (CMS.) However, the two agencies still have their separate missions. In the District's overall Medicaid program, for which DHCF is responsible as the "single state agency," (42 C.F.R. § 431.10) DSS/DDA is a relatively small part of the system and one whose interests have often been subordinated to the larger responsibilities of MAA/DHCF. The lengthy, convoluted and dysfunctional process that had previously existed between the agencies for the crafting of an appropriate Medicaid waiver to support services in the least restrictive environment in the community, and for the promulgation of implementing rules—which had been the subject of discussion at numerous status conferences over the years—was part of the backdrop against which this order of the court was issued.[65] It was intended to elevate the priority given by MAA/DHCF as well as other agencies to the District's obligation to implement the court orders in this case by engaging a high level agent of the Mayor in overseeing the day-to-day work of the agencies and ensuring close collaboration and coordination.

There has been little evidence submitted regarding specific compliance with this court order. What is missing is evidence of leadership or coordination by the Mayor's designee—the central point of the order—to give focus, direction and priority to interagency communication and coordination, to identify planned actions of one agency that may adversely affect the mission of another and to take proactive steps to prevent such a consequence. In the absence of evidence of such efforts, the inter-agency efforts at the staff level between agencies have not been consistently successful, and gaps in communication and coordination have resulted in harm to class members as has been described earlier.[66] The defendants acknowledged such shortcomings in the response to the Court Monitor's report

---

[65] *See*, Thaler Rpt. at 10-11, describing the past difficulties in the interagency relationship between Medicaid and DDS/DDA.

[66] *See*, discussion regarding transportation broker system, section III.B. (g) (iii) *supra*.

of May 8, 2008 wherein the Monitor cited numerous problems being experienced by class members as a result of changes in the Medicaid transportation system (May 8, 2008 Monitor's Report at 3). In the response, the defendants wrote:

> DDA cannot be blamed for the chaos that followed, and the unpredictability that continues to follow, this decision. At the time of this report, numerous complaints continue to be made about the lack of timely transportation. Medical appointments and other plans for community outings have been missed because the transportation provider was late or failed to show up at all. Providers have been required to expend unbudgeted funds to compensate for this lack of accountability. For example, one new provider has been transporting its client to his day program despite the fact that it must pay staff overtime to take care of this responsibility.

(*Id.,* at 26.)[67] Defendants' expert witness, Nancy Thaler, wrote:

> The recent decision made by MAA to change the Medical Assistance transportation arrangements had a negative impact on the consumers in the DDA program by limiting their capacity to travel to medical and other appointments. The decision was made contrary to what DDS believed was an agreement that DD consumers would not be included; it was also made without DDS being notified. The DDS had no opportunity to offer alternatives, and MAA did not assist DDS in dealing with the impact of the decision which continues today.

(Thaler Rpt. at 11-12, Defs.' Ex. at 3.) Thaler goes on to recommend that the DOH Medical Assistance Administration must take more direct ownership of the issues, understanding that any decision made by MAA will affect DDA consumers. They must confer with each other more often and at a higher level. (*Id.*) Thaler made her observations and recommendations regarding the interagency relationship without being aware of the issuance by MAA/DHCF, without prior consultation with DDS/DDA, of the transmittal letter concerning billing for office visits by medical directors of

---

[67] The same response also explains the efforts of DDA to correct an error made by the Department of Health in promulgating the rule to increase personal needs allowances from $70 to $100 a month on October 20, 2006. The Department of Health did not notify then MRDDA of the change and excluded its clients from the increased allowances. When DDS/DDA later researched the issue, its clients were found eligible and, as of April 2008, efforts were underway to amend the rule to provide them with the increased personal needs allowance which had been denied to them for 18 months. (*Id., at* 27)

ICFs/MR, which was discussed earlier in this report. She stated that she could not comment on this issue (Nancy Thaler, Trial Tr., at 429:12-14.)

The development of the application for The Money Follows the Person Grant also illustrates gaps in communication and coordination. This five-year grant[68] from the Center for Medicare and Services (CMS) of over $37 million in federal funds, matched by $8 million from the District, is intended to support the movement of individuals from ICFs/MR to less restrictive homes in the community (Thaler Rpt. at 7.) Although this grant would further one of the central objectives of the court orders in this case and an important goal of DDA, MAA/DHCF proceeded to develop an Operations Protocol, a key document describing how the transition process would work, without the involvement of DDS/DDA staff. After several reviews and rejections at the application by CMS, and at the specific request of CMS staff, MAA/DHCF finally involved Deputy Director of DDA, Laura Nuss, in the rewriting of the Operations Protocol, which resulted in approval of the grant (*Id.,* at 12.)

In the section of this report on guardianship, the evidence demonstrates that DDA and the Office of Atty. Gen. have yet to develop an efficient and effective process for the timely filing of petitions for guardianship for class members who require surrogate decision-making for medical and dental care

The evidence is that leaders in the key agencies that have the most significant interagency relationship, as cited by defendants' Expert Witness, Nancy Thaler, were unaware of the existing court order or of the responsibility of the Mayor's designee in implementing it (Laura Nuss, Trial Tr. 254:20-23; John McCarthy, Trial Tr. 525:1-10.) Moreover, Ms. Thaler herself was unaware of the requirements of this 2004 court order and of a significant example of the failure of interagency coor-

---

[68] See note 49 *supra.*

dination in expressing her opinion about interagency cooperation and collaboration (Nancy Thaler, Trial Tr. 429:15—430:1-3.)

The problem of rapid turnover of mayoral designees that had impeded the effective imple-mentation of this court order in its first three years has abated. However, the current lack of awareness by key senior officials of the Order's existence and its requirements, coupled with the ab-sence of evidence of regular interagency meetings or communications with the Mayor's designee regarding significant initiatives, and the evidence of breakdowns in interagency coordination leading to the problems discussed above, are all clear and convincing evidence of ongoing noncompliance with this court order which was that this Court Order has not been implemented as intended to rem-edy a long-standing problem of lack of interagency coordination.

## V. FACTORS GUIDING EXTRAORDINARY JUDICIAL INTERVENTION

After the court's 2007 finding of liability, the plaintiffs sought a remedy. Modifying their re-quest for a receiver, the plaintiffs asked the Court to appoint a special administrator as an extraordinary, but necessary, remedy to protect the health, safety and lives of *Evans* class mem-bers.[69] They would have the Court appoint a judicial officer to exercise "the Mayor's entire authority as it affects class members" including the authority to direct and replace agency heads with Court authority to craft a resolution of the problems of non-compliance. (Pls.' Br. at 14.)

Defendants contend that with such broad authority, plaintiffs' special administrator is a re-ceiver by another name. Notwithstanding the Court's Opinion finding serious, wide spread

---

[69]   Plaintiffs' Statement on Remedies, p. 3 Docket No. 985 (June 13, 2008.) In their pleading, Plain-tiffs described the special administrator they seek as a court appointee with authority over certain functions (procurement, contracts, personnel, etc.) who "oversees government agencies and func-tions pertaining to class members" with the ability to move quickly as necessary to achieve substantial compliance with the Court's Orders. *Id.*   2-3. See footnote 1 *supra.*

noncompliance, defendants maintain that the facts necessary to support plaintiffs' entitlement to a receiver have not been established. Although defendants do not contend that they are in compliance with any of their obligations under the court orders, defendants maintain that no remedy at all is merited.

Both parties misconceive the task. The Masters' task is not to recommend one or another remedial model – administrator or receiver. Rather the Special Masters were asked by the Court to recommend "an appropriate remedy" – a remedy which, in light of the history of this particular case, can most effectively correct specific, existing failings that have confounded the parties and the court for so long. To perform this task, the Masters have made specific findings of fact relevant to defendants' compliance with court orders and to the factors to be weighed in recommending the extraordinary remedy of direct judicial intervention in government operations.

### A. General Equitable Authority of the Court to Remove Obstacles to Compliance.

Courts of equity have the power to grant prospective relief to bring about compliance with their orders where they have been disregarded. (*Swann v. Charlotte-Mecklenberg Bd. of Ed.*, 402 U.S. 1, 15 [1971] ["[A] district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies"]; *Hutto v. Finney*, 437 U.S. 678, 687 [1978] ["[T]aking the long and unhappy history of the litigation into account, the court was justified in entering a comprehensive order to insure against the risk of inadequate compliance"]; *United States v. United Shoe Mach. Corp.,* 391 U.S. 244, 251-52 [1968] ["If the decree has not, after 10 years, achieved its 'principal objects'. . . the time has come to prescribe other, and if necessary more definitive means to achieve the result".])

94

Thus, this Court has inherent equitable powers, as well as its authority under Rules 66 and 70 of the Federal Rules of Civil Procedure,[70] to compel compliance with its previous Orders through a variety of means. *Ab initio*, these options include civil contempt, the imposition of civil fines,[71] further injunctive relief,[72] appointment of a special master,[73] appointment of a mediator,[74] appointment

---

[70] FED. R. CIV. P 66 provides:

> These rules govern an action in which the appointment of a receiver is sought or a receiver sues or is sued. But the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule. An action in which a receiver has been appointed may be dismissed only by court order.

FED. R. CIV. P 70 provides in part:

> (a) Party's failure to Act; Ordering Another to Act. If a judgment requires a party to convey land, to develop a deed or other document, or to perform any other specific act and the party fails to comply within the time specified, the court may order the act to be done – at the disobedient party's expense – by another person appointed by the court. When done, the act has the same effect as if done by the party.
> * * *
>
> (e) Holding in Contempt. The court may also hold the disobedient party in contempt.

[71] In *Salazar v. District of Columbia* Medicaid applicants brought suit against the District of Columbia officials for failure to issue eligibility decisions within 45 days and failures to provide notice of terminations. (954 F. Supp. 278.) Judge Kessler held that defendants had violated the statutory requirements for timely determinations and notifications. In 2003, Plaintiffs moved the court to establishing civil financial penalties for defendants' repeated failures to meet deadlines imposed by the settlement order and subsequent Court orders. In its 2006 opinion on the motion, the Salazar Court acknowledged that the defendants had improved its "pretty dismal" record, but granted the motion to establish fines as a deterrent of future misconduct, citing *Evans v. Williams*, 206 F.3d 1292, 1295 (D.C. cir. 2000) (holding automatic doubling of non-Medicaid contempt fines required criminal due process, but leaving in place per diem fines associated with late Medicaid payments).

[72] *E.g. Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978), *aff'd sub nom, Evans v. Kelly*, 979 F.2d 248 (D.C. 1992), *rev'd sub nom¸ Evans v. Williams*, 206 F.3d 1292 (D.C. Cir. 2000) (Defendants…are permanently enjoined to … provide all class members with community living arrangements suitable to each….")

[73] FED. R. CIV. P. 53; *Ex parte Peterson,* 253 U.S. 300, 314 (1920); See *Alberti v. Klevenhagen*, 660 F. Supp. 605 (S.D. Tex. 1987) *remanded by Alberti v. Sheriff of Harris Cty*., 937 F.2d 984 (5th Cir.

of a court monitor,[75] appointment of a special administrator,[76] appointment of an ancillary receiver

and imposition of a full receiver to perform defendants' court-ordered obligations.[77] When remedies

are sought for failure to comply with court orders, the question is: which remedy—given the facts

regarding non-compliance with court orders in each case—has the best chance of achieving compli-

ance quickly and efficiently? As the Court of Appeals for the District of Columbia Circuit stated,

"Our view of a district court's choice of equitable remedies is highly contextual and fact dependent.

But the remedy should begin with what is absolutely necessary.  If [those] measures later prove inef-

---

Tex. 1991) (establishing that the inherent power of courts of equity and mandated powers under Federal Rule of Civil Procedure 53 allows these courts to fashion appropriate remedies which include the appointment of experts such as Fact Finding Special Masters, Medical Monitor-Assessors and Jail Monitor-Assessors.) For cases in which special masters were appointed to oversee implementation of orders protecting rights of elderly patients and persons with mental retardation, see *Fox v. Bowen*, 656 F. Supp. 1236 (D.Conn.1986) (implementation of order requiring revision in standards and procedures for determining Medicare eligibility for nursing home benefits); *Halderman v. Pennhurst State Sch. and Hosp,*, 154 F.R.D. 594 (E.D. Pa. 1994); *New York State Ass'n for Retarded Children v. Carey,* 706 F.2d 956, 962-65 (2d Cir. 1983.)

[74] E.g. *In re Joint Eastern and Southern Districts Asbestos Litigation*, NYAL CV 87-1383, CV-87-2273 (E. &S. D.N.Y. 1991.) Kenneth F. Feinberg, *Creative Use of ADR: The Court Appointed Special Master*, 59 ALB. L. REV. 881 (1996.)

[75] E.g. *Benjamin v. Fraser*, 343 F.3d 35 (2d Cir. 2003) (Monitoring body appointed pursuant to court's inherent equitable authority to file reports, make informal findings of fact not entitled to deference, and to facilitating defendants' awareness of its compliance with remedial directives.)

[76] *Reed v. Rhodes*, 635 F.2d 556 (6th Cir. 1980) (affirming district court order requiring defendants to employ a court selected desegregation administrator to supervise compliance); *Petties v. District of Columbia*, 1:95-cv-00148-PLF Document No. 1118; 2006 WL 1046943, aff'd 232 Fed.App'x. 4 (D.C. Cir. May 01, 2007) (appointing an independent administrator of special education transportation with defendants' consent); *EBI-Detroit, Inc. v. City of Detroi*t, 2008 WL 2130472 (6th Cir. 2008) 279 Fed.App'x. 340 (6th Cir. 2008) (affirming district court's appointment of the mayor to contract for water treatment plant without city council approval).

[77] *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976); *Dixon v. Barry*, 967 F. Supp. 535, 551-52 (D.D.C. 1997).

fective, more stringent ones should be considered." (Citations omitted.) *LaShawn A. v. Barry*, 144 F.3d 847, 854 (D.C.Cir. 1998.)

The burden of establishing the factual predicate of disobedience that is required for the imposition of sanctions becomes greater as the severity and intrusiveness of the sanction becomes greater. Thus, the more intrusive the remedy sought—measured by the degree to which it limits the prerogatives of the defendant—the greater the burden of proving its necessity. Part of the proof is showing that less intrusive measures have failed.

B. Remedies Imposed on Public Officials to Protect Fundamental Rights.

When government officials disobey court orders, remedial options are more circumscribed than when private parties disobey them. Courts faced with government non-compliance must find remedial measures that not only have the best prospect for achieving timely compliance but which, in the individual circumstances of each case, intrude least upon the government's legitimate activities.[78] Thus, in cases of official disobedience, courts take a number of factual elements into consideration before granting relief. These include long histories of non-compliance; previous orders intended to compel compliance; the effectiveness of court appointed assistants in bringing about compliance; the kinds of structural impediments and particular deficiencies identified as responsible for non-compliance; and the likely success of alternative measures.[79]

---

[78] *Judge Rotenberg Educ. Cent. Inc. v. Commissioner of the Dep't of Mental Retardation*, 677 N.E.2d 127, 148 (1997) (public officials who failed to meet legal standards found not immune from equitable remedies including appointment of a receiver to take over their main functions.)

[79] *See generally*, Lloyd C. Anderson, *Implementation of Consent Decrees in Structural Reform Litigation,* 1986 U. ILL. L. REV 725 (1986.)

On the one hand, courts faced with official non-compliance weigh the extent to which direct judicial intervention can be effective:  i.e. can remove those obstacles, redress the deficiencies, provide leadership and bring about official action necessary to compliance. On the other hand, they consider the extent to which judicial intervention will be duplicative, disruptive, increase expenses, deter attractive candidates from seeking leadership positions and usurp legislative authority.[80]

Most instructive are those cases in which vulnerable populations in custody or under the protection of the state (like the class in this case), such as prisoners, disabled people, and children, have sought court protection of their constitutional rights. In some of those cases, "special administrators" have been appointed to redress official recalcitrance or inability to effectuate those rights.  In other cases, appointees with similar powers and limitations have been called "limited receivers"[81] "temporary receivers"[82] or "referees." In all of these cases, federal courts used their equitable authority to appoint a judicial agent to exercise focused, limited authority over executive-branch defendants to carryout existing court orders.

Especially where constitutional rights have been violated for years after the issuance of court approved consent decrees, the appointments of judicial officers to carry out compliance plans have

---

[80] In *United States v. City of Detroit*, the district court appointed an administrator of operations with powers to manage and conduct operations of water treatment facilities under the supervision of the court. 476 F. Supp 512 (E.D.Mich. 1979.) Doing so, the court noted "Whenever a federal court is involved in the affairs of local government and a remedy is sought which may interfere with traditional notions of separation of powers, great care must be taken to reach a balance that does not summarily deny to such local government the full exercise of its authority over its affairs." *Id., at* 520-521 (E.D. Mich. 1979.)

[81]  *Dixon*, see discussion *infra* at note 99.

[82]  In *Morgan*, 540 F.2d at 527, a "temporary receiver" appointed for racially troubled South Boston High School was given authority to transfer school staff to avoid racial insults and intimidation where school officials failed to ameliorate conditions, receivership to last only as long as conditions justified. The temporary receiver was made the Superintendent of Schools for the purpose of bringing the elected School Committee into compliance with constitutionally based court orders.

been sustained.  For example, inmates of a women's state prison claimed in *Glover v. Johnson*, that

the state deprived them of constitutionally protected equal protection by denying them parity in edu-

cational and vocational opportunities comparable to those of male inmates.[83]  The district courts'

1979 order found that the women's constitutional rights had been violated and set forth in general

terms the remedies defendants would be required to implement. (478 F. Supp. 1075 [E.D. Mich.

1979])  As in this case, the subsequent judgment was agreed to by the parties and not appealed. (510

F. Supp. 1019 [E.D. Mich. 1981] (Final Order) and 721 F. Supp. 808, 811 [E.D.Mich. 1989])

Seven years and two contempt proceedings later, the district court approved an order for a

court approved "special administrator" to develop a remedial plan for state defendants.[84]  In justifica-

tion of its order making the appointment the district court stated:

> Fines or imprisonment are not the best remedies in this case.  A remedy is needed
> which will result in parity.  This elusive concept needs to be structured in this case by
> skillful individuals who can create programs which will meet the constitutional de-
> mand.  The Department needs to be helped to provide parity. 721 F. Supp. at 849.[85]

---

[83]  For a history of the case see *Glover v. Johnson,* 934 F.3d 703, 705-706 (6th Cir. 1991.)

[84]  721 F. Supp. 808 (E.D. Mich. 1989.)

[85]  A 1987 Order appointing an administrator was appealed, (659 F. Supp. 621, 623 (E.D. Mich. 1987)
and set aside by the Court of Appeals as not supported by sufficient findings of fact.  On remand, the
District Court ordered defendants to appoint an administrator to develop a remedial plan.  The Court
of Appeals affirmed the second appointment as based on "a lengthy and carefully crafted opinion, the
district court addressed defendants alleged failure to comply with the court's orders…." 934 F.2d 703,
707. It found district court applied the correct legal standard – whether the respondent violated, i.e.
failed to comply with, the court's prior order.  "Defendant simply did not convince the court that they
took all reasonable steps to comply, and they do not convince us…. Upon the facts disclosed . . . de-
fendants have fallen far short of the requisite diligence."  The Court of Appeals held that the correct
legal standard was "not whether defendants made a good faith effort at compliance but whether 'de-
fendants took all reasonable steps within their power to comply with the court's order.'" *Id., at* 708 -
709.

Defendants were not allowed to disavow the constitutional violation. They had argued that the district court erred by not determining whether defendants were *currently* denying plaintiffs' equal protection. The Circuit Court rejected the argument, noting that the equal protection violation had been found in earlier un-appealed orders. The appeals court also noted that:

> [T]he 1981 final order was a negotiated settlement between the parties. Defendants did not object to the language until now and have never asked the district court to clarify the purportedly ambiguous language. Moreover, we find the language unambiguous and, even if it were ambiguous, defendants' failure to request the court to clarify, explain, or modify the language in the decade since the order was served precludes raising an ambiguity argument at this time." *Id.* 708-709.

The Circuit Court held that, where prison officials had not used their best efforts to comply with court remedial orders, their continued failure to comply warranted the district court's order requiring them to hire a special administrator—approved by the court—to design and implement a remedial plan. (*Glover*, 934 F.2d at 703.)

Again, in a case particularly relevant to the case at hand, the court appointed an administrator to ensure that the constitutional rights of school children to equal protection and non-discrimination were respected.[86] In *Reed v. Rhodes*, a protracted school desegregation case begun in 1978, after several years of non-compliance, the federal district court required the defendants to employ a "desegregation administrator" – selected by the court—whose powers were confined to the implementation of remedial orders in the case. The special administrator chosen by and held accountable to the District Court was appointed to supervise the school board's compliance with court orders. The defendant Cleveland Board of Educa-

---

[86] The District Court initially found that the defendant school board had violated plaintiffs' constitutional rights by fostering and maintaining a segregated school system. 422 F. Supp. 708 (N.D. Ohio 1976).

tion appealed.  After reviewing defendants' history of serious failings, the Appellate Court recognized that some progress had been made but affirmed the appointment of the "administrator" to oversee the board's compliance with desegregation orders at the same time that it vacated the lower court's adjudication of civil contempt.[87]  (635 F.2d 556 [6th Cir. 1980] (Per curiam opinion.))

The Circuit Court expressly rejected defendants' argument that the appointment was tantamount to the appointment of a receiver.  Finding that the District Court had not abused its discretion by appointing the administrator in the absence of a contempt finding, the Court of Appeals stated:

> We have considered carefully the arguments of the appellant that the requirement of a court-appointed desegregation administrator is in reality an order placing the Cleveland school system in receivership.  Though the powers to be exercised by the administrator are broad, they are confined to implementation of the district court's remedial orders in this desegregation case.  *Id.*

Affirming the district court's appointment of an administrator to be selected by the court, the appellate court recognized the more extensive powers usually granted to a receiver.

> [T]hese provisions [do not] require the Cleveland Board of Education to forego its responsibilities for administration of the affairs of the Cleveland school system in matters outside the scope of the duties imposed upon the Administrator of Desegregation.

*Id.*  At 556.[88]

---

[87] The appellate court held that the special administrator remedy was not dependent upon a finding of civil contempt. It stated, "We agree" with the position of the United States, amicus curiae in the case, that a contempt citation "is not a prerequisite for the appointment of a desegregation administrator." 635 F.2d 556, n.2, aff'd 642 F.2d 186 (6th Cir. 1981) (rehearing.)

[88] On rehearing, the Circuit Court clarified its 1980 opinion and reiterated "This court did not approve a receivership for the Cleveland School System. … Though we approved the appointment of an Administrator of Desegregation with broad authority to implement special remedial orders of the district court, we did not purport to remove or displace the Cleveland Board of Education.  The Board con-

Even where constitutional rights are not at issue, courts have appointed special administrators to exercise executive branch authority in order to obtain compliance with consent judgments. Thus, in *United States v. City of Detroit*, a suit to bring about compliance with the Federal Water Pollution Control Act, the district court appointed Detroit's Mayor to as the "administrator of operations" in order to "conjoin in one person . . . both the traditional powers of his office and extraordinary powers inherent in [the court's appointment] to bring about compliance" with a consent judgment after uncontested findings of non-compliance. (476 F. Supp. at 512, 517 – 518.) [89] In performing that function the Court instructed, the Mayor would not be responsible to the water board, civil service, common council or the state, but only to the court. *Id.,* at 521. Acknowledging defendants' "note-worthy efforts" to comply, the court appointed the administrator "not in any punitive sense, but to secure compliance with the law and this court's judgment." (*Id.,* at 518 – 520.) [90]

In a 2008 opinion in a related case removed to the federal court, the Sixth Circuit Court of Appeals construed the powers granted to the special administrator in 1979 by the Michigan district court to bring about compliance with a consent decree requiring compliance with federal clean water

---

tinues to have ultimate responsibility for the affairs of the Cleveland School System, except as to issues directly affecting desegregation". 642 F.2d 186 (6th Cir. 1981.) The appeals court sustained the district court's enjoining defendants from interfering with the Administrator and confirmed its direction that the Administrator to report any such interference. *Id.*

[89] Notwithstanding defendants' effort to achieve compliance with the consent decree, the district court found defendants had failed to comply with the court's orders and appointed an "administrator of operations" empowered to exercise extraordinary remedies in control of management and operations… necessary to achieve compliance with the requirements of the Consent Judgment….". 476 F. Supp. at 517.

[90] The court observed "Where "[t]he more usual remedies contempt proceedings and further injunctions - [are] plainly not very promising as they [invite] further confrontation and delay; and when the usual remedies are inadequate, a court of equity is justified, particularly in aid of an outstanding injunction, in turning to less common ones …." *Id.,* at 520 (citing *Morgan v. McDonough*, 540 F.2d 527, 533 [1st Cir. 1976].)

laws and previous court orders to provide a basis for removal jurisdiction. *EBI-Detroit v. City of Detroit*, 279 Fed. App'x. 340 (6th Cir. 2008) held that defendant Mayor's exercise of his powers as Special Administrator were not illegal. (*Id.,* at 353-354.)


    C.  <u>Special Administrators and "Limited Receivers".</u>

    In general, judicial agents called "special administrators" differ from ones termed "receivers" in several important respects. First, based on their historical use in commercial cases to take over the property and assets of debtors and bankrupts, receivers literally "take over" the activities of the defendants.[91] Judicial agents termed "special administrators," on the other hand, have not been charged with responsibility for running corporations or government agencies.[92] Second, in keeping with their charge to run whole companies or government agencies, receivers are made responsible for acquitting defendants' responsibilities to non-litigants as well as parties to the action, while special administrators are given more limited instructions to intervene and exercise judicially derived powers only to protect the interests of parties to the litigation.[93] Finally, special administrators are not given general authority to override local laws in order to exercise their enumerated powers, as receivers sometimes are, but must seek specific approval from the court, on a case-by-case basis to act contrary to other laws. [94]

---

[91] Cases *supra* Part B and Spence Tr. at 91:3-9.

[92] E.g. *Reed*, supra note 71, *United States v. City of Detroit*, *supra* note 85.

[93] Lewis Spence Test., Pls.' Ex. 14 at ¶¶ 55-60, Spence Tr. 60:4-8, 14-16; Martha Knisley Test., Pls.' Ex. 10 at ¶. 71.

[94] See LaShawn *A.*, Opinion of Judge Hogan's discussed *infra*.

Yet, the appointment of a special administrator is not a one size fits all remedy. In the past, federal courts have ordered the appointment of judicial officers to intervene in government operations in specific ways when the circumstances of the case require it. Thus, there is no uniform factual predicate required for such appointments. Nor are there a pre-packaged set of delegated authorities for adoption off the shelf. Rather, the powers and duties to be exercised by the appointee depend on what is needed to achieve compliance. The term "special administrator" has been used to denote a judicial appointee with specific, limited authority to directly intervene in defendants' activities in order to bring about specific performances. Courts of equity fashion relief to fit the needs of the case before them. The test is one of reasonableness under the circumstances.[95]

The factual predicate for the appointment of a special administrator differs from that required by courts when they appoint a fully empowered receiver. When appointing a receiver to run entire government agencies—an admittedly dramatic remedy—courts have often justified their action by making findings that: the defendants have repeatedly failed to comply with court orders in the past; other efforts would lead to further confrontation and delay; there is a lack of leadership available to bring about compliance; there has been a lack of good faith effort; and resources are being wasted while compliance is delayed.[96]

Courts that have appointed special administrators have also taken these factors into account, as well as other factors such as defendants' progress toward compliance, as discussed below.

---

[95] *Morgan*, 540 F.2d at 533.

[96] These cases cannot be read to require all of these conditions be met in order to justify the appointment of a judicial official to bring about government compliance. However, the cases confirm that there are some factors to be considered in the exercise of the appointing court's discretion. (*Jerry M*, 738 A.2d 1206 (D.C.1999.)

D.  Judicial Appointments in the District of Columbia.

In at least four suits against the District of Columbia government seeking essential services for vulnerable populations, courts have made judicial appointments to bring District agencies into compliance with court orders.  They are: *La Shawn A*- neglected and delinquent children;[97] *Petties* and *Blackman/Jones*- children in special education;[98] *Dixon* - mentally ill residents of Washington;[99] and *Jerry M* – incarcerated juveniles.[100]   The tales of these four cases are informative about the circumstances which District of Columbia courts have found require extraordinary remedies.

In all of these cases, discussed more fully below, the District government was found to have breached its constitutional or statutory duty to protect and care for vulnerable classes of persons within the District.  In each, the District defendants consented to the original judicial determination that they had violated their obligations to class plaintiffs, and in each, the original finding of liability was followed with permanent and temporary injunctions and further decrees to which the defendants consented.  After sometimes decades of continuing non-compliance with original and subsequent orders, in each of these cases, the courts ordered a series of increasingly more intrusive remedies in an effort to compel that compliance.  Their remedies took the form of judicial appointments of court officers with varying authorities and responsibilities—called monitors, special masters, administrators, limited receivers, and full receivers.

---

[97] *LaShawn A. v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993).

[98] *Petties v. District of Columbia*, 227 F.3d 469 (D.C. Cir. 2000); *Blackman v. District of Columbia*, 454 F. Supp. 2d 1 (D.D.C. 2006).

[99] *Dixon v. Weinberger*, 405 F. Supp. 974 (D.D.C. 1975).

[100] *District of Columbia v. Jerry M.*, 738 A.2d 1206 (D.C. 1999), cert. denied, 529 U.S. 1118, 120 S. Ct. 1981, 146 L. Ed. 2d 809 (2000).

The circumstances that merited judicial interventions in these cases are similar to each other and similar to those in this case.  First, because of their dependence on the District for basic services and protection, vulnerable plaintiffs had no other recourse but to seek judicial enforcement of their adjudicated constitutional or statutory rights.  Second, in all of the cases, the District agreed to a decree recognizing their constitutional or statutory obligations to the plaintiffs. Third, defendants were unwilling or unable to obey injunctions intended to bring about effectuation of plaintiffs' rights. Finally, the courts in each case had tried a series of less intrusive remedies before they appointed a judicial officer to facilitate or direct compliance.

### 1. Judicial appointments after decades of non-compliance.

Mentally ill people in the District of Columbia, as well as people with mental retardation, have sought the protection of the federal court to assure their right to treatment in settings least restrictive of their liberty and protection from harm.  In *Dixon v. Weinberger,* 405 F. Supp. 974 (D.D.C. 1975), as in *Evans v. Washington* , Judge Aubry Robinson determined that plaintiffs had a right to community based treatment by the least restrictive means and to medical and psychiatric care in accordance with individualized treatment plans based on their specific needs.  (*Id.,* at 977.) [101] Five years later, the *Dixon* parties agreed to the 1980 Consent Order and Final Implementation Plan.[102]

---

[101] The plaintiff class consisted of individuals who are or may be hospitalized in a public hospital under the District of Columbia's 1964 Hospitalization of the Mentally Ill Act, D.C. Code Section 21-501 et seq. (See generally *Dixon v. Barry*, 967 F. Supp. 535, [D.D.C. 1997] for a summary of the procedural history in this case.)

[102] In an effort to facilitate compliance, the court had approved additional consent orders in 1987 and 1989.

Between the 1980 Final Plan and 1992, the Court found community based treatment for class members in the least restrictive settings had proved difficult, if not impossible, to achieve. (967 F. Supp. at 539.) Thus, the court entered another Consent Order calling for a Service Development Plan, setting forth detailed types, numbers of programs, and a sequential timetable for implementation. When the Court found overwhelming evidence that the District had failed to meet its obligations for the first year of the Service Development Plan—despite its commitment and sufficient funding –it appointed a Special Master with powers to require compliance reports, comment on implementation plans, make recommendations to the parties and mediate disputes. (*Id.,* at 540.) After a successful implementation of a 120 day agreement, the parties negotiated a second agreement with specific, identifiable objectives and deadlines, but the District was unable to sustain its progress and carry out its intentions.

Thus, when the District admitted in 1996 that it still was not in substantial compliance with its agreements, plaintiffs moved for a receiver. Threatened with receivership, the Mayor issued two executive orders delegating procurement and personnel authority to the Commissioner of Mental Health Services and creating the position of "Dixon Administrator" to provide a leadership position directly responsible for overseeing compliance with the Court's Orders. (*Id.,* at 541.) Nevertheless, after extensive hearings in 1997, Judge Robinson made detailed findings of fact regarding defendants' failure to serve mentally ill adults, elderly class members and homeless people. In addition, the court found failures in interagency collaboration, facility maintenance, crisis intervention, and quality assurance. (*Id.,* at 542 – 548.) Finally, the Court identified obstacles to system reform in the areas of leadership, organization, procurement, quality and finances – all of which had deteriorated since the 1992 plan.

Faced with 22 years of non-compliance, the Dixon Court invoked the inherent equitable powers of federal courts and appointed a receiver to oversee the Commission on Mental Health Services as necessary to implement court orders.  In his opinion, Judge Robinson set forth some criteria to be considered in determining the justification for an extraordinary remedy:  whether there are repeated failures to comply; whether continuing to insist on compliance through usual remedies would lead only to more confrontation and delay; whether there is a lack of leadership necessary to make significant progress within a reasonable time; whether there has been bad faith; whether resources are being wasted and whether a receiver can provide a quick and efficient remedy (relative, at least, to the speed and efficiency of past remedies)  (*Id.,* at 550.)

Judge Robinson addressed directly issues of federalism and the separation of power that are raised when a federal court imposes an extraordinary remedy—a judicial officer—on an executive branch agency of a local government. He concluded "where the actions or omissions of elected public officials, whether representatives of federal, state, or local government, impermissibly infringe on the constitutionally protected rights of individuals…federal courts as interpreters and, most importantly, protectors, of the United States Constitution must act to stop such infringement." (*Id.,* at 552 (quoting *Shaw v. Allen*, 771 F. Supp. 760, 763 [S.D.W.Va. 1990]) [103]

### 2. Limitations on the authority of judicial appointee.

Perhaps the *La Shawn* case illustrates best the judicial frustration involved in obtaining compliance with injunctions issued to secure fundamental constitutional and statutory rights in the District of Columbia.  In that case abused and neglected children in District and private custody

---

[103] The Court's opinion was quoted favorably by the D.C. Court of Appeals in Jerry M, discussed below, to support its conclusion that before appointing a judicial officer to act in the stead of elected officials, a court should consider the factors outlined by Judge Robinson. *Jerry M*, 738 A.2d at 1213.  The Dixon litigation is on-going.  See *Univ. Legal Serv. v. St. Elizabeth's Hosp.* 2005 WL 3275915 (D.D.C.)

claimed that their Fifth Amendment due process and statutory rights were violated by the District's failure to provide adequate food, shelter and education to children in its care.[104]  As Judge Hogan put it:

> It is a case about thousands of children who, due to family financial problems, psychological problems, and substance abuse problems, among other things, rely on the District to provide them with food, shelter, and day-to-day care. It is about beleaguered city employees trying their best to provide these necessities while plagued with excessive caseloads, staff shortages, and budgetary constraints. It is about the failures of an ineptly managed child welfare system, the indifference of the administration of the former mayor of the District of Columbia, Marion Barry, and the resultant tragedies for District children relegated to entire childhoods spent in foster care drift. Unfortunately, it is about a lost generation of children whose tragic plight is being repeated every day. (762 F. Supp. at 960 (D.D.C. 1991.)

A detailed remedial order was entered and a monitor appointed with the parties' consent in 1991. By 1994, "defendants were utterly out of compliance with the Remedial Order and Revised Implementation Plan" and the Court imposed three "limited receiverships" for resource development, corrective action and protective services.[105]  Some months later, faced with defendants'

---

[104] The federal statutes allegedly violated were the Adoption Assistance and Child Welfare Act of 1980, Pub. L. No. 96-272, 94 Stat. 516 (June 17, 1980) (codified as amended at 42 U.S.C. §§ 620-627 and §§ 670-679) (Adoption Assistance Act) and the Child Abuse Prevention and Treatment Act, Pub's. No. 93-247, 88 Stat. 4 (January 31, 1974) (codified as amended at 42 U.S.C. §§ 5101-5106) (Abuse Prevention Act).

The District statutes allegedly violated are the Prevention of Child Abuse and Neglect Act of 1977, Declaw 2-22 (Sept. 23, 1977) (codified as amended at D.C. Code Ann. §§ 2-1351 to -1357, §§ 6-2101 to -2107, §§ 6-2121 to -2127, and §§ 16-2351 to -2365) (Abuse and Neglect Act) and the Youth Residential Facilities Licensure Act of 1986, Declaw 6-139 (Aug. 13, 1986) (codified as amended at D.C. Code Ann. §§ 3-801 to -808) (Licensure Act Plaintiffs' complaint also alleges violations of the Child and Family Services Division (CFSD) Manual of Operations (September 1985) and reasonable professional child welfare standards.

In a 1998 opinion concerning attorney's fees, the district court stated that even if plaintiffs' federal statutory claims did not survive … plaintiffs have substantial constitutional claims on which they would prevail, citing *La Shawn A. v. Dixon*, 762 F. Supp. at 990-994.

[105] See *La Shawn A. v. Kelly,* 887 F. Supp. 297, 298 – 300 (D.D.C. 1995.)

increasing resistance and no plans to comply, Judge Hogan issued a series of orders directing com-
pliance and adopted the Receivers' emergency resource plan, including provision for diapers, intake
forms, telephones and food vouchers.  Finally, a year later, the plaintiffs asked again for a full re-
ceiver.

On a record compiled by the limited receivers—alleging non-compliance with important re-
quirements voluntarily proposed by the defendants—Judge Hogan found that defendants had failed
to pursue adoptions, adequately staff the adoption branch, do home studies, employ an adequate
number of social workers, provide administrative supports such as phones, word processors and of-
fice maintenance and train child care and group home provider staff – all in contravention of the
Remedial Orders. (887 F. Supp at 300-303.)  Defendants argued that they continued to make sub-
stantial progress.  While the court recognized progress in some areas, it found regression in others.
Thus, the Court concluded that the District defendants had not substantially complied with court or-
ders, held defendants in civil contempt and appointed a full receiver to effectuate the fundamental
changes needed.  (*Id.,* at 315-316.)

Although it clearly affirmed the federal courts' broad equitable powers to enforce court or-
ders, citing *Swan v. Charlotte-Mecklenburg Bd. of Educ.*[106] the D.C. Court of Appeals reversed
Judge Hogan's appointment order holding that where court orders are based on local, not federal
law, the Court's equitable powers do not include the authority of a court appointed receiver to disre-

---

[106] *Swan F. Charlotte-Mecklenburg*, 402 U.S. 115 (1971); Stone *v. City and County of San Francisco*,
968 F.2d at 861.

110

gard local law unless it is necessary after the consideration of other alternatives.  (144 F.3d 847.) [107]

The appellate court reiterated its conviction that:

[A] district court's choice of equitable remedies is 'highly contextual and fact de-
pendent *Id.,* at 854 (quoting *Stone v. City and Cnty of San Francisco*, 968 F.2d at
861.) But the remedy should begin with what is absolutely necessary. If those meas-
ures later prove ineffective more stringent ones should be considered, *Id.* (quoting
*Ruiz v. Estelle*, 679 F.2d 1115, 1145-46 (9th Cir. 1982.) 144 F.3 847 (1998.)[108]

Further, the appeals court observed that "the respect due the federal judgment is not lessened

because the judgment was entered by consent." It noted that the plaintiffs' suit alleged a denial of

constitutional rights. "When the defendants chose to consent to a judgment, rather than have the Dis-

trict Court adjudicate the merits of the plaintiffs' claims, the result was a fully enforceable federal

judgment that overrides any conflicting state law or state court order." (*Id.,* at 854 (quoting *Badgley*

*v. Santacroce*, 800 F.2d 33, 38 [2d Cir. 1986].)

### 3. *Factors to be considered before appointing a judicial officer to assure compliance*.

Again, in a case bearing important similarities to the *Evans* case, the D.C. Court of Appeals

in *Jerry M* confirmed the trial court's authority to appoint a receiver under certain circumstances af-

---

[107] "[W]e believe that the district court needs to consider each contemplated violation of District law
on a case-by-case basis. Should a situation arise in which it is alleged that desired action by the Re-
ceiver violates local law, the District should bring this to the attention of the district court and bear the
burden of making the case that a conflict exists. If the district court concludes that there is indeed
such a conflict, it should only authorize the Receiver to violate local law in those instances where,
considering other alternatives, it specifically concludes an override is necessary to enforce the terms
of the consent decree." *Id.*   At 854.

[108] The issue in *La Shawn* was whether the un-implemented orders were based on federal law or on
only local law.  The Court of Appeals reversed Judge Hogan's order for a receiver because it found
that in his modified Judgment, Judge Hogan explicitly disclaimed any federal basis for the consent
decree. *Id., at* 853.  Furthermore, the appellate court found that the Judge had authorized his receiver
to override local law in "a whole host of areas" without a case-by-case determination that an override
of local law was necessary to enforce the terms of the consent order.  *Id., at* 854.

ter years of constitutional and statutory violations. However, the appeals court reversed the appointment of the receiver because, in that case, the trial court had not given sufficient consideration to particular circumstances.  (738 A.2d at 1214.)

The suit was commenced in 1985 by Jerry M, a juvenile representing a class of minors incarcerated at Oak Hill, a detention home operated by the District of Columbia.  He contended that the District government had failed to provide him "appropriate care, rehabilitation, and treatment" in violation of the Constitution and the District of Columbia Code. The parties had entered into a Consent Decree acknowledging those constitutional and statutory rights, which was approved by the trial court and entered as a judgment. (*Jerry M.,* 571 A.2d at 181; 738 A.2d at 1213.)

As here, the Consent Decree required performance of certain detailed, critical functions such as the development of "minimum standards for staffing and training, improvements in diagnostic services, treatment planning through individual service plans (ISP) … as well as education, recreational and mental health services."  (571 A.2d at 181.) In addition, as in this case, a Monitor was appointed pursuant to the Consent Decree to make findings and recommendations concerning the steps to be taken to achieve compliance with the Consent Decree, and seven years later, the trial court appointed a Special Master to "initiate the process of judicial action with an effort of minimal intrusiveness to assist, not take over, [appellants'] duties under the Consent Decree." (*Jerry M.*, 738 A.2d at 1209.)  Superior Court Judge Richard Levie warned that if the District continued to fail to meet their obligations the court would consider a receivership.

That time came in 1998. After finding numerous violations of the Consent Decree, implementing orders and applicable statutory provisions, Judge Levie appointed a receiver, only a few

days before the beginning of the new school year and before the recently appointed School Superintendent had had an opportunity to make improvements at Oak Hill. [109]

The District of Columbia Court of Appeals confirmed the trial court's equitable jurisdiction to take broad remedial action to secure compliance with its orders, including the power to appoint a receiver, *citing Dixon v. Barry, Morgan v. Donough, and La Shawn A. v. Barry.* However, the appeals court faulted the trial court for taking only one of several factors into account to determine whether other remedies were inadequate and receivership the only viable option. The trial court had focused on "the District's abysmal response to its mandates for such a protracted period of time" as the only compelling consideration, when it should have taken other important criteria into account. These included those enumerated in the *Dixon* case in which the Court of Appeals had affirmed the appointment of a receiver: i.e. repeated failures to comply; likelihood of further confrontation and delay; availability of effective leadership; bad faith; wasting resources; and whether a receiver should bring about a quick and efficient remedy, citing *Dixon*, (967 F. Supp. at 550.)

### 4. Independent judicial agent with focused responsibilities.

In another protracted, complex piece of reform litigation in the District, *Petties v. District of Columbia*, Judge Paul Friedman issued repeated injunctions and contempt citations before appoint-

---

[109] In appointing the Special Master, the trial court found that "(1) 'despite the assistance of the Monitor and the Monitor's experts, and in the face of the Court's remedial Orders … have never achieved compliance with the educational requirements of the Consent Decree'; (2) the 'appellants have demonstrated an inability to achieve and sustain compliance with the Consent Decree and the Court's remedial orders regarding educational services. Moreover, the Court is convinced that the 'lack of communication and cooperation' ... is likely to recur without Court intervention'; (3) the appellants 'conced[ed] substantial non-compliance on educational issues' following a hearing on [appellees'] motion for contempt held on May 9, 1997, foregoing the defense of impossibility of performance; and (4) 'there is no factual dispute as to whether the Court has sufficient evidence to find defendants in contempt for violation of the Consent Decree.' 738 A.2d at 1210.

ing several judicial officers to bring about compliance with his orders.[110] The case illustrates a pattern, now familiar in the District of Columbia, of federal courts appointing judicial agents with increasingly intrusive powers to compel compliance with their orders – first a special master, mediator and advisor, then an internal transportation administrator and then an external, independent administrator – with varying degrees of success.

In *Petties v. District of Columbia* children entitled to special education sued the District in 1983 to obtain payment for the costs of special education placements and related services from private providers under the Individuals with Disabilities Education Act. (20 USC section 1400 et. seq. Civil Action No. 95-0148.)  As in the *Evans* case, in 1995, the District had fallen behind in its payments and providers threatened to terminate the students.  (881 F. Supp. 63 [D.D.C. 1995] and 894 F. Supp. 465 [D.D.C. 1995].) Two years later, a class of special education students filed a related action, *Blackman v. District of Columbia,* claiming the District's failure to respond to their requests for administrative due process hearings violated the IDEA. Judge Friedman found the District had violated its binding obligations to the class under the IDEA. (Opinion of June 3, 1998), [111] and appointed a Special Master for the limited purpose of facilitating a resolution of individual claims and assisting the Court in resolving the requests for immediate injunctive relief.  (185 F.R.D. at 7; 558 F. Supp. 88, 91 [D.D.C. 1989], discussed in 538 F. Supp.2d 88, 91.) A consent decree in 2006 resolved that phase of the *Blackman/Jones* litigation, but *Petties* is still an open case. (*Id.*)

In *Petties*, the defendants' failure to make significant progress towards meeting its obligations after the start of this litigation led to the Court's appointment (with the consent of the parties) of an

---

[110] For a history of the *Petties, Blackman/Jones* litigation see Judge Friedman's opinion at 538 F. Supp.2d 88 (D.D.C. 2008.)

[111] For injunctive orders and contempt orders issued in an effort to bring the District into compliance with the IDEA, *see* 897 F. Supp. 626 (D.D.C. 1995); 185 F.R.D. 4,5 (D.D.C. 1999)

Administrator of DCPS' special education transportation on August 7, 2000. This Administrator was a DCPS employee who reported directly to the Superintendent of Schools. For the next two years the Administrator tried without success to execute various interim plans designed (at the direction of the Court) to help bring special education transportation into compliance with federal law and ultimately to facilitate resolution of the litigation.

On January 28, 2003, plaintiffs filed a motion to place the transportation system into receivership. Defendants subsequently agreed to the appointment of an Independent Transportation Administrator to manage, supervise and assume responsibility for the transportation operations of DCPS.[112] On June 25, 2003, the Court approved the parties' Consent Order. Subsequently, in 2006 Judge Friedman interpreted the consent orders to authorize the Transportation Administrator to "step into the shoes" of the Superintendent of Schools and the Board of Education and enter collective bargaining agreements. (2006 WL 1046943 at 6.) The Court of Appeals reviewed Judge Friedman's appointment and affirmed his interpretation of the terms of a 2003 Consent order appointing an independent Transportation Administrator to, among other duties, oversee, supervise and direct all financial, administrative and personnel functions of the DC public school transportation system. (232 Fed. App'x 4, 2007 WL 1411632.)

## VI.    FACTORS TO BE CONSIDERED REGARDING REMEDY.

---

[112] See Judgment, United States Court of Appeals, No. 06-7074 (May 1, 2007) "On June 25, 2003 the District of Columbia agreed to entry of a Consent Order appointing a Transportation Administrator to among other duties, 'oversee, supervise and direct all financial, administrative and personnel functions of District of Columbia Public Schools." Transportation Consent Order A.2. (Affirming district court's order authorizing Transportation Administrator to enter into collective bargaining agreements without prior approval from the District of Columbia Board of Education on the ground that the Consent Order provided that the administrator could and did petition the Court to waive any requirements that clearly prevent the administrator from carrying out his duties.)

The conclusion that Plaintiffs are entitled to additional remedial measures does not clearly dictate what such a remedy should be. With respect to the initially requested remedy of a receiver, courts in this jurisdiction have identified six factors to be considered. In referring the remedial phase of this action to the Special Masters, Judge Huvelle wrote:

> The Court's determination whether other remedies are inadequate and whether receiver-ship remains the only viable option to effectuate compliance with court orders is to be guided by a number of factors, including (1) 'whether there were repeated failures to comply with the Court's orders'; (2) whether further efforts to secure compliance would only lead to 'confrontation and delay'; (3) whether leadership is available which can 'turn the tide within a reasonable time period'; (4) 'whether there was bad faith'; (5) 'whether resources are being wasted'; and, (6) 'whether a receiver can provide a quick and efficient remedy.' (Citations omitted)

480 F. Supp. 2d at 326.

As noted earlier, no court has ruled that all six factors must be present to support the re-quested remedy, but a careful consideration of each factor should guide the Court's consideration of whether such a drastic remedial action, that significantly intrudes into a local government's opera-tions, is warranted. We turn now to a consideration of these factors.

1. ***Repeated failures to comply with court orders***. There is little doubt, based upon the record before the court, and before the Special Masters as discussed in this report, that there are ongoing failures to comply with Court Orders over an extended period of time, to the detriment of class members' inter-ests. Notably, in all of their voluminous filings, Defendants do not claim to be complying with the Court Orders.

2. ***Confrontation and delay***. In arguing that there is no evidence that further efforts to secure com-pliance would only lead to confrontation and delay, the Defendants cite the progress they have been making and are continuing to make, and the lack of evidence that they are actively seeking to dis-obey court orders.

The efforts to secure compliance in this round of litigation have already been the subject of requests to hold the Plaintiffs' motion in abeyance (February 6, 2007, Hr'g Tr. at 11-12) prior to the court's ruling on March 30, 2007; for a stay of proceedings on the remedial phase which the Court characterized as an attempt at "more delay" (May 15, 2008, Hr'g Tr. at 50:5-7); and, most recently, a motion to vacate the outstanding Court Orders and dismiss the case, arguing that "any further per-petuation of this litigation is not only practically unnecessary also legally impermissible." (Defs.' Motion to Vacate Consent Orders and to Dismiss Action, at 3, Docket #1108.)[113]

3. ***Leadership can turn the tide.*** Defendants point to the creation of two Cabinet level agencies, the Department on Disability Services and the Department of Health Care Finance, the recruitment of qualified leaders, and the provision of procurement, contracting, personnel and rulemaking authority with the agency (Defs.' Findings at 8, 12-23, 31, 86-94.) They cite the accomplishments of the new leadership team including developing a new Medicaid waiver program, which has been widely praised (*Id.,* at 76); disciplining and removing employees who were not contributing to the reform efforts (Trial Tr. 359-360); and significant interagency cooperation (Defs' Findings at 46, 50, 57-64, 65 and 127.) Defendants argue that the tide has already turned.

Plaintiffs argue that there continued to be serious deficiencies in health, safety and welfare of class members as found in the Court Monitor's reports and those of her expert consultants for 2007 and 2008; and in the Special Masters' earlier report (Special Masters' Report, Pls.' Ex. 7) .

We find that the new leadership team has been making incremental progress in addressing some of the long-standing problems that have plagued the system of services and harmed class members. At the same time, as described above in our findings, many of the reforms identified are

---

[113] On May 1, 2009, the Court entered a Minute Order holding this motion in abeyance until this Report and Recommendation of the Special Masters is received.

still in the planning stages and have not been fully implemented. Whether the efforts of this new leadership team will prove successful remains to be seen. In the meantime, there is strong evidence that serious and systemic problems of noncompliance continue. In particular, problems with interagency communication, coordination and collaboration persist.[114]

4. ***Bad faith***. Defendants argue that the record is devoid of any evidence of bad faith. To the contrary, they assert that those instituting reforms are deeply committed to improving the system for the benefit of the persons who are served. They cite the evidence of their expert witness Dr. Jackson, that they are making good faith efforts (Jackson Decl. at ¶ 10 (g)), as well as the inability of Plaintiffs' expert witness, Martha Knisley, to cite examples of bad faith (Trial Tr. at 115.)

Plaintiffs claim that the Defendants have repeatedly filed erroneous and misleading reports and declarations with the Court each month for 11 month period from January through November 2008 in which they claimed to be in compliance with Court orders regarding timely payments, while there were in fact significant delays which negatively impacted class members (Decl. of Robert Maruca & Affidavit of Delicia Moore, Pls.' Ex. 189; Wild's Test. Trial Tr. at 227:6-19; Nuss Test. Trial Tr. at 283:19-284:20; 287:17-25) Defendants acknowledged that they had started receiving complaints in July 2008 that day programs were not being paid on time, but the affidavits filed with the

---

[114] DDA Deputy Dir. Laura Nuss captured this dichotomy well in her testimony at trial:

> [R]egarding the speed of change, it's a mixed statement. The infrastructure, crafting a Medicaid waiver, writing policies, recruiting employees, assigning resources, has all been done at breakneck speed. But on the other side of the coin, you don't see the outcomes you want to see us fast as you would like to see them. This is a historically plagued service system. So I think it is taking time to see the outcomes. We still see the bad outcomes for individual issues. But we're also seeing a lot of positive outcomes. Although it is not as fast as any director would like it, it is going at a very fast pace.

Trial Tr. 167-68.

court stated that there were no delays in payments to vendors (Docket #1063, ¶ 10.)[115] Plaintiffs also argue that Defendants provided misleading information to the Special Masters by failing to report significant delays in securing guardians, in the course of submitting evidence of compliance with the September 12, 2007 Consent Order (Special Masters' Report at 87.) Finally, Plaintiffs cite the "significant alteration of death investigation reports" that was addressed in the Court's opinion (480 F. Supp. 2d at 310) and other inaccurate and misleading information provided to the parties and to Court Officials earlier. Plaintiffs clarify that they are "not asserting individual malice or corruption" but the "chronic inability of the District to secure needed results." (Pls.' Post Trial Br. at 31.)

We do not address the issues cited which predate the remedy phase and which were dealt with in the Court's opinion. Mere errors in documents filed, without evidence of an intention to mislead, are not sufficient to carry the burden of proof of bad faith. There is no persuasive evidence of such an intention.  "Chronic inability" is not the same as deliberate efforts to mislead the court. We do not find bad faith by the Defendants.

5. ***Resources are being wasted***. Defendants argue that they have properly utilized and even maximized their resources during the last two years through their Medicaid waiver revision which increased provider rates and federal reimbursement for services delivered to waiver participants (Defs.' Findings at 71, 74.) They state that the appointment of a receiver or special administrator would utilize resources that could be directed to serve consumers, especially since there is already a Court Monitor and two Special Masters.

---

[115] The Special Masters granted Defendants' motion to strike this exhibit which was filed and submitted after the close of trial. Special Masters' Order Granting In Part And Denying In Part Defendants' Motion To Strike Evidence Not Presented At Trial And To Exclude The Special Masters' Ruling ,Findings Regarding The September 12, 2007 Order, at 3-4,  March 17, 2009 (Docket # 1099.) Accordingly, we have not considered it in making our findings and conclusions on this point.

Plaintiffs cite the succession of experts, consultants and plans which required significant resources but which have not resulted in compliance with Court Orders. Plaintiffs assert that Defendants have not properly utilized the talents of consultants like Kathy Sawyer. They cite as examples of waste the need for repeated re-issuance of the same recommendations from investigations (480 F. Supp. 2d at 312); the long delays in authorizing providers to bill to the Medicaid waiver, which results in expending 100% local money rather than Medicaid funding for which the federal government provides 70% reimbursement. (Cook Test. Trial Tr. at 157:14-158:22.) Resources are also wasted when the unreliability of the Medicaid transportation system forced providers to spend their own funds to transport their residents to day programs or medical appointments. (Wilds' Decl. Pls.' Ex. 19 at ¶ 23; Cook Decl., Pls.' Ex. 18 at ¶ 20; Brooks Test. Trial Tr. at 192:14-24.)

It is unquestionable that there has been some level of inefficiency in the operation of Defendants' system which has resulted in avoidable or wasteful expenditures. There is no evidence quantifying what is the actual cost of the inefficiencies cited by the Plaintiffs in relation to the overall expenditures of the system. On the other hand, the recent actions to expand the Medicaid Waiver, to increase reimbursement rates for ICFs/MR and waiver rates as well, and to secure the Money Follows the Person Grant, have collectively brought in millions of dollars of federal reimbursement to enrich the service delivery system for class members and others (Laura Nuss, Trial Tr. at 351-52.) On this record, we do not find substantial evidence of a significant waste of resources.

6. ***Whether a receiver can provide a quick and efficient remedy.*** Defendants assert that a receiver will not bring about reform any faster than it is already occurring (Defendants' Findings 196-99.) Instead, they argue that changing leadership at this time will impede progress and may disrupt healthcare services, and impair their ability to recruit new providers and professionals. Another layer of authority, they assert, will add confusion for stakeholders. Furthermore, they cite the legal im-

pediment under federal law of giving a court-appointed official authority over the Medicaid single

state agency (42 C.F.R. § 431.10.) Finally, they argue that the remedy would itself cause delay as a

receiver develops a plan, and hires a staff.

Plaintiffs argue that the Special Administrator, with the authority of the Court, would break

the pattern of noncompliance with court orders in this case by lending "focus, will, and coordination

capacity" to a dysfunctional system (Spence Decl., Pls.' Ex. 14 at ¶¶ 48, 63.) We address the respec-

tive arguments of the parties in our recommendation below.

## VII. CONCLUSIONS AND RECOMMENDATIONS.

### A. Remedial History of the Case

In the preceding sections of this report, we identified areas in which plaintiffs sustained their

burden of proving current, continuing, serious and systemic noncompliance with the requirements of

court orders addressing class members' rights to timely and adequate health and mental health care,

safety and protection from harm, and individualized services in the least restrictive environment. In

addition, we have identified areas where the plaintiffs failed to sustain their burden of proving non-

compliance by clear and convincing evidence. Throughout, we have recognized evidence submitted

by the defendants about their ongoing efforts to implement system reform plans in each of the areas

discussed above.

Many of the equitable means available to the Courts to remedy non-compliance in discussed

in section V. above, have already been invoked in this case – and have proved insufficient. In the

1978 Final Judgment, this Court issued a permanent injunction requiring defendants to place class

members in community settings outside of Forest Haven and imposed requirements for defendants'

custody of plaintiffs. Since the 1978 permanent injunction, the Court issued further orders and injunc-

tions in 1981, 1983, 1995, 1996, and 2007.  In addition, the Court appointed an independent Court

Monitor in 2001 to assess defendants' performance and report to the Court,[116] a Special Master in

1995 to develop a final remedial plan[117] and a Co-Special Master in 2001 to work with the parties to

implement the 2001 Plan for the vacation of court orders.[118]  In addition, in 2004, the Court ordered

the Mayor to appoint a Deputy Mayor or other senior official to coordinate the efforts of all District

agencies "necessary to secure the timely delivery of appropriate services to class members in com-

pliance with court orders and the 2001 Plan."  (480 F. Supp.2d at 290.)[119] None of these measures

has brought about compliance.

- ***Consent decrees and plans since 2000***.

    The context in which this motion arises is relevant to the issue of remedy.  This case is a veri-

table trail of broken promises and unperformed obligations which have resulted in regular, serious,

systemic and demonstrable harm to class members.  Without going all the way back into the "tor-

tured history" of this case from its origins in Forest Haven,[120] it suffices to review the period since

the turn of this century.

---

[116] Docket # 440, filed January 19, 2001.

[117] After a series of contempt motions and court orders, the Court, in 1995, found defendants in con-
tempt of their court- ordered obligations to pay providers in a timely manner, maintain required case
management ratios, manage class members' personal funds, and pay the Court Monitor.  With the
agreement of the parties, the Court appointed Margaret G. Farrell, Special Master to develop a reme-
dial plan in collaboration with the parties.

[118]  Clarence J. Sundram was appointed Special Master in 2001 on the same terms as the Order of
Reference to Special Master Margaret Farrell. Docket # 445, filed January 30, 2001.

[119]  General Counsel to the Mayor, Peter Nickles, now Interim Attorney General, was tasked with
this function for a time.  February 6, 2007 Hr'g Tr. at 23.

[120] 480 F. Supp. 2d at 326. *See also*, Burton Blatt, Souls In Extremis, at 502-507 [Allyn and Bea-
con, Boston: 1973].

After approximately two years of negotiation, the parties agreed upon the 2001 Plan for Compliance and Conclusion of this case.  In the process, the then new Mayor, Anthony Williams, made numerous admissions regarding the District's failure to comply with court orders (*Evans v. Williams*, 139 F. Supp. 2d 79, 81 [D.D.C. 2001]) The 2001 Plan provided a roadmap for achieving compliance and concluding this litigation.[121]  It was held up in the professional literature as an example of a court order which gave the defendants control of the ways and means of achieving compliance. (Charles F. Sabel & William H. Simon, *Destabilization Rights: How Public Law Litigation Succeeds*, 117 Harv. L. Rev. 1015, 1032-35 [2004].) The plan set deadlines for the accomplishment of various agreed-upon tasks that were necessary to achieve compliance with the underlying court orders.  Shortly after the adoption of the plan and the Court's approval, the defendants sought to renegotiate the timelines contained therein, and numerous deadlines were extended with the consent of all parties.

Despite that, in the ensuing eight years there have been continuing findings of noncompliance, documented by two different Court Monitors in their periodic reports to the court, the Court itself in 2007 (*Evans v. Fenty,* 480 F. Supp. 2d 280, 326 [D.D.C. 2007]), and the Special Masters in 2008 (*Special Master' Report and Recommendation Regarding Defendants' Compliance with the Consent Order of September 12, 2007*, Docket # 1002, August 15, 2008.)

- ***Deficiencies and obstacles to compliance.***

---

[121] *Evans v. Williams,* 139 F. Supp. 2d 79, 81 (D.D.C. 2001):

> Taken together, these documents, fashioned collaboratively by the parties who are represented by able and experienced counsel, set forth a careful and detailed blueprint for achieving compliance with the Court's Orders, for the development of permanent and independent mechanisms to safeguard the rights of class members, and for the phased withdrawal of judicial oversight of the District of Columbia's mental retardation system as compliance with the Court's Orders is achieved.

*Id., at* 1-2.

*Balkanized bureaucracy.*

The problem has not been a lack of effort by MRDDA or its successor agency, DDA.  Nor, in our view, is the problem in the District that talented individuals are not working hard to serve a population that desperately needs their assistance.  This is also not a case about the lack of good intentions or a willingness within DDS/DDA to comply with court orders.  Rather, it is about inadequate governmental capacity, as well as lack of a single-minded focus and priority at all levels of government to achieve compliance.[122]

The problem is that the government systems within which they work are Balkanized and dysfunctional, and do not act with the coherence of purpose or a sense of urgency that is warranted.  As described above in our findings based on events after November 2006 and those following the Court's March 30, 2007 ruling, these failures have real and adverse consequences for class members and their families.[123]  As a result, for example, access to medical care is needlessly delayed while class members suffer pain, deterioration and other adverse consequences; incidents are not reported as required and  investigations are not completed timely and the implementation of recommendations is also delayed, leading to the same recommendations being made over and over again and harm to class members continuing; despite court orders, and promises to improve, business processes con-

---

[122] In *Dixon v. Barry,* 967 F. Supp. 535, 540  (D.D.C. 1997),  the Court wrote:

> The District's failure to fulfill its obligations under the 1992 consent Order and Plan stem from incapacity, not unwillingness, to do what it had agreed to do and when it was supposed to do it. This failure is consistent with its past failures. Its efforts have not been lacking, but they have been insufficient, ineffective and untimely.... However, [the Court declares] emphatically that twelve years is long enough for the District to perfect and effectuate a system which protects the legal rights and lives of the mentally ill in the community consistent with its statutory mandate and the Judgment of this Court.

[123] *Id.* (Describing similar problems in the District's mental health service system, which resulted in the court granting a motion to place the Commission on Mental Health Services under receivership.)

tinue largely as they always have, with gaps in communication and coordination between agencies around important decisions. The problem generally has been a failure of District agencies, which share responsibilities for critical functions that must be performed timely and well to comply with obligations under court orders, to adequately prioritize the tasks necessary for compliance, to cooperate with one another and to pull in the same direction.

*Lack of agency coordination.*

Recognizing this ongoing problem, in 2004 the Court took the unusual step of entering a *sua sponte* order requiring the Mayor to appoint a Deputy Mayor or other senior official to coordinate the day-to-day implementation activities of District agencies so as to achieve compliance with the previous court orders. (Docket #685, entered January 21, 2004.) This required that the named official "shall have the necessary authority to supervise and direct the activities of District of Columbia agencies to carry out their obligations under the 2001 Plan and previous orders of this Court." That is, the Court ordered the Mayor, as the chief of the executive branch, to appoint a person to be responsible, i.e. the Deputy Mayor or other senior executive official—chosen by and accountable to the Mayor, not the Court—to be responsible for coordinating efforts in the executive branch to comply with *Evans* court orders. Thus, the Court tried to inject stability and coordination to the compliance effort, while leaving the Mayor substantial discretion in the management of local government agencies.

*Leadership turnover.*

However, in the ensuing years after 2004, the same problem of turnover that affected critical positions in District agencies in the past also affected the position of the Deputy Mayor who was to coordinate their efforts. Since the Court Order was entered five years ago, there have been six different people occupying this position, and most of them did not remain long enough to be a consistent

125

presence needed to accomplish the intended task. For example, the City Administrator, Robert Bobb, appeared at a status conference on June 29, 2006 and promised to take charge of the problem of inter-agency coordination and fix it (Hr'g Tr. at 24.) However, a few weeks after making this statement, he resigned his position.

The election of a new Mayor in 2006 ushered in a period of high expectations.  With the Mayor's appointment of a new team, there was optimism that the personal engagement of the Mayor's Counsel, Peter Nickles, who had been assigned the coordination role, would dramatically improve compliance.  However, under the Fenty Administration, defendants continued to lack the focus of a single official who assumed responsibility for effectuation of the Court's 2004 Order, compliance with the 2001 Plan and implementation of all of the requirements of outstanding court orders.  Senior officials in the Developmental Disabilities Administration and in the Department of Health Care Finance testified that they were unaware of the role of the Mayor's Counsel as the Mayor's designee pursuant to the Court's 2004 Order or that the Order called for coordination of agency action.  (Nuss Test. Trial Tr. at 254:20-23; McCarthy Test. at Trial Tr. 525:1-10.)

Nevertheless, in apparent recognition of the Special Masters' findings of lack of agency co-ordination, as well as Mayor's and Mr. Nickles' failure to date to manage inter-agency cooperation, defendants belatedly plead that now the District *actually will* comply with the 2004 Order through the appointment of a Task Force headed by the Deputy Director of DDS -- "to moot the function of the court official Special Masters recommend" [in their Draft Report].  (Defendants' Exceptions to the Special Masters' Draft Report, p. 29 (July 6, 2009), and Attachment Mayor's Order 2009-119, June 25, 2009.)

The Mayor's June 25, 2009 Order does not moot the remedy proposed in Master's Draft Report or in this Final Report. This newly created Task Force is not a significant change in the status quo. It does not provide for any accountability to the Court for the implementation of all of the other court orders outstanding in this case or the conclusion of the suit.  In effect, defendants claim that because **now** they **plan** to obey the 2004 Order, they should be relieved of their responsibility to meet the obligations of all of the other court orders, -- which they have asked the Court to dismiss, *including this one*.  Thus, defendants' take the position that the planned Task Force justifies their rejection of an  agreement to empower the Deputy Director of DDS to act for and be accountable to the Court in that capacity.  The 2004 Order has been in effect for five years.  It did not result in the defendants seeking a determination of compliance with even one element of one outstanding court order.  In effect, defendants again ask the Court's indulgence for continuation of the status quo – and adoption of no remedy at all.[124]  The Special Masters do not recommend such indulgence. Having re-

---

[124] There have been interagency Memoranda of Agreement (*see, e.g*. Memorandum of Agreement entered in 2001 re Investigations), and interagency workgroups created before, without evidence of success in remedying the underlying deficient performance in attending to class members' rights as described in the Court's 2007 opinion and in this Report. For example, the 2006 Mayor's Order, which is rescinded by the one now proffered, provided:

> The District of Colombia's implementation of the "2001 Plan for Compliance and Conclusion of *Evans v. Williams*" ("Plan for Compliance") and the related orders in the *Evans* class action litigation required that MRDDA's request for action involving its budget, contracting and procurement of goods and services, personnel matters, and interaction with MAA in its capacity as the single state agency for Medicaid receive priority, expedited and timely consideration by all District of Columbia agencies, departments and employees. The directors of all agencies subordinate to the Mayor interacting in any capacity with MRDDA hereby are directed to take steps necessary and appropriate to comply with the foregoing Plan for Compliance and related court orders. To ensure compliance with this Order and to monitor its implementation, the City Administrator shall convene a meeting at least once each month to include (but not limited to) the Deputy Mayor for Children, Youth, Families, and Elders, the DHS Chief Financial Officer, the Chief Procurement Officer, the Director of Personnel, the MAA Administrator, and the MRDDA administrator. . . .

(Mayor's Order 2006-101, July 26, 2006)

jected the Masters' proposed Special Compliance Officer working within DDS/DDA, defendants leave the Masters no choice but to recommend an Independent Compliance Administrator empowered by and accountable to the Court to bring about compliance and end this lawsuit. This remedy is justified on the clear and convincing evidentiary record of non-compliance before the Masters and the history of this case – past and recent.

*Reforms have not prevented repeated damage to class members' daily lives.*

Some progress has been made, as discussed above and as found in the Special Masters' Report which concluded that there was substantial compliance with seven of 13 provisions of the September 2007 Consent Order and partial compliance with one other. At one level, the District has demonstrated a willingness to move on reform measures, including the creation of a Cabinet level Department on Disability Services, long sought by advocates, the development of a more suitable Medicaid waiver, increasing enrollments of class members in the Waiver, beginning the process of moving class members to less restrictive community residential placements, increasing the level of reimbursement under the Medicaid program for ICF/MR and waiver services, and developing inter-agency memoranda of understanding between DDS and MAA/DHCF, and with HRLA.

In addition, there is, of course, some communication and collaboration between DDA and MAA/DHCF. The Medicaid program could not function without it. As testimony at the trial indicated, there have been continued efforts to improve attention to class members' health and safety, to increase utilization of the Medicaid Waiver to provide services in smaller and more integrated community settings, and to increase the quality and availability of primary care. We appreciate that the District seems to be a difficult jurisdiction for delivery of public services, with numerous human ser-

vice agencies subject to court orders and varying levels of judicial supervision, having been found to have failed to comply with their legal obligations.[125]

Unfortunately, these broad administrative and organizational reforms, important as they are, have not resolved the on-going problems in the day-to-day lives of class members, or operational issues which cross agency lines, as described earlier. Time has shown that the problems with interagency coordination persist under the Fenty Administration as they had under the previous administration, and have resulted in the same sub-standard living conditions, lack of necessary medical care, as well as inappropriate and ineffective day programs. As discussed in this Report, lack of coordinated management of the process for applying for guardianships for class members has resulted in inordinate delays in processing such applications between DDA and the OAG, creating a barrier to the timely access to necessary medical treatment. At trial, there was evidence that the lack of communication and interagency coordination had resulted in unilateral decisions being made by MAA/DHCF, without advance notice to DDA, that created havoc with transportation arrangements for class members that lasted for months, adversely affecting their ability to attend their programs, keep their jobs and keep their appointments to receive medical and other services; that MAA/DHCF had changed rules regarding reimbursement of services of medical directors of ICFs/MR without prior notice to DDS/DDA, resulting in two agencies of government giving conflicting directions to provider agencies; Other examples have been discussed earlier in this report. (See section IV *supra.*)

The bottom line is that the level of coordination and collaboration between and within agencies is not consistent enough or effective enough to prevent unilateral and damaging actions being taken by MAA, without notice to DDA, as cited by Defendants' own experts and fact witnesses and

---

[125] See section VI (D) *supra*.

providers. (Thaler Rpt. at 10-11, 13; Nuss Test. Trial Tr. at 266:6-9; Heumann Test. Trial Tr. at 457:4-7; McCarthy Test. Trial Tr. at 508:7-17.) Thus, on this record of continued serious and systemic noncompliance, as well as failure to implement the Court's 2004 order which was intended to place additional responsibility upon the defendants themselves to manage their service system and achieve compliance, the Court has very little choice left but to provide an additional remedy for the ongoing noncompliance.

- ***The need for additional remedies***.

*No evidenced intention or plans to comply with court orders*.

Additional remedial relief is particularly merited here where defendants neither claim to be in compliance with any of the court's orders, nor have any apparent plan for coming into compliance or any timetable for doing so. When questioned during the trial, neither the Director of DDS nor the Deputy Director of DDA had a specific plan or a timeline for submitting reports of compliance as envisioned by the 2001 Plan (Heumann Test. Trial Tr. at 483:10-484:4; Nuss Test. Trial Tr. at 338:24-340:23.) Rather, defendants claim no remedy is needed because they have done enough to "ameliorate" the constitutionally based permanent injunction issued in 1978 and thus all of the court's orders should be terminated, including those to which they consented.[126]

Defendants have had eight years to do so but have made no effort to demonstrate compliance with *any* portion of the 2001 Plan, and offered only a vague statement of an intention to do so sometime in the future (*Id.*) Significantly, in the strategic plan developed by DDS for the three-year period 2008 to 2010, achieving compliance with the court orders in this case is not explicitly identified as a goal. (Pls.' Ex. 50; Laura Nuss, Trial Tr. 61:20-22) In failing to put forward any proposal

---

[126] The terms "amelioration" and" compliance" do not have the same meaning. Webster's New Collegiate Dictionary defines the terms as follows: *Ameliorate:* to make more tolerable. *Comply:* to complete, perform what is due, to conform ones actions to a rule. G. & C. Merriam Co. 1980.

for a remedy in response to the Court's finding of serious and systemic noncompliance, defendants are arguing to be left alone to make progress in whatever manner and at whatever pace they decide—with no end to the continuous disregard of court orders in sight.

Defendants assert that they have "ameliorated" any constitutional violations leading to this litigation, and with respect to specific court orders, have made substantial progress. Therefore, no court-ordered remedy is necessary. Defendants have cited no specific actions or evidence in support of their broad claim that "underlying constitutional violations have long since been ameliorated." (Defs.' Post Trial Br. Regarding Remedy at 6.) They do not identify which specific constitutional violations they are addressing or how they have ameliorated them. They claim that the underlying court orders on which the 2001 Plan is based are difficult to comprehend and thus compliance cannot be easy even if possible (*Id.,* at 28.)

This latter argument is particularly disingenuous. The 2001 Plan was apparently clear enough when, after two years of careful deliberation, defendants agreed to it and a related Consent Order and a Settlement Agreement. (*Evans v. Williams*, 480 F. Supp. 2d 280 [D.D.C. 2001].) It was clear enough for Judge Harris, after a fairness hearing, to describe it as a "detailed blueprint" for concluding this case. (*Id.*) And it was clear enough for Judge Huvelle to measure in considerable detail the defendants' performance against their court-ordered obligations in her March 30, 2007 opinion. (*Evans v. Fenty*, 480 F. Supp. 2d 280 [D.D.C. 2007].) Defendants have offered no explanation why, if they did not understand either the court orders or the 2001 Plan, they have not sought clarification of any alleged ambiguity prior to being found in serious, systemic and continuous noncompliance (*Id.; See, Glover v. Johnson*, 434 F2d 703, 708-709 [6th Cir. 1991].)

*Current good faith efforts do not amount to compliance.*

This report is not a judgment on the efforts of the DDS Director, or Deputy Directors of DDA or of DHCF or the new staff that have been brought in. In this case there has been a history of the District treating as personal failures the organizational, interagency and systemic problems officials encounter which are beyond their control. This accounts, in part, for the revolving door of leadership and responsibility in the executive branch to persons with developmental disabilities. The current leaders seem to recognize class members' problems, but their time is consumed dealing with systemic dysfunctions, as discussed above. They have articulated some plans to improve conditions in the future. But we are mindful that the history of this case is littered with plans, most of which have not been fully implemented, including the 2001 Plan agreed to by the parties and endorsed by the Court.[127] There is no evidence that anyone in the agency or in fact anywhere in the District gov-

---

[127] There are parallels to the situation described by the Court in *Dixon*:

> . . . [T]he District argues that the situation is not nearly as bleak as it appears. Rather, the District argues that it continues to make progress and, as such, will continue to move closer to full compliance without the imposition of a receiver. Virtually the entirety of the District's arguments on the facts surrounds what the District intends to do in the future. For example, the District cites the appointment of a new commissioner, the creation of the *Dixon* Administrator position, modifications to the structure of the CMHS, procurement and contracting modifications, and the like as evidence that it is improving. *See generally* Defendants' Opposition at 5-15. The District also adduced much testimony during the hearing regarding the recent personnel and procurement modifications, and the positive effect that such changes will have on the ability of the District to reach compliance. Accordingly, the District argues that the severe sanction of a receiver is not necessary, given its recent efforts.

> The Court is respectful of the District's attempt to effectuate real change in its mental health system. Unfortunately, this is a song that the District has sung many times before. Given the repeated failure of the District to do what it has promised, either by way of consent order, side agreement with Plaintiffs, or simple proclamation to the Court and to the public, the Court cannot again take the District on faith. The Court simply is in no position to rely on the District's assurances of improvement. The long and frustrated history of this litigation provides no basis upon which the Court can put such trust in the District. Rather, the history of this litigation is that the District repeatedly has made promise after promise about what it would do, but has substantially failed to so do.

*Id., at* 553.

ernment is tasked with coming into compliance with the court orders and the 2001 Plan. For in-

stance, the Mayor's Order attached to Defendants' Exceptions to the Special Masters' Draft Report

creating the Mayor's Inter-Agency Task Force on Coordination and Management of the Supports

and Delivery System for Persons with Intellectual and Developmental Disabilities (the Task Force)

states only that one of its functions – other than advising, reviewing, developing priorities and assist-

ing in coordination -- is "to advance the end of court supervision." (III. c.) It contains no stated

intention, much less any commitment or plan to implement outstanding court orders in this case, and

in fact rescinds the language in the previous Mayor's Order addressing the compliance with the 2001

Plan.


## B. Recommendations Regarding a Remedy

We conclude that the plaintiffs have demonstrated by clear and convincing evidence that

there is a need for additional remedial measures ordered by the Court. Defendants clearly have not

used their best efforts or taken all reasonable steps within their power to achieve compliance with

the court orders. (*Glover v. Johnson*, 934 F. 3d 703 [6th Cir. 1991])

Although the evidence of noncompliance is clear and substantial, as discussed in this report,

noncompliance with orders alone does not necessarily lead to the remedy the plaintiffs seek. The

most significant barrier to compliance that emerges from our review of the evidence is the same one

as initially identified by the Court in 2004, which led to the issuance of the *sua sponte* order directed

to the Mayor regarding interagency coordination and collaboration to achieve compliance. (Docket

#685, entered January 21, 2004.) The division of responsibility among several District agencies for

the performance of key functions that are required—for timely and adequate financing of private

_____

provider agencies, for entering into contracts and agreements with them, for issuing licenses, for holding providers accountable for compliance with federal and local laws and professional standards, and for taking enforcement action when necessary—all make close coordination and collaboration indispensable for the effective functioning of the system. The weaknesses in achieving such coordination continue to impair the effectiveness of the separate efforts of defendants' agencies.

### *Independent Compliance Administrator.*

We have carefully considered the plaintiffs' proposals for a remedy for defendants' continued noncompliance, as well as the defendants' argument that no remedy is warranted. We conclude that, on this record, there is an adequate legal basis to recommend the appointment of an agent of the court of the sort sought by plaintiffs to direct the defendants' efforts to achieve compliance with previous orders of this Court. Such an Independent Compliance Administrator like the Transportation Administrator appointed in the *Petties* case, would be appointed by the Court, be accountable only to the Court and would not hold an executive appointment.

It is the intent of this recommendation that the Independent Compliance Administrator will serve as the focal point for the compliance efforts of the defendants and work in close collaboration with them, resulting in regular submissions of compliance reports as set forth in the 2001 Plan, and phased judicial disengagement from active supervision of the defendants' developmental disabilities service system within three years. The Independent Compliance Administrator is not intended to have the powers of a receiver or to generally displace the power and authority of agency heads or subordinate officers. Rather, the authority and role of the Independent Compliance Administrator is limited to actions necessary to achieve compliance with the court orders within a three year period.

All District agencies and personnel should be directed to cooperate with the Independent Compliance Administrator. If there is a lack of cooperation, or resistance or intransigence, the Independent Compliance Administrator should be required to report it immediately to the Special Masters or the Court.

In our Draft Report, we proposed a less intrusive remedy than that sought by the plaintiffs, recommending the appointment of a hybrid Special Compliance Officer to be jointly responsible to the Mayor and the Court, to serve as the focal point of defendants' compliance efforts. We recommended that the Court appoint the Deputy Director of DDS/DDA, Laura Nuss, as the Special Compliance Officer merging in one person the legal responsibility under local law with the responsibilities and authority to be conferred by the Court, to lead defendants' efforts to achieve compliance with the court orders. Our rationale for this recommendation as proposed in the draft report is contained in Appendix A to this Report, and supported cases in which similar remedial relief was ordered in other institutional reform litigation (see section V *supra*). However, defendants have rejected that recommendation which would have required their consent, and plaintiffs have also expressed reservations. As a result that remedy is no longer a viable one in this case.

We therefore recommend that pursuant to the Court's inherent power, the Court modify its 2004 Order regarding the role of the Deputy Mayor, which has not proved to be an effective remedy for the reasons stated earlier.  In its place, we recommend that the Court appoint an Independent Compliance Administrator as an agent of the Court, who is authorized and directed to:

1. Take all actions necessary to secure the timely delivery of appropriate services to class members and to achieve compliance with the Court's Orders and the 2001 Plan within three years;[128]

2. Determine, in consultation with the parties and the Court Monitor, a schedule for the defendants' submissions of evidence of compliance with distinct sections of the 2001 Plan, and proposals to vacate the related court orders as envisioned by the parties in adopting the plan, including orders which are outdated or no longer relevant (2001 Plan at 6, n.3);

3. Direct defendants to make such submissions in accordance with the schedule thus established, and provide such assistance as may be required to develop and submit such submissions;

4. Direct, as necessary, the actions of any person or agency of the District government, including DHCF and HRLA, as needed to perform the functions described in paragraphs 1, 2 and 3 above, consistent with federal law relating to the role of the single state agency for Medicaid (42 C.F.R. § 431.10);

5. Consult with the Court Monitor, the Special Masters and the parties and propose a schedule for the phased transition of monitoring responsibilities from the Court Monitor to the Quality Trust as compliance is achieved with distinct groups of court orders and such orders are vacated (2001 Plan at 10);[129] and

---

[128] Defendants' expert witness, Nancy Thaler, opined that it would take 3 to 5 years to turn the system around (Thaler Rpt. at 14.) The new leadership team has already been in office for almost 2 years.

[129] The Settlement Agreement entered into between the parties to this action and the Quality Trust, which accompanied the 2001 Plan, §III (Eight) (A)(8) provides: "As each *Evans* Order is vacated by the Court, monitoring of corresponding operations shall be transferred from the Independent Court Monitor to the Quality Trust, and shall no longer be subject to Court supervision." (§III (Eight) (A)(8)

6. Report directly and in person to the Court on a schedule established by the Court.

We recommend that the Independent Compliance Administrator be appointed for a term of three years, unless extended by the Court, and shall have all of the powers and authorities necessary to perform these functions on behalf of the Court, including the same access to information, persons and places as provided to the Court Monitor and the Special Masters. The Independent Compliance Administrator may be removed and replaced only by the Court. Within 30 days of appointment by the Court, the Independent Compliance Administrator shall advise the Court of what additional staff and resources, if any, are needed to execute these responsibilities together with a plan for retaining such staff, whether on contract or otherwise.

We also recommend that, as has been done in similar cases in the District, the Independent Compliance Administrator and defendants not be bound by the DC Procurement Practices Act, DC code Section 2-301.01 et seq., any other district or federal law relating to procurement, or any regulations thereunder thus enabling them to move as rapidly as possible in contracting for services as necessary to meet class members' needs and achieve compliance with court orders. (*See, e.g.,* Consent Decree, *Blackman v. District of Columbia*, Civ. Action 97-1629, at ¶ 139.) Although the new Department on Disability Services has independent contracting and procurement authority, District law has, in the past, created barriers to timely entry of contracts for necessary services.[130]  In effect,

---

[130] These difficulties were highlighted in March 2006 when the District was required to enter into contracts with new providers to replace the services provided by Community Alternatives of Washington DC (CADC) to 63 class members and 34 other consumers. Although provided with significant advance notice on December 16, 2005 of the planned departure of CADC from the District on March 31, 2006, the District reported that it could not enroll new providers into its system rapidly enough due to the time-consuming local approvals required from various District agencies involved in the contracting and procurement process, and issuance of Certificates of Occupancy. On March 23, 2006, the District applied to the Court for an order suspending local laws to enable it to conclude the approvals of the new providers before the planned departure of CADC on March 31, 2006. (Case 1:76-cv-00293-ESH, Docket #795, 797). See also, Special Masters' Report at 22-30.

such a provision would give the Independent Compliance Administrator additional flexibility, should it be needed, to act promptly in procuring services when the need is urgent.

The Independent Compliance Administrator  shall report to the Court if there are specific local laws which pose significant obstacles to achieving compliance, together with specific recommendations for additional judicial relief that may be warranted and the factual basis

In summary, our recommendation is intended to clearly empower an agent of the Court, to bring this case to an orderly conclusion by demonstrating compliance court orders that were entered to protect the interests of class members. The 2001 Plan, which provided a blueprint for achieving compliance with court orders and phased disengagement from active supervision of the court, provides for such an orderly process.

/s/_____          /s/_____

Clarence J. Sundram                            Margaret G. Farrell

Special Master                                 Special Master

**Appendix A –** Rationale for Recommendation in the Draft Report

Our primary concern about recommending the appointment of such an independent special administrator at this time is a fear of destabilizing the current situation, creating possible confusion and lack of clarity for providers as well as employees about who is in charge of the operations of DDA, and other agencies responsible for compliance with court orders, especially at a time of heightened uncertainty in most areas of governmental operations. After years of instability and rapid turnover of leadership, there is evidence from testimony at the trial that providers, including those testifying on behalf of the plaintiffs, have confidence in the current leadership (Defendants' Findings 76.)[131] We are wary about disrupting any momentum for progress, especially as there is evidence that, notwithstanding the deficiencies and problems we have cited in this report, the new leadership is making incremental progress.

### *Hybrid Special Compliance Officer.*

Therefore, we recommend that the Court take a less drastic and less intrusive remedial action at this time to provide the defendants one final opportunity to take effective control of the compliance efforts and to demonstrate that additional judicial intervention is unnecessary. In fashioning this remedy, we are not seeking to punish a contumacious defendant but trying to identify a mechanism that we believe is reasonably calculated to achieve compliance with court orders, entered for the benefit of the class, within the reasonably near future.

---

[131] Plaintiffs' witness, John Cook, testified that the leadership at DDS/DDA is impressive, that people higher up are more knowledgeable and motivated than people in the past. He expressed the opinion that it was best to leave the top leadership in place and let them continue to make changes. (Trial Tr. at 150-151.)

We recognize that the District has created two relatively new Cabinet Level Agencies, the Department on Disability Services and the Department of Health Care Finance, with relatively new leadership recently put in place.  While we are cognizant that there remain ongoing problems with interagency coordination and management of the implementation efforts, as discussed earlier, we believe this less intrusive and more specifically tailored remedy can address the Court's and class members' interest in compliance with court orders without exceeding the limits of the court's jurisdiction or unnecessarily displacing the authority of the local government to manage its own affairs. We believe that a remedy that is specifically focused on achieving compliance with the court orders is appropriate in light of the long history of noncompliance and due to the absence of any evidence of a plan by the defendants for achieving compliance. [132]

We also recognize that the past effort to place the locus of compliance responsibility in the Mayor's office through the Court's 2004 Order has proved unsuccessful; it is our hope and expectation that providing the clear authority of both the Mayor and the Court to a qualified individual who bears primary responsibility for managing services to class members and others on a day-to-day basis will be less distracting than giving this responsibility to an official with a much wider set of responsibilities and constituencies has proved so far. We therefore recommend that the Court appoint the current Deputy Director of DDS/DDA to be a Special Compliance Officer, merging in that one individual the legal responsibilities given under local law with the additional responsibilities and authorities conferred by the Court, to lead the defendants' efforts to achieve compliance with court orders (*United States v. Detroit*, *supra* note 75*.*)

We are aware that a previous effort in this jurisdiction to take a similar approach with respect to the transportation of students to special education proved unsuccessful, resulting in a later Consent

---

[132] The 2001 Plan recognizes that one of the remedies for noncompliance is specific performance of the Plan (2001 Plan, at 10, ¶ 9.)

Order for the appointment of an independent Transportation Administrator (*Petties*, 897 F. Supp. 626, discussed *supra* in section V.D.) However, we are reluctant to saddle the current Mayor with responsibility for the failure of a previous administration by predicting that this arrangement too, with a different set of professionals, will fail. The Defendants' consent to the type of Court Order we recommend will be necessary for the Deputy Director to accept this additional responsibility to be conferred by the Court and they will have a large stake in its success as a pathway to ending judicial supervision. If that consent is not forthcoming, or if this approach proves unsuccessful, we believe that the record in this case would fully justify the Court in appointing an independent Special Administrator.

### *Appointment of the Current Deputy Director of DDA*.

The Deputy Director for DDA, Laura Nuss, has shown promising signs of leadership in moving the agency to a higher level of performance, including recruiting qualified individuals into key positions within the agency. She led the effort to expand the Medicaid waiver and to write a new broader waiver (Thaler Rpt. at 13-14) which has increased federal revenue supporting services to class members and others (Defs.' Findings at 71-73, 108-110, 115, 123); she terminated a third-party contract for the writing of individual service plans and assigned that responsibility to case managers working with class members served under the waiver (Nuss testimony, Trial Tr. 327:3-328:3); she brought the case management program in-house, ending the prior practice of contract case managers, to enable the provision of more consistent supervision; she has shown a willingness to take disciplinary action against poorly performing staff (Pls.' Findings at 99; Trial Tr. at 359-360) and providers (Special Masters' Report at 102-105); she has been assertive in advocating for the interests of DDA consumers in her interactions with MAA/DHCF regarding the transportation broker fiasco (Letter from Laura Nuss, Deputy Director of DDA, to Robert Maruca, Senior Deputy Director of MAA,

Feb. 27, 2008 Pls.' Ex. 55); she has begun the process of moving responsibility for licensing and enforcement from the Department of Health to DDA for persons served by the Medicaid waiver (Nuss Test. Trial Tr. at 275:2-6.)[133] All of these factors are reasons for a level of confidence in her continued and unambiguous leadership role and for giving her clear responsibility and authority for implementation of the court orders, without the thorny operational questions might arise about the authority of an independent Special Administrator over non-class members who outnumber the class.[134]

We realize that there are risks associated with this remedy, perhaps none more acute than the challenge that a mayoral appointee will face in exercising truly independent judgment on behalf of the class pursuant to the additional responsibility being conferred by the Court. The Special Compliance Officer will have to walk a tightrope in performing her duties to the Mayor and to the Court. But we also recognize that the alternative is not free from its own challenges (Spence Decl. at ¶ 31.) These include the uncertain prospect of quickly finding a qualified independent Special Administrator who can "hit the ground running," the time necessary for such a person to learn and understand

---

[133] Plaintiffs have pointed out that several of these initiatives are limited to persons served under the Medicaid waiver and do not address the approximately 40% of the class served in ICFs/MR. We recognize this and understand the rationale for the priority being given to the Medicaid waiver services, as DDA's plan is to progressively reduce reliance upon this more restrictive ICR/MR model of service, utilizing the resources provided by the Money Follows The Person Grant discussed above. The evidence produced indicates that this process has already begun. ICFs/MR are also required to have Qualified Mental Retardation Professionals who are typically relied upon to lead the ISP development process. We also believe that the additional authority conferred by the Court would strengthen her ability to develop effective enforcement strategies for the ICF MRs as well as waiver programs.

[134] In this regard, we note that the role and responsibility of the independent Transportation Administrator assigned to manage special-education transportation in *Petties* was a more discrete responsibility for all of a single function within the education system, and more readily severable from the rest of the responsibilities for the management and operation of the school system. In this case, by contrast, as noted above, the responsibilities for meeting the needs of the class are spread over multiple District agencies, in most of which they are a small part of the overall responsibility of those agencies.

the complex service environment, develop effective working relationships with a host of local officials, establish an office, hire a staff, and set priorities for compliance efforts. As plaintiffs' expert Spence testified, even an independent Special Administrator "stands astride two worlds: (1) the logical/orderly world of the law, and (2) the messy world of political entities, management and leadership (*Id.*, at ¶ 60.)" We also believe that the defendants will have a greater sense of ownership of the success of the Special Compliance Officer known to them, with already established working relationships, and in whom they have placed their confidence; such a remedy may reduce the likelihood of "confrontation and delay."