1             UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2    --------------------------X
     JOY EVANS, ET AL              Docket No. CA 76-293
3                    Plaintiffs,

4          v.                      Washington, D.C.
                                   **June 18, 2009**
5                                  2:10 p.m.

6    ADRIAN FENTY, ET AL
                     Defendants.
7    --------------------------X

8                    ***STATUS CONFERENCE***
            *BEFORE THE HONORABLE ELLEN SEGAL HUVELLE*
9                *UNITED STATES DISTRICT JUDGE*

10   APPEARANCES:

11   For the Plaintiffs:   CENTER FOR PUBLIC REPRESENTATION
                           By:  Ms. Cathy E. Costanzo
12                         22 Green Street
                           Northampton, MA  01060
13                         413.586.6024
                           *ccostanzo@cpr-ma.org*

14
                           HOLLAND & KNIGHT
15                         By:  Mr. Paul J. Kiernan
                           2099 Pennsylvania Avenue, N.W.
16                         Suite 100
                           Washington, D.C.  20006
17                         202.663.7276
                           *paul.kiernan@hklaw.com*

18
                           UNIVERSITY LEGAL SERVICES
19                         By:  Ms. Sandy Bernstein
                           Protection & Advocacy Program
20                         220 I Street, N.E./Suite 130
                           Washington, D.C.  20002
21                         202.547.0198
                           *sbernstein@uls-dc.org*

22

23

24

25

```
1    APPEARANCES:  (CONT'D.)

2    For the Defendant:      OFFICE OF THE ATTORNEY GENERAL
                              FOR THE DISTRICT OF COLUMBIA
3                             Civil Litigation Division
                             By:  Ms. Ellen A. Efros
4                            One Judiciary Square
                             441 - 4th Street, N.W.
5                            Suite 600 South
                             Washington, D.C.  20001
6                            202.442.9886
                             ellen.efros@dc.gov
7
     FOR DDS:                GENERAL COUNSEL
8                            Ms. Martha J. Mullen
                             Ms. Grace Graham
9                            Mr. Mark Back

10   For the Government:     Mr. William G. Maddox

11   Director of DDS:        Ms. Judy Heumann

12   Deputy Director:        Ms. Laura Nuss

13   SPECIAL MASTER:         Mr. Clarence J. Sundram

14   COURT MONITOR:          Ms. Elizabeth Jones

15
     Court Reporter:         Catalina Kerr, RPR, CRR
16                           U.S. District Courthouse
                             Room 6716
17                           Washington, D.C.  20001
                             202.354.3258
18                           catykerr@msn.com

19   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
20

21

22

23

24

25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2            (2:10 A.M.; OPEN COURT.)

 3            THE DEPUTY CLERK:  Civil Action 76-293, Joy Evans,

 4    et al versus Adrian Fenty, et al.  This is set on the calendar

 5    for a status conference.  Would the parties at counsel table

 6    come to the microphone and identify yourselves for the record,

 7    please.

 8            MR. KIERNAN:  Good afternoon, Your Honor, Paul

 9    Kiernan on behalf of the Plaintiffs.  With me on behalf of the

10    Plaintiffs is Sandy Bernstein and Cathy Costanzo.

11            THE COURT:  Okay.  And I'm sorry, one more.

12            MR. MADDOX:  Good afternoon, Your Honor, Bill Maddox

13    for the United States.

14            THE COURT:  Good afternoon.

15            MS. JONES:  Good afternoon, Your Honor.  Elizabeth

16    Jones, court monitor.

17            THE COURT:  Good afternoon.  Okay.  For the

18    District?

19            MS. EFROS:  Good afternoon, Your Honor.  Ellen Efros

20    for the District of Columbia.  At the counsel table are Martha

21    Mullen, Grace Graham, Mark Back, who's general counsel of DDS;

22    Judy Heumann, who's the director; Laura Nuss who's the deputy

23    director; and also Special Master Clarence Sundram.

24            THE COURT:  Okay.  Good afternoon.

25            Now, I think we should start -- I take it, Mr.
```

1    Sundram, you decided not to speak.  Oh, I received a letter.

2    I actually -- I think I'll just have that letter be filed.

3    It's not signed.  It's called, "The Group Concerned for the

4    Wellbeing of the Defenseless."  I don't know what else to do

5    with it, so I'm going to ask the clerk just to let it be filed

6    and then you can read it.

7         It's the Inspector General and to me.  I forgot that

8    I received it in the mail and I really don't feel comfortable

9    receiving anything that I don't make available to everybody.

10        I don't think there -- Mr. Sundram, can you take a

11   look at this and make sure we don't have any identifying

12   information about people who are -- they go through Case 1, 2

13   and 3, so -- Okay.  Sorry.  I think it's inappropriate for

14   people to be writing to me directly without sending it to all

15   the parties, but they don't identify themselves either because

16   they express concern about whistleblowing.

17        Okay.  Well, I've read the -- I have read Ms. Nuss'

18   filing as well as Ms. Jones' report.  We're going to hear

19   first from Ms. Jones.  I think this is, for lack of a better

20   word, you know, stone-throwing contest is really unseemly.  I

21   thought we were here to try to help the class, but this

22   litigation, it seems that we cannot get ourselves out of it.

23   This is being controlled by lawyers, not by professionals, and

24   I'm sorry about that and I don't know what else to do about

25   it.  I feel terrible that we are not spending our time, money

1  and effort on behalf of the class, but I find that I think

2  that we have tried endlessly to get the District to the table

3  and their condition is to basically get the Court and the

4  masters and monitor out, and given their own consent decrees,

5  I can't do it.

6          It's just simply not possible.  So, unless they come

7  up with a new tune, we can't have any kind of meeting of the

8  minds, and therefore, we continue, because of the District's

9  posture here, to distract ourselves and divert our energies

10 away from the actual thing that we're supposed to be doing.  I

11 am happy and I think even the Plaintiffs would be happy to get

12 out of this litigation, but until the District can see their

13 way to being less recalcitrant about things, and I have no

14 doubt that the person I should be talking to is not here, but

15 we will go ahead.

16         I have no interest in having the two -- my monitor

17 and Ms. Nuss come to blows, none.  I think you're both

18 professionals, and it's not useful.  But if -- Ms. Jones, I'm

19 happy for you to give us your report.  I've read it.  I've

20 read Ms. Nuss' rebuttal.  The bottom line still remains that

21 we're in a system where we have problems and I bet everybody

22 will agree to that much.  How bad, you know, is not for us to

23 figure this out now, but I just don't think we're getting

24 anywhere sitting and throwing darts at each other.

25         I'm tired of it myself, but -- and it won't help the

1    District to throw darts at the monitor; it really won't.  I

2    mean, she's doing the best job she possibly can and I think

3    Ms. Nuss is, too, so I really -- I'm distressed at how

4    diverted we've become.

5            Okay.  Go ahead.

6            MS. JONES:  Good afternoon again, Your Honor.  I

7    wanted to start by talking to you about the seven class

8    members that I asked be removed from their current providers.

9    I made that request of Ms. Nuss after a very careful

10   consideration, not only of the information we received during

11   this quarter's health reviews, but because of information that

12   my office has had about these individuals over the course of

13   the years.

14           Each of the individuals is well known to my office.

15   We have had numerous reviews of certain of this group of

16   seven.  I personally knew six of the seven and have spent time

17   visiting their apartments or houses, both with their current

18   providers and with past providers, and I have raised repeated

19   concerns about the adequacy of their care.

20           The first class member, PJ, was spoken about in the

21   last status conference.  His new wheelchair was received on

22   April 17th, 2009, but our health review on May 4th indicated

23   that the correct mealtime protocol was not being followed, he

24   must be in a certain position so that he doesn't choke or

25   breathe particles of food into his lungs, the staff are not

1  knowledgeable about his needs, and he was not repositioned

2  every two hours as directed by his clinicians.

3       If he's not positioned correctly, it's not just an

4  issue of whether he has pressure sores or not, it's whether

5  he's comfortable, whether he's aligned properly, whether he

6  can, you know, experience his surroundings without discomfort

7  and pain.

8       PJ was actually removed once before from this

9  current provider after an unannounced site visit by the

10  Plaintiffs, the Department of Justice and I in 2005.  We

11  happened to be seeing homes that were in the general

12  neighborhood and stopped by his house and were, quite frankly,

13  appalled by the neglect that we witnessed in that setting.  It

14  was reported and he was eventually removed from that provider

15  and sent to a provider that subsequently left the District.

16       When the second provider, HRDI, left the District,

17  PJ was returned to the first provider, although he was in a

18  different house than when we first saw him.  After that first

19  visit to him in 2005 where we found him not having his

20  one-to-one present, where there were no activities for him,

21  where he was not properly dressed and where he was being left

22  primarily by himself in the living room, even though he was

23  supposed to have constant attention, he was hospitalized in

24  July.

25       THE COURT:  July of?

1          MS. JONES:  July 2005 for severe hydration and

2    malnutrition.  This client's health care was reviewed again by

3    us on July 12th, 2008 when he returned to the current

4    provider after HRDI left the City, and we found similar

5    concerns to the concerns I have cited this quarter.

6          SK has been of longstanding concern to my office and

7    to me personally.  We have reviewed his health --

8          THE COURT:  And the last time you -- you say 7/12/08

9    you had -- you visited PJ.  Have you visited since '08?

10          MS. JONES:  Yes, Your Honor, we visited him in --

11          THE COURT:  Last quarter.

12          MS. JONES:  -- this last quarter.

13          THE COURT:  Okay.  All right.  So that's in the

14    report.

15          MS. JONES:  And actually, the Plaintiffs have seen

16    him before we did, and we took the Plaintiffs' report, which

17    also had a number of the same concerns we've continually

18    expressed, with us when we made the last visit in May.

19          A second class member --

20          THE COURT:  He's still in the same place now?

21          MS. JONES:  He is still in the same house and there

22    is not agreement that he should move from that house.

23          SK has been of longstanding concern to me and my

24    office.  When I first met him and his roommate, I've included

25    his roommate, SF, in my request that they be removed because

they share the same staffing and they both have some very
similar challenging behaviors that have resulted from the long
institutionalization they had at Forest Haven.

During this quarter -- and as I mentioned, we have
reviewed SK's health care seven times since 2005 because of
the enormous amount of concern that we have about his care.
During this quarter, for example, we found that it took over
one year for a swallowing study that had been ordered by his
clinician to be completed and for the recommendations to be
implemented.

Because I always try to be straightforward with the
providers, after I made the recommendation that SK and SF be
removed, I met with the director of that agency and told her
what I had recommended, and even though she didn't -- I think
she's having second thoughts about whether she would like them
to stay or go, but when I met with her, she talked more about
the lack of a competent work force that she has in her program
and how difficult it is to retain staff who really understand
how to work with people with challenging behaviors.

So, at least in the discussion I had with her, she
did not dispute the findings and she told me that she agreed
that they were not well cared for.  Since then, as I noted,
she sent an e-mail saying that she would like to have help to
work with them more competently, but I think, overall, my
decision here is coming from my impatience at having people

1  live in these environments any longer that they need to.

2        You know, the question can be raised, you put a lot

3  of effort into the current environment or do you find a

4  competent provider who knows what to do and can see that

5  people's quality of life has improves, and for these seven

6  people, I made the decision right before I drafted my report

7  that I, frankly, was uncomfortable with waiting any longer for

8  them to have the competence around them that they're entitled

9  to.

10        The next class --

11        THE COURT:  The one question this raises is, do you

12  have enough decent providers to move people?  I mean, that's

13  sort of part and parcel of the equation, I suppose.

14        MS. JONES:  I think in these cases, Your Honor,

15  there are providers available, including some of the new

16  providers.  That could be -- it could be recruited to work

17  with them.

18        The next client, WW, actually lives in Maryland.  He

19  has -- his history is actually a very tortured history.  There

20  were many, many concerns over the years when Dr. Haddad was

21  here in particular, about the --

22        THE COURT:  When what?

23        MS. JONES:  When Dr. Haddad was court monitor.

24        THE COURT:  Oh, yeah.

25        MS. JONES:  There were many, many concerns raised

1   through our office and with the District about his

2   self-injurious behavior and his need to be in a home that was

3   properly staffed and properly monitored.  So, I had not met

4   him before, but after I received the nurse consultant's

5   report, I was concerned enough that I went on a Sunday

6   afternoon, May 24th, to make an unannounced visit to his

7   house.

8           What I found in his house was identical to the

9   concerns raised in my nurse consultant's report.  He was --

10  his behavioral plan that monitors and helps protect him from

11  injuring himself was not being followed nor tracked as it is

12  supposed to be.  The one-to-one that he is supposed to have

13  present at all times was not with him.  She was in the kitchen

14  cooking.

15          WW was in front of the television set with another

16  client next to him.  There was no interaction from any staff.

17  The staff was one less than it was supposed to be because of

18  the weekend.  He was fed his meal in front of me in less than

19  ten minutes.  He was not offered any liquids while he was

20  eating.  He coughed after the meal was over.  There was

21  nothing in the environment that reflected any kind of

22  activity, active treatment, anything that would be a

23  stimulation for him other than the television set.

24          The three other residents in that house are Maryland

25  residents, and I reported this house to the State of Maryland.

1  The last house is one that I've objected to since the day it

2  opened.  This house had three -- has now two class members.

3  There were three class members living here when it was opened.

4  The provider is a new provider to the District.  I had said at

5  the beginning of these placements that this provider, based on

6  my observation and discussion with the staff in the house, did

7  not have sufficient knowledge to manage these three particular

8  class members.

9       I have filed repeated objections to this house.  DDA

10 has sent staff out to investigate.  When we made the site

11 visit this last time, the nurse consultant noted that staff

12 were sleeping on the couch, that one -- there were five staff

13 present.  One staff person was sleeping on the couch and had

14 to be shaken by the management person that was there for a

15 site visit so he would wake up.  One staff person was out on

16 the front sidewalk talking with the neighbors and smoking a

17 cigarette.  Another staff person was texting on her cell

18 phone, and the two other people who were trying to interact

19 with the class members lacked sufficient skill and support to

20 really know what they should be doing.

21      We went back, actually, to this house last Sunday.

22 We gave notice, as we usually do, almost all of my staff or

23 consultant appointments are announced.  Mine almost never are,

24 but the consultants are.  We called on Friday and said that we

25 would be coming by to chat with the staff, to visit the

1  residence and to again look at some of the records.

2  We were told that the records might not be in the

3  house, but we were not informed that there wouldn't be any

4  class members there.  We arrived at the house at a quarter to

5  8:00 in the morning.  The class members had been taken out of

6  the house at 7:00 o'clock that morning and were not returned

7  to the house until well after our visit, which lasted eight

8  hours.  So we were --

9  THE COURT:  The visit lasted eight hours?

10  MS. JONES:  We did.  We reviewed all of the records

11  and spoke with the staff and went through the house one more

12  time.

13  THE COURT:  I'm sorry, how many class members were

14  there?  Two or three?

15  MS. JONES:  There were three class members until the

16  beginning of this week.  One class member was moved to another

17  residence on Monday.  We visited him on Tuesday.  He appears

18  to be doing well.

19  The other residents -- the other two class members,

20  I believe, a residence has been located for them.  We have

21  visited that residence and we're concerned that it's rather

22  small for these two men who have a lot of energy and need for

23  space.

24  At any rate, last Sunday, when we went, we weren't

25  able to observe the clients but we did observe --

1          THE COURT:  You know where they went?

2          MS. JONES:  We were told that they had taken a trip

3    to Sandy Point Park.  We were, however, able to identify a

4    number of serious environmental problems and we received an

5    accurate and conflicting information about the food that was

6    being provided to the class members on their trip, even though

7    they require highly prepared diets.

8          When I presented, as I always do, the findings of my

9    report before they were formally written up and issued to the

10   parties in a draft form, I asked Ms. Nuss to provide me with a

11   plan for how these issues might be addressed and what the

12   timetable might be, and perhaps she can speak more to that

13   today.

14         I know that one class member has been moved.

15   There's a dispute about PJ, and I have no information about SK

16   and SF except that referrals have been made to other

17   providers.

18         THE COURT:  Okay.

19         MS. JONES:  In addition to addressing the issues of

20   these seven particular class members, as a result of the work

21   that we did this quarter in the health review area, I referred

22   16 residences to DDA for inclusion on the watch list.  The

23   watch list was set up as part of the September 12th order so

24   that sites where there are concerns could be monitored more

25   intensely.

1    It's my responsibility to suggest that a house go on

2    the watch list.  It's the -- it's DDA's, Developmental

3    Disability Administration's responsibility to make that final

4    decision.

5    In addition to referring 16 cites for the watch

6    list, we filed more incident reports alleging neglect.

7    THE COURT:  How does that compare with other

8    quarters?

9    MS. JONES:  I was just going to say, Your Honor,

10   compared to other quarters, this is a substantial increase

11   in -- I've never reported 16 sites for the watch list as the

12   result of our work.

13   THE COURT:  How long have we had the watch list?

14   Does that date back to the September '07 --

15   MS. JONES:  Well, it actually was in place a little

16   bit before that, but officially it was with the September 12th

17   order.

18   THE COURT:  So, does -- you know, for incident

19   reports for during this quarter, is that typical, atypical?

20   MS. JONES:  I would say we filed incident reports

21   before, it's the combination of the findings for the seven

22   people, plus the 16 houses on the watch list and the four

23   incident reports, the cumulative total is more than I usually

24   see.

25   One of the providers that I referred to the watch

1  list, you know, providers do get in touch with me after I

2  issue my reports.  He issued a very comprehensive corrective

3  action plan, which we reviewed.  It addresses the points that

4  we've raised.  It really doesn't dispute those points but it

5  addresses them.

6        THE COURT:  So that's one residence or one provider?

7  More than one residence?

8        MS. JONES:  It's two residences.

9        THE COURT:  One provider, two residences.

10        MS. JONES:  One provider, two reports.

11        THE COURT:  I'm sorry, two -- when you say 16

12  residents, you had one provider who responded that applies to

13  two residences?

14        MS. JONES:  That's correct.

15        THE COURT:  All right.  But the other two -- the

16  other 14 you have not gotten responses from?

17        MS. JONES:  That's correct.

18        In terms of the provision of adequate health care,

19  this quarter, 58 class members were selected for review.  47

20  of these class members are considered to be at risk for

21  medical behavioral issues, and as you know, Your Honor, that

22  group of people has been the subject of heightened attention

23  for some time now.

24        After the individual reviews are completed, the

25  reports are sent to the parties for discussion and for

1   follow-up as needed, and I wanted to spend a minute just

2   telling you what I do with that.

3           This time, usually I hold the individual reports

4   closer to the time when my draft report is issued.  This time

5   I decided that I would issue them more quickly and in batches

6   and I also decided that I would meet with the D.C. Health

7   Resources Partnership to talk about the reports for eight

8   people that also had been seen last quarter for my -- last

9   time for my September report and needed follow-up.

10          So, we started talking about my health reviews on

11  April 29th, and the reports themselves began to be

12  circulated to the parties on May -- May 4th or 5th, as I

13  recall.  The last group of reports that went out was the

14  largest group of 39 reviews and that was issued on May 19th

15  of this year.

16          So, at a minimum, there were 15 workdays to review

17  these reports before any comments were required to my draft

18  report.  I did not receive, except for the discussions that

19  were held with the Georgetown clinicians, any comments or

20  questions about any of those reports at that time.

21          When the -- when my nurses, the group of five

22  nurses, who worked with me since 2005 now, go to the houses,

23  we spend a minimum of four hours on each review.  We do two

24  reviews a day; each review is four hours in length.  We have

25  revised our protocol to make sure that criticisms that have

1    been issued in the past are addressed.

2            For example, I've heard repeatedly that there are

3    documents that we don't locate or that we don't ask questions.

4    The nurse consultants are instructed to ask for every single

5    document in the house that relates to the particular client

6    that we are reviewing.  It doesn't matter what the document

7    is.  It could be an ISP, it could be a logbook, it could be

8    anything related to that client that's in the house.  It's not

9    just health information.

10           Secondly, staff -- these are announced visits and

11   staff are present in the house.  Sometimes the management of

12   the agency will send management staff or they'll send the

13   nurse in charge of the agency's health care work.  There are

14   various informants.  We list those informants at the top of

15   our reports, and the nurses are instructed that if they cannot

16   find a document they're looking for, to ask for it and to ask

17   any questions that they have before they leave the house.

18           We have had, following that process, staff send

19   documents to my office that weren't located at the time of our

20   visit and we have had staff provide other information through

21   telephone calls, for example, if they don't have it directly

22   when we ask.

23           After the reports are issued to the parties, these

24   same reports go to the providers and the providers have a

25   chance to comment on anything they feel is incorrect or to

1    ask, you know, any questions that they might have.  Five

2    providers contacted me or my staff to either respond to our

3    findings or to ask for a meeting about our concerns, and we

4    have followed up with that.

5          One provider actually pointed out a mistake.  We had

6    transcribed a note on the bottom of one report improperly.  It

7    was an error.  She pointed it out.  We reissued the report.

8    So the reports are not held secretly.  They are distributed

9    widely.

10         So, based on all of that work, the findings from

11   this quarter seem to me to be especially disappointing and

12   disturbing, and I chose those words really carefully.  They're

13   disappointing because I know from my discussions with the

14   clinicians at Georgetown and from having information about

15   what the Developmental Disability Administration is trying to

16   do with this health care initiative, that there is

17   considerable effort being put into looking at the health care

18   issues.

19         Because these findings -- you know, I read every

20   report at least once.  Because these findings and the

21   individual reports were of such concern to me, I did the

22   entire analysis myself.  I did not have a nurse do a sort of a

23   preparatory analysis.  I sat at the dining room table.  I went

24   through all 57 reports that are in this section, and I read

25   them again, I recorded the data, and I analyzed it myself to

1   make sure that there were no mistakes.

2           The findings that I have from these reviews were

3   also echoed in reports that I read that were issued by the

4   Health Regulation Licensing Administration and they were

5   reflected in the concerns and recommendations about health

6   care that have been brought out in the Columbus reports that I

7   received since the September 2008 status conference.

8           I don't know if it would be helpful for me to

9   summarize the findings.  I know that you've read the report,

10  but I would like to just highlight a couple of things.  We

11  have continued to focus in on the use of psychotropic

12  medication.  63 percent of the class members in the group who

13  were receiving psychotropic medication were determined by the

14  nurse -- the nurse's IUs and the lengthy questionnaire that we

15  use on this matter not to be receiving competent and

16  consistent monitoring of potential side effects.  This same

17  finding occurred when the Health Regulation Licensing

18  Administration issued surveys on certain residences.  So it

19  continues to be a finding across this system.

20          THE COURT:  And where do they fall in the

21  bureaucracy, if you can remind me, the --

22          MS. JONES:  They're the Department of Health, and I

23  met last week with the woman who heads up the surveying

24  process for the DDA residences and met with her and her staff

25  to talk about our mutual concerns about the findings and about

1   the attention to the findings.

2           When they issue a survey, DDA receives a copy of the

3   survey as does the provider.  DDA has asked -- there are forms

4   that document this, but they asked the provider if they would

5   like to have technical assistance.  Generally, the provider

6   says no.

7           In talking with providers about that, they've

8   informed me that they're not confident that there is any

9   technical assistance that would be helpful to them, but be

10  that as it may, the technical assistance isn't provided and

11  DDA does not go back out to that house to look at,

12  independently, the findings contained in those surveys.  It's

13  up to HRLA, the Health Regulation Licensing Administration, to

14  go back to the house within six months.  The maximum amount of

15  time they can wait to go back is six months, and that's what

16  they do.  They go back to see if the corrective action plan is

17  implemented.

18          So, unless it's an immediate jeopardy issue, a

19  highly serious issue, it could in fact be six months before

20  they go back to look again.

21          I wanted to raise one issue as well about why we

22  look at certain issues.  We've been criticized for not

23  focusing more on outcomes, the health outcome of the person

24  versus looking at discreet criteria related to planning or

25  procedures.  The position that we've taken is that health care

1   outcomes will more likely be achieved if there is

2   individualized knowledge about the class member, if there's an

3   individualized approach to his or her health care, if the

4   staff are knowledgeable and then if the directions and the

5   orders that are prescribed are implemented.

6          So, when we find, for example, that someone is not

7   positioned properly, our concern is that they might not just

8   have pressure sores but they might be uncomfortable or that if

9   their mealtime protocol isn't followed, that they might choke

10  or they might have food particles in their lungs.  The health

11  care outcome is the most important thing, that people are

12  healthy and have a good quality of life, but what we've tried

13  to do is to actually look at specific indicators that would

14  lead to that because my hope is that our reports would be

15  instructive, that they wouldn't be seen as punitive, but they

16  would be a way to really take a fresh look at what's happening

17  and say, "Is there a problem here that we need to address?"

18          THE COURT:  I have no doubt that would happen but

19  for this litigation.

20          MS. JONES:  Right.

21          THE COURT:  There's a double-edged sword here.

22          MS. JONES:  I've had some very good conversations

23  with Georgetown.  I think the clinicians that have been hired

24  there are excellent.  I think that their reviews are not as

25  intense in some ways as ours but that some of our findings are

1 very compatible and that it would have been my hope that that

2 would have been the approach that we would continue on.

3           Okay.  Why don't I move to a final point on health.

4 We did -- we did document generally excellent health care by

5 one provider agency who has had problems cited in the past,

6 but this agency is very serious about the recommendations that

7 we make.  They have sat with me a number of times with their

8 staff to talk about my concerns, and they -- and then they

9 followup.

10           So, that's reflected in the findings, and I've told

11 them that I will probably back off now any monitoring of

12 health care with them for awhile and instead will begin to

13 look at habilitation and individualized approaches for those

14 clients they support because I'm confident that there's a base

15 there now.

16           THE COURT:  We have more than one good provider.

17           MS. JONES:  Oh, yes, there is more than one group,

18 but this is one provider that had several people in this

19 sample, consistently positive ratings, and because I know them

20 and the depth of what they're doing, I felt comfortable

21 raising them to this kind of attention.

22           In terms of the day and vocational services, the

23 1978 final order defines what habilitation is.  It's acquiring

24 and maintaining skills so that the person, the class member

25 can master their own environment and can, you know, exercise

1    as much self-autonomy and control over their person and

2    environment as possible, and not only would the skills be

3    acquired and maintained, but that they would grow, they would

4    move forward and learn new things.

5            I decided that we really needed to focus in on the

6    day and vocational services, especially whether supported

7    employment is offered or not, because the research in this

8    field clearly indicates that when people have employment that

9    is of their choosing, the effects -- the negative effects of

10   institutionalization are ameliorated, the person becomes more

11   a part of their community and their skills tend to grow and be

12   enhanced.

13           The District also had promised that after the health

14   care initiative was under way, that they would develop a plan

15   for supported employment and would move forward with that.

16           The findings from the experts I used from Virginia

17   Commonwealth University, who are universally recognized as

18   experts in this field, found no change in the status of day

19   and vocational services, no substantial change since we last

20   did this survey in the summer of 2008.  We resurveyed -- the

21   summer of 2008, we surveyed the entire class.  This past

22   quarter, we surveyed 125 class members again and we found that

23   the day programs, the habilitation services offered to the

24   class members are largely center-based day services with a

25   focus on arts and crafts, participation in community based

1   recreation increased, but volunteer activities which are seen

2   as a more integrated activity decreased and that participation

3   and community based employment activities also decreased.

4        I spoke again about this with Ms. Nuss.  She plans

5   to begin a robust self-assessment of day and vocational

6   services in July next month and then a concrete plan is to be

7   developed for advancing these services over the next two

8   years, and while I continue to applaud any efforts like that,

9   I'm worried about the class members having to wait any longer

10  for these programs to be put in place.

11       The majority of class members are between 50 and 61

12  years of age.  The window of opportunity for them to go to

13  work is diminishing and they really, in my opinion, need to be

14  a priority as this issue should be as well.

15       And then finally, Your Honor, two last -- three last

16  points.  The District has maintained its commitment to have

17  the Columbus organization review deaths.  There are 15 death

18  investigations outstanding at this point.  Seven

19  investigations are for deaths in 2009, and the Plaintiffs have

20  asked me to try and find out why it's taking so long to

21  complete those reports.

22       I find the Columbus reports extremely helpful

23  because in analyzing what happened to the person, the deceased

24  class member, they give recommendations for improving health

25  care for all individuals.  I was confident that the process

1   for reviewing the Columbus reports was being strengthened by

2   DDA, and I haven't necessarily changed my mind about that, but

3   I learned just recently that the Columbus report for the one

4   class member referred to most often in my review this quarter,

5   WT, hit most of the recommendations from the Columbus reports

6   centered on WT, and his provider had never received a copy of

7   that Columbus report.

8          I gave it to her on Monday and she immediately sat

9   down and went through it with her staff and with the primary

10  care physician working with the client.  She found it very

11  helpful.  So now I need to go back and find out are those

12  reports actually getting to people so that the recommendations

13  can be considered.

14         The Quality Trust continues to maintain the

15  statistics for my report in terms of the number of

16  investigations of serious reportable incidents due.  There

17  were, as of the end of the April, April 30th, there were 200

18  investigations due and not yet received from the Incident

19  Management Enforcement Unit.  39 of those investigations are

20  for class members.  We did receive 19 of those investigations

21  the day after the deadline for reporting information, so there

22  are, you know, approximately 20 more investigations that are

23  due.

24         I do want to commend the staff with the Quality

25  Management Division at DDA.  I worked fairly closely with Paul

1   Smith, who's the person in charge of that area, to look at the

2   monitoring that they're doing, to really look at how he can

3   coordinate our findings.  He's been very responsive and very

4   open to suggestions, any suggestions that might -- I might

5   have or to providing any information that I need.

6           The District should be commended again for its

7   steady progress in bringing people into the Medicaid waiver.

8   There are 334 class members now enrolled in the home and

9   community based services waiver, which is an increase of 15

10  people since the last quarterly report.

11          And now, finally, as of April 30th, there were

12  five people, five class members with actions pending for

13  guardianship.  Three of the decisions have been issued since I

14  submitted my report.  The length of time elapsing from before

15  the packet of information is sent to the Attorney General who

16  then forwards it to the Court continues to be of concern.  I

17  met with Attorney Back and Attorney Patel to discuss why these

18  delays are happening.

19          THE COURT:  Who do they work with?

20          MS. JONES:  Mark Back is General Counsel for DDA and

21  Attorney Patel works for the Attorney General's office but is

22  assigned to this issue at DDA.  I came out of that meeting

23  convinced that they have a thorough grounding in what the

24  problems are.  They have some very promising strategies for

25  addressing delays.  I would continue to hope that they be

1   given the resources that they need to make sure these

2   petitions move forward in a timely manner.

3            THE COURT:  Can I just ask an informational

4   question?  There are reviews of individuals that go on

5   periodically in superior court.  Does anything come of that,

6   such as PJ?  I mean, there are lawyers appointed for these

7   people; there is a magistrate judge that sits on this.  I

8   mean, if there's some dispute about his care, there is a

9   mechanism to address it, it seems to me.  Does anyone invoke

10  that?

11           MS. JONES:  I have just in this last quarter.  I had

12  not invoked that before.  This last quarter, after the status

13  conference, I met with Judge Brenneman to talk about her role

14  and the role of her attorneys.  I first met to present some at

15  a brown bag lunch to talk about what I do as monitor and then

16  she and I had a two-hour meeting subsequently to go over what

17  she does and what I do and the concerns that she has from a

18  systemic perspective.

19           And what I -- what I've told her I will do and what

20  I will do now then I'm finished with this part of the report,

21  is I will send to her and to the attorneys for each of the

22  class members a copy of this health review for this quarter,

23  so she will --

24           THE COURT:  That's of the specific people you were

25  going to send to the lawyers.

1          MS. JONES:  -- get information about the -- she and

2     the attorney will get specific information that we have about

3     individual class members.  She's also sent me the schedule of

4     the hearings and she's invited me to sit in on any hearing

5     that I have concern about.

6          THE COURT:  I mean, there's so much out there and so

7     many resources and so much to bring to bear, but it seems to

8     me, I mean, in the way of monitors, monitoring the monitors

9     who monitor what they have, Plaintiffs have monitors,

10    Defendants have monitors, I have monitors, we have a whole

11    structure in the superior court.  There is a fundamental

12    overlap here, and then we have the Quality Trust.

13         I just -- I'm overwhelmed by the ineffectiveness of

14    the structure.  Oh, well.  All right.  So at least as to

15    individuals, there is now going to be some invocation of the

16    judicial process where necessary, at least you've informed

17    their lawyers and the guardians and advocates for these

18    people.

19         MS. JONES:  I've been invited by Judge Brenneman to

20    share any concerns with either her or with the attorneys, and

21    I will do that when we have concerns.

22         THE COURT:  Somebody ought to address them.  I mean,

23    we're not -- I'm not -- I have a class action, but I'm not

24    dealing with each individual.  Obviously, you are, but, you

25    know, there may be people that you and -- Ms. Nuss and you

1   don't agree about but that's why they've got a case.  Maybe

2   that's the way to solve that.  Okay.

3          All right.

4          MS. JONES:  Were there any other questions, Your

5   Honor?

6          THE COURT:  I have a lot of questions, thank you.

7   All right.

8          MS. JONES:  Thank you.  I'm excused, right?

9          THE COURT:  Well, no, you're going to stay in the

10  courtroom.

11         MS. JONES:  All right.  Okay.

12         THE COURT:  I think you ought to hear from the

13  Department of Justice and the Plaintiffs before Ms. Nuss gets

14  her opportunity and her lawyers.  All right if we deviate a

15  little bit?

16         MR. MADDOX:  Department of Justice has no questions.

17         THE COURT:  All right.  Thank you.  Mr. Kiernan.

18         MR. KIERNAN:  Your Honor, I just want to speak

19  briefly, because I think Ms. Jones covered in detail the

20  issues, but if I might, I do want to back up to a point that

21  you were addressing earlier when we started.

22         As you recall, it used to be the process where the

23  District would submit its sort of quarterly report about what

24  they think they had accomplished, and then the special mas- --

25  I mean, the court monitor would submit one and we'd comment on

1  that, and we've now gotten into this sort of litigation over

2  the quarterly reports.

3         THE COURT:  Oh, yeah, yeah, yeah.

4         MR. KIERNAN:  It's just so -- you called it stone

5  throwing.  I sort of think of it as sandbagging.  It's turning

6  into litigation over the monitoring.  It's like the players

7  arguing that the referee made the wrong call as opposed to

8  finishing the game and getting on with it.  And it's just --

9         THE COURT:  You know, if we removed you, me and all

10  the other lawyers, you know, we might do better, but that's,

11  you know, we can't do that.  I know that.  But lawyers

12  don't -- you know, we are a double-edged sword, too, because

13  now -- I have no doubt, and I don't have personal knowledge of

14  this and I don't even blame the people over there, but they're

15  telling their clients to fight and you would tell your clients

16  fight back.

17         MR. KIERNAN:  Well, it's --

18         THE COURT:  And I don't know how to stop it without

19  us reaching some resolution, and their criteria for a

20  resolution doesn't agree with yours.  You can tell that from

21  the latest pleading.  They want us to go bye-bye.

22         MR. KIERNAN:  Right, their criteria for a resolution

23  is that you leave and I leave and we all leave and they --

24         THE COURT:  And Mr. Sundram, they want him out, too.

25         MR. KIERNAN:  Mr. Sundram leave, they want him out,

1    they want all the orders out, they want 30 years of lawsuit

2    out, they want everything out as if it didn't happen, and

3    that's just not realistic, and I don't want to belabor it

4    because, I mean, Plaintiffs obviously --

5            THE COURT:  I'm sorry, we're going to discuss

6    schedule towards the end.

7            MR. KIERNAN:  Right.  But the Plaintiffs do support

8    the court monitor's report, we support her findings and her

9    conclusion that she used the terms "disappointing" and

10   "disturbing" and the one other point that she alluded to but I

11   just want to highlight in her report is the reference to the

12   diminishing class.  You know, we do not -- and I don't mean to

13   say this to Your Honor.  We don't have all the time that

14   District wants to spend fighting over everything as opposed to

15   moving forward.  We're running out of time with this class.

16           THE COURT:  Well, you know, to put it in

17   perspective, though, as soon as you have litigation, you --

18   the adversarial process kicks in and I don't know how to stop

19   that.  We tried desperately, but it's kicked in full-time.

20           The Mayor is determined to bring this litigation to

21   an end, and once you accept that proposition, we've never had

22   that posture in quite the same way that is now quite clear,

23   and so the battle is -- the gauntlet has been thrown and

24   you're here.  You weren't here before because that gauntlet

25   has now been thrown.

1         MR. KIERNAN:  Right.

2         THE COURT:  And his lawyers who, you know, they're

3    operating consistent with the desires of their client, which I

4    understand.  They are a much better team of professionals than

5    we've seen in my time.  I don't think anybody would dispute

6    the team that they've put together is an improvement over what

7    existed, but that doesn't end the litigation.

8         I don't know how else to get us to back to the

9    problem of dealing with the health and welfare of the people

10   there.  I mean, I'd be happy to have your suggestions, but you

11   and I contribute to the litigation.  I'm the only one that,

12   you know, the -- I mean, I'm sure there's a middleman here,

13   but you've got an adversarial process that we just cannot

14   bring to an end until I make my final decisions and then

15   presumably the Court of Appeals, unless we have a different

16   posture, but you cannot say that they're not entitled to take

17   the position.

18        It may not be in the -- it may be legally wrong, it

19   could be factually wrong and ultimately it may not be in the

20   best interest of the people they're supposed to serve, but

21   they are, under the law, entitled to fight you.

22        MR. KIERNAN:  I take the point, Your Honor.  The

23   only point I was making, and then I'll sit down, is the

24   structure that's supposed to be established by the order where

25   the court monitor reports to you was not itself supposed to

1    spawn a satellite back and forth over that, which is now where

2    we are as part of, I think, the District's overall

3    structure --

4             THE COURT:  Strategy.

5             MR. KIERNAN:  -- about strategy.  So, it's

6    regretful.  I appreciate the point.

7             THE COURT:  It's regrettable.  I don't know.  I'm

8    sure, you know, frankly, I have a sense that even the other

9    side would agree it's regrettable, but unless they disagree

10   that their strategy is not advisable or their client is not

11   making the right choice, whether they regret it or don't

12   regret it, it's consistent with their strategy.

13            MR. KIERNAN:  Thank you.

14            THE COURT:  I don't know what to do, but -- anything

15   further for the Plaintiffs?

16            The floor is yours, Ms. Nuss or Ms. Efros.

17            MS. EFROS:  Your Honor, excuse me.  Ms. Nuss is

18   going to speak as to the programmatic issues, but I do want to

19   address a few of the Court's preliminary comments, including

20   some of the Court's -- comments that were made by Mr. Kiernan.

21            The District isn't involved in stone throwing or

22   throwing stones, however the Court wishes to characterize it.

23   We're not sandbagging anyone.  I think the District is

24   entitled to present its perspective on where it believes the

25   agency is in terms of the progress it's made and the programs

1   that it's instituted.  We do this not because --

2           THE COURT:  That's a little different than starting

3   with the court monitors disputing, you know, whether a

4   placement is correct or not.  We're not in a programmatic

5   level at all.

6           Yeah, I understand you're entitled to present --

7   that you've made great progress.  I don't dispute that, and I

8   understand all that.

9           MS. EFROS:  Well, if I may, Your Honor, I think we

10  are entitled to dispute the court monitor where we have

11  legitimate differences.  That's the unfortunate point this

12  litigation has reached, but we do have differences with the

13  court monitor.  We are entitled to present those differences

14  to the Court.  In every equity case or consent order case in

15  which we are involved --

16          THE COURT:  Okay.  I wanted to know how many have

17  you filed that motion in, by the way, the one that's been

18  filed here?  Has it been filed in all of them?

19          MS. EFROS:  It has been filed in *LaShawn*.

20          THE COURT:  With Judge Hogan and who else?

21          MS. EFROS:  It has been filed, and he's actually

22  going to have a hearing.

23          THE COURT:  Oh, when?

24          MS. EFROS:  He's going to have one hearing at the

25  end of June on a contempt motion, and he's going to have a

1   hearing around July 20th on our motion to vacate or modify.

2          THE COURT:  Vacate the consent?

3          MS. EFROS:  Yes.

4          THE COURT:  I see.  I mean, it's basically a vacate

5   the consent type of motion?

6          MS. EFROS:  Yes, Your Honor.  I mean, it's different

7   in that case from this case, obviously, because the facts are

8   different.

9          THE COURT:  How about the other ones?

10          MS. EFROS:  We have filed an abbreviated version in

11   the *Pettys* [ph.] case, but that just goes currently to the

12   payment orders in that case, which is a severable issue.  We

13   filed -- we filed it here, obviously.  Oh, *Salazar,* excuse me,

14   Your Honor.

15          THE COURT:  Judge Kessler?

16          MS. EFROS:  Yes, and Judge Kessler is in -- thank

17   you.  Judge Kessler is having briefing on one of the legal

18   issues that we've raised in our briefs.  She's having separate

19   briefing on that and she's going to hear that issue.

20          THE COURT:  Okay.  When you say "separate issue,"

21   what do you mean?

22          MS. EFROS:  We raised the issue of whether there was

23   a private right of action in that case.

24          THE COURT:  She's going to have a hearing?

25          MS. EFROS:  She's going to have -- well, we've

1    already submitted our brief.  She's asked the Plaintiffs to

2    address that issue specifically.

3            THE COURT:  That's not my issue.

4            MS. EFROS:  Then she's going to have a hearing on

5    it.  It's not an issue currently in this case, no, Your Honor.

6            THE COURT:  Are any issues that has been brought up

7    in this case going to be argued before any of these other

8    judges?

9            MS. EFROS:  Well, I think on the *LaShawn* case,

10   certainly, there's a big overlap between the issues of the

11   *LaShawn* case and this case, Your Honor.  But may I go back for

12   a second with the Court's indulgence?

13           THE COURT:  Yes.  Trust me, I don't think that

14   you're not entitled to contest, but it is regrettable.  And

15   you're entitled, and I don't think that it is frivolous.  That

16   doesn't mean I agree with it.  The legal issues that have been

17   raised are not frivolous.  I understand.  There's a lot of

18   dispute in the literature on institutional law, lawsuits and

19   the meaning of consent decree and all the rest, and you know,

20   that academic interest subject may some day get clarified,

21   perhaps by the Supreme Court.

22           At the same time, one can sit around and just -- you

23   know, it's hard to be very sympathetic to the argument that

24   we're wasting the District's money because there are ways to

25   avoid that as a practical matter.  I agree that you have legal

1   rights, and so therefore you will pursue them, but I can

2   express my chagrin over the situation.

3            MS. EFROS:  As a practical matter, Your Honor, I

4   don't think we're ignoring anybody's rights in terms of the

5   services that are to be provided by DDS.  We have tried to not

6   let the litigation divert from what Laura and Judy and her

7   people need to do.

8            Unfortunately, there is some diversion because, for

9   example, they have to respond from all the requests from the

10  court monitor for information.  That is part of this

11  litigation.  That puts a drain on resources.

12           So, whenever you have a proceeding like this, you

13  are going to drain -- and the very resources of the agency

14  that you want to serve the population, which is the subject

15  matter of the class.  But my point being, in no other case in

16  which we are involved, and I started to say in none of the

17  other big consent decree cases in which I unfortunately

18  supervise, God help me.

19           THE COURT:  Lucky you.

20           MS. EFROS:  When we do -- we do have a difference of

21  opinion with the court monitor.  We have this in every case.

22  We're not accused of sandbagging.  We're not accused of

23  throwing stones.  It is recognized there's going to be a

24  difference of opinion.  We look at it one way.  The court

25  monitor looks at it another way.  You are the ultimate arbiter

1   of who is right and who isn't right, but we are entitled to

2   present that position to the Court without being casticized

3   for doing so.

4          And, you know, our client is not here because she

5   wishes to pick a fight.  That's not the purpose of this.  None

6   of us are here because we simply want to pick a fight.  I

7   would agree with you, we all have better things to do, but we

8   do want to present the District's position and I think we've

9   done that, and Ms. Nuss is here to address any of the issues

10   that Ms. -- that the court monitor has raised today or any

11   issues that the Court wishes her to address.

12          THE COURT:  I just know that if Ms. Jones and

13   Ms. Nuss got together and they had sufficient resources and

14   the ability to do a few things in terms of staff and

15   providers, we really would do better, but here we all are.

16          Okay.  Go ahead, Ms. Nuss.  And then we'll take up

17   the scheduling, if we can.

18          MS. NUSS:  Good afternoon.  Since you have read my

19   declaration and you have several questions, I don't know what

20   to do, if I should bother addressing things that I want to

21   bring to your attention.

22          THE COURT:  I don't have any specific questions.  I

23   mean, I'm not going to -- I can't arbitrate PJ's placement.

24   I'm not --

25          MS. NUSS:  No.

 1          THE COURT:  -- able to and that's not, I think, what

 2   this is all about.

 3          MS. NUSS:  All right.

 4          THE COURT:  So, to say I'm the arbitrator is not

 5   quite right.

 6          MS. NUSS:  No, that wasn't my words.  Well, let me

 7   just respond to some things and update you on some of the

 8   positive things that are happening systemically with the

 9   District of Columbia.

10          In reference to the specific cases that the court

11   monitor brought up in the beginning of her discussion today,

12   we have, as she noted, moved one individual.  Two others are,

13   as she noted, she went to the home but didn't like it, so I

14   imagine we'll continue to look for another location.

15          I've asked for team meetings for the other three.

16   The -- just to be sure that we're making planful transition

17   plans for the individuals, there is some dispute around the

18   matter of one individual because his health has improved with

19   that provider and there is some concern about moving him again

20   given that his condition has stabilized according to other

21   medical professionals.  So, I want a very thorough team

22   meeting on his behalf to make sure that what we're doing is in

23   his benefit.

24          THE COURT:  Can I ask?

25          MS. NUSS:  Yes, ma'am.

1    THE COURT:  If you have a team meeting, does the

2  court monitor participate?  Is that something that's possible?

3  You know, if we could try to get some of us off your back, I

4  understand.  Can you communicate with Ms. Jones and say, "Here

5  is what we think and here is why we're doing it," I mean, or

6  have we really --

7    MS. NUSS:  We do.

8    THE COURT:  -- no long communication.

9    MS. NUSS:  No.  We have -- as she noted, we've been

10  in a lot of communication with the court monitor in the past

11  quarter, more specifically around systemic issues and

12  individual monitoring methodologies and quality assurance

13  activities, so we do --

14    THE COURT:  She's now down to one person placement

15  issue.

16    MS. NUSS:  Yes, she is.

17    THE COURT:  As opposed to seven.

18    MS. NUSS:  Uh-huh.

19    THE COURT:  I mean, if you have a different point of

20  view -- if I hear what she's saying, that the point of view is

21  sort of recently expressed in your affidavit, but now we have

22  to address it and either it has to be addressed by the

23  magistrate judge across the way or between the two of you,

24  really.  It's not going to be between the lawyers.  They don't

25  know what's in the interest of these people, and I'm just

1  suggesting the way to address it is to bring her back in the

2  loop on these seven people or six now or whatever it is.

3       MS. NUSS:  If she would like to sit in in individual

4  team meetings, she has that right and we'll make sure she's

5  invited.

6       THE COURT:  Okay.

7       MS. NUSS:  So we are having team meetings for three.

8  Three will move -- or four will move, actually, the gentleman

9  from Maryland will also move.

10      I don't have specific time lines for these moves

11  because it takes some time to do good transition planning and

12  identify a qualified provider to serve those individuals.  I'm

13  very anxious about just picking folks up and moving them

14  quickly, so -- but all those team meetings have been

15  scheduled, and as the court monitor noted, referrals have been

16  made to other organizations, so that process will continue.

17      You know, it's interesting you bring up the

18  magistrate court.  Those lawyers actually are supposed to see

19  their wards four times a year and advocate on their behalf,

20  and I -- it's part of what I have been saying in this

21  courtroom and in this system for a long time that people are

22  accustomed to what they have.  They don't know what good

23  quality is when they see it or don't see it, and I think that

24  goes for the attorneys and that magistrate court's chambers

25  often.

1          So I would welcome -- Judge Brenneman is clearly one

2     of our big advocates.  Sometimes she's a little off base, too,

3     but --

4          THE COURT:  We all are.

5          MS. NUSS:  -- she clearly cares about the

6     individuals that she sees on a daily basis, and we spend a lot

7     of time in her courtroom.

8          With respect to adequate health care, really broadly

9     about the health care initiative, you read my declaration.  I

10    won't go through it in that great detail.  I can tell you that

11    the health care initiative has now been really fully up and

12    running for a good six months or more.  We're seeing real

13    progress as a result.  The D.C. Health Partnership is now, has

14    been fully staffed for over six months, and the real, I think,

15    benefit that what we've intended to be seen is that they're

16    working both with agencies on systemic health practices, not

17    just improving or correcting one individual's health care when

18    it's been identified by a monitor as being inadequate, but

19    addressing it from the whole agency perspective.

20         THE COURT:  Well, yeah, but one way to test that, so

21    to speak, is to look at what's happening on the street.

22         MS. NUSS:  I appreciate that, and they have

23    substantial plans with three large agencies that they're

24    working through, actual concrete training, technical

25    assistance, getting --

1          THE COURT:  You're using, I'm sorry, the word

2     "agency."  Do you mean a provider?

3          MS. NUSS:  A provider.  Not only are they providing

4     technical assistance with clinicians of all types, PT/OT,

5     speech, behavioral psychology and nursing, but they're also

6     working with agencies, helping them recognize whether they

7     need additional nursing oversight in their agencies.  They are

8     working aggressively across our system with PTs and OTs and

9     speech pathologists who do work in our system and behavioral

10    psychologists who again we brought this group in from across

11    the country to help bring best practice to those clinicians

12    that are already working in this field, provide them with the

13    tools and technical assistance to do a better job.

14          Likewise, we have continued to refer practitioners,

15    therapists, in particular, to boards and fraud investigations

16    when we have found poor quality in the work of providers or

17    clinicians in this system which I think is critical.  We're

18    going to have to get, as you have said many times, the poorly

19    performing providers or the crooked clinicians who might be

20    working in the system out of the system.

21          I just saw it today on the way down in the elevator,

22    the speech pathologist who is anxiously talking with me about

23    her efforts to recruit new speech pathologists into the system

24    because there's so much need and the need for really competent

25    practitioners.

1        We've increased the rates for the therapy services.

2   That waiver amendment was just approved another $10 an hour;

3   again, for the express purpose of recruiting additional

4   therapists to serve the needs of our people.

5        The DCHRP therapists have done 56 targeted technical

6   assistance assessments for the class members alone.

7        THE COURT:  Say that again.  Who?

8        MS. NUSS:  The D.C. Health Resources Partnership.

9   They have PT/OT, speech behavior and nursing.  They've done 56

10  targeted assessments alone for class members in the last

11  quarter.  The speech pathologist is doing bedside swallowing

12  studies.  The behavioral psychologist has initiated a really

13  good training on behavioral best practice, on how to do

14  positive behavioral supports.  It's another area that we're

15  weak in the District that we've talked about in the past, so

16  we have that training that's been initiated with psychologists

17  and QMRPs.

18        There's another training that's been initiated with

19  Howard University on another type of behavioral intervention.

20  On the area of behavioral health, Seton House has joined the

21  D.C. system for providing psychiatric services.  They're going

22  to be providing psychiatric services for over 100 people in

23  the DD system, and that's a system that used to have perhaps

24  two or three psychiatrists.

25        Now we'll have Seton House, which is affiliated with

1    Providence Hospital, has many psychiatrists who are willing to

2    work with our individuals.  Dr. Koshes is working with them,

3    if they have any concerns about a dual diagnosis.  So here we

4    have a whole cadre of skilled psychiatrists that have been

5    added to the system that we did not have before, and that's a

6    direct result of the D.C. health initiative.

7           Dr. Bullock, if she was in this room, she'd be

8    passionate about how improved health care services are for

9    people in our system.  I know the individual monitorings

10   continue to find problems in documentation, problems with

11   timely followup on health care, and that, too, is part of the

12   D.C. system of health.  It is not always easy to get an E&T

13   appointment or a dental appointment in a timely fashion but

14   those appointments are being made.

15          We are hitting screening performance that exceeds

16   the general population in terms of screening for routine

17   health care.  We are doing things that are again hard to see

18   by -- sometimes by the individual outcomes that the court

19   monitor might find, but another example is flooding the system

20   with referrals for E&Ts, let's say.  That just backs up the

21   system.  There is not enough E&Ts out there, so instead a

22   number of agencies are working on aggressive screenings by

23   nurses, using the primary care physicians to monitor earwax so

24   that you don't have to take up specialty time to have followup

25   appointments, and then when you really need an E&T, you can't

1    get them in a timely fashion.

2              We're working with that health initiative.  We --

3    you know, another area was access to primary care was a

4    concern that we've talked about a long time now, and in fact,

5    I was just looking at the results of the health care.  We're

6    doing an enhanced care coordination pilot where a physician

7    assistant is chairing care coordination meetings with the

8    primary care physician, the service coordinator, the provider

9    agency to really make sure that primary care physician is

10   fully aware of the health care, the coordinated health care,

11   what the provider is doing, what the specialists are doing,

12   and in fact, that pilot, just for Evans class members alone,

13   has touched 30 different primary care physicians, 30 primary

14   care physicians serving people with developmental disabilities

15   in this system.

16             It's a huge increase over the past history of a

17   number of ICFMRs and a handful of medical directors and nobody

18   else saw the individuals for primary care.  So that is a huge

19   accomplishment for the system at large.  And that's really the

20   effort of people like Dr. Alexander and Dr. Bullock who are

21   aggressively recruiting through physician coalitions,

22   physician meetings, hospitals, area health education

23   activities to recruit physicians who want to work with people

24   with developmental disabilities and can work with them.

25             Dr. Bullock and Dr. Alexander spend many hours,

 1  many, many hours all the time supporting physicians who are

 2  yet, maybe not yet, quite comfortable serving our folks but

 3  then they know they've got somebody to turn to when they have

 4  questions about the dual diagnosis or intellectual disability

 5  concerns.

 6          So, we are seeing real progress out of that health

 7  initiative in terms of access to health care, both specialty

 8  and primary care that is just -- and that can only lead to

 9  improved outcomes for the people that we serve and it is

10  health outcomes that we want.

11          I don't dispute Ms. Jones by saying the measures

12  they measure can give you some suggestion or clue or evidence

13  that their health care is good so that they're going to have

14  positive outcomes, but I do also have to say that

15  documentation issues continue to plague our system, and when

16  it's a documentation problem, it should not always be assumed

17  that the person's health outcomes are going to be negative as

18  well.

19          We're addressing documentation both in the health

20  care arena --

21          THE COURT:  In this opinion, one of the reports --

22  sorry, it might have been your affidavit.  Which made it sound

23  like there was a pathetic coordination problem with the

24  monitor, the Quality Trust and you folks about documentation

25  or computerization.

1         MS. NUSS:  A coordination problem?

2         THE COURT:  Yeah.

3         MS. NUSS:  Well, we --

4         THE COURT:  The same systems are not --

5         MS. NUSS:  Used?

6         THE COURT:  It's your affidavit, paragraph 25.

7  (Reading)  A significant obstacle to DDA's ability to this

8  effort -- which I thought had to do with documentation or

9  data -- is the paper reporting process or incompatible

10  information systems --

11         MS. NUSS:  Right.

12         THE COURT:  (reading)  -- by HRLA, court monitor and

13  Quality Trust.

14         This is just my problem of enormous bureaucratic

15  menace.

16         MS. NUSS:  Yeah, it's 25.  That's referencing --

17  what we are doing, we don't ignore HRLA monitorings, the court

18  monitorings, Quality Trusts or our own, but a stack of papers

19  is very hard to analyze in terms of where your systemic

20  problems or where are the problems with providers on a dynamic

21  basis, and so what we've been doing is literally entering into

22  a data system from the hand reports that we get on a regular

23  basis the kinds of data points that's going to allow us to be

24  able to identify long before a quarterly report or an HLRA

25  monitoring that a certain provider is having problems across a

1   number of settings in the same area and be able to intervene

2   rather than having to have different individuals read paper

3   documents.

4          And it's hard to identify systemic or provider

5   specific concerns.  So, those are all, you know, paper

6   documents, so we're, like I said, now we're hand entering all

7   that information into our information system, but I think over

8   time, what we would all want is one that could be exchanged

9   electronically and entered in to data systems without that

10  much manpower having to do data entry.

11         We are --

12         THE COURT:  Is there any effort being taken to do

13  such a thing?  It just seems we're in the 21st Century, I

14  think.

15         MS. NUSS:  It is, I believe so.

16         THE COURT:  Although this case predates the 21st

17  century by a long time.

18         MS. NUSS:  Yeah.  We are putting in a lot of work

19  into our information management system.  It's costly and a lot

20  of time but we've got a lot of our monitoring tools are now

21  being integrated in our system.  We -- as I said, we hand

22  enter the court monitor's findings.  HRLA is discussing with

23  us how we can share that information more electronically but

24  they have to use the federal data system for the ICFMR

25  program, and Quality Trust does send it to us electronically,

```
 1    but again it's the format does not allow for electronic

 2    transfer of the data, but they are certainly --

 3              THE COURT:  Quality Trust is giving you what?

 4    Monitoring data or --

 5              MS. NUSS:  They have monitoring reports that they do

 6    as well.

 7              THE COURT:  Does the -- do you get them, too?

 8    Sorry?

 9              MS. JONES:  Nonclass members do.

10              THE COURT:  Nonclass members, correct, okay.

11              Are you all right?

12              COURT REPORTER:  Yes, ma'am.

13              THE COURT:  I wanted to leave a little bit of time

14    to discuss schedule.

15              MS. NUSS:  Right.  I don't want to go into great

16    detail after the lengthy report by the court monitor.  I don't

17    want to take that much time.

18              To just say that regarding the invocational

19    services, I would like to say the court monitor mentioned,

20    yes, we're going to be doing an intensive self-assessment.

21    What she doesn't mention is that it's the support employment

22    leadership network.  It's the national association between the

23    national association of State DD directors.

24              THE COURT:  Who directors?

25              MS. NUSS:  National Association of State
```

1    Developmental Disability directors and Boston University, and

2    what I wanted to point out is that transforming the day and

3    vocational service system is something that just -- it just

4    challenges this whole country.  Over 15 states have joined

5    this association for the express purpose of getting the kinds

6    of assistance and collaboration with their sister states about

7    the best way to go about it.

8              And in a time of fiscal crisis across this nation, I

9    find it interesting that over a third of the country continues

10   to spend money to join that kind of an association to get the

11   kind of technical assistance one needs to change a really

12   entrenched old day and vocational services system.

13             Likewise, DCHRP, the therapists have been working

14   with those large facility-based day programs to really enhance

15   the quality of therapy services there, because until

16   individuals can overcome some of these institutional and

17   educational weaknesses and have good safety and habilitation,

18   that is also going to get in the way of their improved quality

19   of life, and so the OTs, PTs and SPL have been literally

20   working with those big day facilities and going through their

21   programming, assessing individuals and again trying to

22   systemically address quality in the day programs.

23             Likewise, we've engaged with the customized

24   employment effort with ODEP, the Office of Disability --

25             MS. HEUMANN:  Employment Program.

1

2          MS. NUSS:  -- Employment Program.  Thank you, Judy.

3          They've been working with six agencies on customized

4   employment who are actively interesting in doing supported

5   employment and customized employment for people today, not two

6   years from now, and so we'll continue that commitment with day

7   and vocational services.

8          Relative to qualified providers, I want to just

9   point out two things relative to qualified or poorly

10  performing providers.  One is the idea that the District is

11  not sitting still.  You had us in a 90-day court order that we

12  agreed to, as I noted in my declaration, do timely reviews and

13  admission of providers within 15 days of a waiver application,

14  and we did so and what we have found since then is that

15  providers write good paper and they don't always actually

16  provide good service.

17          In fact, we found consultants who were writing the

18  paper for the provider.  And so what we initiated in February

19  was a provider readiness review that would not let a provider

20  serve anybody until they went through a much more robust

21  review with our staff on the grounds, in-person meetings,

22  on-location reviews, meeting with actual staff that they were

23  employing so that they were ready to deliver good service.

24          And in fact, A, we have held some providers in that

25  process for over three months now because they haven't met our

expectations to understand how to deliver good services, but

as importantly, my partners in the Health Care Finance

department, John McCarthy is here today, have agreed to put

that step in the provider application process such that a

provider will not even get to become a provider without

passing that intensive review.

So that's the front door, and then likely --

likewise on the back door, again, with our partners at Health

Care Finance who are responsible for the Medicaid agreement,

we are adding -- have added into the mechanisms to remove

providers from our system a grounds of repeated quality

concerns, not just fraud, not just intentional fraudulent

billing but actual quality concerns such that DDA can present

information to the Medicaid agency of repeated efforts to

improve quality and efforts that failed and those providers

can be terminated from the program, and that's what we've all

been looking for is a way to terminate providers who are not

performing well, and we now have that.

I want to really say a little -- Health Care

Finance, we've had a lot of problems, historically, with

Medicaid.  Those problems are largely abating on a daily

basis.  I am very fortunate to have that partnership with

Health Care Finance.  We're working on billing.  They do

on-site billing, technical assistance for provider agencies.

We're developing written policies and procedures updated for

1  the ICF program, for billing, for provider documentation so

2  there's no question as to how one should document, joint

3  sharing of information around audit results and referrals for

4  problems with providers that we think are poor quality or

5  fraudulent.

6  So, again, I can't say enough about how fortunate we

7  are to have this relationship with the Health Care Finance

8  agency.  It's taken a lot of weight off of the DD agency.

9  I think I will wind up there.  We've done a lot of

10  work, continued, too, in health safety, qualified providers.

11  We have more to go on certainly day and vocational services, a

12  long way to go, and the other thing, just to note about

13  guardianship, Your Honor, that we've done an assessment and

14  there are only now 15 class members left who do not have a

15  guardian who may need one out of 600 class members.

16  And so those last 15 are being -- their work is

17  being done to prepare their guardianship packages for their

18  behalf and then there will be none.

19  THE COURT:  That's good, because that's a --

20  obviously can be solved.  I don't know why it isn't.

21  MS. NUSS:  Yeah, but there is an emergency process

22  well in place that should there be an urgent need, that our

23  attorneys process that in one to three days and make sure --

24  three days -- three to ten days, I'm sorry.  Three to ten

25  days.

1          THE COURT:  Well, I don't know what an emergency

2    means, but three days might be not quick enough, I don't know.

3    But I mean, this has been a process, you know, you say only 15

4    to go, but we've only --

5          MS. NUSS:  15.

6          THE COURT:  I know, but this case has been around --

7          MS. NUSS:  I know.

8          THE COURT:  -- for a long time.  So, it may be

9    progress.

10          All right.  If I may, I'd like to now start to focus

11    on the elephant in the room.  I am not actually familiar -- I

12    have not seen the report, the proposed report, which is very

13    frustrating to me because I really can't maneuver scheduling

14    the way I would like, but I can tell you the following is

15    going to apply.

16          I want an administrative record.  If I'm going to

17    review a case, I need an administrative report like any other

18    case.  So, to the extent that after you've had your

19    opportunity to make your objections to the draft report, which

20    I understand from Mr. Sundram are due the 6th of July, I think

21    the parties are going to, at that point, know whether they're

22    going to be bringing things to my attention, my guess, and

23    they're going to have to get together and have a paginated

24    administrative record like any other administrative appeal.

25          That means you've got to get together, and you know,

1   you can do it chronologically and paginate it so that

2   delivered at the whatever point and time we agree upon, I

3   mean, we'll have a schedule, I get filed with the clerk of

4   court and with my chambers, you know, comes in -- perhaps it

5   would be -- I will insist on a hard copy.

6           You can also give me a CD ROM, but I'm not capable

7   of sitting and spending all my time on a computer to read, so

8   you just -- this is like any other case, unfortunately, even

9   though there are all kinds of issues involving human beings.

10  I have to have the paper.

11          I don't want anymore filings until we set a

12  schedule.  I don't see that the District is -- I mean, all the

13  issues you want to raise are going to get raised, but it's

14  going to be in an orderly fashion.  I'm not taking things up

15  piece by piece.  I'm not going to address and I won't let the

16  Plaintiffs waste our time and money now to respond to the

17  motion to vacate, either of these things.  You want me to cut

18  off the special masters, you want to cut me off and you want

19  to dismiss the action.  It's part and parcel of what's going

20  on here.  I'm not bifurcating or segmenting this stuff.

21          So, I don't want to see another pleading about

22  anything until we come back here.  Whatever the masters do,

23  the masters will do, and they're going to get it to me before

24  we come back.

25          I, therefore, am proposing the best schedule to

1   allow me some time I'd like to read what they have to say, but

2   I've been told I can't see it until it's finalized because

3   maybe everybody will agree they've got a great idea and we

4   have no appeal, so I'm not privy to what exactly -- I have a

5   certainly some sense but I don't have any sense in the

6   specifics whatsoever.

7        So, the only schedule I can come up with is I want

8   us back here either the 18th or 19th of August.  I don't

9   have any flexibility on this, and then we will set a schedule.

10  So, you can ignore the issue of 30 days from the time of their

11  report, but I'm going to have a very quick turnaround on the

12  filing of an administrative record, so I suggest you start

13  going, getting together and saying what you need.

14        I don't need to know everything that has happened

15  over the last two years.  I only need to know what's going to

16  be on appeal.  I don't need -- and I'll establish a briefing

17  schedule.  It's not going to be simultaneous.  I suspect it

18  may be, depending on what happens, I don't know if both sides

19  are going to be appealing.  Maybe there will be one side

20  appealing and the other objecting, so sit tight.

21        I don't want to hear about the 90-day report.  I

22  don't -- I have -- only what we need is in the administrative

23  record.  It's not a garbage dump.  I won't permit that.  It's

24  the stuff that you need to object to their -- the master's

25  findings of fact, conclusions of law or if you have some other

1   legal objection.  I can see you have a legal argument out

2   there that has almost nothing to do with their report and

3   recommendation in a way, but I think the report and

4   recommendation will have impact on my decision on the legal

5   matters.

6          So, I suggest we come back here on Wednesday the

7   19th at 2:00 o'clock, and I do not want to see anybody's

8   pleading.  I want then, if I turn around and say we're going

9   to have an administrative record filed in a week, you ought to

10  be prepared for that notion.  Start talking as soon as the 6th

11  is over.

12         I don't -- I caution you.  It's not a dump.  You

13  want to be able to put together what the Court needs to move

14  expeditiously to decide both the legal and factual issues.

15  The legal issues, obviously, some of them have been alluded to

16  here clearly.  Maybe there are other ones as well.  And then

17  we may have issues regarding facts, but it's not -- I know

18  that there was a -- there were live witnesses and some

19  exhibits.  It may be that not every witness and every exhibit

20  needs to be dumped into this administrative record, I don't

21  know.

22         So, 2:00 o'clock on the 19th we will have a

23  status.

24         Does that letter raise any privacy concerns?  I have

25  no idea who the author is, but before I put anything on the

1   record, I want to make sure I'm acting consistently.

2           MR. SUNDRAM:  I just skimmed through it, Your Honor.

3   I didn't notice any specific names of identifiable

4   individuals.

5           THE COURT:  All right.  I just don't want anybody --

6   I'll have that be filed.

7           On the 19th I will set a briefing schedule, and the

8   beginning of the briefing schedule will be the administrative

9   record and it will be required quickly because that means

10  somebody's got to paginate it and produce it.  None of this is

11  without, you know, expense and time, but it's the only way you

12  can have an appeal.  So, any questions about that?

13          MR. KIERNAN:  Your Honor, I guess the only question

14  I have, and it's just a practical one, which is that assumes

15  that the special masters have taken whatever input from the

16  parties had --

17          THE COURT:  I'm telling them they have to.

18          MR. KIERNAN:  I didn't feel I could, so --

19          THE COURT:  No, I know.  They understand.  I mean,

20  I've consulted.

21          MR. KIERNAN:  That gives us then time to digest what

22  they've done from the draft to the final to be -- to decide

23  what it is we do need to put in front of you either side.

24          THE COURT:  True.  But I suspect that there is some

25  core stuff, at least, that you can start on.  I agree.  But I

1  urge them, I mean, to operate as quickly as possible, and I

2  need time to read it.  I've never been able to read their --

3  obviously, and we don't have the final one, and it will have

4  to be a short period of time after the 19th for the

5  finalization of an administrative record.  It has to be

6  paginated and indexed like any other administrative record.

7        MR. KIERNAN:  Mechanically, I mean, if I suggest,

8  I'm not -- if this is what you're thinking.  You know, when it

9  goes up to the Court of Appeals, they, quote, get the whole

10 record, but the parties have agreed on an appendix that kind

11 of boils down the key things.  Would that be the idea here?

12       THE COURT:  I think you really want to do one

13 record.  It seems to me that the testimony, I understand, took

14 three days.

15       MR. KIERNAN:  That's right.

16       THE COURT:  And I don't know what else needs to be

17 put in this record and I don't even know if all the -- maybe

18 even nobody --

19       MR. KIERNAN:  There is some witnesses, I think,

20 neither party would probably put in the record.

21       THE COURT:  Neither would or --

22       MR. KIERNAN:  Probably.  There are a couple of

23 smaller witnesses, but there was obviously a group of

24 exhibits, there were a group of witnesses, there were filings,

25 substantial filings with the special masters, both pretrial

1    and posttrial.

2            THE COURT:  I don't need those.

3            MR. KIERNAN:  I'm trying -- I'm thinking aloud with

4    you about what you really need in the record.

5            THE COURT:  I need to know the bases for your

6    objections.  I mean, I don't want your advocacy pieces before

7    the magistrate -- the masters, really.  You made arguments to

8    them, they either accepted them or not.

9            You won't, generally speaking, let's say if you have

10   an administrative proceeding, I don't get the briefs before

11   the administrative proceeding.  I get the record which

12   consists of what the agency considered, i.e., what did they

13   consider, not your legal advocacy.

14           MR. KIERNAN:  Correct.

15           THE COURT:  I don't know.

16           MR. KIERNAN:  I think that's -- again, as you

17   recall, the way that we structured this was that there were

18   written submissions of direct testimony and then there was

19   live cross-examination and then recross for some people and

20   all that.

21           So, you know, depending on what aspects of the

22   report either side is challenging, they would presumably put

23   in the witnesses relevant to that and so forth.

24           THE COURT:  Right.

25           MR. KIERNAN:  I'm just trying to mechanically, how

```
 1   we do it.

 2            THE COURT:  I hope so.

 3            MR. KIERNAN:  Well, we can -- the parties can --

 4   counsel can certainly work on that.

 5            THE COURT:  You have to have a joint index and it

 6   has to be those portions upon which you're relying to argue

 7   error or that the facts don't -- it's not supported.

 8            MR. KIERNAN:  Or responding to that.

 9            THE COURT:  Oh, yeah, right, I understand.  But so,

10   there may be facts that are not objected to.  I don't need

11   support for those, and I don't need -- you don't need to put

12   in things in the record.  I am not going to judge their report

13   and recommendation based on your, quote, advocacy before the

14   masters.

15            It is the evidence and the legal arguments, at least

16   the ones I have here, aren't terribly dependent on

17   line-by-line disputes with the report and recommendation,

18   because you've already made that without any relationship

19   whatsoever.  There is a legal argument, an overlay to the

20   whole thing, which they may think is unrelated to the report

21   and recommendation.  I don't think it is.  But it's unrelated

22   for purposes of administrative record in a lot of ways.  So

23   yeah, I can't be more specific because I don't know what there

24   is out there.

25            MR. KIERNAN:  Right.  And I guess the other point of
```

1    it would be that your standard of review, as I understand it,

2    essentially *de novo* standard, and I'm presuming before you're

3    discussing, you're not envisioning taking new testimony on

4    this at least at this point.

5         THE COURT:  Well, certainly not new.  The record is

6    closed.  I have to close it.  I have to move on.  If in

7    fact -- I mean, there are -- it is *de novo*, so I have to look

8    at the record.  I mean, there could be some irrelevancies, and

9    please don't bother me with that, and there may be certain

10   things that they say, "Yes, I don't contest what was found in

11   the report and recommendation, but it doesn't support the

12   final conclusion."  I can't -- I can't answer that.

13        Yes, it's *de novo* except for procedural issues or

14   abuse of discretion, and I -- therefore, I would -- I don't --

15   I don't know if we're going to have to -- evidentiary issues

16   are really -- I mean, that isn't going to make a whole lot of

17   difference one way or another, so I hope people aren't going

18   to waste their time criticizing every rule on this on

19   evidence, per se, I mean, hearsay or what have you.  I mean,

20   that's not where we're at.

21        Anyway, Ms. Efros, questions on your behalf?

22        MS. EFROS:  No, Your Honor.  I think we understand

23   what you want in this appendix.

24        THE COURT:  Yeah.  How about the rest of the

25   schedule?  You get it, 19th at 2:00 o'clock?

1    MS. EFROS:  The 19th is fine for the District, Your

2    Honor.

3    THE COURT:  All right.  We're not going to have a

4    report then, Ms. Jones.  Take a week off.

5    Okay.  Thank you.  Thank you.

6    MS. MULLEN:  Good day, Your Honor.

7    THE COURT:  Good day.

8    (PROCEEDINGS END AT 3:41 P.M.)

9                          *-*-*-*

10

11    **CERTIFICATE OF REPORTER**

12    I, Catalina Kerr, certify that the foregoing is a

13    correct transcript from the record of proceedings in the

14    above-entitled matter.

15

16

17

18

19    _____   _____

20    Catalina Kerr                          Date

21

22

23

24

25