UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOY EVANS, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Intervenor, | ) | Civil Action No. 76-293 |
| | ) | (ESH/JMF) |
| v. | ) | |
| | ) | |
| | ) | |
| ADRIAN M. FENTY, et al., | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANTS' RENEWED MOTION TO VACATE CONSENT ORDERS AND TO DISMISS ACTION[1]

The District of Columbia Defendants (hereinafter "the District" or "Defendants"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 60(b)(5), respectfully move this Court, at the conclusion of a period of monitoring not to exceed three months, to vacate the Consent Order entered on June 14, 1978 (the "1978 Consent Order"), together with all subsequent remedial orders entered in this action, and to dismiss this action.[2]  Because the District has remedied the original violations of law,

---

[1]    This renewed motion includes Defendants' Objections to the Special Masters August 14, 2009 Report and Recommendation ("Report") [Docket No. 1129], which are discussed both in the Memorandum and in exhibit 23 to the Memorandum.

[2]    On April 20, 2009, the District filed a similar motion [Docket No. 1108]—albeit before the issuance of the United States Supreme Court's decision in *Horne v. Flores*, 129 S. Ct. 2579 (2009)—which this Court declined to consider.  The District also filed a Notice of Supplemental Authority briefly addressing *Horne* on July 10, 2009 [Docket No. 1126]; yet the Court still declined to consider the District's pending motion.  Now with the conclusion of the remedial phase of this proceeding and with the benefit of full briefing on the impact of *Horne* on this case, the time is more than ripe to consider the merits of the District's motion.

"continued enforcement of the order[s] is not only unnecessary, but improper" under the Supreme Court's recent decision in *Horne v. Flores*, 129 S. Ct. 2579, 2595 (2009).

The District's current system to care for individuals with intellectual and developmental disabilities ("IDD") bears little resemblance to the one that existed when this litigation began more than 33 years ago. In 1976, Plaintiffs charged the District with violating statutory and constitutional law[3] by failing to provide a minimal level of habilitation to the approximately 1,050 residents of Forest Haven. (Compl. at 1 ¶ 1, attached at Exhibit 1.) Among other deficiencies, Plaintiffs alleged that residents were beaten and/or burned by staff (*see id.* at 7 ¶ 9), restrained on "urine-covered" mattresses (*id.* at 3-4 ¶ 5), denied basic medical treatment (*id.* at 3-4, 6 ¶¶ 5, 8), and denied <u>any</u> programming to prevent regression (*id.* at 5-6 ¶¶ 7-8). Plaintiffs specifically requested that the Court permanently enjoin the District from continuing to operate Forest Haven in a manner that violated the rights of its residents. (*Id.* at 16 ¶ XV.2.) Accordingly, this case should have concluded when Forest Haven closed in 1991 and class members were moved into community-based living arrangements. Despite this fundamentally changed circumstance, however, the case continued. And over the course of more than three decades of litigation, the obligations imposed on the District have become ever more exacting and onerous, and now far exceed any constitutional minimum regarding treatment of class members.

In short, and as fully explained in the accompanying memorandum, the District has dramatically reformed its service-delivery system for IDD individuals. The

---

[3]     As explained in the accompanying memorandum, the statutory violations alleged in the Complaint cannot be sustained and accordingly should also be dismissed.

Department on Disability Services ("DDS")[4] was created in 2006 as a cabinet-level
agency tasked with managing, implementing, and sustaining improvements to the system.
The District has hired a dedicated and stable leadership team that, in turn, has recruited
additional IDD professionals to provide state-of-the-art services to District residents.
Implementation of the Medicaid Home and Community-Based Services ("HCBS")
waiver has enabled the District to redesign its service system to provide expanded
integrated-living alternatives and more services at less cost to the District; indeed, class
members now receive a range of services and treatments that did not even exist in 1976.
The District has moved away from its initial focus on the institutionalization and
segregation of individuals with IDD from the larger society, instead creating a system
dedicated to providing residential treatment that, as expressed in DDS's mission
statement, "enable[s] people with disabilities to lead meaningful and productive lives as
vital members of their families, schools, workplaces and communities."  Department on
Disability Services, *Welcome to the DDS Online Policy Manual*, available at
http://www.dds.dc.gov/dds/cwp/view,a,3,q,498438,ddsNav,%7C31341%7C.asp (last
accessed September 22, 2009).

  Under *Horne*, and as demonstrated by the indisputable facts, intrusive and open-
ended federal oversight of the type that has been in place for more than thirty years is no
longer warranted in this case.  Any further perpetuation of this litigation is not only
unnecessary as a practical matter but also legally impermissible.  Reaching far beyond
minimum standards necessary to satisfy constitutional requirements, the orders in this
case dictate virtually every facet of operations relating to the provision of services to

---

[4]    DDS includes the Developmental Disabilities Administration ("DDA"), the specific entity
primarily responsible for services to the class.  In this motion and the accompanying memorandum, the
District may refer to DDS, DDA, or DDS/DDA.

class members.  Now that the District has progressed far beyond the constitutionally

required minimum, prospective enforcement of these orders is no longer equitable.

Furthermore, there is no reasonable basis for asserting that the District will revert to

violating the law if the Court's orders are lifted.  These facts, standing alone, are

sufficient grounds to dismiss this action.

In addition to the District's remediation of any systemic legal violations, the

current economic and fiscal conditions facing the District are the very type of "changed

circumstances" recognized by the Court in *Horne,* that also make continued enforcement

of a consent decree inequitable.  Thus, these changed circumstances also provide an

independent ground for dismissal of this action.

Moreover, nothing in the Special Masters' recent Report changes the impact of

*Horne* on this case.  Indeed, the Special Masters' findings ignore *Horne* and other

decisional precedent and represent a continuation of the approach to long-running

institutional reform litigation that the Supreme Court specifically repudiated in *Horne*.

The Report—all 143 pages of it—is devoid of any attempt to connect the Masters'

findings and recommendation to the constitutional requirements that are at issue in this

case.  (*See* Report at 131 (specifically refusing to address such an argument).)  While the

District also has provided specific objections to the Special Masters' findings, delineated

*infra*, most are relevant only to the extent that this Court rejects the application of *Horne*

as a threshold matter.

Finally, the District has implemented a Quality Management Strategy upon which

it may be monitored for an additional three months, to ensure that the ongoing reforms

continue to move in the right direction.  As discussed *infra*, the Quality Management

Strategy is closely tied to the requirements imposed by the Centers for Medicaid and Medicare ("CMS"), the federal entity that regulates many of the services provided by DDS/DDA.  CMS has specific regulatory requirements, or assurances, in six areas including level of care, service plan, qualified providers, health and welfare, administrative oversight, and financial accountability.  The District has consistently demonstrated that it is designing and implementing a system equally applied to class members regardless of funding source or location, and is applying these federal standards across the DDA service system.  The District's Quality Management Strategy, which measures progress consistent with the current regulatory requirements, represents a rational effort to ensure the continuation of systemic improvements.

For the aforementioned reasons, the time has come—after more than three decades of litigation—to return full management of the District's service-delivery system for individuals with IDD to the District's elected officials.  Accordingly, the District requests that the orders in this case be vacated, and after a period of monitoring not to exceed three months, the case be dismissed.  A proposed Order is submitted herewith.

In the alternative, at the very least, the Court should discharge all provisions of any order now in effect, to the extent that those provisions are no longer necessary to remedy ongoing constitutional violations.[5]

Dated: October 7, 2009                    Respectfully submitted,

                                          PETER J. NICKLES
                                          Attorney General for
                                          the District of Columbia

                                          GEORGE C. VALENTINE

---

[5]        Counsel for Plaintiffs and for Plaintiff-Intervenor do not consent to the relief sought by this motion.

Deputy Attorney General
Civil Litigation Division

/s/ Ellen A. Efros
ELLEN A. EFROS [250746]
Chief, Equity I
Telephone: (202) 442-9886
ellen.efros@dc.gov

/s/ Martha J. Mullen
MARTHA J. MULLEN [419036]
Senior Assistant Attorney General
Telephone: (202) 724-6612
martha.mullen@dc.gov

/s/ Grace Graham
GRACE GRAHAM [472878]
Assistant Attorney General
Telephone (202) 442-9784
Facsimile (202) 727-3625
grace.graham@dc.gov

/s/ Sarah A. Sulkowski
SARAH A. SULKOWSKI [493235]
Assistant Attorney General
Telephone  (202) 724-6627
Facsimile  (202) 730-1454
sarah.sulkowski@dc.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JOY EVANS, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff-Intervenor,** | ) | **Civil Action No. 76-293** |
| | ) | **(ESH/JMF)** |
| **v.** | ) | |
| | ) | |
| | ) | |
| **ADRIAN M. FENTY, et al.,** | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO VACATE CONSENT ORDERS AND TO DISMISS ACTION

Dated: October 7, 2009

PETER J. NICKLES
Attorney General for
the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

 /s/ Ellen A. Efros
ELLEN A. EFROS [250746]
Chief, Equity I
Telephone: (202) 442-9886
ellen.efros@dc.gov

/s/ Martha J. Mullen
MARTHA J. MULLEN [419036]
Senior Assistant Attorney General
Telephone: (202) 724-6612
martha.mullen@dc.gov

/s/ Grace Graham
GRACE GRAHAM [472878]
Assistant Attorney General
Telephone (202) 442-9784

Facsimile (202) 727-3625
grace.graham@dc.gov

/s/ Sarah A. Sulkowski
SARAH A. SULKOWSKI [493235]
Assistant Attorney General
Telephone  (202) 724-6627
Facsimile  (202) 730-1454
sarah.sulkowski@dc.gov

2

## TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................3

II. PROCEDURAL BACKGROUND ............................................................7

III. LEGAL STANDARD..........................................................................10

IV. THIS COURT SHOULD VACATE THE 1978 CONSENT ORDER AND
    DISMISS THE CASE BECAUSE THE DISTRICT HAS PROVIDED A
    DURABLE REMEDY TO THE CONSTITUTIONAL VIOLATIONS AT ISSUE ..14

A. The District has remedied the Constitutional Violation Giving Rise to the 1978
   Consent Order ....................................................................................14

   1. Forest Haven closed in 1991..............................................................18

   2. Service Coordinators and the Individual Service Plan .....................19

   3. Home and Community-Based Services Waiver ................................21

   4. Recruitment and Retention of Qualified Providers...........................24

   5. Intermediate Care Facilities for the Intellectually Disabled .............25

   6. Money Follows the Person Grant .....................................................27

   7. Health and Welfare ...........................................................................28

   8. Payments to Provider ........................................................................31

   9. Conclusion ........................................................................................32

B. The Remedy Implemented By the District Is Durable ...........................36

   1. The District has reformed its systems for the provision of care to the
     intellectually and developmentally disabled......................................37

      a. The establishment of DDS ...........................................................37

      b. The establishment of DHCF .......................................................38

      c. Interagency Cooperation ..............................................................39

2. The Superior Court provides additional oversight to ensure that consumers are being treated appropriately ..............................................................43

3. The District is monitored externally by CMS......................................................44

4. The District is monitored externally by the Quality Trust................................45

5. The District has established an aggressive internal quality-assurance system ..47

6. Conclusion ............................................................................................................51

V. ENFORCEMENT OF THE CONSENT DECREE AND OTHER ORDERS IN THE LITIGATION IS NO LONGER EQUITABLE GIVEN THE CHANGED CIRCUMSTANCES ...............................................................................................52

A. The Absence of Systemic Legal Violations, Combined With The Implementation of Structural and Legislative Changes, Supports Vacatur of the Consent Order and Dismissal of the Litigation .....................................................................................52

B. Current Economic and Fiscal Conditions Also Support Vacatur of the Consent Order and Dismissal of the Litigation...................................................................53

1. Revenue Gap......................................................................................................54

2. Payments to the Court Monitor and Special Masters......................................55

3. Payments to the Quality Trust...........................................................................55

4. Payments to Plaintiffs' Attorneys ....................................................................55

VI. THE COURT SHOULD REJECT THE SPECIAL MASTERS' REPORT AND RECOMMENDATION ...............................................................................................57

A. The Special Masters have Failed to Properly Consider *Horne* .............................57

B. The Masters' Reliance on the Court Monitor's Reports to Make Systemic Conclusions is in Error............................................................................................58

C. The Special Masters' Conclusions are Erroneous to the Extent that the Masters Rejected Evidence Regarding Current Progress ...................................................60

VII. THE SPECIAL MASTERS' PROPOSED RECEIVER IS CONTRARY TO LAW.61

A. Because There Is No Ongoing Constitutional Violation, This Court Lacks the Power to Appoint a Receiver Or "Independent Compliance Administrator"........62

B. A Receiver Is Not Appropriate In These Circumstances ..........................................66

C. Evidence of the Reformed Service-Delivery System, in Addition to the District's Quality Management Strategy, Adequately Remedies Any Potential Violation of the Constitution .....................................................................................................69

VIII. CONCLUSION ...........................................................................................................70

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Agostini v. Felton*, 521 U.S. 203, 117 S. Ct. 1997 (1997))................................................52

*Ambrose v. Puckett*, 198 F. App'x537 (7th Cir. 2006) ....................................................15

*Board of Education of Okla. Public Schools v. Dowell*, 498 U.S. 237 (1991) ............10, 53

*Bracco v. Lackner*, 462 F. Supp. 436 (N.D. Cal. 1978)....................................................66

*Concrete Pipe & Products v. Construction Laborers Pension Trust*, 508 U.S. 602 (1993)16

*Demore v. Kim*, 538 U.S. 510 (2003) ................................................................................16

*Dixon v. Barry*, 967 F. Supp. 535 (D.D.C. 1997) ....................................................... 65-67

*Dixon v. Weinberger*, 405 F. Supp. 974 (D.D.C. 1975)....................................................64

*Evans v. City of Chicago*, 10 F.3d 474 (7th Cir. 1993).......................................................5

*Evans v. Fenty*, 480 F. Supp. 2d 280 (2007)............................................................8-9, 19

*Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978) ........................................... *passim*

*Evans v. Williams*, 206 F.3d 1292 (D.C. Cir. 2000) ......................................................9, 64

*Falter v. Veterans' Admin.*, 632 F. Supp. 196 (D.N.J. 1986)...................................... 14-15

*Feagley v. Waddill*, 868 F.2d 1437 (5th Cir. 1989) ....................................................18, 36

*Frew v Hawkins*, 540 U.S. 431 (2004) ................................................................... *passim*

*Futernick v. Sumpter Township*, 78 F.3d 1051 (6th Cir. 1996) ........................................15

*Glover v. Johnson*, 934 F.2d 703 (6th Cir. 1991) ............................................................64

*Horne v. Flores*, 125 S. Ct. 2579 (2009) ............................................................... *passim*

*Hicks v. James*, 255 F. App'x744 (4th Cir. 2007) ...........................................................15

*Hutto v. Finney*, 437 U.S. 678 (1978)....................................................................... 62-63

*Hydrick v. Hunter*, 500 F.3d 978 (9th Cir. 2007), *vacated & remanded on other grounds*, 129 S. Ct. 2431 (2009).....................................................................................................15

*Ingraham v. Wright*, 430 U.S. 651 (1977) ..........................................................................15

*League of United Latin American Citizens v. Clements*, 999 F.2d 831 (5th Cir. 1993) ......5

*Milliken v. Bradley*, 433 U.S. 267 (1977) ................................................................... 13-14

*Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987 (1st Cir. 1992) ..................17

*Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976) .......................................... 64, 66-67

*NLRB v. Harris Teeter Supermarkets*, 215 F.2d 32 (D.C. Cir. 2000)................................12

*Newman v. Alabama*, 466 F. Supp. 628 (M.D. Ala. 1979) .................................................68

*Overton v. Bazzetta*, 539 U.S. 126 (2003) ........................................................................14

*P.C. v. McLaughlin*, 913 F.2d 1033 (2d Cir. 1990) ..........................................................35

*In re Pearson*, 990 F.2d 653 (1st Cir. 1993)......................................................................52

*Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1 (1981), *overruled in part on other grounds*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)...........................15

*Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114 (3d Cir. 1979)........36

*Phillips v. Thompson*, 715 F.2d 365 (7th Cir. 1983)..........................................................17

*Reed v. Rhodes*, 422 F. Supp. 708 (N.D. Ohio 1976) ........................................................65

*Reed v. Rhodes*, 455 F. Supp. 546 (N.D. Ohio 1976) ........................................................65

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992).................................... *passim*

*Salazar v. District of Columbia*, Civil Action No. 93-452 (GK), 2006 U.S. Dist. LEXIS 46130 (D.D.C. 2006), *cited in* Report at 95 n...................................................................64

*Shaw v. Allen*, 771 F. Supp. 760 (S.D. W.Va. 1990)........................................................66

*Society of Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d Cir. 1984)34-35

*Society of Good Will to Retarded Children, Inc. v. Cuomo*, 902 F.2d 1085 (2d Cir. 1990)35

*Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971) .......................62

*System Federation Number 91 Railway Employees' Department v. Wright*, 364 U.S. 642 (1961), *quoted in United States v. W. Elec. Co.*, 46 F.3d 1198, 1205 (D.C. Cir. 1995) ......6

*United States v. City of Detroit*, 476 F. Supp. 512 (E.D. Mich. 1979) .............................64

*United States v. United Shoe Machine Corp.*, 391 U.S. 244 (1968)................................63

*United States v. W. Elec. Co.*, 46 F.3d 1198, 1205 (D.C. Cir. 1995).......................6, 12-13

*Winston v. Children & Youth Services*, 948 F.2d 1380 (3d Cir. 1991).............................17

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ................................................ *passim*

## STATE CASES

*D.C. v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. 1999)  .................................................. 66-67

*Perez v. Boston Housing Authority*, 400 N.E.2d 1231 (Mass. 1980) ...............................66

*Petitpren v. Taylor School District*, 304 N.W.2d 553 (Mich. Ct. App. 1981) .................66

## FEDERAL STATUTES

42 U.S.C. §§ 6001 *et seq.*..................................................................................15

Fed. R. Civ. P. 53 ..............................................................................................63

Fed. R. Civ. P. 60(b)(5)................................................................................... 11-12

Fed. R. Civ. P. 66 ..............................................................................................63

Fed. R. Civ. P. 70 ..............................................................................................63

## STATE STATUTES

D.C. OFFICIAL CODE § 7-761.03 ......................................................................37

D.C. OFFICIAL CODE § 7-761.06 ......................................................................38

D.C. OFFICIAL CODE § 7-771.03 ......................................................................39

D.C. OFFICIAL CODE § 7-1304.11 .....................................................................44

D.C. OFFICIAL CODE § 7-1304.12 .....................................................................44

D.C. OFFICIAL CODE § 7-1305.13 .....................................................................44

Superior Court Rule - MRP ............................................................................44

## MISCELLANEOUS

12 C. Wright and A. Miller, Federal Practice and Procedure, Section 2983 ....................66

The District, pursuant to Federal Rule of Civil Procedure 60(b)(5), submits this Memorandum in support of its motion to vacate, after a period of monitoring not to exceed three months, the 1978 Consent Order, together with all subsequent remedial orders entered in this action, and to dismiss this case.  The District has remedied the alleged constitutional and statutory violations that gave rise to the 1978 Consent Order and its progeny, and continued federal-court oversight is therefore no longer either equitable or permissible.  *See Horne v. Flores*, 125 S. Ct. 2579 (2009).  This fact, standing alone, compels dismissal of this action.

Moreover, in addition to the remediation of the original systemic violations, total reformation of the District's service delivery system to individuals with IDD, and the current economic and fiscal conditions faced by the District are the very type of "changed circumstances," also recognized by the Supreme Court in *Horne*, that render continued enforcement of a consent decree inequitable.  Thus, these changed circumstances also provide an independent ground for dismissal of this action.

## I.    INTRODUCTION.

The Supreme Court has long recognized, and most recently reemphasized in *Horne*, that the only legitimate goal of a consent order is to secure compliance with the law.  Any specific obligation imposed by such an order is, then, simply a means to the same end—statutory compliance.  Extra-statutory requirements unduly interfere with local autonomy and with the separation of powers, implicating serious federalism concerns.  Such orders also impose considerable legal and administrative burdens on local government and its taxpayers.

This litigation continues only because the 1978 Consent Order, and subsequent orders issued pursuant to it, impose requirements that exceed the constitutional minimum standards applicable to Plaintiffs' Fifth and Eight[1] Amendment right to be free from harm and their Fifth Amendment right to receive habilitative care and treatment. Lost in the more than 33 years of litigation in this case is the principle that these rights are <u>limited</u> in scope. The constitutional right to be free from harm ensures simply "that the courts make certain that professional judgment in fact was exercised" in attempting to protect the rights of an involuntarily committed individual. *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982) (internal quotation marks omitted). The right to receive habilitation and treatment entitles an intellectually or developmentally disabled individual involuntarily committed to a state facility to "*minimally* adequate training[, which] is such training as may be reasonable in light of [the individual's] liberty interests in *safety and freedom from unreasonable restraints*." *Id.* at 322 (emphases added).

There simply is no question that, upon the application of these standards to the District's provision of services today, the District is entitled to dismissal of this litigation. Forest Haven closed in 1991, and as outlined in detail below, the District has undertaken an ambitious and successful reform of its service-delivery system. As a result, the alleged violations identified in the 1976 Complaint—which were the basis of the 1978 Consent Order—have been cured, and the District's provision of services to the *Evans* class now amply satisfies constitutional requirements. Indeed, were Plaintiffs to bring the same challenge today, such a lawsuit would unquestionably fail. Moreover, the District has shown that there is no serious risk that it would begin violating the law if the 1978

---

[1]    Although Plaintiffs claim a violation of their rights under the Eighth Amendment, it is far from clear that they in fact possess any such rights. *See* n.11, *infra*.

Consent Order were vacated.  Indeed, the District has proposed an additional three month period of monitoring of its Quality Management Strategy (discussed herein) to allay any concerns that the Court might have with regard to sustainability.

The District's consent to the entry of the 1978 Consent Order, and subsequent orders, cannot justify continuing judicial oversight now.  The District does not consent to any further court supervision or continuation of this case, and the agreement of prior administrations does not bind the current leadership for the simple reason that "[c]onsent alone is insufficient to support a commitment by a public official that ties the hands of his successor."  *Evans v. City of Chicago*, 10 F.3d 474, 478 (7th Cir. 1993) (en banc); *see also League of United Latin American Citizens v. Clements*, 999 F.2d 831, 846 (5th Cir. 1993) (en banc) ("Courts must be especially cautious when parties seek to achieve by consent decree what they cannot achieve by their own authority.  Consent is not enough when litigants seek to grant themselves powers they do not hold outside of court.").  As the Supreme Court has aptly explained, such agreements may "bind . . . local officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'"  *Horne*, 129 S. Ct. at 2594 (quoting *Frew v Hawkins*, 540 U.S. 431, 441 (2004)).[2]

This principle, which is founded upon the separation of powers, necessarily limits the courts' discretion in enforcing consent decrees.  "[P]arties cannot, by giving each

---

[2]    In its own *Evans* case, the Seventh Circuit held:

> Although the decree purports to last for all time . . . [,] democracy does not permit public officials to bind the polity forever.  What one City Council enacts, another may repeal; what one mayor decrees during his four-year term, another may revoke.  Today's lawmakers have just as much power to set public policy as did their predecessors . . . and the people are free to upset even the most enlightened policies of earlier times.

10 F.3d at 478.  In short, "temporary officeholders may not contract away the basic powers of government ... ."  *Id.*

other consideration, purchase from a court of equity a continuing injunction." *Sys. Federation No. 91 Ry. Employees' Dep't v. Wright*, 364 U.S. 642, 651 (1961), *quoted in United States v. W. Elec. Co.*, 46 F.3d 1198, 1205 (D.C. Cir. 1995).  Accordingly, where—as here—a plaintiff's suit arises from alleged constitutional violations, and any such violations have long been cured, the defendant's prior consent to extra-constitutional requirements cannot be invoked to justify continuing judicial oversight.  In short, absent an ongoing constitutional violation, this Court has no basis for continuing to enforce orders that have long outlived their purpose and utility.

The reality is that, almost 32 years after its entry, the 1978 Consent Order is doing far more harm than good.  It has cost taxpayers more than $1.8 million in attorneys' fees (with three years yet to be billed) since 1999 alone.  The services of the Court Monitor and Special Masters have cost more than $10 million from fiscal year 2000 until the present, with no end in sight.  And these costs are in addition to the more than $20 million that the District has spent funding the Quality Trust, which provides even more extensive monitoring services than does the Court Monitor (as the Quality Trust monitors all DDS consumers, not only *Evans* class members).  Adding yet another "administrator" to the mix, as proposed by the Special Masters, would only increase an already unnecessary burden on the taxpayers.  These exorbitant costs are all the more problematic in light of the District's current fiscal crisis.

In addition, it is impossible to overstate the immense burden that this litigation imposes on those actually responsible for providing services to the District's vulnerable IDD population. This Court has remarked time and again on the vast number of voluminous filings that this litigation continues to generate—many of which can only be

authored by the very personnel responsible for service-delivery to class members.
Indeed, during the "remedial phase" of this litigation alone, numerous District employees,
including the Director and Deputy Director of DDS and her key management team
members, responded to discovery requests, were deposed, and testified at or otherwise
attended a four-day trial.  Every moment dedicated to the litigation simply diverts critical
resources—both human and financial—from meeting the urgent needs of those who rely
on the system.

And yet, despite constitutional compliance and more, the District now faces the
imposition of yet another severe penalty—a receivership in all but name—solely for
failure to comply with the extra-constitutional requirements of the 1978 Consent Order
and subsequent orders of the Court.  Such a result would turn the law on its head.

The 1978 Consent Order and all subsequent remedial orders should be vacated,
and this action should be dismissed.  In the alternative, the Court should at the very least
modify the orders currently in force, to eliminate any provisions that are not reasonably
necessary to remedy a current and ongoing constitutional violation.

## II.    PROCEDURAL BACKGROUND.

Plaintiffs filed their complaint in February 1976, asserting claims arising under
the First, Fourth, Fifth, and Eighth Amendments to the Constitution, as well as federal
and local statutory claims.  In 1977, the Court certified the class, later redefined as "those
individuals who are now, have been, or will be residing at Forest Haven as a result of
involuntary commitment."[3]  (Order dated Jan. 19, 1977.)  On June 14, 1978, the parties
consented to a final judgment and order (the "1978 Consent Order"), 459 F. Supp. 483

---

[3]        The class is now closed, as its membership is confined to former residents of Forest Haven.

(D.D.C. 1978), in which the Court concluded that the District had violated class members' constitutional rights "to be free from harm" under the Fifth and Eighth Amendments and "to receive habilitative care and treatment in the alternative least restrictive of individual liberty under the Fifth Amendment." (1978 Consent Order at 1-2 ¶¶ 2-3, attached at Exhibit 2) The 1978 Consent Order set forth prescriptive terms and conditions to be fulfilled by the District, under the oversight of a Developmental Disabilities Professional (the "DDP")[4] and in consultation with Plaintiffs. Certain provisions of the 1978 Consent Order were geared explicitly to arrangements at Forest Haven, while others were intended to address post-Forest Haven residential arrangements for class members.

In October 1980, June 1981, and February 1983, the Court entered additional orders setting forth measures that the Court deemed necessary to the implementation of the 1978 Consent Order. As with the 1978 Consent Order, some provisions of these orders were directed specifically to the operation of Forest Haven, while others sought to address the provision of services to consumers after discharge from Forest Haven.

In April 1990, the Court entered an order (the "1990 Order") mandating quotas and a timetable for the phased outplacement of Forest Haven residents, to be completed by September 30, 1991, with daily fines prescribed in the event that Defendants failed to meet the timetable. A further order entered in August 1991 granted Defendants a brief extension of time to effect these relocations, which were completed in October 1991. *See Evans v. Fenty*, 480 F. Supp. 2d 280, 284 (2007).

---

[4]    The DDP was redesignated, by Order of the Court dated November 21, 2000, as the Court Monitor.

In October 1995, the Court found Defendants in contempt of the Court's prior orders.  (Oct. 11, 1995 Findings and Conclusions.)  As a remedy, the Court appointed Special Master Margaret Farrell[5] and vested her with broad powers to develop a remedial plan via which the District could purge itself of contempt.  (Oct. 11, 1995 Order of Reference.)  The following August, the Court entered a Remedial Plan (the "1996 Order")[6] based on a report from Special Master Farrell.[7]

The parties subsequently negotiated and filed with the Court the 2001 Plan for Compliance and Conclusion of *Evans v. Williams* (the "2001 Plan"), attached at Exhibit 3.  A few months later, in March 2001, the Court formally adopted the parties' stipulated findings in an opinion and order accompanying the consent order and settlement agreement.  (*See* Mar. 30, 2001 Order, at 9.)  The 2001 Plan identified seven goals and outcome criteria related to health, safety, and welfare.  Compliance with the 2001 Plan would purportedly result in compliance with the Court's underlying orders.  The 2001 Plan itself is not an enforceable court order.

On May 24, 2006, Plaintiffs moved for an order finding Defendants in noncompliance with existing Court orders and placing the Mental Retardation and Developmental Disabilities Administration ("MRDDA," a predecessor agency to DDS) in receivership.  In its Memorandum Opinion issued in March 2007, the Court found that Defendants had "failed to comply with existing Court Orders in the core areas of health, safety, and welfare."  *Evans*, 480 F. Supp. 2d at 298.  The Court further found that the

---

[5]     On January 30, 2001, the Court gave notice of its intent to appoint a second special master, Clarence Sundram, to share duties with Special Master Farrell.

[6]     Defendants did not consent to the entry of the 1996 Order.

[7]     In February 1999, in an order that was otherwise largely reversed on constitutional grounds by the Court of Appeals, the Court set a schedule of daily fines to be imposed for noncompliance with the timing provisions of the Plan.  *See Evans v. Williams*, 206 F.3d 1292 (D.C. Cir. 2000).

noncompliance was "systemic, serious and continuous." *Id.* at 325. The Court did not, however, impose a receivership, did not find Defendants in contempt, and, most importantly, did not address whether the underlying Court orders exceeded constitutionally required standards of treatment.

Since that time, the parties have engaged in a hearing on remedy before the Special Masters, which concluded on December 13, 2008. The Special Masters issued their Report and Recommendation regarding remedy on August 14, 2009, and recommended what they refer to as an "Independent Compliance Administrator."[8] Maintaining that the Administrator would somehow be less drastic than a receiver, the Masters' recommend that the Administrator be allowed to "take all actions necessary" to "secure compliance with Court Orders and the 2001 Plan." (Report at 136.)

As demonstrated herein, the overwhelming weight of decisional law militates against any continuation of Court oversight under the current circumstances. Thus, the District now moves to vacate the 1978 Consent Order and all other remedial orders, and to dismiss this action.

## III.    LEGAL STANDARD.

As the Supreme Court recently re-emphasized in *Horne*, the "critical question" that a district court must answer under Rule 60(b)(5) is whether the movant has satisfied the objective of a court order—that is, whether the movant has remedied the underlying violation of law. *Horne*, 129 S. Ct. at 2595; *see also Bd. of Educ. of Okla. Pub. Schs. v. Dowell*, 498 U.S. 237, 247 (1991) ("In the present case, a finding by District Court that

---

[8]    For Defendants' filings related specifically to the hearing on remedy, *see* Defendants' Proposed Findings of Fact and Conclusions of Law [Docket No. 1074] and Defendants' Post-Trial Brief Regarding Remedy [Docket No. 1082].

[the agency] was being operated in compliance with the commands of the [law] and that it was unlikely that the [agency] would return to its former ways, would be a finding that the purposes of the . . . litigation have been fully achieved.").

In *Horne*, several English-Language Learner ("ELL") students and their parents filed a class action alleging that an Arizona school district was violating the Equal Educational Opportunities Act of 1974 ("EEOA") by providing inadequate ELL instruction.[9]  129 S. Ct. at 2588.  The district court entered a declaratory judgment in favor of the plaintiffs, finding that the state's funding for the special needs of ELL students was arbitrary and not related to the actual funding needed to cover the costs of ELL instruction.  *Id.* at 2589.  It therefore ordered that the State appropriately fund its ELL programs.  *Id.*

A few years later, state officials moved for relief from the order pursuant to Rule 60(b)(5), on the ground of changed circumstances.  *Id.* at 2591.  The district court denied the motion, and the Court of Appeals affirmed.  *Id.*

The Supreme Court reversed, holding that both of the lower courts had erred in focusing on whether the state was complying with the district court order, instead of asking whether the state "is now fulfilling its statutory obligation by new means."  *Id.* at 2589.  In reaching this conclusion, the *Horne* Court began with the fundamentals of Rule 60(b)(5).  The Rule permits a party to obtain relief from a judgment or order "if, among other things, 'applying [the judgment or order] prospectively is no longer equitable.'"  *Id.* at 2593 (quoting FED. R. CIV. P. 60(b)(5)).  Thus, Rule 60(b)(5) "provides a means by

---

[9]      The EEOA requires a state to "take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs."  *Horne*, 129 S. Ct. at 2589 (internal quotation marks and emphasis omitted).

which a party can ask a court to modify or vacate a judgment or order if 'a significant

change either in factual conditions or in law' renders continued enforcement 'detrimental

to the public interest.'" *Id.* (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367,

384 (1992)).

The *Horne* Court emphasized that "Rule 60(b)(5) serves a particularly important

function in . . . 'institutional reform litigation.'" *Id.* (quoting *Rufo*, 502 U.S. at 380).

"For one thing, injunctions issued in such cases often remain in force for many years, and

the passage of time frequently brings about changed circumstances—changes . . . in

governing law . . . and new policy insights—that warrant reexamination of the original

judgment." *Id.* "Second, institutional reform injunctions often raise sensitive federalism

concerns," particularly where they "involve[] areas of core state responsibility" or

"ha[ve] the effect of dictating state or local budget priorities." *Id.* at 2593-94. Moreover,

consent decrees often "go well beyond what is required" by law, and "thereby

'improperly deprive successor officials of their designated legislative and executive

powers.'" *Id.* at 2594 (quoting *Frew,* 540 U.S. at 441). When "state and local officials

… inherit overbroad or outdated consent decrees that limit their ability to respond to the

priorities and concerns of their constituents, they are constrained in their ability to fulfill

their duties as democratically-elected officials." *Id.* (internal quotation marks and ellipsis

omitted).

In recognition of these features of institutional reform decrees, the *Horne* Court

reiterated that "courts must take a 'flexible approach' to Rule 60(b)(5) motions

addressing such decrees." *Id.* (quoting *Rufo*, 502 U.S. at 381); *see also Frew*, 540 U.S. at

441; *NLRB v. Harris Teeter Supermarkets*, 215 F.2d 32, 35 (D.C. Cir. 2000); *W. Elec.*

*Co.*, 46 F.3d at 1202-03 (noting the Supreme Court's recognition in *Rufo* that "it should generally be easier to modify an injunction in an institutional reform case than in other kinds of cases").  In applying this flexible approach, "courts must remain attentive to the fact that 'federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.'" *Horne*, 129 S. Ct. at 2595 (quoting *Milliken v. Bradley,* 433 U.S. 267, 282 (1977)).  "When the objects of the decree have been attained—namely, when [statutory] compliance has been achieved—responsibility for discharging the State's obligations must be returned promptly to the State and its officials." *Id.* at 2596 (quoting *Frew,* 540 U.S. at 442) (internal quotation marks and brackets omitted).

These fundamental principles were not followed by the lower courts in *Horne*, which erred by failing to recognize that an institutional reform decree must end as soon as the underlying legal violation is remedied.  "Rather than applying a flexible standard that seeks to return control to state and local officials as soon as a violation of federal law has been remedied . . . , the Court of Appeals concerned itself only with determining whether [the defendants' actions] complied with the original declaratory judgment order." *Id.* at 2595.  This was error. *Id.*  "[R]elief may be warranted even if [defendants' actions] have not 'satisfied' the original order," *id.* at 2597; that is, an institutional-reform litigant may instead obtain relief "if prospective enforcement of that order is no longer equitable." *Id.* (internal quotation marks omitted).  To make such a determination, a court "need[s] to ascertain whether ongoing enforcement of the original order [is] supported by ongoing violation of . . . law." *Id.* (citing *Milliken*, 433 U.S. at 282).  If the local government is "no longer in violation of the [law] . . . , continued enforcement of

13

the District Court's original order is inequitable within the meaning of Rule 60(b)(5), and relief is warranted." *Id.* at 2606.

It is against these decisional precedents that the instant motion must be evaluated. Applying *Horne*'s directives, this Court should find that the District has remedied the constitutional violations identified in the 1978 Consent Order and that changed circumstances—including undisputed major structural and other improvements to DDS and to the delivery of services to individuals with IDD in the District—have negated any justification for federal court oversight of this local function. In other words, because a "durable remedy has been implemented, continued enforcement of the order is *not only unnecessary, but improper*." *Id.* at 2595 (emphasis added) (citing *Milliken*, 433 U.S. at 282).

## IV. THIS COURT SHOULD VACATE THE 1978 CONSENT ORDER AND DISMISS THE CASE BECAUSE THE DISTRICT HAS PROVIDED A DURABLE REMEDY TO THE CONSTITUTIONAL VIOLATIONS AT ISSUE.

### A. The District Has Remedied the Constitutional Violation Giving Rise to the 1978 Consent Order.

In the 1978 Consent Order, the Court found that the District had violated Plaintiffs' Fifth and Eighth Amendment rights to be free from harm and their Fifth Amendment right to receive habilitative care and treatment.[10] (Ex. 2, 1978 Consent Order at 1-2 ¶¶ 1, 3-4.)

---

[10] The Court has not previously addressed the other claims asserted in Plaintiffs' Complaint. These claims should not be considered at this juncture because they have had no bearing on the substance of any order in the litigation. Further, because those claims cannot succeed as a matter of law, they should also be dismissed.

Count XI of the Complaint asserts a First Amendment claim. (Ex. 1, Compl. at 15 ¶ 27.) But First Amendment rights are not absolute; rather, they must be balanced against legitimate institutional goals. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("An inmate does not retain rights inconsistent with proper incarceration."); *Falter v. Veterans' Admin.*, 632 F. Supp. 196, 204 (D.N.J. 1986) (standard applicable to

The constitutional right to be free from harm is protected by the Due Process

Clause of the Fifth Amendment. *See Ingraham v. Wright*, 430 U.S. 651, 672-74 (1977);

*Youngberg*, 457 U.S. at 315.[11]  This right, however, is not absolute, for the simple reason

that "an institution cannot protect its residents from *all* danger of violence if it is to

permit them to have any freedom of movement," which is itself a protected liberty

interest. *Youngberg*, 457 U.S. at 320 (emphasis added).

Thus, while "[p]ersons who have been involuntarily committed are entitled to

more considerate treatment and conditions of confinement than criminals whose

conditions of confinement are designed to punish," the standard for their treatment "is

lower than the 'compelling' or 'substantial' necessity tests . . . ." *Id.* at 321-22.  In

practice, "the Constitution only requires that the courts make certain that professional

---

prisoners' rights also governs First Amendment rights of hospitalized patients).  Here, Plaintiffs cannot show that their First Amendment rights were unreasonably curtailed.

Count XII of the Complaint asserts a Fourth Amendment claim.  (Ex. 1, Compl. at 15 ¶ 28.) Plaintiffs cannot show that the District currently has any policy or practice of using excessive force against them or of unreasonably seizing their persons or property.

Count XIII of the Complaint asserts a claim under 42 U.S.C. §§ 6001 *et seq.*, the Developmentally Disabled Assistance and Bill of Rights Act ("DDABRA").  (Ex. 1, Compl. at 15 ¶ 29.)  DDABRA does not create any individually enforceable right.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981), *overruled in part on other grounds*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989), *as noted in Futernick v. Sumpter Twp.*, 78 F.3d 1051, 1055 (6th Cir. 1996).

Count XIV of the Complaint asserts a claim under D.C. OFFICIAL CODE §§ 32-601 *et seq.*  (Ex. 1, Compl. at 15 ¶ 30.)  These provisions have since been repealed and accordingly cannot provide a basis for ongoing federal-court supervision.

[11]    Plaintiffs also claim a violation of their right to be free from harm pursuant to the Eighth Amendment's prohibition on cruel and unusual punishment.  It is far from clear, however, that the Eighth Amendment even applies here, given the circumstances of this case.  Several courts have held that "the Eighth Amendment is not the proper vehicle to challenge the conditions of civil commitment."  *Hydrick v. Hunter*, 500 F.3d 978, 994 (9th Cir. 2007), *vacated & remanded on other grounds*, 129 S. Ct. 2431 (2009); *see also Hicks v. James*, 255 F. App'x 744, 748 (4th Cir. 2007) ("the Eighth Amendment … is not available for challenges to the conditions of civil commitment); *Ambrose v. Puckett*, 198 F. App'x 537, 539-40 (7th Cir. 2006) ("Since [the plaintiff] is not serving a criminal sentence but rather is civilly committed, his deliberate-indifference claim arises under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment's prohibition against cruel and unusual punishment.").

judgment in fact was exercised" in attempting to protect the rights of an involuntarily committed individual. *Id.* at 321 (internal quotation marks omitted). In other words, "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* (internal quotation marks omitted).

The constitutional right to minimally adequate habilitation, like the right to be free from harm, "is a substantive due process claim that is said to be grounded in the liberty component of the Due Process Clause … ." *Id.* at 316.[12] This right entitles an intellectually or developmentally disabled individual involuntarily committed to a state facility only to "*minimally* adequate training[, which] is such training as may be reasonable in light of [the individual's] liberty interests in *safety and freedom from unreasonable restraints*." *Id.* at 322 (emphases added).[13]

---

[12]    While the *Youngberg* Court referred to the right to habilitation as rooted in the Fourteenth Amendment, *id.*, the Supreme Court has held that the Fifth Amendment confers substantive due process rights at the federal level just as the Fourteenth Amendment does at the state level. *See Demore v. Kim*, 538 U.S. 510, 549 (2003); *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 636 (1993).

[13]    In its 1978 Consent Order, this Court adopted a much more expansive definition of the Fifth Amendment right to habilitative care and treatment:

> Each class member has a federal constitutional right, based upon the Due Process Clause of the Fifth Amendment, to receive habilitative care and treatment *in the alternative least restrictive of individual liberty* and to be kept free from harm.
> Habilitation is the process by which a resident is assisted in *acquiring and* maintaining those life skills which enable him to cope *more effectively* with the demands of his own person and of his environment *and to raise the level of his physical, mental, and social capabilities. Habilitation includes but is not limited to[] programs of formal, structured education and training.*
> *Habilitative care in the alternative least restrictive of individual liberty means* living as normally as possible and receiving appropriate individualized services in the community in the least separate, most integrated and least restrictive settings.
> *As used in this Order, "integrated" refers to the integration of mentally* retarded persons with nonretarded persons in the community.

(Ex. 2, 1978 Consent Order at 2 ¶ 3 (emphases added).)

The portions of this definition emphasized above are not required by the Fifth Amendment's due process clause but, rather, reach far beyond any constitutionally guaranteed minimum. It is unlikely that the Court would have adopted such an expansive definition absent the parties' agreement. Regardless, Defendants

In gauging whether the training provided is minimally adequate, "courts must show deference to the judgment exercised by a qualified professional." *Id.* Under this standard, a decision made by such a professional "is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323 (footnote omitted).[14] Specifically, then, under *Youngberg*, "there is *no* constitutional right to care

---

cannot now be bound by their three-decades-old consent to the use of an overly expansive, erroneous definition. *See Rufo*, 502 U.S. at 392; *Frew*, 540 U.S. at 441. And, in any event, as the Supreme Court made clear in *Horne*, changes in law also constitute a changed circumstance that may make the prospective application of an order inequitable. *See* 129 S. Ct. at 2593 (referring to "changes in governing law or its interpretation by the courts" as the basis of a Rule 60(b)(5) motion). Accordingly, this Court should disregard the 1978 Consent Order's incorrect statement of the applicable standard and implement the correct standard, which the District has more than satisfied.

[14]    Federal courts applying this standard have consistently held that the Constitution requires the government to provide each individual with only such habilitation and training "as an appropriate professional would consider reasonable to ensure his *safety* and to facilitate his *ability to function free from bodily restraints.*" *Id.* at 324 (emphases added); *see also Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 990 (1st Cir. 1992) (same). As the Third Circuit has explained:

> The [*Youngberg*] Court defined the liberty interest as the right *only* to minimally adequate or reasonable training needed to ensure *safety and freedom from undue restraint*. Significantly . . ., the Court did not apply a strict scrutiny standard, which requires the state to justify each restraint under a least restrictive analysis. Instead, *Youngberg* stated that the level of care that a state must provide must be determined by balancing the patient's liberty interests against the relevant state interests.

*Winston v. Children & Youth Servs.*, 948 F.2d 1380, 1391 (3d Cir. 1991) (emphasis added) (internal quotation marks, citations, and brackets omitted); *accord Phillips v. Thompson*, 715 F.2d 365, 368 (7th Cir. 1983) (emphases added):

> With respect to training, *Youngberg* teaches that, at the most, the class members were entitled to [such] minimally adequate training as is reasonable in the light of their interest in *freedom of movement* and that deference must be shown to the professional judgment of those directing the operation of the institution. Such training as is required, therefore, is training to enhance the ability of the class members to exercise their right to *liberty of movement*.

or treatment in a least restrictive alternative setting." *Feagley v. Waddill*, 868 F.2d 1437,

1440 (5th Cir. 1989) (emphasis added) (internal quotation marks omitted).[15]

The current IDD system administered by DDS/DDA, as described in more detail

below, not only satisfies but greatly surpasses the minimum constitutional standards

established by the Fifth Amendment and (if applicable) the Eighth Amendment.

### 1. Forest Haven closed in 1991.

First, and most fundamentally, the District's current system bears no resemblance

to the system that existed in 1978. When the 1978 Consent Order was entered, Forest

Haven was home to more than 1,000 intellectually and developmentally disabled District

residents, who were kept segregated by sex (*see* Ex. 1, Compl. at 10 ¶ 17(c))[16] and were

frequently locked into dirty, run-down wards (*see id.* at 11-12 ¶¶ 19(a)-(b), (g)). Many

Forest Haven residents slept in large, open dormitories affording little privacy or security.

(*See id.* at 11 ¶ 19(d).) Safety precautions were inadequate to protect residents from

physical harm (*see id.* at 12 ¶¶ 20(a) (inadequate staffing resulting in poor custodial care),

(b) ("Some residents have been beaten or physically abused by Forest Haven staff; other

residents have been beaten or abused, either physically or sexually, by their peers."); *see*

*also id.* at 13 ¶¶ 21(a) (inadequate medical and clinical personnel to provide proper health

care), (c) (failure to properly treat injuries and illnesses), (d) (inadequate dental care), (e)

(inadequate nutrition).) Medication and physical restraints were sometimes used to

---

[15]     More generally, "the constitutional minimum standard of habilitation does not relate to the qualitative betterment of a retarded person's life, and . . . where the state does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimal treatment that it is under no obligation to grant." *Feagley*, 868 F.2d at 1440 (internal quotation marks omitted).

[16]     For the purpose of this motion to vacate the 1978 Consent Order and its progeny, the District does not contest the factual allegations set forth in the Complaint.

control residents. (*See id.* at 13 ¶ 21(b).) Forest Haven residents were afforded virtually no habilitative care; as a result, some class members regressed in personal and social functioning over time. (*See id.* at 10-11 ¶ 18.)

Due in part to this litigation, in 1991 the District became one of the first jurisdictions to close its large institution (Forest Haven) and re-focus its service-delivery system toward providing community-based care and treatment.[17] Indeed, consistent with the 1978 Consent Order, every class member has been placed in a community-based setting—housing no more than eight individuals. (*See* Ex. 2, 1978 Consent Order at ¶ 5.b.) Over the years, the District has added numerous services and supports that contribute to the goal of fully integrating, to the extent possible, persons with intellectual and developmental disabilities into their community. In fact, class members today have access to a wide range of supports and services that did not even exist in 1976—including supported living and employment, a range of therapeutic options (including physical, occupational, and music therapy), day habilitation, and recreational supports—none of which is required by the Constitution. *See* discussion, *infra*.

That this case continues long after the fundamental goal of the litigation—the end of Forest Haven—has been achieved, and notwithstanding the implementation of services and treatment that exceed the requirements of the Constitution, is a clear violation of the constitutional rule articulated by the Supreme Court in *Horne*.

## 2. Service Coordinators and the Individual Service Plan.

One of the key requirements of the 1978 Consent Order was that the District develop an individual service plans ("ISP") for each consumer based on an individual assessment. (*See* Ex. 2, 1978 Consent Order at ¶ 5.a (referring to individualized

---

[17]     *See Evans*, 480 F. Supp. 2d at 284.

habilitation plan).)  The District long ago accomplished this fundamental goal and has continued to improve the development and effectiveness of ISPs throughout the last several years in particular.  Service coordinators, the 71 current individuals in DDS/DDA tasked with fulfilling this important function, meet and talk with individual consumers, their families and/or significant others, and their providers, to gather information in order to develop each consumer's ISP.[18]  (Declaration of Laura Nuss, October 7, 2009 ("Oct. 7, 2009 Nuss Decl.") at ¶ 9, attached at Exhibit 4.)  Through this process, in addition to the team review of professional and program assessment reports, the service coordinator and team identifies the supports needed to maximize an individual's capabilities, and ensure quality services and a healthy lifestyle.[19]

The ISP can be revised or updated at any time but, at a minimum, must be reviewed and discussed annually to ensure that changes in an individual's condition and/or needs are taken into consideration in providing care and treatment.  (*Id.* at ¶¶ 9-10.)  Therefore, each coordinator is required to meet with consumers on a regular basis. At present, and for the last two years, between 86% and 98% of class members have met personally with their service coordinators each quarter.  (*Id.* at ¶ 11.)  ISPs have been completed on time at least annually on average 90% of the time for the past two years. (*Id.*)  And DDS/DDA has maintained a ratio of one service coordinator to no more than 30 individuals (class and non-class members) for the last six years.  (*Id.* at ¶ 12.)

---

[18]    In October 2008, consistent with best practice, DDA service coordinators assumed responsibility for facilitating and completing the ISP for HCBS Waiver participants, ending a long-standing practice of third-party contractors completing that practice.  (*Id.* at ¶ 14.)  DDA met its stated goal of assuming that same responsibility for individuals living in Intermediate Care Facilities for the Intellectually Disabled ("ICFs/ID") beginning August 1, 2009.  (*Id.*)

[19]    Moreover, the ISP is a data-driven document, and programming is being completed to link the service coordinator's monitoring tool with the specific outcomes in the ISPs.  (March 9, 2009 Status Report at 8, Docket No. 1092 ("Status Report"), attached as Exhibit 5.)

In October 2008, DDS/DDA completed design and implemented a new ISP
format that demonstrates its continuing commitment to quality improvement.  (*Id.* at ¶
13.)  The new ISP format is built on best practice and organized around the same eight
domains that are used throughout the District's planning and performance measurement
systems:  rights and dignity; safety and security; health and wellness; choice and
decision-making; community inclusion; relationships; service planning and delivery; and
satisfaction.  (*Id.*)  Moreover, the ISP itself is now an on-line document that is completed,
reviewed, approved, and disseminated via the web application to improve timely
approval, dissemination, and implementation.  (*Id.*)

In short, the District has moved to a person-centered and comprehensive
assessment that is tailored to the modern community-based service-delivery system and
the preferences, opportunities, and risks associated with today's consumer population.[20]

### 3.      Home and Community-Based Services Waiver.

A result of extensive DDA and stakeholder effort, implementation of the
Medicaid Home and Community-Based Services ("HCBS") waiver has enabled the
District to redesign its service system to provide expanded integrated-living alternatives
and services to consumers.[21]  (Ex. 4, Oct. 7, 2009 Nuss Decl. at ¶ 15.)  Through the
waiver program, the District is eligible for a federal reimbursement of 70%, which has
the effect of maximizing more limited local dollars while simultaneously providing more

---

[20]      As discussed in the Nuss Declaration, the District has also obtained permission from CMS and the
State of Connecticut to adopt the Connecticut Level of Need Assessment and Risk Screening tool, which is
a web-based database system producing clear person-centered planning assessment results detailing
strengths, preferences and support needs in the areas of health and medical supports, behavioral supports,
mental health, mobility, personal care, daily living, comprehension, communication, social life, safety, and
caregiver supports.  (*Id.* at ¶ 61.)

[21]      The renewed-HCBS Waiver was implemented in 2007.

services and supports to the consumers who need them.  (*Id.* at ¶ 16.)  These include a

range of professional services, assistive supports, and residential and day supports,

outlined below, all designed to improve each consumer's health, independence, and

inclusion in the community:

> Professional Services—including speech, hearing, or language services,
> occupational and physical therapy, skilled nursing, behavior supports, and
> less traditional therapy such as dance or drama therapy;
>
> Assistive Supports—including emergency response, vehicle modification,
> and environmental adaptation (such as the addition of ramps or grab bars)
> without which an individual might need to be institutionalized;
>
> Residential Supports—including residential habilitation (housing 4-6
> individuals), supported living (housing 1-3 individuals), and in-home
> support or live-in caregivers that allow a person to live as independently as
> possible; and
>
> Day Supports—including day habilitation to allow individuals to develop
> skills to support, or further, community integration opportunities, as well
> as supported employment[22] to enable an individual to live as
> autonomously as possible through an ability to earn income.

(*Id.* at ¶ 17.)  Moreover, these services are available *a la carte*, so that each individual has

the maximum amount of choice consistent with his or her general support, medical,

emotional, and/or physical needs.  (*Id.* at ¶ 18.)

However, the District's efforts to improve the availability of services did not end

with the initial renewal of the waiver.  An amendment was submitted in September 2008

to add skilled nursing and supported living with transportation services to the waiver

menu.  (*Id.* at ¶ 19.)  The amendment also sought to increase the payment rate for

---

[22]     Indeed, DDS/DDA has joined the State Employment Leadership Network ("SELN"), a cross-state
cooperative venture of state developmental disability agencies that are committed to improving
employment outcomes for adolescents and adults with intellectual and developmental disabilities.  The
District is one of only 16 participating states.  (*Id.* at ¶ 66.)

physical and occupation therapy and speech and nutrition services in order to improve recruitment efforts of new clinicians to the program.  (*Id.*)  The amendment, approved by the Centers for Medicaid and Medicare ("CMS") in the summer of 2009, will be implemented with the passage of final rulemaking in October 2009.  (*Id.*)

Moreover, also in the summer of 2009, the District created an HCBS Waiver Advisory Committee to solicit broad stakeholder participation on proposed additional changes for submission of a second amendment.  (*Id.* at ¶ 20.)  Three meetings have been held to date and changes to the waiver are being prepared in the following areas:  level of care; service planning and delivery; services; qualifications of providers; health and welfare; financial accountability; administrative oversight; and quality management plan. (*Id.*)

Finally, the District has demonstrated improvement in the provision of services under the ISPs.  For example, for HCBS waiver participants, prior authorizations must be processed in a timely manner in order for services to be offered consistent with the ISPs. In fiscal year 2008, prior authorizations were issued <u>late</u> 70% of the time.  (*Id.* at ¶ 21.) In only a year, the District dramatically improved its performance such that in fiscal year 2009, prior authorizations were issued <u>in advance</u> 70% of the time.  (*Id.*)

In short, the availability and accessibility of waiver options in and of themselves illustrates that, consistent with constitutional standards, each individual consumer is free from harm and receives minimally adequate habilitation.  But perhaps more importantly, the waiver amendment process demonstrates on-going refinement to address changes in the service-delivery system, to stay abreast of best practice, and to move to the forefront with innovative service options and quality strategies.  This is further proof of a system

that is self-directed in its drive for continued improvements; there is no need for continuing court supervision.

### 4.    Recruitment and Retention of Qualified Providers.

The District's ongoing and continuous efforts to recruit and retain qualified providers have been successful.  In Fiscal year 2008, the District recruited sixty-seven (67) new providers.  (Ex. 5, Status Report at 3.)[23]  In the last reporting period alone (August 2008 through January 2009), the District recruited 20 new HCBS waiver providers.  (Id.)  Since January 2009, five additional waiver providers were added, for a total of 104.  (Ex. 4, Oct. 7, 2009 Nuss Decl. at ¶ 22.)  As a result of these efforts, waiver enrollment continues to grow:  64% of all residential services are currently delivered via the waiver program, and more than half of the Evans class is currently enrolled in the waiver.  (Id.)

These 104 providers offer a range of services available under the waiver.  As of September 1, 2009, there are forty-two (42) Day Habilitation providers, thirty-eight (38) Pre-vocational Services providers, thirty-eight (38) Supported Employment Providers, ninety-one (91) Supported Living Providers, ninety-four (94) Residential Habilitation Providers, forty-five (45) Host Home providers, twenty (20) Live-in Caregiver providers and sixteen (16) Professional Services providers enrolled in the HCBS waiver.  (Id. at ¶

---

[23]    The District incorporates the Status Report by reference as well as its previous filings outlining improvements in the areas of health, safety, and welfare.  These include the Health Care Agreement [attached as Ex. 1 to Docket No. 979]; Defendants' Motion for Order to Modify Special Masters' Report & Recommendation, Consistent with Defendants' Objections, to Find Defendants in Compliance with Consent Order of September 12, 2007 [Docket No. 1011]; Defendants' Comments to Court Monitor's September 1, 2008 Draft Report [Docket No. 1014]; Defendants' Comments to Court Monitor's Draft April 24, 2008 Report [Docket No. 1015]; DDS Report for Fiscal Year 2008 for Period April 1 through August 10, 2008 [Docket No. 1020]; Defendant's Proposed Findings of Facts and Conclusions of Law [Docket No. 1074]; Defendants' Post-Trial Brief Regarding Remedy [Docket No. 1082]; Defendants' Comments to Court Monitor's March Quarterly Report [Docket No. 1093]; DDS Report August 2008 through January 2009 [Docket No. 1094]; and Notice of Filing Declaration of Laura Nuss [Docket No. 1122].

23.)  Perhaps as importantly, and consistent with the Court's September 12, 2007 Order, the District recognized that just enrolling new providers in a timely manner did not assure that there were qualified providers available to serve individuals and expand the service system capacity effectively.  As a result, in February 2009, DDA developed and implemented a more robust enrollment process—the Provider Readiness Review Protocol—to review new provider applicants vigorously through a process of paper application, interview, and on-site observation and review to ensure that new applicants were prepared to serve DDA consumers effectively upon enrollment in the program.  (*Id.* at ¶ 24.)  Since the inception of the enhanced protocol, twenty-seven (27) providers passed this process successfully, two (2) failed, and six (6) have been delayed due to poor performance in the review process.  (*Id.*)

In addition, the District through DDA and the Department of Health Care Finance ("DHCF") removed three (3) providers from the waiver program in the past 12 months due to performance deficiencies, providing further evidence of the District's ability and self-imposed commitment to remove poorly-performing providers from the DDA service-delivery system.  (*Id.* at ¶ 25.)

In other words, capacity and choice among qualified providers are no longer issues.

### 5.    Intermediate Care Facilities for the Intellectually Disabled.

An intermediate care facility for the intellectually disabled ("ICF/ID") in the District serves no more than eight individuals and, as its name suggests, provides active treatment to those individuals who require more intermediate levels of care.  (Ex. 4, Oct. 7, 2009 Nuss Decl. at ¶ 26.)  Indeed, many of the individuals served by ICFs/ID are non-

ambulatory and have seizure disorders, behavioral support needs, mental illness, visual or hearing impairments, chronic significant health conditions or a combination of these. (*Id.* at ¶ 27.) Without the option of the more intensive supports and supervision provided by ICFs/ID through the medical director model in the District, these individuals would most likely be housed in a large, institutional setting such as Nursing Homes.[24] Thus, while the District makes every effort to serve as many consumers as possible via the waiver, this alternate housing option must also continue to be made accessible while the District continues to build the capacity of the community health care system, as these settings can be as appropriate to serve the more complicated and complex needs of a subset of consumers.[25] (*Id.* at ¶ 28.)

In the ICF/ID program as a whole, through the efforts of DDA, DHCF and the Money Follows the Person ("MFP") program, discussed *infra*, a strategic plan is being fully implemented to reduce all ICF/ID homes to six (6) persons or less to improve the ability of these homes to provide more personalized services and supports, close older and non-accessible ICF/ID homes, and reduce the overall number of persons receiving services via the ICF/ID program—all of which is consistent with the District's goal of treatment in the least restrictive environment. (*Id.* at ¶ 29.) In FY 2009, the number of eight-person homes decreased from 15 to 12. (*Id.*) In addition, the District has a plan for

---

[24]     It should also be noted that services provided in ICFs/ID are similar to those identified above with respect to the waiver. The difference primarily is the method and the additional federal regulations applicable to these facilities. With ICFs/ID, providers are paid a daily rate, rather than having services selected *ala carte*. Declaration of John McCarthy, Oct. 7, 2009 ("Oct. 7, 2009 McCarthy Decl.") at ¶ 12, attached at Exhibit 6.)

[25]     For example, to meet the needs of the extremely medically-complex and fragile persons who currently reside in hospital settings, DDA issued a Request for Proposal ("RFP") for a small ICF/ID setting to effectively serve these individuals in the community. (Ex. 4, Oct. 7, 2009 Nuss Decl. at ¶ 26.) The RFP has been awarded to Volunteers of America ("VOA"), a national provider that practices person-centered service delivery and specializes in serving medically complex individuals in the District. VOA believes inclusive, personalized services can also be delivered under the ICF/ID model. (*Id.*)

DC Healthcare to reduce all of its homes to six persons or less via the MFP program; nine

(9) homes closed or were reduced in size and converted to the HCBS waiver program;

and in total, the number of individuals receiving services through the ICF/ID program

decreased by 13% (class members by 11%) from the start to close of FY 2009.  (*Id.*)

### 6.    Money Follows the Person Grant.

In July 2008, CMS awarded the District a three-year, multi-million dollar grant

through the Money Follows the Person Rebalancing Demonstration Program ("MFP").

(Ex. 4, Oct. 7, 2009 Nuss Decl. at ¶ 30.)  This initiative has enabled the District to reduce

its reliance on ICFs/ID for people with a wide range of developmental and physical

disabilities, as well as older adults and persons with chronic mental illness.  (*Id.* at ¶ 31.)

The MFP enables the District to receive a 15 percent higher Medicaid matching rate[26] for

each person whom it assists in moving to a community setting, and the grant is expected

to result in an additional $4 million to $ 6 million in federal Medicaid funding to the

District over the lifetime of the grant.  (*Id.* at ¶ 32.)

The District uses the higher federal Medicaid match that it receives from the grant

to help people who wish to leave intermediate care facilities or nursing homes to move

into homes or apartments of their choice, and to provide the Medicaid waiver services

that these consumers need to live in the community.  (*Id.*)  This program thus allows

individuals to avoid being institutionalized and to exercise far greater choice and control

over the essentials of their lives, such as where and with whom to live; what to do during

the week and weekend; and what supports to receive and from whom.  (*Id.*)  In addition,

---

[26]    The federal matching rate is increased from 70% to 85% under this program for the first 365 days each individual receives services in the HCBS waiver program.  (*Id.*)

individuals in this program are participating in pilots to demonstrate the effectiveness of peer counseling, transition coordination, and enhanced primary care coordination.  (*Id.*)

From August 2008 through September 2009, DDS transitioned 43 individuals with developmental disabilities from ICFs/ID to smaller settings including apartments in which they live alone or with one or two other persons; there are an additional 29 individuals who are in some phase of exploring the MFP process.[27]  (*Id.* at ¶ 33.)  This program illustrates the District's commitment to deinstitutionalization and individual choice:  it allows an individual with IDD to choose his environment within a range of professionally acceptable alternatives, rather than imposing a state-selected placement. (*Id.*)

### 7.    Health and Welfare.

In the areas of health and welfare, the progress made by DDS cannot be overstated.  With the on-the-ground implementation of the Health Care Agreement ("HCA")[28] initiated in May 2008, DDS has devoted considerable resources (exceeding $2.5 million) and has successfully improved the quality and quantity of health care offered to consumers.  (Ex. 4, Oct. 7, 2009 Nuss Decl. at ¶ 34.) The HCA established a Health Care Quality Initiative ("Initiative") in partnership with George Washington and Georgetown Universities.  The Initiative has been able to recruit new providers such as Seton House (affiliated with Providence Hospital), which now provides for the

---

[27]    As of March, DDS had offered MFP housing services to another fifteen (15) individuals and their families who declined those services.  (*Id* at ¶ 33.)  Some of these individuals declined MFP services due to deteriorating health; others were satisfied with their current placements; and still others refused because their families were not supportive of the proposed changes.  (*Id.*)

[28]    In 2008, the District negotiated the Health Care Agreement ("HCA") [Docket No. 513] with Plaintiffs and Plaintiff-Intervenor.  The purpose of the HCA is to provide for systemic improvements in the provision of health services at the provider level.  Despite Plaintiffs' refusal to sign the agreement, the District has implemented its provisions, some of which are highlighted in this motion.

comprehensive psychiatric service needs of more than 100 individuals.  (*Id.*)  In addition, a third primary care physician is not being supported as he begins a homebound visiting practice in District of Columbia Wards 7 and 8.  (*Id.*)

The HCA has also enabled the District to deliver enhanced primary care coordination for individuals considered to be high-risk who are in the waiver, and as a clinically-based research project, has provided outcome findings and recommendations for further enhancements to the District's IDD and overall health care delivery-system as anticipated by the Initiative.  (*Id.* at ¶ 36.)  Such coordination has occurred for 158 individuals since the inception of the program, all class members, and was designed to be a proactive strategy for DDS/DDA to track the transition of individuals from the Medical Director ICF/IDD model into the waiver program, identify possible barriers to clinical care, and address any patient safety threats that could emerge as a result of this transition.[29]  (*Id.*)  Select findings of the first year of the project included, for example, (1) access to medical services impedes ability to meet timeline requirements established by the IDD service system; (2) access to PCP services during evening and weekend hours contributes to high use of emergency services; and (3) primary care physicians received the pilot project positively to improve communication and support for care coordination. (*Id.*)  These findings now drive quality improvement initiatives in health care by targeting service coordination training, exploring new health care delivery models with DHCF, and focused interventions targeted toward mobility, fall prevention, and expansion of physical therapy services.  (*Id.*)

---

[29]  This program also allows meaningful fulfillment of the goal of providing treatment in least restrictive environment as it allows even high risk individuals to be served in HCBS waiver settings short of ICFs/ID.

In addition, the DC HRP[30] has further enhanced the District's clinical oversight and has led to systemic provider improvements necessary to ensure continued implementation of high-quality health services.  DC HRP has added eight (8) new full-time clinicians since January 2009, who provide services in homes and day/vocational settings with a focus on quality, technical assistance, and training.  (*Id.* at ¶ 38)  In the last roughly six months alone, the DC HRP interdisciplinary team have completed 1058 targeted technical assistance requests in a range of areas including occupational and physical therapy, speech, psychology, medicine, health education, and nursing.  (*Id.*)  In addition, the DC HRP medical director has assumed an increasingly active role in facilitating communication exchange between and among primary care physicians, the hospitals, medical specialists and interdisciplinary team members.  (*Id.*)  The use of DC HRP has been useful in reducing hospital stays, ensuring timely care provision, assisting teams to develop priorities for people with complicated health conditions and competing needs for treatments.  (*Id.*)  It also has helped to educate hospital staff about the needs of people with disabilities and to better understand the community-based system of services and supports.[31]  (*Id.*)

Additionally, to increase the number of experienced practitioners, DC HRP provides community-wide training in a variety of areas to teach those who serve individuals with IDD how to provide better care.  (*Id.* at ¶ 39.)  Training includes, for

---

[30]     The DC HRP, funded by the District, seeks to expand the community health care capacity for individuals with IDD by (1) providing health and mental health services that are accessible; and (2) implementing strategies to promote quality health outcomes.  (*Id* at ¶ 38.)

[31]     In addition to the efforts of the DC HRP, the DDS/DDA Health and Wellness Unit has been assigned to small and mid-sized providers to provide similar technical assistance.  In the past quarterly reporting period alone, two individuals have been successfully transitioned from nursing homes to community-based living as a result of this focused assistance.

example, "Using Visual Strategies to Prevent and Reduce Behavior Problems," "End of Life Planning," and "Substitute Decision-Making in Healthcare." (*Id.*) And in a significant development for the long-term sustainability of the service-delivery system, for the third consecutive year, Georgetown University family medicine residents must devote a portion of their residency to the health care of adults with IDD, to assist in recruiting providers to this practice area. (*Id.*)[32]

The District's successful efforts to improve health care now, but also to prepare the next generation of health care providers, demonstrate its commitment to implementing and sustaining reforms that, by far, satisfy the constitutional right to be free from harm and to receive habilitative care and treatment.

### 8.    Payments to providers.

Most fundamentally, the District has made every effort to pay providers in a timely manner. Ninety-eight percent of all claims are adjudicated in 30 days. Additionally, DHCF has moved to a weekly payment cycle, meaning payments are sent out once a week instead of every other week. (Ex. 6, Oct. 7, 2009 McCarthy Decl. at ¶ 11.) DDA and DHCF continue weekly conference calls to resolve emerging billing concerns. (*Id.* at ¶ 13.) DHCF provides on-site provider technical assistance, and DDA and DHCF compare billing reports against prior authorizations under the HCBS waiver program to proactively identify potential billing problems prior to significant delays emerging. (*Id.*)

Moreover, to further improve payments, the District has submitted to CMS a State Plan Amendment that provides an alternative method of determining ICF/ID provider

---

[32]    For additional developments in the area of health and welfare, please *see* Oct. 7, 2009 Nuss Decl. at ¶¶ 34-43 and 58-64.

reimbursement. (*Id.* at ¶ 12.) DHCF, the District Medicaid State Agency, worked

collaboratively with both DDS/DDA and the providers to develop the new methodology.

(*Id.*) This alternative moves away from a cost-based reimbursement methodology where

providers were locked into rates based on cost caps set at the median cost in 1993 inflated

forward. (*Id.*) Because the way in which care is provided has changed so much in the

interim—for example, minimum wage increases, changes in rent, increases in utility

costs, staffing ratio changes—these median cost caps do not reflect the actual cost of care

today. (*Id.*) The new methodology allows providers to know the price set by the District

for the services provided in an ICF/ID, and they are rewarded for reducing cost so long as

they continue to provide quality services. (*Id.*)

These efforts to ensure timely payment and to implement a new methodology for

provider payments ultimately benefit consumers by ensuring that they receive the

services they need.

### 9.    Conclusion

As these examples illustrate, the District's current system for serving individuals

with intellectual and developmental disabilities is, in every respect, vastly superior to the

state of affairs that prompted the Court to enter its 1978 Consent Order, and patently

satisfies class members' Fifth (and, if applicable, Eighth) Amendment rights to be free

from harm and to receive minimally adequate habilitative care and treatment.

With respect to freedom from harm under the Fifth (and purportedly Eighth)

Amendment, it is obvious that class members are no longer housed in hazardous or

unduly restrictive conditions. *See Youngberg*, 457 U.S. at 324 ("the essentials of the care

that the State must provide" to persons involuntarily committed consists of provision of

food, shelter, clothing, and medical care; assurance of "reasonable safety"; and refraining

from imposing physical restraints except when "necessary to assure . . . safety . . .").  If

any further proof were needed, the District's internal monitoring system reveals that in

the past twelve months, only 10% of the *Evans* class has been the subject of a Level 1,

Serious Reportable Incident, and despite a 50% increase in accepted reported incidents

over the previous year, the number of past-due open investigations has remained the same

or decreased each quarter.[33]  (Ex. 5, Status Report at 8; *see also infra* (discussion of

quality-assurance methods).  Furthermore, the Court Monitor's most recent report found

"no evidence that psychotropic medication was used on an as-needed basis;[34] that

aversive behavior modification techniques or seclusion were used; or that physical

restraint or 'time out' were used as punishment or for the convenience of staff."  (Court

Monitor's March 5, 2009 Report, at 10, attached at Exhibit 7.)

    With respect to the Fifth Amendment right to minimally adequate habilitative care

and treatment, no credible argument can be made that there is a systemic lack of

professional judgment exercised by treating professionals in the IDD system.  *See*

*Youngberg*, 457 U.S. at 321 (courts must "show deference to the judgment exercised by a

---

[33]     The Incident Management and Enforcement Unit ("IMEU"), now a part of the DDA's Quality Management Division, investigates and evaluates all reported incidents.  The 10% automatically includes reports of deaths of class members, even though the average age of death in the past year was 65 years of age.  (*See* Ex. 4, Oct. 7, 2009 Nuss Decl. at ¶ 55 (noting the rate of incidents excluding deaths is only 7% for the class).)  Moreover, the fact that the number of reported incidents has increased should not be viewed as evidence of a poorly performing system because, as the Court recently noted during the March 12, 2009 Status Conference, and as experience in other jurisdictions indicates, increases in training and oversight often result in increased reporting.  In fact, improved incident reporting is a central goal of this training and oversight, a goal that the District appears to be achieving.

[34]     The 1978 Consent Order prohibits the administration of medication to class members on an as-needed, or "PRN," basis.  (*See* Ex. 2, 1978 Consent Order at 14 ¶ 14(h).)  This prohibition is presumably intended to prevent the use of medication solely for the purpose of rendering patients docile.  (*See* Ex. 1, Compl. at 12 ¶ 20(c) ("The vast majority of residents spend their days at Forest Haven in forced inactivity. Many are over-medicated and exhibit such behavior as head-nodding and/or body posturing.").)

qualified professional" in evaluating Fifth Amendment claims).  And no one even

contends that DDS is failing to provide treatment sufficient to enable class members to

avoid being placed in physical restraints.  Class members' freedom from such restraints

is, in fact, conclusively evidenced by the Court Monitor's central complaint:  that "[t]he

majority of class members spend their days—twenty-one hours or more per week—in

Center-based activities consisting primarily of arts and crafts . . . [d]espite an absence of

inappropriate behaviors that would preclude more integrated activities or employment."

(Ex. 7, Court Monitor's March 5, 2009 Report at 3.)

        While the District understands the Court Monitor's concerns and is determined to

move as many class members as possible from day programs into supported

employment,[35] the fact remains that it is under no constitutional obligation to do so.  The

Second Circuit's holding in *Society for Good Will to Retarded Children, Inc. v. Cuomo* is

apposite here.  In that case, the district court found, *inter alia*, that the state had violated

the plaintiffs' constitutional rights "by failing to provide enough community placements

[and thereby] unduly restrain[ing] many residents for whom institutional life precludes

the exercise of basic liberties."  737 F.2d 1239, 1247 (2d Cir. 1984) (internal quotation

---

[35]        This fact, too, is confirmed by the Court Monitor's report:  "DDA leadership continues to affirm its commitment to realigning day services.  Promising initiatives are underway.  Since August 2008, eleven class members have been placed into supported employment."  (Ex. 7, Court Monitor's March 5, 2009 Report at 3.)  Indeed, DDS now partners with various governmental and other organizations to affirmatively improve class members' employment opportunities.  For instance, DDS and the District's Department of Mental Health ("DMH") are working to form a partnership with RISE, a nationally known organization with expertise in business start-ups for individuals with disabilities who seek entrepreneurial opportunities.  (*See* Ex. 5, Status Report at 1-3.)  DDS is also working in concert with the National Disability Institute, Internal Revenue Service, Social Security Administration, and others to create an Asset Development Initiative in the District, which will replicate the Real Economic Impact Tour that is assisting people with disabilities in eighty-four (84) other cities throughout the country by ensuring that consumers have access to all of the tax incentives available to them, thereby creating networks that benefit consumers and, for some, remove barriers to employment.  (*Id.*)  And DDS is collaborating with the DC Business Leadership Network to link into a broad network of regional employers, thereby expanding the options available to the people served by DDS and its provider agencies.  (*Id.*)

marks omitted). The district court "thus ordered that 400 . . . residents be released into

community settings . . . ." *Id.* The Second Circuit reversed, citing *Youngberg*:

> *Youngberg* in no way suggests that mere residence in a school for the
> mentally retarded violates constitutional rights; there were no such
> allegations in the case. The Supreme Court's opinion stated that liberty
> from undue bodily restraint must survive involuntary commitment. This
> implies that involuntary commitment by itself is *not* undue bodily
> restraint. Our conclusion is buttressed by *Youngberg*'s statement that
> decisions made by a professional are entitled to a presumption of
> correctness to enable institutions . . . —often, unfortunately, overcrowded
> and understaffed—to continue to function. This clearly implies that mere
> residence in an institution or school for the mentally retarded, without
> more, does not violate due process.

*Id.* at 1247 (emphasis added) (internal quotation marks, brackets, ellipsis, and citations

omitted).[36]

If commitment to an institution—even one that is "overcrowded and

understaffed"—does not violate the Constitution, then there is certainly no constitutional

deprivation here. Class members' "absence of inappropriate behaviors" (Ex. 7, Court

Monitor's March 5, 2009 Report at 3), and ability to spend most of their time in creative

and social day programs, unequivocally establishes that they are receiving adequate

habilitative treatment to enable them to function free of physical restraints.[37] *See also*

*P.C. v. McLaughlin*, 913 F.2d 1033, 1038, 1043 (2d Cir. 1990) (no constitutional

violation where placement decision was made by "qualified professionals in light of the

---

[36]    In a second appeal after remand, the Second Circuit again reversed the district court's finding of a
constitutional violation, this time because the district court had found that a "'loss of capacity in residents'
due to [the state's] failure to 'provide reasonably safe conditions of confinement, freedom from
unreasonable bodily restraints and minimally adequate training' . . . amounted to [a] constitutional
violation[]," without first determining "whether the conditions and treatment . . . substantially departed
from accepted professional judgment, as required by *Youngberg*." *Society of Good Will to Retarded
Children, Inc. v. Cuomo*, 902 F.2d 1085, 1089 (2d Cir. 1990) ("*Cuomo II*").

[37]    The District also notes that the system upheld by the Second Circuit, *i.e.,* the housing of
developmentally disabled individuals in an institution, has been rejected as a service model by the District
in favor of community-based alternatives. But, alas, even this systemic overhaul exceeding any
constitutional requirement fails to satisfy Plaintiffs, or the Special Masters.

circumstances," even though the institution concededly could not provide "appropriate care, treatment and habilitation").

In short, while the District may choose to do so—and, in fact, has done so—it simply is not required by the Constitution to provide treatment that secures a qualitatively better life for the developmentally disabled.  As the Fifth Circuit noted in *Feagley*, "where the state does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimal treatment that it is under *no obligation to grant*."  868 F.2d at 1440 (emphasis added) (internal quotation marks omitted).

The evidence in the record conclusively demonstrates that the District is more than meeting its constitutional obligation to provide class members with minimally adequate habilitative care and treatment.  This case continues for no valid, legally-supportable reason.

Accordingly, because the District has met the requirements of both the Fifth Amendment and, to the extent applicable, the Eighth Amendment, ongoing court oversight is unnecessary and unwarranted, and the 1978 Consent Order and its progeny should therefore be vacated.

**B.    The Remedy Implemented By The District Is Durable.**

Under *Horne*, "[i]f a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper."  129 S. Ct. at 2595 (citing *Milliken*, 433 U.S. at 282); *see also Philadelphia Welfare Rights Org. v. Shapp*, 602 F.2d 1114, 1120 (3d Cir. 1979) (distinguishing between complex ongoing remedial

decrees and simple prohibitory injunctions (*e.g.*, injunction to close a prison unit) that, if

vacated, would leave class open to the evils to which the lawsuit was first addressed).  As

discussed *infra*, the District has implemented permanent structural changes and will

remain subject to a strong external oversight structure by CMS and the Quality Trust.

Accordingly, under *Horne*, this case should be dismissed.

1.    **The District has reformed its systems for the provision of care to the intellectually and developmentally disabled.**

a.    **The establishment of DDS.**

The statutory provision establishing DDS as a cabinet-level department indicates

the seriousness of purpose with which the District has approached the reform of its

services for providing care to the intellectually and developmentally disabled:

> **Establishment and purpose of the Department on Disability Services.**
>
> Pursuant to § 1-204.04(b), the Department on Disability Services is established as a separate Cabinet-level agency, subordinate to the Mayor, within the executive branch of the District of Columbia, for the purpose of:
>
> (1) Leading the reform of the District's mental retardation and developmental disabilities system by coordinating the collaborative efforts of government agencies, contractor providers, Medicaid waiver providers, labor, and community leaders to improve the care and habilitation services provided to consumers;
>
> (2)  Ensuring that District laws, regulations, programs, policies, and budgets are developed and implemented to promote inclusion and integration, independence, self-determination, choice, and participation in all aspects of community life for individuals with developmental disabilities and their families; and
>
> (3)  Promoting the well-being of individuals with developmental disabilities throughout their life spans, through the delivery of individualized, high-quality, safe services and supports.

D.C. OFFICIAL CODE § 7-761.03.

In creating DDS, the Council required the Mayor to delegate to the DDS Director "all personnel authority . . . [to be] exercise[d] . . . independent of the Office of Personnel," *id.* § 761.06(d), and "all procurement authority, including contracting and contracting oversight, . . . [to be] exercise[d] . . . independent of the Office of Contracting and Procurement," *id.* § 761.06(e). With this independent personnel and procurement authority, the new agency became better able to institute, support and sustain the organizational reforms described above.

Moreover, the District has recruited high-quality and dedicated leadership for the new agency. Director Judith Heumann, eminently qualified in the field of disabilities rights, has led the agency since July 10, 2007. In addition, DDS hired Laura Nuss as Deputy Director of DDS in August 2007. Deputy Director Nuss has extensive experience as an administrator; exceptional skill with and great understanding of the IDD population; extensive work experience in both public and private sectors; and a strong background in and knowledge of Medicaid. (*See* Ex. 4, Oct. 7, 2009 Nuss Decl. at ¶¶ 2-8.) From August 2007 through February 2009, DDS also installed new management staff to provide continuity and stability in critical areas of the department. (*Id.*) These individuals now form a core management team dedicated to continued quality improvements.

      **b.**      **The establishment of the Department of Health Care Finance.**

The District also created the Department of Healthcare Finance ("DHCF") as an independent, cabinet-level agency that functions as the single state Medicaid agency. Formerly known as the Medical Assistance Administration, which was part of the much larger Department of Health, the now-independent DHCF is tasked with developing a

"comprehensive, efficient, and cost-effective health-care system" as well as developing

"eligibility, service coverage, and service-delivery and reimbursement policies for the

District's health-care-financing programs that ensure improved access and efficient

delivery of service." D.C. OFFICIAL CODE §§ 7-771.03(2)-(3). The creation of this

agency has been instrumental in, first, ensuring timely payments to providers, which

helps guarantee services for consumers; and, second, establishing a strong and vital

working relationship with DDS/DDA, which together form the two agencies most

critically responsible for providing appropriate care and treatment to the IDD population.

As part of the re-structuring, DHCF has added a new Office of Chronic & Long-

Term Care, focused on people with long-term care needs. (Oct. 7, 2009 McCarthy Decl.

at ¶¶ 8-9.) Headed by two associate directors (there had been only one), the office also

has six full-time equivalents; and DCHF is set to hire two additional staff (an increase

from two to four) dedicated to persons with development disabilities Medicaid-financed

services oversight and monitoring. (*Id.*) This, in and of itself, demonstrates an renewed

emphasis on serving the needs of the *Evans* class.

### c.    Interagency cooperation.

Even before the creation of DHCF, interagency cooperation among all of the

agencies responsible for care and treatment of the *Evans* class was vigorous and effective.

Even a cursory review of the evidence presented at the hearing on remedy, as well as

additional developments outlined here, demonstrates the frequent, in-depth, and effective

communication among agencies in the District government. (*See* Test. of Nancy Thaler,

Trial Tr. at 419, attached at Exhibit 8; Test. of Laura Nuss, Trial Tr. 146-147, 162,

attached at Exhibit 9.)[38]   Such communications include, for example, routine weekly

telephone calls between DDS/DDA and DCHF.  (Test. of John McCarthy, Trial Tr. at

556-58, attached at Exhibit 10; *see also* Ex. 6, Oct. 7, 2009 McCarthy Decl. at ¶ 13.)

This high level of cooperation has consistently yielded rapid and dramatic results:  as Dr.

Lisa Alexander, one of the medical professionals participating in the DC HRP, testified in

the hearing on remedy:

> [W]e took advantage of that regular conference call [between DDS and
> MAA] and dealt with the issue [of the rule prohibiting medical directors
> from providing primary-care services to ICF/MR residents off-site].  I
> believe the—I got the memo on a Tuesday and on Friday morning the
> issue was being dealt with on the phone.  And that represents to me a
> relatively strong interagency collaboration.
>
> And in the ensuing months, I then asked for another conference call and
> we were able to, I think, come up with a relatively strong alternative.  And
> I was notified last week that that alternative was about to be announced as
> approved.

(Trial Tr. at 162-63, attached at Exhibit 11.)

Dr. Alexander recalled the transitioning of class members to new primary care

providers as "another example . . . of strong interagency collaboration":

> I contacted the Department of Health interim director, Dr. Cano, and I
> asked him if he would be kind enough to have a meeting between myself
> and Laura Nuss for the purpose of exploring new sites for individuals with
> disabilities as it relates to primary care.  And so we started a series of
> meetings and Dr. Cano was extremely supportive and very, very sensitive
> to the needs of the population and the predicament that we were in.  And
> then he assigned a health policy person from his department who was on
> detail, I believe, from the mayor's office.  And they opened the doors for
> us to explore these possibilities down at the D.C. General site.  And they
> actually hosted a meeting in July.  Laura and I went to it.  And it resulted
> in 48 patients being transferred to that site.

*(Id.* at 165.)

---

[38]     Citations to "testimony" refer to testimony offered at the December 2008 hearing regarding
remedy.

Additionally, the development of a new HCBS waiver in late 2007 and the development of 27 rules necessary to effectuate the waiver are yet another prime example of strong interagency coordination. Even Thomas Wilds, a member of the interagency rate-setting task force who testified for Plaintiffs at the hearing on remedy, went out of his way to state, "I'd really like to commend Laura [Nuss] and Judy [Heumann] that, you know, after like 20 years, they really did a wonderful job in creating the waiver. And we're all proud of it and we're grateful to them for their leadership." (Trial Tr. at 212, attached at Exhibit 12; *see also id.* at 229 ("I would probably say . . . , we [are] covering our cost. . . . [B]ecause the way Laura Nuss . . . designed the waiver program, unless somebody dismantles it . . . in the near future, . . . she did a good job at budgeting and accounting for CPI increases in the future.").)

This cooperation extends to routine work between DDA and DHCF to resolve claiming and billing concerns. (*See* Declaration of Laura Nuss, Oct. 8, 2008 ("Oct. 8, 2008 Nuss Decl.") at ¶ 19, attached at Exhibit 13; Declaration of John McCarthy, Oct. 8, 2008 ("Oct. 8, 2008 McCarthy Decl.") at ¶ 13, attached at Exhibit 14; *see also* Ex. 6, Oct. 7, 2009 McCarthy Decl. at ¶ 13.)[39] These two agencies collaborated, for instance, to resolve issues that arose from the implementation of the transportation-broker system with MTM beginning in October 2007. (*Id.*; *see also* Exs. 9-10, Test. of Nuss and McCarthy, Trial Tr. at 334, 519-20, 557-58.) That process involved daily and then biweekly meetings, in addition to weekly conference calls to resolve transportation complaints. (*Id.*) As Deputy Director Nuss testified, DDS's and DHCF's experience working together to solve the MTM problem "helped fuel the need to make sure there

---

[39]    Declarations dated October <u>2008</u> were submitted as part of direct testimony at the December 2008 hearing regarding remedy.

was much closer collaboration and communication between the two agencies." (Ex. 9, Trial Tr. at 334.) For example, DDS and DHCF are working closely together to establish written standards for program documentation to address concerns identified through DHCF audits, and are actively sharing information revealed by both departments as it pertains to concerns regarding quality of service providers, both IDD agencies and clinicians, and potentially fraudulent practices. (Declaration of Laura Nuss, June 15, 2009 ("June 15, 2009 Nuss Decl.") [Docket No. 1122], at ¶¶ 24, 34-35, attached at Exhibit 15 (outlining collaboration between DDS, DHCF, and HRLA); *see also* Ex. 6, Oct. 7. 2009 McCarthy Decl. at ¶¶ 13-15 (outlining specific areas of cooperation.) And now, at least one day a week, a DHCF staff person works at DDS. (Ex. 6, Oct. 7, 2009 McCarthy Decl. at ¶ 14.) Co-location of staff has created opportunities for impromptu meetings on important topics such as waiver financial reporting, ICF/IDD provider transmittals, and special projects. (*Id.*)

Finally, a similarly collaborative relationship exists between the Health Regulation and Licensing Administration ("HRLA")[40] and DDS, with findings from HRLA reviews and investigations provided to DDS, and some joint investigations. (*See* Declaration of Nancy Thaler, October 7, 2008 ("Oct. 7, 2008 Thaler Decl.") (Report) at 8, attached at Exhibit 16.) This relationship is facilitated by a Memorandum of Understanding ("MOU") that specifies the roles and responsibilities of the respective

---

[40] The Intermediate Care Facilities Division ("ICFD") of HRLA licenses and inspects group homes for persons with developmental disabilities and certifies intermediate care facilities for developmentally disabled Medicaid participants. ICFD conducts annual on-site and monitoring surveys to ensure that these facilities maintain compliance with District and federal health, safety, sanitation, and habilitative requirements. Regulated facilities include Certified (Federal) Intermediate Care Facilities and Group Homes for Persons with Mental Retardation.

agencies, which conduct their business processes and daily practices consistently with

that MOU. (*Id*. at 12.)

More recently, to further strengthen the collaboration among agencies, in July

2009, the Mayor established a Task Force to advise him regarding all issues related to

services provided to individuals with IDD. (Mayor's Order 2009-119, June 25, 2009,

attached at Exhibit 17.) Composed of high-level representatives from DDS/DDA,

DHCF, and HRLA, the group has met three times and has already established a mission

statement and framework within which to focus problem-solving and initiatives to

advance the effectiveness of and innovation in services to persons with IDD. (Ex. 4, Oct.

7, 2009 Nuss Decl. at ¶ 65.) The Task Force has been collaborating on a new waiver

application to design improved transportation services for persons with IDD in the

Medicaid program. (*Id.*)

Even prior to the establishment of the Mayor's Task Force, which can only

improve collaboration, one provider at the hearing on remedy testified that interagency

collaboration is the best that it has been in the last 11 years. (Test. of Amy Brooks, RCM

president, Trial Tr. at 200-01, attached at Exhibit 18.)

These examples, and indeed the testimony of both Plaintiffs' and Defendants'

witnesses at the hearing on remedy, clearly illustrate a strong, collaborative relationship

among all agencies responsible for the provision of services to the *Evans* class, thereby

obviating the need for ongoing (much less additional) court oversight.

> **2.    The Superior Court provides additional oversight to ensure
> that consumers are being treated appropriately.**

To the extent that additional court oversight is necessary, it is already being

provided by the Superior Court. First, any person brought before the Court (to be

admitted or committed to DDS/DDA) has a right to be represented by retained or appointed counsel.  *See* SCR-MRP 11; *see also* D.C OFFICIAL CODE § 7-1304.12(2) (authorizing fees to be a paid to appointed counsel).  Moreover, any interested party has the right to initiate an action in Superior Court to compel DDS to accord persons with IDD the rights afforded them under District law.  D.C OFFICIAL CODE § 7-1305.13(a). Indeed, each person committed to DDS/DDA supervision is entitled to an annual judicial hearing to determine whether the person has "benefited from . . . habilitation."  *Id.* at § 1304.11(a)(1).

These procedures conclusively demonstrate that members of the *Evans* class have an adequate remedy at law for any potential future failure by the District to provide them with appropriate treatment.

### 3.    The District is monitored externally by CMS.

CMS is the federal agency that administers the Medicare and Medicaid programs and already provides extensive oversight for services provided by DDS/DDA.  For example, the District submits to CMS an annual report (known as the 372 report) that details fiscal and quality performance measures.  (Ex. 4, Oct. 7, 2009 Nuss Decl. at ¶ 49.) In addition, CMS will be initiating expanded 372 quality-reporting in the next fiscal year that mirrors the expanded quality management requirements now found in the HCBS waiver program.  (*Id.*)  CMS also conducts unannounced random audits on various areas of its six assurances, including level of care, service plan, qualified providers, health and welfare, administrative oversight, and financial accountability.  (*Id.*)  Most recently, in August 2009, DHCF and DDS/DDA were evaluated on Provider Enrollment protocols. (*Id.*)

From February 2007 to March 2009, CMS engaged in even more intensive monitoring to ensure the then-MAA and DDS/DDA's compliance with the federal HCBS waiver requirements. This included monthly written and telephonic monitoring of a corrective action plan in three of the six assurances: Plan of Care; Health and Welfare; and. Administrative Oversight. In March 2009, however, CMS determined that the District had "made major changes in the performance, structure, oversight mechanism, and systems sufficient enough to engage in continuous Quality Improvement (QI)." (March 9, 2009 CMS Letter, attached at Exhibit 19.) To qualify for such a finding, a state must demonstrate a robust system of "discovery, remediation and improvement" in all six assurances.[41] (Ex. 5, Status Report at 2.) Citing the "demonstrated effectiveness of the many newly implemented systems to meet the CMS quality requirements," CMS discontinued its intensified monitoring. (*Id.*; Ex. 19, March 9, 2009 CMS Letter.)

This achievement should not be underestimated; indeed, it speaks extraordinarily well of how far the new agency has come in a very short time. Recognition by CMS of "major changes," as well as the impact of CMS routine oversight, merits serious consideration by the Court in deciding this motion.

### 4. The District is monitored externally by the Quality Trust.

The District's extraordinary funding of and consultation with the Quality Trust for Individuals With Disabilities (the "Quality Trust") also establishes the improbability of the District returning to its "former ways."

The Quality Trust was established by the 2001 Plan as an independent entity tasked with providing "monitoring, legal services and lay advocacy services for

---

[41]    These six assurances also form the basis of the District's Quality Management Strategy, discussed *infra*.

45

consumers in the District of Columbia." (Ex. 3, 2001 Plan at 45 (footnote omitted).)  The

Quality Trust reviews "services to all *Evans* class members as well as non-class

members, who are applicants for or are receiving protections, supports and services in the

District of Columbia's developmental disabilities service-delivery system." (*Id.* at 46.)

Specifically, the Quality Trust is tasked with developing and implementing an annual

monitoring plan with input from all stakeholders; reviewing all reports and investigations

of serious incidents involving DDS consumers; issuing annual reports; and reviewing and

providing input regarding DDS budgeting information. (*Id.* at 47-48.)  In fulfilling these

duties, the Quality Trust is represented on the District's Mortality Review Committee and

Quality Improvement Committee and, in addition, its officers meet with the Deputy

Director of DDS both regularly and on an *ad hoc*, as-needed basis.  The Quality Trust is

funded by the District (*id.* at 49-50), at a cost to date of more than $20 million.

   In other words, the Quality Trust is fulfilling the very needs for monitoring and

reporting that led the Court to appoint the Court Monitor and Special Masters in this case.

The Quality Trust has been involved in the implementation of legislative reforms, and it

"works closely with the DC Superior Court and attorneys appointed to represent

individuals . . . to partner and identify solutions."  Quality Trust, *Legal Advocacy &*

*Education*, available at http://www.dcqualitytrust.org/pages/page02b.shtml (last accessed

September 24, 2009); *see also id.* ("We work for legislative reform critical in the lives of

people with developmental disabilities, such as the Health Decisions for Persons with

Developmental Disabilities Temporary Amendment Act of 2006 and the Disability

Rights Protection Act of 2006."); Quality Trust, *Monitoring*, available at

http://www.dcqualitytrust.org/pages/page02d.shtml (last accessed September 24, 2009)

("Quality Trust's Monitoring Team includes a monitoring coordinator and three monitoring specialists with over 40 years of combined experience supporting and working with people with developmental disabilities.").

The Quality Trust has now been in operation since 2003. According to its website, in that time it has supported more than 1,800 consumers with disabilities. Quality Trust, *Advocacy*, available at http://www.dcqualitytrust.org/pages/page02a.shtml (last accessed September 24, 2009). This support has included, among many other projects, various partnerships with District and federal authorities to improve outcomes for HCBS waiver recipients; a collaboration with the D.C. Department of Human Services that resulted in a federal grant for the Family Support 360 program; efforts to promote proactive planning regarding end-of-life supports for intellectually and developmentally disabled consumers; collaboration with the D.C. Superior Court to develop a framework for implementing a volunteer advocacy program; establishment of the Family EMPOWERment Center, a one-stop family support and resource center focused on individuals with developmental disabilities; and a 2007 Disability Support Professionals Conference focused on training and supporting developmental-disability staff members. Quality Trust, *Our Achievements*, available at http://www.dcqualitytrust.org/pages/page01f.shtml (last accessed September 24, 2009).

Such intensive, ongoing monitoring and feedback ensures that DDS/DDA will remain responsive to the needs of all consumers, including *Evans* class members, and will continue to improve the quality and range of services available to this community.

5.    **The District has established an aggressive internal quality-assurance system.**[42]

---

[42]    Internally, the District is also monitored by the District of Columbia Office of Inspector General ("OIG"), which reviews all incidents of death, abuse, neglect, and exploitation that are filed in the DDA

As noted above, CMS recently found that intensive federal monitoring of the
HCBS waiver was no longer necessary given the caliber of the District's quality-
assurance process. DDS's internal monitoring methods will ensure that it sustains the
extensive reforms now in place. First, DDA's Quality Management Division ("QMD")
monitors all aspects of the service-delivery system to ensure compliance with federal and
local law, national best practices, and applicable court orders. (Ex. 4, Oct. 7, 2009 Nuss
Decl. at ¶ 51.) The QMD focuses on strengthening DDA's ability to discover areas of
concern, remediate both discrete and systemic issues, and implement strategies for
continuous improvement. (*Id.*)

The QMD is divided into four functional units: Health and Wellness, Quality
Enhancement and Quality Improvement ("QE/QI"), Incident Management and
Enforcement ("IMEU"), and Mortality Review. (*Id.* at ¶ 52.) The Health and Wellness
Unit supports the health of individuals by providing oversight and support to individuals
residing in natural homes, nursing homes, hospitals, and small and mid-sized provider
agencies. (*Id.*) The oversight includes provision of technical assistance, community
outreach, and monitoring of health management care plans, behavior support plans, meal
protocols, and other treatment regimes necessary to realize optimal health status and
outcomes. (*Id.*)

The Quality Enhancement and Quality Improvement Unit uses the Provider
Certification Review ("PCR") process[43] as the mechanism that measures provider

---

service system. OIG may and does assign investigators to cases at will for purposes of criminal
prosecution.

[43]       The PCR replaced the BASA review and is a far superior tool to evaluate quality. (*Id.* at ¶ 53.)
The new PCR process (1) allows for the identification of positive practices and areas for improvement in

performance, determines whether the provider/vendor does or does not meet the

minimum thresholds for performance, and acknowledges each provider as able to deliver

services and supports to people served by DDA.  (*Id.* at ¶ 53.)  DDS/DDA has completed

the RFP process to award the contract to a nationally recognized vendor to assume

responsibility for certifying all HCBS waiver providers using the PCR and it is pending

Council approval.  (*Id.*)

    The Quality contract also includes independent audit of the DDA Service

Coordination service delivery, providing the DDA Director and DHCF with an

independent performance evaluation of this critical function.  (*Id.*)  A third component of

this contract includes a 10% sample of all ISPs to assess implementation of all services

per the ISP on an annual basis.  (*Id.*)  Both elements are critical performance measures for

CMS as described in the Quality Management Strategy, and to provision of services to

the *Evans* class.   DDA included these elements for an additional high quality, arm's

length source of performance measurement of DDA service delivery, and did so

independent of any direction or requirement from an outside body.

    One of the more recent initiatives has been ensuring that Quality Improvement

Specialists in the Technical Assistance ("TA") Unit increase the number of unannounced

visits and contacts that occur on a monthly basis.  (*Id.* at ¶ 54.)  QMD began tracking the

providers' services and supports; (2) allows for the ability to aggregate, analyze, and compare data from various sources including information from the HRLA, the IMEU, Service Coordination, Provider Resource Management, Mortality and Fatality Review Committees, and Contracts Department; and (3) provides evidence that providers are operating in accordance with HCBS waiver regulations, D.C. Rules and Regulations, and DDS/DDA approved policies.  (*Id.*)  Further, under BASA, only a small sub-set of living settings, including ICFs/ID, group homes, and supported living residential service providers, were reviewed.  (*Id.*)  Moreover, only 10% or less of total recipients of the agency were evaluated.  (*Id.*)  In contrast, the PCR is applied to a broader range of providers including in-home supports, host home services, day habilitation, pre-vocational services and supported employment, and expands the sampling methodology to be statistically significant for *each service* delivered by the provider agency.  (*Id.*)  The implementation of the PCR process is yet another example of the agency's ability to improve the quality assurance capacity of the District.

number of contacts in August 2008, and since that time, there has been an over 200%

increase in the number of monthly contacts (including initial visits, re-visits,

unannounced visits, and telephone contact) made by TA staff.  (*Id.*)  This has allowed the

Technical Assistance Unit to more effectively discover and remediate issues in a timely

manner.  (*Id.*)  Further, QE/QI assumes the responsibility of data integration for all

information that reflects provider performance and its impact on people served through

the DDA service-delivery system.  (*Id.*)

      The IMEU is critical as it provides the mechanism to track and remediate

problems, or incidents.  There have been several developments implemented by the

District that has contributed to the improvement of the investigatory process.  These

include requiring all investigators to pass LRA Level I certification[44] to improve

investigatory skills; assigning investigators to specific providers enabling each

investigator to better recognize trends in the quality of services; providing trainings; and

conducting quality assurance review of investigations submitted by providers.  (*Id.* at ¶

55.)  In fiscal year 2009, IMEU provided training to more than 20 provider agencies,

conducted more than 100 quality assurance reviews, and made approximately 40

technical assistance contacts with providers.  (*Id.*)  In addition, a recent update to the

Consumer Information System ("MCIS") allows DDA to track the outcome of an

investigation and capture the responsible provider, allowing IMEU to accurately track

and trend data for specific providers.  (*Id.*)

---

[44]     Certification requires completion of a course designed to teach individuals appropriate
techniques for the investigation of serious incidents.  (*Id.* at ¶ 55.)  Participants learn the fundamental
principles of investigation, including the types and forms of evidence, techniques for collecting all four
forms of evidence, interviewing witnesses, taking statements, and reconciling conflicting testimony.  (*Id.*)

The District also has a mortality-review process (consisting of the Fatality Review Committee and the Mortality Review Committee[45]), which allow DDS/DDA to identify and, as necessary, address potential quality-of-care issues.  (*Id.* at ¶ 56.)  The District's mortality-review process meets all six of the criteria established by the U.S. Government Accountability Office ("GAO") in its recent report to the ranking member of the U.S. Senate Committee on Finance (Declaration of David Jackson, Oct. 8, 2008 ("Oct. 8, 2008 Jackson Decl.) at ¶ 10(n), attached at Exhibit 20.).  In fact, CMS has requested that the District submit briefs describing its Mortality and Fatality Review processes, to serve as illustrations of "Best Practice" for other states to review.  (Ex. 5, Status Report at 2.)  Moreover, in fiscal year 2009, the FRC maintained a 90% compliance rate of reviewing all cases within 90 days.  (Ex. 4, Oct. 7, 2009 Nuss Decl. at ¶ 56.)  Further, as of this filing, DDA's Mortality Review Committee Review has concluded reviews of all completed death investigations in FY 2009.  (*Id.*)

Finally, the HRLA licenses and inspects group homes for persons with intellectual and developmental disabilities and certifies ICFs/ID.  HRLA conducts annual on-site and ad hoc monitoring surveys to ensure that these facilities maintain compliance with District and federal health, safety, sanitation, and habilitative requirements.  (*Id.*)  Regulated facilities include Certified (Federal) Intermediate Care Facilities and Group Homes for Persons with Mental Retardation.  (*Id.*)

###    6.    Conclusion.

These structural safeguards conclusively establish the District's commitment to continued improvement in service-delivery.  There simply is no plausible argument that

---

[45]    The District has an overall MR/DD Fatality Review Committee ("FRC"), while DDA has an agency-specific Mortality Review Committee ("MRC").

the District will "return to its former ways" such that Court supervision is necessary.  *See*

*Dowell*, 498 U.S. at 247.

## V.    ENFORCEMENT OF THE CONSENT DECREE AND OTHER ORDERS IN THE LITIGATION IS NO LONGER EQUITABLE GIVEN THE CHANGED CIRCUMSTANCES.

### A.    The Absence of Systemic Legal Violations, Combined With The Implementation of Structural and Legislative Changes, Supports Vacatur of the Consent Order and Dismissal of the Litigation.

Absent systemic constitutional violations, and in light of the major structural and

legislative changes identified above, continued enforcement of this sweeping consent

decree is inequitable.  As the Supreme Court has observed, district courts are empowered

to modify or vacate consent decrees based on changed circumstances.  *See Horne*, 129 S.

Ct. at 2593 ("The party seeking relief bears the burden of establishing that changed

circumstances warrant relief, but once a party carries this burden, a court abuses its

discretion 'when it refuses to modify an injunction or consent decree in light of such

changes.'" (quoting *Agostini v. Felton*, 521 U.S. 203, 215, 117 S. Ct. 1997 (1997))).

Indeed, judicial experience with institutional reform litigation "has made the ability of a

district court to modify a decree in response to changed circumstances all the more

important."  *Rufo*, 502 U.S. at 380.  As the Supreme Court has noted, "injunctions issued

in such cases often remain in force for many years, and the passage of time frequently

brings about changed circumstances—changes in the nature of the underlying problem,

changes in governing law or its interpretation by the courts, and new policy insights—

that warrant reexamination of the original judgment."  *Horne*, 129 S. Ct. at 2593; *see also*

*In re Pearson*, 990 F.2d 653, 658 (1st Cir. 1993) ("the district court is not doomed to

some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without

52

occasionally pausing to question whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest").

In short, the Supreme Court has determined that consent decrees in institutional-reform cases "are not intended to operate in perpetuity" and cannot condemn an agency "to judicial tutelage for the indefinite future." *Dowell*, 498 U.S. at 248-49.

Precisely the same "changed circumstances" recognized by the Supreme Court in *Horne* are present here. There can be no doubt that significant changes in the system for delivery of services to IDD individuals have occurred over the course of this litigation. As described in previous sections, one critical changed circumstance is the District's correction of the systemic constitutional violations that originally gave rise to the various orders in this case. In addition, and as also described above, major structural and legislative changes, combined with extensive oversight, constitute another changed circumstance.

In summary, DDS/DDA today is a wholly transformed agency. As such, even if some *de minimis* violation remained (a possibility that the District rejects), such a circumstance simply would not rise to the level of the kind of all-encompassing, systemic violation necessary to sustain this Court's continued jurisdiction. The case should be dismissed on this ground alone.

**B.  Current Economic and Fiscal Conditions Also Support Vacatur of the Consent Order and Dismissal of the Litigation.**

In deciding whether to vacate a consent order, it is appropriate for the Court to take into consideration conditions, including economic circumstances, that make compliance "substantially more onerous" than it originally was. *Rufo*, 502 U.S. at 393; *see also Horne*, 129 S. Ct. at 2594 (noting that a consent decree can have the effect of

"tak[ing] funds away from other important programs"). This is especially so where, as here, prior public officials "consent[ed] to, or refrain[ed] from vigorously opposing, decrees that [went] well beyond what is required by . . . law." *Horne*, 129 S. Ct. at 2594; *accord Rufo*, 502 U.S. at 392 (officials "may agree to do more than that that which is minimally required by the Constitution to settle a case and avoid further litigation"). As the Supreme Court noted in *Horne*, to refuse consideration of a motion based, like this one, on a change in conditions is to "bind state and local officials to the policy preferences of their predecessors and . . . thereby 'improperly deprive future officials of their designated legislative and executive powers.'" 129 S. Ct. at 2594 (quoting *Frew*, 540 U.S. at 441).

In this context, the Supreme Court has recognized that fiscal problems are relevant to a request for modification or dismissal. "Financial constraints may not be used to justify the creation or perpetuation of constitutional violations, but they are a legitimate concern of government defendants in institutional reform litigation and therefore are appropriately considered in tailoring a consent decree modification." *Rufo*, 502 U.S. at 392-93. Accordingly, the District's current financial constraints are an appropriate consideration in this case, and one that independently warrants vacatur of the Consent Order.

### 1.    Revenue Gap

In considering the District's motion, the Court must take into account the publicly documented and indisputably dire current economic climate, and the concomitant financial constraints on the District. Specifically, the District is currently projected to suffer budget shortfalls of $583.5 million (or 10.5% of the total budget) for

fiscal year 2009, and $952.2 million (or 16.3% of the total budget) for fiscal year 2010.
(Declaration of Merav Bushlin ("Bushlin Decl.") at ¶ 4, attached at Exhibit 21.)  Under
*Horne* and *Rufo*, the Court must consider these severe constraints on the District's ability
to continue to absorb the exorbitant legal and administrative expenses associated with
court supervision, as outlined below.

### 2.    Payments to the Court Monitor and Special Masters.

In considering the cost of this litigation, the Court should note the extraordinary
fees and expenses collected to date by the Court Monitor and Special Masters.  Since
fiscal year 2000 alone, the District has paid or allocated approximately $10,302,047 for
the services of these three individuals.  (*Id.* ¶ 10.)  Specifically, the District pays for the
services of not one, but two, Special Masters, at a budgeted cost of at least $250,000 per
year (*id.* ¶¶ 7-8),[46] and the Court Monitor's costs usually exceed $800,000 per year (*id.* ¶
5).  When considered in light of the strain already imposed by the current and projected
revenue shortfalls, these costs simply cannot be justified on an ongoing basis.

### 3.    Payments to the Quality Trust.

The District has, to date, paid more than $20 million to the Quality Trust, an
entity that, as explained *supra*, is designed to provide monitoring, legal services, and lay
advocacy to all IDD consumers in the District of Columbia's service-delivery system –
including *Evans* class members.  (*Id.* ¶ 13.)  The Quality Trust's services are projected to
cost an additional $2 million or more in fiscal year 2010.  (*Id.* ¶ 12.)

### 4.    Payments To Plaintiffs' Attorneys.

---

[46]    Indeed, it is highly questionable that the entire cost of the Special Masters' services should be
taxed to the District, when the Special Masters are performing work that the Court or a magistrate judge
would otherwise undertake (at no additional cost to the parties), and when the Special Masters' work
benefits Plaintiffs and Defendants equally.  The perpetuation of this system of using Special Masters to do
what the Court or a magistrate judge could do is unfair to the District.

Finally, the Court should also note the extraordinary amount of attorneys' fees and costs that the District has paid since 1999. For the period January 1999 through March 31, 2006, the District has paid Plaintiffs' attorneys a total of approximately $1,867,828 in fees and costs.[47] (Declaration of Donnell Ferguson, ("Ferguson Decl."), at ¶ 6, attached at Exhibit 22.) This amount does not include the $673,874.73 that Plaintiffs initially requested in their proposed fee petition, covering the five-month period from April 1, 2006 through September 30, 2006.[48] Further, it should be noted that this total also does not take into account attorneys' fees for the period from October 1, 2006 until the present, which will include the hearing on noncompliance, negotiation of the Health Care Agreement, multiple status conferences, discovery during the remedial phase, and the hearing and post-trial briefing on remedy. The fee statements for this period of time will no doubt be exceedingly large and may well eclipse Plaintiffs' past requests.

With all due respect to Plaintiffs' counsel, who have represented the class with great energy, Defendants submit that almost $1.9 million in attorneys' fees, with much more yet to be billed for events that have already occurred, is a sufficiently high price and heavy burden for the District to bear. This is particularly true now that the District has satisfied the applicable constitutional requirements. It is time for the Court to eliminate this burden.

---

[47]    The docket indicates that a consent motion was filed on October 27, 2003 [Docket No. 679] requesting that the Court approve $300,000 in fees and costs for the period from October 1, 2001 through October 31, 2002. While the District was unable to confirm an order in that amount by reviewing the electronic docket, this amount has been included in the total because the District consented to the payment.

[48]    The District responded with objections to this amount based on a review of the proposed fee petition. Plaintiffs have not yet filed a fee petition pertaining to the period from October 1, 2006 to the present.

## VI.    THE COURT SHOULD REJECT THE SPECIAL MASTERS' REPORT AND RECOMMENDATION.[49]

In their 143-page Report, the Special Masters employ the very type of logic that the Supreme Court repudiated in *Horne*: namely, they focus narrowly on whether the District has complied with the specifics of particular court orders, to the exclusion of any analysis of whether the District "is now fulfilling its [legal] obligation by new means."[50] *See Horne*, 129 S. Ct. at 2589. Because the Special Masters plainly utilized the incorrect legal standard, their conclusions cannot be considered, if at all, until the Court has ruled on the fundamental issues raised by *Horne*.

Moreover, the Special Masters' findings—to the extent that the Court entertains them at all—are based on faulty "evidence." Citing isolated examples of supposedly substandard care identified by the Court Monitor, the Masters ignore the Monitor's open acknowledgment that her findings cannot be utilized to identify trends—that is, to make the very type of systemic conclusions that the Special Masters make in their Report. Additionally, the Special Masters ignore developments that occurred after the conclusion of the hearing on remedy. Because this case sounds in equity, and because the most drastic remedy—a receiver in all but name—is being proposed, the Court must consider recent evidence supporting the District's position that a receiver is not necessary.

### A.    The Special Masters Have Failed to Properly Consider *Horne*.

---

[49]    In addition, the District renews its Motion to Vacate the Orders of Reference to the Special Masters [Docket No. 1109].

[50]    The District repeatedly requested that the Special Masters and/or the Court address this very issue prior to the issuance of the Special Masters' final Report. *See* Findings of Fact and Conclusions of Law at 95-96 [Docket No. 1074]; Post-Trial Brief on Remedy at 28-30 [Docket No. 1082]; April 20, 2009 Motion to Vacate [Docket No. 1108]; and Notice of Supplemental Authority (specifically referencing the Supreme Court's *Horne* decision) [Docket No. 1126]. Despite being served with all of these filings, the Special Masters made no attempt to address or to incorporate binding Supreme Court precedent in their Report.

The Special Masters quite openly perceive their task <u>only</u> as "assessing compliance since 2006 and recommending to the Court a remedy for defendants['] deficient performance of its *court-ordered obligations*."  (Report at 3 (emphasis added).)  While, as discussed below and in the appendix hereto, the District disagrees with the Masters' findings in numerous respects, the most salient is that the Masters fundamentally misunderstood the job before them.  Wedded to the past, the Special Masters cannot conceive of recommending anything that transcends the four corners of the 2001 Plan—not even binding acknowledging Supreme Court precedent.[51]

The Special Masters' conclusions simply cannot be utilized at this juncture, because the Masters have failed to consider whether the District's actions, as adduced at the hearing and beyond, satisfy applicable <u>constitutional</u> standards, which is the relevant question under *Horne*.

**B.      The Masters' Reliance on the Court Monitor's Reports to Make Systemic Conclusions is in Error.[52]**

The Court Monitor has acknowledged that her anecdotal findings with respect to individual class members cannot be utilized to chart trends for the *Evans* class.  (*See* May 8, 2008 Quarterly Report at 5, attached at Exhibit 25.)  Her reports admittedly are not based on statistically significant samples and, therefore, cannot be treated as empirical evidence regarding the overall care and treatment of the IDD population generally or

---

[51]      This is particularly problematic given that this Court has already acknowledged, on more than one occasion, that it neither understands nor believes the 2001 Plan is achievable.  (*See* Tr. of Status Hr'g, Aug. 9, 2007, at 49 (describing the 2001 Plan as "too big, . . . too cumbersome, … [and] way beyond the capabilities of the Court, the plaintiffs or the defendants"); Tr. of Status Hr'g, May 15, 2008, at 30-31 ("I cannot in good faith sign any more consent orders.  I can't even understand the ones I inherited.  They have not solved the problem.  We know that."), attached at Exhibit 24.).  From the District's perspective, these comments simply support its conclusion that the orders in this case ought to be vacated, or at the very least severely limited, to the extent that they extend beyond constitutional requirements.

[52]      Additional objections are offered at Exhibit 23.

*Evans* class members in particular. (*See* Supplemental Direct Test./Decl. of John Sumner at 2 ¶ 6, attached at Exhibit 26; Report at 6-7.)

Nor does the Court Monitor make any effort to (1) connect findings with the requirements of specific court orders (or the 2001 Plan) or (2) identify any normative standards that would allow the parties to identify any actual deficiencies. Indeed, Dr. John Sumner, an expert statistician whose testimony at the hearing on remedy was rejected in its entirety by the Special Masters, recommended that normative standards be used in measuring DDS/DDA's performance and benchmarking results against those of other jurisdictions to determine the reasonableness of a particular court order or objective. (Report at 7-8.) The identification of such a standard is critically important under *Horne* because a narrow focus on compliance with court orders, without reference to the broader factual and legal context, obscures the true goal of the orders—to ensure that the District substantially complies with its constitutional obligations to the class. It is here, especially at the remedial stage, that national data are relevant. Indeed, the term "constitutional minimum standard" ceases to have any meaning when used to hold the District hostage to requirements that are not constitutionally mandated and that may not be met by any other jurisdiction.

Despite these obvious limitations, the Special Masters erroneously conclude that the Court Monitor's reports are "reliable evidence of the defendants' overall performance with respect to their obligations under court orders." (Report at 18.) As the vast majority of the "evidence" utilized to support the Special Masters' conclusions rests on the findings of the Court Monitor, the Masters have committed clear error. Their conclusions must be rejected for this reason alone.

**C.     The Special Masters' Conclusions are Erroneous to the Extent that the Masters Rejected Evidence Regarding Current Progress.**

The Special Masters not only rejected evidence adduced at the hearing on remedy (*see* Ex. 23, discussion of Sawyer Declaration, Objections at ¶ 9), but they also failed to consider information provided subsequent to the hearing.  In a case sounding in equity, in which the most severe penalty—a receivership—is being sought, the Special Masters had an obligation to consider the latest developments in the District's provision of services to class members, developments that are outlined in summary form in Laura Nuss's most recent declaration filed with the Court on June 15, 2009, and cited to the Special Masters in Defendants' Comments to the Masters' Draft Report.  Despite the District's continuing progress on each of the issues discussed by the Special Masters, the Masters continue to judge Defendants exclusively on the basis of a liability record that closed in November 2006, and a remedial phase record that closed in December 2008.

Because this case sounds in equity, the District cannot fairly be denied the opportunity to present evidence of its ongoing progress.  During the approximately ten months that have elapsed since the hearing on remedy, the District has presented additional compelling evidence of continued reforms with demonstrable results, as well as collaboration among agencies sufficient to completely address the Special Masters' concerns.  Yet the Special Masters have ignored all of this critical evidence.

The Special Masters' recommendation of a remedy based on stale facts, nonexistent problems, and a record long since closed cannot withstand a *de novo* review by this Court.  More importantly, for purposes of this motion, the Masters' Report cannot survive the impact of *Horne.*  As the Supreme Court made clear in that case, a district court commits error where it fails to make "up-to-date factual findings" with respect to

60

changed circumstances.  129 S. Ct. at 2606.  As such, this Court must ascertain the District's current state of compliance with the underlying constitutional standards.

In these circumstances, the flawed findings of the Special Masters must be rejected.

## VII.    THE SPECIAL MASTERS' PROPOSED RECEIVER IS CONTRARY TO LAW.

The Special Masters' "Independent Compliance Administrator" is a receiver in all but name.  The powers that the Masters recommend for the Administrator are vast and sweeping.  For example, the Masters urge the Court to authorize the Administrator to "take all actions necessary" to ensure compliance with court orders and the 2001 Plan. (Report at 136.)[53]  More to the point, the Administrator can "direct, as necessary, the actions of any person or agency of the District government, as needed."  (*Id.*)  Yet, astonishingly, the Masters maintain that the Administrator will not "displace the power and authority of agency heads."  (*Id.* at 134.)   And the Administrator reports directly, not to the Mayor, but to the Court.  (*Id.* at 137.)

Moreover, the Special Masters urge that the Court allow the Administrator and the District not to be bound by local laws including the law on procurement.  (*Id.* at 137.) The Court would be hard pressed to identify a more sweeping power than the right to ignore local law.  Based on the breadth of the Administrator's authority and power, its relationship with and reporting obligations to the Court, its capacity to violate local law, and its ability to direct and/or replace the political leadership of the executive branch with regard to agency functions, the proposed "Independent Compliance Administrator" is no different than a Receiver.  In short, the Masters have attempted to impose the most drastic

---

[53]    Indeed, the Special Masters implicitly argue that the 2001 Plan should become an order of the Court even though it was intended to be a private agreement between the parties.

remedy of receivership under the more innocuous title of Administrator. This Court

should reject the Masters' remedy because it is contrary to law.

### A. Because There Is No Ongoing Constitutional Violation, This Court Lacks The Power To Appoint A Receiver Or "Independent Compliance Administrator."

Most fundamentally, the very Supreme Court precedents cited by the Special

Masters conclusively demonstrate that no such remedy is available here. First, the

Special Masters' interpretation of *Swann v. Charlotte-Mecklenberg Board of Education*,

402 U.S. 1 (1971), as authorizing this Court to grant broad "prospective relief to bring

about compliance with [its] orders" (Report at 94) is erroneous; *Swann* says no such

thing. On the contrary, *Swann* stands for the proposition that a court sitting in equity has

broad remedial powers only "[o]nce a right *and a violation* have been shown." 402 U.S.

at 15 (emphasis added). Indeed, the *Swann* Court took pains to emphasize that "judicial

powers may be exercised *only on the basis of a constitutional violation*" and that

"[r]emedial judicial authority does *not* put judges automatically in the shoes of . . .

authorities whose powers are plenary. Judicial authority enters *only* when local authority

defaults." *Id.* (emphases added); *see also Evans v. Washington*, 459 F. Supp. 483, 484

(D.D.C. 1978) (granting injunctive relief upon a finding of constitutional violations),

*cited in* Report at 95 n.72.

In other words, the very section of *Swann* on which the Special Masters rely is, in

essence, an early articulation of the animating principle of *Horne*, which the Special

Masters refuse to acknowledge. Thus the Report's validity is belied by its own supposed

legal foundation. *Accord Hutto v. Finney*, 437 U.S. 678, 687 (1978) (emphasizing that

"[t]he question before the trial court was *whether past constitutional violations had been*

*remedied*" (emphasis added)), *cited in* Report at 94; *cf. United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968) (pointing out that, "in a [Sherman Act antitrust] case, *upon appropriate findings of [a statutory] violation*, it is the duty of the court to prescribe relief which will *terminate the illegal monopoly*" – that is, right the underlying legal violation (emphases added)), *cited in* Report at 94.

Nor do Federal Rules of Civil Procedure 66 and 70 (*see* Report at 95) support the Special Masters' contention that this Court possesses the inherent power to impose the broad equitable remedy that the Masters recommend, for the simple reason that neither rule applies here. Rule 66 provides that where a receivership is <u>already in effect</u>, only the court that imposed the receivership can vitiate it by dismissing the case. *See* Fed. R. Civ. P. 66 advisory committee's note ("Rule 66 prevents a dismissal by any party, *after a federal equity receiver has been appointed*, except upon leave of court." (emphasis added)). And Rule 70 applies only where a court has ordered a party to perform a specific act such as conveying land or delivering a deed or other document (*see* Fed. R. Civ. P. 70(a)); it is not apposite to a situation such as this, in which the particulars of the court's multiple expansive orders are the means by which the underlying violation is to be remedied, not the ends of the lawsuit in themselves.[54]

This distinction is illustrated by various cases cited by the Masters, in which courts imposed sanctions for defendants' failures to perform *specific* and *discrete* actions analogous to the conveyance of land or title under Rule 70(a), but easily distinguishable

---

[54]    Rule 53, halfheartedly cited by the Special Masters in a footnote, is similarly unavailing: contrary to the Report's clear implication (at 95 n.73), this rule does *not* include, in its exhaustive list of circumstances warranting the appointment of a Special Master, the enforcement of prior court orders. *See* Fed. R. Civ. P. 53(a). Similarly, none of the case law cited in the footnotes to pages 95-96 of the Report supports the Masters' assertion that broad equitable relief is available to remedy a violation of a prior court order, absent a concurrent legal or constitutional violation.

from the series of evolving standards and vague aspirations set forth in the orders in this

case as means of achieving the underlying goal of the litigation.  *See, e.g.*, *Salazar v.*

*District of Columbia*, Civil Action No. 93-452 (GK), 2006 U.S. Dist. LEXIS 46130, at *5

(D.D.C. 2006) (imposing fines for party's failure to meet specific filing deadlines), *cited*

*in* Report at 95 n.71; *Evans v. Williams*, 206 F3d 1292, 1295 & n.1 (D.C. Cir. 2000)

(permitting imposition of civil *per diem* fine for, *e.g.*, each day that a Medicaid payment

is late), *cited in* Report at 95 n.71.

   In contrast, where courts have imposed broad equitable relief such as that urged

by the Special Masters here, they have uniformly done so on the basis of express findings

of current and on-going constitutional or statutory violations.  *See Glover v. Johnson*, 934

F.2d 703, 707 (6th Cir. 1991) ("The [district] court held that the remedy it fashioned was

the least intrusive means to ensure that defendants do what they have not done for the last

ten years—provide parity in educational and vocational opportunities for female

inmates."), *cited in* Report at 99-100 & nn. 83-85;[55] *Morgan v. McDonough*, 540 F.2d

527, 529-30 (1st Cir. 1976) ("The questions now before us are simply whether the lower

court properly determined that plaintiff's rights under the desegregation plan were being

violated . . ., and if so, whether the temporary remedies ordered were reasonable and

lawful.  We answer these questions in the affirmative."), *cited in* Report at 98 n.82;

*United States v. City of Detroit*, 476 F. Supp. 512, 520 (E.D. Mich. 1979) ("Defendants . .

. have failed to comply with the judgment of this court and federal law governing water

pollution."), *cited in* Report at 98, 102 & nn. 80, 89-90.

---

[55]  It is unclear why the Masters cite *Dixon v. Weinberger*, 405 F. Supp. 974 (D.D.C. 1975), *cited in* Report at 98 & n.81, as the court in that ruling did not appoint a receiver.

This limitation on the power of the federal courts—the requirement that a right and a violation thereof be established before the courts can impose a broad equitable remedy—was expressed with admirable clarity by the U.S. District Court for the Northern District of Ohio in *Reed v. Rhodes*:

> During at least the last 20 years, patterns of racial isolation in the Cleveland public school system have become steadily more pronounced.
> . . . .
> These statistics and the underlying situation which they describe give rise to many troubling questions.  Most of these questions[,] however[,] are beyond the purview of this court in resolving the issue now before it.  In reviewing the above facts as well as all of the evidence included in the voluminous record in this case, the court has sought an answer to a single question of constitutional law.

422 F. Supp. 708, 711-12 (N.D. Ohio 1976), *cited in* Report at 100-02 & nn. 86-88; *see also remand after appeal*, 455 F. Supp. 546, 550 (N.D. Ohio 1978) ("The Supreme Court made clear in *Dayton* [*Board of Education v. Brinkman*, 433 I/S/ 406 (1977),] that federal courts have the authority to grant broad relief of the kind ordered in this case when *systemwide constitutional violations* . . . are proven." (emphasis added)).  The District of Columbia federal courts are no exception to this rule.  *See Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997) ("various courts have appointed receivers *to protect constitutional and statutory rights* in a variety of circumstances"), *cited in* Report at 108; Report at 108-09 & nn. 104-05 (conceding that the imposition of a receivership and other sanctions in *LaShawn A. v. Kelly* was premised on constitutional and statutory violations); *id.* at 111-12 (acknowledging that "the D.C. Court of Appeals in *Jerry M* confirmed the trial court's authority to appoint a receiver *under certain circumstances after years of constitutional and statutory violations*"); *id.* at 114-15 (acknowledging that the appointment of an administrator in *Petties* was by consent of the parties).

Because the necessary precondition to a grant of broad equitable relief—the establishment of an ongoing legal or constitutional violation—has not been (and cannot be) met in this case, the Court lacks the power to impose the Masters' recommended remedy of an Independent Compliance Officer.

### B.    A Receiver Is Not Appropriate In These Circumstances.

Substituting the Court's authority for that of elected and appointed officials is an "*extraordinary step* warranted only by the *most compelling* circumstances." *Morgan*, 540 F.2d at 533. Therefore, a receivership is appropriate only as a remedy of last resort. *Id.*[56] Assuming for the moment that there were ongoing constitutional violations in this case, absent compelling circumstances including consideration of whether less drastic measures would suffice, a court abuses its discretion in appointing a receiver. *See Dixon*, 967 F. Supp. at 550 (appointing a receiver is within court's judicial discretion and the most significant factor is whether any other remedy is likely to be successful); *see also Jerry M.*, 738 A. 2d at 1213-14 (court abused discretion where it failed to consider factors other than compliance with court orders).

In assessing whether a receivership is absolutely necessary, a court must consider a number of factors: (1) whether there were repeated failures to comply with the Court's orders; (2) whether further efforts to secure compliance would only lead to

---

[56]    *See also Dixon*, 967 F. Supp. at 550 (court must evaluate whether a receivership is "really the only remedy left"); *Bracco v. Lackner*, 462 F. Supp. 436, 456 (N.D. Cal. 1978) (receivership is an "extraordinary step" and a remedy of "last resort"); *D.C. v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. 1999) (as a remedy of "last resort," a receivership should be undertaken only when "absolutely necessary"); *Perez v. Boston Housing Authority*, 400 N.E. 2d 1231, 1249 (Mass. 1980) (receivership is remedy of last resort and therefore, not often applied in practice); *Petitpren v. Taylor School Dist.*, 304 N.W.2d 553, 558 (Mich. Ct. App. 1981) (receivership is a "harsh" remedy and should only be resorted to in extreme cases); *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W.Va. 1990) (a receivership is an "intrusive remedy" that should only be resorted to in "extreme cases"); 12 C. Wright & A. Miller, Federal Practice and Procedure, Section 2983, at 21 (1973) (receivership is an "extraordinary remedy that should be employed with the utmost caution").

confrontation and delay; (3) whether leadership is available that can turn the tide; (4)

whether there was bad faith; (5) whether resources are being wasted; and, (6) whether a

receiver can provide a quick and efficient remedy.  *Jerry M*., 738 A. 2d at 1213; *see

also Dixon,* 967 F. Supp. at 550.  The Special Masters do not contest two of the six

factors, finding that there was no substantial evidence of either bad faith or that

resources were being wasted.  (Report at 118-120.)  The Special Masters erred,

however, in asserting that there was evidence of the remaining factors.

     While the Court held that the District had failed to comply with court orders on a

record that closed in 2006, for the reasons stated above, the Special Masters' conclusion

of continued noncompliance is suspect due to their reliance on the Court Monitor's

reports and their failure to consider recent developments.  With respect to whether

further efforts would lead to confrontation and delay, the Special Masters

inappropriately refer to the District's initial motion to vacate as evidence of

confrontation and delay.  (*Id.* at 117.)  While fundamentally, this statement ignores the

continued progress that has been made often in spite of this litigation, more importantly,

it simply illustrates that while the Special Masters may choose to ignore Supreme Court

precedent, the District's attorneys cannot.  Moreover, the agency leadership has made

almost heroic efforts to reform an agency to meet constitutional standards and beyond,

as discussed *supra*.  In the absence of evidence that the District actively seeks to

disobey court orders, the appointment of a receiver is not necessary.  *See Morgan*, 540

F.2d at 533 (receiver appointed only where the leadership refused to cooperate and

actively resisted court orders).  Similarly, there is no evidence that the leadership has

been unable to "turn the tide."  Indeed, as the evidence illustrates, the tide has already

turned.  *See Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) (receiver

appropriate only where the defendant agency is "incapable of effective leadership").

Additionally, there is a complete dearth of evidence to support the idea that

adding an additional layer of administrative oversight will provide a "quick and

efficient remedy."  Indeed, this case suffers from too much and too costly oversight

already, in the form of the Court Monitor and the Special Masters, which according to

the Special Masters' findings has not proved effective.  Moreover, changing leadership

at this time will only serve to impede progress and may result in the disruption of

healthcare services for all consumers.  Such an appointment may dissuade professionals

and new provider organizations from joining the District out of concern for revolving

door leadership and policies, as well as enhanced court oversight and intervention.  And

adding yet another layer of authority will only serve to confuse stakeholders and/or

exacerbate the tendency of individuals to continually lobby each authority figure for

their preferred solutions.

Finally, even under the Special Masters' proposed remedy, compliance is not

anticipated for three years.  (Report at 136.)  Where the District has already reformed its

service-delivery system and sustained improvement, there is no evidence that a receiver

would provide a quicker, or more efficient, remedy, in order to obtain compliance with

court orders that impose extra-constitutional obligations.[57]  In fact, the Special Masters

offer <u>no</u> evidence to support their supposition that adding an additional layer of

bureaucracy would expedite reform.  The proposed remedy, which is not even

---

[57]     Indeed, the Administrator would cost additional money.  (*See* Report at 137 (noting that the Administrator should advise the Court of what "additional staff and resources, if any, [were] needed to execute" its responsibilities).)  Moreover, should the Court agree with the Special Masters, according to the recommendation, the District would continue to pay $250,000 per year for the services of not one, but two masters.

supported by findings of on-going, systemic constitutional, is simply just more of the same unnecessary and expensive judicial oversight.

In short, the foregoing factors, as applied in this case, do not support the appointment of a Receiver, even if identified as an Independent Compliance Administrator.

> **C.     Evidence of the Reformed Service-Delivery System, in addition to the District's Quality Management Strategy, Adequately Remedies Any Potential Violation of the Constitution.**

Throughout the progression of this case during the past two years, the new leadership of DDS/DDA has aggressively pursued a course of action to move the District's service system for residents with IDD into compliance with current federal and local statutory and regulatory requirements, and advance the District toward best practice nationally.  The field agrees today that the course laid out by CMS under the HCBS waiver program setting standards for the operation of that program represents best practice for all community-based services.  The CMS course is described succinctly in the six assurances under the HCBS waiver program.

To complement the work of CMS and to enable this Court to assure itself that the reforms continue and are sustainable, the District has implemented an Quality Management Strategy upon which it may be monitored for an additional three months. While the District has met federal requirements as noted *supra*, the District continues to develop its strategy and the Quality Management Strategy details the objectives, specific discovery, remediation, and performance measures by which the District will assess its own performance.  (Quality Management Strategy, attached at Exhibit 27; Declaration of Nancy Thaler, Oct. 7, 2009 ("Oct. 6, 2009 Thaler Decl.") (Report) at 1-3, attached at

Exhibit 28.)  Nancy Thaler, a very highly-respected expert in state disability systems,

testified that systems change took 3-5 years, in situations far less complicated and far-

reaching than the complete overhaul of the IDD system undertaken by the District.  The

Masters, who the Court trusts, agreed with that assessment and recommended the

independent compliance officer be given an additional three years (two to date plus three)

to finish the job.  Given the legal precedents, including the recent *Horne* decision, by any

account, the Court orders should be vacated now and the District should be released from

judicial oversight.  To address the court's ultimate concern, however, and to ensure the

continuing welfare of the class, the District also puts forward evidence of its ability to

finish the job as per its Quality Management Strategy for a continuation of quality

reform, as recognized by Nancy Thaler.  And the District will do so sooner than five

years without the unnecessary burden and unavoidable distraction of yet another layer of

oversight.  (*See*, generally, Ex. 28, Thaler Oct. 6, 2009 Decl.)

## VIII.   CONCLUSION

There is no question that the District's IDD system has been systematically and

systemically reformed.  And there is no going back.  Institutional reform litigation loses

its way when it begins to focus on perfecting the policies of an agency rather than on

correcting substantive legal violations; the perfect should not become the enemy of the

good.

Plaintiffs will no doubt continue the current cycle of relying on anecdotal

evidence and respond with specific examples from the Court Monitor's reports,

identifying the supposed "much work that remains."  But, though the process of

improvement never will (and never should) end, this case is not about creating an ideal

system.  The District should not be held captive to Court orders that reach far beyond the demands of the Constitution.

The facts demonstrating the District's remediation of the underlying violations and the changed circumstances, including the complete transformation of the developmental disabilities service delivery system and the heavy costs that this litigation continues to impose, provide independent and separate grounds requiring that the Consent Order be vacated and the case be dismissed.

The Special Masters' Report does not change this analysis in the least.  Their failure to consider whether the District has met the underlying constitutional requirements is a critical error and one that requires the Court to reject their erroneous findings in their entirety.

For all of these reasons, the District requests that the 1978 Consent Order, and all subsequent orders, be vacated, and the case dismissed.