IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

JOY EVANS, *et al.*,                        )
                                            )
      Plaintiffs,                       )
                                            )
and                                         )
                                            )
UNITED STATES OF AMERICA,                   )
                                            )
      Plaintiff-Intervenor,             )    Civil Action No. 76-293 (ESH/JMF)
v.                                          )
                                            )
                                            )
ADRIAN M. FENTY, *et al.*,                  )
                                            )
                                            )
      Defendants.                       )
_____)

**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTERS' REPORT AND RECOMMENDATION, AND OPPOSITION TO THEIR MOTION TO VACATE ALL PRIOR ORDERS AND DISMISS THE CASE**

## TABLE OF CONTENTS

**Table of Authorities**                                                                 v

**Introduction**                                                                         1

**I.    The Special Masters' Report and Recommendation Should Be
        Affirmed And Adopted.**                                                          4

    *A.    The Special Masters' Report and Recommendation Is
        the Product of a Deliberative, Substantive Process.*                             4

    *B.    Defendants' Substantive Objections To the Special
        Masters' Report and Recommendation Are Not Well-Taken
        and Should Be Rejected.*                                                         7

        1.    The Special Masters Applied the Correct Legal Standard          8

        2.    The District's Objections to the Special Masters' Report are
                Unsupported and Without Merit.                                           9

            (a)    Nature of the Objections                                 9

            (b)    Use of Court Monitor Reports                             10

            (c)    Objection Regarding Sawyer Declaration                   13

            (d)    Objection Regarding Health Resources Partnership
                        Report                                                          14

    *C.    The Defendants' Effort to Introduce New Evidence After the Record
        Has Been Closed Should Be Rejected.*                                             16

    *D.    Because There are Ongoing Constitutional and Federal Law
        Violations and Violations of Court Orders Designed to Remedy
        Those Violations, The Court Has Broad Remedial Authority to
        Enforce Its Orders.*                                                            17

        1.    The Special Masters' Relied Upon A Correct Analysis of
                the Supreme Court's Leading Remedial Decisions.                          18

        2.    The Court Has the Authority to Appoint a Judicial Officer

|  |  | to Bring About Compliance in this Case. | 20 |

| | 3. | Other Courts Have Appointed Administrators or Other Judicial Officers. | 20 |

| | 4. | The Court Has the Authority to Appoint the Independent Compliance Administrator Recommended by the Special Masters. | 22 |

| E. | | *The Factors Established in Jerry M. Are Satisfied Even Though They Are of Limited Relevance Since the Plaintiffs Did Not Request the Appointment of a Receiver and the Special Masters Did Not Recommend a Receiver.* | 24 |

| | 1. | Repeated Failures to Comply with the Court's Orders | 25 |

| | 2. | Leadership to Turn the Tide | 25 |

| | 3. | Confrontation and Delay | 26 |

| | 4. | Whether a Receiver Can Provide a Quick and Effective Remedy | 26 |

| **II.** | | **The Defendants' Motions to Vacate And Dismiss Should Be Denied.** | 28 |

| A. | | *The Original 1978 Consent Order Was Grounded In Violations of Federal Law.* | 29 |

| B. | | *Each Successive Order in the 1980s and 1990s Was Based Upon Violations of Prior Orders and Federal Law.* | 31 |

| C. | | *The 2001 Compliance Plan and Order Defines Standards for Complying with Federal Law But Does Not Dictate the Means for Achieving Compliance.* | 35 |

| D. | | *There Has Been No Material Change in Federal Law Since the Court Entered Its Original Findings and Order.* | 38 |

| | 1. | *Youngberg* Confirmed the Rights to Protection from Harm, Freedom from Restraint, and Adequate Habilitation. | 39 |

| | 2. | Several Courts of Appeal Have Concluded, After *Youngberg,* That Institutionalized Persons Have a Right to Adequate Habilitation in the Community. | 43 |

| | 3. | Olmstead Confirmed the Right to Be Free from | |

|  |  | Unnecessary Institutionalization and to Live in the Most Integrated Community Setting. | 46 |

| | 4. | *Rufo* Does Not Require that Consent Decrees Be Modified Any Time There is A Subsequent Legal Decision. | 48 |

| E. | | *The Court's Findings and the Special Masters' Findings of Noncompliance with Court Orders and Federal Law Demonstrate a Persistent and Longstanding Pattern That Has Not Been Altered Over Thirty Years.* | 50 |

| | 1. | The Court's 2007 Decision Found Ongoing and Persistent Violations of Prior Orders and Federal Law. | 50 |

| | 2. | The Special Masters' Findings Underscore Ongoing and Persistent Violations of Prior Orders and Federal Law. | 51 |

| | | a. Health and Medical Care | 51 |

| | | b. Safety | 52 |

| | | c. Welfare and Habilitation | 53 |

| | 3. | The Defendants Have Never Been in Compliance With Any of the Court's Orders, Have Never Petitioned the Court to Be Found in Compliance, and Do Not Claim to Be in Compliance Today. | 55 |

| F. | | *The District's Requested Relief is Drastic and Will Create Disputes.* | 56 |

| **III.** | | **The Supreme Court's Decision in *Horne v. Flores* Does Not Require Vacating All Orders of the Court and Dismissing This Case.** | 57 |

| A. | | *Horne Did Not Announce a New Rule for Determining When to Modify Judgments or Decrees Under Rule 60(b)(5).* | 57 |

| B. | | *Horne Did Not Modify the Fundamental Principle That Parties to Consent Decrees Must Fulfill Their Obligations in Those Decrees.* | 61 |

| C. | | *Since the Court's Orders and the 2001 Plan Represent Necessary Actions to Comply with Federal Law or to Address Conditions That Flow From the Federal Law Violations,* Horne *and* Milliken *Require Compliance With The Provisions of These Orders.* | 65 |

iii

1.      The 2001 Plan And Order Embodies the "Flexible Approach" Required in Rule 60(b)(5) Determinations.      68

    a.      The Outcomes represent the defendants' own view of what is needed to cure federal law violations.      68

    b.      The Action Steps designed to achieve the Outcomes are flexible and may be adjusted by the defendants if they are not effective or if there are superior methods of achieving compliance.      69

    c.      The Outcomes and Actions are not enforceable precisely to ensure flexibility, but at the same time, they must be achieved in order to cure federal law violations.      69

D.      *Even the Most Expansive Interpretation of Horne Does Not Require Dismissal of a Case Where the Court Has Found Ongoing and Current Violations of Its Orders and Federal Law and Where the Court's Special Masters Have Concluded that There Is No Durable Remedy in Sight to Cure Those Violations.*      71

    1.      There Are Ongoing Violations of Constitutional and Federal Law and the Court's Orders.      71

    2.      The Defendants Have Not Met the Standards for Modifying or Vacating a Court Order Under Fed. R. Civ. P. 60(b)(5).      72

    3.      Given the Pattern of Noncompliance and Recent Findings of the District Court and Special Masters, There Is No "Durable Remedy" That Justifies Vacating All Orders of the Court.      79

E.      *Horne Simply Applied Rule 60(b)(5) Authority to a Remarkably Unusual Set of Facts Which Are Not Present in this Case.*      84

IV.    **Conclusion**      86

# TABLE OF AUTHORITIES

## CASES

*Agostini v. Felton*, 521 U.S. 203 (1997)                                             58

*Armstead v. Coler*, 914 F.2d 1464 (11th Cir. 1990)                                   45

*Association for Retarded Citizens of North Dakota v. Olson*, 561 F.                   41
Supp. 473 (D.C.N.D. 1982)

*Blackman v. District of Columbia*, 454 F. Supp. 2d 1 (D.D.C. 2006)              5, 21, 24

*Board of Educ. v. Dowell*, 498 U.S. 237 (1991)                                  59, 65, 70

*C.A.B. v. Duby*, Civil No. 91-321-P-C (1994, Maine Dist. Ct.)                          5

*Charles Q. v. Houstoun*, No. 1:CV-95-280 (M.D. Pa. April 22, 1996)                    47

*Clark v. Cohen,* 749 F. 2d 79 (3rd Cir. 1986)                                       43, 44

*Cooper v. Noble*, 33 F.3d 540 (5th Cir. 1994)                                         73

*David C. v. Leavitt*, 242 F.3d 1206 (10th Cir. 2001)                                  73

*Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289                    11, 47, 48
(E.D.N.Y. 2009)

*District of Columbia v. Jerry M.,* 738 A.2d 1206 (D.C. 1999)                        21, 24

*Dixon v. Barry*, 967 F. Supp. 535 (D.D.C. 1997)                                     21, 24

*EBI-Detroit, Inc. v. City of Detroit*, 2008 WL 2130472 *11 (6th Cir.,                 21
May 22, 2008)

*Escalera v. New York City Hous. Auth.*, 924 F. Supp. 1323 (S.D.N.Y.                   73
1996)

*Evans v. Barry*, 1996 WL 451054 (D.D.C.)                                              35

*Evans v. Fenty,* 480 F. Supp. 2d 280 (D.D.C. 2007).                              *passim*

*Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978)                             *passim*

*Evans v. Williams,* 139 F. Supp. 2d 79 (D.D.C. 2001).     35, 37

*Evans v. Williams*, 206 F.3d 1292 (D.C. Cir. 2000)     1

*Feagley v. Waddill,* 868 F.2d1437 (5th Cir. 1989)     45

*Firefighters* v. *City of Cleveland*, 478 U.S. 501 (1986)     *passim*

*Freeman v. Pitts*, 503 U.S. 467 (1992)     60

*Frew v. Hawkins*, 540 U.S. 431(2004)     *passim*

*Glover v. Johnson*, 138 F.3d 229 (6th Cir. 1998)     21

*Glover v. Johnson*, 934 F.2d 703 (6th Cir. 1991)     21

*Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1(1979)     39

*Hadix v. Johnson*, 896 F. Supp. 697 (D. Mich. 1995)     73

*Halderman by Halderman v. Pennhurst State School and Hosp.*, 901 F.2d 311 (3rd Cir. 1990)     40

*Helen L. v. DiDario*, 46 F.3d 325 (3d Cir. 1995), *cert. denied sub nom Pennsylvania Secretary of Public Welfare v. Idell S.,* 116 S. Ct. 64 (1995)     47

*Horne v. Flores*, 129 S. Ct. 2579 (2009)     *passim*

*Hutto v. Finney*, 427 U.S. 678 (1978)     17, 18, 19, 20

*Ingram v. Wright,* 430 U. S. 651; 97 S.Ct. 1401 (1977)     39

*Inmates of Suffolk County Jail v. Rufo*, 148 F.R.D. 14 (D. Mass. 1993)     73

*Jackson by Jackson v. Fort Stanton Hosp. and Training School*, 757 F. Supp. 1243 (D.N.M. 1990)     41

*LaSahwn A. v. Dixon,* 762 F. Supp. 959 (D.D.C,1991)     40, 41

*LaShawn A. v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993)     21

vi

*League of United Latin American Citizens v. Entz*, 999 F.2d 831 (5th Cir. 1993) — 65

*Lelsz v. Kavanagh,* 673 F. Supp. 828 (N.D. Tex. 1987) — 41

*Milliken v. Bradley*, 433 U.S. 267 (1977) — *passim*

*Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976) — 19

*NLRB v. Harris Teeter Supermarkets*, 215 F. 3d 32 (D.C. Cir. 2000) — 74

*Olmstead v. L.C.* 527 U.S. 581 (1999) — *passim*

*PA Dept. of Corrections v Yeskey*, 524 U.S. 206 (1998) — 46

*PA Sec. of Pub. Welfare v. Idell S.*, 116 S. Ct. 64 (1995) — 47

*Petties v. District of Columbia*, 227 F.3d 469 (D.C. Cir. 2000) — 20, 21

*Pigford v. Veneman,*, 292 F.3d 918 (D.C. Cir. 2002) — 72

*Reed v. Rhodes*, 635 F.2d 556 (6th Cir. 1980) — 23

*Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367 (1992) — *passim*

*S.H. v. Edwards*, 886 F.2d 292 (11th Cir. 1989) — 43, 44

*Small v. Hunt*, 98 F. 3d 1013 (6th Cir. 1994) — 73

*Society for Goodwill to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d Cir. 1984) — 45

*State of New York v. Microsoft Corporation*, 531 F. Supp. 2d 141 (D.D.C. 2008) — 72

*Swann v. Charlotte-Mecklenberg Bd. Of Ed.*, 402 U.S. 1 (1971) — 17, 18, 19, 20

*Thomas S. by Brooks v. Flaherty*, 902 F.2d 250 (4th Cir. 1990) — 41, 43, 44, 45

*Thomas S. by Brooks v. Flaherty*, 699 F. Supp. 1178 (W.D.N.C. 1988) — 41

*Thomas S. v. Morrow*, 781 F.2d 367 (1986). — 40, 43

*United States v. Paradise*, 480 U.S. 149 (1987) — 18

*United States v. United Shoe Machinery Corp.,* 391 U.S. 244 (1968)                                    18

*Vanguards of Cleveland v. Cleveland*; 23 F.3d 1013 (6th Cir. 1994)                              73

*Wyatt v. Alderholt*, 503 F.2d 1305 (5th Cir. 1974).                                          44

*Wyatt v. Hanan*, No. 3195-N (M.D. Ala. March 6, 1995)                                          47

*Youngberg* v. *Romeo,* 457 U.S. 307 (1982)                                                *passim*

## STATUTES. RULES AND REGULATIONS

Fed. R. Civ. P. 12(b)(6)                                                                          2

Fed. R. Civ. P.60(b)                                                                          2, 48

Fed. R. Civ. P. 60(b)(5)                                                                      *passim*

Fed. R. Civ. P. 60(c)(1)                                                                          48

Fed. R. Civ. P. 70                                                                              20

42 U.S.C. §§ 12101-12213                                                                      46

42 U.S.C. §§ 12131-34                                                                          46

28 C.F.R. §35.130(b)(7)                                                                          47

28 C.F.R. §35.130(d)                                                                          46, 47

D.C. CODE § 7-1303.04                                                                          40

D.C. CODE § 7-1304.11                                                                          81

## MISCELLANEOUS

(Charles F. Sabel & William H. Simon, *Destabilization Rights: How
Public Law Litigation Succeeds,* 117 Harv. L. Rev. 1015, 1032-35)                          36

**Introduction**

Plaintiffs demonstrated to two knowledgeable Special Masters that the District's continued failure to meet the requirements of federal law can best be remedied by the appointment of an Independent Compliance Administrator charged with concluding this case within three years.  The Special Masters' findings and conclusions are fully supported, logical, and compelling.  The proposed remedy draws its essence from the unique nature of this case.  When implemented, the remedy will allow the District to join the rest of the Nation in providing to its most vulnerable population what the Constitution requires.

The District has not presented a principled or substantiated objection to what the Special Masters have recommended.  Yes, the District seized upon the fortuitous issuance of the *Horne* decision to try to change the subject, but the District's approach evaporates as one reads it.  Over 30 years after this Court entered the Consent Order[1], the District asserts a legal position that apparently eluded *all* of the predecessors of this Court[2], of Mayor Fenty, and of current-Attorney General Nickles.[3]  First, the District argues that "the 1978 Consent Order, and subsequent orders issued pursuant to it, impose requirements that exceed the constitutional minimum standards applicable to Plaintiffs' Fifth and Eight[h] Amendment right to be free from harm and their Fifth

---

[1]  For the convenience of the Court, the plaintiffs have attached the 1978 Court Order, *Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978) as Exhibit 1.  Throughout this memorandum, the Order is cited to the Federal Supplement.

[2]  Judge John Pratt entered the 1978 order and presided over the case until 1995.  Judge Stanley Harris and this Court have presided over the last 14 years.  D.C. Circuit Judges Silberman, Williams, and Ginsburg reviewed the 1978 order and its progeny extensively 10 years ago when the District sought to modify the consent decree.  *See Evans v. Williams*, 206 F.3d 1292 (D.C. Cir. 2000).

[3]  Among the men and women who served as Corporation Counsel (now Attorney General) since the consent order was entered were Chuck Ruff, John Payton, Fred Cooke, Bob Spagnoletti, Linda Singer; and Judges John Suda, Robert Rigsby, John Ferren, Inez Smith Reid, and Vanessa Ruiz.

Amendment right to receive habilitative care and treatment."[4] Second, the District says that it "does not consent to any further court supervision or continuation of this case."[5]

The District's position is disingenuous, and its reading of *Horne* dangerous.  If the 1978 Consent Order were truly "extra-constitutional,"[6] the District's recourse was a timely appeal (if one *can* appeal a consent order); if the District had a 12(b)(6) motion, it should have pursued it during the Carter Administration.  And if the District had a sustainable argument that the 1978 Consent Order has been satisfied, it would have made that argument long ago – and certainly should have presented that case in the trial before the Special Masters.  But unable to establish the genuine compliance necessary to end the case, the current Attorney General wants to change the rules of engagement to see if that will end the case.  This is a fundamentally lawless conclusion that the Court must resist strongly.

In this matter, *Horne* is a distraction, not a solution.  The Supreme Court did not overrule any precedents when it cautioned trial courts to "apply[ ] a flexible standard that seeks to return control to state and local officials as soon as a violation of federal law has been remedied."[7]  The Court certainly did not suggest that it was changing the standard for assessing a violation of federal law, nor did it hint that Rule 60(b) could be used to challenge the underlying legal conclusions that were reached years ago.  The District could not prove to the Special Masters in

---

[4]    *See* Memorandum in Support of Defendants' Motion to Vacate Consent Orders and to Dismiss Action, Doc. 1138 at 17.  Plaintiffs are following the ECF-assigned page numbers throughout the document, which includes the renewed motion and the memorandum.

[5]    *See id*  at 18.

[6]    *See id*  at 20.

[7]    *See Horne v. Flores*, 129 S. Ct. 2579 (2009).  While not essential to plaintiffs' argument, it should be added that the Supreme Court devoted much of its analysis to the unique concerns of federalism under our constitutional system, and it is not clear that those same concerns are implicated in a case brought against the District of Columbia.

2008-2009 that it was in compliance with federal law, just as it had failed to prove compliance to this Court in 2006-2007. At the end of an extensive trial on the specific question of remedy, the Special Masters did not find that a "durable remedy has been implemented."[8] Indeed, the District and its witnesses did not argue that a durable remedy had been implemented; at best, it argued that a durable remedy could be implemented or was in the process of being developed to be implemented. The District refused to put before the Special Masters a proposed remedy—durable or otherwise—and cannot now be heard to complain that the Special Masters found against them on this issue.[9]

The District also cannot argue that "equity" grants it special exemption from the normal rules of adjudication, or that it is somehow "unfair" or contrary to *Horne* for the Court to impose limits. The District's response to every review of its actions is submitting new affidavits or declarations or documents, and insisting that it cannot be judged on how it performed yesterday so long as it can raise a question about how it is performing today. The District has essentially conceded that its "remedy" is not "durable."[10] For if the goal post is constantly being moved, the District will ultimately prevail—when the last of the plaintiffs has died. That is not why this suit was brought and has been prosecuted for 30 years. A workable, durable solution is now at hand, as formulated by the Special Masters, and the Court should implement that solution as soon as

---

[8]    *See id.* at 13.

[9]    The Special Masters even proposed a hybrid remedy which would involve providing Laura Nuss with additional authority. The District said no. *See* Special Masters' Report, Doc. 1131 at 135.

[10]    Webster's defines "durable" as "able to exist for a long time with retention of original qualities, abilities, or capabilities . . . unchangeable, strong." The District's own evidence in this motion and before the Special Masters betrayed its conclusion that what it was doing for the class was fluid and temporal—so much so that it is afraid to be judged on how it performed last month or last year. One can only prove "durability" with reference to the passage of "a long time," not starting with last week's Director's report.

3

possible.

I.     **The Special Masters' Report And Recommendation Should Be Affirmed And Adopted.**

    A.     *The Special Masters' Report and Recommendation Is The Product of a Deliberative, Substantive Process.*

The Special Masters' Report and Recommendation Regarding a Remedy for Defendants' Noncompliance With Court Orders (Doc. 1131) (the "Special Masters' Report") reflects an exhaustive analysis of an extensive record.  Relying upon the Court Monitor's reports, the Columbus Organization's mortality investigations, statements of deficiencies issued by the Health Regulatory Licensing Administration, Incident Management Enforcement Unit reports, and correspondence among District of Columbia agencies, as well as sworn declarations and testimony of the key witnesses and decision-makers, the Special Masters found that the defendants continue to violate federal law by denying class members the adequate medical, dental and behavioral health care which is required under the Constitution; by failing to ensure class members' right to be free from harm; and by failing to ensure class members' right to habilitative day programs in the least restrictive and most integrated settings.  Special Masters' Report, Doc. 1131 at 31, 41, 67, 74.

The Special Masters' work was the second stage of a process the plaintiffs initiated in 2006 when they filed a motion for noncompliance and for appointment of a receiver.[11]  This Court, having found the District in systemic, continuous and serious violation of the requirements of federal law in March 2007, could have imposed a remedy at that time.  But the Court stayed its hand pending the accumulation of additional evidence regarding the District's

---

[11]     *See* Doc. 809, copy attached as <u>Exhibit 2</u>.

4

actions and plans, and the analysis of remedies. The Court authorized the Special Masters[12] to make findings and recommendations addressing "the current status" of defendants' compliance, options to cure the identified deficiencies, and whether receivership would be the most effective remedy.[13]

In 2007, the parties negotiated an agreed-upon program to demonstrate the District's ability to deliver on short-term goals of increasing provider capacity and improving class members' health, safety, and welfare. The 90-day program, reflected in the September 12, 2007 Consent Order (Doc. 938, Exhibit 5), was welcomed by the Court as a "way for the District to show at the remedy phase that they could get things done." (May 15, 2008 Status Conf Tr. 51:11-12, Exhibit 6). But the District couldn't show that. Instead it confirmed its inability to comply fully with limited and focused orders, even when it had a hand in formulating those orders. As the Special Masters concluded, "Despite a new leadership team at DDS and in the Office of the Attorney General, and the supervision of their work by the Mayor's office, the end result is substantially the same as it has been in the past – substantial noncompliance with these limited and focused Court Orders." [14]

---

[12]    Special Master Farrell is a law professor and former federal judicial fellow with expertise in public health and mental health law in national and international jurisdictions. Special Master. Sundram, a nationally recognized expert on community programs for individuals with psychiatric and developmental disabilities, has served on court-monitoring boards in several institutional reform cases and consulted in more than 20 states and for the U.S. Department of Justice on issues including protection from abuse and neglect, restraint and seclusion, investigations, and quality assurance. He also serves as the Special Master in *C.A.B. v. Duby*, Civil No. 91-321-P-C (D. Ct. Me. 1994) and as an expert in *Blackman v. District of Columbia*, 2006 WL 2456413 (D.C. Cir. 2006).

[13]    *See Evans v. Fenty*, 480 F. Supp. 2d 280, 326 (D.D.C. 2007). *See* also Supplemental Order of Reference, Doc. 920, copy attached as Exhibit 3. Plaintiffs first sought a receiver, but changed that request to a special administrator. *See* Doc. 985, copy attached as Exhibit 4, at 2.

[14]    *See* Special Masters' Report Regarding the September 12, 2007 Consent Order, Doc. 1001, relevant portions of which are attached as Exhibit 7, at 108.

After conducting a three-day trial, hearing testimony from 12 witnesses in December 2008, and reviewing comprehensive post-trial memoranda, proposed findings of fact and conclusions of law, and over 200 exhibits, the Special Masters concluded that "based on a record of events extending from November 2006 (when the record before the Court closed) to the end of 2008 . . .defendants continue to be in serious noncompliance with critical provisions of outstanding court orders." *See* Special Masters' Report, Doc. 1131 at 3.

The Special Masters' initial recommendation that DDS Deputy Director Nuss expand her responsibilities and become a hybrid compliance officer to oversee necessary actions to achieve compliance was rejected by the District. *Id.* at 3, 141-43.   Their final recommendation that the Court appoint an Independent Compliance Administrator is well-supported by the evidence of ongoing noncompliance and interagency disarray, not to mention the District's abandonment of compliance with the Court's 2004 order requiring an interagency coordinator within the District's executive office.[15]   As the Special Masters found:  "This is…not a case about the lack of good intentions or an unwillingness within DDS/DDA to comply with court orders. Rather, it's about inadequate governmental capacity, as well as a lack of single-minded focus and priority at all levels of government to achieve compliance."  Special Masters' Report, Doc. 1131 at 124.

An Independent Compliance Administrator's responsibilities would include actions to secure timely provision of appropriate services to class members, and, within three years:

- achieve compliance with outstanding orders, including the 2001 Plan[16];

---

[15]      *See* Doc. 685, attached as <u>Exhibit 25</u>.

[16]      The 2001 Compliance Plan is included in the Defendants' Renewed Motion as <u>Exhibit 3</u>, attached as Doc. 1138-4.

- coordinate the defendants' submission of evidence of compliance so that the District can be relieved from continuing supervision of the court orders;

- direct District personnel to perform necessary functions to meet those goals;

- oversee a planned transition of monitoring responsibilities from the Court Monitor to the Quality Trust as compliance is achieved.

The Special Masters' findings and recommendation should be adopted. It is crucial that the Court swiftly appoint an individual with the requisite powers and authorities to finally compel compliance with the Court's orders. The ongoing failures of government systems to respond with a sense of urgency to the needs of this class have "real and adverse consequences:"

> [A]ccess to medical care is needlessly delayed while class members suffer pain, deterioration and other adverse consequences; incidents are not reported as required and investigations are not completed timely and the implementation of recommendations is also delayed, leading to the same recommendations being made again and harm to class members continuing; despite court orders, and promises to improve, business processes continue largely as they always have, with gaps in communication and coordination between agencies around important decisions.

*Id.* at 124-125.

As the Special Masters concluded, based on the "clear and convincing evidentiary record of non-compliance" the Court should appoint "an Independent Compliance Administrator empowered by and accountable to the Court to bring about compliance and end this lawsuit." *id* at 128.

> B.   *Defendants' Substantive Objections To the Special Masters' Report and Recommendation Are Not Well-Taken and Should Be Rejected.*

The District makes two kinds of objections to the Special Masters' Report. First, it challenges the legal standard used by the Masters—namely their analysis of the Court's authority to impose a remedy and the nature of that remedy. Second, the District makes a half-hearted challenge to the Special Masters' findings. On this second prong, the District's argument is not

that the findings were without substantial support in the record, but more that the Masters did not "credit" the District enough for the points the District raised.   However, both branches of the District's objections should be rejected.

1.      The Special Masters Applied the Correct Legal Standard.[17]

The Special Masters applied the proper legal standard during the remedial phase of this case to conclude that the defendants have violated court orders and to recommend that the Court appoint an Independent Compliance Administrator.   They adopted the same legal standard which the Court used in the liability stage of the case, when it found that the defendants continued to violate the requirements of federal law.   *See Evans v. Fenty,* 480 F. Supp. 2d 280, 295 (D.D.C. 2007).   The Court held that the 2001 Plan incorporates relevant court orders, and that violations of the 2001 Plan constitute violations of those orders.   The Court concluded that evidence that defendants have failed to perform the agreed-to tasks and to meet the agreed-to outcome criteria set forth in the Plan to satisfy those orders is evidence of noncompliance with existing court orders.   *id*  at 295-96.   This is precisely the analysis used by the Special Masters, and was plainly correct.

The defendants now fault the Special Masters for measuring their performance against long-standing court orders rather than an alleged "constitutional minimum," which the District never placed before the Special Masters.   Not once during the earlier liability stage nor during the trial on remedy did the defendants raise any issues about constitutional standards, or contend that they had satisfied their constitutional obligations.   They did not mention the Constitution in a pre-trial filing; no witness testified about the constitutional standards at trial.   Only now, in their

---

[17]      For a detailed discussion of the legal standard for compliance, *see* section III, *infra*, and its discussion of *Horne*.

8

post-trial filings, the District suggests that somehow "the underlying constitutional violations upon which this case was based some 30 years ago have been ameliorated" and as a result, no remedy is required.[18]  Doc. 1074 at 95-96, Doc. 1082-3 at 3.

The Special Masters applied the legal standard which the Court directed and which the Court adopted in its earlier findings.  That standard, which simply asks whether the defendants have met their obligations under numerous, agreed-to court orders that were designed to redress federal law violations and to define compliance with the underlying federal rights, was plainly correct.  That standard was correct when used by the Court in 2007, and continues to be correct for the remedial phase of the same motion.[19]

    2.    The District's Objections To the Special Masters' Report are Unsupported and Without Merit.

*(a) Nature of the Objections*.  The District attached as Exhibit 23 to its Motion to Vacate a document labeled "Defendants' Objections to the Special Masters' August 14, 2009 Report and Recommendation Regarding a Remedy."  Normally, a party objects to the findings of a master or court by identifying the finding, stating why the finding is without support in the record or is contrary to more compelling evidence, and identifying where in the record the contrary evidence

---

[18]    In a footnote, the defendants further represent that "the circumstances supporting the initial [1978] Complaint" were remedied by the closing of Forest Haven in 1991, and "the case should have ended soon after the District removed every person from Forest Haven and placed them in residential settings." Doc. 1074 at 96, n.13. The defendants are using a new tactic to seek the same result.  In 2006, they tried to convince the Court that provisions of the 1978 Consent Decree included under the heading, "Interim Operation of Forest Haven" no longer applied.  The Court gave short shrift to that approach, holding that each provision of the Consent Decree pertaining to class members' care in the community was incorporated into the 2001 Plan — with the defendants' consent — "as a 'specific provision of [the] outstanding Court Orders that must be complied with.'" 480 F. Supp. 2d at 294, n.25.

[19]    The District's complaint that the Special Masters did not properly account for *Horne* is nonsensical when the trial was conducted in late 2008 and early 2009, the draft report was circulated on May 22, 2009 and *Horne* was not issued until June 25, 2009.  Moreover, the Special Masters were tasked with recommending a remedy for a found violation, not weighing whether earlier court orders should be modified.

was proffered.  But here, the District starts by making the important concession that what the

Special Masters describe in their findings is already "well-documented":

> The Special Masters devote six pages to the remedy and one hundred thirty
> pages to a needless repetition of the well-documented thirty-three year
> history of the case, much of which is no longer relevant.[20]

The District then identifies a relative handful of nuances in the Special Masters' weighing of the

well-documented facts, and seeks to refute them not based on record evidence, but on affidavits

and other evidence created *after* the close of the hearing.

For example, consider the District's "objections" regarding the Special Masters'

discussion of the important issues of mental and behavioral health care, found at Paragraphs 28-

34 of the Defendants' Objections (pp. 9-11).  Most of the "objections" are unsupported arguments

regarding facts and claims not raised by the District in the actual hearing.[21]

*(b)   Use of Court Monitor Reports*.   The Special Masters cited and relied upon

information furnished through the reports of the Court Monitor.  There was no error in that

reliance.  Throughout this litigation, the Court has consistently relied on the Court Monitor to

report on the current status of class members.  The 1978 Consent Decree required the defendants

to hire an expert, then called a Developmental Disabilities Professional (DDP), to assist them and

the Court "in coordinating and carrying out the implementation of the provisions of this Order"

to redress their violations of constitutional law.  *See Evans,* 459 F. Supp. at 485, Exhibit 1.  Over

the years, the title changed to Court Monitor, but the core responsibilities remained the same.

The Monitor shall "observe, monitor, report findings, and make recommendations to the parties,

---

[20]     *See* Defendants' Objections , Doc. 1138-24 at 2 ¶ 2.

[21]     *See*, e.g., Paragraphs 30, 33 (relying on an affidavit of Laura Nuss never submitted to the Special Masters); *id.* at Paragraph 34 (asserting, without citation, that the Special Masters "ignore[d] the progress being made in the provision of both mental and behavioral health care").

10

Special Master and the Court concerning the implementation of this Court's Orders . . . [and]. . . the findings, recommendations and reports of the Court Monitor. . . may be introduced as evidence when relevant and admissible in accordance with the Federal Rules of Evidence."  480 F. Supp. 2d at 296-297, *citing* November 21, 2000 Appointment Order.    The parties have long agreed that an external, independent expert who reports to the Court should evaluate the defendants' implementation of their court-ordered obligations.  *id* at 296.

As evidenced by the multiple findings of noncompliance, up to and including the Special Masters' findings, the Court Monitor's reports often are not favorable to the defendants.  In response, the defendants have resurrected the same "shoot the messenger" approach they tried three years ago during their unsuccessful attempt to forestall yet another finding of noncompliance.  Now, as then, they challenge the statistical validity of the Monitor's extensive reviews.  In 2007, the Court rejected this argument.  The Court recognized that the Monitor has "reviewed randomly-selected subsets of class members quarter after quarter, and her findings are remarkably consistent in many respects," provide "significant data" and "will be considered as evidence of whether defendants have complied with Court Orders."  *id*  at 297.

The Monitor, an accomplished developmental disability professional whose appointment was approved by the defendants,[22] continues to provide "significant data" for the Court.  In the past three years, the Court Monitor has reviewed the health care of 355 class members at least once and 15% of those class members more than once.  Special Masters' Report, Doc. 1131 at 14.  The Monitor's review process and methodology — how many class members she selects,

---

[22]     Ms. Jones' expertise was acknowledged in the recent landmark federal court decision, *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289 (E.D.N.Y. 2009).  The District's Attorney General, Peter Nickles, also has acknowledged her professionalism and in fact, recommended her to the Court for the position as *Evans* Court Monitor.  May 15, 2008 Status Conf. Tr. 43:12-15. Exhibit 8.

how she selects them, how she separates the at-risk and the non-risk populations, and how she assesses class members' needs and services — has been cited with approval by the Court on multiple occasions.[23]   Her findings continue to inform the Court about the current status of class members in the context of the defendants' compliance with implementation of their court-ordered obligations.

As the Special Masters found, the Monitor's reviews have revealed a "consistent pattern of significant deficiencies in important indicators of the quality of health care provided to class members." *Id.*  These findings are reliable, have been determined by the Court to be reliable, and were properly relied upon by the Special Masters.

Moreover, the Monitor's findings are consistent with the deficiencies identified in the defendants' own investigations and reports.  *Id.* at 17.  Even the defendants' expert statistician, John Sumner, recognized that "the information in the Court Monitor's reports can support a general 'qualitative opinion based on recurrent observation.'" Trial Tr. at 380:4-11, Exhibit 10. He also testified that "you can establish a trend based on [the Monitor's] factual findings."  Trial Tr. 389:24-390:3, Exhibit 11.   As the Masters pointed out, Dr. Sumner allowed that the Monitor's reviews have "tremendous value" when "determining whether defendants were meeting or not meeting specific 'criteria' in the court orders." Special Masters' Report, Doc. 1131 at 13, *citing* Trial Tr. 387-388.   Despite the testimony of their own expert and the acknowledged expertise of the Court Monitor, the defendants seek to dismiss the Monitor's

---

[23]     The Monitor detailed in her September 2008 report how she used a computer program to randomly select 70 class members for a review of their services. Monitor's Report at 7, September 10, 2008, Exhibit 9.  In addition to those class members, the Monitor reviewed 72 class members in May 2008, 59 in January 2008, 37 in August 2007, 79 in April 2007 and 76 class members in January 2007. *See* Special Masters' Report, Doc. 1131 at 14-15.

reports as having "limited" or "marginal value."[24]  Doc. 1138-24 at ¶ 13, ¶ 18.

The Special Masters recognized that the Monitor's findings are "substantially accurate and reliable evidence of the defendants' overall performance with respect to their obligations under court orders."  Special Masters' Report, Doc. 1131 at 17-18.  In addition, the Special Masters properly rejected the defendants' suggestion that the Monitor's role is to compare the District's performance with other agencies in other jurisdictions.  *Id.* at 11.  The Monitors' job is to gather information and report on the defendants' implementation efforts.  *Id.* at 12.  And that is exactly what she does and what she did.

For years, the Monitor has provided invaluable factual information to the parties and to the Court on the defendants' implementation efforts.  The Monitor's reviews consistently have been considered, and often considered conclusive, when determining whether the defendants are complying with this Court's Orders.  It was not error for the Court to rely on this data in its 2007 liability findings, and it is not error now for the Masters to do so in their remedial determination. Therefore, the defendants' objections to the Special Masters' Report and Recommendation based on this claim should be rejected.

(c)  *Objection Regarding Sawyer Declaration.*  One evidentiary objection articulated by the District was the treatment of the declaration of Kathy Sawyer.  The Special Masters properly excluded the re-submission of Kathy Sawyer's direct testimony, which was proffered by the defendants without being subjected to cross-examination.[25]

---

[24]     The defendants do not challenge the Monitor's findings when they present data that is favorable to the District. The defendants relied upon the Monitor's reports in their proposed findings for the Court's 2007 decision, 480 F. Supp. 2d at 297, and in their renewed motion to vacate the *Evans* court orders, Doc. 1138 at 46, 47 n.35.

[25]     *See* Plaintiffs' Opposition to Defendants' Objections to Order Granting In Part and Denying in Part Motion to Strike, Doc. 1084, <u>Exhibit 12</u>.

In interrogatory responses filed in July 2008, and again in the joint pre-trial statement filed in October (Doc. 1032 at 22), the defendants represented that they would call Ms. Sawyer as a witness at trial, and they filed Ms. Sawyer's direct testimony in the form of a sworn declaration, which was reviewed by the Special Masters before the hearing. Moments before she was slated to take the stand, the defendants abruptly announced that Ms. Sawyer would not be called as a witness: "We've withdrawn the witness, and more importantly, we withdrew the direct testimony. There is no direct testimony." Trial Tr. at 581:12-14, Exhibit 13.[26] To ameliorate the obvious prejudice of "withdrawing" a witness who has already testified on direct,[27] the plaintiffs requested the opportunity to submit a deposition designation for Ms. Sawyer, which the plaintiffs would have done had the District not already submitted her direct testimony. The Special Masters not only granted the plaintiffs' request, but they also permitted the defendants to submit responsive deposition counter-designations.

Instead of complying with the Special Masters' Order, the defendants filed twenty pages of Ms. Sawyer's questioning by her own counsel as well as her withdrawn direct testimony in its entirety. In response to the plaintiffs' motion to strike Ms. Sawyer's direct testimony as well specific excerpts included in the defendants' responsive counter-designations, see Doc. 1061, Exhibit 14, the Special Masters struck Ms. Sawyer's direct testimony but allowed the excerpts into the record.[28] As the Special Masters pointed out, the defendants attempted to "have their

---

[26]     Defendants also withdrew the direct testimony of their expert witness Antone Aboud, who also had been in the courtroom, waiting to testify.

[27]     See Exhibit 13 at 581:17-19 (Special Master Sundram: "The unfortunate thing, Ms. Mullen, is that both Special Master Farrell and I have spent some time reading Ms. Sawyer's direct testimony.").

[28]     See Special Masters' Order Granting in Part and Denying in Part Plaintiffs' Motion to Strike, Doc. 1075, Exhibit 15.

cake, *i.e.* the Declaration on the record, and eat it too, *i.e.,* prevent cross-examination of the declarant by the Plaintiffs." Exhibit 15, at 8. The Special Masters also allowed the defendants the opportunity to re-introduce the declaration in full if they made Ms. Sawyer available for cross-examination by the plaintiffs, but the District refused that invitation. The Special Masters did not abuse their considerable discretion regarding the conduct of the hearing in the way in which they handled the District's trial tactics.

(d) *Objection Regarding Health Resources Partnership Report.*   The Special Masters' reference to a December 30, 2007 report by the defendants' healthcare partner, the District of Columbia Health Resources Partnership (DCHRP), about class members' inadequate mental health services was not improper.[29]   The Masters pointed out that DCHRP findings are consistent with the testimony offered by the defendants' expert, David Jackson, namely that "the shortage of mental health professionals willing to provide services to class members is…an issue of the lack of mental health services in the inner city in the District", Special Masters' Report, Doc. 1131 at 36, *citing* Jackson Decl. at 8, ¶ 10 (k), and with findings by the Court Monitor about substandard psychiatric practices.  Special Masters' Report, Doc. 1131 at 36-37, *citing* Monitor's Report at 10, Sept. 10, 2008; Monitor's Report at 7, August 2, 2007.  Since the Masters exercised reasonable discretion in considering the report as it already was before the Court, and since the defendants suffered no prejudice by its admission, the defendants' claim that the Masters should

---

[29]    The DCHRP report is part of the Court record, and was submitted by the defendants in response to the September 12, 2007 Consent Order. *See* Special Masters' Report and Recommendation Regarding the September 12, 2007 Consent Order, Doc. 1001 at 52, Exhibit 16.

not have referenced the DCHRP report should be rejected.[30]

C.     *The Defendants' Effort to Introduce New Evidence After the Record Has Been Closed Should Be Rejected.*

If it were up to the defendants, the Court would never be able to make a ruling or issue an order because they would always have one more report, one more plan or one more initiative that had yet to yield results, and one more document that still had to be reviewed by the Court.  But the Court has been clear: "The record is closed. I have to close it.  I have to move on."  June 18, 2009 Status Conf. Tr. 64:5-6, Exhibit 18.

Even though the trial on the remedy ended December 12, 2008, the defendants have persisted to this day in submitting evidence that was not created until after the close of the record.  Although the Court and the Special Masters have afforded them significant leeway and allowed some additional information into the record, they demand the right to submit new evidence that has not been subject to cross-examination or scrutiny, in an effort to stave off the imposition of any remedial action.  Indeed, their "objections" to the work of the Special Masters regarding the conduct of a trial in December 2008 depends substantially on an affidavit the District drafted for Ms. Nuss some six months after the end of the trial and nearly a month after the District had in hand the draft report of the Special Masters.

The remedial trial is over.  It is plainly unfair to the plaintiffs, and, more importantly, to the Court and its Special Masters, to insist on a continually-evolving record and to demand consideration of such a late post-trial declaration without the plaintiffs having the opportunity to cross-examine Ms. Nuss and test her facts.  As the Court already has pointed out, its review

---

[30]     The District has also failed to show the prejudice in the Special Masters' reference to a January 2009 document in their discussion of bad faith, since the Special Masters concluded that the District had not acted in bad faith. Special Masters' Report, Doc. 1131 at 118-19; *see* also, Special Masters' Ruling Regarding Evidentiary Objections, Doc. 1099 at 3-4, Exhibit 17.

16

cannot be based on a "moving target."  Feb. 6, 2007 Status Conference Tr. 23:18-21, Exhibit 19.

Even a *de novo* review, the Court admonished, "doesn't mean that we're opening up the record

and you start all over again."  Aug. 19, 2009 Status Conference Tr. 18:8-9, Exhibit 20.

The defendants' assertion that the Special Masters based their recommendation of a

remedy on "stale facts" and "nonexistent problems" is without merit.  The Special Masters did

what they were charged to do.  They considered the changes made by the Fenty Administration

and the progress the Administration has made through December 2008—less than six months

before the Special Masters' Report was issued.  They also considered the overwhelming evidence

of the defendants' current noncompliance with court orders, based upon a three-day trial with

twelve witnesses and over 200 exhibits.  Just because the case "sounds in equity," that does not

prevent adjudications and issuance of orders, much less imposition of rules and procedures

including the closing of the record.

> D.  **Because There are Ongoing Constitutional and Federal Law Violations and Violations of Court Orders Designed to Remedy Those Violations, The Court Has Broad Remedial Authority to Enforce Its Orders.**

As the Supreme Court recently observed: "It goes without saying that federal courts must

vigilantly enforce federal law and must not hesitate in awarding necessary relief."  *Horne*, 129 S.

Ct. at 2594.   Federal courts have the unquestionable authority to impose broad and prospective

relief to address the noncompliance with court orders and ongoing constitutional and federal law

violations that are prevalent in the instant case.   *Horne*, 129 S. Ct. at 2594; *Swann v. Charlotte-

Mecklenberg Bd. of Ed.*, 402 U.S. 1, 15 (1971); *Hutto v. Finney*, 427 U.S. 678, 687 (1978).   The

defendants' continued violation of class members' constitutional rights and their failure to

comply with orders of this Court mean that plaintiffs do not get even minimally adequate care

and treatment and that their health, safety and welfare continue to be significantly comprised.

17

1.     The Special Masters Relied Upon A Correct Analysis of the Supreme Court's Leading Remedial Decisions.

The defendants mischaracterize the leading Supreme Court remedial cases to support their position that no remedy is available to the plaintiff class. *See Swann*, 402 U.S. at 15; *Hutto*, 427 U.S. at 687.  They insist that these cases hold that relief can be entered only on the showing of an ongoing constitutional violation. Doc. 1138 at 75.   But *Swann* and *Hutto* do not limit the remedies available to the plaintiffs to violations of minimal constitutional standards.   As discussed in section III (C), *infra,* federal courts have broad authority to address the conditions that flow from constitutional as well as federal law violations.  *See Milliken v. Bradley,* 433 U.S. 267 (1977).   Moreover, as discussed in section III (B), *infra*, federal courts have authority to ensure full compliance with court-ordered consent decrees designed to remedy federal law violations.

The Special Masters are correct in finding that these cases support the Court's equitable authority to grant prospective relief to bring about compliance and to "remedy past wrongs." *Swann,*  402 U.S. at 15 ("district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies"); *United States v. Paradise*, 480 U.S. 149, 170-71, 183-84 (1987) (plurality opinion) (enhanced relief justified by defendant's violation of prior orders and need to ensure compliance with federal court orders); *Hutto,* 437 U.S. at 687.

Justice Stevens, concurring in the Court's judgment in *Paradise*, observed:  "In this case, the record discloses an egregious violation of the Equal Protection Clause.  It follows, therefore, that the District Court had broad and flexible authority to remedy the wrongs resulting from this violation. . . ."  *Paradise*, 480 U.S. at 190; *see also United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 251-52 (1968) ("If the decree has not, after 10 years, achieved its 'principal

18

objects,' … the time has come to prescribe other, and if necessary more definitive means to achieve the result.  A decade is enough.").

Therefore, this Court has ample justification for prescribing, and clear authority to enter, a detailed, comprehensive remedial order designed to "insure against the risk of inadequate compliance" in the future.  *Hutto*, 437 U.S. at 687; *Dixon v. Barry*, 967 F. Supp. 535, 551-52 (D.D.C. 1997).

Moreover, this Court has the authority to enter the relief recommended by the Special Masters, even if the Court were to adopt the defendants' interpretation of *Hutto* and *Swann* and determine that a constitutional violation was a condition precedent for the ordering of broad remedial relief.  The Court's March 2007 liability decision and the Special Masters' August 2009 Report and Recommendation on Remedy have found constitutional violations that continue to the present day.  *See* section II (E), *infra*.

More than three decades after the first court order in this case, the defendants still are violating their court-ordered obligations, as evidenced by the Special Masters' Report and Recommendation on Remedy, the Special Masters' Findings regarding the September 12, 2007 Consent Order, the Court Monitor's reports and her consultants' reports for 2007 and 2008, and perhaps most importantly, the defendants' own documents.  The Court has given the defendants ample time to prove themselves since it issued its liability decision. Despite the Court's patience and deference in affording the Fenty Administration almost two years to demonstrate both significant progress as well as compliance with very focused consent orders, the defendants have failed to improve the service delivery system's outcomes for class members in any appreciable way.   Time has proven that "the usual remedies are inadequate," thereby justifying resort to "less common ones … to get the job done." *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir.

1976).  An Independent Compliance Administrator as recommended by the Special Masters is an appropriate and necessary remedy.

> 2.      The Court Has the Authority to Appoint a Judicial Officer to Bring About Compliance in this Case.

The defendants' argument that Federal Rule of Civil Procedure 70 is inapplicable to the present case also is not supported by the simple language of the Rule.

> If a judgment requires a party . . . *to perform any other specific act* and the party fails to comply within the time specified, the court may order the act to be done — at the disobedient party's expense — by another person appointed by the court. When done, the act has the same effect as if done by the party. (emphasis added).

The defendants have, as the Court and the Special Masters have found, failed to perform many specific acts over a period spanning more than three decades.  This lack of performance is exactly what is intended by the plain language of Rule 70.  Therefore, the defendants' assertion that Fed. R. Civ. P. 70 does not apply to the present case is flatly wrong and should be dismissed summarily by the Court.

Most importantly, the Court has the authority under its broad equitable powers, as well as under Rule 70, to appoint someone to discharge the judgment and to fulfill the duties which have gone unfulfilled.  Given the breadth of this equitable authority, as interpreted by the Supreme Court in *Swann, Milliken, and Hutto,* the defendants' debate about the limitations of these rules is somewhat beside the point.

> 3.      Other Courts Have Appointed Administrators or Other Judicial Officers.

The use of such a court-appointed Administrator is an established practice in this jurisdiction.  It is a remedy that the District agreed to in the *Petties* litigation, *see Petties v. District of Columbia*, 1:95-cv-00148-PLF, Doc. 1118, Exhibit 21; *see also* 227 F.3d 469 (D.C.Cir. 2000) — and with good reason.  The Special Administrator in *Petties* has been highly

20

effective in addressing longstanding problems in the District's public school transportation system.

Beyond the *Petties* model, there are other examples of similar judicially-appointed or judicially-supervised administrators. For instance, the Mayor of Detroit was appointed special administrator over the city's water and sewer department. His authority includes entering into and performing all contracts involving the city's wastewater treatment plant without approval of the City Council, even if that requires him to waive competitive bidding requirements — a scope of power that was affirmed by the Sixth Circuit. *See EBI-Detroit, Inc. v. City of Detroit*, 2008 WL 2130472 *11 (6th Cir., May 22, 2008).

Similar appointments are often involved in institutional reform litigation. For instance, in *Glover v. Johnson*, 934 F.2d 703 (6th Cir. 1991), the Sixth Circuit Court of Appeals affirmed the district's court's order directing prison officials to appoint a special administrator to devise and implement a remedial plan. *Glover v. Johnson*, 138 F.3d 229 (6th Cir. 1998) (later order discussing remedial plan and implementation).

Significantly, appointment of a judicial officer to bring about compliance is not new to the District of Columbia. As the Special Masters detail in their Report, in at least four suits filed against the District of Columbia, courts have made similar judicial appointments to bring foundering District agencies into compliance with long-standing court orders. Special Masters' Report, Doc. 1131 at 105, *citing LaShawn A. v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993); *Petties v. District of Columbia*, 227 F.3d 469 (D.C. Cir. 2000); *Blackman v. District of Columbia*, 454 F. Supp. 2d 1 (D.D.C. 2006) and *District of Columbia v. Jerry M.,* 738 A.2d 1206 (D.C. 1999). Like *Evans*, these cases involved vulnerable plaintiffs seeking "judicial enforcement of their adjudicated constitutional or statutory rights"; were based upon consent decrees that recognized

21

their constitutional or statutory obligation to the plaintiffs; and were required because the District failed to comply with court orders "intended to bring about the effectuation of plaintiffs' rights." Special Masters' Report, Doc. 1131 at 106.

> 4.   The Court Has the Authority to Appoint The Independent Compliance Administrator Recommended by the Special Masters**.**

The Independent Compliance Administrator recommended by the Special Masters is a remedy that draws its essence from the unique history of this case.  The Court recognized years ago that what this case needs—what this class needs—is someone with the authority to work through and, if necessary around, the bureaucratic hurdles affecting the delivery of services, the supervision of providers, and the payment of vendors and personnel.  Over the last half-dozen years, by agreement or by order, that function had been assigned to a deputy mayor (or two or three or four), a city administrator, and even the Mayor's counsel.  But as the evidence at trial made plain, these previous efforts were ineffective and fell into disuse.

The Special Masters make explicit in their Report and Recommendation that an Independent Compliance Administrator differs from a court-appointed receiver:

> The Independent Compliance Administrator is not intended to have the powers of a receiver or to generally displace the powers and authority of agency heads or subordinate officers.   Rather, the authority and role of the Independent Compliance Administrator is limited to actions necessary to achieve compliance with the court orders within a three year period.

*Id.* at 134.  The Independent Compliance Administrator does not "take over" for the defendants: her powers are limited to protecting the parties to the litigation and effectuating compliance with their rights.  She is not given preemptive authority to override local laws, but must seek approval from the court on a case-by-case basis.  *Id.* at 103.  The Independent Compliance Administrator is similar to the paradigm proposed by the plaintiffs' expert, Lewis Harry Spence, who testified

22

about a court-appointed official embedded in District government who "function[s] at the elbow of the current leadership," Spence, Trial Tr. 60:4-8, and has only the authority necessary to achieve compliance with the Court's orders.  *Id*. at 63:14-16.[31]  As the Sixth Circuit explained in a case involving a court-appointed "desegregation administrator":

> We have carefully considered the arguments of the appellant that the requirement of a court-appointed desegregation administrator is in reality an order placing the Cleveland school system in receivership.  Though the powers to be exercised by the administrator are broad, they are confined to implementation of the district court's remedial orders in this desegregation case.

*See Reed v. Rhodes*, 635 F.2d 556, (6th Cir. 1980), cited in Special Masters' Report, Doc. 1131 at 101.

As the Special Masters detail, the Independent Compliance Administrator would have focused authority over only those District of Columbia government agencies that directly serve or oversee class members including the Department on Disability Services, the Health Regulation and Licensing Administration, and the Department on Health Care Finance, solely as they relate to *Evans* class members.  The Independent Compliance Administrator would not displace agency or department heads, but instead would work with them to oversee budget, personnel, procurement, licensing and enforcement of those agencies only to the extent necessary to achieve compliance.  The Administrator also would report to the Court if there are "specific local laws which pose significant obstacles to achieving compliance, together with specific recommendations for additional relief that may be warranted…"  Special Masters' Report, Doc. 1131 at 138.

The defendants' argument that the Independent Compliance Administrator has "sweeping power" because the Administrator can "ignore local law" is ironic.   As the Special Masters

---

[31]     Spence testimony excerpts consolidated in <u>Exhibit 22</u>.

remind the Court, the defendants recently agreed to such a provision regarding procurement laws in the *Blackman* case to enable the District to provide necessary services to children in special education as quickly as possible. *Id.* at 137. Also, the District petitioned the Court in 2006 to suspend contracting and procurement laws in order to quickly bring in new service providers to replace a provider that was leaving the District. *Id.* at 137 n.130. Therefore, the District clearly recognizes the importance of suspending local laws when critical to meet the needs of vulnerable populations. No more is required by the Special Masters' recommended remedy here.

> E. *The Factors Established in Jerry M. Are Satisfied Even Though They Are of Limited Relevance Since the Plaintiffs Did Not Request the Appointment of a Receiver and the Special Masters Did Not Recommend a Receiver.*

In its March 30, 2007 decision the Court indicated that since receivership "should be undertaken only when absolutely necessary" and as a "remedy of last resort," that the six *Jerry M.* factors were among those it would consider in determining the most viable option to effectuate compliance with court orders. *Evans*, 480 F. Supp. 2d at 326; *citing District of Columbia v. Jerry M.*, 738 A. 2d 1206, 1213 (D.C. 1999). The *Jerry M.* factors are: "'(1) whether there were repeated failures to comply with the Court's orders'; (2) whether further efforts to secure compliance would only lead to 'confrontation and delay'; (3) whether leadership is available which can 'turn the tide within a reasonable time period'; (4) 'whether there was bad faith'; (5) 'whether resources are being wasted'; and, (6) 'whether a receiver can provide a quick and efficient remedy.'" *Id.* (quoting *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997)).

As the Special Masters point out, no court has held all six factors must be satisfied. Special Masters' Report, Doc. 1131 at 116. The Masters found the following four factors are satisfied:

1.     *Repeated Failures to Comply with the Court's Orders.*

The District Court already has determined in its March 30, 2007 decision that the defendants – yet again – are in systemic, continuous and serious noncompliance with court orders, including the 2001 Plan, the 1983 Consent Order, the 1981 Consent Order, and the 1978 Judgment and Consent Order holding that individuals with mental retardation have constitutional rights to be free from harm and unnecessary restraint, and to habilitative care.   The Special Masters have found that from the time of the Court's March 2007 decision to the present, the defendants continue to violate the Court's orders.   The defendants' noncompliance also extends to the Court's January 21, 2004 *sua sponte* Order (Exhibit 25) and the September 12, 2007 Consent Order (Doc. 938, Exhibit 5).   The defendants' "Notice" filed in November 2007, Doc. 951, Exhibit 23, is further evidence of their continued and conceded noncompliance.   Based on "the voluminous and well developed evidentiary record" (Special Masters' Report, Doc. 1131 at 3), the Masters appropriately concluded that "there are ongoing failures to comply with Court Orders over an extended period of time, to the detriment of class members' interests."  *Id.* at 116.

During the three-day trial in December 2008, the defendants failed to produce any evidence that they are in compliance with this Court's orders or with the Constitution.   As the Special Masters note, "[n]otably, in all of their voluminous filings, Defendants do not claim to be complying with the Court Orders."  *Id*.

2.   *Leadership to Turn the Tide*

As the Special Masters found, the serious deficiencies in health, safety and welfare have not been eliminated. "Despite a new leadership team at DDS and in the Office of the Attorney General, and supervision of their work by the Mayor's office, the end result is substantially the same as it has been in the past — significant noncompliance with these limited and focused

25

Court Orders." Exhibit 7 at 108. The Masters note that many of the proposed and ongoing reforms are "in the planning stages and have not been fully implemented. Whether the efforts of this new leadership team will prove successful remains to be seen." Special Masters' Report, Doc. 1131 at 118. As Ms. Nuss testified, "So I think it's taking time to see the outcomes." *Id.* at 118, n.114, *citing* Trial Tr. 167-168.

3.     *Confrontation and Delay*

Throughout its 33-year history, this case has been characterized by the District's persistent noncompliance, highly contentious litigation, court orders, consent judgments and, by any measure, poor outcomes for the plaintiffs. There is no rational basis to believe that this decades-old pattern will change, absent some extraordinary relief ordered by the Court that is designed to vindicate the rights of the plaintiffs. The Special Masters recognize that the defendants' litigation tactics, such as requests to hold the plaintiffs' motion for relief in abeyance, their request for a stay of the remedial proceedings, and their most recent motion to vacate the court orders in this case without providing evidence of compliance with this Court's orders or the Constitution, are all attempts to delay relief to the plaintiff class. Special Masters' Report, Doc. 1131 at 117.

4.     *Whether a Receiver Can Provide a Quick and Effective Remedy*

The *Evans* case is a "veritable trail of broken promises and unperformed obligations which have resulted in regular, serious, systemic and demonstrable harm to class members." *Id.* at 122. The Special Masters conclude there is "inadequate governmental capacity, as well as lack of a single-minded focus and priority at all levels of government to achieve compliance." *Id.* at 124. The District's systems are "Balkanized and dysfunctional and do not act with the coherence of purpose or a sense of urgency that is warranted." *Id.*

26

Under the Special Masters' model, "the Independent Compliance Administrator will serve as the focal point for the compliance efforts of the defendants and work in close collaboration with them." *Id.* at 134.   As Mr. Spence explained, an independent judicial officer would bring "the laser focus of the Court, and the authority and support of the Court to the defendants to facilitate their compliance efforts.  Focus is a critical part of what the Court can bring to bear."  Spence Decl., Exhibit 24, ¶ 63.

It is clear that the appointment of a senior District official to the role created pursuant to the *sua sponte* 2004 Order has not achieved its intent: "greater coordination among District of Columbia agencies which have responsibilities for actions that are necessary to achieve compliance with the 2001 Plan."  Exhibit 25, at 1.  As the Masters pointed out:

> What is missing is evidence of leadership or coordination by the Mayoral designee[32]—the central point of the order—to give focus, direction and priority to interagency communication and coordination, to identify planned actions of one agency that may adversely affect the mission of another and to take proactive steps to prevent such a consequence. In the absence of evidence of such efforts, the interagency steps at the staff level between agencies have not been consistently successful, and gaps in communication and coordination have resulted in harm to class members as has been described earlier.

Special Masters' Report, Doc. 1131 at 90.

As indicated by the last 30 years — including two years of the Fenty Administration — maintaining the status quo cannot be the remedy.  "Time has shown that the problems with interagency coordination persist under the Fenty Administration as they had under the previous administration, and have resulted in the same sub-standard conditions, lack of necessary medical care, as well as inappropriate and ineffective day programs." *Id.* at 129.  Compliance will not occur because of the mere passage of time.

---

[32]    Attorney General Nickles is the sixth designee since the Order issued in 2004. Significantly, none of the leadership at the agencies that must coordinate their activities knew of his designation and most never heard of the Order.  Trial Tr. 254:20-23; 525:6-10, Exhibit 26.

The defendants cite "generally" to the testimony of their expert witness, Nancy Thaler, for the proposition that systems change often takes three to five years in situations "far-less complicated and far-reaching" than the District's predicament.   Doc. 1138 at 83.   The defendants argue that since the Fenty Administration has been in place for two years, they only need three more, and suggest that if the Court were to go away, they could achieve change much faster. *Id*.

There is no evidence that the "systems change" referenced by Ms. Thaler is the same as curing violations of the Constitution, federal law or the Court's orders.   Also, there is no evidence that the District has taken the necessary steps in the first two years of the Fenty Administration to actually complete the systems change that Ms. Thaler references, not to mention to achieve compliance with existing orders.   As the Masters noted, the defendants do not claim to be in compliance and do not propose a plan for coming into compliance.   Special Masters' Report, Doc. 1131 at 130.   Moreover, as the Masters found, the promises of the Fenty Administration far outstrip its performance.   Thus, there is simply no evidence – and in fact there is evidence to the contrary – to support the view that the first two years of accomplishments that Ms. Thaler hoped for have been achieved.

A court-appointed Independent Compliance Administrator with the singular focus on achieving compliance with court orders and protecting the class members' interests is essential to provide a quick and effective remedy to the defendants' longstanding noncompliance.   Without this remedial appointment little is likely to change in the near future, and the Court will be mired in this litigation for the indefinite future.

## II.     The Defendants' Motion to Vacate And Dismiss Should Be Denied.

The primary thrust of the District's Renewed Motions to Vacate and Dismiss is an

argument that the original 1978 consent order and final judgment was flawed.  That argument starts from a cramped assessment of what the Court found in 1978, and is combined with a revisionism that is contradicted by the actual evidence presented in Court and to the Special Masters.

A.     *The Original 1978 Consent Order Was Grounded In Violations of Federal Law.*

In response to a lawsuit contesting harmful conditions and substandard care at Forest Haven, the Court in 1978 found the District of Columbia violated class members' federal constitutional rights by subjecting them to harm, neglect and abuse and denying them appropriate services and supports.   Specifically, the 1978 Final Judgment and Order held that defendants violated class members' federal constitutional right under the Fifth and Eighth Amendments to be free from harm, 459 F. Supp. at 484, Exhibit 1; and class members' federal constitutional right under the Due Process Clause of the Fifth Amendment to liberty, to be free from inappropriate restraint, to avoid unnecessary institutionalization; and to receive adequate habilitative care and treatment. *Id.*

The Court held that the violations of these rights required the District of Columbia to take all necessary actions to remedy these constitutional deficiencies.  *Id.* at 484-88.   The defendants then entered into a Consent Order that addressed the Court's findings and the violations of federal law.

In order to remedy the violations of federal law with respect to the right to safety and to be free from harm, the Court ordered, and the defendants agreed, to:

- provide case management, and all necessary mechanisms to monitor class members' health, safety and welfare, and ensure they receive appropriate services, *id.* at 485-86;

- ensure class members are not subject to "[a]cts of physical or psychological abuse, neglect or mistreatment", *id.* at 488; and

- promptly investigate and report all such incidents, *id.*

In order to remedy the violations of federal law with respect to the right to liberty and freedom from excessive restraint, the Court ordered, and the defendants agreed, to:

- ensure class members are not held in seclusion, *id.*;

- ensure class members are free from unnecessary restraints and that staff abide by specific parameters governing the use of restraints and other time-out procedures, *id.* at 488-89;

- ensure class members are not subjected to aversive behavior modification techniques, *id.* at 489;

- ensure class members are not administered excessive or unnecessary medication, and that medication is not used as punishment, for staff convenience or as a substitute for programming, *id.*;

- provide training to staff who administer medication and ensure a physician monitors class members' medication at least monthly, *id.*; and

- ensure class members are not denied habilitative programming as punishment, *id.*

In order to remedy the violations of federal law with respect to the right to habilitative care and treatment, the Court ordered, and the defendants agreed, to:

- provide every class member an individualized habilitation plan based on individualized assessments in accordance with professional judgment, *id.* at 484-85;

- provide class members with adequate medical and dental care and other health-related services, *id.* at 489;

- ensure all class members are assessed for adaptive equipment and that those who need it, receive it, *id.*;

- ensure class members receive nourishing, well-balanced diets, and that staff follow class members' feeding protocols, *id.*;

30

- end admissions to Forest Haven and begin a phased deinstitutionalization of residents (class members) to the community, *id.* at 488;

- set up individualized community living arrangements for each class member, including community based day programs and services "as are necessary to provide them with minimally adequate habilitation…. in the least separate, most integrated and least restrictive community services," with no more than 8 class members in a single home, excepting medical circumstances, *id.* at 485;

- develop a plan to safeguard class members' personal possessions, including finances, *id.* at 487;

- develop a staff recruitment and staff training plan, *id.* at 486; and

- secure sufficient funding for the deinstitutionalization process, *id.* at 487.

The Court noted that during the pendency of the then two-year litigation, the defendants had "initiated policies and practices which conform to some of the provisions" of the Order. *Id.* at 484. However, their efforts fell short, leading to multiple contempt findings and consent orders in the ensuing years. As the *Evans* Rights Chart[33], <u>Exhibit 27</u>, illustrates, the subsequent orders were based upon the same constitutional and federal law violations — safety, liberty, freedom from restraint, and habilitation — and reaffirmed the defendants' agreed-to obligations to remedy these ongoing violations of federal law and the Constitution. *See* Rights Chart, column 2, <u>Exhibit 27</u>.

     B.     *Each Successive Order in the 1980s and 1990s Was Based Upon Violations of Prior Orders and Federal Law.*

In their zeal to squeeze this case into the *Horne* template, the defendants ignore the salient history of the case. For *Evans* has not been marked by successive intrusions of the judiciary into new areas formerly reserved to the District or outside the scope of the original

---

[33]     The chart tracks the orders and findings entered in this case from 1978 to 2009 in regard to safety, health, and welfare—the core areas of noncompliance identified by the Court in the March 30, 2007 decision on liability.

order. Rather, as the class members were transitioning from their confinement at Forest Haven to the community, there was an associated change not in the District's obligations to the class but in the context in which those obligations were required to be met.

In January 1981, the plaintiffs and the plaintiff-intervenor United States filed motions for contempt and for enforcement of the 1978 Consent Order based upon allegations of a lack of adequate staffing to ensure safety and to provide habilitation as well as serious deficiencies in treatment. In response, the defendants entered into another Consent Order on June 25, 1981. This time, the defendants agreed to, and the Court ordered, "measures being necessary to the implementation of this Court's Order of June 14, 1978 (hereinafter 'the Final Order')." *Evans v. Barry*, No. 76-293, Consent Order at 1 (D.D.C. 1981) (attached as Exhibit 28).

Grounded in federal law, these measures built on the constitutional violations and obligations delineated in the 1978 Consent Order. *See* Rights Chart, column 3, Exhibit 27. They addressed many of the same issues as those listed in the 1978 Order: staff vacancies, staff recruitment, and staff training. The 1981 Order further specified that direct care staff receive priority for training programs; that individualized assessments and habilitation plans, "conform to the standards set forth in the Final Order", by July 1, 1982; and that plans be revised and reviewed annually. 1981 Order at 3-4, Exhibit 28. It also obligated the defendants to contract with an outside agency to conduct the assessments and complete the habilitation plans mandated by the 1978 Consent Order. *Id.* at 4.

The 1981 Consent Order also required the defendants to prioritize the implementation of the individual habilitation programs of class members who are assaultive, self-injurious, abusive, mentally ill, or who have acute medical needs, and to allocate funds for class members' needed adaptive equipment, as set forth in the 1978 Order. *Id.* at 6-7. Building on the 1978 Consent

Order, the 1981 Order further provided that "[n]o class member shall be outplaced without an appropriate day program and living arrangement, or without adequate case management support." *Id.* at 7

But as before, these measures proved inadequate.  As a result, in June of 1982, the plaintiffs and plaintiff-intervenor again filed motions for contempt against the District.  In response to these filings, the defendants entered a third Consent Order on February 8, 1983, which again re-stated and re-affirmed the District's obligations set forth in the 1978 Consent Order to remedy constitutional violations, protect class members from harm, and provide adequate medical care, treatment plans, case management and habilitative care and treatment in appropriate community settings with community-based day programs and services.  *Evans v. Barry*, No. 76-293, Consent Order (D.D.C. 1983) (hereafter 1983 Consent Order, attached as Exhibit 29).  *See* Rights Chart, column 4, Exhibit 27.  In particular, the 1983 Consent Order called upon the defendants to provide one-to-one staffing for class members who need such supports, 1983 Consent Order, Exhibit 29, at III-7; to establish caseload limits for case managers; *id.* at III-9; to create an incident management process as part of its abuse and neglect reporting protocol, *id.* at V; to provide data about assessments and individual habilitation plans within specific time periods, *id.* at VI; to report on the safekeeping of class members' finances. *id.* at VII.; and to provide at least 5 hours of programming for class members. *Id.* at VIII.  In addition, the 1983 Consent Order required the defendants to pay vendors on time, *id.* at IX-10; and place all class members in the community by the end of fiscal year 1988, i*d.* at IX-1.  Once again, the defendants did not meet their obligations.

So once again, in July 1989 the plaintiffs and the plaintiff-intervenor filed motions for contempt.  The Court found the defendants in civil contempt, pointing out that it had "no

alternative except to find that the District of Columbia has been in consistent and continuing violation of the three Consent Orders." 480 F. Supp. 2d at 284, *citing Evans,* Jan. 30, 1990 Order.

The defendants' constitutional and federal-law violations[34] continued after Forest Haven closed in 1991 and class members moved to alternative settings. In May 1995, the Court once again found the defendants in contempt of its orders; in October that same year, the Court held that they violated class members' constitutional right to minimally adequate habilitation as set forth in paragraph II.5.b of the 1978 Consent Order. *Evans v. Barry*, Findings of Fact and Conclusions of Law, ¶¶ 17-22 (Oct. 11, 1995), Exhibit 30. Case manager-to-class member ratios, required to be held at 1 to 60 under the 1983 Consent Order, skyrocketed to at least 1 to 95, according to the defendants, and as high as 1 to 114, according to the Court Monitor. *Id.* ¶¶ 14-16. The Court held that the defendants' conceded-to failure to pay providers of residential and community habilitation services "created the real potential for harm to class members. A collapse of the community-based system in place virtually certainly would return *Evans* class members to an institutional setting similar to that from whence they came." *Id.* ¶ 21.

In response to the defendants' "history of noncompliance," the Court appointed its first Special Master "to evaluate and ensure defendants' compliance with the Court's Orders and Consent Decrees . . . and to recommend remedies for any deficiencies in defendants' compliance with the Orders." *Evans v. Barry*, Order of Reference at 2 (Oct. 11, 1995) (attached as Exhibit 31). In August of 1996, the Court adopted the Special Master's Remedial Plan, which addressed the defendants' constitutional obligations to develop and implement class members' individual

---

[34]   The Americans with Disabilities Act, signed into law on July 26, 1990, establishes the right under federal law to be free from unnecessary segregation and institutionalization and to be provided appropriate integrated services in the community. *See* 42 U.S.C. §§ 12101-12213.

habilitation plans and provide adequate habilitation and care for class members. *See Evans v. Barry*, 1996 WL 451054 (D.D.C.), <u>Exhibit 32</u>. *See also* Rights Chart, column 5, <u>Exhibit 27</u>. The Court castigated the defendants for their "unrelenting contempt" of its Orders and their failure to hire enough case managers and to make timely payments to the providers on whom class members depend for habilitative and residential supports:

> Defendants have, for over two years, chronically and unapologetically violated the terms of nearly every aspect of this Court's multiple Consent Orders. Defendants' unrelenting contempt of this Court's orders, and their seeming inability to bring themselves into compliance therewith, have created chaos for the care providers vested with the day-to-day responsibility for members of this plaintiff class. The plaintiffs comprising this class, as the defendants well know, are ill-equipped to adjust to or defend against the city's failure to assist their care providers in giving them the care and treatment they desperately need.

<u>Exhibit 31</u> at *2.

C.      *The 2001 Compliance Plan and Order Defines Standards for Complying with Federal Law But Does Not Dictate the Means for Achieving Compliance.*

In 1999, the Court again found defendants in contempt of its orders and ordered the parties to develop a plan to bring the defendants into compliance so that the litigation eventually could end.     This led to the 2001 Compliance Plan, developed by the Special Masters in collaboration with the parties, and heralded by the Court as "a careful and detailed blueprint for achieving compliance with the Court's Orders, for the development of permanent and independent mechanisms to safeguard the rights of class members, and for the phased withdrawal of judicial oversight of the District of Columbia's mental retardation system." *Evans v. Williams,* 139 F. Supp. 2d 79 at 81 (D.D.C. 2001).

Grounded on the 1978 Consent Order, the 2001 Plan outlined the defendants' constitutional obligations and federal law requirements under the 1978, 1981 and 1983 Consent Orders; the agreed-upon action steps for meeting those requirements within particular

35

timeframes; and the agreed-upon outcome criteria to measure compliance.  *See* Rights Chart, Exhibit 27, Column 6.  The Plan covered habilitation, health, safety, protection from harm, safekeeping of personal possessions and finances, case management, internal and external monitoring, quality assurance and timely payments to vendors – all within the context of the underlying court orders. The Plan specified the necessary actions to meet the requirements of the court orders—new protocols, procedures and training initiatives—but gave the defendants latitude to develop the mechanisms to realize the sought-after outcomes.  As the Special Masters pointed out, the professional literature cites the 2001 Plan "as an example of a court order which gave the defendants control of the ways and means of achieving compliance." *See* Special Masters' Report, Doc. 1131 at 123 (*citing* Charles F. Sabel & William H. Simon, *Destabilization Rights: How Public Law Litigation Succeeds,* 117 HARV. L. REV. 1015, 1032-35(2004)).

For every action step, the Plan listed outcomes that represented the agreed-upon standard of compliance for each federal law requirement.  The defendants agreed to the provisions of the 2001 Plan—the tasks, the outcomes and the compliance standards—and acknowledged their obligations under the Plan to comply with existing Court orders.   As this Court has pointed out, each of these orders and the Plan were necessary to redress the District's systemic failures to ensure the health, safety and well-being of class members.

> In consenting to the entry of these Orders, and in agreeing to the provisions of the Plan, defendants admitted – in 1978, 1981, 1983, and again in 2001 – that the existing system for persons with developmental disabilities in the District of Columbia was seriously flawed. Indeed, defendants stipulated to violations of class members' constitutional rights in the 1978 Consent Order and acknowledged, in the factual findings accompanying the 2001 Plan, that their service delivery system was "broken" and in need of being "redefined and rebuilt."

*Evans v. Fenty*, 480 F. Supp. at 324.

Among the factual findings that the Court references, *supra*, are the defendants' stipulations in 2000 that the District was not complying with the requirements of the *Evans* Court Orders, and that compliance with the court-ordered mandates began to deteriorate after the closure of Forest Haven in the early 1990s. *Evans*, 139 F. Supp. 2d. at 98.[35]

The Court already has dismissed the defendants' argument that they are not bound by the 2001 Plan because it is a non-enforceable document that was approved, but not ordered, by the Court.

> Although the Plan itself was not court-ordered, defendants agreed that their compliance with the underlying Orders would be measured based on their ability to achieve the outcomes specified in the Plan and that their failure to perform the tasks identified in the Plan would be evidence of noncompliance with those Orders.

480 F. Supp. 2d. at 324. As the 2001 Plan points out, all of the underlying court orders are enforceable in federal court until the defendants comply with its provisions. 2001 Plan at 10-11. The Plan establishes agreed-to compliance criteria for satisfying those orders and for meeting the defendants' obligations to class members under the Constitution and federal law. *Id*. at 7. Significantly, not once in the eight years since the Court approved the 2001 Plan have the defendants alleged compliance with the Plan provisions or the underlying court orders.

And far from being an intrusion into the proper functioning of the District's institutions or

---

[35] These 129 stipulations undermine the defendants' current posture that they cured their constitutional violations to the *Evans* class when Forest Haven closed in 1991. Doc. 1138 at 2. Moreover, the Court already has rejected the defendants' contention that they are no longer bound by provisions of the 1978 Court Order pertaining to the "Interim Operation of Forest Haven." In its March 2007 liability decision, the Court emphasized that each of those 1978 provisions "was incorporated into the 2001 Plan as a 'specific provision of the outstanding Court Orders that must be complied with.'" 480 F. Supp. 2d at 294, n.25 (citing 2001 Plan at 6). The Court noted the defendants consented to the 2001 Plan. "Having affirmed their obligations under these Orders in 2001, nearly a decade after Forest Haven was closed, defendants cannot be heard to argue that the Orders apply only to the operation of that facility." 480 F. Supp. 2d at 294.

an extra-constitutional imposition, the 2001 Plan drew its inspiration and its essence from the following proposition:  The District itself would set the terms for when a durable remedy was achieved.  Within the percentages and measures detailed in that plan, the District drafted the roadmap for its exit from court supervision and a process for ensuring that when it hit those marks, it could be released.

D.     There Has Been No Material Change in Federal Law Since the Court Entered Its Original Findings and Order.

The defendants, faced with the overwhelming evidence of noncompliance found both by the Court in its March 2007 liability decision and the Special Masters in their Report and Recommendation, have attempted to sidestep the findings and change the discussion.   They argue that lost in the 33 years of litigation is the principle that the plaintiffs' constitutionally protected rights to habilitation and safety "are limited in scope" and that the constitutional standards articulated in *Youngberg* v. *Romeo,* 457 U.S. 307 (1982), when applied to the District's provision of services today, mean that they are entitled to a dismissal of the litigation.  Doc. 1138 at 17 (emphasis in original).

The defendants ignore the Court's findings that the 33 years of litigation embody a "tortured history" of noncompliance.   *Evans,* 480 F. Supp. 2d. at 326.  The defendants also ignore the Court's 2007 finding that "there has been systemic, continuous, and serious non-compliance with many of the Court's Orders." *Id.* at 325.   Moreover, defendants barely acknowledge — much less address — the Court's findings of liability and pervasive noncompliance, and the Special Masters' current findings of federal and constitutional law violations as well as violations of the Court's orders.  Finally, the defendants conveniently omit from their argument the fact that they freely entered into consent decrees and agreements several

38

times in the 27 years since *Youngberg* was decided, all based upon violations of the constitutional rights to safety, freedom from restraint, and habilitation that were articulated in the Court's original 1978 Consent Judgment. *See* Rights Chart, <u>Exhibit 27</u>.  Instead, for the first time, the defendants argue that these orders exceed or are inconsistent with the long-established federal rights of class members and, as a result, should be vacated.

   1. *Youngberg* Confirmed the Rights to Protection from Harm, Freedom from Restraint, and Adequate Habilitation.

  In *Youngberg v. Romeo*, the Supreme Court held that individuals with intellectual disabilities who have been involuntarily committed through state legal proceedings have a substantive due process right to safety, freedom from unnecessary restraint, and any training necessary to achieve fulfillment of those rights.[36]  *Youngberg,* 457 U.S. 307 at 315-318.  The Court found that the "right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." *Id.* at 315*,* quoting *Ingram v. Wright,* 430 U. S. 651, 673 (1977). The Court recognized that the right to "liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Youngberg*, 457 U.S. at 316, *citing Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 18 (1979) (Powell, J., concurring in part and dissenting in part).  Finally, the Court held that individuals with disabilities were entitled to training "necessary to avoid unconstitutional infringement" of their rights.[37]  *Youngberg,* 457 U.S. at 318.

---

[36] The state defendant in *Youngberg* had previously conceded that the individuals in its custody had a right to "adequate food, shelter, clothing and medical care" under the Fourteenth Amendment. *id* at 315.

[37] It is noteworthy that Nicholas Romeo's mother did not challenge his involuntary commitment but rather the conditions of his confinement — particularly the right to freedom from bodily restraint and the habilitation necessary to exercise that right.  *Youngberg*, 457 U.S. at 315-18.  The Court specifically found that the case did not present the question of whether there was a more general right to training, "even when no type or amount of training would lead to freedom." *Id.* at 318.  The Fourth Circuit

The defendants in the present case concede that *Evans* class members are entitled to constitutional protections despite their placement in the community.   This consensus is compelled by the laws of the District of Columbia, which has a statutory civil commitment process for individuals with intellectual disabilities who receive services and supports in the community.   D.C. CODE § 7-1303.04 (2008).   Since the vast majority of class members are civilly committed to community programs, they all retain constitutional rights to safety, liberty, freedom from harm, freedom from restraint, and adequate habilitation while they are living in the community.[38]   *See* Defendants' Findings of Fact, Doc. 866 at 21 ¶ 47, September 18, 2006, Exhibit 33.

Numerous lower courts have found violations of the constitutional rights addressed in *Youngberg*, including the right to habilitation, the right to safety and protection from harm, the right to freedom from unnecessary restraint and confinement, and the right to medical and health-related care.   For example, under habilitation, courts have required improvements with respect to adaptive equipment, assistive technology, case management, occupational therapy, physical therapy, programming, speech and language therapies, staffing, staff training, treatment planning, treatment plans, and treatment teams.   *See Halderman by Halderman v. Pennhurst*

---

subsequently held that "[m]uch of *Youngberg* necessarily addresses the situation of a single patient confined to an institution, but the Court did not intend the liberty interests it identified to be limited to these circumstances." *Thomas S. v. Morrow*, 781 F.2d 367, 374 (1986).

[38]   The principle of constitutionally-protected rights to adequate care for individuals in the community who are in the custody and control of the District, has been established for almost two decades. *See* e.g., *LaShawn A. v. Dixon*, 762 F. Supp. 959, 992 (1991).   The District Court in *LaShawn* found that "the rights of children in foster care to be analogous to the rights of the involuntarily committed" and concluded that these children had a right to "reasonably safe placements" in which they would not be harmed. *Id.*   The *LaShawn* Court found that this right is not limited to safety from physical harm, but also extends to psychological and emotional harm. *Id.*   at 993.

*State School and Hosp.*, 901 F.2d 311, 321-22 (3rd Cir. 1990); *Jackson by Jackson v. Fort Stanton Hosp. and Training School*, 757 F. Supp. 1243, 1315-16 (D.N.M. 1990); *Thomas S. by Brooks v. Flaherty*, 699 F. Supp. 1178, 1204 (W.D.N.C. 1988); *Lelsz v. Kavanagh,* 673 F. Supp. 828, 860-62; 864-75 (N.D. Tex. 1987); *Association for Retarded Citizens of North Dakota v. Olson*, 561 F. Supp. 473, 494-95 (D.C.N.D. 1982).   With respect to safety and freedom from harm, courts have ordered states to address accidents and injuries, abuse and neglect, investigations, incident management systems, reporting, data collection, and quality assurance. *See Jackson*, 757 F. Supp. at 1315-16; *Thomas S. by Brooks*, 699 F. Supp. at 1204; *Lelsz,* 673 F. Supp. at 860-61; 864-75; *Olson*, 561 F. Supp. at 494-95.   To remedy violations of the right to be free from excessive restraint and confinement, courts have demanded improvements in discharge planning, discharge plans, restraint standards and procedures, staff training, and data collection. *See Jackson*, 757 F. Supp. at 1315-16; *Thomas S. by Brooks*, 699 F. Supp. at 1204; *Lelsz*, 673 F. Supp. at 861, 864-75; *Olson*, 561 F. Supp. at 494-95.   Finally, to ensure adequate health and medical care, courts have mandated that institutions employ qualified medical staff, maintain adequate medical records, and institute safe drug practices.  *See Jackson*, 757 F. Supp. at 1315; *Thomas S. by Brooks*, 699 F. Supp. at 1204; *Lelsz*, 673 F. Supp. at 865-66.

In the present case, the defendants claim that the 1978 Consent Order adopted a more expansive view of the Fifth Amendment right to habilitative care and treatment than the standard set forth in *Youngberg,*[39] and then argue that this Order, and all subsequent orders of the Court

---

[39]   The defendants also appear to argue that *Youngberg's* professional judgment standard supports their claim, but fail to demonstrate how that standard compels a conclusion that the constitutional violations which supported the 1978 Order contravened that standard.  In fact, the Court's 1978 findings included a determination that the government wholly failed to satisfy that deferential standard.

As Judge Hogan pointed out in *LaShawn v. Dixon*, 762 F. Supp. at 959 "[t]he Supreme Court [in *Youngberg*] acknowledged in a footnote that expert testimony may be relevant for determining whether an

should be vacated.  Doc. 1138 at 29 n.13.  They are wrong on both counts.

First, the Court's initial findings of constitutional violations and subsequent orders to remedy those violations closely track the rights identified by the Supreme Court in *Youngberg*. The 1978 Order was grounded in findings of violations concerning the right to safety and freedom from harm, the right to freedom from excessive restraint, and the right to habilitation. Each of these rights was confirmed by *Youngberg* and each formed the basis for this Court's recent findings almost 30 years later.  *See* Rights Chart, Column 2, Exhibit 27.

The Court's 2007 decision found three violations of federal law:  (1) health/ medical care (2) safety and protection from harm; and, (3) welfare/habilitation.  Each of these three violations is central to the 1978 Consent Order and each is based on findings of violations of constitutional rights to adequate health/medical care, safety and freedom from harm, and welfare/habilitation. *See* Rights Chart, Column 7, Exhibit 27.  Each of the subsequent orders of the Court from 1978-2007, including consent decrees, were based on ongoing violations of these same three rights. *Id.*, Columns 3-6, Exhibit 27.  Thus, the Court's 2007 findings relate directly back to the original 1978 findings of constitutional violations of health/medical care, safety and protection from harm, and welfare/habilitation.

Second, the defendants' position ignores the fact that this Court already has found that "this litigation has resulted in a series of consent orders and remedial plans in which defendants have admitted that class members' constitutional rights have been violated and have agreed to take actions necessary to remedy these constitutional violations."  480 F. Supp. 2d at 281.    If defendants made voluntary commitments to provide the plaintiffs with a more specific standard

---

agency's decisions substantially departed from the requisite professional judgment."  *Youngberg*, 457 U.S. at 323 n.31.

of care than that articulated in *Youngberg,* they did so in response to their admitted violations of class members' constitutional and federal rights and a determination about what was needed to remedy the past wrongs.  Thus, the 1978 Consent Order and subsequent, post-*Youngberg* court orders, consent decrees, and agreements were designed to correct the very same constitutional and federal law deficiencies that the Court found in its 2007 liability decision and continue to this day.

> 2.    Several Courts of Appeal Have Concluded After *Youngberg* That Institutionalized Persons Have a Right to Adequate Habilitation in the Community.

The defendants misleadingly assert that ". . . under *Youngberg* 'there is no constitutional right to care or treatment in a least restrictive alternative setting.'"  Doc. 1138 at 30-31.   This inaccurate statement ignores the holdings of three circuit courts of appeal which found precisely the opposite.  *See Clark v. Cohen,* 794 F.2d 79 (3rd Cir. 1986); *Thomas S. by Brooks*, 902 F.2d. at 255; and *S.H. v. Edwards*, 886 F.2d 292 (11th Cir. 1989).   Each of these courts of appeal applied the holding in *Youngberg*, and held that institutionalized persons have a right to adequate habilitation in the community.  This right primarily is predicated upon the principle that the provision of community services is compensatory for past violations of federal and constitutional law while the individuals were institutionalized. The right to adequate habilitation extends to the community, allowing these courts to address problems or inadequacies of community services.

The Fourth Circuit held in *Thomas S. by Brooks*, a class action involving individuals with intellectual disabilities, that federal courts can remedy the harm suffered by class members when they were institutionalized or inappropriately discharged.  "The object of the remedial order is twofold:  to ameliorate the lingering effects of improper treatment, and to remedy inappropriate community placements, such as those described in *Thomas S. v. Murrow*, 781 F.2d 367, 372-73

43

(4th Cir. 1986) ("*Thomas II*"), that were not anticipated by professionals in the institutions."

Moreover, the same court held state obligations followed class members into the community:

> We believe that the State's duty to render the kind of treatment prescribed by *Youngberg v. Romeo*, 457 U.S. 307 (1982) is not discharged simply by releasing a class member from the institution where he or she has been hospitalized. Otherwise, the State could unilaterally avoid the obligations imposed by *Youngberg* and *Thomas II*, and defeat the claims of class members by terminating their institutional care while the case was pending.

*Thomas S. by Brooks,* 902 F.2d at 254-255.[40]

Similarly, in *Clark,* the Third Circuit held that the plaintiff had a substantive liberty right

to appropriate treatment in the community *after* her discharge from an institution for persons

with severe mental retardation:

> Given the square holding in *Milliken II*, that a federal court may order state officials to fund from the state treasury remedial measures found necessary to undo the harmful effects of past constitutional violations, we hold the commonwealth defendants' eleventh amendment argument is meritless.

*Clark,* 794 F.2d at 84.

The Eleventh Circuit considered this analysis in *S.H.* and narrowly affirmed the lower

court on other grounds, but made clear that members of the plaintiff class may need treatment in

the community "to comply with the law of this circuit that persons so confined be given

'minimally-adequate care' in accordance with professional standards."  *S.H.*, 886 F.2d at 292,

*citing Wyatt v. Alderholt*, 503 F.2d 1305 (5th Cir. 1974).

In a procedurally related issue, the Eleventh Circuit addressed the issue of whether

persons originally institutionalized at a Florida state hospital remained class members after they

were discharged into the community or transferred out of the facility.  *Armstead v. Coler*, 914

F.2d 1464 (11th Cir. 1990).  The class in *Armstead* sought to prevent "any further confinement

---

[40]   The Court in *Thomas S.* also rejected the argument that remedial treatment provided to persons no longer in state custody violates the Eleventh Amendment.

or restrictions of plaintiffs in violation of their constitutional rights." *Armstead,* 914 F.2d. at

1467. Given the broad relief sought by the class, the *Armstead* court concluded that the class

members retained their status after discharge or transfer. The *Armstead* court found persuasive

the Fourth Circuit's reasoning in *Thomas S. by Brooks*:

> That case [*Thomas S.*] was a class action challenging the deficient care of
> mentally retarded persons in North Carolina's psychiatric hospitals. In granting
> relief, the district court included among those entitled to relief all retarded persons
> transferred out of the hospitals after the date of class certification. The Fourth
> Circuit upheld the district court's decision, stating that *if it were to hold
> otherwise, "the state could unilaterally avoid the obligations imposed...and
> defeat the claims of class members by terminating their institutional care while
> the case was pending."*

*Armstead,* 914 F.2d. at 1467, *citing Thomas S. by Brooks,* 902 F.2d at 255 (emphasis added).

In the present case the defendants rely on two cases to justify their bright-line rule that

*Youngberg* rights do not extend into the community. Both cases are distinguishable, and, in any

event are inconsistent with the holdings of the Third, Fourth, and Eleventh Circuits in the cases

discussed above. In *Feagley v. Waddill,* 868 F.2d 1437, 1440 (5th Cir. 1989), the court

concluded that "in *light of Youngberg*" there was not a right to the least restrictive alternative. *Id.*

(emphasis added). But the Supreme Court, in its majority opinion, did not address the issue of

unnecessary confinement of Nicholas Romeo as an element of restraint, since the plaintiff did

not contest his continued confinement in the institution. And the Second Circuit's decision in

*Society for Goodwill to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1247 (2d Cir. 1984),

did not consider the rights of formerly institutionalized individuals who now are involuntarily

committed in the community, as are the vast majority of *Evans* class members.

As illustrated above, these courts applied *Youngberg* to rights in the community during a

six-year window from 1984 to 1990, the year the Americans with Disabilities Act (ADA) was

enacted.  The ADA removed any doubt that persons with disabilities have a right under federal law to be free from unnecessary segregation and institutionalization and to be provided appropriate integrated services in the community.  *See* 42 U.S.C. §§ 12101-12213.

> 3.    *Olmstead* Confirmed the Right to Be Free from Unnecessary Institutionalization and to Live in the Most Integrated Community Setting.

The defendants argue that there has been a change in law that requires the Court to dismiss the instant case and vacate its orders.  The defendants' assertion that after *Youngberg*, individuals with disabilities do not have a constitutional right to the services that are least restrictive of their liberty ignores the developments of federal law and Supreme Court precedent in the last decade.  The right to services in the most integrated setting appropriate to the needs of the individual was secured by the ADA, which is designed to integrate people with disabilities fully into the mainstream of American life.  42 U.S.C. §§ 12101-12213.

Title II of the ADA, 42 U.S.C. §§ 12131-34, prohibits discrimination by state and local government agencies.  Title II covers all public agencies, whether or not they receive federal financial assistance.[41]

Congress instructed the Attorney General to issue regulations to implement the prohibition of discrimination in Title II. *See* 42 U.S.C. §12134(a). These regulations include the "integration regulation" that requires a "public entity [to] administer . . . programs . . . in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. §35.130(d).  The Attorney General also issued a "reasonable-modifications regulation,"

---

[41]   Title II employs broad language in outlawing discrimination, stating that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity or be subjected to discrimination by any such entity."  The Supreme Court confirmed, in *Pennsylvania Dept. of Corrections v Yeskey*, 524 U.S. 206 (1998), that this language covers all public entities "without any exception."

that requires public entities to "make reasonable modifications" to avoid "discrimination on the basis of disability," but does not require measures that would "fundamentally alter" the nature of the entity's programs.  28 C.F.R. §35.130(b)(7).

On June 22, 1999, the United States Supreme Court held that the unnecessary segregation of individuals with disabilities in institutions may constitute discrimination based on disability.[42] *Olmstead v. L.C.* 527 U.S. 581 (1999). The Court held that plaintiffs with disabilities are entitled to placement in community settings when: 1) the State's treatment professionals determine that such placement was appropriate; 2) the transfer is not opposed by the individual; and 3) the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.  *Id.* at 607.

The majority went into some detail to explain why unnecessary segregation constitutes discrimination under the ADA and its regulations.[43]  *Id* at 592.  The case turns on the meaning of a regulation that the U.S. Department of Justice adopted to enforce Title II of the ADA.  28 C.F.R.§ 35.130(d).  *Id.* at 606-07.

The reasoning set out by the Court did not limit the concept of segregation to institutional

---

[42]    Even before the Supreme Court's ruling in *Olmstead*, numerous lower courts had interpreted the ADA to establish a right to services in the community.  *See* e.g., *Helen L. v. DiDario*, 46 F.3d 325 (3rd Cir. 1995), cert. denied sub nom *Pennsylvania Secretary of Public Welfare v. Idell S.*, 116 S. Ct. 64 (1995) (holding that the State of Pennsylvania violated the ADA by confining unnecessarily a plaintiff who did not require nursing home care); *Charles Q. v. Houstoun*, No. 1:CV-95-280 (M.D. Pa. Apr. 22, 1996) (relying heavily on *Helen L.*, the court, in two separate decisions, entered summary judgment for three plaintiffs with mental illness who alleged that the state defendants violated the ADA by treating plaintiffs in a state psychiatric hospital rather than in community settings) (attached as Exhibit 34); *Wyatt v. Hanan,* No. 3195-N (M.D. Ala. Mar. 6, 1995) (in a pretrial ruling in this historic mental disability class action, the court denied plaintiffs' motion for summary judgment regarding their ADA claims, but also stated that the Act "requires that services or programs provided by a public entity 'integrate' qualified disabled individuals with non-disabled persons to the fullest extent appropriate for the disabled and reasonable for a public entity.") (attached as Exhibit 35).

[43]    Courts from pre-Olmstead days to the present have held that the integration regulation has the force of law.  *See* e.g., Helen L., 46 F.3d at 333 (3rd Cir. 1995); DAI v. Paterson, 598 F. Supp. 2d 289, 313 (E.D.N.Y. 2009).  No court has held that the integration regulation is invalid.

settings. Rather, "unjustified isolation, we hold, is properly regarded as discrimination based on disability." *Id.* at 593. Recently a district court applied the integration regulation and concluded that New York State discriminated against individuals with disabilities who had been discharged from state psychiatric hospitals by segregating them in privately operated adult-care homes in the community. *DAI*, 598 F. Supp. 2d at 313. Thus, at least after *Olmstead*, class members have a federal right to the most integrated services, appropriate to their needs in the community.

As demonstrated above, there is no change in law regarding the rights of class members that would call in to question either the *Evans* Court's 2007 findings of violations of class members' constitutional and federal law rights or the Special Masters' conclusions about ongoing violations in their Final Report and Recommendation.

4.     *Rufo* Does Not Require that Consent Decrees Be Modified Any Time
        There is A Subsequent Legal Decision.

The Court's authority to modify consent orders rests both in Rule 60(b) and in its inherent equitable authority. *Frew v. Hawkins*, 540 U.S. 431, 441 (2004). The Supreme Court established the legal standard that governs modification of consent decrees under Fed. R. Civ. P. 60(b)[44] in institutional reform litigation in *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 383 (1992). The Supreme Court held that in order to prevail under a Rule 60(b)(5) motion, the moving party must show first, a change in fact or law that "warrants revision of the decree,"

---

[44]    The District has moved to dismiss this case under Rule 60(b)(5), which provides: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:  (5) the judgment was been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable."

        The rule also requires that a motion under Rule 60(b) "must be made within a reasonable time." *See* Rule 60(c)(1). The District has not argued why this motion is timely, but rather has chosen to ignore this requirement. Whether the court considers the 27 years since Youngberg was decided, or the 17 years since Rufo was decided, the defendants' present motion can hardly be deemed timely.

and second, "that the proposed modification is suitably tailored to the changed circumstance."[45]
*Rufo*, 502 U.S. at 383.

The *Evans* defendants argue that because of a change in law resulting from the Supreme Court's decision in *Youngberg* they are entitled to dismissal of the entire case and all of the Court's orders should be vacated.  They rely on *Rufo* as the authority for this position.  However, their presentation and interpretation of *Rufo* is flawed.  There is no need to modify a consent decree any time there is a change in federal law or a subsequent decision.   Rather, *Rufo* establishes the conditions for mandatory modification of a consent decree and the circumstances when it is optional for a court to modify, based on a change in law.  As the Supreme Court held:

> A consent decree *must* of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law.  But modification of a consent decree *may* be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent.

*Id.* at 388 (emphasis added).

Since the 1978 Consent Judgment in *Evans,* there has been no change in federal law that would require the Court to dismiss the case and vacate its Orders. *See* section II.D., *supra.* There clearly has been no change in law that renders the requirements of the 1978 Order or any subsequent court order impermissible.   Nor has there been any interpretation of the basic constitutional rights secured by the Court's Orders that renders the defendants' previously illegal actions legal.

The defendants' oblique references to, and discussion of, *Youngberg*, Doc. 1138 at 17, 27-31, fail to explain how the *Youngberg* decision made "impermissible under federal law  . . . one or more of the obligations placed upon the parties." *Rufo*, 502 U.S. at 384.  In fact, the Court

---

[45]   The change in factual conditions argument is addressed in sections III (D), *infra.*

in *Youngberg* affirmed the very constitutional rights to safety/protection from harm, habilitation/welfare and health/medical care that were the foundations of the Court's 1978 findings and the consent order.[46]   To the extent that the defendants argue that the right to services in the least restrictive setting was no longer constitutionally secured after *Youngberg*, they ignore the passage of the ADA and the Supreme Court's decision in *Olmstead* that guarantees the right to the most integrated services appropriate to meet the needs of the individuals with disabilities. Given that the major changes in federal law moved the law in the plaintiffs' favor, the defendants meet neither the test for a mandatory nor optional modification or dismissal.

As discussed in section II (E), *infra*, the defendants do not have a credible basis for claiming that they have cured constitutional and federal law violations.  Under no fair reading of *Rufo* can the defendants justify a change in law that would vacate all the orders of this case. Rather, the legal violations that formed the basis for the Court's liability decisions and the Special Masters' remedial findings date back more than 30 years and can be squarely traced to the same federal rights that formed the foundation for the 1978 Consent Order.

>   E.   *The Court's Findings and the Special Masters' Findings of Noncompliance with Court Orders and Federal Law Demonstrate a Persistent and Longstanding Pattern That Has Been Little Altered Over Thirty Years.*
>
>       1.   The Court's 2007 Decision Found Ongoing and Persistent Violations of Prior Orders and Federal Law.

As noted above, the Court's March 30, 2007 decision held that the defendants failed to meet their constitutional and federal obligations to class members and were in violation of existing Court orders and federal law.   The defendants' noncompliance was systemic,

---

[46]      To the extent that the defendants rely on *Horne*, 129 S. Ct. 2579 (2009), as the change in law that would require the Court to modify, dismiss or vacate, their argument falls short for the reasons discussed in section III.G., *infra*.

continuous, and serious in three areas: health, safety, and welfare. *Evans*, 480 F. Supp. 2d at

325. *See* Rights Chart, Column 7, <u>Exhibit 27</u>.

> 2.   The Special Masters' Findings Underscore Ongoing and Persistent
> Violations of Prior Orders and Federal Law.

The Special Masters reached the same conclusion: "[D]efendants continue to be in

serious noncompliance with critical provisions of outstanding court orders" in regard to the

health, safety and welfare. Special Masters' Report, Doc. 1131 at 3.  With one exception (*see* II

(E)(2)(c)), *infra*, the Special Masters' findings highlighted the same deficiencies and violations

cited by the Court.  In each of the major areas of potential federal-law deficiencies—health and

medical care, safety, welfare and habilitation, the Special Masters' findings found fresh evidence

of continuing problems.  *See* Rights Chart, Column 9, <u>Exhibit 27</u>.

> a.   Health and Medical Care

The Special Masters found that defendants violated federal law, including constitutional

law, due to their failure to ensure that class members receive adequate medical, dental and

behavioral health care.

> [T]he court orders in this case clearly set forth defendants' obligations to assess
> the medical and other health needs of each plaintiff class member, establish health
> plans that address his or her particular needs and implement the health plans. The
> requirement that defendants identify class members' needs for medical and other
> health care services dates back to the original 1978 Court Order which declared
> that class members had a constitutionally protected right to habilitative care and
> treatment.

Special Masters' Report, Doc. 1131 at 19.   Notably, the Masters found that defendants'

noncompliance has been continuous and ongoing since the Court issued its March 30, 2007

noncompliance decision, which was based on a record that ended in November of 2006. *Id.* at

31.

The Special Masters found that defendants failed to ensure that class members' health plans identified all their clinical needs, and even when they did, the plans were not implemented, so that class members went without medically necessary diagnostic tests, consultations and follow-up appointments. *Id.*.  As the Masters pointed out, even the defendants' expert, Dr. Jackson, acknowledged that the recommendations of medical consultants and physicians were not implemented promptly. *Id.* at 29.

In addition, the Special Masters held that defendants jeopardized class members' health and safety due to lengthy delays in obtaining guardians to consent to medically necessary treatment. *Id.* at 45-50.  The defendants, as the Masters noted, have obligations to provide timely medical care and treatment, especially to class members with acute needs, under the 1978 Consent Order and the 1981 Consent Order. *Id.* at 49.

The Special Masters also determined that the defendants violated court orders (the 1978 Court Order, the 1981 Consent Order, the 1983 Consent Order, the 1996 Remedial Order and the 2007 short-term Consent Order) by not providing class members with adequate mental health and behavioral health care. *Id.* at 41.  The Masters cited the defendant's "substantial failure" to provide class members with access to mental health professionals and to monitor the administration of psychotropic medications and their side effects. *Id.* at 41-42.

b.      Safety

Citing ongoing problems with inadequate health care management, delayed and cursory investigations into serious incidents, and the MTM transportation debacle, the Special Masters found "clear and convincing evidence that the problems being experienced by class members in the area of safety and protection from harm are continuous, serious and systemic." *Id.* at 67.

The Special Masters declared that the defendants are violating existing court orders,

dating to the 1978 Consent Order, to protect class members from harm.  Timely investigations, tracking and trending incidents, identifying and implementing preventive and corrective actions, and ensuring staff have appropriate training are all required under these court orders.  *Id.* at 50.  However, as the Special Masters noted, "the recurrent failure of providers to adequately protect class members from harm is a continuing concern," *id.* at 60, and the defendants' agency, the Incident Management Enforcement Unit (formerly the IMIU), "continue[s] to fail to thoroughly investigate serious reportable incidents and to protect class members from harm." *Id.* at 54.  In addition, the Health Regulation and Licensing Administration (HRLA), which oversees the ICFs/MR where more than 40 percent of the class reside, does not track or trend the citations it issues "with some regularity" against providers.  *Id.* at 58.

The Special Masters determined that "there continue to be numerous instances of providers filing late incidents or no reports at all, conducting inadequate investigations, or failing to conduct required investigations with no recommendations for or evidence of enforcement actions being taken in response to these deficiencies." *Id.* at 60.

c.      Welfare and Habilitation

As the Special Masters noted, class members' core constitutional right to adequate habilitative care and treatment was clearly established in the 1978 Consent Order requiring the defendants to provide necessary services "to provide them minimally adequate habilitation . . . in the least separate, most integrated and least restrictive community settings." *Id.* at 67 *citing Evans,* 459 F. Supp. at 484.   The Court found in its March 30, 2007 noncompliance decision that the defendants were violating this Order, based on their inability to place class members in less restrictive, more integrated settings; overcrowded and segregated day programs; and an ineffective Medicaid waiver.

53

The Special Masters pointed out that since the Court handed down its decision, the defendants have revamped the Medicaid waiver, and placed an estimated 250 class members into less restrictive residential settings, including apartments and group homes.  Although some class members' transition from institutional settings to less restrictive residences was problematic because the new homes were not properly set up, their ISPs were not available or implemented, and their necessary adaptive equipment was not available, the Special Master determined that the defendants substantially complied with the *residential* component of the least restrictive environment envisioned by the 1978 Consent Order.  Special Masters' Report, Doc. 1131 at 72.

However, the Masters found the defendants continue to violate class members' right to be in the most integrated setting in regard to their day habilitation programs, where they spend up to six hours a day.  Citing the Court Monitor's finding that 84 percent of class members are stuck in segregated day programs "engaged" in arts and crafts—"an outmoded form of therapy"—as well as defendants' admissions that class members remain in overcrowded, congregate care settings, the Special Masters found the defendants still are violating court orders "to provide habilitation in non-residential, least restrictive, community-integrated settings."  *Id.* at 73-74.

The defendants also are continuing to violate the same court orders and federal laws by their ongoing failure to ensure class members' ISPs are current, comprehensive and most important, implemented. *Id.* at 82-84.  The Special Masters correlated the defendant's failure to implement ISPs with their failure to provide adequate case management as required under the 2001 Plan and existing court orders, including federal laws and constitutional obligations dating to 1978, which require "all necessary and proper monitoring mechanisms to assure that community living arrangements, programs and supportive community services of the necessary

54

quantity and quality are provided and maintained."[47]  *Evans*, 459 F. Supp. at  485, <u>Exhibit 1</u>.

The Special Masters cited the defendants' expert trial testimony that service coordination is a "critical weak link" in the defendants' service system, and added: "This weakness is manifested in the quality of the work done by service coordinators . . . [T]he evidence demonstrates that service coordinators are not ensuring that ISPs are fully implemented or following up when they are not."  Special Masters' Report, Doc. 1131 at 82-83.   For example, due to this failure of service coordination, class members are not receiving speech and language services; behavioral support plans; physical therapy; adaptive equipment, such as glasses, dentures and wheelchairs; and regular opportunities for community outings and integration.  *Id.* at 83.

<blockquote>

3.      The Defendants Have Never Been in Compliance With Any of the Court's Orders, Have Never Petitioned the Court to be Found in Compliance, and Do Not Claim to Be in Compliance Today.

</blockquote>

Not once in the decades-old history of this litigation have the defendants been in compliance with any of the Court's orders.  As the record shows, the Court has found them in continuous, serious and persistent noncompliance with underlying orders since this litigation was filed February 23, 1976.   The defendants consented to most of these orders, including the 1978 Consent Order, the 1981 Consent Order, the 1983 Consent Order, and the 2001 Plan. Significantly, they were charged with noncompliance with each order, then negotiated new orders to facilitate compliance, but again and again failed to remedy their federal law violations

---

[47]      Subsequent court orders, embodied in the 2001 Plan, established visit minimums, caseload maximums, service coordination training protocols, and additional responsibilities, such as monitoring implementation of quality assurance and incident investigations.  Special Masters' Report, Doc. 1131 at 79-80.

honor their commitment.[48]

The defendants even failed to achieve full compliance with the short-term 2007 Consent Order, which was designed to provide "an opportunity for the Fenty Administration and the new leadership of the Department on Developmental Disability Services to demonstrate their ability to perform in a significantly more effective manner than their predecessors in implementing court orders." Doc. 1001 at 2, Exhibit 36.

Not once in the thirty years since the 1978 Consent Order was entered, the eight-and-a-half years since the 2001 Plan was approved, or the 34 months of the Fenty Administration has the District made a proffer of compliance on any one of the myriad tasks and obligations in virtually any order, and specifically, in the 2001 Plan. At present, and as part of their motion to dismiss, the defendants still make no proffer of compliance. Instead, they seek to vacate all Court orders on a 33-year record of noncompliance. Most significant for purposes of the Court's consideration of the current motion, the District has not proven compliance with the requirements of federal law even today.

F.    *The District's Requested Relief is Drastic and Will Create Disputes.*

The District has asked this Court to vacate the 1978 Consent Order and all the subsequent remedial orders. All of them—including, apparently, orders entered 20 years ago, or the order through which the Quality Trust was established,  The District has not bothered to analyze for the Court what it would mean to "vacate" 30 years of judicial orders—some of which were

---

[48]    For instance, the 2001 Compliance Plan, Defs.' Exhibit 3, was negotiated by the parties with the assistance of the Special Masters and crafted to enable the defendants to initiate tasks and produce outcomes that demonstrate compliance on specific issues.  The Plan addressed habilitation, welfare, training, safeguarding personal possessions, monitoring, quality assurance, and advocacy with an end-goal of compliance with underlying court orders and the end of the litigation.  "The Plan anticipates that over time the defendants will implement all of the required actions and meet the specified outcome criteria in order to successfully move the Court to vacate and dismiss the related Court orders." 2001 Plan at 11.

appealed, some of which have expired by their terms, some of which are active today.  Even if a case were closed and finished, it is extremely rare for past orders to be vacated as part of closing a case, so why should that relief be appropriate now?

The shotgun approach of the District underscores that the Renewed Motion to Vacate is not aimed at demonstrating compliance and exiting the case.  It is about changing the rules of the game, or knocking over the card table in the middle of a bad hand.  Vacating orders is the District's way of undermining long-ago findings of contempt, or possibly of dodging the District's liability for payment of attorneys' fees (maybe even seeking to recoup fees if they were granted as part of now-"vacated" orders), or of avoiding the District's financial responsibilities. The relief requested by the District is overbroad and unsupported, and would generate a host of disputes and problems—none of which the District has even bothered to consider.

## III.   The Supreme Court's Decision in *Horne v. Flores* Does Not Require Vacating All Orders of the Court and Dismissing This Case.

### A.   *Horne Did Not Announce a New Rule for Determining When to Modify Judgments or Decrees Under Rule 60(b)(5).*

*Horne* did not announce a new rule for modifying judgments under Rule 60(b)(5).  To the contrary, the Court in *Horne* reaffirmed by application the cases that had previously set forth the standards and procedures for a Rule 60(b)(5) inquiry.  It cited with approval and extensively relied upon *Milliken,* 433 U.S. at 282, and *Rufo*, 502 U.S. at 367, to reach its result.  Because the Court approved, rather than limited or overruled, these controlling authorities, the standards governing this Court's Rule 60(b)(5) inquiry remain the same as they did before the issuance of *Horne*.

Rule 60(b)(5) authorizes modification of an institutional injunction when the party seeking modification demonstrates "a significant change either in factual conditions or the law."

*Rufo*, 502 U.S. at 384; *see Agostini v. Felton*, 521 U.S. 203, 215 (1997).  Modification may be warranted when changed factual conditions "make compliance . . . substantially more onerous" or "prove[] [the decree] to be unworkable"; compliance would be "detrimental to the public interest"; or the court's remedial order has "become impermissible under federal law."  *Rufo*, 502 U.S. at 384, 388.  In assessing requests for modification of an institutional injunction, courts should utilize a "flexible approach."  *Id.* at 381; *see also Frew,* 540 U.S. at 441.  *Horne* re-emphasizes the need for flexibility in enforcing judgments in institutional reform litigation and explains the factors justifying such flexibility in specific cases.  But it does not suggest that modification is appropriate simply because some conditions may have changed, and certainly not when a court finds that violations of federal law and core provisions of its remedial orders continue.  As the Court noted in *Rufo*, "it does not follow that a modification will be warranted in all circumstances."  *Rufo*, 502 U.S. at 383; *see also Frew*, 540 U.S. at 441.

The Rule 60(b)(5) determination is entrusted to the sound discretion of the district court. *Agostini*, 521 U.S. at 238.  As Justice O'Connor observed in her concurrence in *Rufo*, "[d]etermining what is 'equitable' is necessarily a task that entails substantial discretion, particularly in a case like this one, where the District Court must make complex decisions about a host of factors," concluding that deference to the District Court's exercise of discretion is heightened where the District Court is intimately familiar with the factual dimension of an extraordinarily fact-bound inquiry.  502 U.S. at 393-94. ("[A]n appellate court should examine primarily the *method* in which the District Court exercises its discretion, not the substantive outcome the district court reaches.  If the District Court takes into account the relevant considerations (all of which are not likely to suggest the same result) and accommodates them in a reasonable way, then the District Court's judgment will not be an abuse of discretion,

regardless of whether an appellate court would have reached the same outcome in the first instance.") (emphasis in original). *Id.* at 394. Given this Court's extensive familiarity with the facts, its longstanding oversight of its orders, and the degree of factual nuance in the instant litigation, the exercise of this Court's "flexible equity powers" in what is a necessarily fact-bound inquiry, is to be afforded substantial deference. *Id.*

As the Court reiterated in *Horne*, it is the party seeking modification who bears the burden of establishing that modification is warranted. 129 S.Ct. at 2593 (*citing Rufo*, 502 U.S. at 384). Even if a party proves entitlement to a modification, it bears the additional responsibility of proving that the modification it seeks is congruent with the change in fact or law that it has established. *See, e.g.*, *Rufo*, 502 U.S. at 391 ("Once a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district should determine whether the proposed modification is suitably tailored to the changed circumstance.").

Moreover, since complete dissolution of an injunction ordinarily is warranted only when the moving party has "operated in compliance with it for a reasonable period of time," *Board of Educ. v. Dowell*, 498 U.S. 237, 248 (1991), the party seeking complete dissolution effectively bears a higher burden. As *Dowell* made clear, the movant's burden is not merely to prove that constitutional violations have been cured but also that they will not recur. 498 U.S. at 247 (noting that in order to demonstrate purposes of litigation have been achieved there must be a finding by the District Court that the movants were in compliance with constitutional requirements "*and* that it was unlikely that [they] would return to [their] former ways.") (emphasis added). The District fails to establish not only that the constitutional violations have been cured, but also that they will not recur.

59

Nor does the District make any serious effort to meet the heavy burden of proving that particular modifications are warranted in light of particular changes of fact or law, much less that complete dissolution of extant orders is appropriate.  *Cf. Freeman v. Pitts*, 503 U.S. 467, 491 (1992) (noting as one factor which must inform the "sound discretion of the court" in ordering partial withdrawal of supervision is "whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn" and noting that "a court should give particular attention to [the defendant's] record of compliance").  To the contrary, the District proposes no specific, suitably-tailored modifications.  Instead, it requests a complete dissolution of the 1978 Consent Decree and all subsequent orders in this matter, demanding "that the orders in this case be vacated [and] the case be dismissed."[49]  Doc. 1138 at 5.  Indeed, the District's argument for categorical dissolution is based on the claim that every provision of every court order, beginning with the 1978 Consent Order and continuing through the 2007 Consent Order, is invalid, supposedly because each and every obligation set forth therein exceeds some undefined "constitutional floor."   That clearly is not this Court's view of the facts today, nor is it any court's view of the law today.  It certainly is not the Supreme Court's view of the requirements of Rule 60(b)(5).  *See Rufo*, 502 U.S. at 392.

While *Horne* emphasized the flexibility district courts should exercise in conducting the "changed-circumstances inquiry prescribed by [*Rufo*]." 129 S. Ct. at 2596 n.5,  full compliance with the law must nevertheless be demonstrated before courts can or should relinquish their

---

[49]   The District argues, "[i]n the alternative" that the Court "should discharge all provisions of any order now in effect, to the extent that those provisions are no longer necessary to remedy ongoing constitutional violations." *Id.*   But it makes no effort to identify any specific orders that are of particular concern in light of purported changed legal or factual circumstances, or even to suggest to the Court the orders that should remain intact.  It is not the Court's duty to sort through its own orders and determine which should continue under the District's modification theory.  Instead, this unsupported and half-hearted suggestion should be rejected without further discussion.

oversight.  And here, no such compliance has ever been alleged by the District, let alone found by the Court.

Instead, the District seeks total dissolution of each and every order in the case, and, indeed, outright dismissal of the entire action.  To be entitled to this dramatic result, it must bear the heavy burden of demonstrating that it has fully cured all violations of federal law, that it has eliminated all of the conditions that flow from such violations, and that it has established a durable remedy for a reasonable period of time that will prevent the recurrence of such violations and conditions.  As this Court's 2007 Memorandum and the Special Masters' 2009 Report amply document, that simply is not the case.

> B.    *Horne Did Not Modify the Fundamental Principle That Parties to Consent Decrees Must Fulfill Their Obligations in Those Decrees.*

There is a well-settled difference between a consent decree and a court-adjudicated judgment.  As the Supreme Court made clear in *Firefighters v. City of Cleveland*, 478 U.S. 501, 517 (1986), "it is the agreement of the parties, rather than the force of law upon which the complaint was originally based, that creates obligations embodied in a consent decree."  The Court reasoned that while "a consent decree must spring from and serve to resolve a dispute within the court's subject matter jurisdiction" and "come within the general scope of the case made by the pleadings," a federal court "is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after trial." *Id.* at 525-26.

The Court's holding in *Firefighters* turned on the unique properties of consent decrees in our adversarial system of justice.  *See id.* at 522 ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.  The parties waive

their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation.   Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation.") (internal quotation omitted; emphases in original).

The Court strongly reaffirmed this principle in *Rufo*:

> Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated.   But we have no doubt that, to save themselves the time, expense, and inevitable risk of litigation, petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires (*almost any affirmative decree beyond a directive to obey the Constitution necessarily does that*), but also more than what a court would have ordered absent settlement. Accordingly, the District Court did not abuse its discretion in entering the agreed-upon decree, which clearly was related to the conditions found to offend the Constitution.

*Rufo*, 502 U.S. at 389 (emphasis added) (internal quotations and footnote omitted).   Consistent with its recognition of the importance of respecting a carefully struck bargain, the Court observed that "to hold that a clarification in the law automatically opens the door to relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation." *Id*.   Therefore, before a consent order will be disturbed, the party seeking modification or dissolution must show far more than simply that "it is no longer convenient to live with the terms of the decree." *Id.* at 383.

The reasoning of *Firefighters* was embraced again more recently in *Frew*, 540 U.S. at 439.   The petitioners in *Frew* alleged that a Texas Medicaid program did not satisfy the

requirements of federal law.[50]   Following extensive settlement negotiations, petitioners and the state officials agreed to resolve the suit by entering into a consent decree.

The decree in *Frew* was a "detailed document about 80 pages long that order[ed] a comprehensive plan for implementing the federal statute," and "[i]n contrast with the brief and general mandate of the statute itself, the consent decree require[d] the state officials to implement many specific procedures."[51]  *Id.* at 435.   When petitioners filed a motion to enforce the consent decree two years later, and the District Court concluded that provisions of the decree had been violated, the state officials filed an interlocutory appeal.   The Court of Appeals reversed, holding that the Eleventh Amendment prevented enforcement of the decree unless the violation of the consent decree was also a statutory violation of the Medicaid Act.   The Court of Appeals concluded that, "[r]egardless of whether the EPSDT program complied with the detailed consent decree," it "was good enough to comply with the general mandates of federal law."  *Id.* at 436.   It then held that because petitioners had not established a violation of federal law, the District Court lacked jurisdiction to remedy the consent decree violations.

The Supreme Court reversed, observing that a consent decree "is a federal-court order that springs from a federal dispute and furthers the objectives of federal law."  *Id.* at 438 (citing *Firefighters*, 478 U.S. at 525).   It confirmed that federal courts can compel States to comply with the purpose and provisions of a consent decree, rather than simply the federal floor on

---

[50]   As mothers of children eligible for an Early and Periodic Screening, Diagnosis, and Treatment program, they asserted that the Texas program did not ensure that eligible children would receive health, dental, vision, and hearing screens; failed to meet annual participation goals; gave eligible recipients inadequate notice of available services; lacked proper case management and corrective services; and did not provide uniform services throughout Texas.

[51]   To take one example, the consent decree at issue in *Frew* required not only the maintenance of toll-free numbers for eligible recipients, but also directed in careful detail the information which operators at the toll-free numbers were to provide to callers. *See Frew*, 540 U.S. at 435.

which it is based.

The Eleventh Amendment theory unsuccessfully advanced by the state officials in *Frew* sounds strikingly similar to the position taken by the District here.  The Texas officials, like the District officials here, argued that:

> Consent decrees involving state representatives threaten to broaden [the *Ex Parte Young*] exception [since] decrees allow state officials to bind state governments to significantly more commitments than what federal law requires.  Permitting the enforcement of a broad consent decree would give courts jurisdiction over not just federal law, but also everything else that officials agreed to when they entered into the consent decree.  A State in full compliance with federal law could remain subject to federal-court oversight through a course of judicial proceedings brought to enforce the consent decree.

*Frew*, 540 U.S. at 438.  The Court flatly rejected this argument.  It agreed that the Texas decree did "implement the Medicaid statute in a highly detailed way," but, echoing *Rufo,* explained that the same could be said of "*any* effort to implement [federal law] in a particular way."  *Id.* at 439 (emphasis added).  The Court concluded that the decree simply reflected a choice among various ways that a State could implement the Medicaid statute and, as a result, "enforcing the decree vindicates an agreement that the state officials reached to comply with federal law."  *Id.*; *see also id.* at 432 (noting that consent decrees have elements of both contracts and judicial decrees).

*Horne* involved a litigated judgment and not a consent decree.  But it reaffirmed two of its the leading consent decrees cases – *Rufo* and *Frew* – and left undisturbed the special role of consent decrees set forth in *Firefighters.*   Despite the District's protests, then, consent still matters.[52]

---

[52]   The District nevertheless urges, without citation, that "consent to the entry of the 1978 Consent Order, and subsequent orders, cannot justify judicial oversight now."  Doc. 1138 at 18.  It then cites two cases, one from the Seventh Circuit Court of Appeals and one from the Fifth Circuit Court of Appeals, for the proposition that consent alone is insufficient to support a commitment by a public official that ties the hands of his successor. *Id.*   The cases were not cited by the Court in *Horne*; nor would they be, as they contain language inconsistent with *Frew*, *Firefighters*, and *Horne* itself. *Evans v. the City of Chicago*, 10

C. *Since the Court's Orders and the 2001 Plan Represent Necessary Actions to Comply with Federal Law or to Address Conditions That Flow From the Federal Law Violations,* Horne *and* Milliken *Require Compliance With the Provisions of These Orders.*

The District asserts that the orders in this case exceed the scope of the original constitutional violations. *See* Doc. 1138 at 13 ("[F]ederal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.") (citing *Horne*, 129 S. Ct. at 2595 in a passage quoting *Milliken,* 433 U.S. at 282). The petitioners in *Milliken* argued that since the constitutional violation found by the District Court was the unlawful segregation of students by race, the court's decree must be limited to remedying "unlawful pupil assignments" and could not encompass remedial education. *Id.* The Supreme Court concluded that "[t]his contention misconceives the principle petitioners invoke," *id.*, and rejected it.

The Court in *Milliken* went on to explain its reasoning:

> The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the unconstitutional violation itself. Because of this inherent limitation on federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation . . . . But where, as here, a constitutional violation has been found, the remedy does not "exceed" the violation if the remedy is tailored to cure the "condition that offends the Constitution."

F.3d 474 (7th Cir. 1993), issued one year after the Supreme Court's decision in *Rufo* and well before its decision in *Frew*, represents an effort to, as the dissent notes, "flatly reject[] the previously unarguable truth that 'a deal is a deal.'"10 F.3d at 483. Outside the Seventh Circuit, a deal is still a deal. *League of United Latin American Citizens v. Entz*, 999 F.2d 831 (5th Cir. 1993) is clearly inapposite as it involved the issuance of an injunction, and not its dissolution. *See Dowell*, 498 U.S. at 248 (distinguishing Supreme Court case that "did not involve the dissolution of an injunction but whether an injunction should be issued in the first place.").

*Id.*at 281-82.   Although the Court found that the condition offending the Constitution was Detroit's *de jure* segregated school system, it upheld the District Court's finding that "the need for the educational components flowed directly from constitutional violations by both state and local officials."   *Id.* at 282.   While the Supreme Court observed that normally special education remedies are left to the discretion of the elected school board and professional educators, it recognized that the District Court, in its discretion, properly had deemed these compensatory measures necessary "to restore the victims of discriminatory conduct to the position they would have enjoyed in terms of education" absent the constitutional violation.   *Id.*

The District takes a position remarkably similar to the one taken by the petitioners in *Milliken*. In *Milliken*, the petitioners claimed that anything beyond student-reassignment (out of segregated schools) exceeded the scope of the constitutional violation; in *Evans*, the District urges that anything beyond class member-reassignment (out of Forest Haven) would exceed the scope of a permissible remedy.   As in *Milliken*, however, "assignment alone does not automatically remedy the impact of previous, unlawful educational isolation; the consequences linger and can be dealt with only by independent measures."   *Id.* at 287.   Indeed, the District's argument in *Evans* is far more extreme than that of the petitioners in *Milliken,* since in *Milliken*, students at least had a right to attend an integrated school.   Here, the District argues that all class members may be entitled to improved institutional conditions, but if the District elects to close the institution altogether, as it did in 1991, then class members are entitled to *nothing*.

Just as in *Milliken*, the Court's many orders, beginning with the 1978 Consent Order and continuing through the 2007 Consent Order, either directly remedied federal law violations or addressed conditions that flowed directly from these violations. As more fully described in

section II.A-B., *supra,* the 1978 Final Judgment and Order held that class members' constitutional rights had been violated, and mandated obligations directed entirely to remedying those violations or the conditions that flowed from those violations.   *See, e.g.*, *Evans*, 459 F. Supp. at 484-87 (recognizing that "Plaintiffs have a constitutional right to be free from harm" and prohibiting "use of physical restraint as punishment for the convenience of staff.")  The 1978 Consent Order, just like the consent decrees in *Rufo* and *Frew*, included a number of specific requirements, all of which reflected a choice — made jointly by the parties — as to how to redress these conditions and secure the federal rights of class members.

Building on the 1978 Consent Order, the 1981 Consent Order included provisions regulating the transition of class members from Forest Haven to the community, providing that "[n]o class member shall be outplaced without an appropriate day program and living arrangement, or without adequate case management support."  1981 Consent Order at 7, <u>Exhibit 28</u>.

The 1983 Consent Order (<u>Exhibit 29</u>), like the two consent orders that preceded it, in effect contained a restatement and reaffirmation of the District's constitutional obligations.  *See, e.g.*, 1983 Order at 8 (requiring, in order to advance the safety interests of class members, the reporting of "unusual incidents" involving class members).   Reaffirming its constitutional and federal law foundations, the 1983 Order called upon the defendants to protect class members from harm, provide adequate medical care, treatment plans, case management and habilitative care in appropriate community settings.   These requirements, like the ones before them, all flowed from the original constitutional violations set forth in the 1978 Consent Order, <u>Exhibit 1</u>.

After the District failed, for years and years, to implement the court-ordered obligations that were set forth in the first three consent decrees and to remedy the constitutional violations

found by the Court in 1978, a final plan was devised.  The goal of this plan, developed by the parties with the participation of the Special Masters, was to bring the defendants into compliance with federal law and finally end the litigation.  Grounded in the same issues and federal rights that justified the 1978 Consent Order, the 2001 Plan repeated the constitutional requirements under the 1978, 1981, and 1983 Consent Orders.  *See, e.g.*, 2001 Plan at 25, 28 (identifying protection from harm as one of its goals and including restrictions on "use of restraints").  Significantly, presaging *Horne,* the Plan defined the standards for compliance with federal law but did not dictate the means for achieving such compliance.

       1.     The 2001 Plan And Order Embodies the "Flexible Approach" Required in Rule 60(b)(5) Determinations.

The 2001 Plan itself is flexible and does not dictate a specific means of achieving compliance.  As the District itself explains, the 2001 Plan was negotiated and filed by both parties.  Doc. 1138 at 22.  While the 2001 Plan "identified seven goals and outcome criteria related to health, safety, and welfare," compliance with the 2001 Plan was agreed to by the parties as a way to attain compliance with the Court's original orders, which flowed from the constitutional violations.  The 2001 Plan was "not an enforceable court order," *id.*, but rather a roadmap by both parties to compliance.   Unlike in *Horne*, the 2001 Plan was not imposed by the Court but rather represented the Defendants' own articulation of what they needed to do to cure the constitutional violations and to comply with the Court's orders.

       a.     The Outcomes represent the defendants' own view of what is needed to cure federal law violations.

Unlike in *Horne*, the 2001 Plan did not boil down to a single, non-negotiable prescription for complying with federal law, like *Horne*'s incremental funding mandate.  Rather, the 2001 Plan established concrete Outcomes that defined standards for complying with the

District's constitutional and federal law obligations to class members.  The Outcomes mirrored the areas of the original Consent Order, with specific outcomes for class members' health, safety, and welfare/habilitation.  The 2001 Plan recognized that there are many ways to achieve these outcomes, and afforded the District considerable discretion in designing the most effective methods for doing so.  While flexibility was the cornerstone of the 2001 Plan, there was a clear command that these outcomes must be achieved in order to cure the ongoing constitutional and federal law violations.

                    b.        The Action Steps designed to achieve the Outcomes are flexible and may be adjusted by the defendants if they are not effective or if there are superior methods of achieving compliance.

There is no question that the Actions Steps set forth in the 2001 Plan may be modified, as necessary, in order to more effectively achieve the Outcomes.  As long as the District can demonstrate that the current steps need improvement and propose a superior method of accomplishing the Outcomes, they have the flexibility to proceed.  This is precisely what the *Horne* Court found lacking in the district court's rigid order and what the Supreme Court made clear should be permitted in institutional reform litigation.  Thus, the 2001 Plan, which formed the basis for this Court's 2007 liability finding, clearly satisfies the Supreme Court's directive in *Horne.*

                    c.        The Outcomes and Actions are not enforceable precisely to ensure flexibility, but at the same time, they must be achieved in order to cure federal law violations.

The District has long argued that the 2001 Plan is not an enforceable court order, *see* section II (C), *supra*.  If anything, the fact that the 2001 Plan is not independently enforceable lends further support to the argument that it permits a flexible approach.  The 2001 Plan was to serve as a benchmark of compliance with underlying court orders, which themselves flowed

69

from constitutional violations.  The persistent failure to achieve the objectives of the 2001 Plan amounts to a failure to remedy the underlying federal law violations.

As in *Milliken*, then, the orders in this case dealing with not only the closure of Forest Haven, but also the relocation and care of class members in the community, flowed directly from the constitutional violations themselves.[53]  Acceptance of the District's narrow and rigid universe of potential remedies flowing from constitutional violations would make virtually any equitable judgment or decree untenable.[54]  *See, e.g.*, *Rufo*, 502 U.S. at 389 ("[A]lmost any affirmative decree beyond a directive to obey the Constitution necessarily [undertakes more than the Constitution requires.]").   This would result in precisely what the Court concluded could not occur, namely "rewrit[ing] a consent decree so that it conform[ed] to the constitutional floor." *Id.* at 370.  As the Court explained:

> The position urged by petitioners would necessarily imply that the only legally enforceable obligation assumed by the state under the consent decree was that of ultimately achieving minimal constitutional [institutional] standards . . . .  Substantively, this would do violence to the obvious intention of the parties that the decretal obligations assumed by the state were not confined to meeting minimal constitutional requirements.  Procedurally, it would make necessary, as

---

[53]   The District's position, moreover, begs the question of what exactly the District would have done with the *Evans* class had the case indeed ended with the closure of Forest Haven.  The dangers of simply removing individuals from an institution, only to dump them into a community without necessary services and support, are by no means new.  *See*, e.g., *Olmstead*, 527 U.S. at 609-10 (Kennedy, J., concurring) (noting that the depopulation of institutions "has its dark side" and discussing risk of removing individuals "in need of medical care and treatment" and placing them into settings with "too little assistance and supervision").  The *Evans* class members not only suffered from being institutionalized; they were abused and scarred, both physically and emotionally, by the very people entrusted with their care.  To claim that the District could remedy the constitutional violation by simply abandoning the very class members whose fundamental rights it had violated, cannot withstand scrutiny.

[54]   Not only would desegregation remedies have been limited to allowing African-American children into white schools and vice versa, precluding other forms of relief like busing and remedial education, but other cornerstone equitable cases — relied on in *Horne* — could never have come to pass.  *See*, e.g., *Dowell*, 498 U.S. at 250 ("In considering whether the vestiges of *de jure* segregation have been eliminated as far as practicable, the District Court should look not only a student assignments, but to every facet for school operations—faculty, staff, transportation, extra-curricular activities and facilities.") (internal quotation omitted).

this case illustrates, a constitutional decision every time an effort was made to enforce or modify the decree by judicial action.

*Id.* at 389-90 (internal quotation omitted).

> D. *Even the Most Expansive Interpretation of Horne Does Not Require Dismissal of a Case Where the Court Has Found Ongoing and Current Violations of Its Orders and Federal Law and Where the Court's Special Masters Have Concluded that There Is No Durable Remedy in Sight to Cure Those Violations.*

The majority opinion in *Horne* points out: "It goes without saying that federal courts must vigilantly enforce federal law and not hesitate in awarding necessary relief."  129 S. Ct. at 2594.   It is precisely this vigilant enforcement of federal and constitutional law, and of the Court's orders that are designed to remedy the defendants' violations of these laws, that requires denial of the defendants' motions to vacate and dismiss, even under an expansive interpretation of the Supreme Court's decision in *Horne.*

> 1. There Are Ongoing Violations of Constitutional and Federal Law and the Court's Orders.

The Supreme Court in *Horne* determined that the Court of Appeals "needed to ascertain whether ongoing enforcement of the original order was supported by an ongoing violation of federal law."  *Id.* at 2595 (*citing Milliken,* 433 U.S. at  282).  This is precisely the process that this Court has followed in the present case.

In response to the Plaintiffs' Motion for Noncompliance, this Court's 2007 85-page liability decision found that there was overwhelming evidence that the defendants were in serious, systemic and continuous non-compliance with its orders.  *Evans,* 480 F. Supp. 2d. at 325.   The 143-page Special Masters' Report and Recommendation Regarding A Remedy for Defendants' Noncompliance with Court Orders in August 2009 found that the District continues to violate federal and constitutional law and the Orders of this Court.  Special Masters' Report,

71

Doc. 1131 at 3.

The defendants argue that their prior consent to court-ordered requirements cannot be invoked to justify continuing judicial oversight and that absent an ongoing constitutional violation, the Court has "no basis for continuing to enforce orders that have outlived their purpose and utility." Doc. 1138 at 19. The defendants insist that these findings of noncompliance should be disregarded entirely and that some alleged changed circumstances require the Court to dismiss the case and to vacate its orders. But none of the authorities cited by the District, and none of the reasons given for relief under Rule 60(b)(5), supports the conclusion that the Court should now relieve the District of its obligation to conform its behavior to the Constitution.

       2.      The Defendants Have Not Met the Standards for Modifying or Vacating a Court Order Under Fed. R. Civ. P. 60(b)(5).

"[A] party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Rufo,* 502 U.S. at 393. Courts of this circuit have consistently understood and applied *Rufo* in exactly this way, requiring a party seeking a modification of a consent decree to show an unanticipated burden or obstacle that significantly impedes its ability to perform its obligations under that decree. *See, e.g. Pigford v. Veneman,,* 292 F.3d 918, 927 (D.C. Cir. 2002) (finding that plaintiffs' dereliction amounted to "unforeseeable obstacle" that made decree "unworkable", warranting modification); *State of New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 171 (D.D.C. 2008) (finding that difficulties in implementing certain provisions were "entirely incongruous with the original expectations of the parties and the Court" and so constituted "significant change in circumstances," warranting

modification).[55]

The flexible standard articulated in *Rufo* applies to both modification and dissolution of

consent decrees.  The Supreme Court does not draw a distinction between the two types of relief

in either *Rufo* or in *Frew*.  The District chose not to pursue modification of the Court's orders,

but rather moved the Court for a wholesale dismissal of its orders and the action — despite the

fact that the defendants do not satisfy the standards for either modification or termination.  *See,*

*Rufo*, 502 U.S. at 384; *Inmates of Suffolk County Jail v. Rufo*, 148 F.R.D. 14 (D. Mass. 1993);

*Cooper v. Noble*, 33 F.3d 540, 544 (5th Cir. 1994); *Frew v. Hawkins*, 401 F. Supp. 2d 619 (E.D.

Texas, 2005).

> The party who moves for modification has a heavy burden to show that a
> "significant change in [factual] circumstances" that was not anticipated at the time
> the parties entered into the decree "make[s] compliance with the decree
> substantially more onerous," that the decree "proves to be unworkable because of
> unforeseen circumstances" or "enforcement of the decree would be detrimental to
> the public interest."

---

[55]   Courts of other circuits are also in accord.  *See*, e.g. *Cooper v. Noble*, 33 F.3d 540, 544 (5th Cir. 1994) ("[T]he Supreme Court [in *Rufo*] never suggested that changed factual circumstances in and of themselves were sufficient grounds for relief from judgment . . . [O]fficials must also: (1) show that those changes affect compliance with, or the workability or enforcement of, the final judgment, and (2) show that this changes occurred despite the county officials' reasonable efforts to comply with the judgment") (citations omitted; quoting *Rufo*, 502 U.S. at 385); *Hadix v. Johnson*, 896 F. Supp. 697 (E.D. Mich. 1995) (declining to modify consent decree where defendant failed to show that proffered changed circumstances made compliance more onerous or decree less workable); cf. *David C. v. Leavitt*, 242 F.3d 1206 (10th Cir. 2001) (on plaintiffs' motion in suit seeking reform of Utah's child-welfare system, finding defendants' significant non-compliance  constituted changed circumstances that made decree as formulated unworkable and so warranted extension); *Small v. Hunt*, 98 F.3d 789 (4th Cir. 1996) (affirming decision to modify consent decree based on changed circumstances where increase in prison population was much larger than defendant had anticipated, making compliance more onerous); *Vanguards of Cleveland v. Cleveland*; 23 F.3d 1013 (6th Cir. 1994) (affirming decision to extend consent decree where smaller-than-anticipated number of minority candidate passing qualifying exam constituted changed circumstance, making compliance with decree mandating hiring of minority supervisors more onerous); *Escalera v. New York City Hous. Auth.*, 924 F. Supp. 1323, 1340-41 (S.D.N.Y. 1996) (granting defendants' motion to simplify procedures for eviction of public-housing tenants associated with drug trafficking because crack cocaine "epidemic" had made compliance with more lengthy procedures mandated by decree substantially more onerous).

*Rufo,* 502 U.S. at 384

The District of Columbia Circuit has used a four-part analysis for determining whether to grant a modification:

> a party seeking a modification of a consent decree must establish that a significant chance in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the change in circumstances."  [M]odification "may be warranted when changed factual circumstances make compliance with the decree substantially more onerous" . . ."when a decree proves to be unworkable because of unforeseeable obstacles"; "or when enforcement would be detrimental to the public interest."

*NLRB v. Harris Teeter Supermarkets*, 215 F. 3d 32, 35 (D.C. Cir. 2000) (quoting *Rufo*, 502 U.S. at 383) (citation omitted).

The defendants cite *Frew,* 540 U.S. at 442 for the proposition that federal courts have the equitable power to vacate or modify a consent order.  Doc. 1138 at 26.  The defendants rely on *dicta* in *Frew* that the federal Court must ensure that "when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." Doc. 1138 at 26, *citing Frew*, 540 U.S. at  442.  The "objects" of the multiple decrees in the present case have not been attained. When and if these objectives are attained, it will be proper for the Court to promptly return authority to the defendants.  But this is far from the current reality.

The defendants do not (and cannot) claim that they have complied with the 1978 Consent Order or its progeny.  Instead, they appear to argue that because they have made progress in a few select areas, hired some new staff, partially reorganized their governmental structure, and closed Forest Haven, they have cured the "alleged" constitutional violations and the case should be dismissed.  Doc. 1138 at 31-45.  This argument wholly ignores the Court's 2007 liability finding and the Special Masters' Report and Recommendation.   It baldly seeks to repudiate no

less than five consent orders specifically designed to cure constitutional and federal law violations.  It explicitly disregards that the plaintiffs bargained for specific compliance measures, and insists that the Court and the plaintiffs should trust them despite the pattern of noncompliance which they attempt to recast as progress.

Of the factors identified in Rule 60(b)(5), the District appears to focus on two:  (1) the judgment has been "satisfied" and (2) applying the judgment "prospectively is no longer equitable."  Given the undisputed and unappealed findings of the Court in its 2007 liability finding, neither factor justifies terminating this case and vacating all orders of this Court.

To support the first factor, the District sprinkles several disconnected allegations which are both factually inaccurate and legally irrelevant:  First, the District argues that the physical closing of Forest Haven, in and of itself, justifies terminating this case, without regard to the quality of the services provided to class members after their discharge from the institution.  Doc. 1138 at 2.  This "theory" would allow a jurisdiction to close an institution for individuals with disabilities, dump vulnerable citizens into homeless shelters or worse, and provide inadequate services and supports or even no services at all. This is exactly the kind of unacceptable care that Justice Kennedy addressed in his concurrence in *Olmstead*: placing "patients into settings devoid of the services and attention necessary for their condition" did not comply with the majority's holding.  *Olmstead*, 527 U.S. at 610.

Second, the District argues that the manner in which it operates its community service system for developmentally disabled persons meets constitutional standards, even if it falls far short of satisfying the requirements of the 1978 Consent Order.  Doc. 1138 at 3-4.  The defendants' position is inapposite to the Court's findings in its 2007 Order and in the Special Masters' Report and Recommendation, both of which concluded that there remained a pattern of

75

violations of the Constitution, federal law, and the Court's orders that were designed to remedy the unconstitutional conditions identified by the Court in 1978.  *See* section II (E), *supra*.

Third, the defendants claim progress has been made.   "The District's current system to care for individuals with developmental disabilities bears little resemblance to the one that existed when the litigation began more than 33 years ago."  Doc. 1138 at 2.  There is no question that this is true.  There is also no question that the defendants have failed to cure their violations of class members' federal rights or to meet their obligations as set forth in the Court's orders. *See* section II.E, *supra*. The District ignores the repeated findings of violations of these orders – even those findings which the District itself conceded.  Moreover, the passage of time – 30 plus years—essentially guarantees that any public system would look different, would change, and would be at least somewhat more aligned with emerging professional standards.  However, these changes — some of which are indicative of some progress but many of which perpetuate the longstanding pattern of noncompliance — are not the same as curing the federal law violations that continue to be a hallmark of this case.

Equity calls for a remedy proportionate to the harm.   Indeed, the Court in *Milliken* emphasized that given "the nature of the antecedent violation," its victims would "continue to experience the effects of [the violation] until such future time as remedial programs [could] help dissipate the continuing effects of past misconducts."  *Milliken*, 433 U.S. at 290.  Contrary to the District's repeated claims in its Motion to Vacate, remedies are often not, nor "as a practical matter could be, intended to wipe the slate clean by one bold stroke," nor can the effects of constitutional violations "be eliminated by judicial fiat."  *Id.*   This is precisely why this Court's equitable powers are "broad and flexible," *id.*, and left to the Court's sound and broad discretion.

On the question of whether the order is "no longer equitable," the District identifies other

76

factors, including:  (1) the cost of the proceedings; (2) the length of time of judicial supervision; and (3) the District's decision to withdraw its consent to anything associated with this lawsuit or these plaintiffs.  Doc. 1138 at 65-69. Once again, they overlook the basic principle that equitable considerations cut both ways and must be carefully weighed.  In striking that balance, the defendants conveniently omit the ongoing harm to vulnerable, aging class members who have waited decades for vindication of their protected rights.[56]

First, the defendants contend that "the obligations imposed on the District … become ever more exacting and onerous, and now far exceed any constitutional minimum regarding the treatment of class members." *Id.* at 2.   Since the orders in this case, beginning with the 1978 Consent Order and continuing through the 2001 Compliance Plan have all been designed to cure the defendants' violation of class members' constitutional and federal law rights, the defendants' position that the orders exceed a constitutional minimum is inconsistent with the very purpose of the orders that they helped draft and to which they consented.  Moreover, as *Milliken* makes clear, the constitutional minimum is not the standard.  Rather, the Court may properly demand remedial actions to cure constitutional violations or conditions that flow from such violations.

Even if the defendants' assertion is true, their position is contradicted by the very cases on which they rely.  Although the defendants heavily cite the *dicta* in *Frew*, they ignore the Supreme Court's holding that a consent judgment which exceeds the scope of federal law

---

[56]     The District's refrain regarding the fact that the original violations involved individuals strapped to urine-soaked sheets and otherwise abused, apparently endeavors to persuade the Court that because the original violations were so severe, relatively little needed to be done to show significant improvement. Unstrap the class member, wash the sheets, and refrain from the kind of abuse that shocks the conscience and—voila—"fundamentally changed circumstances" have been proven.  Were this Court to accept the District's arguments, it would signal that equity rewards the grossest offender; the more horrific the violation, the less one needs to do to "fundamentally change."  While this case does indeed sound in equity, that does not sound like equity.

nevertheless is enforceable by the federal court. *Frew*, 540 U.S. at 438.  The Court overturned a Fifth Circuit decision which concluded that because the petitioners had not established a violation of federal law, but rather only a violation of a consent decree provision, the District Court lacked the authority to remedy the consent decree violations.  *Id.* at 436-39.

Second, the defendants allege that temporary but undeniable economic constraints justify not merely a suspension of certain, costly obligations but a wholesale vacation of them all.  The defendants argue that "the current economic and fiscal conditions facing the District" are the very type of 'changed circumstances' … that also make the continued enforcement of a consent decree inequitable."  Doc. 1138 at 66-69.

Interestingly, the defendants do not argue that they should reduce the expenditures for services to class members,[57] but rather reference the resources that have been spent on paying for the Monitor, Special Masters and the plaintiffs' attorneys' fees for the last eight years and for the Quality Trust.[58]  If the defendants believe that the current fiscal climate makes expenditures at these current levels difficult, then they may seek limited relief from the Court, through a motion to modify specific obligations.  But their motion requesting a wholesale dismissal of this case because of perceived expensive monitoring requirements is plainly an exaggerated and unjustified response to a time-limited problem.  If defendants' argument was taken to its logical conclusion, then every state that has outstanding court-ordered obligations should be able to seek dismissal of the underlying actions because of the current national fiscal climate.

Finally, the District's equitable arguments conveniently ignore the equitable considerations that impact class members:  ongoing rights violations, longstanding court orders

---

[57]     To do so would undermine their argument that they have established a durable remedy.  Doc. 1138 at 49-64.

[58]     The defendants' calculations are wrong.  *See* Declaration of Flynn, Exhibit 37.

repudiated, and, perhaps most importantly, the commitment of government to protect the safety of its most vulnerable citizens unfulfilled.  When these factors are placed on the scale, it is clear that the balance tips decidedly against the District.

3.      Given the Pattern of Noncompliance and Recent Findings of the District Court and Special Masters, There Is No "Durable Remedy" That Justifies Vacating All Orders of the Court.

The defendants have not put in place a durable remedy.  The defendants have not remedied the violations of class members' rights guaranteed by constitutional and federal law. They have not complied with the Court orders they agreed were necessary to cure those violations.  They have not produced the requisite outcomes to demonstrate compliance.

The defendants have revamped the developmental disability system with some new staff, a few new policies and new names for the same agencies.[59] They tout these changes as evidence of a durable remedy.  *See* Doc. 1138 at 50-52.  This is a misnomer, if not blatantly misleading. These changes, some of which are noteworthy, are not a remedy: until the on-the-ground problems are solved and class members' rights vindicated, changes in staffing and processes cannot be elevated to a remedy, never mind a remedy that lasts.

A remedy fixes a problem.  In this case, a remedy would cure the violations of the Constitution, federal law and court orders by ensuring class members receive the long-awaited supports and services to which they are entitled.  A durable remedy has a proven track record that demonstrates the capability and the capacity of the system to provide those services.  The defendants have not yet made that showing.  Rather as the Special Masters found, the reforms

---

[59]      "[M]any of the reforms identified [by the defendants] are still in the planning stages and have not been fully implemented. Whether the efforts of this new leadership team will prove successful remains to be seen.  In the meantime, there is strong evidence that serious and system problems of noncompliance continue.  In particular, problems with interagency communication, coordination and collaboration persist."  Special Masters' Report, Doc. 1131 at 117-18.

cited by the defendants "have not resolved the on-going problems in the day-to-day lives of class members, or operational issues which cross agency lines."  Special Masters' Report, Doc. 1131 at 129.  The defendants make a number of unconvincing arguments for why the remedy they purport to have implemented is durable.  An analysis of the elements that form the basis of the defendants' claims (*see* Doc. 1138 at 49-65) demonstrates why they are wrong and why continued judicial orders and oversight is essential.

First, the District claims it has reformed its systems for the provision of care to the intellectually and developmentally disabled and points to the establishment of DDS and the Department of Health Care Finance.  Doc. 1138 at 50-52.  In each of these instances, the District took agencies that had serious performance issues and that were subsumed in other governmental agencies and elevated them to cabinet level positions.[60]  Changes in governmental structure and new agency names with different directors are not a remedy.  Most obviously, as the Court and Special Masters have recently determined, these changes have not been sufficient to cure the violations of class members' rights guaranteed by the Constitution, federal law and the orders of this Court.  These steps may ultimately prove helpful in remedying those violations, but there is no basis for concluding that they already have.

Second, the defendants' claim that even before the creation of DCHF, interagency cooperation among all of the agencies responsible for the care and treatment of class members was "vigorous and effective," Doc. 1138 at 52-56, is not supported by the findings of the Court or the Special Masters in the Report and Recommendation.  480 F. Supp. 2d at 290; Special Masters' Report, Doc. 1131 at 89-93.   Interagency coordination has been a long-recognized, well-documented problem that has plagued the service system for individuals with intellectual

---

[60]   DDA is still not a cabinet level position as it is located within DDS that is also responsible for Rehabilitation Services Administration.

and developmental disabilities.  480 F. Supp. 2d at 290; Special Masters' Report, Doc. 1131 at 89-93; Order, Doc. 685, <u>Exhibit 25</u>.  To argue that the collaboration between DDS and DHCF to "resolve issues that arose from the implementation of the transportation broker system", Doc. 1138 at 54-55, as an exemplar of inter-agency coordination is belied by the very findings of the Court.   The MTM debacle epitomized the interagency problems that continue under the *Fenty* administration, despite the change in agency names, the hiring of some staff, and the modification of governmental structure.  Special Masters' Report, Doc. 1131 at 64, 67, 90 n.66.

Equally unconvincing is the defendants' assertion that a collaborative relationship exists between DDS and HRLA, as evidenced by HRLA sharing its reviews and investigations with DDS.  Doc. 1138 at 55-56.  Yet the DDA director admitted that HRLA does not routinely share its death investigations of DDA consumers with DDA.  Trial Tr. 275:22-24, <u>Exhibit 38</u>.

Third, the defendants argue that to the extent any judicial oversight is necessary, the Superior Court provides additional safeguards to ensure that class members are being treated appropriately.   Doc. 1138 at 56-57.   However, defendants ignore that the Superior Court's involvement has been a constant during the tenure of this case and has not produced any meaningful measure of compliance.   Moreover, the Superior Court's authority is limited to treatment decisions about individual class members.   It has no authority to order the defendants to improve services or to address systems issues.  D.C. CODE 7-1304.11 (2008) (stating that the periodic review of an individual's commitment examines whether the individual has benefited from the habilitation provided, whether continued residential habilitation is necessary, whether the individual is a resident of the District of Columbia and whether the individual meets the standard for commitment).

Fourth, the defendants' claim that they are monitored externally by the Centers for

Medicare and Medicaid Services (CMS) is irrelevant.  *See* Doc. 1138 at 57-58.   CMS monitors

all states that participate in the federal Medicaid program.  All such states are required to file the

type of annual reports that the defendants reference.  *Id*. at 57.   The defendants' position, if

taken to its logical conclusion, means that no state that receives federal Medicaid dollars should

ever be the subject of a federal court case with respect to the services it provides with those

funds.   That is contrary to established practice and strains credibility.

Fifth, the defendants point to their "extraordinary funding of and consultation with the

Quality Trust for Individuals with Disabilities as establishing an "improbability of the District

returning to its 'former ways.'"  Doc. 1138 at 58.   The defendants fail to acknowledge that the

Quality Trust filed an *amicus curiae* brief with this Court last winter supporting the plaintiffs and

the appointment of a Special Administrator.

> We have first-hand knowledge of how the system fails to respond to and support
> people in critical areas of their lives with respect to health, safety and meaningful
> involvement in the community.  We see the costs of the failures of the system on
> a daily basis.  In consideration of the long history of this case, the many attempts
> of the part of Defendants to achieve compliance and their inability to do so,
> Quality Trust supports the imposition of a Special Administrator who will cut
> through the existing barriers to compliance and who will work with existing
> leadership to achieve the goal of an effective system.

Doc. 1078 at 18, Exhibit 39.  In addition, contrary to the defendants' position, the Quality Trust

does not see itself as obviating the need for the Court Monitor.  The QT is explicit that the Court

Monitor should remain even if the Court appoints the Special Administrator.  *Id.* at 17-18.

Finally, the District points to its establishment of "an aggressive internal quality

assurance system."  Doc. 1138 at 60-64.   The defendants claim that their newly redesigned

system coupled with DDS' internal monitoring methods will ensure that it sustains the

"extensive reforms" now in place.  The defendants rely almost exclusively on an October 7, 2009

Declaration from Laura Nuss as the basis for their assertions.  Aside from falling outside of the fact cut-off period by ten months,[61] Ms. Nuss' declaration is replete with aspirations about what the new unit will do, new processes it has developed, and a description of a new organizational design.  Evidence of accomplishments, and notably, outcomes, is absent.   Not surprisingly, Ms. Nuss does not claim that the District has remedied the conditions that violate class members' rights guaranteed by the Constitution, federal law and the orders of this Court designed to remedy these legal violations.

The Court in *Horne* stated that "[i]f a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Horne*, 129 S. Ct. 2595, *citing Milliken,* 433 U.S. at 282.[62]  In the present case, there is no remedy, much less a durable remedy.  Since the underlying legal violations of class members' rights have not been cured it is antithetical for the District to argue that there is a durable remedy in place.

At bottom, the defendants continue to violate class members' constitutional and federal rights as well as this Court's orders designed to cure those violations.  There has been no change in law or fact that would justify the relief that the defendants seek — a wholesale dismissal of this case.  Therefore, this Court should deny Defendants' Renewed Motion to Vacate Consent Orders and to Dismiss Action.

---

[61]  Plaintiffs request that the Court not allow this late-submitted document into evidence.  They have had no opportunity to conduct discovery on any of these assertions, to investigate the bases and facts supporting these conclusions, and to consider other competing evidence.  As a result, absent an entirely new fact-cutoff and another round of discovery, the plaintiffs would be seriously prejudiced if the Court allows this document, and new documents appended to the defendants' motion, into evidence.

[62]  Although the majority in *Horne* cites *Milliken* to support their position, there is no reference to durable remedy in the *Milliken* decision cited by the Court.

E.       *Horne Simply Applied Rule 60(b)(5) Authority to a Remarkably Unusual*
         *Set of Facts Which Are Not Present in this Case.*

The result in *Horne* stemmed from an extraordinarily unusual confluence of factors — a kind of perfect storm for Rule 60(b)(5) purposes.  Actions taken by the District Court to enforce its judgment (not consent decree) raised "sensitive federalism concerns," 129 S. Ct. at 2593, concerns that were "heightened when [the federal judgment had] the effect of dictating," *id.* at 2593-2594, a state's budget priorities.  Finally, the Court in *Horne* expressed serious concerns about evidence of collusion between nominal adversaries.

In *Horne*, the District Court concluded, following a trial, that the defendants were in violation of a federal statute, a judgment the defendants elected not to appeal.  The District Court in *Horne* went on to take a number of unusual steps, including applying the declaratory judgment order statewide, granting broad injunctive relief, commanding the legislature to fund particular state programs within 15 days, and then imposing fines ranging from $500,00 to $2 million per day when the Legislature failed to heed its order.  Nor did the trial court encounter any kind of opposition from the defendants along the way; to the contrary, "the record suggests that some state officials supported [the orders'] continued enforcement," 129 S. Ct. 2590, and the state attorney general even "acquiesce[] in the state-wide extension of the declaratory judgment order," *id.*  The next attorney general went so far as to oppose the superintendent's request for a stay of the order imposing fines, and began assembling a distribution plan for the fines.  Before the state legislature finally passed its statute, it had accrued more than $20 million in fines.  *Id.*

Also unusual, "the principal defendants (State Board of Education and the State of Arizona, including the Governor) in the action sid[ed] with the plaintiffs," such that the Speaker of the House and the President of the Senate sought to intervene as representatives of the

Legislature.  It was the Legislators and the superintendent who, having been granted leave to intervene, then moved to purge the District Court's contempt order in light of the statute, moving in the alternative for relief under Rule 60(b)(5) based on changed circumstances.

The actions of the District Court in *Horne* reflected the potential dangers of unbridled judicial intrusion by way of equitable judgments.  While recognizing that "federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief," *id.* at 2594, the Court in *Horne* emphasized that a flexible approach is necessary to Rule 60(b)(5) inquiries in light of sensitive federalism concerns and the dynamics of institutional reform litigation, particularly when there is evidence of collusion between the defendants and the plaintiffs.

The District's discussion of *Horne* is noticeably silent when it comes to the facts of the case, particularly those which resulted in its thorny procedural history and standing questions, *see* Doc. No. 1138 at 24-25, with good reason.  The concerns present in *Horne* are utterly absent in this case.  The District Court's actions in this case were in no way reflective of the unbridled judicial intrusion seen in *Horne*, in large part because the most significant orders in the *Evans* case were arrived at by the consent of both parties.  These orders, moreover, set out a remarkably flexible set of standards for constitutional compliance.  *See* section III (C)(1), *supra*.  Nor did the District Court seek to expand its remedy beyond the small, closed class, as the District Court did in *Horne*, and the *Evans* Court certainly did not use federal power to extend the remedy across the District or even the Department.  In fact, given the small, fixed class compared to the broad responsibility of the Department for a much larger group of persons with developmental disabilities, this entire case hardly can be classified as an institutional reform lawsuit that seeks to restructure an entire agency or service system.

Moreover, the District Court made no demands of the legislature, much less strict

demands followed by fines and penalties totaling more than $20 million dollars.  Finally, the District Court has not employed a myopic inquiry, focusing on one sub-part of the remedy, as the District Court in *Horne* did with incremental funding.  Rather, the District Court's review has always been more akin to a totality of the circumstances inquiry, assessing compliance with court orders, which themselves flowed from violations of the Constitution, from a more three-dimensional perspective.

Additionally, the record in this case reflects a lengthy, hard-fought adversarial process, where negotiated agreements more closely resemble the consent decree the Supreme Court approved in *Firefighters* than the collusion as to court judgments it disdained in *Horne*.  At this point in the case, certainly, where the Attorney General for the District of Columbia has led a hard-charging crusade, including a full-blown trial, and has attacked virtually every present and past decision in the case, including those to which the District previously agreed, it cannot be said with any measure of seriousness that the parties are somehow engaging in collusion to achieve a mutually desired outcome.

## IV.    Conclusion

The Court should adopt the Special Masters' Report and Recommendation, deny the defendants' Motion to Vacate and Dismiss, and reject the defendants' alternative of selectively vacating certain unspecified orders.

Respectfully submitted,

Date: November 6, 2009          Cathy E. Costanzo_____
                               CATHY E.COSTANZO (MA Bar # 553813)
                               Center for Public Representation
                               22 Green Street
                               Northampton, MA 01060
                               413-586-6024

SANDY BERNSTEIN (D.C. Bar # 455355)
University Legal Services
220 I. Street, N.E.
Suite 130
Washington, D.C.  20002
(202) 547-0198

PAUL J. KIERNAN, (D.C. Bar # 385627)
STEPHEN F. HANLON (D.C. Bar # 481751)
LAURA FERNANDEZ (D.C. Bar # 500258)
Holland & Knight, LLP
2099 Pennsylvania Ave., N.W.
Suite 100
Washington, D.C. 20006
(202) 663-7276

## CERTIFICATE OF SERVICE

     I hereby certify that a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic filing.  Parties may access this filing through the court's CM/ECF System.

Dated:  November 6, 2009

                                    /s/ Cathy E. Costanzo
                                    Cathy E. Costanzo
                                    Center for Public Representation
                                    22 Green Street
                                    Northampton, MA 01060
                                    (413) 586-6024