# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JOY EVANS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 76-293 (ESH/JMF) |
| | ) | |
| ADRIAN M. FENTY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### *AMICUS CURIAE* BRIEF OF QUALITY TRUST FOR INDIVIDUALS WITH DISABILITIES, INC. REGARDING DEFENDANTS' RENEWED MOTION TO VACATE CONSENT ORDERS AND TO DISMISS ACTION

Laura M. Flegel (D.C. Bar # 431478)
Erin Leveton (D.C. Bar # 486099)
Morgan K. Whitlatch (D.C. Bar # 485813)
QUALITY TRUST FOR INDIVIDUALS
WITH DISABILITIES, INC.
5335 Wisconsin Avenue, NW
Washington, D.C. 20015
Tel:  (202) 448-1443
Fax:  (202) 448-1451
LFlegel@DCQualityTrust.org

J. Michael Klise (D.C. Bar # 412420)
Leslie A. Davis (D.C. Bar # 481138)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500
ldavis@crowell.com

*Counsel for Amicus Curiae Quality Trust for Individuals with Disabilities, Inc.*

## TABLE OF CONTENTS

I.      **INTRODUCTION** ................................................................................................... 1

II.     **QUALITY TRUST'S INTEREST AND UNIQUE EXPERTISE** ............................. 3

III.    **ARGUMENT** ........................................................................................................ 4

    A.    The Motion To Vacate Should Be Denied Under The *Horne* Analysis
        Because Defendants Have Yet To Meet The Objective Of the 1978
        Consent Order And Cannot Demonstrate A Durable Remedy ............................ 4

    1.    The Objective Of The 1978 Consent Order Has Not Been Achieved................... 5

    2.    Defendants Have Not Demonstrated A Durable Remedy Or Changed
        Circumstances Sufficient To Warrant Vacating The Consent Orders ................ 12

    B.    Quality Trust Agrees That An Independent Compliance Administrator
        Should Be Appointed to Coordinate Among Service Agencies ......................... 13

    1.    The Service Delivery System Requires Cooperation, Stability, And Continuity . 14

    2.    Both Class Members And Non-Class Members Suffer From Deficiencies In The
        Current Service Delivery System...................................................................... 16

    C.    Transitioning The Monitoring Role To Quality Trust Is Premature At This
        Stage .............................................................................................................. 19

    1.    The Court Monitor Remains Necessary Because Defendants Have Not Complied
        With The Court's Orders ................................................................................. 20

    2.    Transitioning Class Monitoring To Quality Trust Requires Significant Preparation
        And Planning.................................................................................................. 21

IV.     **CONCLUSION** ................................................................................................. 24

## TABLE OF AUTHORITIES

**CASES**

*Evans v. Fenty*, 480 F.Supp.2d 280 (D.D.C. 2007)................................................. 1, 2, 6, 7, 8, 11

*Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978) .............................................................. 8

*Horne v. Flores*, 129 S.Ct. 2579 (2009) ......................................................................... 4, 5, 12

**RULES**

Fed. R. Civ. P. 60 ................................................................................................................. 4, 5

*Amicus Curiae* Quality Trust for Individuals with Disabilities, Inc. ("Quality Trust"), by and through counsel, hereby responds to Defendants' Renewed Motion to Vacate Consent Orders and Dismiss Action (the "Motion to Vacate") (Dkt. No. 1138), including Defendants' Objections to the Special Masters' August 14, 2009 Report and Recommendation (Dkt. No. 1138-24).

## I.   <u>INTRODUCTION</u>

As the Court has recognized, "this litigation has resulted in a series of consent orders and remedial plans in which [Defendants] have admitted that class members' constitutional rights have been violated and have agreed to take actions necessary to remedy these constitutional violations." *Evans v. Fenty*, 480 F.Supp.2d 280, 281 (D.D.C. 2007). *Evans* class members have been harmed by Defendants' repeated failure to provide adequate services to individuals with intellectual and developmental disabilities ("IDD").[1]   The Court has concluded that Defendants have been, and continue to be, in "systemic, continuous, and serious noncompliance with many of the Court's Orders" that are intended to remedy the ongoing violation of the class members' constitutional rights. *Id.* at 324.   The Court's decision was informed, *inter alia*, by the fact that:

> All of the Court Orders that plaintiffs seek to enforce through this action were agreed to by defendants.   Defendants also agreed to the terms of the 2001 Plan.   In consenting to the entry of these Orders, and in agreeing to the provisions of the Plan, defendants admitted-in 1978, 1981, 1983, and again in 2001-that the existing system for persons with developmental disabilities in the District of Columbia was seriously flawed. Indeed, ***defendants stipulated to violations of class members' constitutional rights*** in the 1978 Consent Order and acknowledged, in the factual findings accompanying the 2001 Plan, that their ***service delivery system was "broken" and in need of being "redefined and rebuilt."***

---

[1]   Consistent with the stance adopted by the American Association on Intellectual and Developmental Disabilities, Quality Trust has used the term "intellectual and developmental disability" or "IDD" in lieu of "mental retardation" throughout this brief.   *See* http://www.thearc.org/NetCommunity/Page.aspx?pid=1496 (last visited Nov. 11, 2009).

*Evans*, 480 F.Supp.2d at 324 (emphasis added).

Defendants' liability with respect to the May 2006 noncompliance motion has been established, and the case has been in the remedy phase since March 2007, with the Special Masters filing their recommendations on the remedy on August 14, 2009.  Now, however, with the possibility of a remedy at hand, Defendants, through their October 7, 2009 Motion to Vacate, seek to end this litigation in its entirety and to vacate every order entered by the Court, including all those to which Defendants expressly consented.

Defendants' Motion to Vacate should be denied because it rests on the premise that Defendants have "progressed far beyond the constitutionally required minimum" of care for individuals with IDD — a premise that Quality Trust, with its extensive first-hand knowledge of how Defendants' systems work for people with IDD, disputes.  Quality Trust agrees that life is better for people with IDD in the District since the closure of Forest Haven.  However, the conditions at Forest Haven were so poor and substandard that closing the facility's doors and providing community based services that are better cannot be all the Constitution requires.  Rather, Defendants must provide class members with consistently adequate health care, keep class members safe from harm, and provide for class members' welfare.  Unfortunately, the Defendants' service delivery system has such a myriad of problems that this has not yet been achieved.

Defendants have not demonstrated the basis for terminating the litigation at this stage; they have not met the objectives of the 1978 Consent Order, nor have they demonstrated the existence of a durable remedy to cure the ongoing and current violations of the Court's orders, the Constitution, and other federal law.  Quality Trust believes that the Court should adopt the Special Masters' recommendation for the appointment of an Independent Compliance

Administrator who can work with Defendants and the *Evans* class to "design and implement" improvements to its service delivery system.  We believe that progress has been made, and there are strong skills currently within Developmental Disabilities Administration (DDA) leadership.  These things, if combined with the focus and authority of an Independent Compliance Administrator, can create the proper conditions to ensure once and for all that the constitutionally required minimum needs of class members will be met.

## II.      QUALITY TRUST'S INTEREST AND UNIQUE EXPERTISE

Quality Trust is an independent, non-profit District of Columbia organization that was created by the parties in this lawsuit and approved by the Court pursuant to the 2001 Consent Order.  *See* Opinion and Order, Dkt. No. 472 (March 30, 2001), Consent Order at 1-2 (attached as Exh. A).  As set forth in that Order, Quality Trust was explicitly created to be a "durable" and "independent" entity that would survive the *Evans* litigation, with a mission that includes the "advance[ment] of the individual and collective interests of consumers with developmental disabilities, and in particular, Evans class members; monitor[ing of] the health, safety, and welfare of these consumers; and monitor[ing of] the protections, services and supports provided to these consumers."  *Id*.

Quality Trust has a unique perspective and interest regarding the issues in this case because it is charged with the monitoring of, and lay and legal advocacy regarding, Defendants' provisions of "protections, services and supports" to individuals with IDD.  *Id*.  Quality Trust staff collectively has a deep breadth of experience working with people with IDD and the systems that serve them.  The staff works on a daily basis with people with IDD, providers, and Department of Disability Services ("DDS") officials to coordinate services and maximize health, safety, meaningful choice, and community involvement.  Since its inception, Quality Trust has collected scores of data on class and non-class members' experiences in Defendants' service

delivery system, and has analyzed and reported on that data, identifying trends in service and support delivery and shortfalls.  Additionally, Quality Trust's Board of Directors and staff include members who are nationally-recognized experts in the IDD field.

## III.   ARGUMENT

### A.   The Motion To Vacate Should Be Denied Under The *Horne* Analysis Because Defendants Have Yet To Meet The Objective Of the 1978 Consent Order And Cannot Demonstrate A Durable Remedy

Defendants seek to vacate the prior Consent Orders – including the 1978 Order that was entered along with Defendants' stipulated admission that they had violated the constitutional rights of the *Evans* class members – on the grounds that it has progressed "far beyond the constitutionally required minimum," such that "continued enforcement of the order[s] is not only unnecessary, but improper."  Motion to Vacate at 2, 4.  Defendants rely on *Horne v. Flores*, 129 S.Ct. 2579 (2009), to support the requested vacatur and dismissal pursuant to Fed. R. Civ. P. 60(b)(5).[2]  In *Horne*, the U.S. Supreme Court examined a District Court's contempt order finding that the state of Arizona was in violation of the Equal Educational Opportunities Act because of the state's funding mechanism.  The state challenged the contempt order and sought relief from the judgment pursuant to Fed. R Civ. P. 60(b)(5) on the grounds that the orders were "no longer equitable" in light of certain structural changes in the state's funding along with policy changes as demonstrated through statutory modifications.

The Supreme Court in *Horne* acknowledged that Rule 60(b)(5) "serves a particularly important function" in "'institutional reform litigation,'" because "changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy

---

[2]      The Plaintiffs have thoroughly set forth extensive legal analysis as to why *Horne* and related cases do not require this Court to vacate all of its orders and dismiss this case, and the Quality Trust adopts, but will not repeat, those legal arguments here.

insights" could "warrant reexamination of the original judgment." *Id.* at 2593 (citation omitted). The Court explained that "a critical question in th[e] Rule 60(b)(5) inquiry is whether the objective of the [original] judgment order [ ] has been achieved. If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id.* at 2595.

Assuming that the constitutional minimum is the correct standard to apply in deciding Defendants' Motion to Vacate,[3] Defendants do not currently meet that standard. As the Plaintiffs have argued, the orders in this case — beginning with the 1978 Consent Order and continuing through the "2001 Plan for Compliance and Conclusion of *Evans v. Williams* " (the "2001 Compliance Plan") — have "all been designed to cure the defendants' violation of class members' constitutional and federal law rights." Plaintiffs' Response at 77. Yet, this Court and the Special Masters have found that Defendants are in persistent and longstanding noncompliance with these orders. *See id.* at 50-55. Going beyond the record, based on Quality Trust's first-hand experience working day-to-day with the local IDD community, we have seen signs of progress, but we have not found evidence of significant compliance with the 2001 Compliance Plan, or that Defendants regularly meet the objectives of the court orders.

**1.      The Objective Of The 1978 Consent Order Has Not Been Achieved**

Applying the *Horne* analysis – "whether the objective of the [original] judgment order has been achieved" – to the circumstances of this case leads only to the conclusion that the Consent Orders should remain in force. The objective of the original 1978 Consent Order, which

---

[3]      *See contra* Plaintiff's Response to Defendants' Objections to the Special Masters' Report and Recommendation, and Opposition to Their Motion to Vacate All Prior Orders and Dismiss the Case ("Plaintiffs' Response"), Dkt. No. 1138, at 77.

defined the constitutional standards with which Defendants must comply, has not been achieved.

All of the Consent Orders are intended to address a singular issue – ensuring that the *Evans* class

members obtain services sufficient to satisfy constitutionally minimal standards.

The 1978 Order was entered in connection with the Court's finding that Defendants had

violated the constitutional rights of a class of individuals with IDD who resided at Forest Haven.

The 1978 Consent Order required, *inter alia*, that all residents of Forest Haven be provided

suitable community living arrangements, community-based day programs, and services

necessary to give them minimally adequate habilitation in the most integrated and least

restrictive community setting.  *See* Motion to Vacate at Exh. 2.  Since the 1978 Consent Order

was entered, this Court has presided over a course of litigation seeking, at bottom, Defendants'

compliance with their obligation to provide the requisite "minimally adequate habilitation" and

services to the *Evans* class members, to which they are constitutionally entitled.

The Court has also entered a series of orders with the consent of the parties, beginning

with the 1981 Consent Order, that specified measures "necessary to the implementation of th[e]

Court's Order of June 14, 1978."  *Evans*, 480 F.Supp.2d at 283 (citing *Evans v. Barry*, No. 76-

293 (D.D.C. June 25, 1981), Consent Order at 1).  Nothing in this series of Consent Orders

obligates Defendants to provide services to the *Evans* class beyond the constitutional minimum.

Rather, as at each step of the way Defendants failed to meet their obligations and commitments,

the parties were required with each successive order to detail more specifically the steps

Defendants should take to come into compliance.

The constitutional minimum standards that Defendants must meet are set forth in the

1978 Consent Order and culminated in the 2001 Compliance Plan and the 2001 Consent Order to

implement the 2001 Compliance Plan.  *Evans*, 480 F.Supp.2d at 286.  As the Court aptly

described it, the 2001 Compliance Plan was "[i]ntended to remedy [] deficiencies and to provide a means for defendants to come into compliance with the outstanding Court Orders." *Id.* at 287. The 2001 Compliance Plan identified the major goals and sub-goals of the outstanding Court Orders as follows:

> (1) appropriate individualized habilitation and treatment in the community in the least separate, most integrated and least restrictive settings, including (a) individualized habilitation plans, (b) the provision of residential, vocational, and day services, (c) staff training, and (d) restricted control procedures (including use of medication, restraints, and time out);
> (2) protection from harm;
> (3) safeguarding consumers' personal possessions;
> (4) monitoring, including (a) case management, (b) quality assurance and fiscal audits, and (c) external monitoring;
> (5) advocacy for consumers;
> (6) adequate budget; and
> (7) timely payment of vendors.

*Id*. *See also* Motion to Vacate at Exh. 3.

Defendants argue that the 2001 Compliance Plan (*see* Motion to Vacate at Exh. 3) and Consent Order, as attached to the 2001 Opinion and Order (*see* Exh. A), imposes "extra-constitutional" requirements upon them. Memorandum in Support of Motion to Vacate ("Memorandum") (Dkt. No. 1138) at 7. But examining the goals of the 2001 Compliance Plan as described above, it seems clear that ensuring "protection from harm," safeguarding consumers' possessions, and ensuring timely payment of vendors and adequate budget so that individuals with IDD may continue obtaining services to which they are entitled, are consistent with a constitutional minimum of care and are not in fact "extra-constitutional." What the Plaintiffs seek, and the Court Monitor reports upon, is Defendants' compliance with basic standards of health care and safety for the class members – not extras that could be construed as going "beyond" the constitutionally-required minimum. Defendants are obligated to meet that

basic standard and the Consent Orders provide an agreed upon road map as to how they can do so.

To be sure, the circumstances for the *Evans* class members and individuals with IDD served by Defendants have improved since Forest Haven was closed in 1991.  As Defendants recognize, when the 1978 Consent Order was entered, Forest Haven was:

> home to more than 1,000 intellectually and developmentally disabled District residents, who were kept segregated by sex and were frequently locked into dirty, run-down wards.  Many Forest Haven residents slept in large, open dormitories affording little privacy or security.  Safety precautions were inadequate to protect residents from physical harm, and some residents [were] beaten or physically abused by Forest Haven staff; other residents [were] beaten or abused, either physically or sexually, by their peers.  Medication and physical restraints were sometimes used to control residents.  Forest Haven residents were afforded virtually no habilitative care; as a result, some class members regressed in personal and social functioning over time.

Memorandum at 18-19 (citing *Evans* complaint, Motion to Vacate at Exh. 1).  Defendants also recognize that, at the time of the 1978 Consent Order, the District was providing "inadequate medical and clinical personnel to provide proper health care," failing to "properly treat injuries and illnesses," and providing "inadequate dental care" and "inadequate nutrition" to the class members.  *Id*. at 18.

Given the dire situation for the *Evans* class members at Forest Haven, eliminating the wrongs described above is an obvious improvement.  Closing the doors to Forest Haven was certainly a start, and Defendants' ongoing process of "designing and implementing" a better service delivery system is progress toward the ultimate goal.  But better than Forest Haven simply is not good enough – the constitutional bar cannot be set that low.  What is required of Defendants, and what the *Evans* class is entitled to, is, in part, "rehabilitative care and treatment in the alternative least restrictive, most integrated setting."  *Evans*, 480 F.Supp.2d at 314; *Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978).  What has changed since Defendants have

-8-

closed Forest Haven is not the need for a remedy but the context in which that remedy must occur – class members living in the community are still suffering from the effects of a "broken system" that causes disruptions in their health care and habilitation services, and that jeopardizes their safety and welfare.

Although Defendants have taken steps in the right direction, evidence abounds of Defendants' continued violation of class members' constitutional rights to health care, safety, and welfare, as the Special Masters have recounted at length in their Report and Recommendation. *See* Special Masters' Report And Recommendation Regarding A Remedy For Defendants' Noncompliance With Court Orders ("Special Masters' Report"), Dkt. No. 1131, at 18-83. Likewise, the Court Monitor has expressed concern over the class members' health care and the fact that those concerns have gone "largely unabated" by Defendants. (Jan. 10, 2008 Monitor Report (attached as Exh. B), at 5.) The Court Monitor reported that during 2007 and 2008, Defendants systemically failed to (i) document significant health problems in the class members' health management plans, (ii) monitor implementation of health management plans, (iii) implement medical recommendations by class members' physicians and medical specialists, and/or (iv) ensure the completion of lab work and diagnostic tests ordered by the class members' physicians. (Jan. 26, 2007 Monitor Report (attached as Exh. C), at 13-19; Sept. 10, 2008 Monitor Report (attached as Exh. D), at 9. The most recent June 2009 Court Monitor Report documents still more of the same. The Court Monitor reported, among other things, that:

- Slightly more than half of the class members included in the sample had Health Care Management Plans that referenced all current, significant health problems with appropriate interventions; ***nearly half did not***;

- Almost forty percent of the class members at risk lack the expected monitoring by the nurses responsible for their overall care;

- Timely implementation of recommendations by treating physicians and medical consultants did not occur ***in the majority of cases reviewed***;

- ▪ ***Lab work and physician-ordered diagnostic tests and consults were not completed*** as prescribed for thirty-six percent and ***fifty-four percent of the class members*** not at risk and ***at risk***, respectively;

- ▪ ***Clinical therapy recommendations were not implemented*** for forty-five percent of the class members not considered to be at risk and, strikingly, ***over sixty percent of the most vulnerable people in this sample***; and

- ▪ ***Nursing assessments were documented to lack comprehensiveness*** and specificity for ***nearly three quarters*** of the not at risk group and nearly sixty percent of the at risk individuals.

June 11, 2009 Court Monitor Report (attached as Exh. E), at 2-3.

The Court Monitor has also documented consistent failures in management of psychotropic drug use, obtaining appropriate consents to the use of psychotropic drugs, and adequate monitoring for individuals to whom psychotropic drugs are administered. Because of the serious and potentially permanent side effects of those drugs, and the concern that psychotropic medications are used to control maladaptive behaviors when less restrictive measures would suffice, competent and consistent monitoring of individuals taking psychotropic drugs, and informed consent by or given on behalf of those individuals, is required. Yet, the Court Monitor consistently reports Defendants' failure to ensure adequate monitoring. *See* Exh. B at 5 ("over fifty percent (52%) of the individuals who receive psychotropic medications are not monitored competently and/or consistently for side effects from these drugs"); May 8, 2008 Monitor Report (Exh. 25 to Motion to Vacate), at 2 ("one of the most serious areas of concern is the failure to ensure competent and consistent monitoring of psychotropic drugs and their side effects"); Exh. E at 12 ("nineteen class members receiving psychotropic medication were found not to be receiving competent and consistent monitoring of the side effects of this medication").

Moreover, it is well-documented that these drugs are being prescribed to class members without first obtaining the informed consent from the person or their alternative decision maker. The Court Monitor recently reported, for example, that for nearly one third of the individuals it

examined during the quarter who had been prescribed psychotropic drugs, "there was no evidence that informed consent had been obtained for the use of psychotropic medication." Exh. E at 13.  The Special Masters likewise found that there is "much evidence in the survey reports of [DC Health Regulation and Licensing Administration] that ICFs/MR often fail to inform family guardians of recommended use of psychotropic medication, obtain the informed consent of the guardian or obtain Human Right Committee approval of the use, as indicated in the provider survey reports."  *See* Special Masters' Report at 39.

Safety is yet another area where Defendants continuously fail to provide for the minimal constitutional rights of class members.  The Court has already noted the "widespread" issues of class members' abuse and neglect; that many serious reportable incidents, including deaths, were not investigated by Defendants in a timely or appropriate manner; and that Defendants did not consistently ensure that appropriate preventive/corrective actions were implemented.  *Evans*, 480 F.Supp.2d at 309-312.  The Court Monitor has reported continuing issues since that time. Specifically, in the August 2007 report, the Court Monitor cited eight overdue investigations of serious reportable incidents, and eighteen outstanding death investigations.  (Aug. 2, 2007 Monitor Report (attached as Exh. F), at 2.)  The Court Monitor subsequently reported on May 8, 2008, that 33 of 57 investigation reports that were due had been received, but almost half were late.  (May 8, 2008 Monitor Report (Exh. 25 to Motion to Vacate), at 23.)  The September 2008 report stated that 179 investigations were due but not completed, and 80 of those pertained to class members.  Exh. D at 5.

Unfortunately, these reported violations of the class members' health, safety, and welfare are nothing new and do not show signs of abatement.  Defendants cannot be said to be in compliance with the consent orders unless and until they can demonstrate that these

pervasive problems have been abated. The ongoing failure to comply with the requirements

of the original 1978 consent order, as more specifically defined in subsequent consent orders,

prevents any finding that Defendants have "achieved the objectives" of any of the consent

orders.

> **2.  Defendants Have Not Demonstrated A Durable Remedy Or Changed Circumstances Sufficient To Warrant Vacating The Consent Orders**

As Defendants have not yet remedied the initial violations of class members'

constitutional rights, they cannot be said to have demonstrated any remedy, much less the

durable remedy *Horne* would require to vacate the Consent Orders. *Horne* does not justify

vacating the Consent Orders and terminating this case because, unlike the defendant in *Horne*,

Defendants cannot show that a "durable remedy has been implemented."

The Supreme Court's expressed concern in *Horne* was that principles of federalism did

not justify the federal court requiring the state of Arizona to spend a certain amount of money, in

a specific way, to cure a perceived deficiency in one city's implementation of a federal education

statute. Our situation is very different. First, in *Horne,* problems in one small school district

resulted in a court order that affected the entire state. Here, the serious problems class members

face transverse every ward, so the solution must be District-wide. In *Horne,* the consent order

dictated a single methodology for achieving compliance. Here, the parties agreed on broad goals

to meet constitutionally minimal standards, but Defendants are free to use any methodology they

wish to achieve those goals. Further, unlike in *Horne,* which dealt with the state of Arizona, the

parties here face systemic problems within the District, which is not a state, so the concept of

federalism is less of a concern.

Finally, distinguishable from *Horne*, the circumstances that currently exist in this case have not changed so dramatically since Defendants entered into the consent orders that it is now unjust to require compliance with them.  Defendants assert "changed circumstances," citing the current economic climate and complaining primarily about their expenses associated with this litigation such as those of the Special Masters, plaintiffs' attorneys, and Quality Trust, as sufficient grounds for vacating the Consent Orders.  *See* Motion to Vacate at 53-56.  But a party cannot get out of litigation simply by saying that it costs too much.  Defendants have now, and always have had, a means of ending the costs and that is by meeting their obligations to class members and coming into compliance.  The one and only reason that this litigation has continued for more than 30 years and has cost millions of dollars is Defendants' steadfast refusal and/or inability to provide minimum constitutionally adequate standards of care for the class.

**B.      Quality Trust Agrees That An Independent Compliance Administrator Should Be Appointed to Coordinate Among Service Agencies**

The Special Masters found that "[a]dditional remedial relief is particularly merited here where defendants neither claim to be in compliance with any of the court's orders, nor have any apparent plan for coming into compliance or any timetable for doing so."  Special Masters' Report at 130.  Quality Trust agrees.  While Quality Trust remains encouraged by initiatives currently in development to reform the system and improve services and supports for DDA consumers, DDA's "current good faith efforts do not amount to compliance."  *Id.* at 131. Further, based on Quality Trust's observation of the service delivery system, it appears that even the best DDA leadership team would be destined to fail in a mission for compliance, because of the two-pronged problem of (1) "Balkanized and dysfunctional" government systems along with (2) the lack of authority vested in the DDA Deputy Director to compel the level of interagency

cooperation needed to ensure consistently adequate service delivery to class members.  *Id*. at 124.

1.     **The Service Delivery System Requires Cooperation, Stability, And Continuity**

Defendants, by their own devices, created a service delivery system that is complex, has artificial separations of powers and functions,  and that requires (but does not achieve) ongoing interagency communication and cooperation, the combination of which puts people with IDD at risk.  The Special Masters have found that the "division of responsibility among several District agencies for the performance of key functions that are required . . . all make close coordination and collaboration indispensable for the effective functioning of the system.  The weaknesses in achieving such coordination continue to impair the effectiveness of the separate efforts of defendants' agencies."  *Id*. at 133-134.  To deal with this, the Special Masters have recommended, and Quality Trust supports, the appointment of an Independent Compliance Administrator to work with the leadership at DDA to effect the needed interagency coordination and assist the DDA leadership with overcoming the systemic barriers to compliance.  *Id*. at 134.

In supporting this remedy, Quality Trust has no intention of undercutting the current leadership at DDA, whom we see as having made progress towards compliance and who have encouraging initiatives underway, most notably improvements to the Medicaid system which has aided in moving people out of intermediate care facilities (ICFs) and into their own homes while significantly increasing the leverage of our local dollars.  *Id*. at 72, 120.  Quality Trust views this remedy as a means both to empower and to free up the leadership team to enable them to move forward more quickly and successfully with their initiatives to improve "delivery of adequate health services, meaningful habilitation, integrated living arrangements and other services owed to class members who must live out their lives in defendant's service system."  *Id*. at 5.

Throughout this case, Defendants have suffered from a lack of stability and continuity of leadership at the highest levels of DDA.  To succeed in the significant reforms necessary for Defendants to come into compliance and achieve a truly durable remedy, DDA needs a leader not only with a vision and a certain skill set, but also the authority and sufficient time to bring that vision to fruition.  Quality Trust believes that Laura Nuss is a leader with good vision and the appropriate skill set, but she needs additional authority and time to bring her vision to fruition.  Quality Trust perceives any remedy that requires stepping back and starting anew as a disruption and derailment of the progress that has been achieved to date.  Thus, Quality Trust urges that the remedy be implemented in a way that respects the continuity of leadership.  The current Deputy Director and her team should have the opportunity to build on their efforts, knowledge, and relationship building to date with the additional much needed power, through the Independent Compliance Administrator, to compel sister agencies such as the Department of Health and the Department of Health Care Finance.

Quality Trust encourages a process for selecting the Independent Compliance Administrator that will take into consideration the perspective of existing DDA leadership in identifying someone for that role who will add and not detract from progress being made.  Because the Independent Compliance Administrator will "work in close collaboration" with the District to "serve as the focal point for the[ir] compliance efforts," it is important for Defendants to have input in the selection process.  *Id*. at 134.  Likewise, since the "authority and role of the Independent Compliance Administrator is. . . to achieve compliance with the court orders," the Plaintiffs must have a significant role in the selection process.  *Id*.

In Quality Trust's view, it would be a benefit for the Independent Compliance Administrator to possess a contemporary knowledge of best practices in systems of support for

people with IDD.  However, given that the Independent Compliance Administrator as

contemplated will work closely with the current leadership at DDA whom we believe has the

necessary expertise, we do not see that as critical.  Quality Trust sees the Independent

Compliance Administrator as taking direction from the leadership at DDA as to best practices

and to clear the way for the team to be successful.

**2.      Both Class Members And Non-Class Members Suffer From Deficiencies In The Current Service Delivery System**

In Quality Trust's experience, many of the areas where Defendants have demonstrated

non-compliance involve system-wide issues that affect class and non-class members alike.

Defendants purport to operate a single service delivery system, serving class and non-class

members in the same fundamental ways.  Class members share homes with non-class members,

attend day programs with non-class members, have the same service coordinators as non-class

members, and use the same doctors, transportation services, and other providers as non-class

members.  Thus, the deficiencies in the system and the lack of compliance with court orders

leave non-class members facing the same jeopardy as class members.  On the positive side,

improvements to the system for one group should result in improvements for all.  But this also

means that both class members and non-class members suffer from failures in the service

delivery system in the areas of mental and behavioral health care, safety and protection from

harm, and welfare.

In the area of mental and behavioral health care, the Special Masters, relying on the Court

Monitor's and D.C. Health Resource Partnership (DCHRP) reports, have found "that there are

ongoing and significant problems with the delivery of timely and appropriate mental health and

behavioral healthcare."  Special Masters' Report at 35.  Problems include "recommended clinic

therapies not being implemented," and "failure to obtain appropriate consent and approval from

Human Rights Committees [HRC] for the use of these restrictive measures." *Id*. at 38, 39.
Quality Trust's monitoring of non-class members found similar problems with lack of
documentation of consent, HRC approval, and implementation of the behavioral support plan.
Quality Trust Annual Monitoring Data Summary and Report (2009) (the "2009 Quality Trust
Report") available at http://www.dcqualitytrust.org/pages/documents/2008-
09Monitoringreport.pdf  (last visited November 11, 2009), at 8-9.

Problems persist in the realm of safety and protection from harm.  The Special Masters
found, based on the Court Monitor's reports, that "the problems of a significant number of
untimely investigations has continued and remained uncorrected" for class members.  Special
Masters' Report at 53.  Quality Trust's monitoring of non-class members shows that at least 60%
of all serious incident investigations were untimely.  2009 Quality Trust Report at 15.

Finally, in the area of welfare, the Special Masters found that "most class members have
written ISPs containing current habilitation plans, behavioral support plans and health plans."
Special Masters Report at 78.  However, the Special Masters also found that many of the ISPs
are not implemented, thereby depriving class members "of the benefits they were intended to
bestow – needed services."  *Id.*  For non-class members, the situation is even worse.  Quality
Trust's monitoring found that "of the 228 people reviewed 169 (74%) had a current, DDS
approved ISP" (2009 Quality Trust Report at 6), meaning that over one quarter of that population
has no ISP (and, therefore, may not be able to obtain needed services).  Given the difficulty in
implementing ISPs for court-monitored class members, it is not a stretch to infer that a larger
percentage of non-class members do not receive the full range of services that they need.

The data set forth above are merely highlights demonstrating that the problems faced by
class members in every area in which Defendants must come into compliance are systemic

-17-

problems that affect class members and non-class members alike.  In some quantitative areas, such as having a written ISP and incident investigation, class members receive better services than non-class members, perhaps due to the scrutiny of this lawsuit.  Quality Trust describes these issues and facts with the understanding that this case and the court's jurisdiction are limited to the class, because they demonstrate how poorly (at least parts of) the system is working.  To ensure that the service delivery system upon which class members rely for housing, health care, and habilitation is functioning at adequate and maintainable levels – in other words, that the remedy is durable – the Independent Compliance Administrator must be focused on solutions that are systemic in nature and therefore will benefit everyone in the system.  To the extent that Defendants fail to uphold the minimum constitutional rights of the class members, it also fails to uphold non-class members' rights, even though it is obligated to ensure that all of those whom it serves are constitutionally protected.  Improvements to the system for class members will inure to the benefit of all.

Finally, the Special Masters enumerate tasks for the Independent Compliance Administrator to complete within three years, essentially creating a three-year exit strategy for the litigation.  Implicit in this is recognition from the Special Masters that compliance is achievable and that Defendants can do it with a person at the helm who is focused and empowered to work solely on compliance.  The role envisioned by the Special Masters starkly contrasts to the current DDA leadership, who must balance the substantial tasks it will require for Defendants to come into compliance with their court-ordered objectives with the day-to-day work of running an agency that is responsible for providing care and services to over 2,000 individuals with IDD.

Quality Trust seconds the Special Masters, because it believes that Defendants can and should come into compliance with the consent orders within a relatively short time.  But instead of focusing on ways to attain compliance, Defendants wish instead to vacate all of the consent orders that require it to do so.  Given the typical length of litigation and the appeals that most certainly will follow, and the work, resources, and expense that will be required to defend their position, Quality Trust urges Defendants to take a different path.  It is well within Defendants' power to put an end to this lawsuit with integrity and in the class members' best interests.  Defendants need only follow the 2001 Compliance Plan that they agreed would satisfy constitutional standards.  Quality Trust does not believe the bar is set too high for Defendants to achieve that goal.  In the context of Defendants' work towards compliance, Quality Trust will be there, as it has since its creation, working with all involved to help build a well functioning, reliable and durable system to serve the class and all people living with IDD in the District; Quality Trust will do this through our monitoring, through legal and lay advocacy, and through our deep expertise in best practices for working with people with IDD.  In Quality Trust's experience, Defendants are well equipped to take on the challenge and succeed – they require only the will to make it happen.

**C.**     **Transitioning The Monitoring Role To Quality Trust Is Premature At This Stage**

Defendants argue there is no longer a need for the Court Monitor and that the "extraordinary funding of and consultation with the Quality Trust for Individuals with Disabilities (the Quality Trust) also establishes the improbability of the District returning to its

'former ways.'" Memorandum at 45.[4]  Defendants further assert that Quality Trust is already

"fulfilling the very needs for monitoring and reporting that led the Court to appoint the Court

Monitor and Special Masters in this case." *Id.* at 46.  Quality Trust currently works with

Defendants in numerous ways to improve services for people living with IDD in the District.

Quality Trust provides regular monitoring of non-class members and report to the District on our

findings and recommendations; our advocates work hand-in-hand with people to overcome

barriers to services in Defendants' system; and our attorneys serve as experts in the City on

issues of capacity and the rights of people with IDD.  However, the monitoring role that

Defendants wish to assign to Quality Trust now is untimely and the structure is not yet in place

for us to do this work. Defendants are speaking here about the question of a durable remedy in

the *Evans* case.  But the key component of a durable remedy in this longstanding litigation is,

and always has been, compliance on the part of Defendants.

**1.      The Court Monitor Remains Necessary Because Defendants
Have Not Complied With The Court's Orders**

Quality Trust agrees with the idea that is implicit in Defendants' assertions: ongoing

monitoring must be part of any durable remedy in this case.  Although Quality Trust sees

monitoring as an important function now and into the future as a means of identifying problems,

measuring the performance of a system, and measuring the effectiveness of efforts to address

problems, the assumption of an ongoing monitoring of class members by Quality Trust has

always been envisioned as something to be undertaken *after* Defendants had come into

compliance with the consent orders in this case.  *See* Exh. A, Attachment A at 6-7.  Therefore, a

---

[4]       In referring to the "extraordinary funding of" the Quality Trust, Defendants neglect to
mention that Quality Trust was created as the result of the 2001 Consent Order entered into by
the District and the Plaintiffs, to address outstanding contempt fines that were imposed by the
Court in February 1999 and subsequently appealed (*see* Exh. A).

proposal to transition the monitoring function solely to Quality Trust is premature.  For this reason generally and for reasons discussed in greater detail below, is premature to eliminate the Office of the Court Monitor.

One of the key reasons that it remains essential to maintain the Office of the Court Monitor at this stage of "fixing" of the DDA system is the simple fact that the Office of the Court Monitor has an enforcement power that Quality Trust does not.  The 2001 Consent Order grants Quality Trust broad *access* authority to monitor, but Quality Trust has no *enforcement* authority.  At some time in the future, when enforcement is no longer a daily, ongoing concern, the monitoring role that Quality Trust can and will play will be an important mechanism for Defendants and others to understand the situation for all people receiving services through DDS/DDA, just as Quality Trust's monitoring is currently a critical tool for understanding the DDS/DDA system's work with and for non-class members.  After compliance has been achieved, Quality Trust's monitoring function will continue to play a key role in identifying the problems that a well-functioning system faces.  But so much more is needed now.  This Court is the entity with the authority to require Defendants to attend to unsolved problems and issues identified by its own monitor.  Quality Trust has no such power under current law.

**2.      Transitioning Class Monitoring To Quality Trust Requires Significant Preparation And Planning**

Once the Defendants have achieved compliance, Quality Trust is completely willing and indeed is planning for the day that it will step into the role of monitoring class members.  However, the role that the District describes for Quality Trust in its Motion to Vacate is not consistent with the activities that Quality Trust has undertaken to date, which have been in keeping with the role defined by the 2001 Compliance Plan that created Quality Trust (*see* Exh. 3 to Motion to Vacate at 48) and with the Court's 2001 Opinion and Order (*see* Exh. A at 6-9).

Defendants state that Quality Trust currently "*reviews* 'services to all Evans class members as well as non-class members'" (Memorandum at 46 (emphasis added)), which is correct. However, by design and pursuant to the 2001 Settlement Agreement (*see* Exh. A, Attachment A at 6-7) , Quality Trust's direct monitoring function was always intended to focus on monitoring of non-class members for the duration of this litigation.  Quality Trust's assumption of direct monitoring responsibility for the group of people defined as class members was intended to happen only at the close of the litigation, when Defendants have achieved compliance with the existing consent orders.

Importantly, while Quality Trust has the authority to monitor class members pursuant to the 2001 Compliance Plan and the Court's 2001 Order and Opinion, Quality Trust does not currently monitor the *Evans* class members precisely because the 2001 Settlement Agreement directs Quality Trust to work alongside the Court Monitor, and to "avoid redundancy, until [the *Evans* class members] are no longer subject to regular Court supervision."  Exh. A, Attachment A at 6.  To underscore this relationship, the settlement agreement also required that Quality Trust's monitoring unit and the Court Monitor be "physically co-located," to further ensure coordination, communication, and to further avoid redundancy.  *Id.*  This is exactly how Quality Trust and the Court Monitor currently operate.  Thus, pursuant to its role as prescribed in the 2001 Compliance Plan, Quality Trust utilizes its funding and resources to engage in a variety of monitoring activities for non-class members.  These activities include individual monitoring; review and follow-up on all abuse, neglect and personal theft incidents involving non-class members of which Quality Trust becomes aware; environmental site visits; regular reporting based on the data collected; and technical support to providers.  Quality Trust performs personal interviews of all of the people with IDD that it monitors, focusing its assessments on collecting

data pertinent to the services received by those individuals and ensuring that required supports for each person are in place.

Although the overarching issue is compliance and the steps required to achieve an end to this litigation, it is nevertheless worth raising the narrower question of the requirements for successfully transitioning the monitoring role from the Court Monitor to Quality Trust.  There are several key structural issues which absolutely must be solved if the Quality Trust is to assume this important role.  First, after the consent orders are vacated, the essential rights of access to [DDA] consumers, and their residences, facilities, buildings, programs, services, documents, records (including medical and departmental) and other materials, will disappear, because these rights are spelled out in the 2001 Compliance Plan and 2001 Consent Order and are not codified or ordered anywhere else.  Without legislation or some other durable mechanism ensuring the right of Quality Trust to access that information, it will be impossible for Quality Trust to carry out the essential function of ongoing monitoring.

Moreover, there has been no meaningful process thus far, on the part of Defendants, to engage with Quality Trust to plan for this important, ongoing collaboration which is envisioned by the 2001 Compliance Plan (*see* Exh. 3 to Motion to Vacate), the 2001 Settlement Agreement (*see* Exh. A, Attachment A at 5-7), by the Court's 2001 Order (*see* Exh. A at 6-9), and by Defendants' Motion to Vacate.  Further, a plan must ensure that Defendants comply with and fulfill their obligations under the 2001 Settlement Agreement and consider the potential need for continued funding for Quality Trust's ongoing monitoring activities.  Quality Trust strongly urges the parties to begin working on a plan for ongoing access authority for Quality Trust, and for a mechanism to enforce the recommendations resulting from monitoring, as both are crucial components that must be part of the planning and preparation to exit the litigation.  We

respectfully urge the Court to address these issues in its decision and order on remedy in this matter.

When adequate structures are in place, and an opportunity for meaningful transition from the Court Monitor has occurred, Quality Trust will be able to assume post-litigation monitoring of the *Evans* class members along with its current monitoring function.  Compliance as well as each of these elements is crucial to a durable remedy.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Quality Trust opposes the District's motion to vacate all the prior consent orders and dismiss this case, and supports the appointment of an Independent Compliance Administrator as the Special Masters have recommended.

Dated:  November 11, 2009                    Respectfully submitted,

*/s/ Laura M. Flegel*                                */s/ J. Michael Klise*
Laura M. Flegel (D.C. Bar # 431478)      J. Michael Klise (D.C. Bar # 412420)
Erin Leveton (D.C. Bar # 486099)          Leslie A. Davis (D.C. Bar # 481138)
Morgan K. Whitlatch (D.C. Bar # 485813)   CROWELL & MORING LLP
QUALITY TRUST FOR INDIVIDUALS             1001 Pennsylvania Avenue, N.W.
WITH DISABILITIES, INC.                    Washington, D.C. 20004
5335 Wisconsin Avenue, NW                  (202) 624-2500
Washington, D.C. 20015
Tel:  (202) 448-1443                       ldavis@crowell.com
Fax:  (202) 448-1451
LFlegel@DCQualityTrust.org                *Counsel for Amicus Curiae Quality Trust for*
                                          *Individuals with Disabilities, Inc.*