# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JOY EVANS, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff-Intervenor,** | ) | **Civil Action No. 76-293** |
| | ) | **(ESH/JMF)** |
| **v.** | ) | |
| | ) | |
| | ) | |
| **ADRIAN M. FENTY, et al.,** | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF MOTION TO VACATE CONSENT ORDERS AND TO DISMISS ACTION

Defendants (hereinafter "the District'), by and through undersigned counsel, hereby file their consolidated reply in support of their Motion to Vacate Consent Orders and to Dismiss Action.[1]

In opposing the District's motion, Plaintiffs rely heavily, if not exclusively, on the 2001 Plan—a Plan that, as the Court has repeatedly stated, is neither comprehensible nor capable of implementation.[2]  In focusing on the Plan to the exclusion of the actual constitutional standards at issue, Plaintiffs apparently hope to distract the Court from the

---

[1]     This Reply is responsive to the Plaintiffs' and Plaintiff-Intervenor's Oppositions, as well as to the *Amicus Curiae* brief filed by the Quality Trust.  The District has elected to address all of these briefs in a single filing due to the near-total overlap between the Plaintiffs' and Plaintiff-Intervenor's oppositions, and because the Quality Trust's filing, to the extent that it makes any new argument at all, is essentially limited to making the point that planning is needed before the Quality Trust can assume all monitoring responsibilities in this case.

[2]     (*See* Mot. to Vacate at 58 & n.51.)

plain fact that this case originated, more than 33 years ago, from allegations of abuse and neglect occurring at Forest Haven, an institution that has long been closed.   In the intervening decades, this case has expanded to encompass nearly every aspect of the District's provision of services to individuals with developmental disabilities, an unwarranted and unworkable expansion that cannot and should not be perpetuated any longer.

A careful review of the 164 pages filed in opposition by Plaintiffs, Plaintiff-Intervenor, and the Quality Trust makes another thing exceedingly clear:  those parties go to extraordinary lengths to deny the applicability of *Horne v. Flores*, 129 S. Ct. 2579 (2009), to this litigation, going so far as to call the Supreme Court's decision a mere "distraction."[3]  The reason is simple—the Supreme Court's reasoning in *Horne* makes it virtually impossible for this institutional-reform litigation to continue at all, much less in its current form.

As the District explained in its Motion to Vacate, and as further demonstrated herein, the District has fully satisfied the constitutional standards governing the rights asserted by Plaintiffs in this litigation, which the Court's remedial orders are intended to enforce.  As such, and as required by the Supreme Court's holding in *Horne*, "continued enforcement of the order[s] is not only unnecessary, but improper."  *Id.* at 2595 (citing *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)).  There can be no question, based on *Horne*, that where, as here, "compliance [with the law giving rise to the suit] has been achieved[,] responsibility for discharging the State's obligations must be returned

---

[3]      (Pls.' Opp at 2.)  The District confesses that it is utterly confounded as to how Plaintiffs can accuse it of taking a "fundamentally lawless" approach (*id.*) when, well within its rights, all it asks this Court to do is apply binding Supreme Court precedent to the current case.

promptly to the State and its officials." *Id.* at 2596 (internal quotation marks and brackets omitted).[4]

The fallacy of Plaintiffs' position is further demonstrated by their insistence that the District's current state of compliance with underlying constitutional requirements is irrelevant—that is, that this Court should impose a remedy (which probably will not occur until sometime in 2010) based on a record that closed almost one year ago.[5]  This Court, sitting in equity, should do and can do no such thing.

## I. THE DISTRICT HAS SATISFIED THE APPLICABLE CONSTITUTIONAL STANDARDS

### A. *Horne* Provides the Governing Standard

#### 1. *Horne* is not limited to its facts.

Plaintiffs insist that the Supreme Court's holding in *Horne* does not apply to this case because the *Horne* Court based its decision on an extremely unusual set of facts not in evidence here.  (*See* Pls.' Opp. at 84-86; Plaintiff-Intervenor's ("PI.'s") Opp. at 3; Quality Trust's ("QT") Amicus Br. at 12.)  This argument, which amounts essentially to a contention that *Horne* is limited to its facts, is unavailing because—as Plaintiffs surely must know—when the Supreme Court intends to limit the import of its decisions to the facts of the case before it, it says so explicitly.  *See Bush v. Gore*, 531 U.S. 98, 109 (2000) ("Our consideration is limited to the present circumstances * * * ."); *Taylor v.*

---

[4]       Plaintiffs continually conflate noncompliance with previous court orders with failure to satisfy constitutional requirements.  (*See* Pls.' Opp at 6, 8, 19.)  But this is, of course, the wrong analysis; the former does not equate to the latter, and it only is the latter that, under *Horne*, should be of concern to this Court.

[5]       Plaintiffs complain that "[i]t is unfair to [them], and, more importantly, to the Court and the Special Masters, to insist on a continually-evolving record" and to consider later evidence of reform.  (Pls.' Opp. at 16.)  To the contrary, that is precisely what this Court is charged to do by *Horne*:  Determine whether compliance with the law has been achieved.

3

*Kentucky*, 436 U.S. 478, 490 (1978) ("We hold that on the facts of this case * * * ."); *United States v. Van Leeuwen*, 397 U.S. 249, 253 (1970) ("We only hold that on the facts of this case * * * ."); *Barton v. Barbour*, 104 U.S. 126, 131 (1881) ("Our decision upon this question will be limited to the facts of this case * * * .").

The *Horne* Court, of course, made no such statement.  Moreover, Plaintiffs ignore the most crucial facts of *Horne*—that the case involved institutional-reform litigation implicating federalism and separation-of-powers concerns under circumstances indicating, as here, that the state may have been entitled to relief from judgment because it had met the underlying legal standard even without complying with the court's orders.[6]

### 2.	*Horne* applies to cases involving consent decrees.

Plaintiffs go on to argue that *Horne* is inapposite because it involved a litigated judgment rather than a consent decree.  But this is a distinction without a difference; as the language of *Horne* itself makes clear, the relevant issue is the proper application of Rule 60(b)(5) in the specific context of institutional-reform litigation, in which "public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law."  *Id.* at 2594.  Indeed, the *Horne* Court explicitly noted the risk inherent in relying on consent in evaluating 60(b)(5) motions—namely, that "injunctions of this sort bind state and local officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated

---

[6]	Plaintiffs insist that the Special Masters applied the correct legal standard, but Plaintiffs also concede that the Special Masters could not have considered *Horne*, since their draft report was circulated in May 2009, and *Horne* was not issued until June 2009.  Not only are Plaintiffs' two positions mutually exclusive, but the Special Masters certainly could have considered the correct legal standard—that is, the impact of *Horne*—before filing their final Report on August 14, 2009.

legislative and executive powers.'"  *Id.* (quoting *Frew v. Hawkins*, 540 U.S. 431, 441 (2004)).

Just as the state defendant in *Horne* did not appeal the district court's orders in that case and, in fact, went on to consent to the statewide extension of those orders, *see id.* at 2590, in this case prior District administrations consented to the entry of orders whose enforcement is no longer equitable.  Notably, in all 96 pages of their Opposition, Plaintiffs are unable to point to a single indication that the current administration of Mayor Adrian M. Fenty ever consented to, *inter alia*, either the 1978 Consent Order or the 2001 Plan.  Here, as in *Horne*, "'Tomorrow's officeholder may conclude that today's is wrong, and there is no reason why embedding the regulation in a consent decree should immunize it from reexamination.'"  *Id.* (quoting Easterbrook, *Justice and Contract in Consent Judgments*, 1987 U. CHI. LEGAL FORUM 19, 40).

Indeed, states and localities "'depen[d] upon successor officials, both appointed and elected to bring new insights and solutions to problems of allocating revenue and resources.'"  *Id.*  It is "in recognition" of these unique characteristics of institutional reform decrees that the Supreme Court applied the "flexible approach" to Rule 60(b)(5) motions.  *Id.* (quoting *Frew*, 540 U.S. at 442).  Thus, the Supreme Court's directive that responsibility must be returned promptly to state officials once underlying legal violations have been corrected is not limited to cases involving litigated judgments.[7]  *See,*

---

[7]      It also bears noting that, as Plaintiffs have conceded, the record in *Horne* showed that some state officials supported the continued enforcement of the orders in the case and that, at one point, the principal defendants even sided with the plaintiffs.  *Id.* at 2590-91; Pls.' Opp. at 84 (noting that the trial court in *Horne* did not "encounter any kind of opposition from the defendants along the way").  While initially contested, then, the orders at issue in *Horne* ultimately took on distinct characteristics of a consent decree.  This simply proves the District's point—*i.e.*, that the Supreme Court in *Horne* intended to address the application of Rule 60(b)(5)

*e.g.*, *Cleveland Fire Fighters For Fair Hiring Practices v. City of Cleveland*, No. 1:00 CV 301, 2009 U.S. Dist. LEXIS 74221, at *42 (N.D. Ohio Aug. 20, 2009) (noting, in terminating 35-year-old case, that "[t]he United States Supreme Court examined the issue of long-standing consent decrees recently in *Horne*[, and] recognized that long-standing consent decrees are not immune from reexamination").[8]

There is simply no question, then, that the reasoning of the Supreme Court in *Horne* makes no distinction between consent decrees and litigated judgments.[9]

### 3. *Horne* articulated a new rule of law.

According to Plaintiffs (and Plaintiff-intervenor), the Supreme Court's decision in *Horne* is decidedly plain; they maintain that there is certainly nothing new in the decision worthy of this Court's attention. (*See* Pls.' Opp. at 57 & PI.'s Opp. at 2 (both stating that *Horne* established no new rule or law in dealing with Rule 60(b)(5) motions).) Indeed, in

---

in institutional-reform cases involving injunctive relief, whether in the form of a consent decree *or* a litigated judgment.

[8]    Plaintiffs' citations to *Firefighters v. City of Cleveland*, 478 U.S. 501 (1986), *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), and *Frew* to support their position are unavailing.  In a very narrow holding, the *Firefighters* Court addressed only whether a consent decree is an "order" pursuant to § 706(g) of Title VII of the Civil Rights Act of 1964, which might have precluded the court from entering the decree.  478 U.S. at 504.  Obviously, no such question exists in this case.  And, in any event, the Court in *Firefighters* noted explicitly that consent decrees "have attributes both of contracts and of judicial decrees, a dual character that has resulted *in different treatment for different purposes*."  *Id.* at 519 (emphasis added) (internal quotations omitted).  Consistent with this statement, the Supreme Court in *Horne* makes no relevant distinction because, in institutional reform cases, a consent decree operates in the exact same way as does a judgment, with all the inherent potential problems, *e.g.*, improperly impinging on the democratic processes.  S*ee also United States v. W. Elec. Co.*, 46 F.3d 1198, 1205 (D.C. Cir. 1995) ("A consent decree, in other words, is subject to modification to the same extent as if it had been entered as a final judgment after a full trial."); *see also infra* § I.A.3 (discussing *Rufo* and *Frew*).

[9]    *See United States v. Bd. of Educ. of City of Chicago*, No. 80 C 5124, 2009 U.S. Dist. LEXIS 87867, at *19 (N.D. Ill. September 24, 2009) (finding that "[t]he *Horne* opinion makes no distinction between court-ordered or consent decrees").

their zeal to evade the dictates of *Horne*, Plaintiffs insist on relying exclusively on pre-*Horne* case law as establishing the standard for vacatur of the orders in this case. Plaintiffs' characterization of *Horne* begs the question, however, why the Supreme Court would have bothered to take up the case at all, if it intended only to reiterate wholesale its previous holdings, something that the Supreme Court most decidedly does not do.

In reality, of course, the Supreme Court intended to (and in fact did) use *Horne* to provide additional guidance to lower courts in making Rule 60(b)(5) decisions in the very type of institutional-reform litigation at issue in the present case.[10]  *Horne* certainly builds upon the holdings in *Frew* and *Rufo*, in that courts must continue to apply a "flexible approach" in evaluating Rule 60(b)(5) motions to determine whether there has been "a significant change either in factual conditions or in law." *Horne*, 129 S. Ct. at 2593-94. But *Horne* also establishes conclusively, for the first time, that in institutional-reform cases likes this one, vacatur of a judgment is *required* once the defendant has complied with the underlying legal standard.  This is so even where the defendant's action fails to comply with the original order.[11]  *Id.* at 2604.

The case law cited by Plaintiffs is not to the contrary.  In *Frew*, although its holding was based on the dictates of the Eleventh Amendment (not at issue here), the

---

[10]     Judge Thomas F. Hogan of this Court, presiding over a similar case—*LaShawn v. District of Columbia*, CA No. 89-175—certainly disagrees with Plaintiffs' characterization of *Horne*.  As Judge Hogan recently noted, "There is no question that I think the *Horne* litigation has moved in a new direction. * * * [I]t does represent the [Supreme] Court's sensitivity to the separation of powers and avoid[ing] the judicial oversight of the executive."  (Tr. of July 20, 2009 Hearing, attached at Exhibit 1, at 62.)

[11]     Plaintiffs cite *Board of Education v. Dowell*, 498 U.S. 237, 248 (1991), for the proposition that a party seeking to vacate a consent order bears a "higher burden."  (Pls.' Opp. at 59.)  *Horne*, however, makes no mention of a "higher burden"; on the contrary, the *Horne* Court repeatedly emphasized the need for flexibility in evaluating Rule 60(b)(5) motions in institutional-reform cases.  *See Horne*, 129 S. Ct. at 2594-96.

Supreme Court specifically noted its concern that consent decrees "may improperly deprive future officials of their designated and executive powers." 540 U.S. at 441. The Court went on to articulate what would become one of the animating principles of *Horne*: That, while "the basic obligations of federal law may remain the same, * * * the precise manner of their discharge may not," and therefore, "[i]f the State establishes [a] reason to modify [or, as in this case, vacate] the decree," the Court must act accordingly. *Id.* at 442.

Far from merely restating this principle articulated in *Frew*, however, the *Horne* Court went on to specify that "structural and management reforms * * * constitute [a] relevant change in circumstances" sufficient to justify vacatur. *Id.* at 2604. Indeed, the Court specifically chided the Court of Appeals for acknowledging significant structural and management reforms implemented by the defendant in *Horne*, but missing "the legal import of this observation"—namely, that those reforms might have brought the defendant into compliance with the underlying legal requirement even "without satisfy[ing] the District Court's original order."[12] *Id.*

Finally, the passage in *Rufo* on which Plaintiffs rely stands for the unremarkable proposition that a court does not abuse its discretion in entering a consent order when, having determined that constitutional violations were present, the parties agree to do more than what the court would have ordered absent settlement. (*See* Pls.' Opp. at 62.)

---

[12] Plaintiffs also cite *Milliken v. Bradley*, 433 U.S. 267 (1977), in support of their argument that *Horne* does not establish a new rule for determining when to modify or vacate a consent decree. In *Milliken*, the Supreme Court explicitly held that any remedy must "directly address and relate to the constitutional violation itself." *Id.* at 282. While the holding of *Milliken* is, of course, entirely consistent with (indeed, foreshadows) that of *Horne*, the *Horne* Court went on to make clear—for the first time—that a defendant need not comply even with a remedial order that satisfies the *Milliken* standard, if it can remedy the underlying constitutional violation by some other method.

Here, after laboring under such an order for more than 33 years, the District is arguing that it has, in fact, satisfied any underlying legal violation and that all of the orders in the case should accordingly be vacated.  These arguments were not specifically before the Court in *Rufo*; indeed, the *Rufo* Court expressly noted that it was *not* deciding whether "there is no constitutional violation to serve as the predicate for the federal court's continued exercise of its equitable power."[13]  *See Rufo*, 502 U.S. at 389 n.12.  In contrast, this was the exact question addressed by the Court in *Horne*, a fact that Plaintiffs (and Plaintiff-Intervenor) try so desperately to ignore.  *See Horne*, 129 S. Ct. at 2597 (holding that courts must "ascertain whether ongoing enforcement of the original order [is] supported by ongoing violations of federal law").[14]

In short, there simply is no question that the Supreme Court's opinion in *Horne* established a new standard.  That standard clearly applies in this case.  Plaintiffs' attempt to evade its application is therefore futile.

---

[13]     Plaintiffs and Plaintiff-Intervenor also argue that *Rufo* stands for the proposition that no consent decree can be modified if doing so would simply conform the decree to the "constitutional floor."  (Pls.' Opp. at 70; PI Opp. at 4.)  This argument, however, again ignores the holding in *Horne*, which is that in this type of institutional-reform case, once compliance with the underlying legal standard has been achieved, the Court must promptly return responsibility for "discharging the State's obligations to the State and its officials."  *Horne*, 129 S. Ct. at 2595.

Moreover, in *Rufo*, one of the petitioners had argued that a change in law, "*without more*," was sufficient to modify the decree.  502 U.S. at 388 (emphasis added).  Naturally, the Supreme Court determined that a mere clarification in the law, as was the case in *Rufo*, would not automatically result in a modification.  *Id.* at 390.  In this case, however, the District has established not only that the constitutional standard set forth in the 1978 Consent Order is inconsistent with prevailing Supreme Court precedent, but also that numerous changes in facts and circumstances make continued enforcement of the orders in this case plainly inequitable under Rule 60(b)(5).

[14]     Although *Horne* technically involved a statutory claim, as the Supreme Court noted, "the dissent is quite wrong in contending that these are not institutional reform cases."  *Horne*, 129 S. Ct. at 2593 n.3.

### B.      The District Has Satisfied The *Horne* Standard

Under *Horne*, the "critical question" that a district court must answer under Rule 60(b)(5) is whether the movant has satisfied the objective of the order at issue—that is, whether the movant has remedied the underlying violation of law.  129 S. Ct. at 2595.  As Plaintiffs concede (Pls.' Opp. at 29), the only purported violations of law underlying the Court's orders in this case are the deprivation of Plaintiffs' Fifth and Eighth[15] Amendment rights to be free from harm and of Plaintiffs' Fifth Amendment right to receive habilitative care and treatment.

Yet, unable to dispute the District's contention that any past deprivations of those rights have been cured,[16] Plaintiffs now seek to characterize this case as involving not only constitutional issues, but also previously unmentioned and nebulous "violations of federal law."  (*Id.* at 31; *see also, e.g., id.* at 31 ("constitutional and federal law violations"), 32 (characterizing the Court's orders as "[g]rounded in federal law [and] buil[ding] on * * * constitutional violations"), 34 ("constitutional and federal-law violations"), 35 ("constitutional obligations and federal law requirements"), 38 ("federal and constitutional law violations").)  Not content to create non-constitutional allegations from whole cloth, Plaintiffs then attempt to equate the constitutional standards at issue

---

[15]      In fact, as the District has previously explained, the Eighth Amendment does not apply at all in these circumstances.  (*See* Mot. to Vacate at 15 n.11.)  Plaintiffs do not argue otherwise in their Opposition and therefore must be found to have conceded this point.

[16]      Whatever the basis for the Court's findings of liability in March 2007, given the current state of compliance more than 2 ½ years later Plaintiffs clearly are not entitled to a remedy, much less the draconian one that they seek.  Indeed, what, if any, remedy the Court could permissibly have imposed in 2007 is entirely irrelevant today.  Since this is a case that sounds in equity, and thus current compliance with constitutional standards must be considered at this stage of the proceeding, the District's relative restraint in challenging allegations of noncompliance during the liability stage (*see* Pls.' Opp. at 8) is of no moment.  Under *Horne*, this Court, at this time, is legally required to consider whether the underlying constitutional standards that prior Court orders were intended to enforce have been satisfied.

with the specific programmatic dictates set forth in this Court's orders (*see* Pls.' Opp. at 51-55), an elision that is plainly prohibited by *Horne* (*see* Defs.' Mot. to Vacate at 10-14).[17]

Most astonishingly, Plaintiffs now seek, for the first time in more than 33 years of litigation, to assert (though not to plead) claims based on the Americans with Disabilities Act ("ADA").[18]   (*See id.* at 34, 46-48 & n.34.)   These extraordinary contortions expose Plaintiffs' position for what it is: an untenable and baseless attempt to deny that plainly applicable Supreme Court precedent clearly mandates vacatur of the orders in this case.

## 1.   Any underlying constitutional violations have been cured.

The constitutional rights asserted by Plaintiffs and relied upon by this Court in issuing its orders are the Fifth Amendment rights to be free from harm and to a minimum standard of care and treatment, and the Eighth Amendment right to be free from harm. The seminal case governing enforcement of these rights is *Youngberg v. Romeo*, in which the Supreme Court held that the right to be free from harm requires only "that the courts make certain that professional judgment in fact was exercised" in attempting to protect the rights of an involuntarily committed individual, 457 U.S. 307, 321 (1982) (internal quotation marks omitted), and that the right to receive habilitation and treatment entitles an intellectually or developmentally disabled individual involuntarily committed to a state facility to "*minimally* adequate training[, which] is such training as may be

---

[17]     Indeed, in their recitation of the Special Masters' findings, (Pls.' Opp. at 51-55), Plaintiffs ignore entirely the many programmatic and structural changes outlined at length in the District's opening brief.   (*See* Defs.' Mot. to Vacate at 14-51.)   As the District explained in that prior brief (*see id.*), any violations of the underlying constitutional standards have been remedied and thus, under *Horne*, compliance with the specifics of the Court's prior orders is immaterial.

[18]     Plaintiffs also include an inexplicable reference to D.C. OFFICIAL CODE § 7-1303.04. (*See* Pls.' Opp. at 40.)

reasonable in light of [the individual's] liberty interests in *safety and freedom from unreasonable restraints*," *id.* at 322 (emphases added).  As explained at length in the District's opening brief, it is indisputable that the District has met these standards.[19]  (*See also supra* at § I.B.2 (discussion of additional progress).)

Plaintiffs protest, however, that this case has a "tortured history of noncompliance" (Pls.' Opp. at 38 (internal quotation marks omitted)) and that the Court's orders should be read as merely articulating, rather than exceeding, the constitutional minimum standard established by *Youngberg* (*id.* at 38-39, 41-43).  Yet Plaintiffs' persistent efforts to confuse the issues cannot elide the vast differences between the minimum constitutional standards articulated by the Supreme Court, on the one hand, and the many, intricately detailed, and highly intrusive program requirements established by the Court's orders in this case, on the other.

Similarly unavailing are Plaintiffs' citations to cases from other jurisdictions that, in some instances, do not even purport to apply the Fifth or Eighth Amendment.  (*See* Pls.' Opp. at 40-41 (citing, *inter alia*, *Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 321-22 (3d Cir. 1990) (dealing with contract interpretation and state-law issues).)  Even where a case does cite the relevant constitutional provisions, it is (in addition to being nonbinding) inapplicable because it turns on factual circumstances not present here.  *See Clark v. Cohen*, 794 F.2d 79, 83 (3d Cir. 1986) (affirming district court's order requiring extensive habilitation where defendant stipulated that the

---

[19]     Indeed, although it is not constitutionally required to do so, the District has provided evidence establishing that it provides services far exceeding this constitutional minimum standard.

individual plaintiff's unconstitutional confinement had caused her deterioration and consequent inability to live a normal life), *cited in* Pls.' Opp. at 44.

Other case law cited by Plaintiffs actually acknowledges the very constitutional standard that Plaintiffs are seeking to avoid in this case – namely, the *Youngberg* rule that the right to habilitation is the right to "*minimally* adequate or reasonable training to ensure safety and freedom from undue restraint." *Jackson v. Fort Stanton Hosp. & Training Sch.*, 757 F. Supp. 1243, 1315-16 (D.N.M. 1990) (emphasis added), *rev'd in part*, 964 F.2d 980, 986 (10th Cir. 1992), *cited in* Pls.' Opp. at 41; *see also Thomas S. v. Flaherty*, 902 F.2d 250, 253-54 (4th Cir. 1990) ("The [district] court did not apply a least restrictive analysis.  Rather, the court identified the class members' right to *minimally adequate* habilitation in a setting *minimally adequate* to reduce self-abuse and aggression.  * * * We do not interpret the court's order to require community placement of all class members." (emphases in original)), *cited in* Pls.' Opp. at 43-44.

In perhaps the most flagrant example of their willingness to distort the legal landscape, Plaintiffs cite an Eleventh Circuit case that not only summarily affirms the district court's denial of the plaintiffs' claim to care in the least restrictive environment, accurately stating that the law of the circuit requires only "minimally adequate" care and treatment, but goes on to explicitly forbid the reader to extrapolate from it anything at all. *See S.H. v. Edwards*, 886 F.2d 292, 292 (11th Cir. 1989) ("This ruling is not to be interpreted as involving *anything* other than the one issue presented" (emphasis in original)), *cited in* Pls.' Opp. at 44 (inexplicably stating that the *S.H.* court decided the appeal on other grounds).

2. **Additional progress in the two months since the District's Motion to Vacate again demonstrates that the District has fully satisfied, and even exceeded, the *Youngberg* standard.**

As outlined below and discussed in detail in the attached Declaration of Laura Nuss ("Nuss Decl."), the District has continued its progress during the interim between the District's Motion to Vacate and this Reply, demonstrating further that it has complied with any applicable constitutional standards. (*See* Exhibit 2.)

- *Increased Access to Providers*:   Family Medical Counseling Services has been recognized as a federally funded qualified health center, and Dr. Veronica Jenkins has agreed to take on as patients a large number of Department of Disability Services' ("DDS") consumers. (*Id.* at ¶ 32.) Likewise, Dr. Naing, a family medicine physician, has also begun accepting new patients. (*Id.* at ¶ 34; *see also* ¶¶ 28-35 (noting increase in clinics that provide ophthalmology services and additional practitioners added to staff at organizations serving the DD population).)

- *Additional staffing*:    The Developmental Disabilities Administration ("DDA") has hired two full-time Clinical Quality Improvement Specialists into the Health and Wellness Unit, bringing the total of full-time staff in the Unit to eight (8). (*Id.* at ¶ 36.) Also, the Incident Management and Enforcement Unit ("IMEU") is hiring two additional investigators and another investigator has recently returned from an extended leave. (*Id.* at ¶ 45.) This will bring the workforce to nine (9) full-time employees from the five (5) that were available in July. (*Id.*)

14

- *Preventive Healthcare Screenings*:  The D.C. Health Resources Development Partnership ("DC HRP") has conducted a study of preventive health screenings for 147, or approximately 11 percent, of all consumers served by the DDA in residential settings.  (*Id.* at ¶ 41.)  The study group exceeded the national rate in percentage of individuals who receive annual flu vaccines, colonoscopy screenings, PAP smears, and mammography screenings.  (*Id.*)  Moreover, these studies evidence the continuing quality improvement efforts of the District, and the findings from the study are guiding changes in documents to assist the DDA in tracking and trending critical health indicators.  (*Id.*)

- *Supported Employment*:  The DDA is continuing its efforts to implement its supported employment program.  (*Id.* at ¶ 54.)  In addition to joining the State Employment Leadership Network ("SELN"), the DDA has begun to participate in monthly teleconferences with stakeholders to advance employment outcomes.  (*Id.*)  Further, the DDA attended the annual SELN meeting in November and will begin Strategic Planning activities with SELN and key stakeholders in the District on December 2 and 3, 2009, to build a work plan for the District to advance an Employment First Initiative.  (*Id.*)

Illustrating that the District has exceeded constitutional standards, these initiatives, in addition to the numerous structural and programmatic improvements outlined in the District's opening brief (at 14-51), make obvious that the District is entitled, under *Horne*, to dismissal of this litigation.

### 3.      Plaintiffs' attempt to rely on the ADA is utterly impermissible.

Plaintiffs' attempt to add a new cause of action to the case—more than 33 years after it was filed and, needless to say, well beyond any discernible time limit for amending the Complaint—is astonishing, if not absurd.[20]   Plaintiffs maintain that the Americans with Disabilities Act ("ADA"), enacted in 1990, supports their reading of this Court's orders as entitling them to receive services in the least restrictive, most community-integrated environment.  (Pls.' Opp. at 34, 46-48.)  The problem, of course, is that the Plaintiffs do not assert, and have never asserted, an ADA claim in this litigation. Their last-ditch attempt to insert a new claim simply demonstrates the impossibility of establishing that (1) there is an underlying, continuing constitutional violation for which the extensive remedial scheme in place is necessary or (2) even assuming a *constitutional* violation, that the orders in the case are necessary to remedy that *constitutional* violation.

Moreover, Plaintiffs' attempt to rely on *Olmstead v. L.C.*, 527 U.S. 581 (1999), in which the Supreme Court held that the ADA's prohibition on disability-based discrimination forbids the unnecessary segregation in institutions of people with disabilities, not only invokes inapplicable law but creates an entirely new allegation from whole cloth: namely, that the violation at issue here is one of unlawful discrimination. (*See* Pls.' Opp. at 47-48.)  Plaintiffs must not be permitted to sustain their lawsuit at any cost by luring the District and the Court far beyond their actual claims and into areas of law that might have been, but never were, either pleaded or proven.

---

[20]       Indeed, Plaintiffs might be accused of "changing the rules of the game" or "knocking over the card table in the middle of a bad hand," accusations that Plaintiffs themselves have unfairly leveled (Pls.' Opp. at 57) at the District for simply requesting that the Court apply binding Supreme Court precedent to the facts of this litigation.

**4.      The 2001 Plan is not an enforceable order and cannot supplant the applicable constitutional standards.**

Plaintiffs maintain speciously that the Plan represents a "flexible approach" required in Rule 60(b)(5) determinations and that the outcomes actually represent the District's own view of "what is needed to cure federal law violations." (Pls.' Opp. at 68.) Of course, this characterization ignores entirely the basis of the District's Motion to Vacate, which is that the District has already complied with all constitutional requirements "by other means," as allowed under *Horne*. *See* 129 S. Ct. at 2589.

Moreover, even a cursory glance at the 2001 Plan establishes, notwithstanding Plaintiffs' statements to the contrary, that (1) the goals of the Plan far exceed any applicable constitutional minimum and (2) the requirements are exceedingly specific and onerous. For example, Goal I of the Plan (individualized habilitative treatment in the least separate, most integrated, and least restrictive settings[21]) instructs the District, among other things supposedly required by the Constitution, to "develop a computerized information system to aggregate information" and "purchase and distribute computers and software for use by case managers." (2001 Plan at 15, attached to Defs.' Mot. to Vacate as Ex. 3.) Goal B (monitoring) requires that the District maintain a case manager ratio of 1:30 and that case managers conduct a minimum of eight monitoring visits per year. (*Id.* at 38.) Regarding "Essential Systemic Conditions," the District is required to modify the waiver and the definition of "day treatment program" for purposes of Medicaid reimbursement. (*Id.* at 63.) Nothing could be a more specific requirement, or

---

[21]      For the reasons stated above, this goal, as articulated, obviously goes well beyond any constitutional minimum.

more clearly beyond constitutionally mandated standards, than obligating the District to modify its regulatory relationship with the federal government.

And, of course, the ultimate point remains:  The 2001 Plan—a plan that the Court repeatedly has stated it finds cumbersome and impossible to implement[22]—is not an enforceable order, and the District, if it did previously, no longer consents to its requirements.

## II.     PLAINTIFFS FAIL TO REBUT THE DISTRICT'S OBJECTIONS TO THE SPECIAL MASTERS' REPORT AND RECOMMENDATION

### A.     Special Masters' Function/Role

As a threshold issue, it is indisputable—as aptly noted by Chief Justice Roberts during a recent oral argument in the U.S. Supreme Court—that the Report and Recommendation of a Special Master (even one appointed by the Supreme Court itself) is entitled to absolutely no deference from the trier of fact:

> MR. BAROLOMUCCI:  Thank you, Mr. Chief Justice, and may it please the Court:
>
> The Special Master correctly concluded that Charlotte, Duke, and the Catawba River Water Supply Project should intervene in this original action.  Her recommendation deserves some deference because she is in the best position to know whether these parties would assist her in the adjudication of this complex dispute.
>
> CHIEF JUSTICE ROBERTS:  This is our original jurisdiction.  I regard the Special Master as more akin to a law clerk than a district judge. We don't defer to somebody who's an aide that we have assigned to help us gather things here.

Transcript of Oral Argument (attached hereto as Exhibit 3) at 26, *South Carolina v. North Carolina*, — U.S. — (No. 138 [Orig.]) (Oct. 13, 2009).

---

[22]     (*See* Mot. to Vacate at 58 & n.51.)

As a substantive matter, Plaintiffs, in maintaining that the Special Masters "did what they were charged to do" (Pls.' Opp. at 17), appear to fall into the same kind of misguided thinking that marred the Special Masters' recommendation in the first place. That the Special Masters followed their mandate is precisely the point—and the problem. As noted in the District's Motion to Vacate, the Masters perceive their task as "assessing compliance since 2006 and recommending to the Court a remedy for defendants' deficient performance of its [sic] *court-ordered obligations*." (Report at 3 (emphasis added); *see also* Pl.'s Opp. at 7 (agreeing that the Special Masters were instructed to determine the "current status of Defendants' compliance").) As a result, the Special Masters fail to even consider the impact of *Horne* (or, for that matter, *Frew* and *Rufo* either). And they make no pretense that they did.[23]

In short, unless and until the Court determines whether the District "is now fulfilling its [constitutional] obligation[s] by new means," *Horne*, 129 S. Ct. at 2589, an inquiry ignored entirely by the Special Masters, the Masters' Report and Recommendation cannot support any remedy in this litigation, and certainly not the imposition of a receiver in all but name.

## B.     The Court Monitor's Reports

In Plaintiffs' extensive defense of the Special Masters' use of the Court Monitor's reports (Pls.' Opp. at 10-13), they fail to acknowledge one critical point: That the Court Monitor herself has already acknowledged the inherent, and fundamentally fatal, weakness of her analyses. The Court Monitor admits that her reports are not based on

---

[23]     Plaintiffs erroneously assert (Pls.' Opp at 8) that the District never notified the Special Masters of the impact of *Horne*. The District filed its Notice of Supplemental Authority (Docket No. 1126) on July 10, 2009, more than a month before the Special Masters issued their Report and Recommendation on remedy.

statistically significant samples, that any differences across time are described for reference purposes only, and that she has not used her own data to analyze trends. (*See* Exhibit 26, May 8, 2008 Quarterly Report at 5, attached to Defs.' Motion to Vacate.) If these reports cannot identify systemic issues that establish an ongoing constitutional violation—and they cannot—then, under *Horne*, they must be rejected.[24]

### C.      The Sawyer Declaration

The Special Masters' exclusion of the Kathy Sawyer declaration was clearly improper. During the December 2008 hearing on remedy, the District withdrew Kathy Sawyer from its witness list and, accordingly, also withdrew her declaration, which had been proffered as her direct testimony pursuant to the Court's May 19, 2008 Scheduling Order. (*See id.* at ¶ II.H. (requiring direct testimony to be in the form of a declaration).) This should have ended the matter, as the District was not required to call any particular

---

[24]      The Quality Trust also relies extensively, and almost exclusively, on the Court Monitor's reports to buttress its arguments that the District has not met the constitutional standard. (*See* QT Amicus Br. at 8-12). For the same reason, Quality Trust's arguments on this issue must be rejected.

As for the adequacy of the Quality Trust's monitoring to ensure that problems with the District's service delivery are promptly identified and corrected, the Quality Trust confirms that it is currently engaged in precisely this type of monitoring with regard to non-class members, and that it "is completely willing and indeed is planning for the day that it will step into the role of monitoring class members." (QT Amicus Br. at 21.) Indeed, the Quality Trust acknowledges in its brief that it has historically refrained from such monitoring out of a desire to avoid redundancy with the Court Monitor. (*Id.* at 22.) Thus, the time is ripe for the District and the Quality Trust to implement a plan under which the Quality Trust will monitor class members as well as non-class members. (*See id.* at 24 ("When adequate structures are in place, and an opportunity for meaningful transition from the Court Monitor has occurred, Quality Trust will be able to assume post-litigation monitoring of the *Evans* class members along with its current monitoring function.").)

The Quality Trust's opposition to undertaking this transition at this time appears to be based on a mistake of law: namely, the Quality Trust believes that only compliance with the Court's orders can evidence a durable remedy. (*See id.* at 20.) As explained above, under *Horne*, that plainly is not the law.

witness to testify.  But Plaintiffs insisted that they wanted Sawyer to testify, and initially stated that they would call her as a witness, though they changed their minds after the lunch recess.  Thus, there was no live testimony by Sawyer.  Instead, the Special Masters allowed Plaintiffs to submit excerpts from Sawyer's deposition[25] and ruled that the District could submit counter-designations of testimony from that deposition, in addition to portions of the Sawyer declaration to "round out the picture."  (*See* Trial Tr. at 582, attached here at Exhibit 4 (Exhibit 1 to Defs.' Objections to Special Masters' Order Granting Pls.' Mot. to Strike Sawyer Decl. [Docket No. 1083]).)

In response to the Special Masters' ruling, Plaintiffs offered Sawyer's direct testimony in a number of areas including compliance with court orders, agency infrastructure, interagency cooperation, bifurcation of the DD population, and the time frame within which substantial reforms would be in place.  (*See* Exhibit 5 (Exhibit 2 to Defs.' Objections).)   The District then offered its own counter-designations and the original declaration, which the Special Masters erroneously excluded.

The rules of evidence clearly allow for cross-examination on the subject matter of a witness's direct testimony.  *See* FED. R. EVID. 611(b).  Where Plaintiffs' designated testimony implicated compliance with court orders, for example, the District should have been allowed to cross-examine Sawyer on the District's progress in numerous areas, which was the subject matter of Sawyer's declaration.  (*See* Exhibit 6 (Sawyer Decl. attached as Exhibit 3 to Defs.' Objections at §§ 6-20).)  Moreover, Sawyer's opinion on

---

[25]      Plaintiffs' position is particularly troubling because Plaintiffs could have chosen to provide deposition excerpts for Sawyer prior to the hearing on remedy, as they did with Lisa Alexander, who was also identified as a defense witness in the Pretrial Order.  Instead, Plaintiffs insist that the Special Masters were correct in allowing Plaintiffs to submit evidence, without cross-examination, at the hearing on remedy.

remedy went to the heart of the proceedings.  (*See id.* at ¶ 21.)  While the District did not choose to offer Sawyer as a witness, it clearly was entitled to cross-examine her, in this case through written submissions, once Plaintiffs proffered her as their witness.  And given the absolute lack of prejudice to Plaintiffs, the Special Masters' ruling excluding the Sawyer declaration was clear error.  (For additional discussion, *see also* Exhibit 7, attaching Defs.' Reply to Pls.' Opp. to Defs.' Objections to the Special Masters' Order Granting Pls.' Mot. to Strike Sawyer Decl. [Docket No. 1090].)

> **D.     The Health Resources Partnership Report**

Plaintiffs do not deny that the DCHRP Report was not submitted as evidence before the Special Masters during the hearing on remedy.  However, they essentially argue that the Special Masters properly considered the report because it was "part of the Court record."  (Pls.' Opp. at 15 n.29.)  This report was submitted by the District in response to the September 12, 2007 order, which resulted in a Report and Recommendation by the Special Masters.  What Plaintiffs fail to acknowledge, however, is that the Special Masters' Report and Recommendation is the subject of extensive District objections that have never been ruled upon by this Court.[26]  (*See* Docket No. 1101.)  In these circumstances, it was clearly prejudicial for the Special Masters to rely on a report that the District had no opportunity to rebut during the hearing on remedy and, more importantly, that does not represent the current state of compliance with applicable constitutional requirements.  Moreover, because the Court never ruled on the

---

[26]     The District hereby renews its objections as stated in Docket No. 1101.

District's objections and never considered the Special Masters' Report, it has no probative value here, nor does the so called "evidence" used to support its findings.[27]

### E.       Evidence Of Current Progress

Because this case is a case in equity, the District is entitled to submit evidence of its ongoing progress. The Special Masters denied to the District the ability to do so (*i.e.*, the Sawyer declaration) during the hearing. They also failed to consider any evidence of progress during the eight months that passed between the hearing on remedy and the issuance of their Report. (*See* Docket 1129 (filed in August 2009, eight months after the hearing on remedy).) The Supreme Court's holding in *Horne* requires that this Court make "up-to-date factual findings" with respect to changed circumstances. 129 S. Ct. at 2606. The Special Masters' failure to consider up-to-date information is completely improper. Should this Court also fail to consider up-to-date information, it would commit an abuse of discretion.

## III.      THE PROPOSED INDEPENDENT COMPLIANCE ADMINISTRATOR IS A RECEIVER IN ALL BUT NAME

Because the Independent Compliance Administrator is a receiver in all but name, the Special Masters must consider the six factors identified by the Court in its Memorandum Opinion: (1) whether there were repeated failures to comply with the Court's orders; (2) whether further efforts to secure compliance would only lead to confrontation and delay; (3) whether leadership is available that can turn the tide; (4) whether there was bad faith; (5) whether resources are being wasted; and, (6) whether a receiver can provide a quick and efficient remedy. *Evans v. Fenty*, 480 F. Supp. 2d 280,

---

[27]      Similarly, any reliance by Plaintiffs on the Special Masters' prior Report (*see* Pls.' Opp. at 5) should be ignored by this Court, since those findings never have been addressed or adopted by the Court.

326 (D.D.C. 2007) (citing *District of Columbia v. Jerry M.*, 738 A. 2d 1206, 1213).  For the reasons expressed in the District's Motion to Vacate (at 66-69), the Special Masters have failed to demonstrate that the evidence supports the imposition of a receiver, albeit one operating under the title of Independent Compliance Administrator.

Plaintiffs offer no compelling rebuttal to the fact that the Independent Compliance Administrator will exert sweeping power over the District government.  Plaintiffs simply quote with approval the words of the Special Masters that "the authority and role of the Independent Compliance Administrator is limited to actions necessary to achieve compliance with the court orders within a three year period."  (Pls.' Opp. at 22 (quoting Report at 134).)   But, of course, giving one person authority to take any action "necessary" to achieve compliance is by definition a grant of broad and far-reaching authority.

Moreover, Plaintiffs ignore the unique attributes of the current case.  Unlike the desegregation administrator in *Reed v. Rhodes*, 635 F.2d 556, *cited in* Pls.' Opp. at 23, who exercised authority solely over one entity—the Cleveland School System—the Independent Compliance Administrator here will exercise authority over not one, but multiple District agencies, with functions and duties beyond the care and treatment of the *Evans* class.[28]    Additionally, to prevent bifurcation of District functions, any

---

[28]    Plaintiffs themselves recognize that the Independent Compliance Administrator, as envisioned by the Special Masters, will have authority over at least three District entities that serve class members.  (*See* Pls.' Opp. at 23.)  Thus, the instant case is vastly different from that of the Transportation Administrator in *Petties* (*see* Pls.' Opp at 20), whose singular focus is on the provision of transportation for special education students in the District of Columbia Public Schools.  Moreover, one of the many problems with imposing an Independent Compliance Administrator, which both Plaintiffs and the Special Masters ignore, is that the Medicaid program must be administered by a single state agency (now the cabinet-level Department of Health Care Finance) in accordance with the federal requirements in 42 CFR § 431.10.

administrator will necessarily exercise authority over non-class members as well.  (*See, e.g.*, QT Amicus Br. at 16 (the District's "noncompliance involve[s] system-wide issues that affect class and non-class members alike").)  This Court has repeatedly recognized that it has no authority over non-class members.

The Special Masters' proposed remedy was driven by their misconception regarding the current state of inter-agency cooperation necessary to afford class members services and care pursuant to court orders.  Plaintiffs, too, revisit this theme repeatedly but without comprehension of the current state of inter-agency collaboration, arguing that the Independent Compliance Administrator is necessary to "work through and, if necessary around, the bureaucratic hurdles affecting the delivery of services."  (Pls.' Opp. at 22.)  This contention is belied by the facts.[29]  As explained in the District's Motion to Vacate, the premise of Plaintiffs' position is erroneous; cooperation among District agencies has never been stronger.  (*See* Mot. to Vacate at 39-43.)  Moreover, as also discussed in the District's opening brief, the Mayor has established a Task Force composed of high-level representatives from the various agencies to advise him of all issues related to services provided to individuals with IDD.  (*See id.* at 43.)  This forum provides an additional and ample opportunity for District agencies to collaborate as needed to resolve any issue that may arise.

---

[29]    (*See also* Pls.' Opp at 6 (mistakenly arguing that the Special Masters' recommendation is supported by evidence of interagency disarray and that the "District's abandonment of compliance with the Court's 2004 Order requiring an interagency coordinator within the District's executive office").)  What Plaintiffs' argument ignores is that, when the 2004 Order was entered, the then-existing agency serving class members was not an executive-level agency.  Today it is, with direct access at all times to other members of the Executive Office of the Mayor.  This is exactly the type of "changed circumstance" that the Supreme Court in *Horne* instructed district courts to take into account in determining whether to vacate prior orders.  *See Horne*, 129 S. Ct. at 2599 (explicitly stating that "changes in the administration" of the public body at issue constitutes a changed circumstance) (internal quotation marks omitted).

If any doubt remained, the close coordination and collaboration among District agencies involved in the provision of services to the *Evans* class was illustrated in the context of a recent case initiated by the District against one of its service providers, *District of Columbia v. Individual Development, Inc.*, Civil Action No. 7399-09 (D.C. Super. Ct.) ("*IDI*"). The District commenced the *IDI* case by filing a petition for receivership on October 5, 2009, based upon a recurring pattern of deficiencies at eleven (11) residential facilities for persons with developmental disabilities.[30] (*See* Petition for Receivership, attached hereto as Exhibit 8.) Immediately upon filing the petition, the District government brought its various stakeholder agencies—including the Department on Disability Services' Developmental Disability Administration ("DDS/DDA"), the Department of Health's Health Regulation and Licensing Administration ("HRLA"), the D.C. Health Resources Development Partnership ("DC HRP"), and the Department of Health Care Finance ("DHCF")—together with the operator of the facilities at issue, to discuss meaningful and durable ways to resolve the health, safety, and welfare concerns giving rise to the receivership petition. (*See* Nuss Decl. at ¶ 4.)

Over the next three weeks, these parties engaged in intensive settlement discussions that required rapid and seamless coordination among the various District agencies. (*Id.* at ¶ 5.) Draft settlement agreements were exchanged, discussed, and revised, sometimes multiple times per day. (*Id.*) Agency representatives met with the principals of the provider on at least three occasions, and agency personnel held intra-agency conference calls nearly every day, and sometimes more than once per day. (*Id.* at

---

[30] The *IDI* action was prompted, in part, by the Court Monitor's expression of concern regarding the services provided to residents of IDI's facilities. (*See* Oct. 22, 2009 Letter from Elizabeth Jones to Hon. Ellen Segal Huvelle, attached as Exhibit 9.) The Court Monitor described the receivership filing as "decisive action." (*Id.* at 1.)

¶ 6.)  The result of this well-coordinated and intensely cooperative process was a consent order entered in the Superior Court twenty-five (25) days after the case began.  (*See* October 30, 2009 Consent Order, attached hereto as Exhibit 10.)  Since the entry of that order, the agencies and the provider have continued to confer regarding the implementation of the settlement agreement, which is proceeding on schedule.  (*See* Nuss Decl. at ¶ 8.)

In sum, the District's agencies are demonstrably willing and able to work together to ensure that *Evans* class members and other vulnerable District residents receive the services and protections to which they are entitled.  It is thus evident that the appointment of a receiver—under any name—is unwarranted.

## IV.   CONCLUSION

Plaintiffs urge this Court to ignore current and binding Supreme Court precedent in order to hold the District to requirements that are not constitutionally mandated. Plaintiffs also hope that this Court will ignore the fact that the District has remedied the underlying constitutional violations that served as the predicate for the commencement of this action and for the Court's previous orders.  And Plaintiffs want this Court to ignore that, given the current state of compliance, the District must be released from Court supervision.

This Court must resist Plaintiffs' invitation to violate the law.  After more than thirty years, and given the District's systemic reforms, which go well beyond compliance with constitutional standards, enough is enough. While the cumbersome extra-judicial bureaucracy attendant to the Court Monitor and the Special Masters may at one point have served some purpose, it serves none now.  It merely is an extensive and expensive

intrusion and distraction, which impairs the effective and economical functioning of an executive-level agency; an agency that has demonstrated its ability to provide class members with the services and care to which they are constitutionally entitled.

And to even suggest that yet another layer of bureaucracy be added to this mix is not only unimaginative, but nothing short of irresponsible and foolhardy.  Not only must this Court reject the Special Masters' proposed remedy, decisional law requires the Court to dismiss this case.

For the reasons expressed herein and in the District's Motion to Vacate and Dismiss, the District requests that all prior orders in this case be vacated and that the case be dismissed.

Filed:  December 2, 2009                    Respectfully submitted,

                                            PETER J. NICKLES
                                            Attorney General for
                                            the District of Columbia

                                            GEORGE C. VALENTINE
                                            Deputy Attorney General
                                            Civil Litigation Division

                                             /s/ Ellen A. Efros
                                            ELLEN A. EFROS [250746]
                                            Chief, Equity I
                                            Telephone: (202) 442-9886
                                            ellen.efros@dc.gov

                                            /s/ Grace Graham
                                            GRACE GRAHAM [472878]
                                            Assistant Attorney General
                                            Telephone (202) 442-9784
                                            Facsimile (202) 727-3625
                                            grace.graham@dc.gov

/s/ Sarah A. Sulkowski
SARAH A. SULKOWSKI [493235]
Assistant Attorney General
Telephone  (202) 724-6627
Facsimile  (202) 730-1454
sarah.sulkowski@dc.gov