# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                          )

**JOY EVANS**, *et al.*,          )

                 )

          **Plaintiffs,**    )

                 )

**UNITED STATES OF AMERICA,**  )

                 )

      **Plaintiff-Intervenor,** )     **Civil Action No. 76-0293 (ESH)**

                 )

     **v.**              )

                 )

**ADRIAN FENTY,** *et al.*,    )

                 )

          **Defendants.**   )

_____)

## MEMORANDUM OPINION

In 1976, residents of Forest Haven, then the District of Columbia's institution for persons

with developmental disabilities, filed this class action alleging that they were receiving

constitutionally-deficient care, treatment, education, and training.  In 1978, the Court entered a

consent decree pursuant to which defendants agreed that plaintiffs' constitutional rights had been

violated and that they would take certain actions to remedy those violations.[1]  A series of consent

orders and remedial plans followed in which defendants admitted that they were still violating

class members' constitutional rights and agreed to take additional actions to remedy those

constitutional violations.  The last such consent order and remedial plan was entered into in

---

[1]Plaintiffs are a class of former residents of Forest Haven.  As of December 2009, there were 600 class members (*see* Court Monitor Report at 2, Dec. 10, 2009); the original class has decreased due to the deaths of class members.  The sole remaining defendants are the District of Columbia ("the District") and the Mayor Adrian Fenty (collectively "the District" or "defendants").  The United States is also a party, having been permitted to intervene as a plaintiff in January 1977.

2001, when the parties jointly agreed to a Plan for Compliance, pursuant to which defendants could demonstrate compliance with the Court's orders and terminate the litigation.

In 2006, plaintiffs filed a motion to find defendants in noncompliance and to appoint a receiver. On March 30, 2007, the Court granted that motion in part, concluding, based on extensive factual findings, that there had been "systemic, continuous, and serious noncompliance with many of the Court's Orders." *Evans v. Fenty*, 480 F. Supp. 2d 280, 325 (D.D.C. 2007) ("March 2007 Liability Opinion"). With respect to remedy, the Court asked the Special Masters to assist by making findings and recommendations to the Court that address, *inter alia*, "the current status of defendants' compliance, what are the available options for curing the identified deficiencies, and whether a receivership is the most effective and efficient remedy available to the Court." *Id.* at 326.

Now before the Court is the Special Masters' Report and Recommendation, which concludes that, as of December 2008, defendants were still in noncompliance with the Court's orders and recommends the appointment of an "Independent Compliance Administrator" to bring defendants into compliance and to end to this litigation. (Special Masters' Report and Recommendation Regarding A Remedy For Defendants' Noncompliance With Court Orders at 128, Aug. 14, 2009 ["2009 Special Masters' Report"].) Defendants have filed limited objections to the report and oppose the imposition of the proposed remedy;[2] plaintiffs have no objections to

---

[2]However, on March 29, 2010 – only a matter of days before the issuance of this Memorandum Opinion – defendants, having rebuffed all recent efforts to settle this matter and having resisted offering any alternatives to the Special Masters' proposed remedies unless the remedy promised the swift cessation of Court supervision, filed a proposed alternate remedy for ending this litigation. (*See* Defs.' Mot. for Consideration of Alternative to Appointment of Independent Compliance Administrator and for Entry of Exit Plan, March 29, 2010 ["Defs.' Mot. for Alternate Remedy"].) Obviously, there has been insufficient time for plaintiffs to

the report and ask that the Court adopt the findings of the Special Masters and their

recommended remedy.  Also before the Court is a motion the District filed, after the Special

Masters concluded their proceedings in January 2009, to vacate all consent orders and to dismiss

the entire case.  For the reasons stated herein, defendants' motion to vacate and dismiss will be

denied.  The Court will address, in a future memorandum opinion and order, defendants'

objections to the Special Masters' Report and Recommendations.

**BACKGROUND**

The lengthy procedural history of this litigation prior to March 30, 2007, will not be

repeated here, as it was fully summarized in the Memorandum Opinion filed on that date.  *See*

*Evans*, 480 F. Supp. 2d at 281.  Certain events, however, are relevant to defendants' pending

motions and will be briefly noted below, followed by a more detailed summary of the facts and

procedural history that post-date that decision.[3]

**I.      KEY EVENTS PRIOR TO THE MARCH 30, 2007 LIABILITY OPINION**

**A.      1978 Final Judgment and Order**

On June 14, 1978, the Court[4] entered a "Final Judgment and Order" providing for

permanent injunctive relief.  *Evans v. Washington*, 459 F. Supp. 483 (D.D.C. 1978) ("1978

---

respond to this proposal, which, if nothing else, as a matter of fairness, should have been
submitted during the remedy phase of this litigation so that the parties, the Special Masters, and
the Court could have had some chance to address defendants' new 17-page plan, which, on its
face, appears to dramatically depart from the definition of outcomes and measurement of success
that were agreed to by the parties when they entered into the 2001 Plan.

[3]Although the Court will address the Special Masters' Report and Recommendation in a
separate memorandum opinion and order, many of the relevant facts will be included here as
they are also relevant to the pending motion.

[4]The Honorable John H. Pratt presided over this case from its inception until his death in
August 1995.

Consent Order"). The 1978 Consent Order was premised on the recognition, which was consented to by the parties, that plaintiffs had federal constitutional rights under the due process clause of the Fifth Amendment "to be kept free from harm" and "to receive habilitative care and treatment in the alternative least restrictive of individual liberty" and that "violations of [those] federal constitutional rights . . . have occurred." *Id.* at 484. To remedy those violations, the 1978 Consent Order required defendants and their successors to take a number of specific actions, *see id.* at 484-90, that, loosely classified, fell into three categories: health care, safety, and welfare/habilitation. Defendants "consented to the entry of [the 1978 Consent Order] so as to assure protection of the rights of plaintiffs." *Id.* at 484.

### B. 1981 Consent Order

In 1981, plaintiffs and plaintiff-intervenor filed motions for contempt, based on defendants' noncompliance with the 1978 Consent Order. Those motions led to the entry of a second Consent Order, which supplemented defendants' obligations under the 1978 Consent Order with a list of agreed-upon "measures necessary to the implementation of this Court's Order of June 14, 1978." (Consent Order at 1, June 25, 1981 ["1981 Consent Order"].) The 1981 Consent Order did not revisit the legal conclusions of the 1978 Consent Order nor did it "release defendants from their obligations" thereunder. (*Id.* at 10.) Rather, the parties came to an agreement that defendants needed to take additional measures to assure protection of plaintiffs' constitutional rights. The agreed-upon measures supplemented defendants' obligations in each area addressed by the 1978 Consent Order – health, safety and welfare/habilitation. (*Id.* at 1-10.)

### C.    1982 Supreme Court Decision (*Youngberg v. Romeo*)

In 1982, the Supreme Court decided *Youngberg v. Romeo*, 457 U.S. 307 (1982), addressing for the first time the constitutional rights of an individual who had been involuntarily committed to a state institution for the mentally retarded.  As discussed *infra*, defendants' motion to vacate is based in part on the *Youngberg* decision and defendants' contention, made for the first time in the 28 years since *Youngberg* was decided, that *Youngberg* changed the law and established that the 1978 Consent Order rested on "extraconstitutional" rights.

### D.    1983 Consent Order

In 1982, plaintiffs and plaintiff-intervenor again filed motions for contempt, which led to the entry of a third Consent Order.  (Consent Order, Feb. 8, 1983 ["1983 Consent Order"]).  The 1983 Consent Order similarly did not revisit the legal conclusions of the 1978 Consent Order nor did it release defendants from their obligations under prior orders; it merely added to those obligations "to assist in the implementation of those orders."  (*Id.* at 14-15.)  Again, the agreed-upon measures supplemented defendants' obligations in each area addressed by the 1978 Consent Order – health, safety and welfare/habilitation.  (*Id.* at 2-14.)

### E.    1990 Contempt Order

In 1989, plaintiffs and plaintiff-intervenor again filed motions for contempt.  In 1990, the Court issued an Order holding the District in civil contempt based on its "consistent and continuing violation of the three Consent Orders [of 1978, 1981 and 1983]."  *Evans*, 480 F. Supp. 2d at 284 (quoting Order, Jan. 30, 1990 ["Jan. 1990 Contempt Order"].)  After a sanctions hearing, the Court issued an Order that, *inter alia*, required defendants to complete the outplacement of the 233 plaintiffs remaining at Forest Haven by September 30, 1991.  *Id.* (citing

Order, Apr. 9, 1990 ["Apr. 1990 Contempt Order"]).  By October 1991, all plaintiffs had been moved from Forest Haven and the institution was closed.

**F.    1995 Contempt Order, Appointment of Special Master, 1996 Remedial Plan**

In 1995, four years after the closure of Forest Haven, plaintiff and plaintiff-intervenor filed motions for contempt, for remedial sanctions and for appointment of a Special Master. After two hearings, the Court again found the District to be in contempt based on "clear and convincing evidence, including defendants' conceded violations, that the District is not in compliance with the consent orders in this case . . . ."  (Findings of Fact & Conclusions of Law at 7,  Oct. 11, 1995 ["1995 Contempt Order"].)  In its decision, the Court[5] observed that as of 1995, it had "entered numerous orders, including consent orders between the parties, to safeguard the rights of class members and ensure their adequate and appropriate habilitation." (*Id.* at 1.)  The Court further noted that "[d]efendants *admit* that the District has a continuing responsibility to provide the class members with habilitation in accordance with their needs" and "*admit* that they also are required to provide adequate medical care, psychological care, day programming, community residential placements and other support systems as set forth in the class members' [individual habilitation plans]."  (*Id.* at 5-6 (emphasis added).)  The Court proceeded to find the District in contempt because it (1) was delinquent in ensuring timely payment of providers, in violation of the 1983 Consent Order; (2) permitted inadequate case manager ratios, in violation of the 1983 Consent Order; and (3) offered inadequate "community living arrangements" and "community-based day programs and services as are necessary to

---

[5]The case was reassigned to the Honorable Stanley S. Harris upon Judge Pratt's death in 1995.

provide them with minimally adequate habilitation," in violation of the 1978 Consent Order. (*Id.* at 7-8.)

The Court further found that defendants' "history of noncompliance, compounded by the complicated and factually elusive nature of the matters under consideration," required the appointment of a "Special Master" pursuant to Federal Rule of Civil Procedure 53 to "evaluate and ensure defendants' compliance with the Court's Orders and Consent Decrees . . . and to recommend remedies for any deficiencies in defendants' compliance with the Orders." (Order of Reference at 2, Oct. 11, 1995 ["1995 Reference Order"].)[6]

In August 1996, the Court, based on a Report and Recommendation from the Special Master, adopted a "Remedial Plan," designed "to enable defendants to come into compliance with the terms of this Court's multiple Consent Orders" and to establish the conditions by which defendants could purge their civil contempt. *Evans v. Barry*, No. 76-CV-293, 1996 WL 451054, at *1-*2 (D.D.C. Aug. 2, 1996) ("1996 Order & Remedial Plan"). In adopting the Remedial Plan, the Court observed that

> [d]efendants have, for over two years, chronically and unapologetically violated the terms of nearly every aspect of this Court's multiple Consent Orders. Defendants' unrelenting contempt of this Court's orders, and their seeming inability to bring themselves in compliance therewith, have created chaos for the care providers vested with day-to-day responsibility for the members of this plaintiff class. The plaintiffs comprising this class, as defendants well know, are ill-equipped to adjust to or defend against the city's failure to assist their care providers in giving them the care and treatment they desperately need.

*Id.* at *2. The Court also warned defendants that:

> the point has been reached beyond which this Court will not tolerate further and continuing incidences of contempt by defendants. Any further noncompliance

---

[6]The Court appointed Margaret G. Farrell to serve as Special Master.

> with this Court's longstanding Consent Orders, and noncompliance with the
> Remedial Plan issued this date, must be expected by defendants to result in
> serious consequences.

*Id.* The remedial plan concerned defendants' obligations in each area addressed by the 1978

Consent Order – health, safety and welfare/habilitation.  Id. at *3-*8

### G.     1999 Sanctions Order

In April 1997, less than a year after the Court adopted the 1996 Remedial Plan, plaintiffs

moved for sanctions based on the District's admitted failure to pay providers within 30 days, as

required under that Plan.  In February 1999, the Court granted the motion and imposed a $5

million fine on defendants.[7] *Evans v. Williams*, 35 F. Supp. 2d 88 (D.D.C. 1999).  As part of that

decision, the Court modified the 1996 Remedial Plan to order the Special Master to work with

the parties to "develop and recommend to the Court a plan for the conclusion of the [litigation]"

and the termination of the Court's jurisdiction in a manner that would ensure that plaintiffs'

interests would continue to be protected.  *Id.* at 97.  As envisioned by the Court, the plan would

include "recommended findings of fact and conclusions of law regarding the following topics":

> a.  Goals.  A summary and articulation of the goals of this lawsuit as reflected in
> the 1978 and 1983 Consent Orders, the 1996 Remedial Plan, and all other
> Court-ordered obligations (hereafter collectively "Court-ordered requirements").

> b.  Current compliance.  An evaluation of existing programs to determine the
> extent of defendants' compliance with requirements for the protection of the
> health and safety of the plaintiff class and their effectiveness in meeting the goals
> described in subparagraph a, including but not limited to the provision of
> necessary medical and other health services and the compliance of private
> vendors with District of Columbia licensing and payment requirements governing
> community residence facilities, intermediate care facilities, foster care, day

---

[7]The imposition of $5 million in contempt fines was reversed by the D.C. Circuit on the
ground that the fines amounted to a criminal sanction that could not be imposed without a
criminal trial.  *Evans v. Williams*, 206 F.3d 1292 (D.C. Cir. 2000).

treatment programs, day programs, employment programs, representative payment and guardianship.

c.  Adequate habilitation.  The extent of defendants' compliance with Court-ordered requirements for the provision of adequate habilitation in the least restrictive setting and their effectiveness (strengths and weaknesses) in meeting the goals described in subparagraph a, including individual habilitation planning, individual financial planning, case management, appropriate residential services, adequate habilitation services, and the safeguarding of client funds.

d.  Payment of providers.  The extent of defendants' compliance with Court-ordered requirements for the timely payment of private providers who provide the plaintiff class with appropriate residential services, day treatment programs, vocational and supported employment services, day programs, medical, mental health, dental, and other services required by the Court.

e.  Quality assurance.  The quality assurance methods to be developed and implemented by defendants to monitor continually the performance of public and private providers of service in meeting the goals of the suit.

f.  Standards and compliance measurement.  The standards, including outcome standards to be developed and implemented by defendants, that should be used to determine defendants' continued compliance with Court-ordered requirements, and the way in which compliance with such standards should be measured.

g.  Substantial compliance standards.  The degree of compliance that should be required with each of the standards recommended.

h.  Permanent monitoring.  The steps necessary to establish permanent, objective, efficient, and effective post-termination monitoring of the programs serving class members by independent entities (for example, private accreditation services and independent monitoring bodies).

I. Individual and community advocacy.  The steps necessary to coordinate existing mechanisms and to develop needed mechanisms for the advocacy of the interests of class members, on a[n] individual and community-wide basis, in compliance with Court-ordered requirements, including but not limited to the use of court-appointed attorneys, guardianships, and medical decision-making procedures for class members.

*Id.* at 97-98.

## H.      Appointment of Independent Court Monitor

In November 2000, the Court entered an Order granting the parties' joint motion for the appointment of an independent Court Monitor.  (Order Regarding the Appointment of an Independent Court Monitor, Nov. 21, 2000.)  The Order specified that the duties of the Court Monitor were to include observing, monitoring, reporting findings, and making recommendations to the parties, the Special Master, and the Court regarding implementation of the Court's Orders, and to submit quarterly reports on defendants' "compliance" with the Court's Orders.  (*Id.* at 2-5.)  The Order also provided that the "findings, recommendations and reports of the Court Monitor . . . may be introduced as evidence when relevant and admissible in accordance with the Federal Rules of Evidence."  (*Id.* at 5.)  In order to perform these duties, the Monitor was granted broad access "to the persons, residences, facilities, buildings, programs, services, documents, records, personnel and materials the Monitor deems necessary or appropriate in performing [her duties]."  (*Id.* at 4.)[8]

## I. 2001 Opinion and Order: Joint Stipulated Findings of Fact; Plan for Compliance; Consent Order and Settlement Agreement

In 2001, after "lengthy negotiations" – almost two years of work by the Special Master, the parties, and an expert to the Special Master –  the parties came to a series of agreements that "set forth a careful and detailed blueprint for achieving compliance with the Court's Orders, for the development of permanent and independent mechanisms to safeguard the rights of class members, and for the phased withdrawal of judicial oversight of the District of Columbia's mental retardation system as compliance with the Court Orders [wa]s achieved."  *Evans v.*

---

[8]On January 19, 2001, Dr. Jane Haddad was appointed as the first Independent Court Monitor.  After her resignation, effective February 10, 2004, the Court appointed, with the concurrence of the parties, Elizabeth Jones as the Court Monitor.  Ms. Jones has continued to serve admirably in that capacity and has been of great assistance to the Court and to the parties.

*Williams*, 139 F. Supp. 2d 79, 81 (D.D.C. 2001) ("2001 Consent Order"). Upon consideration of these agreements, the Court, on March 30, 2001, (1) adopted the Parties' Joint Stipulated Findings of Fact, *id.* at 96-107;[9] (2) approved the 2001 Plan for Compliance and Conclusion of *Evans v. Williams*, *id.* at 85 ("2001 Plan");[10] and (3) entered a Consent Order, with a Settlement Agreement attached thereto. *Id.* at 85-96. Two aspects of these agreements remain critically important today: the 2001 Plan to achieve compliance and the creation of the Quality Trust in exchange for plaintiffs' waiver of claims on noncompliance.

### 1.       2001 Compliance Plan

The 2001 Plan started from the premise "that there is already in place a declaratory judgment and permanent injunction recognizing a federal constitutional right to receive

_____

[9]As previously described by the Court, the joint stipulated findings of fact:

> painted a bleak picture as to defendants' record of noncompliance. The findings acknowledged that there had been a "serious breakdown" in the District's system of support for individuals with developmental disabilities and that the system, which had suffered from years of neglect and mismanagement, "urgently need[ed] to be fixed." *Evans*, 139 F. Supp. 2d at 96-97; *see also, e.g., id.* at 98 (noting that District's mental retardation and developmental delivery system was "broken" and needed to be "redefined and rebuilt"). The findings noted that defendants' compliance with the prior Court Orders had deteriorated following the closure of Forest Haven in 1991 and that defendants were not complying with many of the requirements of those Orders. *Id.* at 98. The findings also identified numerous "fundamental problems," including problems with respect to staffing, staff training, and monitoring; management; reporting of and response to unusual incidents; safeguarding of class members' funds; the budgeting process; and the District's Medicaid Home and Community-Based Services waiver. *See id.* at 98-107.

*Evans*, 480 F. Supp. 2d at 286-87.

[10]Clarence Sundram was the expert to the Special Master who "conceived, shaped, and drafted significantly" the 2001 Plan. (2001 Plan at 5 n.1). He was appointed as a co-Special Master on January 30, 2001. (Order, Jan. 30, 2001.)

individualized habilitative care and treatment in the least separate, most integrated, and least restrictive settings, and to be kept free from harm." (2001 Plan at 6.) The Plan then identified (as the Court's 1999 Order had requested) the agreed-upon "goals" of the existing Court orders. According to the Plan, the parties agreed that existing Court Orders embodied eight goals:

(1) Appropriate individual habilitation in the community in the least separate, most integrated, and least restrictive environment;

(2) Protection from harm;

(3) Safeguarding consumers' personal possessions;

(4) Monitoring the service system;

(5) Advocacy for consumers;

(6) Adequate budget;

(7) Timely payment of vendors; and

(8) Essential systemic conditions.

*Evans*, 139 F. Supp. 2d at 81.[11] For each goal (or subgoal), the Plan identified the "relevant Court Orders," the "specific tasks that must be performed to implement those Orders," the "time frames within which the tasks must be performed," the "specific outcome criteria for measuring compliance," the "standard of compliance," and the "methods by which evidence will be collected and evaluated to assess compliance." *Id.* at 81-82.

The Court approved the 2001 Plan "as, in effect, a statement of the conditions for the expected vacating of the Court's relevant prior Orders." *Id.* at 85. It was anticipated that

[w]hile the Plan is not intended to be an independently enforceable document, the

---

[11]The Court's order and opinion included extensive factual findings documenting the District's failure to meet each of the goals. *Id.* at 97-107.

parties do intend that there will be accountability for its implementation. The Plan requires periodic progress reports to the Special Master on its implementation and calls for status conferences with the Court to be scheduled at least bimonthly. The parties agree that if the Court finds that defendants have satisfied the outcome criteria set forth in the Plan, they also will be in compliance with the related Court Orders. Any failure of defendants to implement the tasks identified in the Plan so as to meet the requirements of the related Court Orders would be evidence of noncompliance with those Orders. The Plan provides that until the existing Court Orders are vacated, plaintiffs may seek appropriate judicial relief, including requesting orders requiring compliance with the Order(s) underlying the objectives of the Plan.

*Id.* at 83.

## 2. Creation of the Quality Trust

The Consent Order and attached Settlement Agreement provided that, in exchange for the plaintiffs waiving "any and all claims for past violations of the Court's Orders," the District would "endow and annually fund . . . a durable, independent, nonprofit organization that will monitor and advance the individual and collective interests of people with developmental disabilities in the District of Columbia's service delivery system." *Id.* at 86. Defendants agreed to fund the organization, denominated the Quality Trust, with a total of $31.5 million over eleven years.[12] Ultimately, the goal was for the Quality Trust to be "an external monitoring body to permanently protect the interests of the class members once this case ends." *Id.* at 83.

* * *

The 2001 agreements, which the Court accepted and adopted, contemplated that as defendants satisfied the outcome criteria in the 2001 Plan for particular groups of Court Orders, they would move the Court to have those Orders vacated and dismissed with the ultimate goal

---

[12]Of that amount, Quality Trust estimates that the District still has $5 million left to contribute. (Hr'g Tr. at 138, Dec. 17, 2009 ["12/17/09 Tr."].)

that, over time, defendants would

> implement all of the required actions and meet the specified outcome criteria in order to successfully move the Court to vacate and dismiss the related Court Orders, *except the declaratory judgment on the constitutional rights of the consumers to receive individualized habilitation in the least separate, most integrated and least restrictive environment and to be protected from harm.*

(2001 Plan at 9-10 (emphasis added).)  Once the Court orders were vacated and dismissed, the plaintiffs agreed that they would not "seek recourse to the federal court to litigate individual violations of rights in this case pursuant to the declaratory judgment which will remain unless: (1) there are systemic violations of the declaratory judgment; or (2) legal remedies are unavailable in Superior Court (*e.g.*, due to repeal of the statutes); or (3) there is a failure to adequately fund the Quality Trust pursuant to the Consent Order dated January 19, 2001."  (*Id.*)

Since 2001, however, defendants have not invoked the procedures set forth in the 2001 Plan, to which they agreed, to vacate any Court Orders based on their implementation of the necessary tasks and satisfaction of the specified outcome criteria.[13]  Accordingly, the Court Orders "continue to remain enforceable in federal court."  (*Id.*)  Moreover, even though the 2001 Plan itself was "not intended to be an enforceable document," the parties agreed that plaintiffs "have a great interest in ensuring that the agreed upon actions identified in this Plan are in fact implemented effectively and in a timely manner by defendants to secure the benefits and protections provided for by the Court Orders," and provided, therefore, that "in the event that defendants do not implement the provisions of this Plan effectively and on a timely basis,

---

[13]As noted above (*see supra* note 2), defendants have now made half-hearted reference to a limited number of orders that they believe should be vacated (Mem. in Supp. of Defs.' Mot. for Alternate Remedy at 3 ["Defs.' Mem. re Alternate Remedy"]), but prior to this, defendants steadfastly maintained that modification was not realistic; instead, all orders must be vacated and the case dismissed.  (*See infra* note 34.)

plaintiffs and plaintiff-intervenor retain the right to seek appropriate judicial relief, based on this evidence of noncompliance with the Court Orders, including Orders requiring specific performance of the Plan." (*Id.*)

**J.     2004 Order**

In 2004, after several years of receiving discouraging monitor reports on the implementation of the 2001 Plan, this Court[14] issued an order to address the "need for greater coordination among District of Columbia agencies which have responsibilities for actions that are necessary to achieve compliance with the 2001 Plan." (Order at 1, Jan. 21, 2004 ["2004 Coordination Order"].)  As described therein, the parties had met with the Court on December 12, 2003, and agreed that "the current lack of such coordination has impeded the timely completion of necessary tasks identified in the 2001 Plan." (*Id.* at 1-2.)  The 2004 Order reiterated that the District remained subject to the Court's previous orders, which were issued "to effectuate the rights of class members to adequate habilitation in a manner least restrictive of their liberty" and that the purpose of the 2001 Plan was to require defendants to take certain actions to achieve compliance with those orders. (*Id.* at 1.)  The Order required, *inter alia*, that the Mayor appoint a Deputy Mayor or other senior official "to be responsible for the day-to-day efforts of District of Columbia agencies to achieve compliance with this Court's orders and the 2001 Plan." (*Id.* at 2.)  That individual was to "have the necessary authority to supervise and direct the activities of" and "coordinate the efforts of all District of Columbia agencies" as necessary to "carry out their obligations under the 2001 Plan and previous orders of this Court,"

_____

[14]Shortly after the 2001 Plan was approved, Judge Harris retired and this case was reassigned to the undersigned.

and was to "cooperate with and report periodically to the Special Masters and Court Monitor on defendants' progress," and "appear before this Court at each status conference and report to the Court on behalf of defendants regarding the status of defendants' compliance with the 2001 Plan and orders of this Court." (*Id.* at 3.)[15]

## II.  MOTION FOR RECEIVERSHIP:  LIABILITY PHASE

In May 2006, plaintiffs filed a motion asking the Court to find defendants in noncompliance with the outstanding Court Orders and to place the District's Mental Retardation and Developmental Disabilities Administration ("MRDDA") into receivership.[16]  The Court bifurcated proceedings into a "liability" and a "remedy" phase.  *Evans*, 480 F. Supp. 2d at 291 ("March 2007 Liability Opinion").

While the liability phase was ongoing, several notable events occurred.  On December 20, 2006, the "Developmental Disabilities Services Agency," later renamed the "Department on Disability Services," was established by emergency legislation as a separate Cabinet-level agency to serve consumers formerly served by the MRDDA, including the *Evans* class members.  Developmental Disabilities Services Management Reform Emergency Amendment Act of 2006, §§ 103, 105(1), (2).  In January 2007, Adrian Fenty took office as Mayor for the District of Columbia.  On February 5, 2007, defendants asked the Court to delay its liability ruling in light of the new administration's "commitment to DDS and its consumers" and its newly adopted

_____

[15]Since January 2004, several different individuals have served in this capacity. Presently, the Mayor's appointee is Peter Nickles, the Attorney General for the District of Columbia. *But see infra* pp. 30-31.

[16]The United States, as plaintiff-intervenor, also filed a motion for an order to show cause why defendants should not be held in contempt.  The Court denied that motion on March 30, 2007.  (Order, Mar. 30, 2007.)

"Systems Improvement Plan" in order "to allow sufficient time for the DDS to appropriately address the continuing concerns of the Court, the Monitor, the Department of Justice, and plaintiffs." (Defs.' Notice of Filing of Supplemental Information in Resp. to the Ct. Monitor's Quarterly Report at 10, Feb. 5, 2007.) In making its request, the District indicated that it was "cognizant that much remains to be done to bring DDS into compliance with outstanding court orders and the 2001 Plan," but promised the Court that the "Fenty Administration is fully committed to the success of the new agency, the delivery of improved services and care to the consumers served by the agency, and compliance with the 2001 Plan." (*Id.* at 8.) At a status hearing the next day, the Court rejected this request and indicated that it intended to issue its liability ruling based on the record as of November 29, 2006, when the Court Monitor had filed her supplemental report as requested by the Court, but that information about improvements and accomplishments after that date would be considered in any remedy phase. (Hr'g Tr. at 23-24, Feb. 6, 2007.)

On March 30, 2007, the Court issued its liability ruling, concluding that plaintiffs had met their burden to show that there had been "systemic, continuous, and serious noncompliance" with the Court's prior Orders. *Evans*, 480 F. Supp. 2d at 325.

A.      **Findings: Health, Safety and Welfare**

The Court organized its findings in terms of these three broad subject areas: health, safety and welfare. Based on a record that closed in November 2006, the Court found that

> plaintiffs have demonstrated, by clear and convincing evidence, that defendants
> have failed to comply with existing Court Orders in the core areas of health,
> safety, and welfare. These failures are systemic in that they affect many class
> members served by a cross-section of providers and occur throughout defendants'
> service delivery system. They are serious in that they concern matters that are
> integral to class members' health, safety, and well-being. And, they are

17

continuous in that the same issues of noncompliance have persisted year after year.

*Id.* at 298. A brief summary of the Court's findings follows.

In the category of "health," the Court found that:

defendants have failed in many significant respects to accomplish the tasks and to achieve the outcome criteria in the 2001 Plan that relate to the Court's Orders regarding the provision of health care and to comply with the terms of the Orders themselves. Defendants' deficient performance with respect to these measures provides ample evidence that defendants have failed to comply with the Court's Order that "[a] program of medical, dental and health related services which provides accessibility, quality and continuity of care is required," as well as with Court Orders requiring development of habilitation plans and programs that incorporate all services needed by class members and implementation of appropriate training programs for all staff.

*Id.* at 305 (citations omitted).

In the category of "safety," the Court found that:

defendants have failed in many significant respects to accomplish the tasks and outcome criteria associated with the Court's Orders relating to class member safety and to comply with the terms of the Orders themselves. Defendants' performance in the areas discussed above provides ample evidence that defendants have failed to comply with the Court's Orders prohibiting all acts of "physical or psychological abuse, neglect or mistreatment" of class members, requiring the prompt reporting and investigation of all such incidents and the prompt dissemination of the reports of such investigations to the Court Monitor and other interested parties, requiring the development and implementation of appropriate training programs for all staff, including staff assigned to residential settings, and requiring defendants to provide necessary monitoring mechanisms.

*Id.* at 313-314 (citations omitted).

Finally, in the category of "welfare," the Court found that defendants were not in

compliance in several respects. First, in terms of the "least restrictive, most integrated setting

requirement," the Court found that:

defendants have not complied with the Court's 1978 Order that all class members be provided with "community living arrangements suitable to each, together with

18

such community-based day programs and services as are necessary to provide them within minimally adequate habilitation . . . in the least separate, most integrated and least restrictive community settings."

*Id.* at 319 (quoting *Evans*, 459 F. Supp. at 484). The Court also found serious problems in the areas of implementing "individual support plans" ("ISPs") and thus in "ensuring that class members actually receive the services and supports they require," *id.* at 320, and a failure to comply with orders regarding "adaptive equipment." *Id.* at 321. Finally, the Court found problems in the area of case management, concluding that:

> defendants "fail[ed] to ensure that case managers complete the required number of visits and that they take appropriate action when a class member has been the subject of a serious incident"; "[f]ail[ed] to ensure that case managers are properly trained before receiving caseloads"; and that case managers "fail[ed] to ensure that ISPs are fully implemented."

*Id.* at 324.

> The Court summarized its findings as follows:

> As a result of these failings, class members continue to be placed in inappropriate and overly restrictive residential and day programs, rather than in the least restrictive, most integrated settings. Provider and MRDDA staff, including case managers, are not adequately trained, and case managers do not visit class members with the required frequency and do not adequately address deficiencies in class members' care. In many instances, class members do not receive the needed services and supports that have been identified in their ISPs. Protocols necessary to protect class members' health and safety, such as feeding, positioning, and behavioral plans, are routinely not followed. Health risks are not adequately assessed and monitored for many class members, and recommendations by health care providers are not implemented in a timely manner. While incidents of abuse and neglect of class members persist, defendants have failed to ensure that these and other serious incidents, including class member deaths, are investigated in a timely manner, that the results of such investigations are shared with providers, and that recommended corrective and preventive actions are implemented. Defendants have also compromised the monitoring process by altering death investigation reports.

*Id.* at 324-25. These findings were the basis for the Court's ultimate conclusion that defendants'

noncompliance with Court orders had been "systemic, continuous and serious." *Id.* at 325.

## B.    Remedy

As for the remedy of receivership sought by the plaintiffs, the Court observed:

Although it is clear based on the tortured history of this case that there have been repeated failures to comply with the Court's Orders, this determination is in no way determinative of the question whether plaintiffs are correct in their argument that a receivership should be imposed.

*Id.* at 326. Rather, receivership is a "remedy of last resort," that "should be undertaken only when absolutely necessary." *Id.* (quoting *District of Columbia v. Jerry M.*, 738 A.2d 1206, 1213 (D.C. 1999)).

In light of the complexity of this inquiry, and the fact that "recent developments . . . are encouraging and will be highly relevant to the remedial phase of this action," the Court determined that it would "enlist the assistance of the Special Masters, who have ably served in this capacity for many years, to make findings and recommendations to the Court that address, *inter alia*, the current status of defendants' compliance, what are the available options for curing the identified deficiencies, and whether a receivership is the most effective and efficient remedy available to the Court." *Id.* at 326. The Court instructed that the "determination whether other remedies are inadequate and whether receivership remains the only viable option to effectuate compliance with court orders is to be guided by a number of factors, including

(1) "whether there were repeated failures to comply with the Court's orders"; (2) whether further efforts to secure compliance would only lead to "confrontation and delay"; (3) whether leadership is available which can "turn the tide within a reasonable time period"; (4) "whether there was bad faith"; (5) "whether resources are being wasted"; and, (6) "whether a receiver can provide a quick and efficient remedy."

*Id.* (quoting *Jerry M.*, 738 A.2d at 1213 (quoting *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C.

1997))).  The Court's final observation was that "the daunting task of finding ways to remedy the problems still remains.  In this regard, the Court expects the parties to continue their prior efforts to resolve this matter so that the plight of the class members can be improved as expeditiously as possible, and they will not have to continue to await the outcome of this painfully lengthy and cumbersome litigation."  *Id.* at 327.

## III.    MOTION FOR RECEIVERSHIP: REMEDY PHASE

### A.    Supplemental Order of Reference to the Special Masters

Following the issuance of the March 30, 2007 decision, the parties conferred and jointly agreed on a supplemental order of reference to the Special Masters.  (Supp. Order of Reference, May 3, 2007 ["2007 Reference Order"].)  The 2007 Reference Order provided, *inter alia*, as follows:

> Both Margaret G. Farrell and Clarence J. Sundram have served as Special Masters in this case for many years under prior Orders of Reference.  The Court finds that it is justified and necessary to continue their appointment to assist the Court for as long as the Court deems necessary in this matter.

(*Id.* at 1.)  It further provided that:

> The Masters are authorized to conduct proceedings relating to the necessity for remedial relief, including, as needed, discovery, hearings, mediation and settlement negotiations.  At the conclusion of such proceedings, the Masters will issue a report to the Court making recommended findings of fact, conclusions of law and recommendations regarding appropriate remedies.

(*Id.* at 2.)  Following the issuance of the Special Masters' report and recommendations, the parties were to "file objections to (or file a motion to adopt or to modify) such order, report or recommendations."  (*Id.* at 4.)  The parties were directed that all objections should "specifically identify the portions of the order, or report containing proposed findings of fact, conclusions of law and recommendations for remedial action, to which objection is made and the basis for the

objection." (*Id.*) Finally, the Order provided that this Court would review *de novo* "all objections to the Masters' proposed findings of fact and recommendations regarding remedial relief" and "all objections to conclusions of law made or recommended by the Masters." (*Id.*)

**B.      September 12, 2007 Consent Order ("90-Day Order")**

After a quarterly status conference on August 9, 2007,[17] the parties agreed to develop, and the Court ultimately entered, a consent order "setting forth a limited number of concrete, short-term goals related to retaining and increasing the number of qualified providers and improving the health and safety of class members" that the District agreed to achieve "during the three-month period from October 1, 2007, to December 31, 2007." (Order at 1, Sept. 12, 2007 ["2007 90-Day Consent Order"]). Pursuant to that Order, defendants agreed to take a number of specific actions that were focused on these two critical goals. (*Id.* at 2.) The Special Masters were tasked with determining defendants' compliance with the 2007 90-Day Consent Order, beginning in January 2008. (*Id.* at 1.)

On August 18, 2008, the Special Masters filed their Report and Recommendation regarding defendants' compliance with the 2007 90-Day Order. (Special Masters' Report & Recommendation Regarding Defs.' Compliance with the Consent Order of Sept. 12, 2007, Aug. 18, 2008 ["2008 Special Masters' Report"].) The 2008 Special Masters' Report concluded that overall defendants "did not demonstrate substantial compliance with six out of the 13 provisions of the Consent Order that they recently agreed-upon, and whose obligations they concede they

_____

[17]At the August 9, 2007 status conference, the director of DDS, Judith Heumann, informed the Court that (1) the name of the MRDDA was changing to the Developmental Disabilities Administration ("DDA"); and (2) that Laura Nuss would be the new deputy overseeing the DDA. (Hr'g. Tr. at 5, Aug. 9, 2007.)

clearly understood."[18]  *Id.* at 107.

### C.    Monitoring Compliance

At the same time it issued the 2007 90-Day Consent Order, the Court ordered the parties

to "file with the Court the agreed-upon methodology to be used by the Court Monitor to monitor

defendants' compliance with the requirements of the 2001 Plan and the existing Court Orders by

January 10, 2008." (Minute Order, Sept. 12, 2007).  Following the issuance of this Order, the

Court Monitor circulated to the parties and the Special Masters a proposed monitoring protocol.

On November 21, 2007, defendants filed a notice stating:

> By communication of November 16, 2007, faced with the expenditure of
> substantial resources and time to develop the above-referenced methodology,
> Defendants informed the Court Monitor that a meeting to develop a methodology
> would not be needed since *Defendants would not assert that conditions have so
> fundamentally changed at this point that such comprehensive monitoring is
> appropriate*.  Accordingly, Defendants expressed the view that there was no need
> for the comprehensive monitoring proposed by the Court Monitor and the
> significant expense attendant thereto that would be incurred.

(Defs.' Notice Concerning Proposed Comprehensive Monitoring at 2, Nov. 21, 2007 (emphasis

added).)  By May 2008, a monitoring protocol had still not been agreed upon.  Just prior to the

status conference set for May 15, 2008, defendants filed a motion to stay discovery during the

remedial phase of the case, which was denied by the Court.  (Hr'g Tr. at 38, May 15, 2008.)  On

May 19, 2008, the Court issued a scheduling order to govern the remedy phase.

---

[18]On September 15, 2008, defendants filed a motion for an order modifying the 2008
Special Masters' Report to find defendants in compliance with the 2007 90-Day Consent Order.
(Defs.' Mot. to Modify the Special Masters' Report & Recommendation, Consistent with Defs.'
Objections, to Find Defs. in Compliance with the Consent Order of Sept. 12, 2007, at 1, Sept. 15,
2008.)  On October 6, 2008, the Court held this motion in abeyance and to the extent it is
necessary to address this motion, it will be done in the Court's opinion regarding defendants'
objections to the 2008 Special Masters' Report and Recommendation.

On June 13, 2008, plaintiffs, in response to the Court's request, filed a summary of the remedies they were seeking. That filing set forth a range of possible remedies, "running from no action by the Court up to court-appointed receivership over the entire Department on Disability Services, with oversight of all District agency functions pertaining to *Evans* class members and other individuals with developmental disabilities served by the defendants." (Pls.' Filing on Remedies at 1, June 13, 2008.) Among these alternatives, plaintiffs endorsed the remedy of appointing a "Special Administrator," who would "oversee[] government agencies and functions pertaining to class members until the District achieves substantial compliance with the Court's Orders," but who would not have all the powers of a receiver. (*Id.* at 3.)

### D.   Proceedings Before the Special Masters

Following additional discovery and pretrial proceedings, the Special Masters conducted a three-day trial on December 10-12, 2008. Direct testimony from both fact and expert witnesses was presented by declaration or excerpts from depositions. (Special Masters' Final Pretrial Order at 6, Nov. 28, 2008.) All witnesses were subject to live cross-examination. (Trial Tr., Dec. 10, 2008; Trial Tr., Dec. 11, 2008.) Plaintiffs presented the testimony of two fact witnesses[19] and two expert witnesses.[20] Defendants presented the testimony of six fact witnesses[21] and three expert witnesses.[22] In addition, more than 200 exhibits were introduced

---

[19]John M. Cook, Executive Director, L'Arche, Inc.; Thomas F. Wilds, member of interagency rate-setting task force.

[20]Martha B. Knisley; Lewis H. Spence, lecturer, Harvard School of Education and Kennedy School of Government (remedy).

[21]Laura L. Nuss, Deputy Director of the Department on Disability Services, responsible for the Developmental Disabilities Administration; John McCarthy, Deputy Director of the Department of Health Care Finance and District of Columbia State Medicaid Director; Kathy Sawyer, former consultant and Interim Director, DDS, former *Evans* Compliance Officer

into evidence. Subsequently, both parties submitted Proposed Findings of Fact and Conclusions of Law, as well as post-trial briefs. The Quality Trust for Individuals with Disabilities filed an amicus brief in support of plaintiffs' motion and for the appointment of a Special Administrator. On February 9, 2009, closing arguments were heard by the Special Masters.

### E.     Districts' Motions to Vacate: April 20, 2009

On April 20, 2009, shortly before the Special Masters issued a draft of their Report and Recommendation, defendants filed a motion pursuant to Federal Rule of Civil Procedure 60(b)(5) to vacate all consent orders and dismiss the case. Defendants asserted that "[c]ontinued federal-court oversight is no longer equitable, as there is no question that the District has remedied the alleged constitutional and statutory violations that gave rise to the 1978 Consent Order and its progeny" and "there is no reasonable basis for asserting that the District will revert to violating the law if the Court's orders are lifted." (Defs.' Mot. to Vacate Consent Orders and Dismiss Action at 1, Apr. 20, 2009.) For the first time, in a litigation that has been ongoing for more than 30 years and despite repeated promises to comply with the existing Court orders, defendants took the position that their noncompliance was irrelevant to the question of whether the Court should continue enforcing its orders because those orders went "beyond minimum standards necessary to satisfy constitutional requirements." (*Id.* at 3.) In a minute order filed on May 1, 2009, the Court advised the parties that no opposition to defendants' motion should be

---

(through Jan. 31, 2008) and former Interim Administrator, MRDDA; Judith Heumann, Director, DDS; Amy Brooks, President of RCM, a provider agency; Lisa Alexander, M.D., DC HRP.

[22]David L. Jackson, M.D., PhD, President, Jackson & Assocs. (2007 mortality review and follow-up on recommendations for improvement); Nancy Thaler, Executive Director, National Association of State Directors of Developmental Disabilities Services; and John Sumner, Ph.D (statistical analysis).

filed because it intended to hold it in abeyance until it received the Special Masters' final Report and Recommendation.

### F.    Special Masters' Report and Recommendations

On May 22, 2009, the Special Masters circulated, as required by the 2007 Supplemental Order of Reference, a draft of their proposed findings of fact and conclusions of law for comment.  In that draft, the Special Masters "recommended that the Court's 2004 Order be amended to provide for a Special Compliance Officer to be jointly appointed by the Court and the Mayor with enhanced authority to coordinate and direct the activities of the various District agencies urgently needed to deliver constitutionally acceptable services to the plaintiff class." (2009 Special Masters' Report at 4.)  The draft recommended "that the Court appoint the Deputy Director of DDS/DDA, Laura Nuss, as the Special Compliance Officer merging in one person the legal responsibility under local law with the responsibilities and authority to be conferred by the Court, to lead defendants' efforts to achieve compliance with the court orders."  (*Id.* at 135.) The Special Masters believed that "this least intrusive, and least expensive, remedy was most likely . . . to achieve compliance with Court Orders."  (*Id.* at 4.)  However, this remedy "required the Mayor's agreement."  (*Id.*)  On July 6, 2009, the parties filed their comments on and objections to the draft report.  Defendants' comments indicated that the Mayor would not agree to the proposal to appoint a Special Compliance Officer, making that remedy "no longer a viable one." (*Id.* at 135.)

On August 14, 2009, the Special Masters filed their final Report and Recommendations, based on the record from November 29, 2006, the close of the record for the liability phase, through December 2008, when they closed the record before them.  (*Id.* at 3.)  As described

herein, the Special Masters found that "plaintiffs had proved by clear and convincing evidence that defendants continue to be in serious noncompliance with critical provisions of outstanding court orders" in the areas of health, safety, and welfare. (*Id.*) They recommended as a remedy the appointment of an "Independent Compliance Administrator accountable only to the Court to supervise and coordinate defendants' serial compliance with individual court ordered obligations so that the suit may be dismissed in three years time or less." (*Id.* at 4-5).

### 1. Findings of Fact and Conclusions of Law

#### a. Health

In the area of health, the Special Masters found that defendants were noncompliant in several significant respects. First, regarding medical care, they found that defendants had "failed to completely perform some or all of the following duties": "documenting significant health problems in class members' health management plans; monitoring implementation of health plans; implementing recommendations put forward by class members' physicians and medical specialists and completing lab work and physician-ordered diagnostic tests." (*Id.* at 26-27.) Thus, they concluded:

> The evidence in the record indicates that a significant portion of the plaintiff class have health care needs that are not identified in their health plans. Furthermore, too often needs identified in health plans are not met because health plans are not implemented – i.e. diagnostic tests, consultations and treatments and follow up appointments are not provided or documented in their health records.

(*Id.* at 31.) The Special Masters also found "ongoing and significant problems with the delivery of timely and appropriate mental health and behavioral healthcare." (*Id.* at 35.) These problems included:

> a) lack of access to sufficient psychiatric and psychological services; b) improper professional practices that are inconsistent with professional standards; c)

recommended clinical therapies not being implemented; d) the failure to integrate the use of psychotropic medications into an overall treatment plan; e) the failure to obtain informed consent and approval from Human Rights Committees for use of these restrictive measures; and f) the lack of monitoring of the usage and side effects of psychotropic medications.

(*Id.*)[23]  Finally, the Special Masters found that "delays in obtaining guardianship for the provision of informed consent for medical and dental treatment of class members . . . have continued" (*id.* at 45), sometimes "for months, sometimes more than a year, after the need for a guardian is first identified." (*Id.* at 50.)  As a result, treatment is delayed and class members suffer harmful consequences.  (*Id.* at 49-50.)

Based on these findings, the Special Masters concluded that "plaintiffs have established by clear and convincing evidence" that defendants continue "to be in non-compliance with . . . outstanding consent orders" with regard to (1) "class members' health" (*id.* at 31);  (2) "mental and behavioral health care" (*id.* at 41-42); and (3) timely appointment of guardians.  (*Id.* at 49-50.)

### b.    Safety and Protection from Harm

The Special Masters found the following problems with respect to defendants' obligations to ensure plaintiffs' safety and protection from harm:  (1) "a significant number of untimely investigations" into "serious reportable incidents" and deaths (*id.* at 52-53); (2) "some IMEU reports continue to fail to thoroughly investigate serious reportable incidents" (*id.* at 54); (3) except for Level I incidents, "the investigation report format does not inquire about potential causes and contributory factors leading to the incident under investigation"  (*id.* at 56); (4) an

---

[23]"About one third of the class members (228) receive psychotropic medications," and "305 class members have behavior support plans."  (*Id.* at 35.)

inability to "identif[y] and address[] systemic issues arising in investigations (*id.* at 57); (5)

"numerous instances of providers filing late incident reports or no reports at all, conducting

inadequate investigations, or failing to conduct required investigations with no recommendations

for or evidence of enforcement actions being taken in response to these deficiencies" (*id.* at 60);

(6) "[i]ncidents of harm . . . , including serious physical injury, physical abuse and neglect" (*id.*

at 60); (7) harm resulting from "delays in treatment due to problems with getting informed

consent (*id.* at 61); (8) "harm due to inadequate health care management" (*id.*); and (9) harm

resulting from problems with the District's "transportation broker contract."  (*Id.* at 64).

Based on these findings, the Special Masters concluded that "while there are some

nascent signs of progress in a few areas," there was "clear and convincing evidence that the

problems being experienced by class members in the area of safety and protection from harm are

continuing, serious and systemic."  (*Id.* at 67.)

### c.    Welfare

In terms of court orders concerning plaintiff's "welfare," the Special Masters found the

plaintiffs had "not sustained their burden of proving by clear and convincing evidence

non-compliance with court orders requiring residential placements in less restrictive settings"

(*id.* at 72); with court orders requiring that "all class members have written ISPs containing

current habilitation plans, behavioral support plans and health plans" (*id.* at 78); or with court

orders requiring a minimum of eight visits per year by a service coordinator/case manager.  (*Id.*

at 82).  However, they did find continuing problems in the following areas:  (1) segregated day

programs with arts and crafts as the primary activity and a lack of opportunity for community

experiences (*id.* at 73-74); (2) supported employment (*id.* at 74); (3) implementation of ISPs (*id.*

at 77-79); and (4) service coordinators not ensuring that ISPs are fully implemented or following up when they are not. (*Id.* at 81-84.)

Based on these findings, the Special Masters concluded that there is "clear and convincing evidence" that defendants have "not met their obligation . . . to provide adequate habilitation in non-residential, least restrictive, community-integrated settings" (*id.* at 74), or to "[p]rovide all necessary and proper monitoring mechanisms to assure that community living arrangements, programs and supportive community services of the necessary quantity and quality are provided and maintained." (*Id.* at 83-84.)

### d.      Interagency Coordination

As the Special Masters noted,

> [a]lthough the primary responsibility for providing timely and effective services and supports to class members rests with DDS/DDA, the success of this enterprise depends upon the coordinated efforts of several District agencies, including MAA/DHCF (formerly the Medical Assistance Administration (MAA) in the Department of Health (DOH) and now the Department of Health Care Finance (DHCF)), through which most of the funding is provided, the Health Regulation and Licensing Agency (HRLA) in the DOH, which is responsible for licensing and enforcement with respect to ICFs/MR, the Office of the Inspector General, which has investigative responsibilities for Medicaid fraud and abuse, the Office of Attorney General which files petitions for guardianships in court, and other agencies involved in the personnel, procurement, and budget process . . . includ[ing] the Office of Contracts and Procurement, which has a significant role in the contracting process.

(*Id.* at 84.) As described *supra*, the 2004 Coordination Order was aimed at improving interagency communication coordination. The Special Masters found that despite evidence of improvement, "[t]here has been little evidence submitted regarding specific compliance with [the 2004 Order]." (*Id.* at 90.) According to the Special Masters

> [w]hat is missing is evidence of leadership or coordination by the Mayor's designee—the central point of the order—to give focus, direction and priority to

interagency communication and coordination, to identify planned actions of one agency that may adversely affect the mission of another and to take proactive steps to prevent such a consequence. In the absence of evidence of such efforts, the interagency efforts at the staff level between agencies have not been consistently successful, and gaps in communication and coordination have resulted in harm to class members.

(*Id.* at 90.) Indeed, the Special Masters found that "[t]he evidence is that leaders in the key agencies that have the most significant interagency relationship . . . were unaware of the existing court order or of the responsibility of the Mayor's designee in implementing it." (*Id.* at 92.) These findings led the Special Masters to conclude that

the current lack of awareness by key senior officials of the Order's existence and its requirements, coupled with the absence of evidence of regular interagency meetings or communications with the Mayor's designee regarding significant initiatives, and the evidence of breakdowns in interagency coordination leading to the problems discussed above, are all clear and convincing evidence of ongoing noncompliance with this court order which was that this Court Order has not been implemented as intended to remedy a long-standing problem of lack of interagency coordination.

(*Id.* at 93.)

## 2. Remedy

The Special Masters concluded "that the plaintiffs have demonstrated by clear and convincing evidence that there is a need for additional remedial measures ordered by the Court." (*Id.* at 133.) Having been unsuccessful in their attempt to get defendants to agree to their first choice of remedy, and after many years of futile attempts to reach an agreement with the Fenty Administration as to a workable remedy, the Special Masters' final report recommended the appointment of an "Independent Compliance Administrator" who "would be appointed by the Court, be accountable only to the Court and would not hold an executive appointment." (*Id.* at 134.) As described by the Special Masters, the Independent Compliance Administrator would

not have the same powers of a receiver but would

> serve as the focal point for the compliance efforts of the defendants and work in close collaboration with them, resulting in regular submissions of compliance reports as set forth in the 2001 Plan, and phased judicial disengagement from active supervision of the defendants' developmental disabilities service system within three years. The Independent Compliance Administrator is not intended to have the powers of a receiver or to generally displace the power and authority of agency heads or subordinate officers. Rather, the authority and role of the Independent Compliance Administrator is limited to actions necessary to achieve compliance with the court orders within a three year period. All District agencies and personnel should be directed to cooperate with the Independent Compliance Administrator. If there is a lack of cooperation, or resistance or intransigence, the Independent Compliance Administrator should be required to report it immediately to the Special Masters or the Court.

(*Id.* at 134-35.)

## IV.    CURRENT PROCEDURAL POSTURE

At a status conference on August 19, 2009, the Court set a briefing schedule for plaintiffs to respond to defendants' motion for vacatur and dismissal, combined with a timetable for filing objections to the 2009 Special Masters' Report. Pursuant to the Court's order, defendants renewed their motion to vacate the consent orders and dismiss the action and combined it with their objections to the 2009 Special Masters' Report. (Defs.' Renewed Mot. to Vacate Consent Orders and To Dismiss Action, Oct. 7, 2009 ["Defs.' Mot. to Vacate"].) On November 6, 2009, plaintiffs filed their opposition to that motion (combined with their endorsement of the Special Masters' Report and Recommendations (Pls.' Resp. to Defs.' Objections to the Special Masters' Report & Recommendation, and Opp'n to their Mot. to Vacate All Prior Orders and Dismiss the Case, Nov. 6, 2009 ["Pls.' Opp'n"]). Plaintiff-intervenor, the United States, and the Quality Trust, as *amicus curiae*, also filed oppositions to defendants' motion. (Pl. Intervenor's Opp'n to Defs.' Renewed Mot. to Vacate Consent Orders and To Dismiss Action, Nov. 6, 2009; Amicus

Curiae Br. of Quality Trust for Individuals with Disabilities, Inc., Nov. 11, 2009 ["Quality Trust Opp'n"].)  Defendants filed their reply on December 2, 2009.  (Defs.' Consolidated Reply in Support of Mot. to Vacate Consent Orders and To Dismiss Action, Dec. 2, 2009.)  On December 17-18, 2009, the Court heard argument on defendants' motions to vacate and to dismiss and on whether to adopt the 2009 Special Masters' Report.  The Court will address herein defendants' motions and will address plaintiffs' request that the Court adopt the 2009 Special Masters' Report in a subsequent memorandum.

## ANALYSIS

Defendants have moved under Federal Rule of Civil Procedure 60(b)(5), "at the conclusion of a period of monitoring not to exceed three months,[24] to vacate the Consent Order entered on June 14, 1978 . . . together with all subsequent remedial orders, and to dismiss the action."  (Defs.' Mot. to Vacate at 1.)

Rule 60(b)(5) provides that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding" if "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; *or applying it prospectively is no longer equitable . . . .*"  Fed. R. Civ. P. 60(b)(5) (emphasis added).  Defendants seek relief solely on the ground that enforcing the existing orders prospectively is "no longer equitable."  (Defs.' Mot. to Vacate at 4.)  Conceding they are not in compliance with existing court orders (*see* 12/17/09 Tr. at 14-16), defendants nonetheless contend that all court

---

[24]Under their latest filing, defendants propose the period of court monitoring and supervision to end at the end of 2010.  (Defs.' Mot. for Alternate Remedy at 2.).  Defendants, however, seek to have the Court accept their alternative remedy while still preserving their rights to appeal the denial of their motion for vacatur and dismissal.  (*Id.* at 2 & n.2.)

orders should be vacated because they have "remedied the alleged constitutional and statutory violations that gave rise to the 1978 Consent Order and its progeny, and continued federal-court oversight is therefore no longer either equitable or permissible." (Mem. in Supp. of Defs.' Mot. to Vacate at 3 ["Defs.' Mem."] (citing *Horne v. Flores*, 125 S. Ct. 2579 (2009)).

A party seeking modification of a judgment or order on the ground that applying it prospectively is no longer equitable "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992); *Horne*, 129 S. Ct. at 2593. A party seeking relief "may meet its initial burden by showing . . . a *significant change in either factual conditions or in law*." *Rufo*, 502 U.S. at 384 (emphasis added); *Horne*, 129 S. Ct. at 2593. Changed factual conditions may include when "'the objects of the decree have been attained.'" *Horne*, 129 S. Ct. at 2596 (quoting *Frew v. Hawkins*, 540 U.S. 431, 442 (2004)). "To determine the merits of this claim, [a court] 'need[s] to ascertain whether ongoing enforcement of the original order [is] supported by an ongoing violation of . . . law.'" *Id.* at 2597 (citing *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)); *see also Frew*, 540 U.S. at 442 ("The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials.") If the party seeking modification or vacatur can establish that the "objective of the [district court's] order . . . has been achieved" *and* "a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Horne*, 129 S. Ct. at 2595. In the alternative, a significant change in law may warrant modification or vacatur of a decree "when the statutory or decisional law has changed to make legal what the decree was designed to prevent." *Rufo*, 502

U.S. at 388; *see also Horne*, 129 S. Ct. at 2595 ("[C]ourts must remain attentive to the fact that 'federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.'" (quoting *Milliken*, 433 U.S. at 282 )).

In considering a request for modification in an institutional reform case, a district court must take a "flexible approach." *Horne*, 129 S. Ct. at 2594; *see also Rufo*, 502 U.S. at 381; *Frew*, 540 U.S. at 441. "A flexible approach allows courts to ensure that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." *Horne*, 129 S. Ct. at 2595 (quoting *Frew*, 540 U.S. at 442). "If the State establishes reason to modify the decree, the court should make the necessary changes; where it has not done so, however, the decree should be enforced according to its terms." *Frew*, 540 U.S. at 442. Relief is warranted if the significant change "renders continued enforcement 'detrimental to the public interest.'" *Horne*, 129 S. Ct. at 2593 (quoting *Rufo*, 502 U.S. at 384).

Defendants contend that there has been both a significant change in law and a significant change in factual conditions and that these changes satisfy *Horne*'s requirements for vacatur. Defendants could, of course, obtain vacatur by complying with the court orders. However, they concede they have not achieved compliance. (12/17/09 Tr. at 20-21.) Nonetheless, they argue that the objects of the court orders have been attained because (1) the scope of the right to habilitation recognized in the 1978 Consent Order and the many subsequent consent orders is premised on an incorrect understanding of the law, as established by the Supreme Court's 1982 decision in *Youngberg* and, therefore, those parts of the consent orders that are dependent on that definition are "extraconstitutional,"(*i.e.,* not based on any constitutional violation) and thus are

legally unenforceable; and (2) the remaining parts of the 1978 Consent Order and subsequent

consent orders impose requirements that exceed minimal constitutional standards, and thus,

under *Horne*, defendants are entitled to vacatur once they achieve the minimum, which they

claim to have done.

Defendants' argument for vacatur fails because (1) *Youngberg* does not represent a

significant change in law (Section I(A)); (2) even if *Youngberg* constituted a significant change,

defendants failed to make that argument within a reasonable time after *Youngberg* was decided

(Section I(B)); (3) no matter how *Youngberg* is interpreted, it can only support a limited

modification of the consent orders (Section I(C)); (4) defendants have misinterpreted *Horne*

when arguing that the objectives of the consent decrees have been met because they have

satisfied the constitutional floor (Section II(A)); and (5) defendants have failed to establish that a

durable remedy is in place (Section II(B)).

## I.     DEFENDANTS ARE NOT ENTITLED TO VACATUR BASED ON A CHANGE IN LAW

### A.     *Youngberg* Was Not a Significant Change in Law

According to defendants, *Youngberg* was a significant change in law because "[i]n its

1978 Consent Order, this Court adopted a much more expansive definition of the Fifth

Amendment right to habilitative care and treatment" than *Youngberg* recognizes or permits.

(Defs.' Mem. at 16 n.13.)  Specifically, defendants take issue with the portions of the 1978

Consent Order, to which they agreed, emphasized below:

> Each class member has a federal constitutional right, based upon the Due Process
> Clause of the Fifth Amendment, to receive habilitative care and treatment *in the
> alternative least restrictive of individual liberty and to be kept free from harm*.

> Habilitation is the process by which a resident is assisted in acquiring and

> maintaining those life skills which enable him to cope *more effectively* with the demands of his own person and of his environment *and to raise the level of his physical, mental, and social capabilities. Habilitation includes but is not limited to[ ] programs of formal, structured education and training.*
>
> *Habilitative care in the alternative least restrictive of individual liberty means living as normally as possible and receiving appropriate individualized services in the community in the least separate, most integrated and least restrictive settings.*
>
> *As used in this Order, "integrated" refers to the integration of mentally retarded persons with nonretarded persons in the community.*

(*Id.* (quoting 1978 Consent Order at 2 ¶ 3) (emphases added).)  According to defendants, "[t]he portions of this definition emphasized above are not required by the Fifth Amendment's due process clause but, rather, reach far beyond any constitutionally guaranteed minimum." (*Id.* at 16-17 n.13)  Defendants maintain, for the first time in over 30 years, that they "cannot now be bound by their three-decades-old consent to the use of an overly expansive, erroneous definition." (*Id.*)  Rather, they argue, "this Court should disregard the 1978 Consent Order's incorrect statement of the applicable standard and implement the correct standard, which the District has more than satisfied."  (*Id.* at 17 n.13.)

It is well-established that a Court can modify or vacate a consent decree based on a significant change in law.  In many cases where this type of argument has been raised, it is undisputed that the law has in fact changed, that a legal basis for the decree has evaporated, and the only question for the Court is whether the change in the legal landscape warrants modification (or vacatur) of the decree.  *See*, *e.g*, *Sys. Fed'n No. 91, Ry. Employes' Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 652 (1961) ("The parties have no power to require of the court continuing enforcement of rights the statute no longer gives."); *Sweeton v. Brown*, 27 F.3d 1162, 1164-65 (6th Cir. 1994) (en banc) (dissolving injunction pertaining to state parole procedures

where subsequent controlling caselaw established that there was no federal due process interest at stake and thus that the "legal theory and analysis upon which the consent decree was formulated was erroneous"); *Evans v. City of Chicago*, 10 F.3d 474, 480 (7th Cir. 1993) (en banc) (vacating consent decree because its "continued enforcement" was "inequitable" where the underlying "substantial claim" under federal law had evaporated); *Doe v. Briley*, 511 F. Supp. 2d 904, 923-26 (M.D. Tenn. 2007) (dissolving consent decree precluding publication of names of persons arrested but not convicted due to Supreme Court decision holding that due process did not protect against stigmatizing publications by law enforcement officials), *aff'd*, 562 F.3d 777 (6th Cir. 2009).

Here, however, the first question for the Court is whether there has in fact been a significant change in the law. *See*, *e.g.*, *United States v. Rueth Dev. Co.*, 335 F.3d 598, 604 (7th Cir. 2003) (refusing to modify or vacate consent decree where Supreme Court decision "did not expressly make [the relevant regulation] illegal" even though that "reading might be the only logical extension of the case"); *see also Rufo*, 502 U.S. at 389 ("To hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation.") That is, does the 1978 Consent Order, in defendants' words, use "an overly expansive, erroneous definition" of the right to habilitative care and treatment. (Defs.' Mot. at 14 n.2.) As explained herein, the answer to this question is simply that defendants cannot argue for vacatur based on a significant change in the law.

### 1. *Youngberg*

In *Youngberg*, the Supreme Court considered "for the first time the substantive rights of

involuntarily committed mentally retarded persons under the Fourteenth Amendment to the Constitution." 457 U.S. at 314.  The plaintiff in *Youngberg*, Nicholas Romeo, had been involuntarily committed under the laws of Pennsylvania to a state institution.  As described in the Supreme Court's decision, he was "profoundly retarded," with "the mental capacity of an 18-month old child, with an I.Q. between 8 and 10," who could not "talk and lack[ed] the most basic self-care skills."  *Id.* at 309.  He had been committed to a state facility at the age of 26 because his mother could no longer care for him after his father's death.  After he suffered a number of injuries, both self-inflicted and from other residents, his mother filed a complaint in federal district court.  The precise question before the Supreme Court was whether a person involuntarily committed to a state institution for the mentally retarded had "substantive rights under the Due Process Clause of the Fourteenth Amendment to (I) safe conditions of confinement; (ii) freedom from bodily restraints; and (iii) training, or 'habilitation.'"[25]  *Id.* at 309.

Based on its prior decisions, the Court concluded, without the need for explication, that the plaintiff's right to safe conditions and right to freedom from bodily restraint were the "core of the liberty protected by the Due Process Clause," noting that since both rights survived criminal conviction and incarceration, they certainly survived involuntary commitment.  *Id.* at 315-16 (quotations omitted).  As for the right to habilitation, the Court had never before

---

[25]It was conceded by the State of Pennsylvania that the plaintiff "ha[d] a right to adequate food, shelter, clothing, and medical care," so the Court limited its inquiry to the narrow question of "whether liberty interests *also* exist in safety, freedom of movement, and training." *Youngberg*, 457 U.S. at 315 (emphasis added).  As discussed *infra*, this fact is relevant because no matter how *Youngberg* is interpreted, it has no effect on a host of issues covered by the consent decrees and the 2001 Plan.  *See infra* pp. 55-58.

considered whether such a right existed or what its scope might be. Ultimately, it held that plaintiff had a right to the habilitation he sought – a right to "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Id.* at 319. In reaching this conclusion, the Court noted that because the plaintiff "seeks only training related to safety and freedom from restraints, *this case does not present the difficult question whether a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training per se*, even when no type or amount of training would lead to freedom." *Id.* at 318 (emphasis added). In a footnote, the Court added:

> It is not feasible, as is evident from the variety of language and formulations in the opinions below and the various briefs here, to define or identify the type of training that may be required in every case. A court properly may start with the generalization that there is a right to minimally adequate training. The basic requirement of adequacy, in terms more familiar to courts, may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case.

*Id.* at 319 n.25.

Having concluded that the plaintiff in *Youngberg* retained liberty interests in safety, freedom from bodily restraint, and minimally adequate habilitation, the Court addressed the question of how a court should identify possible violations of those rights. It held that whether Romeo's rights had been violated "must be determined by balancing his liberty interests against the relevant state interests," but that this balancing "cannot be left to the unguided discretion of a judge or jury." *Id.* at 321. Rather, "the proper standard for determining whether a State adequately has protected the rights of the involuntarily committed mentally retarded" is for a court to "make certain that professional judgment was in fact exercised." *Id.* (quotations omitted). Thus, the Court concluded, "the State [was] under a duty to provide respondent with

such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints." *Id.* at 324.

In a concurring opinion, Justice Blackmun, joined by Justices Brennan and O'Connor, noted that the majority opinion "properly leaves unresolved" "whether respondent has an independent constitutional claim, grounded in the Due Process Clause of the Fourteenth Amendment, to that 'habilitation' or training necessary to *preserve* those basic self-care skills he possessed when he first entered" the state institution. *Id.* at 325, 327. Justice Blackmun opined that "it would be consistent with the Court's reasoning today to include within the minimally adequate training required by the Constitution such training as is reasonably necessary to prevent a person's pre-existing self-care skills from *deteriorating* because of his commitment." *Id.* at 327 (quotation and citation omitted). As explained by Justice Blackmun,

> If a person could demonstrate that he entered a state institution with minimal self-care skills, but lost those skills after commitment because of the State's unreasonable refusal to provide him training, then, it seems to me, he has alleged a loss of liberty quite distinct from – and as serious as – the loss of safety and freedom from unreasonable restraints. For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know.

*Id.* at 327.

Thus, contrary to defendants' suggestion, there is absolutely nothing in the Supreme Court's decision in *Youngberg* that overrules the 1978 Consent Order and the subsequent orders that were entered both before and after *Youngberg* regarding plaintiffs' constitutional right "to receive habilitative care and treatment in the alternative least restrictive of individual liberty" or the definition of what that right means. Indeed, the Court in *Youngberg* expressly stated that it was not answering the "difficult question whether a mentally retarded person, involuntarily

41

committed to a state institution, has some general constitutional right to training per se." *Id.* at 318.

### 2. Post-*Youngberg* Cases

In the almost 30 years since *Youngberg* was decided, the Supreme Court has not revisited the daunting task of explicating the constitutional rights of the involuntarily-committed developmentally disabled, and the United States Court of Appeals for the District of Columbia Circuit has not had the occasion to ever address this issue. Thus, there is no controlling precedent, other than *Youngberg*, and there is no consensus among the courts regarding defendants' proposed interpretation of *Youngberg*. On the contrary, courts and judges have reached differing conclusions about *Youngberg*'s scope.

For example, in *Clark v. Cohen*, 794 F.2d 79 (3d Cir. 1986), the court held that plaintiff's rights were violated where she was confined at an institution "in the face of unanimous professional opinion that she should be placed in a far less restrictive environment . . . ." *Id* at 87. In a concurring opinion, Judge Edward Becker elaborated on his view of the scope of the constitutional right to habilitation,[26] which he believed *Youngberg* did not address. *See id.* at 92-98 (Becker, J., concurring). In his view, "*Youngberg* dealt exclusively with training related to physical restraints; the Court expressly stated that it was neither considering nor ruling on any broader right to habilitation." *Id.* at 95. Citing Justice Blackmun's concurrence in *Youngberg*, Judge Becker stated that he also "would endorse the non-deterioration principle," because "[t]he mentally disabled cannot have meaningful autonomy, and hence meaningful liberty, without

---

[26]The judge examined two possible theories of the right to habilitation – *quid pro quo* and *parens patriae* – and concluded that both apply to a person who has been involuntarily committed. *Clark*, 794 F.2d at 95.

basic skills; therefore, for the state to allow disabled persons' skills to deteriorate is as sure a denial of their liberty as is their confinement to an institution." *Id.* at 96. He then went further than Justice Blackmun, endorsing what he called a "[m]odified non-deterioration principle":

> the State should be required to provide such a person with at least as much training as would match the improvement that he or she would have experienced if never committed. The reasoning behind this position is analogous to the reasoning supporting the non-deterioration principle: by committing people and preventing them from developing self-care skills, the state is effectively depriving them of the opportunity to develop and exercise their autonomy. This is a deprivation of their due process right to liberty. . . . [Thus,] involuntarily civilly committed persons have a right to treatment sufficient to develop their self-care skills to at least the level at which they would be if the persons had not been institutionalized.

794 F.2d at 96. As he explained:

> Because [the plaintiff's] institutionalization has led to her debilitation, the modified non-deterioration principle requires the state to provide [her] . . . with training and treatment sufficient to put her in the position in which she would have been had she never been institutionalized. Because it appears from the numerous, uncontradicted doctors' reports in the record that placement in a [community living arrangement] is the only or best way for [her] to receive the training she is due, I believe she has a right to placement in the [community living arrangement], until she has acquired the skills she would have had had she never been institutionalized.

*Id.* at 97. Finally, and significantly, Judge Becker's opinion left open "the question whether the involuntarily civilly committed have a right to even greater habilitation than the modified non-deterioration principle would allow." *Id.* at 98. For example, as noted in the concurring opinion,

> *[i]t might be argued . . . under the theories discussed here or some other theory of habilitation, that the involuntarily civilly committed have a right to as much habilitation as their capacity will allow.* Alternatively, one might argue that all involuntarily civilly committed persons are entitled to treatment up to an absolute level, regardless of their status upon entrance to the institution.

*Id.* at 98 (emphasis added). Thus, according to this circuit judge, *Youngberg* is merely the starting point for defining the constitutional right to habilitation; it by no means precludes

recognition of additional rights for plaintiffs who, unlike the plaintiff in *Youngberg*, could benefit from more extensive habilitation.

The court's decision in *Thomas S. v. Flaherty*, 699 F. Supp. 1178, 1184 (W.D.N.C. 1988), *aff'd*, 902 F.2d 250 (4th Cir. 1990), is another example of a post-*Youngberg* case that endorses a broader right to habilitation than defendants advocate here.[27]  In *Thomas S.*, the court held that the State of North Carolina was violating the constitutional rights of approximately four hundred mentally retarded persons who were confined in the state's four psychiatric hospitals. The court approved the parties' agreement that in terms of habilitation, "minimum professional standards require *developmentally* oriented habilitation for persons with mental retardation."  *Id.* at 1192.  Such developmental habilitation requires, *inter alia*; "[a]dequate involvement in community activities," defined as "being as involved as that individual is capable of being at the time";  "a good interdisciplinary evaluation" that provides an "adequate assessment of the individual needs of each class member"; "[p]roperly trained staff"; "[h]umane living conditions," which includes more than "endless days of boredom without variation"; "treat[ment] in as normal a setting as possible" featuring "access to ordinary activities," and the chance "to learn and grow through observing and participating in the commonplace events of daily life," "developmental training and structured programs," including "training in basic self-care skills, community living skills, speech therapy, and vocational services."  *Id.* at 1192-94.  The court also found that "[b]ecause vocational activities are often a key to greater independence and enjoyment of liberty, they are for most class members an essential service to avoid unnecessary

---

[27]Although the Fourth Circuit stated that it rejected the idea that class members "had a right to treatment in the least restrictive environment," *Thomas S.*, 902 F. 2d at 253-54, it also affirmed the district court's order which arguably could not exist absent such a right.

restraint." *Id.* at 1194. The court relied on its finding that there was "professional consensus that developmental, behavior-based treatment called 'habilitation' is the appropriate milieu for people with mental retardation." *Id.* at 1185. Finally, the court found that habilitation "is defined as . . . [t]he process by which the staff of an agency assists an individual to acquire and maintain those life skills that enable the individual to cope more effectively with the demands of his or her own person and environmental and social functioning. Habilitation includes, but is not limited to, programs of formal structured education and treatment." *Id.* at 1184 (quoting Accreditation Council for Services for Mentally Retarded and Other Developmentally Disabled Persons (1981 ed.) (quotation and citation omitted)). Not only did the court recognize a broad right to habilitation, it emphasized that plaintiffs were entitled both to appropriate professional decisionmaking and implementation of those decisions. *See id.* at 1185 (faulting defendants for not implementing community placement recommendations by treating professionals and noting that "[t]he record is replete with other examples of placement and treatment recommendations being ignored or their implementation being unjustifiably delayed").[28]

Certainly there are cases in which courts applying *Youngberg* have defined the right to habilitation more narrowly than the Court and the parties did in the 1978 Consent Order. For example, in *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d Cir. 1984), the Second Circuit held that the right to freedom from undue restraint included the right

---

[28]The court in *Thomas S*. also found that "the conditions and services at the state psychiatric institutions are substantially below minimally accepted professional standard" in part because of "[i]nadequate treatment plans and inadequate documentation of their implementation." *Id.* at 1197. As discussed herein, the constitutional requirement that professional judgment be exercised in making decisions also requires that those decisions be implemented. *See infra* pp. 61-62.

to be free from "excess locking of doors, locking of otherwise ambulatory persons into wheelchairs, and failing to put on leg braces for individuals who can walk with their assistance," but it did not include "visiting shops, restaurants and recreational facilities in the outside community." *Id.* at 1247. It also held that there was no "entitlement to community placement or a 'least restrictive environment' under the federal Constitution," and that "[w]here the state does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimum treatment that it is under no constitutional obligation to grant." *Id.* at 1250; *see also Lelsz v. Kavanagh*, 807 F.2d 1243, 1250-51 (5th Cir. 1987) (no "right to habilitation in the least restrictive environment" because "[t]he constitutional minimum standard of habilitation . . . relate[s], not to the qualitative betterment of a retarded person's life, but only to the training necessary to afford him safety and freedom from bodily restraint"); *Phillips v. Thompson*, 715 F.2d 365, 368 (7th Cir. 1983) ("With respect to training, *Youngberg* teaches that, at the most, the class members were entitled to minimally adequate training as is reasonable in light of their interest in freedom of movement and that deference must be shown to the professional judgment of those directing the operation of the institution. Such training as is required, therefore, is training to enhance the ability of the class members to exercise their right to liberty of movement."); *Jackson v. Fort Stanton Hosp. & Training Sch.*, 757 F. Supp. 1243, 1309 (D.N.M. 1990) ("no substantive due process right to habilitation in the least restrictive environment and there is no constitutional right to placement in a community setting"), *rev'd in part*, 964 F.2d 980 (10th Cir. 1992); *S.H. v. Edwards*, 886 F.2d 292 (11th Cir. 1989) (affirming district court's denial of "plaintiffs' claims for relief in the nature of habilitation in the least restrictive

environment in accordance with the recommendation of professional treatment staff" (quotation omitted)).

And then there are cases that fall somewhere in between. For example, in *Association for Retarded Citizens of North Dakota v. Olson*, 561 F. Supp. 473 (N.D. 1982), *aff'd*, 713 F.2d 1384 (8th Cir. 1983), the court held that

> the right to freedom from undue restraint . . . imposes a standard for the court's determination whether professional judgment is being exercised in the use of medication and physical means to restrain residents. *This right obligates the state to provide capable retarded residents with reasonable opportunities to make trips into the outside communities. It also tests the freedoms allowed to residents, such as the opportunity to make small personal decisions concerning what to wear, what to eat, recreation, etc.* This right against unreasonable restraint also involves the much discussed question of alternatives to institutionalization, such as community homes. Prior to the *Youngberg* decision, this court held that the [F]ourteenth [A]mendment secures a right to the least restrictive practicable alternatives to institutionalization. While the *Youngberg* decision does not directly address this specific right, the Court's analysis indicates that it would reject an absolute right to the least restrictive alternatives . . . . Following this analysis, this court must conclude that a constitutional right to the least restrictive method of care or treatment exists only insofar as professional judgment determines that such alternatives would measurably enhance the resident's enjoyment of basic liberty interests.

*Id.* at 486 (emphasis added; citation omitted). As for "the right to minimally adequate training," the court held that "the resident possesses a right to training only insofar as that training serves to enhance or further that resident's exercise of basic liberty." *Id.* at 486-87. Thus, it does not include "training in music or vocational skills," but it does include "training in walking or basic communication . . . if the resident could benefit therefrom . . . ." *Id.* at 487. It also includes "a right to reasonable training which enables the resident to acquire or maintain minimum self-care skills – skills in feeding, bathing, dressing, self-control, and toilet training." *Id.* (emphasis omitted). The court also adopted Justice Blackmun's view that the right to training includes

training "to enable them to maintain the minimum self-care skills that they possessed when they entered the institution," and based on this view, it held that the "the *acquisition* and maintenance of those skills [are] essential to the exercise of basic liberties." *Id.* at 487 (emphasis added).

Accordingly, all that can be said about the post-*Youngberg* cases, none of which is controlling precedent, is that they disagree about how narrowly *Youngberg* should be interpreted and even if interpreted narrowly, how it should be applied to everyday situations. This very lack of clarity dooms defendants' suggestion that *Youngberg* precludes recognition of a constitutional right to habilitation as described in the 1978 Consent Order.

In the end, the critical question in a Rule 60(b)(5) inquiry is whether defendants have met their burden to show that *Youngberg* was a "significant change" in the law. They have not. There is language in *Youngberg* that arguably contradicts defendants' reading of the case; there is no subsequent Supreme Court decision or post-*Youngberg* decision from our circuit court regarding the meaning of *Youngberg*; and among those that have addressed it, there is no agreement. In the face of disagreement about what the law is and no controlling precedent, the mere fact that some courts have adopted the interpretation defendants propose here is not sufficient to meet that burden. Moreover, as explained herein, defendants' position that *Youngberg* is a significant change in law is seriously undermined by the fact that for almost 28 years they have accepted the constitutional standard in the 1978 Consent Order and promised to achieve compliance with court orders based on that standard.

## B. Defendants' Argument Regarding *Youngberg* Was Not Made Within a Reasonable Time

Defendants concede that if *Youngberg* is not treated as a significant change in law, their motion to vacate must fail.[29] But even if the Court agreed with defendants that *Youngberg* represented a significant change in the law, that does not ensure success under Rule 60(b)(5).[30] *See Rufo*, 502 U.S. at 384. It remains for the Court to decide whether modification in light of that change is warranted. *See id.* at 391. Given the particular (and probably unique) facts of this case, the Court does not believe that the relief sought by defendants is warranted.

Rule 60(b)(5) requires that a motion for modification be made within "a reasonable time." Fed. R. Civ. P. 60(b)(5). "[W]hat constitutes 'reasonable time' for a filing under Rule 60(b) depends on the facts of each case." *Ingram v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 371 F.3d 950, 952 (7th Cir. 2004); *see also McCorvey v. Hill*, 385 F.3d 846, 849 n.4 (5th Cir. 2004); *Fed. Land Bank of St. Louis v. Cupples Bros.*, 889 F.2d 764, 767 (8th Cir. 1989). Factors to consider include "the length of the delay, the explanations for the delay, the prejudice to the opposing party caused by the delay and the circumstances warranting relief." *Associated Builders & Contractors v. Mich. Dep't of Labor*, 543 F.3d 275 (6th Cir. 2008); *see also Shakman v. City of Chicago*, 426 F.3d 925 (7th Cir. 2005) (relevant factors include "the litigants'

---

[29]At oral argument, the Court asked defense counsel: "If I say the '78 [order] is a correct statement and that the subsequent orders incorporate and flow from [it], what happens then? End of my analysis?" Defendants' counsel replied: "I think it is the end of your analysis, Your Honor." (12/17/09 Tr. at 49.)

[30]As discussed *infra*, defendants also ignore the fact that even if the Court accepts their *Youngberg* argument, it would justify, at most, partial modification of some court orders pertaining to plaintiffs' right to habilitation and would have no impact on those portions of the orders, arguably the most critical provisions, which address plaintiffs' constitutional rights to safety and health care. (*See infra* pp. 54-58.)

knowledge of the grounds for relief," "the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and [the consideration of] prejudice [if any] to other parties" (quotations omitted)). Even applying the flexible approach a court must take in considering a Rule 60(b)(5) motion in institutional reform litigation, *see Horne*, 129 S. Ct. at 2594-95; *Rufo*, 502 U.S. at 381, defendants' *Youngberg* argument comes decades too late, long after the entry of countless remedial court orders, many of which defendant agreed to and all of which were relied upon these many years by the Court, the Special Masters, the plaintiffs and the Department of Justice.

The Supreme Court decided *Youngberg* in 1982, almost 30 years ago. Defendants could have sought modification of the 1978 Consent Order at any time thereafter based on the same argument they make today – that *Youngberg* effectively overruled parts of this Court's 1978 consent decree, thereby requiring modification of that decree. And if there was any question that a change in law could provide the basis for modification of a consent decree, that question was answered in 1992 by *Rufo*. 502 U.S. at 393. Indeed, there have been a number of cases in the intervening years, which defendants rely upon, where parties have sought and courts have agreed that modifications or vacatur based on a change in law was appropriate. *See, e.g.*, *Sweeton*, 27 F.3d at 1164-65; *Evans*, 10 F.3d at 480, 482-83; *Briley*, 511 F. Supp. 2d at 927.[31]

Nor is this a case where defendants can justify the delay by claiming that they were "unaware" of the existence of the decree or its impact. *Cf. Briley*, 511 F. Supp. 2d at 912 ("Municipal entities, . . . however, do not have perfect institutional memory, and where a consent

_____

[31]Significantly, defendants cannot justify their delay by arguing that *Horne* is the change in law that they are relying on. In fact, defendants filed their motion even before *Horne* was decided on June 25, 2009.

decree has gone unenforced for many years, the individuals who administer those entities may not have any knowledge of its existence.").  To the contrary, defendants have been in Court continually and repeatedly since the 1978 Consent Order defending against plaintiffs' charges of noncompliance, and when their efforts failed for good reason, numerous substantive court orders resulted.[32]

The only reason defendants give for their 27-year delay in making their *Youngberg* argument is that they only just realized that the 1978 Consent Order was based on a "misunderstanding of the governing law."  (*See* 12/17/09 Tr. at 8.)  Even assuming such a "mistake" could ever justify a delay of this magnitude, it does not do so here.  Defendants cannot make a plausible argument that they, along with everyone else involved in this case, have been operating under a misguided view of the law and only now, with the arrival of a new Attorney General, has the law become clear.  (*See* 12/17/09 Tr. at 19.)  Not only did it take 27 years for defendants to realize their purported mistake, during that period, they entered into a number of additional consent orders and agreements that were designed to achieve the constitutional standards enunciated in the 1978 Consent Order.  (*See* 1983 Consent Order; 1995 Reference Order; 2001 Joint Findings of Fact; 2001 Plan; 2001 Consent Order; 2007 90-Day Consent Order.)  For example, in 1995 defendants "admit[ted] that the District has a continuing responsibility to provide the class members with habilitation in accordance with their needs" and

---

[32](*See*, *e.g.*, 1981 Consent Order; 1983 Consent Order; Jan. 1990 Contempt Order; Apr. 1990 Contempt Order; Order Denying Motion for Civil Contempt Sanctions, May 15, 1991; 1995 Contempt Order; 1996 Order & Remedial Plan; 2001 Joint Findings of Fact, Consent Order, Plan for Compliance; 2004 Coordination Order; 2007 Order and Opinion on Liability; 2007 90-Day Consent Order; 2008 Special Masters' Report re 90-Day Consent Order; 2009 Special Masters' Report.)

"admit[ted] that they also are required to provide adequate medical care, psychological care, day programming, community residential placements and other support systems as set forth in the class members' [individual habilitation plans]." (1995 Contempt Order at 5-6.) And as recently as September 2007, the current administration under Mayor Fenty agreed to take a number of specific actions, including "recruiting five new providers" and ensuring that the residences operated by these providers, *inter alia*, "are located close to shops, restaurants, community resources and public transportation, or there is transportation available to class members in order to access these resources" – an obligation that clearly flows from the parts of the 1978 Consent Order the District now contends are "extraconstitutional." (2007 90-Day Order at 2.) Moreover, the Court's March 2007 Liability Opinion and the 2009 Special Masters' Report are replete with references to a legal standard that only now does the District find convenient to repudiate. "Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous," *Rufo*, 502 U.S. at 384, but not simply because "it is no longer convenient to live with the terms of a consent decree." *Id.* at 383.

Finally, and perhaps most importantly, defendants' actions over the past 30 years – their repeated representations, promises and agreements – have led the Court and the plaintiffs to believe that defendants had every intention of complying with the existing orders. For example, in asking the Court in February 2007 to delay its liability ruling, the District stated that it was "cognizant that much remains to be done to bring DDS into compliance with outstanding court orders and the 2001 Plan," but assured the Court that the "Fenty Administration is fully committed to the success of the new agency, the delivery of improved services and care to the consumers served by the agency, and *compliance with the 2001 Plan*." (Defs.' Notice of Filing

of Supplemental Info. in Resp. to the Court Monitor's Quarterly Report at 8, Feb. 5, 2007

(emphasis added).)  Again, in May 2008, Peter Nickles, the Attorney General for the District,

assured the Court "I am not seeking . . . to take away what [the plaintiffs] won."  (Hr'g Tr. at 37,

May 15, 2008.)  But that is exactly what the District seeks to do.

Everyone, including the three judges of this Court, who has struggled with this case for

over 30 years has relied on defendants' repeated promises that they intended to comply.

Plaintiffs have repeatedly entered into new agreements with defendants.  (*See*, *e.g.*, 1981

Consent Decree, 1983 Consent Decree; 2001 Consent Order; 2001 Plan; 2007 90-Day Consent

Order.)  Plaintiff have also withdrawn motions to find defendants in noncompliance or in

contempt that they might otherwise have successfully pursued.  (*See*, *e.g.*, 1983 Consent Order at

14 (withdrawing motion for contempt); *Evans*, 139 F. Supp. 2d at 84 (waiving "all claims for

past contumacious conduct of defendants as of the date of the entry of the [2001] Consent Order

and approval of the Settlement Agreement").)

Moreover, the Court has on numerous occasions endorsed agreements between the

parties and adopted them as court orders.  (*See*, *e.g.*, 1981 Consent Decree, 1983 Consent

Decree; 2001 Consent Order; 2001 Plan; 2001 Joint Findings of Fact; 2007 90-Day Order.)

Judge Stanley Harris's reliance on defendants' stated intention to achieve compliance with

existing court orders is especially apparent in his 2001 opinion, wherein he notes that "[t]he

dispute seemed intractable until last year, towards the end of which there were commendable and

extensive efforts by Mrs. Farrell, Mr. Sundram, and counsel for the parties seeking to resolve the

problems faced by all."  *Evans*, 139 F. Supp. 2d at 85.  The Court commended the Special

Masters and counsel not only for "resolving their differences, but for the exceptionally thorough

manner in which they have agreed upon procedures for dealing with the problems that have persisted for so long" and explained that it approved the Plan and adopted the parties' consent order and settlement agreement because it "readily conclude[d] that the proposed compromise of the controversy, which will be of substantially greater benefit to the class than would continued litigation over how to deal with past conduct by defendants, is fair, reasonable, and adequate." *Id.*; (*see also* 1995 Contempt Order at 1 (emphasizing that "[a]n integral part of this litigation has been the closure of Forest Haven and the relocation of class members to community living arrangements with adequate habilitation suitable to each class member" and "[t]o this end, the Court has entered numerous orders, including consent orders between the parties, to safeguard the rights of class members and ensure their adequate and appropriate habilitation.").)

In sum, *no* factor supports a finding that defendants have filed their Rule 60(b)(5) motion, to the extent it is based *Youngberg*, within a "reasonable time." Defendants have no excuse for their delay; they have repeatedly consented to the constitutional standard as stated in the 1978 Consent Order; they successfully convinced the plaintiffs and the Court on numerous occasions that they intended to comply with the court orders; and the vulnerable class members, their counsel, the Department of Justice and three judges of this Court have relied to their detriment on the District's endless promises.

## C.  At Most, Defendants' View of *Youngberg* Supports Only a Limited Modification of the Consent Orders

Even if defendants could argue that *Youngberg* was a significant change in the law (which they cannot), that argument would support nothing more than a limited modification of the consent orders. In the first place, even if *Youngberg* changed the law with respect to the scope of the constitutional right to habilitation, that would not undermine the legal basis for the

host of provisions in the court orders and the 2001 Plan that relate solely to health care and safety. *See Youngberg*, 457 U.S. at 315-16 (not disputed that plaintiff had "a right to adequate food, shelter, clothing, and medical care" and Court held that right to safe conditions and right to freedom from bodily restraint were the "core of the liberty protected by the Due Process Clause"). Requirements relating to these rights (as opposed to habilitation) are a substantial part of the challenged court orders and the 2001 Plan. (*See* 1978 Consent Order; *Evans*, 459 F. Supp. at 484, 488-89; 1981 Consent Order at 6-7; 1983 Consent Order at 4-8; 2001 Consent Order; 2001 Plan; 2007 90-Day Consent Order.) Moreover, these provisions are arguably the most critical and cover areas where defendants have been most deficient. Certainly, in recent years, health and safety have been the primary focus and concern of the Court, the Special Masters, the Court Monitor and the parties. *See Evans*, 480 F. Supp. 2d at 298-314 (factual findings in March 2007 Liability Opinion regarding health and safety); (2007 90-Day Order (addressing two critical goals: increasing the number of qualified providers and improving the health and safety of class members); 2009 Special Masters' Report at 18-67 (findings and conclusions of law regarding health care, mental and behavioral health care, guardianship, safety and protection from harm); Court Monitor's Report, June 11, 2009; and Court Monitor's Report, Dec. 10, 2009.)

For example, according to the 2001 Plan, the crux of plaintiffs' right to be kept free from harm is addressed by six specific directives in the 1978 Consent Order and the 1983 Consent Order. (2001 Plan at 27-28). These directives

> require conducting timely and thorough investigations into serious incidents, including deaths; identifying causes and contributory factors as well as preventive and corrective actions that appear to be warranted; and ensuring the implementation of recommendations that are made as a result of the

investigations. In addition to responding to individual cases, the defendants are required to identify systemic patterns and trends and communicate them to providers to facilitate corrective action for recurrent problems on an individual consumer level, provider level and a systemic level. . . . [and to] ensure that appropriate training programs for all staff, including staff assigned to residential settings are developed and implemented.

(2009 Special Masters' Report at 50.) In March 2007, this Court found "defendants ha[d] failed in many significant respects to accomplish the tasks and outcome criteria associated with the Court's Orders relating to class member safety and to comply with the terms of the Orders themselves." *Evans*, 480 F. Supp. 2d at 313. In late November 2007, defendants conceded that as of yet, conditions had not fundamentally changed. (Def.'s Notice Concerning Proposed Comprehensive Monitoring at 2.) And, as of December 2008, the Special Masters found that "there is clear and convincing evidence that the problems being experienced by class members in the area of safety and protection from harm are continuing, serious and systemic." (2009 Special Masters' Report at 67). Thus, no matter how *Youngberg* is interpreted, it would not excuse defendants from these obligations.

Moreover, even if defendants' overly narrow interpretation of *Youngberg* were to be adopted, it would only entitle defendants to partial modification of the court orders concerning habilitation. For example, as the 2007 Liability Opinion makes clear, the right to receive habilitative care and treatment in the alternative least restrictive of individual liberty, *see Evans,* 480 F. Supp. 2d at 314-19, is only one aspect of plaintiffs' right to habilitation/welfare. Plaintiffs are also entitled to "a written ISP based upon individualized assessments and formulated in accordance with professional standards"; "an individualized habilitation program designed in accordance with the ISP"; identification in the ISP of "all services and supports required by class members regardless of availability"; annual review of the ISP; "adaptive

56

equipment" if needed; "enough case manager positions to meet the required case manager to client ratio"; "appropriate training programs for staff, including case managers"; and case managers who ensure implementation of ISPs and take appropriate action after incidents. *See id* at 319, 321-22; (*see also* 2009 Special Masters' Report at 67-75 (same)). Similarly, in the six-page, single-spaced 2007 90-Day Consent Order (which defendants agreed to after the Fenty administration took office), the only provision arguably affected by *Youngberg* would be the requirement that defendants ensure that residences operated by new providers "are located close to shops, restaurants, community resources and public transportation, or there is transportation available to class members in order to access these resources." (2007 90-Day Consent Order at 2.)

Finally, one of defendants' primary points about *Youngberg* is that it rejects any right to community placement, but the present record establishes that plaintiffs failed to prove that defendants are in noncompliance with the 2001 Plan with respect to moving a significant number of class members into group homes. (*See* 2009 Special Masters' Report at 72.)[33] For those class

---

[33]As described in the 2009 Special Masters' Report:

The unchallenged testimony of defendants' witness, Laura Nuss, is that there have been 250 placements into less restrictive environments. Defendants have moved a significant number of class members to apartments and group homes. The evidence during the liability phase of this action was that 55% of class members resided in ICFs/MR (366 of 659 class members, 480 F. Supp 2d at 315 n.43.) That number is down to a little over 250 class members (approximately 40% of the class), and defendants reasonably expect to accelerate that movement with the further development of the community-based waiver and the Money Follows The Person Grant, which is expected to further reduce the utilization of ICFs/MR by 60% (Nuss Trial Tr. 275:18-21). Based on these findings of fact, the Special Masters find that plaintiffs have not sustained their burden of proving by clear and convincing evidence non-compliance with court orders requiring residential placements in less restrictive settings.

members who continue to reside in ICF/MR settings, the Report noted that "there was no
evidence submitted to establish that continued placement of all or some subset of these class
members in such settings was improper or contrary to a choice made by the class member or an
authorized surrogate decision-maker." (*Id.* at 73.)

In the end, then, defendants' argument that *Youngberg* changed the law on habilitation
would, at most, require partial modification of a limited number of court orders concerning
habilitation; it would not affect the legitimacy of any other order, including many critical orders,
concerning plaintiffs' health, welfare and safety. But defendants do not seek such a limited
modification; rather they make an "all or nothing" argument for vacatur.[34]

_____

(*Id.* at 72.)

[34](*See* 12/17/2009 Tr. at 22 ("Your Honor, I do not think there is a middle ground."); *id* at
24 ("modification as to the plan would be something that would almost be a futile act").) In
defendants' brief, they state that if the Court rejects this option, "[i]n the alternative, the Court
should at the very least modify the orders currently in force, to eliminate any provisions that are
not reasonably necessary to remedy a current and ongoing constitutional violation." (Defs.'
Mem. at 7.) However, if defendants want a modification, it is their burden to show the Court
that the modification is narrowly tailored to the change in circumstances. *Rufo*, 502 U.S. at 383
("[A] party seeking modification of a consent decree bears the burden of establishing that a
significant change in circumstances warrants revision of the decree. If the moving party meets
this standard, the court should consider whether the proposed modification is suitably tailored to
the changed circumstance."). Defendants have made no effort to offer a modification suitably
tailored to the arguably changed circumstances. (*See* 12/17/09 Tr. at 39 ("Your Honor, in all
candor, if you do not vacate the orders, we would have to look at them anew and see if any – if –
what modifications could be made to them that are realistic.")); *see also See LaShawn v. Fenty*,
No. 89-CV-1754, 2010 WL 1270202, at *21 (D.D.C. Apr. 5, 2010) (defendants similarly did not
"propose[] a modification tailored to the alleged changed circumstances" leaving the court
without "an adequate proposal to consider"). Moreover, they have steadfastly refused to invoke
the procedures provided for by the 2001 Plan (*see* 2001 Plan at 6-10) or under Rule 60(b)(5) for
modification or termination of orders that have been achieved or those that are no longer relevant
or obtainable.

## II.     DEFENDANTS ARE NOT ENTITLED TO VACATUR BASED ON CHANGE IN FACTS

### A.     Defendants Are Not in Substantial Compliance with Constitutional Requirements

Defendants argue that, even though they have not achieved compliance with the court orders or the 2001 Plan, the objects of those orders have been attained because defendants have satisfied the "constitutional minimum."  (Defs.' Mem. at 32 ("District's current system for serving individuals with intellectual and developmental disabilities . . . patently satisfies class members' Fifth . . . Amendment rights to be free from harm and to receive minimally adequate habilitative care and treatment.").)  Defendants' argument fails because (1) it rests on a flawed definition of the constitutional minimum; and (2) its rests on an erroneous interpretation of *Horne* as allowing properly entered consent orders to be vacated, despite defendants' non-compliance with those orders, once defendants achieve the constitutional minimum.

### 1.     Defendants Cannot Provide a Workable Definition of Constitutional Requirements Based on *Youngberg*

Defendants' argument that they have satisfied the "constitutional minimum" requires that that concept be defined, but defendants' proffered definition is fundamentally flawed. According to defendants, *Youngberg* establishes as the constitutional minimum that involuntarily committed individuals have only the right to be kept "free from harm" and the right to "minimally adequate habilitation," defined as "such training as may be reasonable in light of [the individual's] liberty interests in safety and freedom from unreasonable restraints."  (Def. Mot. to Vacate at 16 (quotations omitted) (quoting *Youngberg*, 457 U.S. at 322).  Defendants then baldly assert that they have met this constitutional minimum because "[w]e're exercising professional judgment in the care and treatment of consumers within the class. They're free from harm. And

they're getting sufficient training and habilitation so that their liberty interests are protected."

(12/17/09 Tr. at 104.)

Although the constitutional minimum certainly includes the rights articulated in *Youngberg*, defendants' argument that no more is required is premised on an error of law. First, as noted, *Youngberg* did not concern an involuntarily committed person's constitutional right to "food, shelter, clothing, and medical care." *Youngberg*, 457 U.S. at 315. It is indisputable that any constitutional minimum standard must include protection of these rights.[35] Moreover, as these rights were not at issue in *Youngberg*, *Youngberg* provides no guidance as to what is required to meet the constitutional minimum with respect to the protection of these rights.

In addition, to the extent defendants contend that the constitutional minimum is met as long as there is a system in place that calls for the exercise of professional judgment (*see* 12/17/09 Tr. at 103;[36] Defs.' Mem. at 33 ("no credible argument can be made that there is a systemic lack of professional judgment exercised by treating professionals in the IDD system")),

---

[35]When asked to explain what a minimal right to medical care encompasses, defense counsel suggested that plaintiffs' right to medical care was limited to the "health implications" of the "very minimal" "duty to keep them safe and free from unreasonable restraints." (12/17/09 Tr. at 100.) As an example of what might be covered, defense counsel suggested "if a person needs certain treatment so that they can be free from unreasonable restraints, yes, that is part of what *Youngberg* dictates." (*Id.*) Or, if a person has a tumor, there may be a some duty to act if the person "may not be safe, depending on the invasiveness of the tumor." (*Id.* at 101.) Not only is it incomprehensible that an involuntarily committed developmentally disabled person is not entitled to more than counsel's meaningless and inadequate level of care, but counsel's inability to provide any workable definition illustrates the inherent difficulty prescribing in the abstract what services are required so that a constitutionally protected right will be something more than a hollow promise.

[36]During oral argument, the Court asked defense counsel whether it mattered if "the healthcare provider's recommendations as to the class members are not implemented in a timely manner," to which counsel responded, "I don't think *Youngberg* speaks to the timeliness of the matter." (12/17/09 Tr. at 103.)

that proposition is not supported by *Youngberg*. *Youngberg* expressly states that a court must "make certain that professional judgment *in fact was exercised*" in attempting to protect the rights of an involuntarily committed individual. 457 U.S. at 321 (emphasis added) (quotation omitted). As other courts have recognized, in order for this requirement to have any substance, it cannot be met purely at the systemic level; rather, professional judgments must be implemented in a timely fashion. *See*, *e.g.*, *Thomas S.*, 902 F.2d at 252 (holding that district court properly imposed liability because it "found that many of the decisions of the treating professionals had not been implemented" and "found areas in which the decisions of the treating professional substantially departed from accepted standards"); *Haldeman v. Pennhurst*, 901 F.2d 311, 324 (3d Cir. 1990) ("obligations [under the consent decree] clearly run to class members as individuals, not as a group" and thus "substantial compliance must be measured with respect to the services each *individual* retarded class member is receiving and not with respect to the services received by the class as a whole").

Finally, defendants again ignore, as discussed above, that *Youngberg* did not address the right to habilitation generally; it decided only that the plaintiff, who was profoundly retarded and would not benefit from any other habilitation, was entitled to the limited habilitation he sought – such training as may be reasonable in light of his liberty interests in safety and freedom from unreasonable restraints. *See Youngberg*, 457 U.S. at 318 (because plaintiff "seeks only training related to safety and freedom from restraints, *this case does not present the difficult question whether a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training per se*" (emphasis added)). For all these reasons, the rights recognized by *Youngberg* are necessary, but not sufficient, to give meaning to plaintiffs'

basic constitutional rights.

> **2.** **Even If Defendants Have Satisfied Minimum Constitutional Requirements, This Does Not Justify *Vacatur* Under Horne**

The second problem for defendants is that they cannot seek vacatur of all court orders based on *Horne*. In *Horne*, the district court concluded, after a trial, that the State of Arizona was violating the requirement in the Equal Educational Opportunities Act ("EEOA") "to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs," 20 U.S.C. § 1703(f), because "the amount of funding the State allocated for the special needs of ELL students . . . was arbitrary and not related to the actual funding needed to cover the costs of ELL instruction." *Horne*, 129 S. Ct. at 2589. Pursuant to this judgment, the court ordered the State, *inter alia*, to "prepare a cost study to establish the proper appropriation to effectively implement ELL programs," "to provide funding that bears a rational relationship to the actual funding needed," and to "appropriately and constitutionally fund" the ELL program. *Id.* at 2590 (quotations and citations omitted).

The defendants never complied with any of the court's orders, but in 2006 the State Legislature passed a new law that "increased ELL incremental funding [by a fixed amount] (with a 2-year per-student limit on such funding) and created two new funds – a structured English immersion fund and a compensatory instruction fund – to cover additional costs of ELL programming." *Id.* at 2590. Based on this new legislation, the state legislature asked the district court to vacate its orders. The district court concluded that Rule 60(b)(5) relief was not warranted because the new law "did not establish a funding system that rationally relates funding available to the actual costs of all elements of ELL instruction." *Id.* at 2591 (quotations omitted). The Ninth Circuit affirmed, emphasizing that because the original declaratory

judgment order centered on the adequacy of ELL incremental funding, relief would be appropriate only if "there are no longer incremental costs associated with ELL programs in Arizona," or if "Arizona had altered its funding model." *Id.* at 2591-92 (quotations omitted).

The Supreme Court reversed and remanded, holding that the lower courts had erred by looking only to whether the State was fulfilling the specific terms of the judgment instead of considering whether "Arizona is now fulfilling its statutory obligation by new means that reflect new policy insights and other changed circumstances." *Id.* at 2589. The Court remanded the case with instructions to consider "whether the objective of the District Court's 2000 declaratory judgment order – i.e. satisfaction of the EEOA's appropriate action standard – has been achieved." *Horne*, 129 S. Ct. at 2595 (quotations omitted).

Under *Horne* and earlier Supreme Court decisions, a motion to vacate, such as defendants have filed here, requires the Court to determine whether the "objective" of the court orders has been attained. *Id.*; *Frew*, 540 U.S. at 442 ("The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials."); *see also LaShawn*, 2010 WL 1270202, at *11 (in addressing motion to vacate consent decree, "it is appropriate to consider whether the objectives of the decree have been achieved").

Defendants attempt, nevertheless, to read *Horne* as a new rule of law that equates satisfying the constitutional minimum with attaining the objective of a consent decree. (*See* Defs.' Mem. at 18 (no ongoing constitutional violations because the "current IDD system administered by DDS/DDA . . . not only satisfies but greatly surpasses the minimum constitutional standards established by the Fifth Amendment." ); 12/17/09 Tr. at 10-11, 13, 16,

42, 48.)  This Court cannot accept this exceedingly broad interpretation of *Horne*, for *Horne* cannot mean that when a defendant agrees to a series of measures designed to remedy constitutional violations, these agreements are necessarily unenforceable because the measures exceed some ill-defined constitutional floor.

Unlike *Horne*, the present case involves a consent decree, not a litigated judgment.  A consent decree "'embodies an agreement of the parties' and is also 'an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.'"  *Frew*, 540 U.S. at 437 (quoting *Rufo*, 502 U.S. at 378).  "[A] federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based."  *Id.* (citing *Firefighters*, 478 U.S. at 525).  "Consent decrees entered in federal court must be directed to protecting federal interests."  *Id.*; *see also LaShawn*, 2010 WL 1270202, at *13.

The decision in *Horne* was obviously motivated by the perceived dangers of long-term judicial involvement in local government institutions, noting that "Rule 60(b)(5) serves a particularly important  function in . . . 'institutional reform litigation'" because "injunctions issued in such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances – changes . . . in governing law . . . and new policy insights – that warrant reexamination of the original  judgment."  *Horne*, 129 S. Ct. at 2593.  The Court in *Horne* also noted that "institutional reform injunctions often raise sensitive federalism concerns," particularly where they "involve[] areas of core state responsibility" or "ha[ve] the

64

effect of dictating state or local budget priorities." *Id.* at 2593-94. And in dicta it suggests that these problems are exacerbated in cases governed by consent decrees rather than litigated judgments because consent decrees often "go well beyond what is required" by law, and "thereby 'improperly deprive future officials of their designated legislative and executive powers.'" *Id.* at 2594 (quoting *Frew*, 540 U.S. at 441).

But in *Horne*, the Supreme Court also endorsed and cited its prior decisions in *Rufo* and *Frew* – decisions approving the use of consent decrees in institutional reform cases. *See Horne*, 129 S. Ct. at 2593-95; *see also Salazar v. District of Columbia*, No. 93-452, 2010 WL 547834, at *3 (D.D.C. Feb. 18, 2010) (concluding that *Horne* "reaffirmed the vitality of [*Rufo*,] 502 U.S. 367, 368 (1992), the leading case setting forth the standards for modifying a final judgment under Rule 60(b)(5) in institutional reform cases."); *LaShawn*, 2010 WL 1270202, at *8, *12-*13 (applying *Rufo* standards).[37] If, as defendants argue, there is an inherent conflict between *Horne* and *Rufo* or *Frew*, the Supreme Court certainly did not acknowledge it. Thus, this Court is bound by those earlier decisions, and it will not adopt defendants' attempt to use *Horne* to undermine their holdings. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Significantly for purposes of the present case, *Rufo* and *Frew* establish that a consent decree may appropriately go beyond the bare bones of what a court could order without the local

----

[37]As noted by Judge Hogan, 2010 WL 1270202, at *13, the D.C. Circuit in *LaShawn* upheld a decree even assuming that it "imposes requirements beyond those of District law." *LaShawn A. v. Barry*, No. 94-7044, 1996 WL 679301, at *1 (D.C. Cir. Oct. 30, 1996).

government's consent.[38]  *See Rufo*, 502 U.S. at 389 ("But we have no doubt that, to 'save themselves the time, expense, and inevitable risk of litigation,' [the defendants] could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires (almost any affirmative decree beyond a directive to obey the Constitution necessarily does that), but also more than what a court would have ordered absent the settlement." (citation omitted)); *Frew*, 540 U.S. at 437-38 (rejecting argument that consent decree violates the Eleventh Amendment on the that "state officials [may agree] to bind state governments to significantly more commitments than what federal law requires"); *see also Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) (consent decree may properly "provide[] broader relief than the court could have awarded after a trial").  Indeed, that is one reason why consent decrees are a valuable tool for resolving such cases.  *See Rufo*, 502 U.S. at 383 (noting that if plaintiffs enter into a consent

---

[38]Even without consent, a court may impose a remedy that goes beyond ordering defendants to satisfy  the constitutional floor.  Federal court decrees "exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation," *Milliken*, 433 U.S. at 282, but "where . . .  a constitutional violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the condition that offends the Constitution."  *Id.* (quotation omitted).  For example, in *Milliken*, "[t]he 'condition' offending the Constitution is Detroit's de jure segregated school system, which was so pervasively and persistently segregated that the District Court found that the need for the educational components flowed directly from constitutional violations by both state and local officials.  These specific educational remedies, although normally left to the discretion of the elected school board and professional educators, were deemed necessary to restore the victims of discriminatory conduct to the position they would have enjoyed in terms of education had these four components been provided in a nondiscriminatory manner in a school system free from pervasive de jure racial segregation."  *Id.*

Significantly, this same principle was adopted in *Horne*, where the Court recognized that federal court decrees are not limited to the constitutional floor in awarding relief for a violation of law.  Rather, federal court decrees do not "exceed appropriate limits if they are aimed at eliminating a condition that . . . flow[s] from such a violation."  *See Horne*, 129 S. Ct. at 2495.

66

decree "[a]t least they will avoid further litigation and perhaps will negotiate a decree providing more than what would have been ordered without the local government's consent"); *Local No. 93*, 478 U.S. at 522 ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)); *see also LaShawn*, 2010 WL 1270202, at *12-*13.

In addition, federal district courts retain the power to enforce consent decrees in institutional reform cases. A consent decree "'embodies an agreement of the parties' and is also 'an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.'" *See Frew*, 540 U.S. at 437 (quoting *Rufo*, 502 U.S. at 378.) "Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." *Id.* at 440.[39]

---

[39]As noted by the Supreme Court in *Local No. 93*:

Parties may choose to settle their disputes by consent decree rather than by private contract for a number of reasons. As one commentator points out, [p]ublic law settlements are often complicated documents designed to be carried out over a period of years, . . . so any purely out-of-court settlement would suffer the decisive handicap of not being subject to continuing oversight and interpretation by the court. . . . A consent decree has several other advantages as a means of settling litigation. It is easier to obtain enforcement of a consent decree because it will be unnecessary to prove many facts that would otherwise have to be shown in order to establish the validity of an ordinary contract. A court that maintains

Because *Horne* did not involve a consent decree, it had no occasion to address defendants' claim that all they have to do is satisfy the constitutional minimum as opposed to provisions of a  consent decree that arguably exceed the minimum but were agreed to by the parties to cure conditions that flow from constitutional violations.  But this very claim was addressed and rejected in *Rufo*.  There, the Supreme Court made clear that where there is a consent decree in place, the legally enforceable obligations are "not confined to meeting minimal constitutional requirements." *Rufo*, 502 U.S. at 390.  Moreover, "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor," *Rufo*, 502 U.S. at 391, and a party cannot "require a court to retrace old legal ground, say, by re-making or rejustifying its original 'constitutional decision every time an effort [is] made to enforce or modify'" an order. *Horne*, 129 S. Ct. at 2619 (quoting *Rufo*, 502 U.S. at 389-390, 392); *see also LaShawn*, 2010 WL 1270202, at *11-*13.

Despite this binding precedent, defendants cite to a number of cases decided since *Horne* where courts have vacated consent decrees.  (*See* Defs.' Reply at 6 & n.9; Defs.' Notice of Supplemental Authority, Dec. 9, 2009; Defs.' Notice of Supplemental Authority, Mar. 30, 2010).  However, none of the cited cases is analogous to our case, for, in each of them, there were compelling circumstances that supported the termination of the consent decree that are not

--------

continuing jurisdiction over a consent decree will have a more flexible repertoire of enforcement measures.  And it is likely to be easier to channel litigation concerning the validity and implications of a consent decree into a single forum-the court that entered the decree-thus avoiding the waste of resources and the risk of inconsistent or conflicting obligations. . . .  For all of these reasons, consent decrees have become widely used as devices to facilitate settlement.

478 U.S. at 524 n.13 (quotations and citations omitted).

present here.

In three of the four cases, defendants were found to be in full compliance with the consent decree. In *United States v. Board of Education of the City of Chicago*, 663 F. Supp. 2d 649 (N.D. Ill. 2009), the district court terminated a consent decree that addressed segregation in the Chicago school system based on its determination that defendants had complied in good faith with the consent decree and court orders over a reasonable period of time, had eliminated all vestiges of segregation to the extent practicable, and had demonstrated its good faith commitment to the constitutional rights that were the predicate for intervention. *Id.* at 654, 660-62. Similarly, in *Consumer Advisory Board v. Harvey*, No. 91-CV-321-P-S, 2010 WL 1037593 (D. Me. Mar 19, 2010), defendants had "achieved substantial compliance" with the consent decree by meeting the benchmarks set forth in the decree itself. *Id.* at *3.[40] Finally, in *Basel v. Bielaczyz*, No. 74-40135-BC, 2009 WL 2843906 (E.D. Mich. Sept. 1, 2009), the court vacated a consent judgment that was entered to correct the substantial backlog of hearing requests before a state agency after noting that "[i]n the years closely following entry of the consent judgment, there is no suggestion on the docket or by the parties that Defendants were ever held in contempt based on a failure to comply with the consent judgment. . . . The terms of the consent judgment and the history of apparent compliance suggest that the consent judgment served its purpose, and at some point, the need for the injunction passed ." *Id.* at *7.

In contrast, defendants here have a proven 30-year history of noncompliance. And, in

---

[40]Notably, Clarence Sundram was the Special Master in *Harvey*, which had a similar factual history to our case. One key difference, though, is that in his final report to the district court, Special Master Sundram concluded that the defendants were in compliance and the time was ripe for a Rule 60(b)(5) motion to vacate the consent decree. *See* Final Report of the Special Master, *Harvey*, 2009 WL 5792159, at *11-*12.

fact, based on the representations of defense counsel at oral argument, there is a serious question as to whether defendants are even trying to comply with these orders.[41]

The fourth post-*Horne* case cited by defendants is also inapposite.  In *Cleveland Fire Fighters for Fair Hiring Practices v City of Cleveland*, No. 1:00-CV-301, 2009 WL 2602366 (N.D. Ohio Aug. 20, 2009), the district court denied a Rule 60(b)(5) motion to extend the term of a consent decree that had been entered in 1975 to address discrimination in the hiring practices of the Cleveland Fire Department.  *Id*. at *3, *16.  The court declined to extend the decree because if found that (1) defendant City has "extended its best efforts to achieve the hiring goals" in the decree; (2) all parties used their best efforts to produce dynamic change; (3) "changes relating to, among other things, this nation's declining economy have taken place,

---

[41]As explained by defense counsel:

MS. EFROS: I think what matters is, looking at it today, this is not something that this administration embraces. It is not something that this administration necessarily needs to embrace.

THE COURT: It does as long as the orders exist. I'm sorry to tell you that. You may not like to embrace it happily, but there are Court orders out there.

MS. EFROS: That is the purpose of our motion today.

THE COURT: Sure.

MS. EFROS: If you deny our motion, then we're left with an appeal or conforming to the Court order. But the very purpose of our motion today is to say that these orders should be vacated.

THE COURT: Yes. But until and unless they are, you are, I hope, agreeing they bind you?

MS. EFROS: Until they are vacated, we are not consciously ignoring any Court order.

THE COURT: Well, that's not much of a consolation. All you are saying is you are not intentionally committing contempt of Court.

(12/17/09 Tr. at 20-21.)

which could not have been anticipated at the time the [decree] was entered into" – and (4) "circumstances were . . .

unforeseen and, hence, despite a good faith effort, the City has not satisfied the goals" in the decree. *Id.* at *13-*14. The court therefore concluded that "[t]he evidence demonstrates that it was not the City's lack of effort, but rather circumstances beyond its control, that resulted in it falling short of satisfying the goals in the [decree]." *Id.* at *16. Not only was *Cleveland Fire Fighters* in a different procedural posture because movants were seeking to extend a decree past an already established termination date, but unlike *Cleveland Fire Fighters*, the record before the Court does not support a finding that defendants have "extended [their] best efforts" to satisfy the obligations in the consent orders or that there are "circumstances beyond its control" that have caused it to fall short.[42] To the contrary, defendants freely admit that they are determined to seek vacatur and not compliance.[43]

_____

[42]While defendants refer to the obligations imposed on the District as having become ever more "exacting and onerous" (Defs.' Mot. to Vacate at 2), it is unclear whether defendants argue that any circumstance or obstacle makes the decree "unworkable" or "substantially more onerous." *Rufo*, 502 U.S. at 384; *see also NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 36 (D.C. Cir. 2000) ("Compliance over an extended period of time is not in and of itself sufficient to warrant relief. . . . [P]arties who have successfully sought modification have also established events or changed circumstances which 'make compliance with the decree substantially more onerous,' make the decree 'unworkable because of unforeseen obstacles,' or make 'enforcement [of the decree] detrimental to the public interest.'"). But of course, *Rufo* teaches that "[i]nternal compliance mechanisms instituted to effectuate the decree . . . and hurdles inherent in a consent decree's entry do not count as 'obstacles.'" *Harris Teeter Supermarkets*, 215 F.3d at 35-36 (citing *Rufo*, 502 U.S. at 391). Moreover, other than a reference to the District's financial situation (*see infra* note 43), defendants, as in *LaShawn*, 2010 WL 1270202, at *14, provide no substance to their conclusory claim that the consent decrees and 2001 Plan should be viewed as "exacting and onerous."

[43]Defendants also argue in passing that the Court must take account of the District's dire economic climate and budget shortfall of $583.5 million. (Defs.' Mem. at 54.) But defendants do not complain about the costs of providing services to the class members, but rather they want

Indeed, what the courts did in these cases is similar to the analysis courts engaged in before *Horne*, which was, in considering whether the objects of a consent decree had been met, to look to whether defendants had in good faith complied with the decree. For example, in *Board of Education v. Dowell*, 498 U.S. 237 (1991), the Supreme Court remanded with instructions to the district court to decide "whether the [defendant] had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past

---

to be relieved of the costs associated with the Special Masters, the Court Monitor, the Quality Trust, and the attorneys' fees incurred in litigating this case. (*Id.* at 55.) While "[f]inancial constraints may not be used to justify the creation or perpetuation of constitutional violations, . . . they are a legitimate concern of government defendants in institutional reform litigation and therefore are appropriately considered in tailoring a consent decree modification." *Rufo*, 502 U.S. at 592-93. However, in this case, as in *LaShawn*, 2010 WL 1270202, at *14, defendants have failed to demonstrate that financial circumstances warrant modification.

Most importantly, the District's lengthy history of intransigence and noncompliance have been the major factors in the increased need for monitoring, reliance on Special Masters, and the large costs and fees incurred by plaintiffs and their counsel. Second, the funding of the Quality Trust has almost been completed and is arguably not within the Court's power to modify; the responsibilities of the Special Masters have declined; and the Monitor returned over $180,000 of her budget in an effort to reduce costs. (12/17/09 Tr. at 115.) Third, this litigation has actually resulted in cost savings for the District, since as a result of the efforts of the Court, the plaintiffs, and the Special Masters, many class members and DDA customers have been put on the waiver, thereby shifting costs from the District to the federal government. (*Id.* at 27-28.) This effort, while now reaching fruition (*see supra* pp. 57-58), was started long before this administration and thus can hardly be credited only to the efforts of the current leadership. Fourth, as Judge Hogan held, the costs of monitoring are not properly considered to be obstacles. *LaShawn*, 2010 WL 1270202, at *14 (citing *Agostini*, 521 U.S. at 216 (holding that anticipated costs of compliance with an injunctive order are not changed circumstances under *Rufo*)). Fifth, defendants do not address the impact from the three-year multi-million dollar grant the District received from CMS in July 2008 via its "Money Follows the Person Rebalancing Demonstration Program" (Defs.' Mem. at 27) or the "Medicaid Infrastructure Grant," that was "awarded to DHCF by CMS to improve the DDA's day and vocational service system." (Defs.' Mem. re Alternate Remedy at 7.) Finally, if financial concerns are truly a problem, it is incumbent on the District to propose a specific modification for addressing the shortfall, as opposed to advocating for wholesale dismissal of the case so that the District can escape future court supervision and independent monitoring.

discrimination had been eliminated to the extent practicable." *Id.* at 249-50. Similarly, in *Labor/Community Strategy Center v. Los Angeles County Metropolitan Transportation Authority*, 564 F.3d 1115 (9th Cir. 2009), the court affirmed the district court's decision not to extend a consent decree addressing the day-to-day operations of the Los Angeles County bus system because "the evidence presented supported the district court's finding that the imperfections with respect to load factor targets were de minimis in relation to the overall scheme of things." *Id.* at 1123. And, in *McDonald v. Bowersox*, No. 89-1086 C(2), 1995 WL 17013058 (E.D. Mo. Sep 18, 1995), *aff'd*, *McDonald v. Carnahan*, 109 F.3d 1319, 1321-22 (8th Cir. 1997), the district court dissolved a consent decree regulating day-to-day life on death row, describing the critical question as whether "the underlying constitutional rights addressed through the decree are ensured through defendants' compliance with the decree's provisions in good faith for a reasonable period of time." *Id.* at *3.

In none of these cases is there support for defendants' novel proposition that they can attain the objects of the consent orders without complying with their terms as long as they meet some ill-defined "constitutional minimum.*" See LaShawn*, 2010 WL 1270202, at *20-*21; *Johnson v. Sheldon*, No. 8:87-CV-369, 2009 WL 3231226, at *7 (M.D. Fla. Sept. 30, 2009) (declining to vacate a consent decree despite defendant's "substantial compliance" and "sweeping modifications and improvements to the community mental health system" where decree specified exit criteria, which defendant had not yet fully satisfied); *R.C. v. Walley*, 475 F. Supp. 2d 1118, 1123 (M.D. Ala. 2007) ("termination of consent decree is not appropriate unless the decree's purposes have been fully achieved") (citation and internal quotation marks omitted). Nor does *Horne* support this proposition.

Unlike *Horne*, this case involves a thirty-year series of consent orders whereby the District committed itself to take certain actions to remedy the violations of plaintiffs' constitutional rights. These consent orders are what gives content to otherwise vague rights and substance to a remedy when those rights are violated.[44] Moreover, as the Supreme Court has recognized, consent decrees are a valuable tool for resolving litigation – with benefits to plaintiffs, defendants and the courts. But if the Court were to permit defendants to walk away from their obligations under the consent orders simply because there is a new administration that believes that all it needs to do is achieve the constitutional floor (whatever that means), that would mean that there would be no future consent decrees involving governmental entities. Plaintiffs would have no incentive to enter into consent decrees if the next administration could attack a prior administration's agreement by saying it promised more than was required. And, courts would be unlikely to approve a consent decree if each new administration could force a retrial based on a claim that the constitutional floor has now been met. While *Horne* may have provided parameters for court involvement in institutional reform litigation and consent decrees, it did not declare their demise. In light of the continued vitality of *Rufo* and *Frew*, and as long as the obligations voluntarily assumed by defendants flow from constitutional violations, this Court may not rewrite the existing consent orders so as to reduce defendants' promise to some ill-defined constitutional floor. *See Rufo*, 502 U.S. at 391; *LaShawn*, 2010 WL 1270202, at *21. Accordingly, as defendants concede they are not in compliance with the court orders, they have not satisfied *Horne*'s first requirement of showing that the object of the consent orders has been

[44](*See* Pls.' Opp'n, Ex. 27 (charting flow of orders, starting with the rights recognized in the 1978 Consent Order and then identifying the remedial actions defendants were ordered to take to remedy the violations of those rights).)

attained.

### B.     Defendants Have Not Yet Implemented a "Durable Remedy"

Nor have defendants satisfied *Horne*'s second requirement of showing that a "durable remedy" has been implemented. 129 S. Ct. at 2595. What it means to have a "durable remedy" is a question that *Horne* does not answer, but at a minimum, a "durable" remedy means a remedy that gives the Court confidence that defendants will not resume their violations of plaintiffs' constitutional rights once judicial oversight ends. *See LaShawn*, 2010 WL 1270202, at *21; *Harvey*, 2009 WL 5792159, at *11 (suggesting that a "durable remedy" is the equivalent of having in place "a mechanism for future compliance"). Whether there is a durable remedy thus necessarily depends on the actual impacts or outcomes experienced by the plaintiffs. The Court has to be persuaded that defendants are no longer violating plaintiffs' constitutional rights and that they will "not return to [their] former ways." *Dowell*, 498 U.S. at 247-48. As was the case in *LaShawn*, 2010 WL 1270202, at *22, defendants ask the Court to conclude that it has a durable remedy in place because it has implemented permanent structural changes and will remain subject to extensive monitoring even without judicial involvement.

### 1.     Permanent Structural Changes

Defendants focus on the following permanent structural changes: (1) the establishment of the Department on Disability Services ("DDS") as a cabinet-level department with independent personnel and procurement authority;[45] (2) the creation of the Department of Health

---

[45]Defendants also refer to the fact that "the District has recruited high-quality and dedicated leadership for the new agency" (Defs.' Mem. at 38), which is clearly an important development in this case given the often inadequate and transitory nature of management over the last 30 years. However, as defense counsel conceded during argument, a "durable" remedy cannot depend on the retention of particular personnel. (12/17/09 Tr. at 29 ("I don't think it does

Care Finance ("DHCF") as an independent, cabinet-level agency that functions as the single-state Medicaid agency with two (to increase to four) staff dedicated to persons with developmental disabilities; (3) increased interagency cooperation between DDS/DDA and DHCF, including routine weekly telephone calls, staff co-location and extensive collaboration on a number of ongoing projects; (4) increased interagency collaboration between DDS/DDA and the Health Regulation and Licensing Administration ("HRLA"), including sharing findings and conducting joint investigations; and (5) the establishment in July 2009 of a Task Force including representatives from DDS/DDA, DHCF, and HRLA to advise the Mayor regarding all services for individuals with developmental disabilities. (Defs.' Mem. at 37-43.)

These structural changes are all extremely positive developments, but they do not necessarily translate into proof of a durable remedy.[46] All of the changes have occurred within the past year or two, and, especially in view of the fact that this litigation has spanned over 30 years and still defendants achieved compliance, it is simply too soon to tell whether they will result in improved outcomes for the plaintiffs, and, if so, whether the improvements will be sustained absent judicial involvement. Even defendants admit that systemic change can take three to five years.[47] (Defs.' Mem.' at 70; Defs.' Mem., Ex. 16, Expert Report of Nancy Thaler,

_____

depend on Ms. Nuss staying, although we certainly want Ms. Nuss to stay"). Indeed, defendants' recent filing suggests that if the Court imposes the remedy recommended in the 2009 Special Masters' Report, Ms. Nuss will decline to remain in her job. (*See* Defs.' Mem. re Alternate Remedy at 3-8.)

[46]Similar arguments were raised by the District and rejected by *LaShawn*, 2010 WL 1270202, at *13-*14 and by the D.C. Circuit in *Harris Teeter*, 215 F.3d at 36, where the Court refused to terminate a consent decree even though defendant had instituted personnel changes and an internal reorganization.

[47]Even in their latest filing, defendants acknowledges that there are

July 14, 2008 ("In no state have problems been solved over night.  The full transformation of a

system – the building of structure and processes and the appointment of strong leaders to manage

the way it all works together – takes several years.  Three to five years is the standard time frame

assumed to be necessary to turn a system around.  Progress, that is evidence of the effort to

change things, becomes evident only over time."); *see also* 12/11/08 Trial Tr. at 353 (Test. of

Laura Nuss) ("you don't see the outcomes that you want to see as fast as you would like to see

them.  You know, this is a historically plagued service system.  So I think it is taking time to see

the outcomes.  But, you know, we still see the bad outcomes for individual issues. But we're also

seeing a lot of positive ones").

       Moreover, with respect to interagency coordination and collaboration, there have been

improvements, but the District's performance has been less than consistent given the problems in

this area as recently as December 2008.  (*See* 2009 Special Masters' Report at 129 ("Time has

shown that the problems with interagency coordination persist under the Fenty Administration as

they had under the previous administration, and have resulted in the same sub-standard

conditions, lack of necessary medical care, as well as inappropriate and ineffective day

programs.").)  For example, defendants' expert, Nancy Thaler, concluded that it was a failure in

interagency communication that caused "[t]he recent decision made by MAA to change the

------------------------------

        remaining systemic weaknesses specific to the District's IDD system: access to
        high-quality behavioral health services; clinical services, including physical
        therapy (PT), occupational therapy (OT), speech therapy (SPL), and nutrition
        services; and transformation of the legacy facility-based day services to
        person-centered habilitation and vocational-preparation programs that provide
        quality habilitative, vocational and community-integrated services appropriate to
        each consumer's needs and preferences.

(Defs.' Mem. re Alternate Remedy at 11-12.)

Medical Assistance transportation arrangements [to have] a negative impact on the consumers in the DDA program by limiting their capacity to travel to medical and other appointments." (Defs.' Mem., Ex. 16, Addendum to Expert Report of Nancy Thaler at 11-12, Oct. 7, 2008.) Similarly, as of December 2008, there continued to be problems with obtaining guardianships in a timely fashion. (2009 Special Masters' Report at 45, 49 ("The delays in obtaining guardianship for the provision of informed consent for medical and dental treatment of class members . . . have continued in the compliance period," leading to defendants continued inability "to provide class members with medical treatment and health care that is timely, particularly for class members who have acute medical needs.").)

2.      **Monitoring**

The second part of defendants' durable remedy argument is their claim that their performance is subject to extensive monitoring, including monitoring by the Superior Court, the Center for Medicare and Medicaid Services ("CMS"), the Quality Trust, and the District's internal monitoring by the Health Regulation and Licensing Administration ("HRLA") and the four units of DDA's Quality Management Division – Health and Wellness, Quality Enhancement and Quality Improvement, Incident Management and Enforcement, and Mortality Review. Unfortunately, there are a number of problems with defendants' contention that this monitoring is proof of a durable remedy.

i. **Superior Court** – As described by defendants, the Superior Court for the District of Columbia plays a significant role in overseeing plaintiffs.[48] However, the Superior

_____

[48]According to defendants,

any person brought before the Court (to be admitted or committed to DDS/DDA)

Court's authority is limited to treatment decisions about individual class members, and although

this system has been in place since 1979,[49] significant systemic reforms have not been achieved.

Moreover, proposed legislation may signification alter the role of the Superior Court. *See* D.C.

Council, B18-0501, Developmental Disabilities Reform Act of 2009 (introduced Oct. 20, 2009).

Thus, although Superior Court reviews individual cases and does play an important role, its job

is limited and in light of the pending legislation, the Court can hardly count on its continued

involvement.

      **ii. CMS** – According to defendants, CMS, the federal agency that administers the

Medicare and Medicaid programs, "already provides extensive oversight for services provided

by DDS/DDA." (Defs.' Mem. at 44.) For example, the District must submit an annual report to

CMS that addresses both fiscal and quality performance measures, and CMS conducts

"unannounced random audits on various areas of its six assurances, including level of care,

service plan, qualified providers, health and welfare, administrative oversight, and financial

accountability." (*Id.* (citing Nuss. Decl. ¶ 4, Oct. 7, 2009) (Ex. 4 to Defs.' Mem.).) In addition,

---

      has a right to be represented by retained or appointed counsel. *See* SCR-MRP 11;
      *see also* D.C OFFICIAL CODE § 7-1304.12(2) (authorizing fees to be a paid to
      appointed counsel). Moreover, any interested party has the right to initiate an
      action in Superior Court to compel DDS to accord persons with IDD the rights
      afforded them under District law. D.C OFFICIAL CODE § 7-1305.13(a).
      Indeed, each person committed to DDS/DDA supervision is entitled to an annual
      judicial hearing to determine whether the person has "benefitted from . . .
      habilitation." *Id.* at § 1304.11(a)(1). These procedures conclusively demonstrate
      that members of the Evans class have an adequate remedy at law for any potential
      future failure by the District to provide them with appropriate treatment.

(Defs.' Mem. at 43-44.)

    [49]*See* The Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978,
effective March 3, 1979 (D.C. Law 2-137; D.C. Official Code § 7-1301.02 33 et seq.).

according to defendants, "CMS will be initiating expanded . . . quality-reporting in the next fiscal year that mirrors the expanded quality management requirements now found in the HCBS waiver program." (*Id*.) Finally, defendants assert that:

> From February 2007 to March 2009, CMS engaged in even more intensive monitoring to ensure the then-MAA and DDS/DDA's compliance with the federal HCBS waiver requirements. This included monthly written and telephonic monitoring of a corrective action plan in three of the six assurances: Plan of Care; Health and Welfare; and Administrative Oversight. In March 2009, however, CMS determined that the District had "made major changes in the performance, structure, oversight mechanism, and systems sufficient enough to engage in continuous Quality Improvement (QI)." To qualify for such a finding, a state must demonstrate a robust system of "discovery, remediation and improvement" in all six assurances. Citing the "demonstrated effectiveness of the many newly implemented systems to meet the CMS quality requirements," CMS discontinued its intensified monitoring.

(Defs.' Mem. at 45 (quoting and citing CMS Letter, March 9, 2009 (Ex. 19 to Defs.' Mem.).)[50]

Plaintiff responds that the CMS monitoring "is irrelevant . . . [because] CMS monitors all states that participate in the federal Medicaid program. All such states are required to file the type of annual reports that the defendants reference." (Pls.' Opp'n at 82.) But more importantly, CMS does not perform regular on-site audits to determine the quality of care provided to class members and other DDA consumers. According to the DOJ counsel who represents plaintiff-intervenors, the District conducts the on-site reviews of community placements and the regional office of CMS, "as part of their quality review that occurs every five years, . . . requests evidence from the District that it is meeting all the statutory and regulatory assurances required for CMS." (12/18/09 Tr. at 195.) Given CMS' limited role in conducting on-site visits so that it can assess

---

[50]Of course, prior to CMS issuing its Letter of March 9, 2009, the District had been put on a "corrective action plan" – a program of intensified monitoring – due to the fact that the District failed to substantially meet three of the six waiver assurances. (Defs. Mem., Ex. 19; *see also* Court Monitor Rep. at 27, Jan. 26, 2007.)

the impact of the systems on class members, the Court can take little solace from the increased role of CMS, which is a recent development that will not begin until sometime this year and will be a far cry from the type of monitoring that has any direct impact on the day-to-day lives of the plaintiffs.

   **iii. Quality Trust –** As part of the 2001 Plan and as part of the settlement of the *Evans* litigation, the Quality Trust was established in 2001 as an quasi-independent entity tasked with providing "monitoring, legal services and lay advocacy services for consumers in the District of Columbia." (2001 Plan at 45 (footnote omitted).) As part of its function, the Quality Trust was to monitor services being provided to the over 1400 non-class members and would eventually take over from the Court Monitor the job of monitoring the *Evans* class members. (*Id*. at 46; *see also supra* pp. 13-15.) Specifically, the Quality Trust is tasked with developing and implementing an annual monitoring plan with input from all stakeholders; reviewing all reports and investigations of serious incidents involving DDS consumers; issuing annual reports; and reviewing and providing input regarding DDS budgeting information. (2001 Plan at 47-48.) However, although defendants point to the Quality Trust as an important monitoring component, the Quality Trust has informed the Court in its most recent filing that the "proposal to transition the monitoring function solely to Quality Trust is premature." (Quality Trust Opp'n at 21; *see also id.* at 27 ("When adequate structures are in place, and an opportunity for meaningful transition from the Court Monitor has occurred, Quality Trust will be able to assume post-litigation monitoring of the Evans class members along with its current monitoring function.").) The Quality Trust estimates that it will take 12-18 months "to have a meaningful transition." (12/17/09 Tr. at 140.) Given this assessment, the Court cannot yet look to the

Quality Trust to support defendants' durable remedy argument.[51]

       **iv. Internal DDS Quality Assurance System** – According to defendants, "internal monitoring methods will ensure that it sustains the extensive reforms now in place." (Defs.' Mem. at 48). Within the Developmental Disabilities Administration, the Quality Management Division ("QMD") "monitors all aspects of the service-delivery system to ensure compliance with federal and local law, national best practices, and applicable court orders." (*Id.* (quoting 10/7/09 Nuss Decl. ¶ 51).) The QMD is divided into four functional units: Health and Wellness, Quality Enhancement and Quality Improvement ("QE/QI"), Incident Management and Enforcement ("IMEU"), and Mortality Review. (Defs.' Mem. at 48-50 (quoting 10/7/09 Nuss Decl. ¶ 52).)

       While improvements in internal monitoring are critical to the existence of a durable remedy, over the lengthy history of this case, defendants' monitoring has been woefully inadequate both in terms of the quality and speed of internal investigations of both deaths and serious incidents involving class members and DDA consumers. This problem has continued through 2009. (*See*, *e.g.*, Quarterly Report of the Court Monitor at 7, December 10, 2009; Quality Trust for Individuals with Disabilities Monitoring Unit Annual Report and Data Summary at 1, Oct. 1, 2008 – Sept. 30, 2009 (concluding that "progress in improving the systems and supports for people with developmental disabilities in the District of Columbia is

---

[51]The District's proposed alternate remedy, set forth in a motion filed just days ago (*see supra* note 2), the Quality Trust's responsibility for on-the-ground monitoring appears to have shrunk and it is now described as an "active[] members of oversight committees that review findings generated by these systems and initiatives and contribute to recommendations for improvements going forward." (Defs.' Mem. re Alternate Remedy at 13.) Obviously, if its remedy were to be adopted, the Quality Trust's role (despite the District's obligation to fund it with over $30 million) would be reduced to "ad hoc monitoring." (*Id.*, Ex. A at 7.)

mixed. . . . A more consistent and transparent process for investigating Serious Reportable Incidents at DA is also necessary . . . . Our data indicates that investigation reports are not being completed consistent with policy.)

The flaws in the District's internal monitoring also became apparent recently when the District had to put into receivership one of its largest providers, Individual Development, Inc. ("IDI"). While the District touts this action as an example of "[t]he new institutional culture and collaborative ethos" of officials from DDA, DHCF, and HRLA (Defs.' Mem. re Alternate Remedy at 5), what it conveniently fails to disclose is that many of the problems with this provider that led to the receivership were uncovered by the Court Monitor and reported by the Court Monitor and the plaintiffs, not by the District's internal monitoring apparatus. (*See* 12/18/09 Tr. at 239.)

In sum, defendants have not demonstrated a durable remedy as required by *Horne*. While it is true that the District has made significant strides in the last year or two under new leadership, the Court does not have confidence that the agency's progress is durable and self-sustaining. *Accord LaShawn*, 2010 WL 1270202, at *21-*22. As documented by the 2009 Special Masters' Report, the three most recent Court Monitor Reports and the 2009 Quality Trust's Monitoring Unit Annual Report and Data Summary, results are, at best, uneven, and it is far too soon to determine whether the structural changes, some of which are still in the implementation phase, will have the desired impacts on the safety, health and welfare of the class members.

## CONCLUSION

In 1978, the parties agreed, and the Court endorsed that agreement in an Order and Judgment, that plaintiffs had certain constitutional rights, that those rights had been violated, and

that to remedy those violations, defendants would have to take certain remedial actions. More than 30 years later, defendants ask the Court to relieve them of those obligations under Rule 60(b)(5) on the grounds that enforcing those promises prospectively is no longer equitable. While defendants certainly have the right to file a 60(b)(5) motion, they have the burden to justify their motion. Defendants have failed: the objectives of the original consent decree and subsequent court orders, as incorporated in the 2001 Plan, have not been achieved and defendants have not demonstrated that the prospective enforcement of the court orders would be inequitable or "detrimental to the public interest." *Horne*, 129 S. Ct. at 2593. Accordingly, defendants' motion for vacatur and dismissal will be DENIED.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: April 7, 2010.