# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**JOY EVANS, *et al.*,**                                   )
                                                          )
             **Plaintiffs,**                     )
                                                          )
**UNITED STATES OF AMERICA,**                              )
                                                          )
       **Plaintiff-Intervenor,** )     **Civil Action No. 76-0293 (ESH)**
                                                          )
              **v.**                )
                                                          )
**ADRIAN FENTY, *et al.*,**                                )
                                                          )
          **Defendants.**                     )
_____)

## <u>MEMORANDUM OPINION</u>

In this over 30-year old case concerning the constitutional rights of developmentally-disabled individuals in the District of Columbia who were formerly institutionalized at Forest Haven, the Court has before it a Report and Recommendation from the Special Masters, concluding that as of December 2008, defendants remained in "serious noncompliance" with the Court's remedial orders and recommending the appointment of an Independent Compliance Administrator to ensure that they achieve compliance forthwith. (Special Masters' Report and Recommendation Regarding A Remedy For Defendants' Noncompliance With Court Orders at 3, Aug. 14, 2009 ["2009 Special Masters' Report"].) Defendants have filed objections to the Report's factual findings and conclusions of law, which the Court will address herein. Defendants' objections to the recommended remedy and the Court's ultimate decision as to remedy will be the subject of a separate opinion.

## BACKGROUND

In a recent opinion, the Court summarized the critical facts and lengthy procedural history of this litigation. *Evans v. Fenty*, Civil Action No. 76-0293, 2010 WL 1337641 (D.D.C. Apr. 7. 2010) ["April 2010 Opinion"].[1] To avoid unnecessary repetition, the Court will rely on this earlier opinion and will limit itself to an abbreviated summary of the background of this case, as it relates to the issues presented herein.

In 1978, this Court found that the conditions in which plaintiffs were living violated their constitutional rights and ordered defendants to take a series of actions to remedy those violations. *Id.* at *2. In March 2007, many years and many supplemental orders later, *see id.* at *2-*8, the Court found that defendants were in "systemic, continuous, and serious noncompliance" with the Court's prior Orders in three critical areas: health, safety and welfare. *Id.* at *9 (quoting *Evans v. Fenty*, 480 F. Supp. 2d 280, 325 (D.D.C. 2007) ["March 2007 Liability Opinion"]). Following the issuance of this opinion, the Special Masters were directed to "conduct proceedings relating to the necessity for remedial relief, including, as needed, discovery, hearings, mediation and settlement negotiations" and, "[a]t the conclusion of such proceedings . . . [to] issue a report to the Court making recommended findings of fact, conclusions of law and recommendations regarding appropriate remedies." *Id.* at *11 (quoting Supp. Order of Reference, May 3, 2007).

The Special Masters issued their final Report and Recommendation in August 2009, concluding that, as of December 2008, "plaintiffs had proved by clear and convincing evidence that defendants continue to be in serious noncompliance with critical provisions of outstanding

---

[1] In this Memorandum Opinion, the Court denied defendants' motions to vacate all existing remedial orders and to dismiss the case in its entirety. (*See* Order, Apr. 7, 2010.)

court orders" addressing plaintiffs' constitutional rights to health, safety and welfare, and recommending the appointment of an "Independent Compliance Administrator" to ensure that the defendants, within a reasonable period of time, achieve compliance with these orders and bring an end to this more than 30-year old litigation. (2009 Special Masters' Report at 3; *see also* April 2010 Opinion, 2010 WL 1337641, at \*14-\*17 (summarizing Special Masters' factual findings and conclusions of law).) Pursuant to the Supplemental Order of Reference, both parties were permitted to "file objections to (or file a motion to adopt or to modify)" the 2009 Special Masters Report, but "[f]ailure to timely object" would be "deemed a waiver of any objection." (Supp. Order of Reference at 4.)

Defendants filed a limited number of objections to the factual findings and conclusions of law in the 2009 Special Masters' Report. (*See* Mem. in Support of Defs.' Renewed Mot. to Vacate Consent Orders and To Dismiss Action at 57-60 & Ex. 23, Oct. 7, 2009 ["Defs.' Mem."]; Defs.' Consolidated Reply in Support of Mot. to Vacate Consent Orders and To Dismiss Action at 18-23, Dec. 2, 2009 ["Defs.' Reply"].)[2] The defendants devoted only three pages of their brief to their objections, wherein they identified the following three objections: (1) that the Special Masters "utilized the incorrect legal standard" in light of the Supreme Court's decision in *Horne v. Flores*, 125 S. Ct. 2579 (2009) (Defs.' Mem. at 57-58); (2) that the Special Masters erroneously relied on the Court Monitor's Reports to make "systemic conclusions" (*id.* at 58-59); and (3) that the Special Masters erroneously rejected evidence regarding "current progress." (*Id.*

_____

[2]Defendants also opposed the imposition of any remedy, while plaintiffs advocated in favor of the recommended remedy. As noted *supra*, the Court will address herein defendants' objections to the Special Masters' findings of fact and conclusions of law but not the proposed remedy.

at 60.)  In an exhibit attached to their brief, defendants offer "additional objections" to those

identified in their memorandum  (Defs.' Mem., Ex. 23),[3] including that the Special Masters (1)

erroneously relied on a report issued by the District of Columbia Health Resources Partnership in

December 2007 ("DCHRP Report") (*id*., Ex. 23, ¶ 8); (2) erroneously struck the October 8, 2008

Declaration of Kathy Sawyer (*id.*, Ex. 23, ¶ 9); and (3) in addressing the issue of bad faith,

erroneously cite to an exhibit offered by plaintiffs but stricken on defendants' motion.  (*Id.*, Ex.

23, ¶ 10.)  In Exhibit 23, defendants also elaborate on their objections to specific findings based

on both the record before the Special Masters and "current evidence."  (*Id.*, Ex. 23, ¶¶ 20-75.)

Agreeing with the Special Masters' Report, plaintiffs ask the Court to reject defendants'

objections and affirm and adopt the Report.  (Pls.' Resp. to Defs.' Objections to the Special

Masters' Report & Recommendation, and Opp'n to their Mot. to Vacate All Prior Orders and

Dismiss the Case at 4-16, Nov. 6, 2009 ["Pls.' Opp'n"].)

     The Court heard oral argument on defendants' objections on December 17-18, 2009.

During the argument, the Court directed defendants' counsel to address, in addition to its legal

---

[3]The Court notes that defendants' decision to include certain substantive objections to the 2009 Special Masters' Report only in an "Exhibit" to their memorandum (*see* Defs., Mem., Ex. 23) does not comport with the Court's clearly-stated direction to address in one consolidated brief, their Rule 60(b)(5) legal argument, their objections to the Special Masters' findings of fact and conclusions of law, and their equitable arguments as to what, if any, remedy should be imposed.  (*See* 8/19/09 Tr. at 16-17.)  Nonetheless, the Court will consider the additional objections set forth in Exhibit 23.  The Court will not, however, consider evidentiary objections merely "incorporated by reference" but not substantively addressed (*see* Defs.' Mem, Ex. 23, ¶ 8 ("Defendants incorporate by reference each and every evidentiary objection made at the hearing in this matter and in their submissions to the Court (see Docket Nos. 1026, 1044, 1066, 1080, 1083)), as the Supplemental Order of Reference expressly states that any objection to the Special Masters' Report "shall specifically identify the portions of the order, or report containing proposed findings of fact, conclusions of law and recommendations for remedial action, to which objection is made and the basis for the objection."  (Supp. Order of Reference at 4.)

argument, each and every specific objection that it wanted the Court to consider. (12/17/09 Tr. at 120.)[4] Counsel for the District limited her objections to (1) the Special Masters' dismissal of defendants' expert, Dr. John Sumner (*id.*); (2) the Special Masters' reliance on the Court Monitor's Reports (*id.* at 127); (3) the admission of the DCHRP Report (*id.* at 120); and (4) the exclusion of the Sawyer declaration. (*Id.* at 122-24).

Accordingly, defendants' objections raise the following questions: (1) did the Special Masters apply the wrong legal standard (Section II.A); (2) did the Special Masters err by relying on the Court Monitor's Reports and rejecting the testimony of Dr. Sumner (Section II.B, infra); (3) did the Special Masters err by excluding the October 8, 2008 Sawyer Declaration (Section II.C); (4) did the Special Masters err by relying on the December 2007 DCHRP Report (Section II.D); (5) did the Special Masters' err by citing to a stricken exhibit (Section II.E); and (6) does current evidence render any of the Special Masters' findings or conclusions erroneous (Section II.F)? Each will be analyzed seriatim.

## DISCUSSION

## I.    STANDARD OF REVIEW

As set forth in the Supplemental Order of Reference, the Court reviews *de novo* "all objections to the Masters' proposed findings of fact" and "all objections to conclusions of law

---

[4]At oral argument, the Court emphasized that it would only consider those objections that the District specifically identified and addressed in open court:

EFROS:  I'm just going to hit the higher points.

THE COURT:  No. You are going to hit what I have to decide. I'm not having you incorporate anything by reference and assume that I am going to know.

(12/17/09 Tr. at 120.)

vvvmade or recommended by the Masters" and reviews for abuse of discretion the dispostion of any procedural issues.  (Supp. Order of Reference at 4.)

## II.     DEFENDANTS' OBJECTIONS

### A.     Wrong Legal Standard

Defendants' first objection to the 2009 Special Masters Report is that the Special Masters applied the wrong legal standard.  They assert that "the Special Masters employ the very type of logic that the Supreme Court repudiated in *Horne*: namely they focus narrowly on whether the District has complied with the specifics of particular court orders, to the exclusion of any analysis of whether the District 'is now fulfilling its [legal] obligation by new means.'"  (Defs.' Mem.  at 57 (quoting *Horne*, 129 S. Ct. at 2589)).  Thus, they contend, the Special Masters' "conclusions simply cannot be utilized."  (*Id.* at 58.)

Defendants based their motion to vacate all existing orders on this same legal argument, which the Court has already rejected.  *See* April 2010 Opinion, 2010 WL 1337641, at *33-*38 ("as long as the obligations voluntarily assumed by defendants flow from constitutional violations, this Court may not rewrite the existing consent orders so as to reduce defendants' promise to some ill-defined constitutional floor").  Accordingly, the Special Masters properly focused on the task they were given – to determine whether the defendants remained in noncompliance with existing court orders.

### B.     Use of Court Monitor Reports as Evidence

Defendants also objected to the Special Masters' conclusion that the Court Monitor's reports are "reliable evidence of the defendants' overall performance with respect to their obligations under court orders."  (2009 Special Masters' Report at 18.)  Defendants challenge

this conclusion on the ground that, according to their expert, the information in the reports is "not based on statistically significant samples" and is not "benchmarked against what may be expected to be normal across the country" (Defs.' Mem. at 58-59; 12/11/08 Trial Tr. at 375-79.) The relevant facts are as follows.

Pursuant to the 1978 Consent Order, defendants hired an expert, then called a Developmental Disabilities Professional (DDP), to assist "in coordinating and carrying out the implementation of the provisions of [the 1978 Order]." *See Evans*, 459 F. Supp. 483, 485 (D.D.C. 1978). The Order further provided that:

> The DDP in conjunction with the defendants shall have the duty, obligation and responsibility to plan, organize, coordinate and monitor the implementation of this and any further Order of the Court. The DDP through the Director of DHR shall until further Order of this Court file a verified report every ninety (90) days from the date of appointment of the DDP detailing the status and progress of the defendants in the implementation of this and any further Order of the Court.

*Id.* In November 2000, the DDP was replaced, at the parties' joint request, with an independent Court Monitor. (Order Regarding the Appointment of an Independent Court Monitor, Nov. 21, 2000 ["11/21/00 Order"].) Since that time, the Court Monitor's duties have included "observing, monitoring, reporting findings, and making recommendations to the parties, the Special Master, and the Court regarding implementation of the Court's Orders, and to submit quarterly reports on defendants' 'compliance' with the Court's Orders." April 2010 Opinion, 2010 WL 1337641, at *5 (quoting 11/21/00 Order at 2-5). In addition, the "findings, recommendations and reports of the Court Monitor . . . may be introduced as evidence when relevant and admissible in accordance with the Federal Rules of Evidence." (11/21/00 Order at 5.)

Between November 2006, the close of the record for the liability phase, and December 2008, the close of the record for the proceedings before the Special Masters, the Court Monitor

filed six Quarterly Reports, all of which were admitted without objection at the trial before the Special Masters. (Special Masters' Final Pretrial Order, Att. A, at 15, Nov. 28, 2008.)[5] During that same time period, defendants rejected the Court Monitor's proposal for more comprehensive monitoring to assess compliance with the Court's orders. (Defs.' Notice Concerning Proposed Comprehensive Monitoring at 2, Nov. 21, 2007); *see also* April 2010 Opinion, 2010 WL 1337641, at *12-*13.

At the trial before the Special Masters, however, defendants offered an expert witness, Dr. John Sumner, a statistician with the District of Columbia Department of Health, whom defendants asked to "analyze the methodology used by the Court Monitor's Office in its Quarterly Reports and to determine whether that methodology provides a representative sample that can fairly measure compliance with the mandates of the 2001 Plan." (Defs.' Mem, Ex. 26, Att. 1, ¶ 4 (Sumner Decl., October 8, 2008) ["10/8/08 Sumner Decl."]) Sumner concluded that the "the information in the [Court Monitor's] Quarterly Reports is essentially anecdotal, and . . . informative as it pertains to a particular individual, at a particular point in time" but "cannot be relied upon for determining the degree of compliance with the mandates of the 2001 Plan." (10/8/08 Sumner Decl. ¶ 6.) More specifically, Sumner rejected the Court Monitor's Reports as

_____

[5](Court Monitor's Quarterly Report, January 26, 2007 (review of 76 randomly selected class members from the at-risk list); Court Monitor's Quarterly Report, April 19, 2007 (review of 79 class members, including review of healthcare for 36 randomly selected class members and seven class members selected due to identified concerns); Court Monitor's Quarterly Report, August 2, 2007 (review of health care provided to 37 class members, including 19 who were receiving one or more psychotropic drugs); Court Monitor's Quarterly Report, January 10, 2008 (monitored healthcare to a sample of 59 class members); Court Monitor's Quarterly Report, May 8, 2008 (72 reviews, including 25 class members jointly selected with the District pursuant to the September 12, 2007 Consent Order); Court Monitor's Quarterly Report, September 10, 2008 (reviewed 70 randomly selected class members).)

a means to measure defendants' compliance with court orders for two reasons: (1) because the samples "do not meet the minimum sample size criteria (86 members) as required by statistical sampling theory" (Defs.' Mem., Ex. 26, Att. 3, ¶ 4 (Sumner Supp. Decl., Nov. 11, 2008) ["11/11/08 Sumner Supp. Decl."]); and (2) because the Court Monitor "does not attempt to benchmark the levels of non-compliance found in the DDS programs" to "levels of non-compliance to be found in a theoretical national average." (*Id.* ¶ 8.)

The Special Masters' rejected Sumner's conclusion that these alleged flaws in the Court Monitor's methodology rendered the information in the Reports of no evidentiary value. (2009 Special Masters' Report at 9-18.) Defendants object to this ruling on the ground that Sumner's "education and experience make him eminently more qualified than the Special Masters to determine what data provide a sufficient basis for systemic conclusions and what analytical value (if any) should be assigned to the Court Monitor's reports." (Defs. Mem., Ex. 23, ¶ 6.) Accordingly, they maintain that Sumner's criticisms of the Court Monitor's methodology were improperly rejected by the Special Masters.

Sumner's first criticism of the Court Monitor's methodology relates to sample size. In Sumner's opinion, the minimum sample size that should be used in this case is 86 because that is the size that allows for a 90% confidence level, *i.e.*, an error rate of 10%, in a population of approximately 600.[6] (Defs.' Mem., Ex. 26, Att. 2, at 4 ["Sumner Expert Opinion"].) In his opinion, "the use of samples smaller than this number runs a very significant risk of not being representative of the population" (*id.*), and does not "meet the minimum sample size criteria (86

---

[6]According to the most recent report from the Court Monitor, there are currently 592 class members. (Court Monitor's Quarterly Report at 8, May 5, 2010.)

members) as required by statistical sampling theory, to enable the court to draw inferences about DDS's overall compliance with the service requirements of the Evans Class . . . , as represented by the relevant court orders and the 2001 Plan." (11/21/08 Sumner Supp. Decl. ¶ 3.)

The Special Masters rejected Sumner's opinion that only a statistically significant sample could be used to evaluate defendants' compliance. The Court agrees. As the Special Masters put it – Sumner "mistakenly believes that a legal determination of compliance can only be based on strict, orthodox, statistical analysis as he understands it." (2009 Special Masters' Report at 13.) To the contrary, as even Sumner recognized, the Court Monitor's Reports have "a lot of value" for determining whether defendants are meeting specific criteria in the court orders. (*Id.* at 13 (citing 12/11/08 Trial Tr. at 387).) Moreover, as Sumner also acknowledged, the Court Monitor's surveys over the years can be used "to track trends in terms of . . . specific criteria" in the court orders (12/11/08 Trial Tr. at 389), and the information therein could support a general "qualitative opinion based on recurrent observations." (*Id.* at 379-80.)

The Court Monitor's office, operating as an independent entity, has been reviewing class members and submitting quarterly reports to the Court since 2000. (Order Regarding the Appointment of an Independent Court Monitor (Nov. 21, 2000).) In just the three years preceding Sumner's report, the Monitor reviewed the health care of 355 class members (57% of the class at the time) at least once, and 15% of those more than once. (12/11/08 Trial Tr. at 370.) Even if it were arguable that the findings are not generalizable to the class as a whole,[7] the

---

[7]Prior to September 2008, the findings in the Court Monitor's Reports were

intended to present the Court and the parties with a current snapshot of health care services being provided to class members, of whom most have been identified as 'at risk' for serious health and/or behavioral concerns. It is important to note that

number of class members reviewed, and the information discovered through those reviews, are material facts properly considered by the Special Masters in assessing defendants' compliance with existing court orders.

Sumner's second criticism of the Court Monitor's methodology is that it does "not attempt to benchmark the levels of non-compliance found in the DDS programs" against a "theoretical national average." (Sumner Supp. Decl. ¶ 8; 12/11/08 Trial Tr. at 375.) In his opinion, such a comparison is necessary "in order to determine whether [the Court Monitor's] findings are reasonable and fair" (12/11/08 Trial Tr. at 375) and, therefore, reliable evidence from which to draw conclusions about defendants' compliance. (*Id.* at 385.)

The Special Masters concluded that "Dr. Sumner's testimony on this subject, though interesting, has no bearing on the weight to be placed on the Court Monitor's reports in this proceeding." (2009 Special Masters' Report at 12.) In their view, Sumner "seemed to confuse the use of the Court Monitor's findings to determine compliance with *court-ordered standards* with the use of the court monitor's findings to determine whether the District's implementation of its obligations measured up to *national norms and standards*." (*Id.* at 11.) The Court agrees. As the Special Masters observed, "the District is bound to meet the standards

_____

> each group of reviews provides a separate 'snapshot' of the care, treatment, and services provided to the individuals in the sample at the time of the reviews. The findings are not based on statistically significant samples. Any differences across points in time are provided for reference. Data are not analyzed to identify trends.

(Court Monitor's Quarterly Report at 5, May 8, 2008.) In the September 2008 Report, the Court Monitor used a sample of 70 class members, which was the number the Court Monitor's office determined, using an on-line sample size calculator, would provide a representative sample. (Court Monitor's Quarterly Report at 2, Sept. 10, 2008.) According to Sumner, when he used the same online sample size calculator, he came up with a sample size of 83. (Sumner Supp. Decl. ¶ 4.)

established by the court orders." (*Id.* at 12.) And contrary to defendants' suggestion, "the reasonableness of a particular court order or objective" (Defs.' Mem., Ex. 23, ¶ 14) was not a question before the Special Masters – and nor is it before the Court. The Court Monitor is not responsible for determining compliance with court orders; rather, she is to "gather factual information about defendants' implementation efforts and to report it to the Court." (2009 Special Masters' Report at 12 (citing 11/21/00 Order at 3).) This is precisely what the Court Monitor has done. The absence of any benchmarking to "theoretical national norms" does not undermine the evidentiary value of the information provided by the Court Monitor.

In rejecting Sumner's conclusion about the evidentiary value of the information in the Court Monitor's Reports, the Special Masters also relied on the fact that

> [m]any of the Court Monitor's findings are consistent with deficiencies identified in the reports of independent investigation conducted by the Columbus Organization into class member deaths as well as in survey reports of the Health Regulations and Licensing Administration ("HRLA"), and reinforced by the conclusions reached by the District of Columbia Health Resources Partnership ("DCHRP"), funded by the defendants, following its own analysis of the District's healthcare system.

(*Id.* at 17.) The Court agrees with the Special Masters that

> [t]he consistency of the Court Monitor's findings with these other independent sources of information indicate that, despite the defendants' criticisms of the Monitor's methodology, the observations are substantially accurate and reliable evidence of the defendants' overall performance with respect to their obligations under court orders.

(*Id.*)

In addition, when given the opportunity to do so in November 2007, defendants declined to support the Court Monitor's proposal for "comprehensive" monitoring; defendants have failed to submit any evidence obtained using their proposed methodology; the sample size used by the

Court Monitor usually exceeded 10%, the standard sample size called for by the 2001 Plan to assess compliance (*see*, *e.g*, 2001 Plan at 17, 23, 27); and, ironically, defendants have relied on a 10% sample size in citing favorable data to the Court. (*See* Notice of Filing, Ex. 2, at 16, Dec. 15, 2009 (Report of the District of Columbia Department on Disability Services for the Period of February 1, 2009 through April 30, 2009).) Accordingly, the Court concludes that defendants' objection to the Special Masters' use of information from the Court Monitor's reports is not well-founded.

As was the case in 2007, the Court reaffirms its conclusion that the Court Monitor "has reviewed randomly-selected subsets of class members quarter after quarter, and her findings are remarkably consistent in many respects. These reviews provide significant data with respect to defendants' overall performance under the 2001 Plan." *Evans*, 480 F. Supp. 2d at 297.

### C.     Declaration of Kathy Sawyer

Defendants' next objection is to the Special Masters' Order granting plaintiffs' motion to strike the Declaration of Kathy Sawyer.[8] (*See* Special Masters' Order Granting in Part and Denying in Part Pls.' Mot. to Strike, Feb. 2, 2009 ["2/2/09 Order"].) The Court reviews this procedural ruling for abuse of discretion.

The material facts are as follows. On May 19, 2008, this Court entered a Scheduling Order which provided that if "live witnesses will be called, the direct testimony must be presented by affidavit or deposition excerpts. (Scheduling Order at 2, May 19, 2008.) On

---

[8]Sawyer was the Interim Administrator of the Mental Retardation and Developmental Disabilities Administration ("MRDDA") from June 19, 2006 through December 29, 2006, Interim Director of the Department on Disability Servies ("DDS") from January 2007 through June 2, 2007, *Evans* Compliance Officer from June 2, 2007 through September 30, 2008, and a consultant to DDS until December 31, 2008.

October 8, 2008, pursuant to the Special Masters' Pretrial Order, the parties exchanged written testimony in the form of declarations of witnesses they intended to call at trial. Defendants identified Sawyer as a witness and submitted her direct testimony in the form of a declaration. (*See* Defs.' Notice of Filing of Direct Testimony, Oct. 8, 2008; Defs.' Mem., Ex. 30 (Sawyer Decl., Oct. 8, 2008) ["10/8/08 Sawyer Decl."].) On October 28, 2008, the parties filed their Joint Pretrial Statement, which identified Sawyer as a witness to be called by the defendants and allotted 120 minutes for plaintiffs' cross-examination of her. (Joint Pretrial Statement at 10, Oct. 28, 2008.) On November 28, 2008, the Special Masters issued their Final Pretrial Order, which identified Sawyer as a fact witness whose "[d]irect testimony . . . will be presented by Declaration or excerpts from depositions, which have been exchanged." (Special Masters' Final Pretrial Order at 6, Nov. 28, 2008 (emphasis added).)

On the third and last day of the trial, however, defendants decided, without prior notice to plaintiffs or the Special Masters, not to call Sawyer as a witness and, therefore, they withdrew her October 8, 2008 Declaration. (12/12/08 Trial Tr. at 129.) Plaintiffs, in response, requested permission to file deposition designations for Sawyer as a substitute for the "testimony that . . . we would have elicited in court had she been called as a witness, and that we would have listed as designated testimony had we known she was not going to be proffered for trial." (*Id.* at 132-33.) The Special Masters, over defendants' objection, granted plaintiffs' request, explaining that "fairness" required it because they had already read the Sawyer Declaration in preparation for the trial. (*Id.* at 146.). However, they also granted defendants the right to respond with counter-designations from either Sawyer's deposition or, if deposition excerpts did not adequately cover the matters they wanted to respond to, "portions" from her Declaration to "round out the

picture." (*Id.*)

On December 19, 2008, plaintiffs submitted to the Special Masters their deposition designations for Sawyer. (Notice of Filing, Dec. 19, 2008; Defs' Reply, Ex. 5, Dec. 2, 2009.) In response, defendants submitted counter-designations from Sawyer's deposition and the entirety of her October 8, 2008 Declaration. (Notice of Filing, Jan. 5, 2009.) On January 8, 2009, plaintiffs filed a motion to strike Sawyer's October 8, 2008 Declaration and certain portions of the defendants' deposition designations, arguing that defendants had "far exceeded" the Special Masters' ruling. (Pls.' Motion to Strike at 1, Jan. 8, 2009.) Defendants responded that plaintiffs' motion should be denied because admission of the Sawyer Declaration would not cause undue prejudice to the plaintiffs. (Amended Opp. to Pls.' Mot. to Strike Kathy Sawyer's Decl. and Dep. Testimony at 1, Jan. 21, 2009.) The Special Masters granted plaintiffs' motion to strike as to the Sawyer Declaration, but denied it as to the deposition designations. (2/2/09 Order at 1.) They explained their ruling as follows:

> The Special Masters find that Defendants' effort to introduce as an exhibit the entire Declaration of Ms. Sawyer while preventing the Plaintiffs from cross examining her would be manifestly unfair. Defendants had an opportunity to put the Declaration in the record as the direct, sworn testimony of their designated fact witness at trial. They chose not to do so. The Declaration was prepared by Defendants as her direct testimony, and represented to the Plaintiffs and the Special Masters as the testimony that their witness would adopt at trial. The Defendants having withdrawn the Declaration and having precluded its introduction as direct testimony, it would be unfair to permit the Declaration to become part of the post-trial record and deprive Plaintiffs of the opportunity to cross examine Ms. Sawyer with regard to it.

> Defendants were clearly instructed by the Special Masters to file only "portions of her statement" not covered in Defendants' responsive deposition excerpts that were needed to "round out the picture for us." Submission of the entire Declaration is not responsive to that directive and the Special Masters will not now try to determine what parts of the Declaration, if any, are needed to round out the picture. That task was given to Defendants. They did not do it.

(*Id.* at 7 (internal citations omitted).)  However, to address defendants' complaint that the Special Masters' approach deprived them of the right to question Sawyer, the Special Masters granted defendants permission to refile the Declaration as direct testimony "on the condition that the witness be made available for cross-examination.  (*Id.* at 1, 8.)

Defendants timely filed objections to the Special Masters' ruling (*see* Defs.' Objections to the Special Masters' Order Granting Pls.' Motion to Strike the Declaration of Kathy Sawyer, Feb. 18, 2009)[9] and now argue that "[i]t was plain error for the Special Masters to grant Plaintiffs' motion to strike the Sawyer Declaration."  (Defs.' Mem., Ex. 23, ¶ 9.)  They argue that they "submitted the entire Sawyer Declaration, which is only eight (8) pages long, because it is entirely responsive to the subject matter of Plaintiffs' deposition designations."  (*Id.*)  They further argue that its admission would not have prejudiced the plaintiffs, but that its exclusion was "particularly prejudicial and egregious [to defendants] because Plaintiffs had advance knowledge of its contents, which allowed them to precisely tailor their deposition excerpts to rebut it before Defendants had an opportunity to submit any portion of it for admission."  (*Id.*)

During oral argument the Court asked the defendants to expound on how the exclusion of the Sawyer Declaration was "harmful."  (12/17/09 Trial Tr. at 122.)  Defendants responded that because the Declaration was excluded, the Special Masters' report **"**reflects a very one-sided view of Ms. Sawyer's testimony.  It reflects abstracts from the deposition of Kathy Sawyer that were selected by plaintiff."  (*Id*.)  The Court pointed out that the defendants' counter-designations from her deposition were in the record and again pressed defendants to identify "specifically [w]hat was prejudicial to the defendant . . . line[] by line[]."  (*Id.* at 123.)

_____

[9]Defendants did not seek to refile the Declaration as direct testimony.

Following this instruction, the following colloquy took place:

> MS EFROS: What we did not get in was Kathy Sawyer's testimony as to -- which is reflected in her declaration, as to the status of various programmatic changes at the agency. And --

> THE COURT: You didn't get Ms. Nuss to do any of that?

> MS. EFROS: We did.

> THE COURT: Okay. What did you suffer as a result of not being able to put the whole . . .

> What specific prejudices did the District suffer, i.e., facts that they should have had in the record that they didn't get in the record that makes their report and recommendation wrong? That's what objections are.

> MS. EFROS: I understand, Your Honor. I think what we did not get in the record is additional evidence from Ms. Sawyer that would have supported the evidence we produced at the hearing as to the status of various programmatic changes at the agency, including Ms. Sawyer's opinion, so to speak, lay opinion, as to what remedy, if any, should be imposed upon the District at this time.

(*Id*. at 123-24.)

Thus, defendants' contention that the exclusion of the Sawyer Declaration was prejudicial depends upon whether "additional evidence from Ms. Sawyer as to the status of various programmatic changes at the agency" and her "lay opinion, as to what remedy, if any, should be imposed upon the District" could have affected the Special Masters' findings of fact or conclusions of law with respect to defendants' compliance, or lack thereof, with existing Court orders. Defendants' claim of prejudice is unconvincing.

In the first place, Sawyer's declaration testimony on these issues would not have made any difference. The excerpts from Sawyer's deposition that defendants counter-designated, and that the Special Masters admitted, include Sawyer's testimony on both the status of certain programmatic changes (*see* Sawyer Dep., Aug. 8, 2008, at 280-282, 298-300) and her opinion on

the possible remedies proposed by the plaintiffs.  (*See id.* at 282-293).  Moreover, as defendants

acknowledge, Ms. Nuss testified about the "status of various programmatic changes" (*see* Defs.'

Mem, Ex. 13 (Nuss Decl., Oct. 8, 2008); 12/11/08 Trial Tr. at 234-363; 12/17/09 Tr. at 124).

Accordingly, because Sawyer's declaration testimony on these issues would have been "needless

presentation of cumulative evidence," Fed. R. Evid. 403, its exclusion could not have been

prejudicial to defendants.

### D.     DCHRP Report

Defendants' next objection is that the Special Masters "rely on a report authored by the

District of Columbia Health Resources Partnership ("DCHRP")."  (Defs.' Mem., Ex. 23, ¶ 8.)

The material facts are as follows.  In September 2007, the parties agreed to a short-term

order focusing on two specific goals:  increasing the number of providers and improving the

health and safety of class members.  (Order at 1, Sept. 12, 2007 ["2007 90-Day Consent Order"]

(discussed in April 2010 Opinion, 2010 WL 1337641, at *12).  Pursuant to that order,[10] DCHRP,

"reviewed the health care records of 25 at-risk class members in order to identify deficiencies in

care, take corrective action and make systemic recommendations."  (2009 Special Masters'

---

[10]Section 2 (a) of the 2007 90-Day Consent Order provides that:

Within 14 days of the effective date of this Order, the defendants shall adopt a
methodology for identifying High Health Risk class members. By November 1,
2007, the defendants shall complete needs assessments of all Evans class
members utilizing the Support Intensity Scale ("SIS") and shall apply the
methodology for systematically identifying High Health Risk Class Members.
The defendants, in collaboration with the D.C. Healthcare Resources Partnership
("DCHRP"), shall apply such methodology to update the current listing of at-risk
class members.  The Court Monitor shall be given an opportunity to review and
give input into the methodology prior to its implementation.

2007 90-Day Consent Order at 2.

Report at 35). DCHRP's final report was issued on December 30, 2007 ("2007 DCHRP Report").[11] (*Id.*) Defendants proceeded to submit the DCHRP Report to the Special Masters as evidence of their compliance with the 2007 90-Day Consent Order.

In the 2009 Special Masters' Report, the 2007 DCHRP Report is cited in the section summarizing the Special Masters' findings as to the "mental and behavioral health care" provided to plaintiffs. (2009 Special Masters' Report at 34-41.) Noting that the 2007 DCHRP Report concludes that the area in the most need of intervention is mental health care (2007 DCHRP Report at 84), they cite the Report as evidence supporting two of their underlying findings: (1) that there remained a "[l]ack of access to sufficient psychiatric and psychological services" (*id.* at 35-36); and (2) that there remained a problem with "[i]mproper professional practices that are inconsistent with professional standards." (*Id.* at 36-37.) Based on these and other findings, the Special Masters concluded that "plaintiffs have proved by clear and convincing evidence that defendants continue to be in non-compliance with above-referenced outstanding court orders with regard to their obligation to provide adequate mental and behavioral health care." (*Id.* at 41.)

Defendants object to the Special Masters's reliance on the DCHRP Report on the ground that it "was neither offered into evidence nor admitted as such at trial," and it does not "represent current ongoing practices or conditions, which are most relevant to the question of what remedy, if any, is necessary." (Defs.' Mem, Ex. 23, ¶ 8.) During oral argument, defendants specified that they objected to the use of the DCHRP 2007 Report because "[i]t did not reflect the current

---

[11]*See* Health Resources Partnership, Georgetown University Center for Child and Human Development, Report of Clinical Review on 25 Class Members-Special Master's Order September 12, 2007, Dec. 30, 2007.

status of psychiatric and psychological services that were being provided" and because it was "used it to address improper professional practices" that "as of the time of the hearing . . . had changed dramatically."  (12/17/09 Tr. at 121-122.)

The Court finds defendants' objections to the use of the 2007 DCHRP Report unpersuasive.  First, as plaintiffs point out, the DCHRP 2007 Report is already part of the record before the Court.  The fact that defendants submitted it as evidence of their compliance with the 2007 90-Day Consent Order does not preclude the Special Masters or the Court from considering it for other purposes.[12]

Second, in each instance, the DCHRP 2007 Report is only one piece of the evidence cited by the Special Masters to support their finding.  For example, the Special Masters found a "lack of access to sufficient psychiatric and psychological services" based in part on the DCHRP Report, but they also relied on the testimony of defendants' expert witness, Dr. David Jackson, "who reviewed several aspects of health care provided to class members and others [and] concurred that there was a serious lack of mental health services for class members" due, "in large part . . . [to] the lack of mental health services in the inner city in the District (and in most other large urban centers)."  (*Id.* at 34-36.)  Similarly, the Special Masters found "[i]mproper professional practices that are inconsistent with professional standards" based in part on the

---

[12]Nor does the fact that the defendants have objected to the 2008 Special Masters' Report on defendants' compliance with the 2007 90-Day Consent Order undermine the evidentiary value of the DCHRP 2007 Report.  The Special Masters did not rely on their 2008 Report in preparing the Report now under consideration and, although defendants have renewed their objections to the 2008 Special Masters' Report (*see* Defs.' Reply at 22 n.26), they nowhere suggest that the Court's ruling on those objections bears on their objections to the 2009 Special Masters' Report, and thus, the Court finds that it would serve no useful purpose to address the myriad of objections to the 2008 Report.

DCHRP Report, but also based on other evidence, including the Court Monitor Reports, and Columbus death investigation reports.

Third, the findings at issue are only two of six findings that underlie the Special Masters' conclusion. The Special Masters also found that "recommmended clinical therapies [were] not being implemented" (*id.* at 37); a "failure to integrate the use of psychotropic medications into an overall treatment plan (*id.* at 38); a "failure to obtain informed consent and approval from Human Rights Committees for use of these restrictive measures (*id.* at 39); and a "lack of monitoring of the usage and side effects of pschotropic medications. (*Id.* at 40.)

Finally, defendants fail to identify any countervailing evidence in the record before the Special Masters that they failed to consider. Accordingly, the Court concludes that the defendants' objection to the Special Masters' reliance on the 2007 DCHRP Report is not well-founded.

### E.      Reliance on Stricken Exhibit

The defendants' next objection is to the Special Masters' citation of an exhibit that was offered by plaintiffs post-trial, but subsequently stricken on defendants' motion. (Defs.' Mem., Ex. 23, ¶ 10, p. 4-5.) The exhibit in question is a declaration which the Special Masters describe as the basis for plaintiffs' claim

> that the [d]efendants have repeatedly filed erroneous and misleading reports and declarations with the Court each month for [the] 11 month period from January through November 2008 in which they claimed to be in compliance with Court orders regarding timely payments, while there were in fact significant delays which negatively impacted class members.

(2009 Special Masters' Report at 118.)

The Special Masters granted defendants' motion to strike all references to vendor

payment reports filed after the end of the trial on December 12, 2008 and to declarations filed after December 12, 2008 regarding vendor payment reports.  (Special Masters' Order Granting In Part And Denying In Part Defendants' Motion To Strike Evidence Not Presented At Trial And To Exclude The Special Masters' Findings Regarding The September 12, 2007 Order at 3-4, Mar. 17, 2009.)  Nonetheless, defendants' objection is not well-founded.  First, after describing this exhibit as part of the evidence cited by the plaintiffs to support a finding of "bad faith," the Special Masters expressly state that, because it was stricken from the record, they did "not consider[] it in making our findings and conclusions on this point."  (2009 Special Masters' Report at 118-19 & 119 n.115.)  Moreover, the Specials Masters ultimately concluded that plaintiffs have not carried the burden of proving bad faith.  (*Id*. at 119 ("Mere errors in documents filed, without evidence of an intention to mislead, are not sufficient to carry the burden of proof of bad faith.  There is no persuasive evidence of such an intention.  Chronic inability is not the same as deliberate efforts to mislead the court.  We do not find bad faith by the Defendants.").  Accordingly, even assuming *arguendo* that the Special Masters erred in citing to a stricken exhibit, any error was harmless.

      **F.    Current Evidence**

Defendants' final objection to the Report and Recommendation is that the Special Masters failed to consider "information provided subsequent to the hearing" in December 2008.  (Defs.' Mem. at 60.)  They argue that "the Special Masters had an obligation to consider the latest developments in the District's provision of services to class members, developments that are outlined in summary form in Laura Nuss's most recent declaration filed with the Court on June 15, 2009, and cited to the Special Masters in Defendants' Comments to the Masters' Draft

Report." (*Id.*) Their failure to do so, defendants assert, means that their "recommendation of a remedy" is "based on stale facts, nonexistent problems, and a record long since closed" and that it "cannot withstand a de novo review by this Court." (*Id.*) This contention, even considered in light of the current information that has been made available to the Court from a variety of sources, cannot be sustained.

In March 2007, the Court issued its opinion on liability, concluding, based on a record that closed in November 2006, that defendants were in "systemic, continuous, and serious noncompliance with many of the Court's Orders." *Evans v. Fenty*, 480 F. Supp. 2d at 325. Following that determination, the Special Masters were directed to "make findings and recommendations to the Court that address, *inter alia*, the current status of defendants' compliance, what are the available options for curing the identified deficiencies, and whether a receivership is the most effective and efficient remedy available to the Court." *Id*. at 326. In the fall of 2007, defendants declined the opportunity to develop a protocol for comprehensive monitoring by the Court Monitor because, in their view, conditions had not "so fundamentally changed at this point that such comprehensive monitoring is appropriate." (Defs.' Notice Concerning Proposed Comprehensive Monitoring at 2, Nov. 21, 2007.) In December 2008, the trial before the Special Masters took place. After the trial, the Special Masters closed the record and prepared their draft report, which was circulated to the parties that spring and, after considering the parties' objections and comments, submitted to the Court in August 2009. Based on an extensive record that covered the period from November 2006 through the end of 2008, the Special Masters concluded that "plaintiffs had proved by clear and convincing evidence that defendants continue to be in serious noncompliance with critical provisions of outstanding court

orders" addressing plaintiffs' constitutional rights to health, safety and welfare.  (2009 Special

Masters' Report at 3; *see also* April 2010 Opinion, 2010 WL 1337641, at *14-*17 (summarizing

Special Masters' factual findings and legal conclusions).)

Defendants fault the Special Masters for basing their conclusions on a record that closed

in December 2008.  As a practical matter, in order to carry out their job, the Special Masters had

to pick a point in time to "close" the record and prepare their report.  Thus, the mere fact that the

Report's findings and conclusions do not take into account developments that post date

December 2008 does not render them erroneous.  However, because the ultimate question is an

equitable one, current evidence has not been ignored by the Court.  But, the critical question

remains whether the additional information now in the record, covering the period from January

2009 to the present, is so significantly different from the facts as found by the Court in 2007 and

the Special Masters in 2008 that it negates the need for remedial relief.[13]  It is not.

In the first place, plaintiffs have never had the opportunity to scrutinize or challenge the

post-December 2008 evidence now relied on by defendants.  More importantly, if the Court

considers all the reports and declarations that post date December 2008, the District's progress

has been checkered, at best.  While there is change in the organizational structure, and evidence

of progress in many areas, there are still flagrant examples of significant problems with the

delivery of service to the class members.

For example, although the District has increased the number of providers, and instituted a

"Provider Certification Review" process, provider problems persist.  In just the past year, the

---

[13]To the extent defendants' objections do not challenge the Special Masters' findings or conclusions as to defendants' noncompliance, but merely challenge the likely effectiveness of their remedial recommendation, those arguments will not be addressed herein.

District has filed petitions for receivership against two providers, Individual Development, Inc. ("IDI") and Westview Medical & Rehabilitation Services, P.C. Inc. ("Westview"), and a third provider who would have faced such a petition, Center for Social Change ("CSC"), instead chose to terminate its services. (Court Monitor's Quarterly Report at 3-4, 8-9, May 5, 2010 ["5/5/10 Court Monitor Rep."].)[14] Together, these three providers operated 13 residential sites and served 59 class members.[15] (*Id.* at 4, 8, 9.) While defendants are to be commended for finally taking decisive action against inadequate providers, the circumstances that led to the need for action cannot be ignored.

Westview has been a longtime provider in the District and, according to the Court Monitor, a subject of "continuing concern." (*Id.* at 2.) The most recent Court Monitor's report documents that there is a class member at a Westview site who was prescribed 10 different psychotropic medications (*id.* at 9), and another class member who was subject to abuse by a staff member. (*Id.* at 13.) CSC came in as a provider in September 2008 to take over a troubled site that Westview had been operating. (*Id.* at 8.) Yet, one of the class members residing at the CSC site experienced such severe weight loss in just the past year that IMEU investigated and found neglect. (*Id.* at 11.) And, in January 2010, when CSC staff took its 5 female residents (4 class members) to a beauty school for haircuts, the heads of all the women were shaved. Three

_____

[14]The petition for receivership against IDI, filed on October 5, 2009, sought a receiver to oversee the day-to-day operation of two of IDI's ICF sites. *District of Columbia v. Individual Development, Inc.*, Civil Action No. 7399-09. On October 28, 2009, the District and IDI entered into a settlement agreement covering all 11 ICF sites operated by IDI.

[15]IDI presently operates 10 residential ICF facilities and serves 50 class members (5/5/10 Court Monitor Rep. at 4); Westview operates two residential ICF facilities, serving 5 class members (along with 6 non-class members) (*id.* at 9); and CSC operates one waiver-funded residential site serving 4 class members (and one non-class member). (*Id.*)

of the women had to be restrained while the shaving occurred.  Under DDA policies, according

to the Court Monitor, this constituted "psychological abuse and unauthorized restraint."  (*Id.* at

12.)  Indeed, such serious problems continued under CSC that the District was prepared to take

action against it had it not terminated its services.  Finally, as of May 5, 2010, there were 33

residential sites operated by 18 providers on the "Watch List," which also suggests persistent

problems.  (*Id.* at 6.).

Defendants have made substantial strides in steadily increasing the number of class

members enrolled in the Home and Community Based Waiver.  As of May 5, 2010, 350 class

members were receiving residential services under the Waiver, an increase of 46 since

September 2008.  (*Id.* at 7; Court Monitor Report at 5, Sept. 1, 2008 (304 on waiver)).  However,

enrolling a class member in the waiver does not guarantee the quality of the services provided.

For example, in June 2009, one relatively new waiver provider, EBED, was given a rating of

"needs improvement" under DDA's new provider certification review process  (*Id.* at 8.)  EBED

operates two waiver-funded sites, housing 5 class members (and 2 non-class members).  (*Id.*)

The District has recently issued a contract to Liberty Health Care to review residential services

provided under the waiver.  (5/5/10 Court Monitor Rep. at 7.)  During the status conference on

May 7, 2010, the Court learned that the plan is for Liberty to review all 88 providers within one

year and that 10 reviews had already completed at that time.  (5/7/10 Hr'g Tr. at 51-52.)

However, the results of Liberty's reviews had not yet been provided to the Court Monitor,

making it impossible to know whether this new process will function as intended and/or reveal

problems among the waiver providers.

In the critical area of health care, again there have been improvements, but problems

remain.  To date, the Court Monitor has conducted comprehensive health reviews for 383 class members.  (*Id.* at 10.)  Over time the data shows consistent problems in a number of areas. (5/5/10 Court Monitor Rep. at 16 (chart comparing health care indicators over time).)  For example, the Court Monitor's data shows less than 50% compliance in each of the following categories since April 2007:  "nursing assessments meet professional standards"; "clinical therapy recommendations are implemented"; "competent and consistent monitoring of the side effects of psychotropic medications."  (*Id.* at 16).  And in none of the other categories are the numbers consistently high or even consistently trending upward.  (*Id.*)

Similarly, in the area of safety, the current data is mixed.  Quality Trust's annual report, which covered the period October 1, 2008 through September 30, 2009, identified their "biggest concern" as "the failure of the IMEU (Incident Management & Enforcement Unit) of DDA to complete investigations of Serious Reportable Incidents (SRI's) in the timeframe required by DDA policy."  (QT Report at 1.)  As of April 1, 2010, there were 94 investigations due and not yet received for class members, 31 of these were for Level 1 incidents, which include allegations of abuse and neglect, serious physical injury and theft.  (5/5/10 Court Monitor Report at 24.) Level 2 incidents include 911 calls, emergency inpatient hospitalizations, improper use of restraints, missing person, medication error, and attempt or threat of suicide.  (*Id.*)  Defendants plan to transition the investigation of Level 2 incidents from DDA to the providers.  (Id.) Although in the end that change may comport with "best practice" (5/7/2010 Hr'g Tr. at 43-44) and, thus, lead to better outcomes, it has not yet been successfully implemented.

While these few examples above do not reflect all of the "current evidence," they are illustrative of the fundamental flaw in defendants' argument.  While everyone would agree that

progress has been made, it is also beyond dispute that much remains to be done; the necessary outcomes for the class members have yet to be achieved and even considering all available evidence as of this date, the Court has insufficient reason to question the reliability and accuracy of the Special Masters' conclusions.

## CONCLUSION

For the reasons stated herein, the Court rejects defendants' objections to the 2009 Special Masters' Report and adopts their recommended findings of fact and conclusions of law. Plaintiffs are therefore entitled to remedial relief to ensure that defendants achieve compliance.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: June 1, 2010.