## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| JOY EVANS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| & | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | Civil Action No. 76-cv-0293 (ESH) |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MURIEL BOWSER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## ORDER

Pursuant to the "2010 Revision to the 2001 Plan for Compliance and Conclusion of

*Evans v. Fenty*,"[1] ("2010 Plan"), Special Master Clarence J. Sundram has submitted a Report and

Recommendation regarding defendants' certification of compliance with the remaining outcome

criteria for Goal A.1, Individualized Habilitation Plans. (*See* Special Master's Report and

Recommendation Regarding Individualized Habilitation Plans – Part II, Dec. 9, 2014 [ECF No.

1506], *as amended, see* Errata, Jan. 7, 2015 [ECF No. 1510] ("R&R-Part II"); Director's

Certification of Compliance, Evans Goal A.1, Individualized Habilitation Plan (Outcome Criteria

ii, iii, vii, viii, ix, x, xii, xvi and xvii), June 30, 2014 (filed with the Court as Exhibit 1 to the

---

[1] The 2010 Plan was filed on July 13, 2010 [ECF No. 1200], and approved on August 10, 2010
[ECF No. 1204].

R&R-Part II [ECF No. 1506-1]) ("Certification-Part II").)  Following the Special Master's first

Report and Recommendation regarding Goal A.1 (*see* Special Master's Report and

Recommendation Regarding Individualized Habilitation Plans, Oct. 15, 2013 [ECF No. 1418]

("R&R-Part I") and the Court's Order approving and adopting that Report and Recommendation

(*see* Order, Nov. 27, 2013 [ECF No. 1426]), eight criteria from Goal A.1 remained outstanding

in full (ii, iii, vii, ix, x, xii, xvi, xvii), and one criterion (viii) remained outstanding in part.  The

Special Master now recommends that the Court find that defendants (1) have met their burden of

proof of compliance with respect to criteria ii, vii, xvi, and xvii; (2) have achieved partial

compliance with respect to criteria iii, viii, x (part C), and xii (parts B-D); and (3) have not met

their burden of proof of compliance with respect to criteria ix and the remaining parts of criteria

iii, viii, x (parts A, B and part of D), and xii (part A).  Plaintiffs have not filed any objections, but

defendants challenge the Special Master's adherence to the 2010 Plan's threshold for "high"

compliance as well as his recommended findings of noncompliance as to criteria viii, x.D, and

xii.A.  (Defs.' Objections to the R&R-Part II at 1, Jan. 8, 2015 [ECF No. 1512-1]

("Objections").)  For the reasons explained herein, the Court will partially sustain defendants'

objection as to criteria viii, but will otherwise approve and adopt the pending Report and

Recommendation in its entirety.[2]

## I.    THRESHOLD FOR "HIGH" COMPLIANCE

Under the 2010 Plan, the standard of compliance for Goal A.1 is "high" (2010 Plan at

---

[2] Pursuant to Federal Rule of Civil Procedure 53(f)(3) and the 2007 Supplemental Order of
Reference in this case, when objections to a special master's findings of fact and/or
recommendations are raised, those findings/recommendations are subject to *de novo* court
review.  *See* Fed. R. Civ. P. 53(f)(3); *see also* 2007 Supplemental Order of Reference ¶ (V)(4) at
4, May 3, 2007 [ECF No. 920].)

12),[3] which is defined as follows:

> This threshold requires compliance with the indicator *at a rate generally exceeding 90 percent compliance*. Where instances of noncompliance with the indicator are found, none can involve a serious and substantive violation of the Court Order with significant adverse impact upon class members (i.e., actual harm or a serious risk of harm) in the judgment of the Court and Special Master (e.g., excusable noncompliance may involve failure to comply with documentation or some aspect of process, without significant adverse impact). Generally speaking, this level of compliance will be expected for important programmatic aspects of the Court Orders.

(2010 Plan at 6 (emphasis added).)

In defendants' Certification-Part II, they suggested, for the first time, that the 2010 Plan's definition of "high compliance" was too demanding. (Certification-Part II at 3.) They pointed out therein that they had never "agreed" to a 90% threshold for "high" compliance, that certain outcome criteria do not lend themselves to numerical analysis, and that requiring 90% compliance was virtually unprecedented in any intellectual and developmental disability service delivery system across the country.[4] (Certification-Part II at 3.) After an extensive discussion, the Special Master concluded that, while determining a numerical "rate" of compliance was not always easy, none of defendants' concerns merited jettisoning the approach established by the 2010 Plan. (*See* R&R-Part II at 3-7.)

---

[3] As the parties are well aware, for each of the nine subject areas covered by existing court orders, the 2010 Plan sets forth "specific outcome criteria for determining compliance with the related group of Court Orders," assigns a standard of compliance ("full," "high," or "significant"), and "identifies the method by which the Special Master, and ultimately the Court, will assess compliance for each set of outcome criteria." (2010 Plan at 5-6.)

[4] To support this last point, defendants pointed out that the federal Centers for Medicare and Medicaid ("CMS") recently decided "to use 86% as the threshold for performance in reviewing quality assurances by states for the Home and Community-Based Services ("HCBS") waiver program, before requiring a quality improvement project to improve performance." (R&R-Part II at 3 (citing Certification-Part II at 3).)

Defendants now object to the Special Master's "discussion" of the threshold of compliance, raising the same arguments they made in their certification, and ask the Court for two specific things: (1) that a percentage compliance rate of less than 90% on a particular JMQ question should not be "summarily held as a showing of non-compliance"; and (2) that "the [90%] threshold of [high] compliance can and should be revisited by this Court in evaluating the remaining elements of the 2010 Plan and the underlying court orders in recognition of the progress that has been made as evidenced by the Court orders to date finding compliance with 59 of 70 or more than 84 percent of the outcome criteria in the 2010 Exit Plan."  (Objections at 12-13.)

The Court agrees with defendants' first point, which does not actually conflict with anything said by the Special Master in his Report and Recommendation.  The 90% threshold for "high" compliance is to be measured with respect to the outcome criteria in the 2010 Plan; it does not require a score of 90% or above for each individual question on the Joint Monitoring Questionnaire ("JMQ") assigned to that outcome criterion.  Thus, an underlying JMQ score may fall below the 90% threshold without precluding defendants from demonstrating compliance.

As for defendants' second point, it is not entirely clear what defendants mean by asking the Court to "revisit" the standard for high compliance, but the Court does not believe that any such change is necessary.  As defendants acknowledge, "high" compliance at 90% is the standard set forth in the 2010 Plan and approved by the Court, and they maintain that they are not suggesting "that the 90 percent compliance standard should be fully obviated at this late date and a wholesale revision to another standard should be adopted."  (Objections at 10.)  As the Special Master notes, "it can hardly be concluded that the subsequent 2010 revision of the 2001 Plan set an unreasonable threshold for demonstrating compliance."  (R&R-Part II at 5.)

4

Moreover, although certain outcome criteria may lend themselves more to quantitative analysis, the Court agrees with the Special Master that that does not render the approach of the 2010 Plan unworkable, but rather that "[i]n interpreting and enforcing compliance, the Court has had no difficulty in assessing whether the evidence proffered by the parties met the obligations embodied in these orders."  (R&R-Part II at 5; *see also id.* at 4 ("[T]hese thresholds of compliance have been used consistently in the certification process since 2010 by the Court Monitor in the Joint Monitoring review, by the Plaintiffs, by the Independent Compliance Administrator, by the Defendants themselves, by the Special Master and by the Court -- without objection from any party until now.").  Accordingly, the Court agrees with the Special Master that there is no need to alter the 2010 Plan's requirement that sets 90% as the threshold for achieving a "high" standard of compliance and that all of defendants' valid concerns can be accommodated within the existing compliance framework.

## II.    CRITERION viii

Criterion viii for Goal A.1 requires that "[c]onsumers receive the services and supports identified in the ISP on a *timely* basis."  (2010 Plan at 11 (emphasis added).)  In the first R&R regarding individual habilitation plans, the Special Master advised defendants to develop a "Plan of Correction" as to criterion viii to address deficiencies with respect to "nutrition, OT [occupational therapy], medical and mental health services."  (R&R-Part I at 14; *see* R&R-Part II at 22.)[5]  The Special Master now recommends finding defendants in compliance with criterion viii with respect to nutrition and mental health services, but not in compliance as to occupational

---

[5] The Special Master recommended finding defendants in compliance with respect to other services and supports in the ISP (R&R-Part I at 14), and the Court adopted that recommendation. (Order at 2, Nov. 27, 2013 [ECF No. 1426].)

therapy or medical services.  (R&R-Part II at 25.)  Defendants object to the Special Master's

recommended findings of non-compliance.  As explained herein, the Court agrees with

defendants that they have demonstrated compliance as to occupational therapy services, but

agrees with the Special Master that they have not yet demonstrated compliance as to medical

services.

A.      Occupational Therapy ("OT") Services

The Special Master's negative recommendation with respect to OT services appears to

rest primarily on the responses to JMQ question 102(B) which asked whether, if recommended

by a therapist or ordered by a doctor, there was "a current occupational therapy assessment" in

the ISP.  (Objections at 19.)  Out of a sample size of 4, there was only a single positive response,

which suggested that recommendations for follow up OT assessments were completed only 25%

of the time.  (*Id*.)  Although JMQ question 102(B) was not formally assigned to criterion viii, the

Special Master concluded that "deficiencies in completing recommendations for OT assessments

during the ISP plan year" were "relevant in assessing the timely delivery of services" under

criterion viii.  (R&R-Part II at 24.)  The Special Master also noted that defendants had

"acknowledged the inadequacies of their network of providers to timely deliver some of the

required clinical services," and that there was a lack of evidence to date that defendants' actions

to build capacity pursuant to the Plan of Correction have taken effect or improved the situation.

Defendants' objections to the Special Master's recommendation with respect to OT

services are persuasive.  As defendants point out, the evidentiary significance of the 25% score

in response to JMQ question 102(B) is questionable given the small sample size.  In addition, the

Court does not agree with the Special Master that the failure to complete recommended follow-

up assessments is directly relevant to criterion viii.  JMQ question 102(B), along with a number

6

of other similar questions, was assigned by the parties to criterion iii, while other JMQ questions were assigned to criterion viii.  Criterion iii requires that "ISPs will be based upon individualized assessments" while criterion viii "simply asks whether the services and supports identified in the plan are *delivered*."  (R&R-Part I at 10.)  In the Court's view, the failure to complete a follow up OT assessment is relevant to criterion iii, which focuses on the content of the ISP, but is not relevant to criterion viii, which focuses on its implementation.[6]  Finally, in terms of the specific questions about OT services that were assigned to criterion viii, there are two reported scores that fall below 90% (JMQ 118a and JMQ 248a), but defendants address both and identify flaws in the analysis of the underlying data that, if corrected, would bring both numbers close to or above 90%.  (*See* Objections at 20-22.)  Accordingly, having considered defendants' objections and the entire record herein, the Court will reject the Special Master's recommendation and find defendants in compliance as to the OT services component of criterion viii.

### B.    Medical Services

The Special Master concludes that defendants have not demonstrated compliance with the medical services component of criterion viii based on the low scores in response to JMQ question 81, subparts (b) and (d), the underlying deficiencies that resulted in the negative responses (which were described by plaintiffs in their objections to the certification), and defendants' failure to counter either the low scores or plaintiffs' objections with other evidence of compliance:

> In the face of low compliance scores for some relevant questions on the JMQ relating to healthcare and medical services, and a series of objections to a finding

---

[6] Defendants have not challenged the finding of noncompliance as to the OT services component of criterion iii.  In light of the Court's opinion, the Special Master may wish to revisit his conclusion not to consider the responses to JMQ Question 102(B) in his consideration of any future certification on criterion iii.

> of compliance in the Plaintiffs' Response (pp. 7-9), Defendants have not
> submitted adequate evidence to sustain their burden of proof that the actions that
> they have taken or are taking have yet produced the outcomes for class members
> that is necessary to demonstrate compliance with the obligation to provide the
> services and supports identified in the ISP on a timely basis.

(*See* R&R-Part II at 24-25.)

In this instance, the Court agrees with the Special Master's reasoning and conclusion. JMQ question 81(b) asks: "Is the individual receiving the services identified in the ISP" with respect to "medical" services?  JMQ question 81(d) asked the same question with respect to "healthcare" services.  The responses indicate that only 82.4% (42/51) of the class members in the sample were receiving the medical services identified in the ISP, while only 69.2% (36/52) were receiving the healthcare services identified in the ISP.[7]  (Certification-Part II at 19, 50-51.) Defendants suggest that these scores should be discounted because the nature of JMQ question 81 means that a single failure to timely provide an identified medical or healthcare service will result in a "no" response even if all other identified services are timely provided:

> [T]here are a significant number of contributing JMQ measures that can result in a
> negative response.  This question is a 'summary result' in the defendants' view
> and one that rules the District in compliance (Yes) if found to be 100% correct out
> of multiple outcome measures, or out of compliance (No) regardless if 14 out of 5
> measures were met, or 1 out of 15 measures were met, and as such is not fairly
> reflective of the defendants' status of compliance.  Thus, if class member John
> Does has 30 health care needs identified in his ISP (measured by JMQ question
> 81(d) and of those 30 needs 29 are being addressed, but one is not, then, per the
> Court Monitor the defendants are out of compliance with JMQ question 81(D)
> relative to this John Doe.  The more appropriate result would be that the
> defendants are 97% compliant (29/30) with JMQ question 81(d) relative to class
> member John Doe.  It is the academic equivalent of not getting any credit for your
> work on a mathematics problem even though there was a single mistake in
> computation.  Thus the defendants disagree that JMQ question 81 is a strong
> indicator of compliance with this outcome criterion and would request that the

---

[7] Although the Plan of Correction for criterion viii refers only to medical services, the applicable JMQ questions distinguish between medical and healthcare services.

Court make a finding, based on the defendants' Plan of correction and whatever
weight it deems appropriate to JMQ question 81.

(Objections at 23.)  In theory, defendants are right about the shortcomings of JMQ question 81

and the arguably reduced significance of negative responses thereto, but they have not made any

attempt to establish that any particular "no" response is due only to the failure to provide one out

of many medical services in an ISP.  Perhaps that information can be gleaned from the existing

JMQs, but it is not before the Court.  In addition, even without these low scores, the examples of

deficiencies cited by plaintiffs remain unrebutted by defendants.  Accordingly, the Court will

adopt the Special Master's recommendation and find that defendants have not yet demonstrated

compliance as to the medical services component for criterion viii.

## III.    CRITERION x.D

Critierion x.D provides that "ISPs must address the consumers' need for . . . medical,

dental and health and mental health services which provide for accessibility, quality and

continuity of care."  (2010 Plan at 11.)  The Special Master has concluded that "the evidence

supports a finding of compliance with respect to dental and mental health services, but that the

Defendants have failed to carry their burden of proof of compliance with respect to health and

medical services" due to the "Joint Monitoring findings regarding deficiencies in preventive

services."  (R&R-Part II at 19-20.)  Specifically, the Special Master is referring to the responses

to JMQ question 148, which asks: "Is there evidence that age and gender appropriate

preventative health care is provided in a consistent and current manner?"  (R&R-Part II at 18-

19.)  The answer to this question was yes for only 66.5% (33/50) of the class members surveyed.

(R&R-Part II at 19.)  Defendants attempted to address this low score by submitting to the Special

Master a comprehensive report on the health screenings received by over 500 of the *Evans* class

members (*see* Defs.' Reply in Support of Certification Ex. 1 ("Short Report: Adherence To

Preventive Health Services Study," Georgetown University Center for Excellence in

Developmental Disabilities (2014) ("Georgetown Report") (filed with the Court as Exhibit 16 to

the R&R-Part II [ECF No. 1506-16]), but the Special Master concluded that while the

Georgetown Report showed that there "are clearly areas of strong performance regarding

preventive services," it also confirmed deficiencies in the types of screenings that had led to the

negative responses to JMQ question 148.[8]

Defendants object, arguing that the Special Master has misinterpreted the data in the

Georgetown Report because "citation to percentages for preventive screenings . . . in the absence

of knowing the risk factors that would otherwise necessitate such screenings for people in the

sample, is not a particularly meaningful measure of whether the ISPs address a person's need

[for a screening]." (Objections at 16-17.) They further assert that:

> The authors of the report have verified that the results in fact did not ascertain
> whether each person should have had each of the identified screenings but rather
> was a report of the frequency by which the relevant population is receiving such
> screenings, and without a deeper analysis of a person's full health and lifestyle
> profile a reviewer cannot determine if each screening is required. In the
> defendants' view, being held in non-compliance for all health and medical
> services on the grounds of questionable data regarding preventive health care
> screenings which the class members receive at a significantly high rate is an
> overly broad determination.

(Objections at 17.) The weakness in defendant's argument is twofold. First, they assert that the

authors of the report have "verified" that the screening percentages do not account for whether a

screening was required for that individual, but cite no source to support that assertion. Second,

---

[8] Specifically, the negative responses to JMQ question 148 reflected missed screens for skin
cancer, hepatitis, glaucoma, diabetes and liver function (*see* Pls.' Resp. to Certification-Part II at
18), while the Georgetown Report showed that of the class members surveyed "only 27.7%
received a skin cancer screen; 69.4 % screened for hepatitis B and C; [and] 88.2% for
glaucoma." (R&R-Part II at 19.)

that assertion appears to contradict the report itself which presents the data as showing the "proportion of individuals receiving *appropriate* preventive health screenings." (Georgetown Report at 3.)  In addition, even if defendants' interpretation of the data in the Georgetown Report is correct, that does not negate the evidence from the JMQ that all necessary screenings were provided (or at least reflected in the ISP) only 63.5% of the time.  As defendants bear the burden of proving compliance, the absence of evidence to counter this low score leads the Court to agree with the Special Master that defendants have not yet demonstrated compliance with the medical and health care components of criterion x.D.  Accordingly, the Court will adopt the Special Master's recommendation and find that defendants have not yet demonstrated compliance with these components of criterion x.D.

## IV.    CRITERION xii.A

Criterion xii provides that: "For persons with physical disabilities, the ISP must provide for individualized adaptive equipment, as needed, based on appropriate professional evaluations of the need for such equipment." (2010 Plan at 11.)  Subpart A provides that "An assessment of the need for adaptive equipment is completed within 30 days of a request therefor." (*Id.*) Despite the lack of objection from plaintiffs, the Special Master concluded that defendants had "not met their burden of proof of compliance with respect to this criterion" because "there are no JMQs addressing this provision, nor is there any other evidence in the record specifically addressing the timeliness of assessments regarding the need for adaptive equipment." (R&R-Part II at 11.)  Defendants object on the ground that "[i]n the absence of a disagreement regarding compliance," the Special Master should not have "intervene[d]." (Objections at 14.) They "respectfully request that the Court disregard the Special Master's recommendation relative to Goal A.1., outcome criterion xii.A, and enter a finding of the defendants' compliance for this

outcome measure." (Objections at 14.)

In support of their contention that the Special Master should not have "intervene[d]" absent an objection from plaintiffs, defendants point to language in the 2010 Plan and in the Special Master's order setting forth procedures for the certification of compliance. (See 2010 Plan ¶ 7; Procedure for Director's Certification of Compliance ¶ 9, Aug. 16, 2012 [ECF No. 1332] ("Procedure Order").) Paragraph 7 in the 2010 Plan includes the following language:

> The Plan provides that as the implementation process proceeds, defendants will utilize information generated from internal monitoring processes to determine when they believe they have met the standards for compliance with the identified outcome criteria for each set of actions related to a group of Court Orders. At this point, defendants shall approach plaintiffs and plaintiff-intervenor to see if they concur that there is compliance with the set of actions and outcome criteria. If there is no agreement, the defendants can move the Special Master for a finding of compliance as to these Court Orders and can seek to have the related Court Orders vacated and dismissed.

(2010 Plan ¶ 7.) Paragraph 9 in the Procedure Order states:

> If the plaintiffs of plaintiff-intervenor object to any portion of the Director's Certification, the Special Master shall, in consultation with the parties, issue a Scheduling Order to hear and resolve the objection. The procedure for resolution of the objection may include informal conferences with the parties, submission of documentation evidence and briefs, or an evidentiary hearing on the record as the Special Master deems appropriate."

(Procedure Order ¶ 9.) With respect to criterion xii.A, though, defendants did not obtain plaintiffs' concurrence as to compliance prior to their submission to the Special Master.[9] (2010 Plan ¶ 7.) Rather, in accordance with the Procedure Order, they submitted their certification of compliance to the Special Master for his review, plaintiffs filed their response to the certification, and the Special Master submitted a "Report to the Court with findings of fact and conclusions of

---

[9] Nor have the parties "move[d] jointly for an Order vacating and dismissing the related Court Orders." (2010 Plan ¶ 7.)

law regarding the defendants' compliance with the relevant provisions of the 2010 Plan and related court orders." (Procedure Order ¶¶ 8, 10.) Irrespective of whether plaintiffs object to the certification, defendants bear the "burden of proof of compliance" (*id*. ¶ 5), and the Special Master's submission of a report is required even if there are no objections to the certification by plaintiffs or plaintiff-intervenor. (*Id*. ¶ 8.) Accordingly, the Court concludes that even though plaintiffs did not object to defendants' certification as to criterion xii.A, the Special Master properly "assess[ed] compliance for each set of outcome criteria" submitted to him by defendants and submitted his recommendations to the Court. (2010 Plan ¶ 6.) As the Special Master did not improperly "intervene," and as defendants suggest no substantive basis for rejecting his recommendation as to criterion xii.A, the Court will adopt this recommendation and find that defendants have not yet demonstrated compliance with criterion xii.A.

## CONCLUSION

Accordingly, upon consideration of the Special Master's Report and Recommendation, defendants' objections thereto, and the entire record herein, it is hereby

**ORDERED** that the Court **APPROVES AND ADOPTS IN PART** the Special Master's Report and Recommendation Regarding Individual Habilitation Services – Part II, as amended [ECF Nos. 1506, 1510]; it is further

**ORDERED** that the Court **SUSTAINS** defendants' objections insofar as the report recommends finding noncompliance as to the occupational therapy services component of Goal A.1, criterion viii; it is further

**ORDERED** that the Court agrees with the Special Master that defendants have achieved compliance with Goal A.1 outcome criteria ii, vii, xvi, and xvii, and have achieved partial compliance with outcome criteria iii (physical therapy, psychology, and nutrition services), viii

13

(nutrition and mental health services), x (part C), and xii (parts B, C, and D (dental and mental health services)); it is further

**ORDERED** that the Court agrees with the Special Master that defendants have not yet demonstrated compliance with Goal A.1 outcome criterion ix, the remainder of criterion iii, the medical services component of criterion viii, criterion x (parts A, B and part of D (medical and health services), and criterion xii (part A).  It is further

**ORDERED** that the parties, in conjunction with the Special Master, the Independent Compliance Administrator, and the Court Monitor, shall develop a plan for defendants to resubmit their certifications as to the remaining outcome criteria for Goal A.1.


/s/  *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   March 31, 2015